# EXHIBIT B

```
                                                                Page 1

 1            UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                    MIAMI DIVISION
 3  CORI ANN GINSBERG, NOAH
    MALGERI, KAYLYN WOLF, BILL
 4  WILSON, SHANNON HOOD, ERIC
    FISHON, and ROBERT MCKEOWN, on
 5  behalf of themselves and all
    others similarly situated,       CASE NO.:
 6                                   1:19-CV-22702-KMW
         Plaintiffs,
 7
    v.
 8
    VITAMINS BECAUSE, LLC; CT
 9  HEALTH SOLUTIONS, LLC; GMAX
    CENTRAL; INSPIRE NOW PTY, LTD
10  D/B/A BOOSTCEUTICALS; ASQUARED
    BRANDS, LLC; HEALTHY WAY RX,
11  LLC; KHAKIWARE, INC.; AND JOLLY
    DOLLAR SUPPLY COMPANY, LLC,
12
         Defendants.
13  ------------------------------/
14
15   DEPOSITION OF DOUGLAS S. KALMAN, PHD, RD, FACN, FISSN
              (Conducted Via Videoconference)
16
17
        DATE:           November 24, 2021
18
        TIME:           9:06 a.m. - 5:18 p.m.
19
20      PURSUANT TO:    Notice by counsel for
                        Defendants for purposes of
21                      discovery, use at trial, or
                        such other purposes as are
22                      permitted under the Florida
                        Rules of Civil Procedure
23
        BEFORE:         Rhonda Ellison, Notary Public
24                      State of Florida
25                        PAGES 1 - 252
```

Page 26

1  anyone acting on any plaintiff's behalf, including but
2  not limited to plaintiff's counsel or any other expert,
3  whether a consulting or testifying expert relating in any
4  way to any issue in this case."
5      Do you have emails that you have sent to
6  Mr. Brody's law firm or Mr. Brody?
7      MR. BRODY: Object to form.
8   A.  I think that's been asked and answered.
9   Q.  I asked about info that he had sent you, but
10 have you responded to emails from Mr. Brody and sent him
11 correspondence?
12     MR. BRODY: Same objection.
13  A.  Yes.
14  Q.  If you were asked to have gathered those
15 before today's deposition, would you have been able to?
16  A.  Best efforts to do so, yes.
17  Q.  And I assume you've also responded to emails
18 from Mr. Rowe and Mr. Yan?
19  A.  Yes.
20  Q.  Number 5 is "All records, files, and other
21 documents which deponent has reviewed with reference to
22 this case." Do you see that?
23  A.  Yes.
24  Q.  Do you have access to that information as we
25 sit here today?

Page 27

1   A.  Yes.
2   Q.  Okay. What records did you review in
3  developing your opinions today?
4   A.  Records reviewed would have included prior
5  court proceedings, testing of the products that are part
6  of this lawsuit, FDA documents, published articles, and
7  peer-reviewed journals, published articles regarding the
8  intersection of law and nutrition, if you will, or law
9  and supplements. Those type, yes.
10  Q.  Well, I'm not asking for the type. I'm asking
11 for the actual -- actual records. What articles did you
12 review in reference to this case?
13  A.  If we can pull up my expert report, everything
14 in the bibliography is what I reviewed. And I'm happy to
15 go one by one with you just like you're doing here with
16 me.
17  Q.  You reviewed everything in the bibliography?
18  A.  Everything that's in my bibliography, yes.
19 Otherwise, how would -- why would you cite it if you
20 didn't -- if you didn't actually read it?
21  Q.  And could you put your hands on all that
22 material?
23  A.  Sure.
24  Q.  If you were asked to put your hands on all
25 that material prior to today's deposition, would you have

Page 28

1  been able to do so?
2   A.  Yes.
3   Q.  Now you also said prior court proceedings were
4  part of the records you reviewed. What prior court
5  proceedings did you review?
6   A.  That would be -- again, if my terminology is
7  wrong, I'm not a lawyer so the best I can do is the -- I
8  think it was the third amended complaint and the depo- --
9  and depositions I read.
10  Q.  Okay. What depositions have you read?
11  A.  With -- with respect to the individuals, I
12 don't want to get their names wrong. I think one was
13 Chapman and the other one Cynthia or something.
14  Q.  Valenca?
15  A.  That sounds about right.
16  Q.  When did you review the deposition of
17 Mr. Chapman?
18  A.  Last night.
19  Q.  When did you receive the deposition of
20 Mr. Chapman?
21  A.  Over the -- either yesterday or the day
22 before.
23  Q.  When did you review the deposition of
24 Ms. Valenca?
25  A.  Same time. Last night and this morning.

