EXHIBIT C

# Declaration of
# Douglas S. Kalman PhD, RD, CCRC, FACN, FISSN

*in the case of*

CORI ANN GINSBERG, NOAH MALGERI,
KALYN WOLF, BILL WILSON, SHANNON
HOOD, ERIC FISHON and ROBERT
MCKEOWN on behalf of themselves and all
others similarly situated,

Plaintiffs,
vs.

VITAMINS BECAUSE LLC, CT HEALTH
SOLUTIONS LLC, GMAX CENTRAL LLC,
ASQUARED BRANDS LLC, INSPIRE NOW
PTY LTD d/b/a BoostCeuticals, HEALTHY
WAY RX LLC, KHAKIWARE INC, and
JOLLY DOLLAR SUPPLY COMPANY, LLC,

Defendants.

United States District Court
Southern District of Florida
Civil Action No: 1:19-cv-22702-KMW

Douglas S. Kalman PhD RD
Nova Southeastern University
Dr. Pallavi Patel College of Health Care Sciences
3301 College Avenue
Fort Lauderdale, FL. 33314-7796

1

PLTS EXPERT DISCLOSURES 0163 (CONFIDENTIAL)

## I.   Assignment:

1.   I was retained by Kantrowitz Goldhamer & Graifman, P.C. ("Counsel"), one of the counsel to the proposed plaintiff classes (the "Classes") in the case *Ginsberg, et al v. Vitamins Because LLC, et al*, Case No. 19-cv-22702-KMW (the "Litigation"), to provide an Expert Report and testimony regarding the deficiency of S-Adenosyl methionine ("SAM-e") contained in the subject product dietary supplements manufactured by Defendants Vitamins Because LLC ("Vitamins Because") and CT Health Solutions LLC ("CT Health") (together, "Defendant" or "Defendant Manufacturer"), and their defective nature. All work contained in this report is my intellectual property and is solely intended for use in the Litigation. This report may contain confidential, proprietary, and protected information, as well as original compilations, approaches, concepts, trade secrets and information that has commercial value.  No one may use, benefit from or disclose this intellectual property without my express permission.

2.   Counsel has requested that I prepare this report to explain the deficiency and defective nature of subject product SAM-e supplements, the testing process used to determine that all SAM-e capsules manufactured by the Defendants Vitamins Because and CT Health were deficient and thus uniformly mislabeled, the common deficiencies which were found, and the effective worth of the subject SAM-e to reasonable consumers in the U.S. I have read the Third Amended Complaint (the "Complaint") and numerous documents produced in this Litigation and am so acquainted with the allegations in this case regarding the subject product SAM-e supplements at issue.  In preparing this report, I have relied on Plaintiffs' Expert Disclosures and the records listed in Appendix B to this report as well as on my own pre-existing knowledge and expertise, as reflected below.

## II.   Qualifications as Expert Witness

3.   I am a Registered and State Licensed Dietitian/Nutritionist in the State of Florida. I am also a Registered and Certified dietitian/nutritionist in the state of New York. I am a doctorate level researcher and educator. I am certified by the Commission on Dietetic Registration, licensed by the states of Florida and New York and further certified by the Association of Clinical Research Professionals. I am a Fellow of the American College of Nutrition (FACN) and a Fellow of The International Society of Sports Nutrition (FISSN). I currently hold two academic appointments at Nova Southeastern University, Fort Lauderdale, Florida. I am an Adjunct Assistant Professor in the Dr. Kiran C. Patel College of Osteopathic Medicine, and an Adjunct Professor in the College

PLTS EXPERT DISCLOSURES 0164 (CONFIDENTIAL)

of Psychology. In addition, I also currently serve as an academic advisor to Kaiser University – Miramar, Florida (nutrition program). As a nutrition and nutrition scientist expert, I also serve as the Vice President of Scientific Affairs at Nutrasource Pharmaceutical and Nutraceutical Services, a nutrition-focused Contract Research and Services Organization.

4.   I have obtained a Doctor of Philosophy (Ph.D.) from Touro University International (Cypress, CA), a Master's Degree (M.S.) in Nutrition from Hunter College-City University of New York (New York, N.Y.), and a Bachelor's Degree (B.S.) in Food and Nutrition from Florida State University (Tallahassee, FL). I have also obtained a Certification in Clinical Research with the Association of Clinical Research Professionals and maintain continuing education on an annual basis.

5.   I have worked in hospital in-patient and out-patient care and remain active in conducting nutritional assessments and interventions for patients referred by medical doctors, healthcare professionals, and self-referrals. I have been involved in nutrition-focused clinical research for approximately 30 years, and published and edited many academic textbooks, original scientific studies, review articles and more. I have also consulted for the dietary supplements industry. Within cases or projects that I have worked on for food and or dietary supplement companies, I have provided a range of expert services for companies operating in the nutrition (i.e. foods, dietary supplements, medical foods, beverages) industry, including "substantiation" for claims, evaluating regulatory compliance with the rules and laws that surround the nutrition industry (e.g., Food and Drug Administration ("FDA") regulations, Federal Trade Commission ("FTC") guidance, etc.). I have worked as a clinical dietitian and provided patient and consumer education in areas surrounding nutrition. I have had the honor of being a keynote speaker at various scientific society academic conferences including conference talks focused on weight management, sports nutrition, nutrient bioavailability, absorption, metabolism and effects within humans. As a researcher, I have worked on more than 300 clinical trials (studies), including studies relating to foods, dietary supplements, medical foods, infant foods and beverages. I have served as an Expert on Generally Regarded as Safe Panels ("GRAS"), an FDA regulated path to market for nutrition and nutrition related ingredients under Sections 201(s) and 409 of the Federal Food, Drug, and Cosmetic Act in 21 CFR 170.3 and 170.30. Scientific publications and presentations are noted within my Curriculum Vitae. In addition, I have conducted and published research regarding the

3

dietary ingredient SAM-e (of which, I elaborate later in this document). A copy of my Curriculum Vitae is referenced in Appendix A.

6.   I currently maintain Professional Memberships in good standing with the American Society for Nutrition (ASN), American College of Nutrition (ACN), American College of Sports Medicine (ACSM), Academy of Nutrition and Dietetics (AND), American Physiological Society (APS), Association of Clinical Research Professionals (ACRP), National Strength and Conditioning Association (NSCA) and the International Society of Sports Nutrition (ISSN).

7.   My expert work has traversed federal and state courts, as well as regulatory and non-governmental agencies. My experience includes providing Expert Reports, and deposition and court testimony.

### III.    Statement of Compensation

8.   My testimony in the litigation and the outcome of the case do not affect my compensation rate for work in this case. Compensation is as follows: $450 per hour for consulting, analysis, written report and testimony. In addition, if there is any travel related to this case, I will receive reimbursement for reasonable airfare, lodging and related items.

### IV.    Previous Expert Work and Testimony –

9.   In the past seven years, other than in this matter, I have provided expert reports, testified at deposition and/or at trial(s) or other related legal proceedings as an expert or fact witness in or for:

1.  Expert Witness for Round Table Group/Thomson Reuters Expert Witness Services ("TREWS") a division of West Publishing Corporation, 2015 – current [https://www.roundtablegroup.com].

2.  Franck Capaci and Cynthia Ford v. Sports Research Inc. Case No. 2:19-cv-03440-FMO-FFM.Expert report: nutrition, research, substantiation, regulatory. Worked with the law firm of Garcia Rainey Blank and Bowerbank, LLP. Costa Mesa, CA. 2020 – resolved.

3.  Aldridge v. 310 Nutrition, et al. Superior Court of New Jersey Law Division: Atlantic County Docket No. L-2579-18. Expert report: nutrition, research, substantiation, regulatory. Worked with the law firm of Cole Schotz P.C. Hackensack, New Jersey. 2020. Resolved.

PLTS EXPERT DISCLOSURES 0166 (CONFIDENTIAL)

4. Intellectual Property, Patent infringement case. Worked with the firm of Carr/Ferrell, L.L.P. of Menlo, Park, California. Resolved, 2018 - 2019. [www.carrferrell.com]

5. Substantiation lawsuit. Worked with the firm of Jackson Walker, L.L.P. of Dallas, TX on behalf of their client. Status – Resolved 2019-2020. [www.jw.com]

6. Multi-action case, including substantiation. Worked with the firm of Jackson Walker, L.L.P. of Dallas, TX on behalf of their client. Status – Finalized 2018. [www.jw.com]

7. Federal Trade Commission v. XXXX Inc. 2016 FTC substantiation case. Expert (nutrition, science, research, regulatory). Case resolved without any FTC action.