Page 29

1   Q.  And when did you receive that deposition?
2   A.  At the same time as Mr. Chapman's, so within
3  the past two days.
4   Q.  How long did it take you to read those
5  depositions?
6   A.  I honestly did not read all of it, but I gave
7  about an hour and a half of reading.
8   Q.  Total for the both of them?
9   A.  Yes, sir.
10  Q.  Why didn't you read them all?
11  A.  Got tired. It was late last night. I wanted
12 to go to sleep. So then this morning I picked up on
13 segments or sections of it that I felt were more
14 important.
15  Q.  How did you determine what sections or
16 segments you thought were important and weren't?
17  A.  Combination of communication with Mr. Brody
18 and looking at sections of the deposition that may have
19 mentioned aspects where my -- let me say that again,
20 please. I'm sorry. A combination of communication with
21 Mr. Brody, along with doing a compare and contrast with
22 items of interest or items of concern that I mentioned in
23 my report as compared to how those issues were mentioned
24 or answered or described by Ms. Valenca or Mr. Chapman.
25  Q.  Okay. So am I correct that Mr. Brody pointed

Page 86

1  with you.
2  Q. Okay. Well, let's really read what this says.
3  D does not say anywhere that there was metal or other
4  foreign material in the components; correct?
5  A. D says you did not use effective measures to
6  protect against the inclusion of metal or other foreign
7  material in components or should be of dietary
8  supplements. But it says, "You did not use effective
9  measures to protect against the inclusion of metal or
10 other foreign materials in your product."
11 Q. But it doesn't say that there was foreign
12 material or metals in the components or dietary
13 supplements; correct?
14 A. You are correct but that's not what you first
15 started asking me.
16 Q. It actually is.
17 A. No, it's not, sir.
18 Q. No --
19 A. You asked me -- you asked specifically, "Can
20 you -- can you still meet label claim and have an issue
21 with Number 4?" Right? Like just -- or letter D. And
22 the answer is the supplement facts label doesn't
23 necessarily include things that you can still have wrong
24 in your product.
25 Q. Okay.

Page 87

1  A. You wouldn't claim it if it had arsenic in it,
2  you would just hope it doesn't.
3  Q. You'd agree that you could use ineffective
4  measures and inspector's opinions to protect against the
5  inclusion of metal or other foreign material and still
6  meet the label claim; correct?
7  MR. BRODY: Object to form.
8  A. By happenstance. I would agree that you could
9  still meet label claim or label, but it would be by pure
10 luck or happenstance.
11 Q. You've reviewed a lot. You've reviewed 22 to
12 30 testing reports of SAM-e manufactured by Vitamins
13 Because; correct?
14 A. That would be correct.
15 Q. None of those -- none of those said there was
16 metals or other foreign materials or components in the
17 product; correct?
18 MR. BRODY: Object to form.
19 A. That's not a fair statement by you, sir,
20 because none of those measured were looking for whether
21 there was led, for example. So like, for example, if
22 you're selling your -- if your client is selling their
23 products in California, they're supposed to have all of
24 their products Prop 65 tested to verify to the state of
25 California that they're Prop 65 compliant, but it doesn't

Page 88

1  necessarily state that, hey, this product may have a
2  carcinogen known to the state of California hence this
3  Prop 65 issue. So I think this is sort of like a
4  conflation and misleading questions or statements that
5  are being made here by you.
6  Q. Okay. I move to strike all of that. I'm
7  going to ask you another question.
8  A. Okay.
9  MR. BRODY: Object to that -- that motion.
10 Q. Quote, unquote, "Experts in this litigation or
11 people that purported to be experts coordinated the
12 testing of the products that you reviewed"; correct?
13 A. Correct. Two different people knowledgeable
14 about nutrition and testing coordinated testing of
15 supplements made by your product -- made by your clients.
16 Q. At the time that they did that testing, they
17 had access to the 483 form; correct?
18 MR. BRODY: Object to form.
19 A. I cannot speak to what other people had or did
20 not have.
21 Q. It existed; correct?
22 A. Yes.
23 Q. And they chose not to test the products for
24 any metal or other foreign material; correct?
25 MR. BRODY: Object to form.