8. Nestle Health Science – Pamlab, Inc. and Breckenridge Pharmaceutical, Inc. v. Virtus Pharmaceuticals, LLC. (2015). Miami-Dade, Florida.

9. Joey Herren and Sharon Herren (Plaintiffs) v. Gregory Paul Sucher, Nonstop Fitness Incorporated, Club Management Services, Inc., d/b/a Nonstop Fitness Inc., Curtis Huffman, and Liken Enterprises Company, d/b/a Active Nutrition Corporation, Barrin Innovators and William Mellows (Defendants). Civil Action No. STCV 10-01667-CO.

10. ERSP vs. Direct Digital (February 2014): National Advertising Division: Electronic Retailing Self-Regulation Program. Worked with the Venable law firm. http://www.asrcreviews.org/2014/02/ersp-finds-direct-digital-can-supportperformance-claims-for-nugenix-recommends-marketer-modify-certain-claims/)

## V.  Statement of Opinions

10. This Expert Report contains references to the state of regulatory guidance, nutritional science, and substantiation science as I best currently understand it, within the confines of the issues presented in this case. Further, this Report also includes the latest conclusions regarding regulatory issues and evidence-based practices as shared in the public domain by state and federal regulatory agencies, as well as scientific societies who publish within the peer-review scientific paradigm.

11. For this case, I am being asked to share my expert opinion to explain the deficient and defective nature of subject product SAM-e supplements, the testing process used to determine that all SAM-e capsules manufactured by the Defendants Vitamins Because and CT Health (together, "Defendant" or "Vitamins Because") were deficient and thus uniformly mislabeled, the common

PLTS EXPERT DISCLOSURES 0167 (CONFIDENTIAL)

deficiencies which were found, and the effective worth of the subject SAM-e to reasonable consumers in the U.S. I have read the Third Amended Complaint (the "Complaint") and numerous documents produced in this Litigation and am so acquainted with the allegations in this case regarding the subject product SAM-e supplements at issue. The subject product SAM-e supplements at issue in this case have been defined to include the S-adenosylmethionine ("s-adenosyl-methionine," "SAM-e," "SAM-e,") dietary supplement capsules manufactured and/or labeled by Vitamins Because (the "subject product").

## VI        Regulatory Background

12. Products manufactured by Defendant are governed by the Dietary Supplement Health and Education Act of 1994 ("DSHEA"). The DSHEA Act is a 1994 statute of United States federal legislation which defines and regulates dietary supplements. Under the act, supplements are effectively regulated by the FDA for Ingredient Labeling and Nutrition Informational Labeling, as noted in Section 403 of the Act. 21 U.S.C. § 343. Exhibit 1 and 2.[1]

13. Section 403 of 21 U.S.C. § 343 states that a dietary supplement is considered misbranded if it meets any of the following descriptions:

- "(1) it is a dietary supplement; and
- (2)(A) the label or labeling of the supplement fails to list -
  - o (i) the name of each ingredient of the supplement that is described in section 201(ff); and
  - o (ii) (I) the quantity of each such ingredient; or
  - o (II) with respect to a proprietary blend of such ingredients, the total quantity of all ingredients in the blend;
- (B) the label or labeling of the dietary supplement fails to identify the product by using the term `dietary supplement', which term may be modified with the name of such an ingredient;
- (C) the supplement contains an ingredient described in section 201(ff)(1)(C), and the label or labeling of the supplement fails to identify any part of the plant from which the ingredient is derived;

---

[1] A list of Report exhibits (and source references) and notes are provided in Appendix B. Documents constituting Plaintiffs' Expert Disclosures will be provided to all parties in the litigation in conjunction with Plaintiffs' Expert Reports.

**PLTS EXPERT DISCLOSURES 0168 (CONFIDENTIAL)**

- (D) the supplement -
  - o (i) is covered by the specifications of an official compendium;
  - o (ii) is represented as conforming to the specifications of an official compendium; and
  - o (iii) fails to so conform; or
- (E) the supplement -
  - o (i) is not covered by the specifications of an official compendium; and
  - o (ii)(I) fails to have the identity and strength that the supplement is represented to have; or
  - o (II) fails to meet the quality (including tablet or capsule disintegration), purity, or compositional specifications, based on validated assay or other appropriate methods, that the supplement is represented to meet."

14. Defendant entities in this case, including Defendant Manufacturer, manufacture, package, label, and/or hold dietary supplements, including the subject product SAM-e manufactured by Defendant Manufacturer, and as such, their activities are regulated under the Good Manufacturing Practices, 21 CFR Part 111. Part 111 is titled "Current good manufacturing practice in manufacturing, packaging, labeling, or holding operations for dietary supplements." Exhibit 3.

15. Depending upon the size of the Defendant Manufacturer's company, its manufacture of dietary supplements may also be governed by the Small Entity Compliance Guide, "Current Good Manufacturing Practice in Manufacturing, Packaging, Labeling, or Holding Operations for Dietary Supplements." This FDA Regulation for manufacturers and those in the dietary supplement business applies to companies with 500 or less employees. Exhibit 4.

16. It is my opinion that, given the nature of Defendant's manufacturing and the size of its company, Defendant's manufacturing is governed by the above-referenced federal guidelines. It is my opinion that Defendant's manufacturing is federally regulated by the United States Food and Drug Administration ("FDA"), which includes regulatory authority over the SAM-e product at issue in this case. Exhibits 1-4.

17. It is my opinion that when Defendant manufactures SAM-e, it is required at all times to follow DSHEA and, most certainly, the Good Manufacturing Practices ("GMP") provisions of DSHEA in their business and operations.

**PLTS EXPERT DISCLOSURES 0169 (CONFIDENTIAL)**

18. It is my opinion that Defendant, as a manufacturer of dietary supplements, is supposed to be knowledgeable and aware of with the rules, guidance and laws that govern their business and industry, and ensure their operations are complaint thereto.

19. The FDA audited Defendant's manufacturing facility from January 19th through January 30th, 2018. On January 30, 2018, the FDA issued a 483 "for cause warning and informed the manufacture that they were in violation of FDA guidance's on at least eight (8) different fronts." The FDA findings included that Defendant, the manufacturer, was not following GMP. The FDA Establishment Inspection Report specifically noted the following observations regarding Defendant's dietary supplements and manufacturing operations:

    a.  "you did not establish product specifications for the finished dietary supplements",

    b.  "you did not establish component specifications for purity, STRENGTH (*emphasis added*) and composition";

    c.  "you did not implement quality control operations to ensure the QUALITY (*emphasis added*) of the dietary supplement";

    d.  "you did not use effective measures to protect against the inclusion of metal or other foreign material in components or dietary supplements";

    e.  "you did not take necessary precautions during the manufacture of a dietary supplement to prevent contamination of components";

    f.  "you did not establish specifications for the packaging and labeling of the finished dietary supplement, to ensure that you used the specified packaging and to ensure you applied the specified label";

    g.  "you did not collect and hold reserve samples of packaged and labeled dietary supplements that you distributed";

    h.  "your hand washing facilities are not convenient." Exhibits 5-6.

20. While Defendant was inspected by the FDA regarding its manufacturing and received corrective instructions for their cited deficits and flaws, it is my opinion that Defendant failed after January 30, 2018 to update and upgrade their policies and practices to follow what the GMP law requires for a dietary supplement manufacturer.

21. In his Establishment Inspection Report, FDA Inspector Aaron J. Fox noted a most severe violation of GMP by Vitamins Because. Set forth on the FDA 483 as Observation 2, he noted that: "You did not establish component specifications for purity, strength and composition."

8

Mr. Fox also noted: "Specifically on 1/19/2018, I observed you do not have ingredient specifications for identity, purity, strength and composition for any of your dietary supplements." Exhibits 5-6.

22. It is my opinion that if a manufacturer does not know the purity, strength and composition of the component parts of a dietary supplement that it is manufacturing, all such supplements have no worth, and on face value cannot be compliant with the laws surrounding quality control of manufacturing dietary supplements.

23. It is my opinion that Plaintiffs in this case, and all others who purchased dietary supplements manufactured by Defendant, purchased supplements that were faulty, defective, and noncompliant for the reasons set forth in the 2018 FDA Establishment Inspection Report. Importantly, the SAM-e dietary supplements which they purchased were not made in compliance with the laws and GMP that govern the dietary supplement industry. It is my opinion that supplement products that are manufactured without compliance with legal standards and without complete manufacturing records, including Certificates of Analysis, stability testing, purity testing, analysis for content for each manufactured lot, are defective and should not be sold to the consumer public. The 2018 FDA inspection and Defendant's production in this case shows that Defendant's SAMe manufacturing was noncompliant and without proper records and documentation.