Page 89

1  A. I don't know if the thought crossed their
2  minds to actually test for it because the central aspect
3  of this case is -- or central aspect is label claim
4  versus actual product.
5  Q. That's my exact point. You could meet D -- D
6  can exist -- you can be cited for D in a 483 form and the
7  product can still meet label; correct?
8  MR. BRODY: Same objection.
9  A. But it does not meet good manufacturing
10 practices so then hence it would be an adulterated
11 product under FDA.
12 Q. You've read the third amended complaint;
13 right?
14 A. Yes.
15 Q. You just summarized what this case was about
16 that the product label is different than the amount of
17 SAM-e in it; correct?
18 A. Yes, very consistently underdosed.
19 Q. Yes or no?
20 A. Yes.
21 Q. You can have D occur and the product can still
22 meet label claims; correct?
23 MR. BRODY: Object to form. Asked and
24   answered. And same objection as prior.
25 A. Given if -- given if the label is only making

23 (Pages 86 - 89)

Page 90

1 a claim about the dose of the nutritional ingredient.
2  Q. And then that's what you just said the lawsuit
3 was about; correct?
4     MR. BRODY: Object to form. Misstates prior
5 testimony.
6  A. What I said in part was that the -- the crux
7 or the lawsuit is about product making a claim of having
8 X amount of SAM-e versus what was actually in the
9 product. That's the major deficiency and defectiveness
10 that we're dealing -- or discussing.
11  Q. Okay. You would agree that you could be cited
12 for D and the active amount of SAM-e in a product could
13 meet what the label says; correct?
14     MR. BRODY: Object to form.
15  A. Correct.
16  Q. "E: You did not take necessary precautions
17 during the manufacture of a dietary supplement to prevent
18 contamination of components."
19     You could be cited for E and the active
20 ingredient could still meet what the label says; correct?
21     MR. BRODY: Object to form.
22  A. Yes.
23  Q. "F: You did not establish specifications for
24 the packaging and labeling of the finished dietary
25 supplement to ensure you use the specified packaging and

Page 91

1 to ensure you have complied with the specified label."
2     You could be cited for F and the active
3 ingredient of the product could still meet the label
4 requirement; correct?
5     MR. BRODY: Object to form.
6  A. Correct.
7  Q. "G: You did not collect and hold reserve
8 samples of packaged and labeled dietary supplements that
9 you distributed."
10     The manufacturing facility could be cited for
11 G and the active ingredient of their product could still
12 meet the label requirements; correct?
13  A. Correct.
14  Q. And "H: Your handwashing facilities are not
15 convenient."
16     You could be cited for H and your product
17 could still be perfectly fine; correct?
18     MR. BRODY: Object to form. Misstates prior
19 testimony.
20  A. You could -- what do you mean by perfectly
21 fine?
22  Q. I mean -- I'll ask a better question. Your
23 handwashing facilities could be in the most inconvenient
24 spot on earth, and your product could be perfect in every
25 way; correct?

Page 92

1     MR. BRODY: Same objection.
2  A. With that kind of statement, it could also be
3 imperfect in every way.
4  Q. So is that yes?
5  A. No, that's a no. "Perfect in every way" were
6 the exact words that you used.
7  Q. Right.
8  A. So since this is all theoretical, it can also
9 be the opposite. You can have handwashing facilities an
10 hour away from wherever you manufacture, that doesn't
11 mean that you're still manufacturing correctly. This is
12 just an item that Mr. Fox noted as for whatever reason
13 being an issue.
14  Q. Right. But you would agree that because your
15 handwashing facilities are not convenient does not render
16 the active ingredient in SAM-e to be less than what's
17 stated on the label; correct?
18     MR. BRODY: Form objection.
19  A. Correct.
20  Q. And, again, in response to these eight items
21 that Mr. Fox put on the 483 form, Vitamins Because
22 responded; correct?
23  A. They did send a response letter.
24  Q. And the FDA took no action following receiving
25 the response; correct?

Page 93

1     MR. BRODY: Object to form. Misstates facts.
2  A. As far as I am aware, the FDA has not taken
3 action yet -- or follow-up action yet as related to the
4 483 and the response that they received.
5  Q. All right. To continue on through the report
6 here, you'd agree -- it's your opinion that all SAM-e
7 manufactured by Vitamins Because did not meet the label
8 requirement for active ingredient; correct?
9  A. Can you repeat the question? The first couple
10 of words, I did not hear clearly. I'm sorry.
11  Q. It is your opinion that all of the SAM-e
12 manufactured by Vitamins Because failed to meet the label
13 requirement as it relates to the active amount of SAM-e;
14 correct?
15  A. No, incorrect. I did -- I did see and read
16 perhaps two or three certificates of analysis by
17 third-party analytical labs that did find the label claim
18 was met or nearly met. So that would be 2 or 3 tests out
19 of 30-plus tests found a label claim or near label claim
20 was made.
21  Q. Okay. Would you agree that 3 out of 30 is
22 10 percent?
23     MR. BRODY: Form.
24  A. If I can do the math with my fingers, I would
25 agree. Yes. Sorry about the bad joke. Yes.