24. Based on the Testing Analysis (Part VII) and FDA documentation, it is clear that Defendant not only violated the aforementioned FDA guidance and regulations for the dietary supplement industry, but also manufactured SAM-e supplements that did not contain the quantities of SAM-e as represented on its label claims. For example, many subject product labels represented that the included supplements contained 500 mg of SAM-e which in reality often contained less than 100 mg of SAM-e. The substantially lower than labeled amounts of SAM-e is a variance which in my opinion could not be caused merely by natural product degradation over time. As such, the defective products also violated the Federal Trade Commission ("FTC") guidance for non-misleading advertising and marketing. This is referred to as Truth in Advertising, by the FTC. Exhibit 7.

25. It is my opinion that Defendant further violated the FTC's "Fair Packaging and Labeling Act" ("FPLA"), and specifically the regulations under Section 4 of the Act. 16 CFR Part

PLTS EXPERT DISCLOSURES 0171 (CONFIDENTIAL)

500.[2] The FPLA was enacted in 1967 and directs the FTC and FDA to require that all "consumer commodities" be labeled to disclose net contents, identity of commodity, and name and place of business of the product's manufacturer, packer, or distributor. The Act authorizes additional regulations where necessary to prevent consumer deception (or to facilitate value comparisons) with respect to descriptions of ingredients, slack fill of packages, use of "cents-off" or lower price labeling, or characterization of package sizes. It is my opinion that Defendant entities violated the FPLA through their labeling and marketing of their SAM-e supplements which were not truthful with respect to the amount of SAM-e claimed to be in the product which was far in excess to the amount of SAM-e that the consumer or purchaser was actually receiving. Exhibit 8.

26. I am familiar with the SAM-e supplement industry and I know that consumers of SAM-e supplements purchase such products expecting and trusting that the product contains the quantity and quality of the product that the label states and delivers the claims made, particularly in regards to the amount of SAM-e contained in the product supplements. Simply put, reasonable consumers of dietary supplements rely upon the "Supplement Facts" information provided on the label when purchasing their supplements to determine the amount of the supplement's active ingredient they'll be receiving when they take the supplements. Thus, a typical SAM-e consumer purchasing a SAM-e supplement labeled to contain 500 mg per capsule, reasonably expects to receive 500 mg of S-Adenosyl methionine (i.e. SAM-e) in each capsule. Supplement consumers typically rely upon such label claims to ensure that they receive a particular or requisite dosage of the given supplement through their supplement consumption. SAM-e supplements which are defective and/or deficient in their manufacturing, and which at bare minimum do not meet federal standards for manufacturing and all related aspects and marketing labeling, will not provide the stated benefits and value to consumers which they were reasonably led to believe they would receive from the product label claims.

27. Defendant manufactured dietary supplements, and specifically SAM-e supplements, from around 2015 and forward in a defective and deficient manner. It is my opinion that Defendant failed to enhance its manufacturing or quality control systems even after receiving the FDA 483 warning letter 2018 to correct its manufacturing problems. Because these systems were not rectified, Defendant's production of SAM-e supplements remained faulty, defective and deficient.

---

[2] *See also* 15 U.S.C. 1453, 1454, 1455.

PLTS EXPERT DISCLOSURES 0172 (CONFIDENTIAL)

Defendant's continuous FDA violations included failure to follow GMP, DSHEA, as well as other regulations published by the FTC. It is my opinion that Defendant did not rectify their manufacturing processes and operations of their SAM-e supplements to ensure that their SAM-e products would at least meet the label claimed amounts of SAM-e per serving. Exhibits 1-8.

28. Defendant, in addition to violating FDA regulations, also violated regulations promulgated by the FTC. Specifically, when a company such as Defendant uses a product label claim regarding how much of an ingredient is contained in a product per serving, it is considered advertising and marketing. Pursuant to FTC regulations, such label statements must be truthful and not misleading. Exhibits 1, 2, 7, and 8.

**VII       Testing Analysis**

29.  It is my opinion that in order to best determine with a sense of quality and assurance whether one's analytical testing of a product is accurate and representative of that product's manufacturing, it is best to have the product analyzed by more than one laboratory. If more than one analytical laboratory finds the same or substantially similar results as another analytical laboratory, than the chances that the results across two labs are faulty or wrong is greatly minimized.

30. Testing of Defendant's SAM-e dietary supplements to determine the amount of SAM-e contained therein was coordinated through Catherine Adams Hutt, PhD (Aubrey, TX, USA) and Nutrasource Pharmaceutical & Nutraceutical Services ("Nutrasource") (Guelph, ON, Canada), a clinical research and service organization. Samples from the subject product SAM-e supplements were selected for testing from across a range of multiple private label brands, label claims, manufacturing dates, and lot numbers. At least three different accredited laboratories were also employed for the testing which took place in 2019 and 2020. A range of SAM-e samples, brands, dates of manufacture, lot numbers, experts, and testing labs were employed to ensure both the accuracy of their findings and their applicability across the class period. The consistent findings of deficiency across the wide range of subject product samples and labs presents clear evidence of deficiency on a class-wide basis which was caused by common systemic problems in Defendant's manufacturing systems and operations. Moreover, I am familiar with the dietary supplement (and SAM-e supplement) industry, and the uniform nature of supplement manufacturing and its operational processes makes the results of the sampling and testing coordinated by Nutrasource

**PLTS EXPERT DISCLOSURES 0173 (CONFIDENTIAL)**

and Dr. Adams Hutt relevant and applicable on a class-wide basis.[3] For these reasons, it is my opinion that the tests coordinated and contracted through both Nutrasource and Dr. Catherine Adams Hutt are valid[4], meritorious and provide utility in examining the issues in this case on a class-wide basis. Exhibits 31-32.

31. It is my opinion that independent testing of the SAM-e supplements manufactured by Defendant demonstrates that, even after the 2018 FDA inspection, Defendant's quality control and ability to meet label claims remained seriously flawed and deficient in regards to its SAM-e product.  In November of 2019, Plaintiffs' expert retained Eurofins (Brea, CA), a leading global food integrity testing contract ISO17025 accredited laboratory, to evaluate SAM-e products manufactured by Defendant, including samples of SAMe which were manufactured after the 2018 FDA inspection. One of the SAM-e products tested by Eurofins (i.e. BoostCeutical 2, Eurofins Sample # 9007930) stated on its label that the supplements contained 500 mg SAM-e per capsule. This specific BoostCeutical product had a Lot # of 11021902, indicating the SAM-e supplements were manufactured by Defendant on February 11, 2019, well after the 2018 FDA inspection .[5] A Eurofins analysis of this sample of subject product SAM-e revealed the precise amount of SAM-e per serving was a mere 136 mg, approximately 27.2% of the label claim, or over 70% deficient from label claim. The test analysis demonstrate that even *after* an FDA inspection, receiving a 483, and informing the FDA in the 483-response letter that all systems of quality control will be

---

[3] While the uniformity of the subject matter SAM-e and its manufacturing processes has not been disputed by Defendant, it is worth noting that any lack of uniformity in Defendant's manufacturing or end-product results (i.e. the subject product's strength or quality) would itself render the SAM-e supplements valueless to consumers who would be unable to ascertain the strength and effect of their purchased product.

[4] It is my opinion that both Nutrasource and Dr. Catherine Adams Hutt are sufficiently qualified and credentialed to coordinate SAM-e testing and provide summaries of their results. Both employed proper chain of custody procedures and used reputable and credentialed laboratories for their SAM-e testing. Exhibits 34-35.

[5] Ms. Kimberly Kitzler, Director of Operations at CT Health Solutions LLC, explained to an FDA inspector in January 2018 that "lot numbers are day, month, and year as in ddmmyy for the date manufacturing began. So, if manufacturing began on January 21, 2018, the lot number would be 220118. Additionally, if the firm has multiple batches in the same lot, the lot number could be 22011801, 22011802, etc. Along with the lot number is expiration date, which can be either two or three years from the date of manufacture."  Establishment Inspection Report, p.6. Exhibit 6.

PLTS EXPERT DISCLOSURES 0174 (CONFIDENTIAL)

amended and corrected by May of 2019, Defendant still failed to correct their defective and deficient manufacturing practices for their SAM-e supplements. Quality control and other aspects of GMP appear to also have remained uncorrected. By examining the Eurofins analysis against Defendant's representations that they would be in compliance with federal regulations and correct all manufacturing flaws by May 2019, it is obvious that the necessary corrective measures were never taken. Exhibit 9.