24 (Pages 90 - 93)

Page 94

1  Q.  So you would agree that this statement is not
2  true? All SAM-e capsules manufactured by the defendant
3  Vitamins Because and CT Health were uniformly mislabeled?
4       MR. BRODY: Object to form.
5  A.  I cannot say all, but given the inconsistency
6  and that at least 90 percent of the testing showed or
7  demonstrated severe issues with regards to purity and
8  strength and composition of the products, it's a huge red
9  flag of inconsistency in manufacturing processes and
10 quality.
11 Q.  Okay.  So you'd agree that some of the SAM-e
12 that you're aware of met the label requirements for
13 active ingredient; correct?
14 A.  I would agree that up to about 10 percent of
15 what I am aware of regarding the SAM-e products met or
16 nearly met label claim.
17 Q.  So it's true that some of Vitamins Because's
18 SAM-e product met label claims; correct?
19      MR. BRODY: Object to form.
20 A.  It is true.  And if my memory serves me
21 correctly that a couple of products from 2020 did meet
22 label claim.  Again, still less than 10 percent or less
23 of all of the products that were tested.
24 Q.  But even in your expert opinion, not all;
25 correct?

Page 95

1       MR. BRODY: Object to form.
2  A.  Correct.
3       MR. ANDERSON: What do you-all want to do
4  about lunch?
5       (Recess.)
6  BY MR. ANDERSON:
7  Q.  All right.  Dr. Kalman, we've been talking
8  about the 483 letter, the inspection, and the testing.
9  I'm going to stop sharing for a second here and I might
10 switch it up.  You -- strike that.
11      The people that you're relying on for the
12 testing shows Eurofins as the testing facility; correct?
13 One of the testing facilities.
14 A.  It would be correct to say that the people who
15 coordinated testing -- one of the testing facilities that
16 they utilized was Eurofins.
17 Q.  Why did they choose Eurofins, if you know?
18 A.  I cannot speak to other people's motivations.
19 Q.  I wrote it down.  You purchased the SAM-e that
20 you took -- I wrote it down.  I think you said it was
21 Doctor's Choice or something.  What was it?
22 A.  I thought it was Doctor's Best.
23 Q.  Doctor's --
24 A.  And I looked.  I don't have it here with me.
25 And it wasn't just a SAM-e, itself, capsule.  It was a

Page 96

1  multi-ingredient product with ingredients that are geared
2  or thought to have positive impacts on bone and
3  cartilage.
4  Q.  Okay.  Now when you purchased that product
5  that included at least -- it included some SAM-e; am I
6  right?
7  A.  Correct.
8  Q.  How did you determine what manufacturer you
9  were going to purchase from?
10 A.  I wasn't looking to determine which
11 manufacturer.  As you may or may not know, companies that
12 sell products don't always manufacture them.  Like I
13 don't -- so -- however, big picture is I was looking for
14 a product that had some specific ingredients that science
15 says should have some benefits towards recovery after a
16 muscle tendon cartilage bone surgery and liked the
17 product that I saw.  Second to that is knowing the name
18 of the company and that they have been around and have a
19 decent reputation was helpful in me deciding let me try
20 this product that has these three or four key ingredients
21 I'm looking for.
22 Q.  Did you read any customer reviews prior to
23 choosing Doctor's Best?
24 A.  No.
25 Q.  Did you review the certificate of analyses

Page 97

1  prior to purchasing the product from Doctor's Best?
2  A.  No.
3  Q.  Did you do any testing on the product you
4  purchased from Doctor's Best?
5  A.  No.
6  Q.  Have you ever done testing on any SAM-e
7  product that you personally purchased for personal use?
8  A.  As an individual consumer, no.  However,
9  separate to that as a research scientist, I have
10 published research on S-Adenosyl methionine or SAM-e, and
11 in that we did have testing as part of the QA of that
12 study.
13 Q.  Okay.  Is that the study that was -- that was
14 comparing SAM-e and another drug for effects on
15 depression?
16 A.  Yes and no.  I say yes but the incorrect word
17 that you used is drug.
18 Q.  Okay.
19 A.  That was a study that was looking to compare
20 the potential antianxiety or antidepressive effects of
21 SAM-e as compared to something -- a specific extract out
22 of corn.
23 Q.  Okay.  Aside from that article, have you been
24 involved in any publications or research projects not
25 related to litigation that involved SAM-e?

25 (Pages 94 - 97)