32. It is my opinion that analytical testing on SAM-e supplements manufactured by Defendant after the FDA inspection and warning letter in early 2018 illustrate that the subject product SAM-e was still not being manufactured in a manner which make the label claims truthful. On November 20, 2019 Eurofins (Brea, CA), a leading food integrity analytical testing organization, tested the Vitamins Because SAM-e product that was labeled to contain 200 mg per serving (Lot # 07111913 and Eurofins Sample # 9007840). Eurofins' analysis determined that the actual amount of SAM-e in the product was only 98.0 mg/serving. In other words, the product analysis determined that the product contained less than half of the claimed SAM-e amount (approximately ~49% of label claim, or ~51% deficient of claim). Thus, it is clear that Defendant's manufacture of SAM-e supplements continued to remain sub-par and out of legal compliance. Exhibit 10.

33. It is my opinion that continued analysis of SAM-e manufactured by Defendant shows its manufacturing processes remained sub-par and out of legal compliance, resulting in deficient end-product SAM-e supplements. Subject product SAM-e labeled as containing 400 mg per serving (ASquared 1, Report # 27275=446-0) was found by Eurofins to only contain 15.9 mg per serving of actual SAM-e. The laboratory analysis by Eurofins revealed that the product contained only approximately ~4% of the claimed amount of SAM-e (also said as the product was underdosed/deficient by almost ~96%). Exhibit 11.

34. In sum, it is my opinion to a reasonable degree of professional certainty that Defendant manufactured deficient SAM-e products, as illustrated by third-party laboratory analysis of the subject product. A further example of this is Eurofin's test of the subject product SAM-e under the NusaPure private label which had a label claim representing that the supplements contained 500 mg of SAM-e per capsule. However, the SAM-e supplements in reality contained only approximately ~34 mg of SAM-e per serving. This analysis (Nusa Pure 2 Eurofins Sample #

PLTS EXPERT DISCLOSURES 0175 (CONFIDENTIAL)

9032324) demonstrated that Defendant's manufactured product contained less than 7% of label claim, meaning is was over 93% deficient to the claimed amount. Exhibit 12.

35. Further testing of subject product SAMe capsules was also completed by Eurofins in April 2020. Eurofins also tested subject product samples of SAM-e under the private labels of Earth Natural, PureControl, and Naturetition with all showing grossly deficient results in SAM-e content. For example, the Naturetition sample had a label claim that it contained 500 mg of SAM-e per capsule. However, the laboratory testing and analysis showed that the SAM-e supplements contained only ~90.4 mg of SAM-e per capsule. This analysis (Naturetition 1, Eurofins Sample # 9408959) demonstrated that the defendants manufactured product contained about 18% of label claim, meaning is was over 80% deficient to the claimed amount. Exhibit 13.

36. Analytical laboratory testing, in addition to the Eurofins analytical testing, was also undertaken by Labs Mart (Edmonton, Alberta, Canada. Report # 92408-3). Labs-Mart is an ISO 17025 accredited laboratory. In this case, the tested SAM-e labeled product manufactured by Defendant was said to contain 500 mg of SAM-e per serving. However, the lab analysis found that it contained 25.6 mg per serving. The analysis thus revealed the product contained only 5% of label claim; in other words, the SAM-e product was ~95% deficient. Exhibit 14.

37. Lab Marts also tested Defendant's SAM-e product which was labeled to contain 400 mg per serving. This subject sample product, however, was found to contain only 21.2 mg of actual SAM-e per serving (Labs-Mart analytical laboratory; Report # 92408-2). Thus, the test result indicates that Defendant's manufacturing produced a product that only contained ~5% of the claimed amount. Said differently, the analysis revealed a product that is ~95% deficient. Exhibit 15.

38. It is my opinion that additional and continued testing of Defendant's SAM-e supplements in 2020, continued to demonstrate deficiency and defect in their processes. As noted, the FDA provided a 483-warning letter in January of 2018, which Defendant responded to and indicated to the FDA that they would have all quality controls and cited deficiencies corrected by May of 2019. Yet the testing of Defendant's SAM-e product by Eurofins in September of 2020 revealed that the 400 mg label claim was *not* supported. The analytical laboratory findings indicated a presence of only 82.1 mg of SAM-e per gram, as the product is sold in 400 mg servings (not 1000 mg), it was found to contain 32.8 mg per serving (this is an amount that is only ~8% of

14

label claim)). The SAM-e product tested to only contain ~8.2% of the label claimed amount, thus the product was close to ~92% deficient of SAM-e compared to label claim. Exhibit 16.

39. It is my opinion that further testing of additional samples of SAM-e products manufactured by Defendant was consistent in demonstrating that its SAM-e products were deficient in SAM-e content. For example, SAM-e products labeled as containing 500 mg of SAM-e per capsule were tested by Eurofins and were found to contain only 59 mg per serving. The product is labeled to contain 500 mg SAM-e per serving, and analysis revealed that it actually contained 59 mg. This product contains 11.5% of label claim, which can also be looked at as being 89% deficient. Exhibit 17.

40. It is my opinion that the analytical testing of Defendant's SAM-e supplements demonstrated consistent deficiency in its end-product. This is further supported by additional testing completed in September of 2020. Labs-Mart, a Canadian analytical laboratory tested Healthy Way 500mg SAM-e (Report 92408-1) and determined that the product contained 25.6 mg of SAM-e per serving. The product is labeled to contain 500 mg SAM-e per serving and contained 25.6 mg (this is, the SAM-e product contained only 5.1% SAM-e as opposed to the label claim). This product as manufactured by the defendants was ~94.9% deficient to label claim. Exhibit 18.

41. It is my opinion that the analytical testing conducted by Eurofins in the United States and the analytical testing carried out by Labs-Mart in Canada were materially consistent in that both sets of testing demonstrates that the subject SAM-e supplements manufactured by Defendant do not meet label claims, are deficient in its claimed active ingredient (i.e. S-Adenosyl methionine), are grossly mislabeled and thus may be considered useless for the consumer.

42. It is my opinion that the analytical testing of a third laboratory also had analytical SAM-e findings analogous to the two other laboratories testing the SAM-e product(s) manufactured by Defendant. Testing of Defendant's SAM-e supplements in November of 2020 also included testing by the laboratory, Merieux Nutrisciences (Markham, Ontario Canada). Merieux Nutrisciences is an ISO 17025 accredited analytical laboratory. The analysis determined that the SAM-e manufactured by Defendant (Healthy Way SAM-e Lot# 20299) which was labeled to contain 500 mg SAM-e per serving actually contained only 25.6 mg of actual S-Adenosyl methionine (i.e. SAM-e). That is, the manufactured SAM-e product was deficient to its label claim by approximately ~95% and contained only about ~5% of the SAM-e amount claimed. Exhibit 19.

PLTS EXPERT DISCLOSURES 0177 (CONFIDENTIAL)

43. The analysis by Merieux in November of 2020 continued to unveil and confirm a lack of improvement in the manufacturing quality and quantity of SAM-e by Defendant. The ISO17025 accredited laboratory found that Defendant's SAM-e which was labeled under the Healthy Way private label to contain 400 mg SAM-e per serving (Lot #20122) contained only 14.32 mg SAM-e per 400 mg serving. This product tested in November of 2020 contained only ~3.5% of the claimed amount of SAM-e (~97% deficient). Exhibit 19.

44. That three different laboratories in three different North American locations all found similar results when analyzing SAM-e supplements manufactured by Defendant for their SAM-e content presents strong evidence of the subject product's deficiency.[6] All tests revealed that the SAM-e products manufactured by Defendant do not meet their label claims, are deficient in the claimed active ingredient (i.e. S-Adenosyl methionine), and thus are effectively useless for the reasonable consumer who is looking to achieve any given SAM-e dosage or receive a certain level of SAM-e supplementation.

45. It is my opinion that any reasonable consumer who purchases the SAM-e supplements manufactured by Defendant is being misled as to the amount of SAM-e contained therein, the key component of the supplement and primary (if not sole) motivation for the supplement's purchase. The subject product SAM-e all have label claims for the amount of SAM-e per serving. All subject product SAM-e products tested, including testing across three different analytical, ISO17025 accredited laboratories, have demonstrated that the subject product SAM-e are consistently underdosed and deficient, and not in compliance with their label claims. If a reasonable consumer is purchasing a SAM-e product that states it contains 500 mg of SAM-e per serving, he or she would reasonably believe that it contains that amount of SAM-e per serving, as stated on the label. Similar to when a reasonable consumer buys a pair of shoes, he or she expects that when the shoebox is opened, it will contain the shoes that were ordered. If the shoebox did not contain what was ordered, or it contained a substantial lesser quality or quantity than stated, the consumer would be materially deceived. Thus, purchasing SAM-e supplements that do not contain what their product labels claim they contain leaves the consumer with an ineffective, mislabeled product, of

---

[6] Consistent testing across three separate laboratories in two different countries, further attests to the testing accuracy of these labs. The likelihood that all three sets of testing results were attained by chance are miniscule to none.

**PLTS EXPERT DISCLOSURES 0178 (CONFIDENTIAL)**

no real value to consumer who is not able to achieve his or her desired level of supplementation through the product's consumption.

46. It is my opinion that the testing employed by all three separate analytical laboratories (Eurofins, Labs-Mart and Merieux) on Defendant's SAM-e products, followed standard and acceptable processes in their analysis of the products for SAM-e content. It is standard and acceptable practice when measuring for SAM-e to employ the methods of HPLC (high-performance liquid chromatography), UPLC (ultra-performance liquid chromatography) and/or capillary electrophoresis with ultraviolet light detection. All three analytical laboratories are ISO 17025 accredited. Each company used external validated or internal validated standards for the comparative measurements. The similarity in analysis across the three ISO 17025 accredited laboratories indicates that the readings and analyses are true and accurate, and Defendant's SAM-e products are underdosed, deficient and of no real value to reasonable consumers purchasing for typical consumer purposes.

47. As noted above, it is my opinion that Defendant's SAM-e supplements have no real worth or value because consumers are deceived and cannot use the product to achieve any desired dosage or level of supplementation. Moreover, because the subject product SAM-e supplements are so grossly underdosed and deficient, studies have indicated that the supplement capsules may provide no effective health benefit to those who take them. For example, SAM-e dosages examined by the Agency for Healthcare Quality Research and Quality included dosages as low as 45 mg of SAM-e. This study (in which the SAM-e was administered to trial participants by IV) found no benefit or effect with that dosage or level of SAM-E supplementation. In addition, the report noted studies indicating that supplementation levels of 800 mg and/or 1600 mg of SAM-e may be required to achieve efficacy for mood states intervention. As the actual amount of SAM-e content in Defendant's SAMe supplements were on the lower end, and at times included findings of only around 45 mg of SAM-e per serving, their actual dosages provided to consumers match with research demonstrating no benefit to the user (for mental of physical health). Exhibit 20.

48. My own direct experience in conducting and publishing research on SAM-e allows me to directly comment on the utility of this dietary ingredient for various quality of mental health or physical health benefits. One published SAM-e study that I participated in and contributed to was titled "A Prospective Randomized Double-Blind Study Evaluating UP165 and S-Adenosyl-l-Methionine on Depression, Anxiety and Psychological Well-Being." The study was published in

17

a peer-reviewed National Library of Medicine database (Pubmed) indexed journal. This SAM-e research revealed that, in the evaluation setting of mild to moderate depression/anxiety, a level of 400 mg of SAM-e could achieve efficacy for reducing depression and or anxiety in a clinically meaningful manner. Because none of the SAM-e supplements manufactured by Defendant have been shown to contain at least 400 mg of SAM-e, the SAM-e products would not be expected to have any meaningful effect or impact for the users in reducing depression and or anxiety. Science does not support efficacy for these purposes at doses of SAM-e lower than 400 mg. Moreover, because the subject product's labels are false and misleading to reasonable consumers, consumers of the subject product SAM-e cannot and do not know to increase their intake of the SAM-e supplements in order to achieve 400 mg or any other requisite amount of SAM-e which is necessary to achieve their dosage, health, or supplementation goals. Exhibit 21.

49. It is my opinion that while the federal guidance under 21 CFR § 101.9 (g), "Class I and II Nutrient Rules," may not apply to the subject product, it is telling that Defendant manufacturer is far outside the bounds of these FDA rules. In the FDA's "Guidance for industry: Guide for developing and using data bases for nutrition labeling. Docket Number: FDA-2020-D-1961," the FDA gives guidance regarding acceptable margins of error for dosing or dose claims in the context of a nutrient. Said differently, the FDA guidance outlines what error rate a nutrition label may have and still be considered acceptable and in line with regulations. The FDA requires 100% compliance for nutrients such as vitamins and minerals and other nutritional items which are categorized as Class I (i.e. the actual amount of nutrient in the item must be 100% consistent with the label declared value or claim). For vitamins and minerals falling under Class II nutrients, the amount of the nutrient must reach at least 80% of the label claim. See 21 CFR § 101.9 (g). Thus, even if one were to consider the SAM-e supplements manufactured by Defendant as a lower level Class II nutrient, the subject product would still be greatly out of line with FDA compliance in that testing has shown that they typically contain far less than 80% of the label declared amount of SAM-e. Exhibit 22.

50. In sum, it is my opinion that when analyzed, the subject product SAM-e supplements produced by Defendant are deficient and of no value to the consumer. This position is supported, not only by the many serious and well documented FDA violations relating to several core aspects of dietary supplement manufacturing under GMP, but also by the many laboratory test findings on Defendant's SAM-e showing their consistent failure to meet label claims for the amount of SAM-

18

e. Analysis of SAM-e product labeled (Healthy Way) to contain 1500 mg SAM-e, found that actual content (as analyzed by both Merieux and Eurofins) was, 72.6 mg and 177 mg respectively. This is 72.6 mg out of 1500 and 177 mg out of label claim 1500 mg per serving. These two products are grossly deficient in SAM-e with containing only 4.8 % and 11.8% of label claim. This is, the Healthy Way 1500 mg SAM-e product was found to be 88.2% to 95.2% deficient of actual SAM-e. Notably, when analyzing the SAM-e supplements labeled to contain 400 mg per serving, testing showed the average serving to contain in the range of only ~50 mg of SAM-e.[7] Exhibits 31-32.

51. The laboratory testing analyses also showed that Defendant's subject product SAM-e which was labeled to contain 500 mg per serving were similarly deficient, with no real worth or value to consumers. In analyzing the samples of SAM-e subject product containing a label of 500 mg, it becomes evident that these SAM-e supplements are similarly deficient and inconsistent with federal regulations and consumer expectations. Testing of these sample SAM-e supplements showed that on average they contained not 500 mg of SAM-e per serving, but approximately only 70.4 mg of actual SAM-e per serving.[8] A SAM-e supplement labeled to contain 500 mg per serving, that contains only approximately 70 mg, is one that is ~86% deficient as compared to label claim. The defendant's 500 mg labeled product was tested by Merieux, Eurofins and Labs-Mart, all three testing laboratories found the 500 mg product to be deficient. Analysis by each lab revealed 26.3 mg, 59 mg and 25.6 mg per serving, not 500 mg per serving (5.6%, 11.8% and 5.1% respectively of label claim. This analysis, conducted in triplicate across two analytical laboratories found these 500 mg labeled products to be on average 88.2% to 94.9% deficient of actual product, rendering them worthless. The consumer is not obtaining what he or she thinks they are purchasing, and the received lower dose of SAM-e has not been associated with any real or potential benefits for the consumer, thus considered worthless. Exhibits 13-14, 17, 31-32.

52. Moreover, Defendant Gmax Central LLC's ("Gmax") own sponsored analysis of their subject product SAMe by Advanced Botanical Consulting and Testing Inc (ABC Testing Inc.; "ABC"; Tustin, CA.) largely supports these findings. In a report released August 30, 2019, ABC found that the subject product SAM-e labeled under GMAX Central's NusaPure private label

---

[7] Test analyses showed actual dose versus labeled as 85.6/400 mg, 21.2/400 mg, 25.6/400 mg, 82.1/400 mg, and 35.8/400 mg, yielding an approximate average of 50.06 mg of actual SAM-e for the 400 mg SAM-e label claim.

[8] Test analyses showed actual dose versus labeled as 118/500, 52.8/500, 91.6/500 and 90.4/500, yielding an approximate average of 70 mg of actual SAM-e for the 500 mg label claim.

19

PLTS EXPERT DISCLOSURES 0181 (CONFIDENTIAL)

brand, which included a label claim of 1500 mg of SAM-e per 3 capsule serving (i.e. 500 mg/capsule), was grossly deficient. The report indicates two tests run on this sample (Lot # 06121832) found that it contained anywhere from 278.17 mg to 283.33 mg per serving. This demonstrates a deficient, non-compliant product with an average actual amount of SAM-e to be in the range of ~280.7 mg per serving (far below the 1500 mg labeled amount). This is under-dosed and deficient by approximately ~82%.  Exhibit 23.

53. Moreover, testing of this kind was repeated by ABC with a different lot of the subject product sold under GMAX Central's NusaPure private label (Lot # 22041901) and found similar deficiency. A second report dated as of August 30, 2019 showed that the sample of SAM-e supplements labeled by Gmax contained, on average, only 292.97 mg per serving (instead of the labeled amount of1500 mg of SAM-e per serving). Those supplements (Lot # 22041901) were thus ~80% deficient as compared to labeled claim for SAM-e. Exhibit 24.

54. A third testing of the subject product sold under GMAX Central's NusaPure private label was performed by ABC. On August 30, 2019, ABC released a report on this testing. The sample was labeled to contain 1500 mg of SAM-e per serving (i.e. 3 capsules). The ABC laboratory determined that the SAM-e supplements from Lot # 02011902 were deficient in their amount of SAM-e and did not meet their label claim. The report indicates that two tests were run, yielding results of 1) 292.42 mg/serving and 2) 298.89 mg/serving. These results indicate an approximate average of ~295.66 mg of SAM-e per serving, well short of the 1500 mg per serving label claim, and approximately ~81% deficient. Exhibit 25.

55. It appears that the SAM-e testing performed by ABC on the subject product supplements labeled under Gmax Central's NusaPure private label showed only a few analyses performed after the commencement of the litigation  where the products met their label claims. These reports were generated on November 21, 2019 (Lot # 17071906), March 16, 2020 (Lot # 06121929) and March 16, 2020 (Lot # 06121928). The ABC report on "NusaPure" (label claim 1000 mg SAM-e per 4 capsules) stated the samples contained 1002.78 mg, 1000.2 mg, and 1001.8 mg of SAM-e per serving of 4 capsules. Exhibit 26-28.

56. However, ongoing FDA inspections and reports of the ABC laboratories, including as recently as 2019, call into question the accuracy and validity of their testing. Specifically, in June of 2019, ABC and its President (Wendi Wang, PhD) were cited by the FDA with a warning letter (FDA 483 letter) noting that the ABC's laboratory systems were materially defective in many areas

PLTS EXPERT DISCLOSURES 0182 (CONFIDENTIAL)

of Good Laboratory and Manufacturing Practices which govern the work that the lab does, including its testing of dietary supplements. ABC's citations included:

    a. Your firm failed to establish and document the accuracy, sensitivity, specificity, and reproducibility of its test methods (21 CFR § 211.165(e)).

    b. Your firm failed to ensure that laboratory records included complete data derived from all tests necessary to ensure compliance with established specifications and standards (21 CFR § 211.194(a)).

    c. Your firm failed to exercise appropriate controls over computer or related systems to assure that only authorized personnel institute changes in master production and control records, or other records (21 CFR § 211.68(b)).

    d. Your firm failed to routinely calibrate, inspect, or check according to a written program designed to assure proper performance of and to maintain adequate written records of calibration checks and inspections of automatic, mechanical, electronic equipment, or other types of equipment, including computers, used in the manufacture, processing, packing, and holding of a drug product (21 CFR § 211.68(a)).

    e. Additionally, the FDA noted that the "FDA considers contractors as extensions of the manufacturer's own facility. Your failure to comply with CGMP may affect the quality, safety, and efficacy of the drugs you test for your clients. It is essential that you understand your responsibility to operate in full compliance with CGMP, and that you inform all your customers of any out-of-specification results or significant problems encountered during the testing of these drugs." Exhibit 29.

57. It is my opinion that, due to the serious nature of the FDA's 483 citations to ABC, and specifically that cited issues were ongoing matters for many years (i.e. repeat violations found from 2012 and forward), the testing and results of ABC's laboratory are questionable at best, and likely entirely unreliable. Moreover, considering the many tests completed by laboratories, including ABC, which demonstrate that Defendant failed to meet label claims for the amount of SAM-e, the bulk and strength of testing evidence clearly supports a finding of uniform deficiency in the subject product SAM-e supplements. Exhibits 9-19, 23-25, 31-32.

58. In sum, it is my opinion that the analytical and testing data supplied by the Europhins, Lab Marts, and Merieux Nutrisciences labs are all valid, standard in nature and are of the quality

21

of accredited testing laboratories that have not been cited by the FDA for wrongdoing. In contrast, the ABC lab chosen by Gmax for their sparse testing in 2020, perhaps unbeknownst to them, is one known to have quality control and operational flaws, and should not be relied upon for purposes of claim substantiation. Exhibit 29.

59. Moreover, while the quality of SAM-e is known to be affected by moisture, sunlight and extreme temperatures, all indications from the SAM-e testing reports, chain of custody declarations and related lab documents are that the SAM-e samples were received by the laboratories under standard environmental conditions, comparable to conditions by which typical consumers receive their purchased subject product SAM-e supplements from Amazon.com or other online vendor. These standard, ambient conditions would not predispose the subject product SAM-e supplements to experience accelerated degradation. It is my opinion that the storage and shipping of the SAM-e products for laboratory testing did not play a role in the overwhelming results of the many analytical tests revealing material deficiencies in the subject product SAM-e supplements. Exhibit 30.

60. Particularly considering Defendant's history of defective manufacturing, its continued violations of various federal regulations relating to core GMPs and the manufacturing of dietary supplements, further evidence of manufacturing defects and failures even following the 2018 FDA 483 warning letter to Defendant demanding corrective actions be taken, it is clear that the defective and deficient nature of the subject product was caused as a result of Defendant's poor manufacturing processes. It is my opinion that testing of Defendant's SAM-e product over a multi-year period was more than sufficient to determine to a reasonable degree of professional certainty that Defendant failed to upgrade its manufacturing processes to comply with the regulations necessary to ensure its SAM-e supplements would be of sufficient quality and quantity to meet their respective label claims.

61. A review of the Certificates of Analysis from Defendant's suppliers of SAM-e raw materials (e.g. Jiaherb) in conjunction with the laboratory analyses of the subject product reveals core problems with Defendant's SAM-e manufacturing operations which resulted in the product's SAM-e deficiency. Even assuming the accuracy of the Certificates of Analysis provided by Defendant's raw material suppliers – an unwarranted assumption given the FDA's finding that Defendant failed to qualify their suppliers and their component materials as required by federal regulations and GMP –, the supplier Certificates of Analysis themselves reveal that the S-Adenosyl

22

methionine disulfate tosylate compound utilized by Defendant in its SAM-e supplement production consisted of only about 50% SAM-e IONs (i.e. 50% SAM-e strength). While the compound may have been specified (and alleged tested by the supplier) to contain between 95-103% of the ordered amount of S-Adenosyl methionine disulfate tosylate, the amount of actual SAM-e (i.e. SAM-e IONs) it was specified (and allegedly tested by the supplier) to contain was only 49.5-54.7%. Exhibit 33 (*see e.g.* VB-PROD-005289).

62. Defendant would have thus needed to include at least approximately twice the specified levels of S-Adenosyl methionine disulfate tosylate to attain their claimed levels of SAM-e strength (i.e. the amount of SAM-e or active ingredient) as shown on the labels and communicated to consumers. That laboratory testing of the subject product consistently showed product samples to be 50% or more deficient in their labeled amount of SAMe indicates that Defendant included an insufficient amount of SAM-e in their supplements without consideration (or understanding) of the SAM-e strength of the S-Adenosyl methionine disulfate tosylate they used. The deficiencies and defective manufacturing process were uniform to all subject product and inherent in the SAM-e supplements from the beginning of Defendant's manufacturing operations, long before any consumer purchased the product through typical commercial venues. Exhibit 33.

63. Tests from 2018, 2019 and 2020, including tests on samples from SAM-e manufactured by Defendant both before and after the 2018 FDA inspection, clearly demonstrate that the SAM-e supplements manufactured by Defendant uniformly fail to meet label claims, and at times are even up to close to 90% deficient in actual SAM-e strength. The added fact that analytical test results were similar from three separate laboratories from two different North American countries (i.e., Canada and the United States) demonstrates the consistency in findings (i.e. that the subject product SAM-e supplements were severely underdosed and deficient) and deficiency in all subject product SAM-e supplements. Defendant thus manufactured and sold defective, deficient, and non-compliant SAM-e supplements which were marketed and sold to consumers by defendant entities under various private labels. Supplements that are mislabeled are misleading to the consumer and health professional. Defendant Manufacturer (and the other defendant entities who sold the subject product SAM-e at retail) marketed and sold SAM-e products that did not meet legal requirements for proper production processes, did not meet label claims for the amount of SAM-e, and contained no material benefit for the consumer failing to provide even the minimal level of SAM-e to see

23

improvements in mood states or joint health (two major areas that SAM-e supplements are typically used and marketed for). Because of the defective manner in which Defendant's SAM-e supplements were manufactured and labeled, it is clear that no reasonable consumer acting reasonably under the circumstances would pay any amount of money to purchase these products if they knew of their non-compliant, defective and/or deficient nature. For these reasons, in my opinion, the subject product SAM-e supplements, which lacked any real utility to the consumer, should be considered a product without any material consumer value.

64. In my opinion, when factoring in the analysis of Defendant's SAMe supplements as contracted by Gmax, it is evident to see their failure to consistently meet and substantiate their label claims. In short, while the testing by ABC found three samples that met or exceeded label claim for SAM-e, it also found three samples that were grossly deficient in actual SAM-e. For example, three products labeled to contain 1500 mg SAM-e were tested, and on average, the ABC analysis revealed $\sim$ 296.11 mg actual SAM-e (296/1500 mg = 19.73% of actual label value, or $\sim$80% deficient of label claim). This, the ABC analysis also found products that were on average 81.3% deficient versus label claim. Exhibits 23-28.

65. In my opinion, the contract analysis coordinated through Nutrasource, with three contract laboratories being utilized for SAM-e analysis of the Defendants products (Merieux Nutrisciences (Markham, Ontario, Canada), Eurofins (Brea, CA, USA) and Labs-Mart (Edmonton – Alberta, Canada), demonstrated consistent defectiveness and deficiency of the subject product. Specifically, three 400 mg SAM-e products were tested, and the testing revealed an average actual content of 81.2 mg (81.2/400). These products were on average approximately 80% deficient versus label claim. There were six 500 mg SAM-e products tested. Testing revealed an average actual SAM-e content of only 38.75 mg (38.75/500). The 500 mg SAM-e labeled products were thus on average over 90% deficient of their label claims. If this set of 400 and 500 mg labeled SAM-e products are averaged, the average deficiency to labeled SAM-e dose is between 80 and 90%. Exhibits 31-32.

66. In my opinion the analysis coordinated by Dr. Catherine Adams Hutt, with the contract analytical laboratory Eurofins Food Integrity & Innovations Unit (Brea, CA) in November of 2019 similarly demonstrates consistent and uniform deficiency and defectiveness in the manufacturing of SAM-e products manufactured by Defendant. Eurofins found the following consistent deficiencies in the SAM-e products as manufactured by the defendants: testing of four bottles of

PLTS EXPERT DISCLOSURES 0186 (CONFIDENTIAL)

500 mg SAM-e/serving, revealed average actual dose per serving of 86.9 mg of SAM-e (approximately ~83 deficient from the label claim). A single 400 mg bottle of SAM-e product was tested and yielded only 15.9 mg of actual SAM-e (approximately ~97% deficient from the label claim). Eurofins also tested three SAM-e supplements labeled to contain 250 mg per serving. Analyses revealed an average SAM-e content of only 124 mg (124/250, approximately 50.4% deficient from the label claim). Finally, Eurofins also tested SAM-e supplements labeled to contain 200 mg per serving. Eurofins analysis revealed an actual SAM-e content of 98 mg of SAM-E per serving (98/200, which is approximately 51% deficient from the label claim). On average, across all doses tested by Eurofins (200, 250, 400 and 500 mg labeled SAM-e), the mean deficiency indicated by that set of testing was 70.35%. Exhibit 31.

67. It is my opinion that when examining the analysis of the Defendant's SAM-e supplements across all samples tested deficiency is evident. On average, across the analysis by Eurofins, Merieux, and Lab's Mart, done at separate times, over a multiyear period there was an average deficiency of 92.6% deficient for the 1500 mg labeled SAM-e product, ~89% deficient for the 400 mg SAM-e labeled products and 96% deficient for the 500 mg labeled SAM-e products. Across this set of analysis, the defendant's products were on average 92.5% deficient of label claim for SAM-e content.   This reveals that Defendant Manufacturer that was not producing product to label claims, adhering to FDA and other federal regulations and GMP. Defendant's SAM-e supplements were thus both defective and deficient, as well as effectively worthless to the typical consumer. Exhibit 32.

68. It is my opinion that given the consistent failure of Defendant's SAM-e supplements to contain the quantity of SAM-e product stated on the label as testing by the above-referenced laboratories clearly demonstrates, and given the wide variance between the amount of SAM-e stated on the label and the amount actually contained in the product, I can state with a reasonable degree of professional certainty that the SAM-e products manufactured by Defendant and sold by Defendant entities have and continue to be  uniformly defective, deficient, and thus misleading and of no value for a reasonable consumer. Part of this analysis includes a review of the scientific literature regarding SAM-e and efficacy for a variety of intended effects. The research demonstrates consistently that daily intake of SAM-e needs to be at minimum 400 mg for the user to experience benefit. The testing demonstrated that the SAM-e products at issue were uniformly deficient, even being in certain cases up to 99% deficient.

25

69. It is my opinion that the Defendant Healthy Way changed their product labeling across brands, from on Front of Packaging stating "SAM-e" to SAM-E; S-adenosyl-methionine disulfate tosylate" and that this name change was done in order to hide that the product did not actually contain the amount of SAM-e claimed. The front of the packaging claims the name S-adenosyl-L-methionine, whereas the Supplement Facts panel (back of bottle), claims that the product contains SAM-e (not S-adenolsyl-methionine disulfate tosylate as claimed on the front of the packaging). The product may contain S-adenolsyl-methionine disulfate tosylate, however it is apparent that the Defendant did not calculate for that the SAM-e portion of S-adenosyl-methionine disulfate tosylate is only about 50% of the total ingredient, thus the redesigned labels are an attempt to hide the true amount (or lack thereof) of SAM-e in the product. This improper labeling of the product still did not result in the Defendant meeting label claims or apparently following Good Manufacturing Practices and standards for the manufacturing industry. Exhibits 36-38.

70. It further is my opinion that, considering the FDA and FTC rules which were broken, ignored and not followed by the Defendant in the course of its supplement manufacturing, that the facts demonstrate that Defendant's supplements were uniformly defective and not in compliance with the even the minimal standards for good quality manufacturing. It is my opinion that by virtue of the FDA 483 which Defendant received, the consistent deficient testing of actual SAM-e content as compared to its label claim, and the flouting of following federal guidelines and standard processes for manufacturing in the dietary supplement industry, that the products manufactured by Defendant have no utility for the health professional and most certainly the reasonable consumer.

**VIII. Conclusions**

71. It is my opinion to a reasonable degree of professional certainty that all SAM-e supplements manufactured by Defendant were deficient in their amount of SAM-e and, at the very most, contained no more than approximately 130 mg of SAM-e per capsule on the high end.

72. It is my opinion to a reasonable degree of professional certainty that all SAM-e supplements manufactured by Defendant were defective and noncompliant with the relevant SAM-e regulations and industry standards.

73. It is my opinion to a reasonable degree of professional certainty that all SAM-e supplements manufactured by Defendant were of no consumer value and effectively worthless to a reasonable consumer.

PLTS EXPERT DISCLOSURES 0188 (CONFIDENTIAL)

74. It is my opinion to a reasonable degree of professional certainty that all SAM-e supplements manufactured by Defendant contained materially deceptive labels with false label claims as to the amount of SAM-e included therein.

75. It is my opinion to a reasonable degree of professional certainty that reasonable consumers of SAM-e supplements expect the SAM-e supplements will contain the claimed amount and strength of SAM-e as presented on the product label, and purchase the supplements in order to receive that level of SAM-e supplementation.

76. It is my opinion to a reasonable degree of professional certainty that no reasonable consumer would pay any amount of money for any SAM-e supplements manufactured by Defendant if they were aware of their deficient, defective, and non-compliant nature.

77. It is my opinion to a reasonable degree of professional certainty that any entity who labeled or sold any SAM-e supplements manufactured by Defendant to consumers engaged in materially unfair and deceptive business practices.

78. It is my opinion to a reasonable degree of professional certainty that any entity who labeled or sold any SAM-e supplements manufactured by Defendant to consumers were intentional or, at minimum, negligent in making false and deceptive claims to the consumer public.

I declare the foregoing as true and correct. I declare under penalty of perjury that my expert report is true and correct and that I would testify competently thereto on the matters discussed herein.

*Douglas Kalman*
_____                    October 29, 2021
                                                                            _____
Douglas S. Kalman PhD, RD, CCRC, FISSN, FACN                DATE

**PLTS EXPERT DISCLOSURES 0189 (CONFIDENTIAL)**

**APPENDIX A**

Curriculum Vitae of Douglas S. Kalman. *See* PLTS EXPERT DISCLOSURES 0133-0162.


**APPENDIX B – Report Exhibits and Notes.**

1. Dietary Supplement Health and Education Act of 1994. Public Law 103-417. 103rd Congress. Link: https://ods.od.nih.gov/About/DSHEA_Wording.aspx

2. FDA: Regulation of Dietary Supplements. Link: https://www.fda.gov/food/dietary-supplements

3. Part 111 - Current good manufacturing practice in manufacturing, packaging, labeling, or holding operations for dietary supplements. Link: https://www.ecfr.gov/current/title-21/chapter-I/subchapter-B/part-111

4. FDA. Small Entity Compliance Guide: Current Good Manufacturing Practice in Manufacturing, Packaging, Labeling, or Holding Operations for Dietary Supplements. Link: https://www.fda.gov/regulatory-information/search-fda-guidance-documents/small-entity-compliance-guide-current-good-manufacturing-practice-manufacturing-packaging-labeling

5. U.S. Department of Health & Human Services. Food and Drug Administration. 483 Form [CT Health Solutions FDA 483 1-19-30-2018 document]. *See* PLAINTIFFS_078-_082.

6. U.S. Department of Health & Human Services. Food and Drug Administration. Establishment Inspection Report, 03/09/18. [CT Health Solutions EIR 1-19-30-2018]. *See* PLAINTIFFS_064-_077.

7. Federal Trade Commission, Truth in Advertising. Link: https://www.ftc.gov/news-events/media-resources/truth-advertising

8. Federal Trade Commission. Fair Packaging and Labeling Act. 16. CFR Part 500. Link: https://www.ftc.gov/enforcement/rules/rulemaking-regulatory-reform-proceedings/fair-packaging-labeling-act-regulations-0

9. Eurofins Report Number: 2732971-0. Report Date December 24, 2019. Sample: BoostCeutical 2, Eurofins Sample # 9007930. *See* PLTS EXPERT DISCLOSURES 0021.

10. Eurofins Report Number: 2727454-0. Report Date December 19, 2019. Sample: Vitamins Because 2, Eurofins Sample # 9007840. *See* PLTS EXPERT DISCLOSURES 0018.

**PLTS EXPERT DISCLOSURES 0190 (CONFIDENTIAL)**

11. Eurofins Report Number: 2727446-0. Report Date December 19, 2019. Sample: ASquared 1, Eurofins Sample # 9007918. *See* PLTS EXPERT DISCLOSURES 0013.

12. Eurofins Report Number: 2727455-0-0. Report Date December 19, 2019. Sample: Nusa Pure 2, Eurofins Sample # 9032324. *See* PLTS EXPERT DISCLOSURES 0017.

13. Eurofins Report Number: 2854058-0. Report Date April 23, 2020. Sample: Naturetition 1, Eurofins Sample # 9408959. *See* PLTS EXPERT DISCLOSURES 0032-33.

14. Labs Mart Inc. Labs Mart Report # 92408-3. Lot #15802020 (92408-3). Report dated September 30, 2020. *See* PLTS EXPERT DISCLOSURES 0094.

15. Labs Mart Inc. Labs Mart Report # 92408-2. Lot #15772020 (92408-2). Report dated September 30, 2020. *See* PLTS EXPERT DISCLOSURES 0097.

16. Eurofins Analytical Report AR-20-QA-078667-01. Report Date September 29, 2020. Sample: Description: SAM-E 400mg-20122. Eurofins Sample # 468-2020-09220250. *See* PLTS EXPERT DISCLOSURES 0063.

17. Eurofins Analytical Report AR-20-QA-078668-01. Report Date September 29, 2020. Sample: Description: SAM-E 500mg-20293. Eurofins Sample # 468-2020-09220251. *See* PLTS EXPERT DISCLOSURES 0065.

18. Labs Mart Inc. Labs Mart Report # 92408-1. Lot #15742020 (92408-1). Report dated September 30, 2020. *See* PLTS EXPERT DISCLOSURES 0096.

19. Merieux NutriSciences. Silliker, Canada. SAM-e analysis from three different SAM-e products manufactured by Defendant. Note: analytical report uses "per gram" basis for the data, however, the serving size is not used in factoring the amount of SAM-e per serving (the report is per gram). As 1000 mg is 1 gram, if the product is labeled as 400 mg, the calculated amount of SAM-e per serving would be 40% of the 1 gram. In the tests herein, the Healthy Way 1500 mg per serving product actually contained 72.6 mg per serving, the 500 mg SAM-e product was found to contain 26.3 mg, and the 400 mg SAM-e product contained 14.3 mg. Product Lot # 20299, 20122, and 20299. Certificates of Analysis Number MRK-44180241-0. *See* PLTS EXPERT DISCLOSURES 0109.

20. U.S. Department of Health & Human Services. Agency for Healthcare Research and Quality. S-Adensyl-L-Methionine (SAM-e). S- Adenosyl-L-Methionine (SAM-e) for Depression, Osteoarthritis and Liver Disease. August 2002. Summary Link:

PLTS EXPERT DISCLOSURES 0191 (CONFIDENTIAL)

https://archive.ahrq.gov/clinic/tp/SAM-etp.htm#Report    Indexed    Book    Link: https://www.ncbi.nlm.nih.gov/books/NBK36942/

21. Kalman DS, Feldman S, Vazquez RR, Krieger DR. A Prospective Randomized Double-Blind Study Evaluating UP165 and S-Adenosyl-l-Methionine on Depression, Anxiety and Psychological    Well-Being.    Foods.    2015;    4(2):130-139. https://doi.org/10.3390/foods4020130    Link:    https://www.mdpi.com/2304-8158/4/2/130/htm

22. FDA: Guidance for industry: Guide for developing and using data bases for nutrition labeling. Docket Number: FDA-2020-D-1961. Link: https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-guide-developing-and-using-data-bases-nutrition-labeling

23. Advanced Botanical Consulting & Testing Inc. Report Date August 30, 2019. Product: GMAX Central. Lot# 06121832. *See* GMAX0500; GMAX0932.

24. Advanced Botanical Consulting & Testing Inc. Report Date August 30, 2019. Product: GMAX Central. Lot# 22041901. *See* GMAX0501; GMAX0933.

25. Advanced Botanical Consulting & Testing Inc. "GMAX Central" Report Date: August 30, 2019. Sample GMAX Central, 1500 mg Lot # 02011902. *See* GMAX 502; GMAX 0934.

26. Advanced Botanical Consulting & Testing Inc. NusaPure Lot# 17071906. Report Date: November 21, 2019. *See* GMAX0927.

27. Advanced Botanical Consulting & Testing Inc. NusaPure Lot# 06121929. Dated March 1, 2020. Dose is per 4 capsules. *See* GMAX 0497: GMAX 0499.

28. Advanced Botanical Consulting & Testing Inc. NusaPure Lot# 06121928. Dated March 16, 2020. Dose is per 4 capsules. *See* GMAX 0496: GMAX 0498.

29. FDA Warning Letter: Advanced Botanical Consulting & Testing Inc dba ABC Testing. MARCS-CMS 572991 – June 4, 2019. Link: https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/advanced-botanical-consulting-testing-inc-dba-abc-testing-572991-06042019.  *See* Plaintiffs 525-531.

30. Medisca - Safety Data Sheet – SAM-e. Section 10 "Stability and Reactivity". Link: https://www.medisca.com/NDC_SPECS/MUS/2904/MSDS/2904.pdf

31. Catherine Adams Hutt PhD, RD, CFS. RdR Solutions Consulting. March 18, 2020 report: "Summary of Test Results". See PLTS EXPERT DISCLOSURES 0004-0012.

PLTS EXPERT DISCLOSURES 0192 (CONFIDENTIAL)

32. Nutrasource Report: SAM-e Laboratory Ring Testing. December 16, 2020 report ("KGG – SAM-e Laboratory Ring Testing Summary Report".) *See* PLTS EXPERT DISCLOSURES 0041-0044.

33. VB PROD 5273-5361.

34. Declaration of Catherine Adams Hutt, Ph.D, R.D., C.F.S., October 27, 2021. *See* PLTS EXPERT DISCLOSURES 0001-0003.

35. Declaration of Kevin Yan, October 28, 2021. *See* PLTS EXPERT DISCLOSURES 0129-00132.

36. Nasa Be'Ahava SAM-e 500mg 20299 front [picture of front label of bottle].

37. Healthy Way SAM-e 20299 - SAM-e S-adenosyl-l-methionine disulfate tosylate [picture of front label from bottle].

38. Healthy Way SAM-e 20299 Supplement Facts Panel

**PLTS EXPERT DISCLOSURES 0193 (CONFIDENTIAL)**