# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CORI ANN GINSBERG, NOAH MALGERI, KAYLYN WOLF, BILL WILSON, SHANNON HOOD, ERIC FISHON, and ROBERT McKEOWN, on behalf of themselves and all others similarly situated,

Plaintiffs,

No. 1:19-cv-22702-KMW

vs.

VITAMINS BECAUSE, LLC, CT HEALTH SOLUTIONS LLC, GMAX CENTRAL, INSPIRE NOW PTY, LTD d/b/a BoostCeuticals, ASQUARED BRANDS, LLC, HEALTHY WAY RX LLC, KHAKIWARE INC., and JOLLY DOLLAR SUPPLY COMPANY, LLC,

Defendants.

________________________________________/

DEPOSITION OF: KALYN WOLF
(Conducted via videoconference)

DATE: November 17, 2021
TIME: 12:00 p.m. to 2:35 p.m.

PURSUANT TO: Notice by counsel for Defendants for purposes of discovery, use at trial or such other purposes as are permitted under the Florida Rules of Civil Procedure

BEFORE: KATHLEEN K. OHMAN, RMR
Notary Public, State of Florida
Pages 1 - 103

APPEARANCES:

JAY I BRODY, ESQUIRE
Kantrowitz, Goldhamer & Graifman, P C
747 Chestnut Ridge Road
New York, New York 10977
Attorney for Plaintiffs

SCOTT W ANDERSON, ESQUIRE
Johnson Daboll Anderson, PLLC
2011 West Cleveland Street, Suite F
Tampa, Florida 33606
Attorney for Vitamins Because and CT Health Solutions

SEAN M O'BRIEN, ESQUIRE
Lippes Mathias, LLP
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202
Attorney for Asquared Brands, LLC

RICHARD J OPARIL, ESQUIRE
Arnall Golden Gregory, LLP
1775 Pennsylvania Avenue, NW
Suite 1000
Washington, D C 20006
Attorney for Gmax Central

I N D E X

DIRECT EXAMINATION BY MR ANDERSON Page 5
CROSS EXAMINATION BY MR O'BRIEN Page 43
CROSS EXAMINATION BY MR OPARIL Page 97
CERTIFICATE OF OATH Page 100
REPORTER'S CERTIFICATE Page 101
ERRATA SHEET Page 102
READ AND SIGN LETTER Page 103

E X H I B I T S

| | Description | Marked |
|---|---|---|
| Exhibit 1 | Third Amended Complaint | Page 58 |
| Exhibit 2 | Amazon Order | Page 85 |
| Exhibit 3 | Request for Production | Page 91 |
| Exhibit 4 | Legal Document | Page 94 |

(Exhibits retained by Mr. Anderson.)

THE REPORTER: The attorneys participating in this deposition acknowledge that I, the court reporter, am not present with the witness and that I will be reporting the proceedings and administering the oath remotely.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting. Please indicate your agreement by stating your name and your agreement on the record.

MR. ANDERSON: Scott Anderson on behalf of Vitamins Because and CT Health. No objection.

MR. OPARIL: Richard Oparil of Arnall Golden Gregory representing Gmax. No objection.

MR. O'BRIEN: Sean O'Brien from Lippes Mathias on behalf of Asquared Brands LLC. No objection.

MR. BRODY: Jay Brody from the law firm of Kantrowitz, Goldhamer & Graifman for the plaintiffs. No objection.

KALYN WOLF,

the witness herein, being first duly sworn on oath, was examined and deposed remotely as follows:

DIRECT EXAMINATION

BY MR. ANDERSON:

Q. Can you please state your full name for the record?
A. Kalyn Wolf.
Q. Where do you currently live, Ms. Wolf?
A. Tucson, Arizona.
Q. What's your address?
A. [redacted], [redacted]
Q. How long have you lived there?
A. Almost 15 years.
Q. Are you employed?
A. I'm self-employed.
Q. What do you do for a living?
A. I own a flotation tank center.
Q. Neat. And how long have you owned a flotation tank center?
A. I'm in my sixth year.
Q. And what does that mean? What do you do? What is a flotation tank?
A. They are also known as sensory deprivation

tanks. They are large tanks that are filled with about ten inches of water, 800 pounds of Epsom salt. They are dark. They are quiet. They reset your brain. They help with recovery -- physical recovery, anxiety, stress, expand your mind.

And so I greet people. I manage the entire center. I get clients. I do everything a business owner does, but I'm an owner-operator.

Q. Great. Do you sell any products at the center?

A. I do. I do.

Q. What do you sell?

A. I sell products that I make myself, so I some nasal inhalers for aromatherapy. I have a pain cream, shower steamers. Things like that.

Q. Okay. What's the nasal inhaler? Can you describe that to me?

A. Sure. I can show you one. Do you want me to get one?

Q. Sure.

A. I don't know if I can describe it.

Okay. Hold on. I'll be right back.

Q. Great.

A. Maybe I can turn my background off.

Q. I can see it.

A. There's one. There's one. So I have six of them.

And so what you do is you just take the top off, you stick it up your nose, you inhale.

And they are for different things. So this one is called Respire. It helps you breathe. It has eucalyptus, peppermint, frankincense and sweet orange in it.

And this one is called Recall, and it helps you recall. It has rosemary and sweet orange in it.

Q. And you said you had six different ones?

A. I do.

Q. Do you sell them anywhere other than your store there?

A. Not yet.

Q. Do you plan to?

A. I'd like to.

Q. And where do you make them?

A. Here.

Q. Do you make them all yourself?

A. I do.

Q. Do you have any other team members or employees that assist you?

A. Nope.

Q. How do you go about making them?

A. Well, it comes in parts. So, you know, there's three parts -- four parts to this. There's this part, this part, this part, this part, and then there's a cap at the bottom, and it's a hollow tube and it has a wick in it.

So I make up the essential oil combinations, and I use Pure Essential Oils. I drop the essential oils onto the wick. I take the cap and put it on, and then do this, and then I label it.

Q. Now, is there a certain ratio that the oils are supposed to be in to be effective, or how does that work?

A. I use a recipe that I made. I've been doing essential oils and aromatherapy for many, many years.

And there's no specific -- I can't tell you what the ratio is. I wouldn't know that, but I can tell you, like, there's three drops of this and two drops of that.

Q. Sure. As part of the product -- can you hold it up again?

A. Yeah.

BY MR. ANDERSON:

Q. Did you guys -- you might have frozen. Are you guys there?

MR. BRODY: We are still here.

BY MR. ANDERSON:

Q. Okay. What does that say on the front there?

A. It says Cloud Nine 100 percent essential oils nasal inhaler.

Recall helps you remember, and it says rosemary and sweet orange. And rosemary has -- I can't even read it. It's little. Rosemary has been scientifically proven to help with memory.

Well, it would be nice if I could see this. Hold on. I wrote it.

Oh. With memory and boosts the immune system and improve circulation.

Q. Have you ever sent your product out for any sort of -- your nasal inhalers out for any sort of third-party testing to ensure that they are, indeed, 100 percent comprised of the essential oils?

A. I have not. I purchase my essential oils from Liberty Natural, which is in Portland, Oregon, and they do all of that. I trust them. They have the assays on everything.

Q. So you just assume -- or that was an

Page 10

unfair word. I didn't mean that to be.

You trust that Liberty Natural is providing you with pure ingredients so that you can make your product?

A. Yes.

Q. When they provide you with the ingredients, do they provide any sort of label or assurance or certificate of testing or certificate of authenticity?

A. Yes, it's all online.

Q. And when you receive that, have you ever done anything to confirm that the certificate of authenticity, or whatever documents it is that they give you, are, indeed, accurate?

A. I have not. I have had no reason to. There has never been any controversy about this company. They've been in business a long time, and I've been doing business with them a long time.

I have done that with other products, but not this one.

Q. What other products have you done that for?

A. There was one product that I was purchasing from somebody locally that had CBD in it, and he said it had a certain amount in it. I think

Page 11

he said it had 4500 milligrams of CBD in it, and I kept asking to see his labs, and he showed me the labs for the CBD oil but not for the product.

And I finally just got fed up with waiting for him to show, because I had been selling it, based on there was no reason not to trust him, but all of a sudden there was something that I didn't trust about him, so I had the lab test the product and found out there was far less.

Q. Where did you send it? Where did you send it for testing?

A. Tucson Analytics.

Q. Approximately --

A. Arizona Analytics. Sorry.

Q. I didn't mean to interrupt you. Arizona Analytics?

A. Yes.

Q. Approximately how long ago did you send the CBD to Arizona Analytics for testing?

A. Two years ago. Maybe three. 2020 was kind of a blur.

Q. It's been a rough one, hasn't it?

Have you sent any other products out for any verification or testing?

A. No.

Page 12

Q. Never in your life?

A. Never.

Q. You also said that you made a pain cream. Did I hear that right?

A. Yep.

Q. Describe that for me.

A. Well, that was my response to the lab work that came back on the other one.

Q. So it was a CBD -- is it CBD based?

A. Yeah.

Not based. Just one of the ingredients. There's a lot more.

Q. Other than the amount of CBD, did you have it tested for anything else?

A. No. No.

He basically told me that what he does -- oh, my God. Anyway, he basically told me that what he does is he gets his cream base from Walmart and he adds CBD, so there was no reason for me to get anything else tested. I wasn't going to sell it. So, yeah.

Q. So you stopped selling it?

A. I did.

Q. During the time that you sold the pain cream, did you ever have any complaints from

Page 13

consumers alleging that it didn't work properly?

A. No.

Q. And how about with your nasal inhalers?

A. No.

Q. Approximately how many nasal inhalers do you think you've sold?

A. Oh, I just started selling them, so not very many. I mean, under -- under 200.

Q. So you've been open for business approximately six years. How long do you think you've been selling these products?

A. Well, the one I've been selling the longest is the pain cream, and so it's been about two-and-a-half years.

Q. Okay. When did you decide --

A. About two years. About two years.

What?

Q. When did you decide to stop selling it?

A. I'm still selling mine. I'm not selling his.

Q. Gotcha. Okay. So now do you make your own pain cream in addition to the pain cream we just talked about, the Walmart-infused-CBD-type thing?

A. Yes.

Q. How do you make yours?

Page 14

A. From scratch.
Q. And what goes in it?
A. Magnesium, CBD, shea butter, Hypericum, emu oil, eight different essential oils, honey, jojoba oil, emu oil. I said emu oil.
I have -- it's -- I can't remember the name of it. I could go get the label. There's about 18 ingredients in it all together.
Q. Does the label make any representations or warranties about the effectiveness of the product?
A. No.
Q. Does the label describe what's in the product?
A. Yes.
Q. Does it describe how much of each ingredient is in the product?
A. No -- yeah. Well, some of the ingredients. Not all of them.
Q. What ingredients does it describe the amount of?
A. The magnesium and the CBD.
Q. Have you ever sent the finished product out for third-party testing to ensure that it, indeed, has that amount of CBD and/or magnesium in it?

Page 15

A. Yes.
Q. And where did you send that?
A. Arizona Analytics.
Q. All right. And where do you source the raw materials that you use in your magnesium and CBD?
A. The magnesium is, essentially, Epsom salts. I use Dr. Teal.
Q. Okay.
A. And the CBD I get from -- oh, God. You are asking me the name of the manufacturer. I don't know the name of the manufacturer. I know the name of the company is CB -- I don't know if I remember the name of it.
I could look. I can get it.
Q. That would be great, if you could.
A. Yeah. Hold on. The CBDistillery.
Q. Okay.
A. Yeah. CBDistillery, Englewood, Colorado. Here it is.
Q. Neat. When you walk through it, it looks like you are walking right through your screen.
When they provide you with the raw CBD -- is it CBD oil?
A. No, it's isolate powder.

Page 16

Q. And I don't mean to interrupt you, and because we are doing a Zoom deposition we are going to do that a lot, but I'd appreciate it if you could finish letting me ask my question and I'll do my very best to let you finish answering before I ask the next one. It has been mostly my fault. Sorry about that.
A. I tend to be a vocal collider as well.
Q. Now, the CBD powder that you order from the distillery in Englewood, Colorado, do they provide any sort of certificate of analysis or testing materials when you receive it?
A. They do.
Q. And do you rely upon that --
A. I do.
Q. -- testing materials as accurate?
A. Well, no.
Actually, you know what? You are jogging my memory. And forgive me. I interrupted you.
I did get this tested from Arizona Analytics because, you know, I had a bad experience, and it is exactly what they say it is.
Q. Okay. What was your experience?
A. Well, with the other guy.
Q. Gotcha.

Page 17

A. Yeah. He kind of destroyed my trust.
Q. Okay. How did you hear about Arizona Analytics?
A. I looked them up on Google. They are the only lab in Tucson that tests this.
Q. Okay. Now, aside from the pain cream that you make and sell and the nasal inhalers that you make and sell, do you sell any other products at your store?
A. I sell shower steamers.
Q. Okay.
A. For the shower. And I make -- I call them bobbles. They're, like, natural stone and crystal for, like, window hangings that catch the light.
Q. Okay.
A. And lip balm that I don't make. By Eos.
Q. Who makes the lip balm?
A. Eos. E-o-s. I think it stands for everyone's one's safety, or something like that. I'm not sure about that.
Q. Have you ever had the lip balm tested?
A. No.
Q. How about the bath balms or shower steamers?
A. No.

Q. Prior to starting the tank company, what did you do for work?
A. U worked for Dun & Bradstreet.
Q. What did you do for Dun & Bradstreet?
A. Commercial sales.
Q. So you did a total 180, huh?
A. I did. I did.
Q. What made you decide to do that?
A. Well, I had a flotation tank center back in the eighties, and I loved it. And before I worked for Dun & Bradstreet I worked for DEX, which is the phone book. I worked for the Yellow Pages. I was in corporate sales.
So I stopped working for -- stopped working for DEX because two things happened in 2008. One, there was a recession and, two, Google. So if you've ever seen a phone book lately, it looks like a pamphlet.
I saw the writing on the wall and knew that was not going to be a winning solution for me, so I was recruited by Dun & Bradstreet. And I stopped working for them. I was let go.
Q. Okay.
A. Yeah.
Q. That was approximately six years ago?

A. Seven.
Q. Seven.
A. Yeah, I took a year off.
Q. Good for you.
A. No kidding. It was a good thing. I mean, it was a weird -- it was weird. The whole thing, I think, was really -- I was supposed to open a float center, and I wasn't listening, and it got my attention.
Q. I'm happy you were able to do that.
A. Me too.
Q. How has business been for you during COVID?
A. Horrific.
Q. Yeah.
A. Horrific. I'm trying to rebuild now to take me into my retirement, but -- you know, so I can retire well.
Q. All right. So, now, we kind of got off on a little bit of a tangent. We are here today because you are part of a lawsuit filed against a manufacturer and some retailers of a nutritional supplement called SAM-e, right?
A. Um-hum. Yes.
Q. What's your understanding of your

involvement in that lawsuit?
MR. BRODY: Object to form.
THE WITNESS: I was contacted because I was -- I purchased SAM-e.
BY MR. ANDERSON:
Q. Who contacted you?
A. Jay Brody.
Q. And how did he know you had purchased SAM-e?
MR. BRODY: I would just caution -- object, and just caution the witness not to reveal any attorney/client communications at any point.
Go ahead.
THE WITNESS: I honestly don't know.
BY MR. ANDERSON:
Q. Am I correct, then, that you never sought counsel --
A. No.
Q. -- related to your purchase of SAM-e?
MR. BRODY: Object to form.
You can answer, if you know.
THE WITNESS: I can't remember the -- oh, no, I have never sought counsel.
BY MR. ANDERSON:

Q. And when you were -- strike that. Do you recall when you purchased SAM-e?
A. I could look it up.
THE WITNESS: Jay, did you say something?
MR. BRODY: No.
BY MR. ANDERSON:
Q. Have you purchased SAM-e --
MR. BRODY: Counsel, can you repeat the question? I didn't hear it.
MR. ANDERSON: Hey, Jay, we are having a hard time hearing your objections. Or at least I am. If you could speak up, I'd appreciate it.
MR. BRODY: I will do my best to speak up.
MR. ANDERSON: Can you guys hear me?
THE WITNESS: Everything seems to be on a delay.
MR. ANDERSON: I'm just asking now if you can hear me.
MR. O'BRIEN: You guys are all just a bit lagged, but it seems like we've caught back up now, so, Scott, you should be good to ask the question.
BY MR. ANDERSON:
Q. Do you recall when you purchased the SAM-e

Page 22

that is the subject of this lawsuit?
A. Several years ago. I could look it up, if you want me to.
Q. I don't need you to do that right now, but how would you look it up?
A. I would go to Amazon, which is where I purchased it from.
Q. After you purchased the SAM-e that's the subject of this lawsuit, did you use it?
A. Yes.
MR. BRODY: Object to form.
BY MR. ANDERSON:
Q. Did you use all of it?
A. No.
Q. What did you do with the product that you did not use?
A. I threw it away.
Q. How long after you purchased the SAM-e that is the subject of the lawsuit did you throw it away?
MR. BRODY: Object to form.
THE WITNESS: I don't know what that means. Sorry.
When Jay says --
MR. ANDERSON: You want to tell her what

Page 23

that means, or do you want me to?
MR. BRODY: Counsel, I don't understand. What's the question that's pending?
MR. ANDERSON: I think she's asking you what "objection to form" means.
MR. BRODY: Oh, that's just attorneys making legal objections. You don't have to worry about the objections.
If I advise you not to answer the question, I'll tell you directly "do not answer the question," otherwise just wait until I'm finished and then answer to the extent that you know the answer.
THE WITNESS: Okay.
MR. BRODY: Sorry. Go ahead. My apologies.
Can you just repeat the pending question?
MR. ANDERSON: Yes.
BY MR. ANDERSON:
Q. How long after you purchased the SAM-e that's the subject of this lawsuit did you throw it away.
A. A few months.
Q. Have you ever had the SAM-e that's the subject of this lawsuit tested for its potency of

Page 24

efficacy?
A. No.
I do have the date that I purchased it, if you want it.
Q. Sure. What date is it?
A. I ordered it on October 2, 2017.
Q. What information are you looking at? Your Amazon account?
A. Yes.
Q. Okay. Aside from that purchase of SAM-e, have you ever purchased other SAM-e?
A. No.
Q. That's the only bottle of SAM-e you've ever purchased?
A. Yes.
Q. Do you have any intent on ever purchasing more SAM-e?
MR. BRODY: Object to form.
THE WITNESS: Not at the moment.
If it was recommended to me.
BY MR. ANDERSON:
Q. That's fair.
Now, I think I had asked you this, but I think I got cut off or you got cut off. Did you ever have the SAM-e that you purchased that's the

Page 25

subject of this lawsuit analyzed by any third party?
A. No.
Q. Did you ever perform any sort of testing yourself on the SAM-e that you purchased that's the subject of this lawsuit?
MR. BRODY: Object to form.
THE WITNESS: No.
BY MR. ANDERSON:
Q. Now, in this lawsuit you are making certain allegations that the SAM-e that you purchased did not contain the amount of the active ingredient that the bottle says it contained; is that right?
MR. BRODY: Object to form.
You can answer.
THE WITNESS: Okay, that's what -- I mean, I'm trusting my lawyer on that.
BY MR. ANDERSON:
Q. So you have no independent knowledge about whether or not the SAM-e that you purchased had the requisite amount of the active ingredient in it?
MR. BRODY: Object to form.
THE WITNESS: Only through him.
MR. BRODY: Same objection.
BY MR. ANDERSON:

Page 26

Q. And am I correct that you threw the SAM-e away that you purchased and did not give it to any other person?
A. Correct.
MR. BRODY: Object to form.
BY MR. ANDERSON:
Q. What is your understanding of your role in this lawsuit, ma'am?
MR. BRODY: Object to form.
THE WITNESS: That I'm a plaintiff and that I was -- I'm here to verify that I purchased the product. I can --
BY MR. ANDERSON:
Q. Have you ever heard the term "class representative"?
A. Have I ever heard it? Maybe.
I think it makes sense that -- I mean, I'm thinking I know what it means, but I may not, so I'm going to say maybe no.
Q. Do you know whether or not in this lawsuit you are a class representative?
MR. BRODY: Object to form. Calls for legal expertise.
You can answer, if you know.
THE WITNESS: I don't know.

Page 27

MR. ANDERSON: Can we go off the record for just one quick second?
(Discussion off the record._
MR. ANDERSON: Back on the record. I apologize.
BY MR. ANDERSON:
Q. Now, Ms. Wolf, how did you come to purchase -- strike that. I withdraw it.
Why did you decide to purchase SAM-e?
MR. BRODY: Objection. Vague.
You can go ahead.
THE WITNESS: My physician suggested it.
BY MR. ANDERSON:
Q. Why did your physician suggest it?
MR. BRODY: Object to form.
And I would just -- I'm also going to object on the physician-patient privilege, so I'll leave it up to the witness to decide if she wants to reveal any communications between her and her doctor.
THE WITNESS: So there was -- I was going through certain issues at the time and my doctor suggested that I supplement my diet with SAM-e.
BY MR. ANDERSON:

Page 28

Q. And what issues were you experiencing?
MR. BRODY: Same objection. Again advise the witness that this is privileged physician-patient content and she can reveal it if she decides to.
THE WITNESS: Yeah, I'm good. Not revealing it.
BY MR. ANDERSON:
Q. Okay. What is your understanding of what the claims are in this lawsuit?
MR. BRODY: Objection. Vague.
Can you rephrase the question?
MR. ANDERSON: No.
MR. BRODY: Okay. You can answer if you understand it.
THE WITNESS: My understanding is that the product was tested and that there was less active ingredient in it than was listed on the label.
BY MR. ANDERSON:
Q. When you were advised by your physician to supplement your regimen with SAM-e, how did you -- strike that.
When your physician recommended that you supplement your regimen with SAM-e, did he or she

Page 29

recommend a particular type of SAM-e or a particular manufacturer of SAM-e?
A. No.
MR. BRODY: Same objection.
BY MR. ANDERSON:
Q. Now, how did you determine what specific brand or product you were going to purchase on Amazon?
MR. BRODY: Objection. Object to form.
THE WITNESS: I went on Amazon and I looked at the different types, you know, that were being offered and the prices and the milligrams and compared products and chose that one.
BY MR. ANDERSON:
Q. What was it about the particular product you purchased that made you choose that one instead of other available options?
MR. BRODY: Object to form. Asked and answered.
THE WITNESS: I liked the milligrams and the price.
BY MR. ANDERSON:
Q. Other than the milligrams and the price, was there any other factor that drove your decision

Page 30

to purchase this particular SAM-e product?
A. No.
Q. When you purchased the SAM-e back in October of 2017, am I correct that you were already operating the tank business?
MR. BRODY: Object to form.
THE WITNESS: Yes.
BY MR. ANDERSON:
Q. How much of the product did you use?
A. I only used two doses.
Q. And why did you only use two doses?
A. Because I didn't like -- I didn't like it. When I unpackaged it, I noticed that it was a really hard capsule.
It came in a capsule, like a powder in a capsule, and it was hard as a rock.
Q. Okay.
A. So I took one and I just -- I'm sorry. I took one and, you know, like, I did the one dose twice a day and I didn't -- I didn't feel right taking it.
Q. Okay. When you say you "didn't feel right," can you explain what you mean?
MR. BRODY: Object to form.
THE WITNESS: Yeah. I didn't know that it

Page 31

was going to digest. I mean, it was, I'm telling you, hard as a piece of stone.
BY MR. ANDERSON:
Q. Okay. Other than the product being hard as a piece of stone, was there any other reason that you chose to cease using it?
A. No.
Q. And you'd agree that in order to appreciate the benefits of a product that you are taking you need to take it more than once or twice, right?
A. Yes.
MR. BRODY: Object to form. Calls for expert answer.
BY MR. ANDERSON:
Q. And so what I'm understanding is that you didn't have any reason to believe the product was effective or not effective. You just didn't like that it was hard as a rock and were worried about your digestion?
MR. BRODY: Same objection.
BY MR. ANDERSON:
Q. Is that correct?
A. That's correct.
Q. On the same day you purchased the SAM-e

Page 32

bottle, you also purchased a digital scale. Do you see that?
A. Yes.
Q. What was that for?
MR. BRODY: Object to form.
THE WITNESS: That was the beginnings of my product making so I needed a scale so that I could accurately measure my ingredients.
BY MR. ANDERSON:
Q. Okay. Am I correct, then, that the purchase of your scale had nothing to do with your purchase of the SAM-e; is that correct?
MR. BRODY: Object to form.
THE WITNESS: Correct.
MR. ANDERSON: Jay, what was wrong with the form?
MR. BRODY: Again, these are leading questions.
MR. ANDERSON: That's your objection? Any other?
MR. BRODY: Not on that one.
BY MR. ANDERSON:
Q. Have you had any conversations related to this lawsuit with a gentleman by the name of Dr. Kalman?

Page 33

MR. BRODY: Object to form.
THE WITNESS: No.
MR. BRODY: You can answer.
BY MR. ANDERSON:
Q. Do you know who a Dr. Kalman is?
A. No.
Q. Have you ever seen any testing related to any SAM-e product?
MR. BRODY: Object to form.
THE WITNESS: No.
BY MR. ANDERSON:
Q. Do you know what a mediation is?
A. Yes.
Q. Have you ever attended a mediation?
A. Yes.
Q. When?
A. During my divorce.
Q. When was that? I just mean years ago. I don't need the specific date, or anything like that.
A. 2004.
Q. Since 2004 have you attended a mediation?
A. No.
Q. Are you aware of whether there was a mediation in this case?
MR. BRODY: Object to form. Calls for

Page 34

legal answer.

THE WITNESS: Answer?

MR. BRODY: Yeah, you can answer it if you know.

THE WITNESS: I'm not aware of a mediation.

BY MR. ANDERSON:

Q. You certainly haven't attended a mediation in this case, right?

MR. BRODY: Same objection.

THE WITNESS: Right.

BY MR. ANDERSON:

Q. As a manufacturer of the nasal inhalers and the pain cream, do you know whether or not you are subject to any governmental or FDA regulations?

MR. BRODY: Object to form. Calls for a legal expertise.

THE WITNESS: I don't believe so.

BY MR. ANDERSON:

Q. Do you currently reside with anyone at your house, or your dwelling? Your residence?

A. My dog.

Q. Okay. How about when you purchased the SAM-e in October of 2017?

A. Maybe.

Page 35

Four years ago?

Q. Let me try to make it easier.

A. Yeah. I don't think so.

Q. Okay. If so, did you have any discussions with that person about your purchase or use of SAM-e?

A. Oh, no.

I'm just trying to decide if my daughter was still living here. I can't, but -- no. The answer would be no.

Q. If she did live there, am I correct to assume that you did not have any conversations with her about your use or purchase of SAM-e?

A. You would be correct.

Q. Aside from your physician who recommended you try SAM-e, have you had any discussions with any other person, besides your lawyers, about your use of SAM-e?

MR. BRODY: Object to form.

THE WITNESS: No.

BY MR. ANDERSON:

Q. I don't want to know the substance of any communications that occurred on the date I'm going to ask you, but approximately when were you contacted by Mr. Brody related to your purchase of

Page 36

SAM-e?

A. It feels like a long time. A couple of years ago. I could look it up.

Q. Sure. Thank you.

A. I can't promise it is going to be accurate because I may have deleted emails, but just a minute.

MR. BRODY: I would just caution the witness not to reveal any contents of the communications, just the date that's being asked.

THE WITNESS: Okay. So it's not going to be accurate. I've recently done a big purge, I finally cleaned it up, and so I don't have the original date.

BY MR. ANDERSON:

Q. Do you think it was before or after January of 2019?

MR. BRODY: Object to form.

THE WITNESS: I don't know.

BY MR. ANDERSON:

Q. Do you think it was before or after January of 2018?

MR. BRODY: Object to form. Asked and answered.

Page 37

THE WITNESS: I don't believe -- I don't believe so, but I can't promise. I just don't know. I'm sorry.

BY MR. ANDERSON:

Q. That's okay. I can only ask you what you know.

A. Yeah, you can ask. I just may not know.

Q. When did you do your email purge?

A. Oh, like, all the time. But, I mean, I did a major one because I had, like, 3,000 unread emails in my in-box, so I just took almost everything, except for the things I knew I needed, and deleted it.

Q. Okay. And when did you do that major purge?

A. About a month ago. I mean, it's ongoing. I'm back up to 2,000.

Q. I know the feeling.

A. Yeah. And that's my personal email.

Q. Oh, boy.

A. Yeah.

MR. BRODY: Counsel, can we take just a quick two- to five-minute break?

MR. ANDERSON: Why don't we come back at --

MR. BRODY: We've been going for a while.
MR. ANDERSON: Why don't we just come back at 1:00.
MR. BRODY: One o'clock. Okay.
THE WITNESS: What time is it?
MR. ANDERSON: It's about nine minutes.
MR. BRODY: It's one o'clock Eastern, so that's --
THE WITNESS: Eleven o'clock.
(Break taken.)
BY MR. ANDERSON:
Q. All right. We are back from a short break, Ms. Wolf. I don't have all that many questions left, to be honest. I just want to clean up some things that we've discussed.
Did I understand you correctly that, aside from your physician and your lawyer, that you've never talked to anyone else about your purchase or use of SAM-e?
MR. BRODY: Object to form.
THE WITNESS: Not that I recall.
BY MR. ANDERSON:
Q. Have you been involved in any other lawsuits aside from your divorce, which some people consider lawsuits, some don't?

MR. BRODY: Object to form.
THE WITNESS: Besides small claims court, I don't think so.
BY MR. ANDERSON:
Q. What types of small claims have you been involved with?
A. It's been years so.
Q. Related to, like, purchases of stuff? Or what was it about?
A. I know I went to small claims court, but I was really young, so I really -- I mean, I was, like, in my twenties, so I really -- I just know I've done it.
Q. Well, that only seems like a couple years ago.
A. Haha. Good answer.
Q. I asked you whether you attended a mediation in this case and you said no, but I want to ask you now were you aware of a mediation happening in this case?
A. No.
Q. Do you have -- strike that. Following your contact -- strike that. After being contacted by Mr. Brody, did you enter into an agreement with his firm to represent you in this case?

MR. BRODY: Object to form.
Just I caution the witness not to reveal any attorney-client communications, but you can answer whether or not you entered into an agreement.
THE WITNESS: Yes.
BY MR. ANDERSON:
Q. When did you enter into the agreement?
A. I don't recall.
Q. Was it more than two years ago?
A. I believe so.
Q. Was it more than three years ago?
A. I don't know.
Q. Do you have a copy of your retainer agreement?
A. I might. I should.
Q. Is there anything you could look at to see if you do?
A. I can try.
Q. Sure. Let's do it.
A. Okay. Let's see. Can I ask Jay a question?
Q. Not during the pendency of this question.
MR. BRODY: Kalyn, you can just answer the question as to whether or not you found it,

but, again, don't reveal any contents in the agreement or any communications between my firm or any attorney.
THE WITNESS: Yeah, I found it.
BY MR. ANDERSON:
Q. What date did you sign it on?
MR. BRODY: You can answer that, if you see the date.
THE WITNESS: November 3, 2021.
That's not right. Okay. Must be a different -- okay.
MR. BRODY: Again, counsel, the question is about the retainer agreement?
THE WITNESS: Yeah.
MR. BRODY: Just to clarify for the witness.
THE WITNESS: Yeah. I'm just putting your name into a search, Jay, so that's what I'm looking for. Give me a second.
I mean, I'm sure I do have it, but I -- honestly, I've done so much configurations to my computer that I'm just not 100 percent sure I can lay my hands on it. I have one more place I can look.
BY MR. ANDERSON:

Q. Sure. Thanks.
A. And, again, all I am putting in is Jay's name, so -- no, I just I don't know where it is.
Q. Okay. That's fair.
Now, you said you were searching emails from Jay, is that right? Or Mr. Brody?
A. Yeah.
Q. What's the earliest -- what's the date of the earliest communication you see from Mr. Brody?
A. I don't know the date of the earliest one I received because I deleted so much.
Q. Right. But what's the earliest date of the ones that you have?
A. Oh.
MR. BRODY: Object to form.
THE WITNESS: February 17th this year. I purged.
BY MR. ANDERSON:
Q. I hear ya.
MR. ANDERSON: I pass the witness to Mr. O'Brien.
MR. BRODY: Kalyn, the other attorney is going to ask you some questions now. He's the attorney for Asquared.
MR. O'BRIEN: What time did you say you

had to stop?
MR. ANDERSON: 1:42.
MR. O'BRIEN: Okay.

CROSS-EXAMINATION

BY MR. O'BRIEN:
Q. Good morning, Ms. Wolf.
A. Good morning.
Q. It's still morning there, right?
A. It is for another 15 minutes.
Q. There you go.
My name is Sean O'Brien. I'm an attorney at Lippes Mathias, LLP. Out law firm represents a defendant in this lawsuit, Asquared Brands, LLC. I'm going to refer to Asquared Brands as "Asquared" moving forward. Is that okay?
A. Sure.
Q. Okay. A couple instructions. You are doing a good job so far, but with the lag, if we can just make sure that my question ends before your answer begins we can help get a clear record.
A. Okay.
Q. Great. And I've noticed a couple times during Mr. Anderson's questions you appeared to be, I think, looking at your computer or your phone to give you assistance in getting the answer.

For my questions, unless I ask you to look at a document, please just answer based on your recollection. Is that okay?
A. Yes.
Q. And if I'm going to show you a document, I'll share it on the screen so you'll be able to see it in the middle of all of our faces and we can talk through it.
A. Okay.
Q. What did you do to prepare for today's deposition?
MR. BRODY: Object to form.
THE WITNESS: Nothing.
BY MR. O'BRIEN:
Q. Did you review any documents?
A. Jay sent me some documents that I reviewed, so, yeah, I did that.
Q. And I know Mr. Brody has mentioned a couple times, at no point in any of my questions should you tell me the content of your and Mr. Brody's conversation. Is that okay?
A. Yes.
Q. What documents did you review?
A. Asking off the top of my head, I don't know.

Q. How many documents did you review?
A. I think there were six total. I'm not sure how many.
Q. Did you speak to Mr. Brody at all in preparation for the deposition?
A. Yes.
Q. Approximately how many times?
A. Twice.
Q. Were those conversations over the phone?
A. Yes.
Q. Again, approximately, but how long did each last?
A. Five to ten minutes.
Q. Prior to preparing for this deposition, when was the last time you thought about this lawsuit?
MR. BRODY: Object to form. The question is when did she think about it?
MR. O'BRIEN: Yeah. When was the last time she thought about it before she prepared for the deposition.
MR. BRODY: You can answer, if you know.
THE WITNESS: It has not been on the top of my mind, so I -- rarely.
BY MR. O'BRIEN:

Q. Prior to speaking to Mr. Brody in preparation for the deposition, when was the last time you spoke to him about this lawsuit?
A. Yesterday.
Q. It was an unclear question. You had testified that you spoke to him twice on the phone in preparation for the deposition, right?
A. Yes.
Q. Prior to those two conversations, when was the last time you spoke to Mr. Brody about this lawsuit?
A. A while ago. I don't know. We don't talk regularly.
Q. Was it sometime in 2021?
A. Yes.
Q. And I failed to mention this earlier, but to the extent you don't know, that's completely okay, Ms. Wolf. I'm only asking you to answer questions to the best of your recollection.
A. Okay.
Q. Again, approximately, but how many times do you think you've spoke to Mr. Brody in 2021 about this lawsuit?
MR. BRODY: Just in 2021?
MR. O'BRIEN: Correct.

MR. BRODY: You can answer.
THE WITNESS: Four or five times.
BY MR. O'BRIEN:
Q. Have you spoke to any other attorney about Mr. Brody -- or, strike that. Have you spoke to any other attorneys, other than Mr. Brody, about this lawsuit?
A. No.
Q. Are you aware if anyone besides Mr. Brody and his law firm represents you in this lawsuit?
A. No.
MR. BRODY: Object to form.
THE WITNESS: Excuse me. That was the longest lag time that I've heard, so how long do you want me to wait before I answer a question?
MR. BRODY: Just wait a couple seconds.
BY MR. O'BRIEN:
Q. Is the lag coming from me at all?
A. No.
Q. Okay. What's your highest level of education?
A. I have a bachelor's degree.
Q. Where did you receive your bachelor's degree from?

A. San Francisco State.
Q. What did you receive your bachelor's degree in?
A. Theater/arts.
Q. Approximately what year was that degree received in?
A. 1977. 1977.
Q. I assume you graduated high school before that?
A. I did.
Q. Do you have any other degrees outside of your high school degree and your bachelor in theater and arts?
A. No.
Q. Do you have any other certificates or licenses?
A. Yes.
Q. Start with the first and then we'll go from there.
A. I have a cosmetology degree and that's it.
Q. What is a cosmetology degree?
A. Beautician.
Q. When did you receive that degree?
A. 1978.
Q. Where did you receive that degree?

A. Charles Ross School of Beauty. California.
Q. I think you said this, but that's it in terms of certificates and degrees?
A. Well, I mean, I have a certificate in reflexology, but not sure that -- yeah, so that and I've got a certificate in Reiki.
Q. When did you receive your certificate in reflexology?
A. Probably '79 or -- well, yeah. Well, earlier. Oh, no. No. I'm sorry. Later. In the early eighties.
Q. Where did you receive that certificate from?
A. I couldn't even tell you.
Q. Do you have a copy of it still?
A. No.
Q. What is reflexology?
A. It's foot massage, for all intents and purposes.
Q. When did you receive your certificate in Reiki?
A. 1985.
Q. Where did you receive that certificate?
A. It was the Usui Method, U-s-u-i, and in

Los Angeles.
Q. Is that an online program or in-person?
A. No, it was a live. It was live.
Q. Is it safe to assume that at some point prior to living in Arizona you lived in California for a period of time?
A. Yes.
Q. Is that directly prior to living in Arizona?
A. No.
Q. Okay.
A. Oh, yes. I've lived here twice. I've lived in Arizona twice.
Q. I believe you testified you lived in Tucson, excuse me, for about 15 years; is that right?
A. Sixteen years. In my house for 15 years.
Q. So prior to that you were in California?
A. I was in Oregon -- Eugene, Oregon, for 15 years.
Q. And then prior to Oregon you were in California?
A. Arizona from 1985 to 1990.
'86. 1986 to 1990.
Q. And, then, prior to being in Arizona the

first time around you were in California?
A. Correct.
Q. In the context of a lawsuit, what does the word "plaintiff" mean to you?
MR. BRODY: Object to form. Calls for legal expertise.
You can answer, if you know.
THE WITNESS: A person bringing the lawsuit.
BY MR. O'BRIEN:
Q. Have you ever been a plaintiff in any lawsuit besides this one?
MR. BRODY: Object to form.
You can answer.
THE WITNESS: Does my divorce count, Sean?
BY MR. O'BRIEN:
Q. Outside of your divorce. I'm sorry.
A. No. Well, whatever that was that I did in my twenties for small claims court would be the only one.
Q. Okay. In the context of a lawsuit, what does the word "defendant" mean to you?
MR. BRODY: Object to form. Calls for legal expertise.
You can answer, if you know.

THE WITNESS: The person defending themselves.
BY MR. O'BRIEN:
Q. Outside of this lawsuit and your divorce and the small claims matter, have you ever been a defendant in any other lawsuit?
A. No.
Q. Have you ever been convicted of a crime?
A. No.
MR. BRODY: Object to form.
BY MR. O'BRIEN:
Q. What is the legal name of your tank center company?
A. Kalyn Wolf -- it's Kalyn Wolf Consulting, and then it's not really a d/b/a. I can't remember what it's called, but it's Cloud Nine Flotation.
Q. Obviously this lawsuit is about a supplement, SAM-e. I'm going to ask you a couple questions more broadly about supplements and then we'll narrow into SAM-e.
Besides SAM-e, have you ever taken other supplements before?
A. Oh, yeah.
MR. BRODY: Object to form.
BY MR. O'BRIEN:

Q. Is supplements something that you consume or have consumed regularly?
MR. BRODY: Same objection.
THE WITNESS: Yes.
BY MR. O'BRIEN:
Q. For what types of purposes do you purchase and consume supplements?
MR. BRODY: Object to form.
THE WITNESS: Multivitamins. Fish oil. Minerals. Supplements. That's about it right now.
BY MR. O'BRIEN:
Q. Do you take a multivitamin -- for example, when you make a decision to purchase a multivitamin, what process do you go through to identify which type of multivitamin you are going to buy?
MR. BRODY: Object to form. Vague.
You can answer, if you understand.
THE WITNESS: Well, currently I try to get something that's going to be absorbable, so it has as little fillers as possible and has the right ratios for what I need so that I'm not overdosing.
Currently, I'm taking one that's organic.
BY MR. O'BRIEN:

Page 54

Q. Do you purchase --
A. Oh, and price. Price.
Q. Sorry. I didn't mean to cut you off.
A. That's okay. Price.
Q. Do you purchase your supplements mostly through Amazon, or some other third party?
MR. BRODY: Object to form.
THE WITNESS: I don't currently get any supplements through Amazon, so I get them through other sources.
BY MR. O'BRIEN:
Q. Such as?
A. Well, Costco. That's where they all come from right now.
Q. Gotta love Costco.
A. You gotta love Costco.
Q. And, generally speaking, why do you take supplements?
A. To stay healthy.
MR. BRODY: Object to form. Vague.
THE WITNESS: And, kind of obvious, to supplement my diet.
BY MR. O'BRIEN:
Q. I believe when Mr. Anderson was asking you questions before you indicated that the purchase of

Page 55

the SAM-e that's at issue in this lawsuit was on or around October 2, 2017; is that right?
A. Yes.
MR. BRODY: Object to form.
BY MR. O'BRIEN:
Q. Do you know what company you purchased that SAM-e from?
MR. BRODY: Object to form.
THE WITNESS: I do not.
BY MR. O'BRIEN:
Q. Have you ever heard of the company Asquared?
MR. BRODY: Object to form.
THE WITNESS: Maybe. I can't be 100 percent sure, but it sounds familiar.
BY MR. O'BRIEN:
Q. Do you have any independent recollection of ever purchasing any product from Asquared?
A. No.
MR. BRODY: Object to form.
BY MR. O'BRIEN:
Q. If I use the word "SAM-e," you know what I'm talking about, right?
MR. BRODY: Object to form.
THE WITNESS: Yes.

Page 56

BY MR. O'BRIEN:
Q. Okay. I just want to make sure I don't have to use the scientific term and completely fumble through the word.
All right. What's your understanding of what SAM-e is?
MR. BRODY: Object to form. Calls for expert answer; expertise.
You can answer, if you know.
THE WITNESS: I know -- well, I suspect it has something to do with liver -- you are correcting liver issues, and I believe there's other things, but I don't know what they are off the top of my head.
BY MR. O'BRIEN:
Q. What's your understanding of the benefits that a person can receive from taking SAM-e?
MR. BRODY: Object to form. Calls for expertise; expert answer.
THE WITNESS: And I don't have that expertise. I don't know.
BY MR. O'BRIEN:
Q. Are you aware of any side effects of taking SAM-e?
MR. BRODY: Same objection. Calls for

Page 57

expertise; expert answer.
THE WITNESS: No.
BY MR. O'BRIEN:
Q. Why did you decide to take SAM-e -- or, strike that. At some point you decided to purchase a bottle of SAM-e; is that right?
MR. BRODY: Object to form.
THE WITNESS: Yes.
BY MR. O'BRIEN:
Q. Why did you decide to do that?
MR. BRODY: Object to form. Vague.
THE WITNESS: My doctor, the physician, suggested it.
BY MR. O'BRIEN:
Q. Do you recall doing any research or diligence into what SAM-e was before purchasing it?
MR. BRODY: Object to form.
THE WITNESS: I do.
BY MR. O'BRIEN:
Q. What types of things did you look at to do that research?
MR. BRODY: Objection. Vague.
THE WITNESS: The Internet.
BY MR. O'BRIEN:
Q. Do you recall any of the information you

found on the Internet regarding SAM-e?
MR. BRODY: Object to form.
THE WITNESS: I don't.
BY MR. O'BRIEN:
Q. I'll share a document on the screen here.
MR. O'BRIEN: Jay, Scott and Rich, are you guys okay with starting at Exhibit 1 for this deposition as opposed to continuing from the last?
MR. OPARIL: No objection here.
MR. BRODY: No objection.
MR. ANDERSON: (Indicating.)
(Exhibit Number 1 was marked for purposes of identification.)
BY MR. O'BRIEN:
Q. Ms. Wolf, do you see a document on your screen?
A. Yes.
Q. Okay. So this is the first document you've seen in this deposition. I'll give you a walk-through of how documents work in a Zoom deposition.
I have control over the document so I can make it bigger and smaller and I can scroll pages, so if at any point you need me to go to a different

page, make something bigger, make something smaller, you just let me know.
A. Okay.
MR. BRODY: Sean, can you just show her the first page and the last page, just as a general review? If she needs to review more, we'll let you know.
MR. O'BRIEN: Okay.
BY MR. O'BRIEN:
Q. Ms. Wolf, the first page of the document I'm showing you is on the screen labeled Third Amended Class Action Complaint. I'll scroll down and show you the last page.
MR. BRODY: When I say "the last page," I mean the end of the complaint.
MR. O'BRIEN: I know what you mean.
MR. BRODY: Yeah.
BY MR. O'BRIEN:
Q. Ms. Wolf, this is the last page of the document labeled Third Amended Complaint.
A. Okay.
Q. Have you ever seen this document before?
A. Not that I can recall.
Q. Do you see in the top section of this document there's a bunch of names?

A. Um-hum.
Q. And do you see your name listed in the plaintiff section?
A. I do.
Q. Okay. Do you know who Cori Ann Ginsberg is?
A. No.
Q. Have you ever communicated with Cori Ann Ginsberg about this lawsuit?
A. No.
Q. Do you know who Noah Malgeri is?
A. No.
Q. Have you ever communicated with Noah Malgeri about this lawsuit?
A. No.
Q. Do you know who Bill Wilson is?
A. No.
Q. Have you ever communicated with Bill Wilson about this lawsuit?
A. No.
Q. Do you know who Shannon Hood is?
A. No.
Q. Have you ever communicated with Shannon Hood about this lawsuit?
A. No.

Q. Do you know Eric Fishon is?
A. No.
Q. Have you ever communicated with Eric Fishon about this lawsuit?
A. No.
Q. And last but not least, do you know who Robert McKeown is?
A. No.
Q. Have you ever communicated with Robert McKeown about this lawsuit?
A. No.
Q. Moving down to the other side of the v., have you ever heard of a company called Vitamins Because, LLC, before?
A. No.
Q. Have you ever heard of a company called CT Health Solutions, LLC, before?
A. No.
Q. Have you ever heard of a company called Gmax Central, LLC, before?
A. No.
Q. We already covered Asquared.
Have you ever heard of a company called Inspire Now doing business as BoostCeuticals before?
A. No.

Page 62

Q. Have you ever heard of a company called Healthy Way RX, LLC, before?
A. That's more familiar, but I couldn't tell you why.
Q. Have you ever heard of a company called Khakiware, Inc, before?
A. No.
Q. Okay. Have you ever heard of a company called Jolly Dollar Supply Company before?
A. No.
Q. Do you, sitting here today, have any understanding about why you've sued all of these defendants?
MR. BRODY: Object to form.
First of all, that misstates the record and also calls for a legal expertise.
BY MR. O'BRIEN:
Q. You can answer, Ms. Wolf.
A. My understanding is that I'm representing others as one of the people who are the plaintiffs who purchased the product that was found to be, by my attorney's labs, I guess, to be -- to have less ingredient -- less active -- I don't know if it is active ingredient, but less than the stated amount on the label.

Page 63

Q. Specific to you, you have no understanding of who these companies are or why they are in the lawsuit?
MR. BRODY: Object to form. Calls for legal expertise.
THE WITNESS: No -- well, I could guess, but that would be guessing, and guessing is always not a good idea, so I'll say no.
BY MR. O'BRIEN:
Q. And, again, the first time you've ever seen this document is today, right?
MR. BRODY: Object to form.
THE WITNESS: So I was given a lot of documents and, to be honest, I scanned them. There's 106 pages here.
BY MR. O'BRIEN:
Q. I'm sorry, Ms. Wolf. This is a single document.
A. Oh, just that. I thought it said 106. I thought you showed me the beginning and the end.
Q. It's 106 pages of one document.
A. Oh, okay. If my attorney sent it to me, I glanced at it.
Q. You can see on the top the writing in blue?

Page 64

A. Um-hum.
Q. Okay. Do you see it says entered on the FLSD docket 10/23/2020?
A. Um-hum.
Q. Do you have any recollection of reviewing this document prior to 10/23/2020?
A. No.
MR. BRODY: Object to form.
BY MR. O'BRIEN:
Q. I'll get rid of Exhibit 1. We are going to move into your purchase of the SAM-e product. Mr. Anderson covered this a little bit, so I'll do my best not to ask you any questions that you've already been asked, okay, Ms. Wolf?
A. Thank you.
Q. This product was purchased from Amazon; is that right?
A. Yes.
Q. And the product date was sometime in or around October 2017?
MR. BRODY: Object to form.
THE WITNESS: Yes.
BY MR. O'BRIEN:
Q. And I assume, based on some of your previous answers, you actually did receive the SAM-e

Page 65

that you purchased, right?
MR. BRODY: Object to form.
THE WITNESS: Yes.
BY MR. O'BRIEN:
Q. And, upon receipt, I believe you indicated that the product appeared hard; is that right?
MR. BRODY: Object to form.
THE WITNESS: Yes.
BY MR. O'BRIEN:
Q. Okay. Did you remove the product from the pill that it came in?
MR. BRODY: Object to form.
THE WITNESS: Yes.
BY MR. O'BRIEN:
Q. And why did you do that?
A. Because it was hard as a rock and it was in a capsule and I had never seen anything like that and I wanted to make sure -- I wanted to see what it looked like.
Q. Did you conduct that review before or after you took the product?
MR. BRODY: Object to form.
THE WITNESS: After I took it, and then I thought, that isn't right, it's in a capsule, so then I took it apart.

Page 66

BY MR. O'BRIEN:

Q. And I believe you had indicated you took two doses, right?

A. Yeah.

Q. Okay. And then at some point after you disposed of the bottle because you weren't going to use the remainder of it?

A. Right.

Q. Okay. How long after your purchase did you throw the product out?

A. A couple of months.

Q. Okay. Why did you wait a couple months?

A. Because I'm terrible at that.

Q. I understand you only took two doses, but did you notice any impact --

A. No.

Q. -- or difference from taking the product?

A. No.

Q. Why do you believe that the SAM-e you purchased has less active ingredient than what's on the label?

MR. BRODY: Object to form. Calls for expertise; expert answer.

THE WITNESS: Do I answer?

BY MR. O'BRIEN:

Page 67

Q. Yes.

MR. BRODY: Yeah, you can answer if you know.

THE WITNESS: Okay. Because the attorney told me so.

BY MR. O'BRIEN:

Q. Mr. Anderson covered this, but you didn't have any of those individual pills that you purchased tested by any third party?

A. No.

MR. BRODY: Objection. Asked and answered.

BY MR. O'BRIEN:

Q. Do you know what goes into the product, SAM-e?

MR. BRODY: Object to form. Calls for expertise; expert answer.

THE WITNESS: No, and I don't.

BY MR. O'BRIEN:

Q. Okay. How would you go about determining what went into SAM-e if you went to purchase it today?

MR. BRODY: Object to form. Calls for expertise; expert answer.

You can answer, if you know.

Page 68

THE WITNESS: So now I would use the same procedure that I use for everything else. I look to see what the -- if there are fillers, what the fillers are.

I want to make sure there's no soy or wheat products in it. I would prefer to use, you know, as clean a product as I can possibly get. Easily digestible and absorbable.

BY MR. O'BRIEN:

Q. Is it fair to say you would find that information on a label?

MR. BRODY: Object to form.

THE WITNESS: I would find some of it on a label, yeah.

BY MR. O'BRIEN:

Q. I'm going to use your -- the inhalers you talked about earlier as a point of reference here.

A. Okay.

Q. Do you think it's possible that the inhalers that you make on a -- an inhaler-to-inhaler basis might have slightly different ingredients between each individual inhaler?

A. No.

MR. BRODY: Object to form.

BY MR. O'BRIEN:

Page 69

Q. Why do you think that?

A. Because --

MR. BRODY: Object to form.

THE WITNESS: Because the way I make it is I put all the ingredients in a dropper bottle and then I put -- and then I drop every -- everything is measured and I drop the same amount on every wick.

BY MR. O'BRIEN:

Q. I'm sorry. So not in terms of your process, but the actual ingredients that you put into the inhaler, okay? So the inhaler is made up of seven, ten different types of product; is that fair?

MR. BRODY: Object to form.

THE WITNESS: Anywhere from two to eight.

BY MR. O'BRIEN:

Q. And my question to you is, is it possible that some of those products have slightly different composition on a product-by-product basis?

MR. BRODY: Object to form. Calls for expertise; expert answer.

THE WITNESS: And I am not sure --

MR. BRODY: Answer, if you know.

THE WITNESS: I don't know -- I am not 100

Page 70

percent sure I know what --
BY MR. O'BRIEN:
Q. Let me ask it this way.
A. Okay.
Q. What does the word "objective" mean to you?
A. Objective.
MR. BRODY: Object to form.
THE WITNESS: Goal.
BY MR. O'BRIEN:
Q. In terms of objective versus subjective, what does the word "objective" mean to you?
A. Oh.
MR. BRODY: Object to form.
THE WITNESS: I don't -- that's terrible. I used it. I don't actually know the definition.
BY MR. O'BRIEN:
Q. What does the word "subjective" mean to you?
A. Something that you are personally experiencing.
Q. Okay. And in terms of a supplement, what does the word "potency" mean to you?
MR. BRODY: Object to form. Calls for

Page 71

expertise; expert answer.
You can answer.
THE WITNESS: Okay. How much of -- the potency would be how much of what a certain ingredient is in the product.
BY MR. O'BRIEN:
Q. Okay. Do you think you could --
A. I'm sorry. Excuse me. As far as strength goes.
MR. ANDERSON: I have to leave. Sean, if you are on a roll -- you got another 20, 30 minutes left, do you think?
MR. O'BRIEN: Yeah, I can stop. It's okay.
MR. ANDERSON: You guys go for it. I'll be back.
MR. O'BRIEN: Okay.
MR. ANDERSON: Feel free to continue.
MR. BRODY: Can we take a five-minute break, in any event?
MR. O'BRIEN: Of course. We'll -- that's fine.
MR. BRODY: We'll be back on in five minutes.
THE WITNESS: Okay.

Page 72

(Break taken.)
BY MR. O'BRIEN:
Q. All right, Ms. Wolf. We are back on the record.
We left off with a little bit of a grammatical exercise in objective v subjective.
A. Um-hum.
Q. And so those are foundational questions to get into the substance of what I'm trying to talk to you about.
And so the claim in the lawsuit is that the SAM-e that you purchased had less active ingredient than what was put on the label. Is that your understanding?
A. Yes.
MR. BRODY: Object to form.
BY MR. O'BRIEN:
Q. And do you think that that claim can be verified through a subjective method? And what I mean by that is, do you think you could smell a SAM-e pill or taste the SAM-e pill and determine whether the ingredients matched the label?
MR. BRODY: Object to form. Compound question. Also calls for expertise.
You can answer, if you know.

Page 73

THE WITNESS: I don't think that would be a scientific method that I would trust.
BY MR. O'BRIEN:
Q. To the contrary, would a scientific method that you would trust be an objective method, such as testing the product?
MR. BRODY: Object to form.
THE WITNESS: Yes.
MR. BRODY: Calls for expertise.
BY MR. O'BRIEN:
Q. And, for example, when you had the problem -- or the potential problem with the CBD cream, in order to verify your concerns you sent that product out to a third party for testing; is that right?
MR. BRODY: Object to form.
THE WITNESS: Yes.
BY MR. O'BRIEN:
Q. Okay. So can you agree that the only way to verify that the product that you purchased, the SAM-e that you consumed, had less active ingredient than what was on the label would be to test that specific product?
MR. BRODY: Object to form. You are asking about testing the specific product?

Page 74

MR. O'BRIEN: Correct.
MR. BRODY: That's the specific question? Object to form. Calls for expertise; expert answer.
You can answer, if you know.
THE WITNESS: What was the question?
BY MR. O'BRIEN:
Q. I can ask it again. Would you agree that the only objective way to verify that the SAM-e that you purchased actually had less active ingredient than what was on the label would be to test that product?
A. Yes.
MR. BRODY: Object to form. Again, calls for expertise and vague.
BY MR. O'BRIEN:
Q. Mr. Anderson covered this a little bit, but I have to go back through it because a couple of the points are important for the lawsuit.
I know you don't recall the exact date when Mr. Brody reached out to you, but do you recall the year?
MR. BRODY: Object to form.
THE WITNESS: I don't. I don't.
BY MR. O'BRIEN:

Page 75

Q. Did he reach out to you by email?
MR. BRODY: Object to form.
THE WITNESS: Yes.
BY MR. O'BRIEN:
Q. Okay. Again, out of an abundance of caution, I want to make sure you know under no circumstance am asking about anything you two discussed at all.
A. Um-hum.
Q. Okay. And I know you don't have a copy of that email, but is it possible that Mr. Brody has a copy of that email?
A. It's possible.
Q. Okay. And approximately how long after that initial communication did you formally engage Mr. Brody's firm to represent you?
MR. BRODY: Object to form.
THE WITNESS: I really don't recall.
BY MR. O'BRIEN:
Q. Okay. Do you recall if it was in the same calendar year?
MR. BRODY: Object to form.
THE WITNESS: No. If he -- I mean, I don't -- I don't know if he -- it's possible, but I don't know.

Page 76

BY MR. O'BRIEN:
Q. Again, Ms. Wolf, I know we are talking about a long time ago, so if you don't know, that's completely okay.
A. Okay.
Q. And I know you don't have a copy of your retainer agreement handy, but you do believe at some point you signed a retainer agreement?
A. Yes.
Q. Okay. And it's fair to say that that retainer agreement was signed sometime after your initial communication with Mr. Brody?
A. Yes.
Q. Okay. Were you ever asked to conduct a search for that retainer agreement?
MR. BRODY: Object to form.
THE WITNESS: No.
BY MR. O'BRIEN:
Q. Okay. I'm not going to --
A. Well, today.
Q. Outside of today. I'm sorry.
A. No.
Q. Okay. And I'm not going to ask you to do it now, but to the extent you can, after this deposition is over, could you try and find that

Page 77

retainer agreement and keep it in case we need it in the lawsuit?
MR. BRODY: Object to form. Calls for legal advice.
THE WITNESS: I can look.
BY MR. O'BRIEN:
Q. That's all I'm asking.
Ms. Wolf, do you know -- I'm sorry. Are you okay?
A. Yeah, I'm fine.
Q. Okay. Do you know what court your lawsuit was filed in?
MR. BRODY: Object to form. Calls for legal expertise.
You can answer.
THE WITNESS: I think it just said Florida, but I don't.
BY MR. O'BRIEN:
Q. Outside of reading the document I showed you, do you have any independent recollection of where the case was filed?
A. No.
MR. BRODY: Same objection.
BY MR. O'BRIEN:
Q. Do you know who the judge is that's been

assigned to preside over this case?
MR. BRODY: Same objection. Calls for legal expertise.
THE WITNESS: No.
BY MR. O'BRIEN:
Q. And so you know this, Ms. Wolf, I'm asking these questions because your complaint alleges that you are going to be a class representative on behalf of other people, and so questions regarding your knowledge of the lawsuit go to that point.
MR. BRODY: I'm going to object to that. It wasn't really a question, but I'm going to object to that.
BY MR. O'BRIEN:
Q. What are you seeking to receive as a result of bringing this lawsuit?
MR. BRODY: Object to form. Calls -- calls for legal expertise. Go ahead.
THE WITNESS: I'm sorry. Should I not answer?
MR. BRODY: You should.
BY MR. O'BRIEN:
Q. You should answer to the extent you know.
A. I haven't been promised anything and I

have no idea. I've not a clue.
Q. Why did you bring this lawsuit in the first place if you are not seeking to receive anything?
MR. BRODY: Object to form. Misstates prior testimony. She didn't say she wasn't seeking. It misstates.
You can answer.
BY MR. O'BRIEN:
Q. You can answer.
A. I never said I wasn't seeking anything. I said I don't know what I would be receiving.
Q. Okay. What are you seeking? Maybe that's an easier way to do it.
A. Justice.
MR. BRODY: Same objection. Calls for legal expertise.
Again, you can answer to the extent that you know.
THE WITNESS: Yeah.
BY MR. O'BRIEN:
Q. What do you mean by "justice"?
A. Well, if the company misrepresented the amounts of active ingredients on their label, they should be -- you know, they misrepresented who they

were to the consumers and the consumers paid a price thinking they were going to be getting something, and they didn't get that, then that is not right.
Q. Okay. And, again, so we are clear, your basis for understanding the product that you purchased was similarly defective is through your attorney only?
MR. BRODY: Object to form.
Again, I just caution the witness not to reveal any communications.
Go ahead.
THE WITNESS: Yeah.
BY MR. O'BRIEN:
Q. Okay. Do you have any pending judgments against you personally?
MR. BRODY: Object to form.
THE WITNESS: Not that I'm aware of.
BY MR. O'BRIEN:
Q. With regard to a lawsuit, what does the term "cause of action" mean to you?
MR. BRODY: Object to form. Calls for legal expertise; legal definition.
You can answer, if you know.
THE WITNESS: I don't know.
BY MR. O'BRIEN:

Q. Okay. Are you familiar with any of the causes of an action that you've alleged against the defendants in this lawsuit?
MR. BRODY: Object to form. Vague.
She just said she didn't understand the term, so, counsel, can you rephrase it? She doesn't understand that term that you just used.
BY MR. O'BRIEN:
Q. Do you need the question read back?
A. No, I understand the question. I just don't know what the term "cause to action" means.
Q. Okay. Do you know what the word "statute" means in the context of a litigation?
MR. BRODY: Same objection. Calls for legal expertise and legal definition.
You can answer, if you know.
THE WITNESS: I believe -- I'm not 100 percent sure, but, you know, I watch enough lawyer shows that you'd think I'd know.
I think a statute is -- actually, I'm not going to say. I don't know.
BY MR. O'BRIEN:
Q. Okay. In the context of a lawsuit, do you know what the word "claim" means?

MR. BRODY: Same objection. Calls for legal expertise tease; legal definition.
You can answer, if you know.
THE WITNESS: I don't know if this is, like, in a lawsuit, but a claim is something that you say is wrong.
BY MR. O'BRIEN:
Q. Okay. Is it fair to say that you have no understanding of the legal claims that you have brought in this lawsuit?
MR. BRODY: Object to form. Calls for legal expertise.
You can answer.
THE WITNESS: My understanding in that -- in that sense is that I am claiming that there was -- the active ingredients listed on the label were not present in the product.
BY MR. O'BRIEN:
Q. Sure. I think, would you agree, that that's the factual basis for your claim?
MR. BRODY: Object to form. Vague. Using legal terminology.
You can answer, if you understand the question. If you understand the terminology that's being used.

THE WITNESS: I believe so.
BY MR. O'BRIEN:
Q. Okay. Are you aware if you've alleged that the defendants have violated any law?
MR. BRODY: Object to form.
THE WITNESS: Yes.
MR. BRODY: Calls for legal expertise.
BY MR. O'BRIEN:
Q. What laws do you allege that the defendants violated in this lawsuit?
MR. BRODY: Same objection. Calls for legal expertise; legal answer.
THE WITNESS: Truth in packaging.
BY MR. O'BRIEN:
Q. Anything else?
A. Is that a law?
MR. BRODY: Same objection.
THE WITNESS: Well, false labeling. I guess that's the same thing.
Yeah. I mean, you know, there are so many intricacies in the law and in the way things are worded that you can change one word and change the complete meaning of everything, so I don't feel confident to answer that question.
BY MR. O'BRIEN:

Q. That's okay. All of my questions, again, Ms. Wolf, are just to the best of your recollection. If you don't know or the answer is "no," that's entirely okay.
A. Okay.
Q. Before Mr. Brody reached out to you about this product, did you have any interest in bringing a lawsuit?
MR. BRODY: Object to form.
THE WITNESS: No.
MR. O'BRIEN: Ms. Ohman, did you hear the answer?
THE REPORTER: I heard "no."
MR. O'BRIEN: Okay.
BY MR. O'BRIEN:
Q. When you received the SAM-e sometime after October 2017, do you recall reviewing the label before taking the product?
MR. BRODY: Object to form.
THE WITNESS: Yes.
BY MR. O'BRIEN:
Q. Okay. Why would you review the label upon receipt?
A. I just always do that. I wanted to make sure I got the product I ordered.

Q. What type of things would you check or did you check? I apologize.
A. Just the milligrams.
MR. BRODY: Objection. Vague.
Go ahead.
THE WITNESS: Sorry, Jay. Just the milligrams.
BY MR. O'BRIEN:
Q. I'm going to share a document with you, Ms. Wolf. All right. Ms. Wolf, I'm sharing on the screen a document that I've marked as Exhibit 2 for today's deposition.
(Exhibit Number 2 was marked for purposes of identification.)
BY MR. O'BRIEN:
Q. It's a three-page document. Page one you can see. I'll scroll down to page two. And there's page three.
A. Um-hum.
Q. I'll bring you back up to the top. Do you recognize this document?
MR. BRODY: Counsel, I'm just going to object to the extent that the exhibit was manipulated or includes different productions by different plaintiffs.

MR. O'BRIEN: I don't understand what you mean.

MR. BRODY: Go ahead. I'm saying if you put together different productions by different plaintiffs, I think that's misleading. I'm going to object to the use of this exhibit on that basis. Go ahead.

MR. O'BRIEN: So, Jay, this is your production and it's Plaintiff's 20, 21 and 22. It's right in line with your documents. If this is not Ms. Wolf's purchase, then we won't use any information related --

MR. BRODY: That's not what I said, counsel. I don't know if all the documents were provided by the same plaintiff, so I'm just objecting on that ground.

I don't recall at the moment, but go ahead. I'm not saying anything about her purchase, or specifically Plaintiff's 20.

Go ahead.

MR. O'BRIEN: I see what you are saying.

BY MR. O'BRIEN:

Q. Ms. Wolf, that's nothing concerning you. Don't worry about it.

Starting with page one of Exhibit 2, Ms.

Wolf, do you recognize this document?

A. Yeah.

Q. Okay. What do you recognize it to be?

A. My order.

Q. Okay. Your order of what?

A. Of the SAM-e and the scale.

Q. Okay. And you can see right here in the middle of the page it says shipped October 4, 2017?

A. Right.

Q. And that's approximately the date of purchase that we've been talking about?

A. I purchased it two days before. Yeah.

Q. So would you agree that this order detail document shows your purchase of SAM-e that we are here about today?

A. Yes.

Q. Okay. And so page two and page three are a picture of a bottle of SAM-e and then some sort of a nutritional fact. Have you ever seen either of those pages before?

MR. BRODY: Object to form.

THE WITNESS: Maybe.

BY MR. O'BRIEN:

Q. Okay. Did you give this document to your attorney for production in the lawsuit?

A. I don't recall.

MR. BRODY: Object to form.

THE WITNESS: This one I did.

BY MR. O'BRIEN:

Q. "This" being page one of Exhibit 2?

A. Yes.

Q. Okay. Now, when Mr. --

MR. BRODY: Is this Plaintiff's 20?

MR. O'BRIEN: Yes. Page one of Exhibit 2 being plaintiff's confidential 20.

MR. BRODY: Thanks.

BY MR. O'BRIEN:

Q. When Mr. Anderson was asking you some questions earlier, Ms. Wolf, I believe you said you could verify the date of purchase by going on your Amazon account and checking; is that right?

A. Correct.

Q. Okay. And is the document we are looking at here on page one some sort of a printout from your Amazon account?

A. Yes.

Q. Okay. And am I looking at a -- did you take a screen shot of the information? Or how did you get this information into this paper form?

A. That's what it looks like.

Q. Okay.

A. Again, it's been a while since I, you know, gave this up, so I can't imagine -- I don't know if there's any other way of doing it.

Q. Okay. Do you have any other information related to your purchase of SAM-e on October 2, 2017?

A. No.

Q. For example, I don't see your name or address on this page.

A. Oh, yeah. I don't either. If I went to -- if I went to my Amazon page, I would know where it was and I could look and see if that's the same order, so I'm assuming by, you know, the fact that it is with the scale that it's mine.

Q. Okay. I'm making that same assumption as well, but for the sake of a clear record in the lawsuit, do you think you would be able to go into your Amazon account -- not now -- and compile all of the documents related to this purchase and turn them over?

A. Yes.

Q. I'm assuming at some point Mr. Brody asked you to do a search for the document we are looking at today?

A. Yes.
Q. Do you recall approximately when that request was made?
A. No.
Q. Was it sometime in 2021?
MR. BRODY: Object to form.
THE WITNESS: I don't -- I don't know if it was 2020 or 2021.
BY MR. O'BRIEN:
Q. Okay. And based on your own recollection, is this the only document that you gave in response to his request?
A. Yes.
Q. Okay. And outside of the other Amazon information that you might be able to obtain, do you have any other documents related to your purchase of SAM-e?
A. No.
MR. BRODY: Object to form.
BY MR. O'BRIEN:
Q. Do you recall when you sent this document to Mr. Brody?
A. I do not.
MR. BRODY: Object to form.
BY MR. O'BRIEN:

Q. Do you recall the year you sent it to him?
MR. BRODY: Object to form.
THE WITNESS: I don't.
BY MR. O'BRIEN:
Q. Okay. All right. We'll get rid of Exhibit 2. We'll move to Exhibit 3.
(Exhibit Number 3 was marked for purposes of identification.)
BY MR. O'BRIEN:
Q. Ms. Wolf, I'm sharing --
MR. BRODY: Go ahead. Give your introduction and then I'll ask you.
MR. O'BRIEN: Yeah. We'll go through the process and identify the document for her.
MR. BRODY: Yeah. I want you to also show the signature, if there is one.
MR. O'BRIEN: Sure. This is a request for production, so it is not going to be verified.
BY MR. O'BRIEN:
Q. Ms. Wolf, I'm showing you a 22-page document. We'll start with just the first page. We can look through the entire thing, if we need to. The first question is, do you recognize this document?
A. Yes.

Q. What do you recognize this document to be?
A. One of the documents that I was sent by the lawyer.
Q. Okay. Is this one of the documents you reviewed in preparation for the deposition today?
MR. BRODY: Object to form.
THE WITNESS: Could be.
BY MR. O'BRIEN:
Q. Okay. Do you recall when you were sent this document by your attorney?
A. I do not.
Q. Do you recall if it was within the last six months?
A. I do not.
MR. BRODY: Object to form.
BY MR. O'BRIEN:
Q. Do you have any independent recollection of reviewing this document?
A. I have a recollection of reviewing the document.
Q. Okay. And do you remember when that was?
A. I do not.
Q. Okay. So you can see the title below the caption is a Request for Production of Documents to Kalyn Wolf.

That would be you, right?
A. Right.
Q. Do you recall being asked to search for documents to respond to this demand?
A. The only document I've ever been asked for is the proof of purchase.
Q. Okay. And you don't recall when that was?
A. I don't.
Q. Outside of asking for the proof of purchase, you don't recall being asked to search for any other documents in this case?
MR. BRODY: Object to form.
THE WITNESS: Yeah, I don't. If I -- I just don't recall.
BY MR. O'BRIEN:
Q. Okay. Take, for example, your retainer agreement. Were you ever asked to search for your retainer agreement?
A. Well, just today.
MR. BRODY: Object to form.
BY MR. O'BRIEN:
Q. You can see number six in the middle of the screen, and I'll Zoom in so it is a little is a bit easier to read. Request six asks for all communication between plaintiff and defendant. I

won't go into the specifics of who plaintiff and defendant were, but were you ever asked to search for communication related to your lawsuit?
A. No.
MR. BRODY: Object to form.
THE WITNESS: No.
BY MR. O'BRIEN:
Q. Okay. We can be done with Exhibit 3.
A. He's back.
MR. O'BRIEN: Hi, Scott.
MR. ANDERSON: Hi.
BY MR. O'BRIEN:
Q. Ms. Wolf, I'm showing you a document that is marked as Exhibit 4 for the purposes of this deposition.
(Exhibit Number 4 was marked for purposes of identification.)
BY MR. O'BRIEN:
Q. Very similar line of questions to the last document. Do you recognize this document?
MR. BRODY: Counsel, again, can you just show the date at the end, any signatures involved?
MR. O'BRIEN: Sure.
MR. BRODY: Scroll down.

BY MR. O'BRIEN:
Q. Ms. Wolf, do you recognize this document?
MR. BRODY: Counsel, I'm asking can you do it now?
BY MR. O'BRIEN:
Q. She can answer the question and then I'll scroll down. It's no big deal.
A. It might be -- I'm sure if it was sent to me I reviewed it.
Q. Okay. At your counsel's request, I'm going to scroll down to the bottom page to your attorney's signature.
A. Did I sign it? I must have signed it. There it is. Look at that. Yep, that's the -- yeah.
Q. Could this be the document you were referring to earlier that you pulled up on your computer?
A. Yeah.
Q. Okay. Do you know why you were asked to sign this document?
MR. BRODY: Object to form. Calls for legal expertise.
You can answer, if you know.
THE WITNESS: I don't know.

BY MR. O'BRIEN:
Q. Did you -- let's go up to the top page again before I ask my question. Did you review the answers to the questions in this document to confirm they were accurate before signing the document?
A. I would have --
MR. BRODY: Object to form.
THE WITNESS: Yes, I would have done that.
BY MR. O'BRIEN:
Q. Yes, you would have or, yes, you did?
A. Yes, I would have done that.
Q. Do you remember doing it?
A. I do remember looking at the answers.
Q. When do you recall looking at the answers?
A. When I received the document.
Q. Okay. We are done with Exhibit 4.
Say it again, Ms. Wolf? I'm sorry?
A. We lost him again.
Q. He'll be back.
All right. I think we should take five. I don't have a ton left. So, Ms. Wolf, you said you have a break you need at 3:30; is that correct?
A. Yeah, that's in about an hour.
MR. O'BRIEN: Okay. So it will certainly be my goal to be done well in advance of 3:30,

so you won't have to come back. Give me a little time to go through my notes and clean a couple things up.
And I don't know if Mr. Oparil or Mr. Anderson have anything further, but we'll get you out of here quickly.
MR. OPARIL: I'll just have a few questions.
MR. BRODY: 2:30 Eastern time we'll be back.
(Break taken.)
MR. O'BRIEN: At this point I have no further questions. Thanks for your time.
I think Mr. Oparil has a few for you.
CROSS-EXAMINATION
BY MR. OPARIL:
Q. I do, Ms. Wolf. Thank you. Can you hear me okay?
MR. BRODY: We can hear you but we can't see you.
MR. OPARIL: Right. That's intentional.
BY MR. OPARIL:
Q. Ms. Wolf, did you ever purchase any products sold by my client, Gmax, or their brand name Lusa Pure (phonetic)?

A. Not that I'm aware of.
Q. Okay. I wanted to follow up some of your testimony on the products that you sell.
A. Um-hum.
Q. Are any of those products made to be ingested, taken into the body? In other words, not a cream or lotion?
A. No.
Well, an inhaler.
Q. Are there -- and the inhaler product consists of what ingredients?
A. They are all 100 percent pure essential oils. They are different essential oils.
Q. All right. You talked about using CBD in one or more of your products, correct?
A. One of my products, yes.
Q. And which one is that?
A. It's called McShea Dream Cream.
Q. So that is a cream product?
A. Correct.
Q. Do you sell any products that are labeled as dietary supplements?
A. No.
Q. Do you have any knowledge about FDA, Food and Drug Administration, regulations of dietary

supplements?
A. No.
MR. BRODY: Object to form.
MR. OPARIL: That's all I have. Thank you.
THE WITNESS: Okay.
MR. BRODY: Okay. Thank you, counsel. Just -- well, I guess we can formally end the deposition.
(The deposition concluded at 2:35 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF MANATEE

I, the undersigned authority, certify that KALYN WOLF remotely appeared before me on November 17, 2021, and was duly sworn.

WITNESS my hand and official seal this 3rd day of December, 2021.

________________________________
Kathleen K. Ohman
Notary Public - State of Florida
My Commission Expires: 3/28/25
Commission No. HH104767
Driver's License Produced.

REPORTER'S CERTIFICATE

STATE OF FLORIDA
COUNTY OF MANATEE

I, KATHLEEN K. OHMAN, Registered Merit Reporter, certify that I was authorized to and did stenographically report the deposition of KALYN WOLF; that a review of the transcript WAS requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 3rd day of December, 2021.

________________________________
KATHLEEN K. OHMAN, RMR

PLEASE ATTACH TO THE DEPOSITION OF KALYN WOLF
TAKEN ON NOVEMBER 17, 2021, IN THE CASE OF
CORI ANN GINSBERG V VITAMINS BECAUSE, LLC, ET AL
VERITEXT JOB: 4848705

PAGE LINE CORRECTION AND REASON THEREFOR
____ ____ ________________________________________
____ ____ ________________________________________
____ ____ ________________________________________
____ ____ ________________________________________
____ ____ ________________________________________
____ ____ ________________________________________
____ ____ ________________________________________
____ ____ ________________________________________
____ ____ ________________________________________
____ ____ ________________________________________

I HAVE READ THE FOREGOING PAGES AND, EXCEPT FOR ANY CORRECTIONS OR AMENDMENTS INDICATED ABOVE, I HEREBY SUBSCRIBE TO THE ACCURACY OF THIS TRANSCRIPT

__________________________ ____________
KALYN WOLF DATE

__________________________ ____________
WITNESS TO SIGNATURE DATE

Kalyn Wolf
c/o Jay I Brody, Esquire
Kantrowitz, Goldhamer & Graifman, P C
747 Chestnut Ridge Road
New York, New York 10977

December 3, 2021

Re: November 17, 2021 Deposition of Kalyn Wolf
Cori Ann Ginsberg v Vitamins Because, LLC, et al

Dear Ma'am:

This Letter is to advise that the transcript of the above-referenced deposition has been completed and is available for review Please contact our office at (800) 275-7991 to make arrangements to read and sign or sign below to waive review of this transcript

It is suggested that the review of this transcript be completed within 30 days of your receipt of this letter, as considered reasonable under Federal Rules; however, there is no Florida Statute to this regard

The original of this transcript has been forwarded to the ordering party and your errata, once received, will be forwarded to all ordering parties

Sincerely,

Kathleen K Ohman, RMR
Veritext Legal Solutions

cc: Scott W Anderson, Esquire
Sean M O'Brien, Esquire
Richard J Oparil, Esquire

**&**

**&** 2:2 4:20 18:3,4 18:11,21 103:2

**1**

**1** 1:25 3:3 58:7,13 64:10
**10/23/2020** 64:3,6
**100** 2:20 9:7,20 41:22 55:14 69:25 81:18 98:12
**1000** 2:13
**101** 2:21
**102** 2:22
**103** 1:25 2:23
**106** 63:15,19,21
**10977** 2:3 103:3
**12:00** 1:17
**14202** 2:10
**14683** 100:14 101:23
**15** 5:15 43:9 50:15 50:17,19
**17** 1:16 100:7 102:2 103:4
**1700** 2:9
**1775** 2:13
**17th** 42:16
**18** 14:8
**180** 18:6
**1977** 48:7,7
**1978** 48:24
**1985** 49:23 50:23
**1986** 50:24
**1990** 50:23,24
**1:00** 38:3
**1:19** 1:6
**1:42** 43:2

**2**

**2** 3:4 24:6 55:2 85:11,13 86:25 88:5,9 89:6 91:6
**2,000** 37:17
**20** 71:11 86:9,19 88:8,10
**200** 13:8
**20006** 2:14
**2004** 33:20,21
**2008** 18:15
**2011** 2:6
**2017** 24:6 30:4 34:24 55:2 64:20 84:17 87:8 89:7
**2018** 36:23
**2019** 36:18
**2020** 11:20 90:8
**2021** 1:16 41:9 46:14,22,24 90:5,8 100:7,10 101:19 102:2 103:3,4
**21** 86:9
**2118** 5:12
**22** 86:9 91:20
**22702** 1:6
**275-7991** 103:8
**2:30** 97:9
**2:35** 1:17 99:10

**3**

**3** 3:5 41:9 91:6,7 94:8 103:3
**3,000** 37:10
**3/28/25** 100:16
**30** 71:11 103:11
**33606** 2:6
**3:30** 96:22,25
**3rd** 100:9 101:19

**4**

**4** 3:6 87:8 94:14,16 96:16
**43** 2:18
**4500** 11:1
**4848705** 102:4

**5**

**5** 2:17
**50** 2:9
**58** 3:3

**7**

**747** 2:3 103:2
**79** 49:10

**8**

**800** 6:2 103:8
**85** 3:4
**85710** 5:13
**86** 50:24

**9**

**91** 3:5
**94** 3:6
**97** 2:19

**a**

**able** 19:10 44:6 89:18 90:15
**absorbable** 53:20 68:8
**abundance** 75:5
**account** 24:8 88:16 88:20 89:19
**accuracy** 102:19
**accurate** 10:14 16:16 36:5,13 96:5
**accurately** 32:8
**acknowledge** 4:2
**action** 59:12 80:20 81:2,12 101:16,17
**active** 25:11,21 28:18 62:23,24 66:20 72:12 73:21 74:10 79:24 82:16
**actual** 69:11
**addition** 13:22
**address** 5:11 89:10
**adds** 12:19
**administering** 4:5
**administration** 98:25
**advance** 96:25
**advice** 77:4
**advise** 23:9 28:2 103:7
**advised** 28:21
**ago** 11:18,20 18:25 22:2 33:18 35:1 36:3 37:16 39:15 40:10,12 46:12 76:3
**agree** 31:8 73:19 74:8 82:19 87:13
**agreement** 4:9,10 39:24 40:5,8,15 41:2,13 76:7,8,11 76:15 77:1 93:17 93:18
**ahead** 20:14 23:15 27:11 78:19 80:11 85:5 86:3,7,18,20 91:11
**al** 102:3 103:4
**allegations** 25:10
**allege** 83:9
**alleged** 81:2 83:3
**alleges** 78:7
**alleging** 13:1
**amazon** 3:4 22:6 24:8 29:8,10 54:6,9 64:16 88:16,20 89:12,19 90:14

**amended** 3:3 59:12 59:20
**amendments** 102:18
**amount** 10:25 12:13 14:20,24 25:11,21 62:24 69:8
**amounts** 79:24
**analysis** 16:11
**analytics** 11:12,14 11:16,19 15:3 16:21 17:3
**analyzed** 25:1
**anderson** 2:5,5,17 3:7 4:11,11 5:5 8:25 9:4 20:5,16,25 21:6,10,15,18,24 22:12,25 23:4,18 23:19 24:21 25:8 25:18,25 26:6,13 27:1,4,6,13,25 28:8 28:13,20 29:5,15 29:23 30:8 31:3,15 31:22 32:9,15,19 32:22 33:4,11 34:7 34:12,19 35:21 36:16,21 37:4,24 38:2,6,11,22 39:4 40:7 41:5,25 42:18 42:20 43:2 54:24 58:12 64:12 67:7 71:10,15,18 74:17 88:13 94:11 97:5 103:21
**anderson's** 43:23
**angeles** 50:1
**ann** 1:3 60:5,8 102:3 103:4
**answer** 20:22 23:9 23:10,12,13 25:15 26:24 28:14 31:14 33:3 34:1,2,3 35:10 39:16 40:4,24 41:7 43:20,25 44:2 45:22 46:18 47:1 47:15 51:7,14,25 53:18 56:8,9,19 57:1 62:18 66:23 66:24 67:2,17,24 67:25 69:22,24 71:1,2 72:25 74:4,5 77:15 78:21,24 79:8,10,18 80:23 81:17 82:3,13,23 83:12,24 84:3,12 95:6,24
**answered** 29:20 36:25 67:12
**answering** 16:5
**answers** 64:25 96:4 96:13,14
**anxiety** 6:5
**anyway** 12:17
**apart** 65:25
**apologies** 23:16
**apologize** 27:5 85:2
**appearances** 2:1
**appeared** 43:23 65:6 100:6
**appreciate** 16:3 21:12 31:9
**approximately** 11:13,18 13:5,10 18:25 35:24 45:7 45:11 46:21 48:5 75:14 87:10 90:2
**arizona** 5:10,13 11:14,15,19 15:3 16:20 17:2 50:5,9 50:13,23,25
**arnall** 2:12 4:13
**aromatherapy** 6:14 8:16
**arrangement** 4:7
**arrangements** 103:8
**arts** 48:4,13
**aside** 17:6 24:10 35:15 38:16,24
**asked** 24:23 29:19 36:11,24 39:17 64:14 67:11 76:14 89:23 93:3,5,10,17 94:2 95:20
**asking** 11:2 15:11 21:18 23:4 44:24 46:18 54:24 73:25 75:7 77:7 78:6 88:13 93:9 95:3
**asks** 93:24
**asquared** 1:9 2:10 4:17 42:24 43:13 43:14,14 55:12,18 61:22
**assays** 9:24
**assigned** 78:1
**assist** 7:24
**assistance** 43:25
**assume** 9:25 35:12 48:8 50:4 64:24
**assuming** 89:14,23
**assumption** 89:16
**assurance** 10:8
**attach** 102:1
**attended** 33:14,21 34:8 39:17
**attention** 19:9
**attorney** 2:4,7,10 2:14 20:12 40:3 41:3 42:22,24 43:11 47:4 63:22 67:4 80:7 87:25 92:10 101:13,15
**attorney's** 62:22 95:12
**attorneys** 4:1 23:6 47:6
**authenticity** 10:9 10:13
**authority** 100:5
**authorized** 101:6
**available** 29:18 103:8
**avenida** 5:12
**avenue** 2:13
**aware** 33:23 34:5 39:19 47:9 56:23 80:17 83:3 98:1

### b

**b** 1:9 3:1 52:15
**bachelor** 48:12
**bachelor's** 47:23 47:24 48:2
**back** 6:22 12:8 18:9 21:21 27:4 30:3 37:17,24 38:2,12 71:16,23 72:3 74:18 81:10 85:20 94:9 96:19 97:1,10
**background** 6:24
**bad** 16:21
**balm** 17:16,17,21
**balms** 17:23
**base** 12:18
**based** 11:6 12:9,11 44:2 64:24 90:10
**basically** 12:16,17
**basis** 68:21 69:20 80:5 82:20 86:7
**bath** 17:23
**beautician** 48:22

**beauty** 49:1
**beginning** 63:20
**beginnings** 32:6
**begins** 43:20
**behalf** 1:4 4:11,17
  78:8
**believe** 31:17 34:18
  37:1,2 40:11 50:14
  54:24 56:12 65:5
  66:2,19 76:7 81:18
  83:1 88:14
**benefits** 31:9 56:16
**best** 16:5 21:14
  46:19 64:13 84:2
**big** 36:13 95:7
**bigger** 58:24 59:1
**bill** 1:3 60:16,18
**bit** 19:20 21:20
  64:12 72:5 74:17
  93:24
**blue** 63:25
**blur** 11:21
**bobbles** 17:13
**body** 98:6
**book** 18:12,17
**boostceuticals** 1:9
  61:24
**boosts** 9:15
**bottle** 24:13 25:12
  32:1 57:6 66:6 69:5
  87:18
**bottom** 8:5 95:11
**box** 37:11
**boy** 37:20
**bradstreet** 18:3,4
  18:11,21
**brain** 6:4
**brand** 29:7 97:24
**brands** 1:9 2:10
  4:17 43:13,14

**break** 37:23 38:10
  38:13 71:20 72:1
  96:22 97:11
**breathe** 7:6
**bring** 79:2 85:20
**bringing** 51:8
  78:16 84:7
**broadly** 52:19
**brody** 2:2 4:19,19
  9:3 20:2,7,10,21
  21:5,8,14 22:11,21
  23:2,6,15 24:18
  25:6,14,22,24 26:5
  26:9,22 27:10,15
  28:2,11,14 29:4,9
  29:19 30:6,24
  31:13,21 32:5,13
  32:17,21 33:1,3,9
  33:25 34:3,10,16
  35:19,25 36:8,19
  36:24 37:22 38:1,4
  38:7,20 39:1,24
  40:1,24 41:7,12,15
  42:6,9,15,22 44:12
  44:18 45:4,17,22
  46:1,10,22,24 47:1
  47:5,6,9,12,17 51:5
  51:13,23 52:10,24
  53:3,8,17 54:7,20
  55:4,8,13,20,24
  56:7,18,25 57:7,11
  57:17,22 58:2,11
  59:4,14,17 62:14
  63:4,12 64:8,21
  65:2,7,12,22 66:22
  67:2,11,16,23
  68:12,24 69:3,15
  69:21,24 70:8,14
  70:25 71:19,23
  72:16,23 73:7,9,16
  73:24 74:2,14,21

  74:23 75:2,11,17
  75:22 76:12,16
  77:3,13,23 78:2,11
  78:17,22 79:5,16
  80:8,16,21 81:4,15
  82:1,11,21 83:5,7
  83:11,17 84:6,9,19
  85:4,22 86:3,13
  87:21 88:2,8,11
  89:23 90:6,19,22
  90:24 91:2,11,15
  92:6,15 93:12,20
  94:5,21,25 95:3,22
  96:7 97:9,19 99:3,7
  103:1
**brody's** 44:21
  75:16
**brought** 82:10
**buffalo** 2:10
**bunch** 59:25
**business** 6:8 10:17
  10:18 13:9 19:12
  30:5 61:24
**butter** 14:3
**buy** 53:16

**c**

**c** 103:1
**calendar** 75:21
**california** 49:2
  50:5,18,22 51:1
**call** 17:12
**called** 7:6,9 19:23
  52:16 61:13,16,19
  61:23 62:1,5,9
  98:18
**calls** 26:22 31:13
  33:25 34:16 51:5
  51:23 56:7,18,25
  62:16 63:4 66:22
  67:16,23 69:21
  70:25 72:24 73:9

  74:3,14 77:3,13
  78:2,18,18 79:16
  80:21 81:15 82:1
  82:11 83:7,11
  95:22
**cap** 8:5,9
**capsule** 30:14,15
  30:16 65:17,24
**caption** 92:24
**case** 33:24 34:9
  39:18,20,25 77:1
  77:21 78:1 93:11
  102:2
**catch** 17:14
**caught** 21:21
**cause** 80:20 81:12
**causes** 81:2
**caution** 20:10,11
  36:8 40:2 75:6 80:9
**cb** 15:13
**cbd** 10:24 11:1,3,19
  12:9,9,13,19 13:23
  14:3,21,24 15:6,10
  15:23,24 16:9
  73:12 98:14
**cbdistillery** 15:17
  15:19
**cc** 103:21
**cease** 31:6
**center** 5:19,21 6:7
  6:10 18:9 19:8
  52:12
**central** 1:8 2:14
  61:20
**certain** 8:12 10:25
  25:10 27:22 71:4
**certainly** 34:8
  96:24
**certificate** 2:20,21
  10:8,8,12 16:11
  49:5,7,8,13,21,24

100:1 101:1
**certificates** 48:15
  49:4
**certify** 100:5 101:6
  101:12
**change** 83:22,23
**charles** 49:1
**check** 85:1,2
**checking** 88:16
**chestnut** 2:3 103:2
**choose** 29:17
**chose** 29:13 31:6
**circulation** 9:16
**circumstance** 75:7
**civil** 1:21
**claim** 72:11,18
  81:25 82:5,20
**claiming** 82:15
**claims** 28:10 39:2,5
  39:10 51:19 52:5
  82:9
**clarify** 41:15
**class** 26:14,21
  59:12 78:8
**clean** 38:14 68:7
  97:2
**cleaned** 36:14
**clear** 43:20 80:4
  89:17
**cleveland** 2:6
**client** 20:12 40:3
  97:24
**clients** 6:7
**cloud** 9:7 52:16
**clue** 79:1
**collider** 16:8
**colorado** 15:19
  16:10
**combinations** 8:8
**come** 27:7 37:24
  38:2 54:13 97:1

**comes** 8:2
**coming** 47:19
**commercial** 18:5
**commission** 100:16
  100:17
**communicated**
  60:8,13,18,23 61:3
  61:9
**communication**
  42:9 75:15 76:12
  93:25 94:3
**communications**
  20:12 27:19 35:23
  36:10 40:3 41:2
  80:10
**companies** 63:2
**company** 1:10
  10:17 15:13 18:1
  52:13 55:6,11
  61:13,16,19,23
  62:1,5,8,9 79:23
**compared** 29:13
**compile** 89:19
**complaint** 3:3
  59:12,15,20 78:7
**complaints** 12:25
**complete** 83:23
  101:9
**completed** 103:7,11
**completely** 46:17
  56:3 76:4
**composition** 69:20
**compound** 72:23
**comprised** 9:20
**computer** 41:22
  43:24 95:18
**concerning** 86:23
**concerns** 73:13
**concluded** 99:10
**conduct** 65:20
  76:14

**conducted** 1:14
**confident** 83:24
**confidential** 88:10
**configurations**
  41:21
**confirm** 10:12 96:4
**connected** 101:15
**consent** 4:6
**consider** 38:25
**considered** 103:12
**consists** 98:11
**consulting** 52:14
**consume** 53:1,7
**consumed** 53:2
  73:21
**consumers** 13:1
  80:1,1
**contact** 39:23
  103:8
**contacted** 20:3,6
  35:25 39:23
**contain** 25:11
**contained** 25:12
**content** 28:4 44:20
**contents** 36:9 41:1
**context** 51:3,21
  81:14,24
**continue** 71:18
**continuing** 58:8
**contrary** 73:4
**control** 58:23
**controversy** 10:16
**conversation** 44:21
**conversations**
  32:23 35:12 45:9
  46:9
**convicted** 52:8
**copy** 40:14 49:16
  75:10,12 76:6
**cori** 1:3 60:5,8
  102:3 103:4

**corporate** 18:13
**correct** 20:17 26:1
  26:4 30:4 31:23,24
  32:10,12,14 35:11
  35:14 46:25 51:2
  74:1 88:17 96:22
  98:15,20
**correcting** 56:12
**correction** 102:5
**corrections** 102:18
**correctly** 38:16
**cosmetology** 48:20
  48:21
**costco** 54:13,15,16
**counsel** 1:19 4:6
  20:18,24 21:8 23:2
  37:22 41:12 81:6
  85:22 86:14 94:21
  95:3 99:7 101:13
  101:15
**counsel's** 95:10
**count** 51:15
**county** 100:4 101:4
**couple** 36:2 39:14
  43:17,22 44:19
  47:17 52:18 66:11
  66:12 74:18 97:3
**course** 71:21
**court** 1:1 4:3 39:2
  39:10 51:19 77:11
**covered** 61:22
  64:12 67:7 74:17
**covid** 19:13
**cream** 6:15 12:3,18
  12:25 13:13,22,22
  17:6 34:14 73:13
  98:7,18,19
**crime** 52:8
**cross** 2:18,19 43:4
  97:15

**crystal** 17:13
**ct** 1:8 2:7 4:12
   61:16
**currently** 5:9 34:20
   53:19,24 54:8
**cut** 24:24,24 54:3
**cv** 1:6

**d**

**d** 1:9 2:16 52:15
**d.c.** 2:14
**daboll** 2:5
**dark** 6:3
**date** 1:16 24:3,5
   33:19 35:23 36:10
   36:15 41:6,8 42:8
   42:10,12 64:19
   74:20 87:10 88:15
   94:22 102:22,24
**dated** 101:19
**daughter** 35:8
**day** 30:20 31:25
   100:9 101:19
**days** 87:12 103:11
**deal** 95:7
**dear** 103:6
**december** 100:10
   101:19 103:3
**decide** 13:15,18
   18:8 27:9,18 35:8
   57:4,10
**decided** 57:5
**decides** 28:5
**decision** 29:25
   53:14
**defective** 80:6
**defendant** 43:13
   51:22 52:6 93:25
   94:2
**defendants** 1:11,19
   62:13 81:3 83:4,10

**defending** 52:1
**definition** 70:17
   80:22 81:16 82:2
**degree** 47:23,25
   48:3,5,12,20,21,23
   48:25
**degrees** 48:11 49:4
**delay** 21:17
**deleted** 36:6 37:13
   42:11
**demand** 93:4
**deposed** 5:3
**deposition** 1:14 4:2
   16:2 44:11 45:5,14
   45:21 46:2,7 58:8
   58:20,22 76:25
   85:12 92:5 94:15
   99:9,10 101:7
   102:1 103:4,7
**deprivation** 5:25
**describe** 6:17,21
   12:6 14:12,15,19
**description** 3:2
**destroyed** 17:1
**detail** 87:13
**determine** 29:6
   72:21
**determining** 67:20
**dex** 18:11,15
**diet** 27:23 54:22
**dietary** 98:22,25
**difference** 66:17
**different** 7:5,12
   14:4 29:11 41:11
   58:25 68:21 69:13
   69:19 85:24,25
   86:4,4 98:13
**digest** 31:1
**digestible** 68:8
**digestion** 31:20

**digital** 32:1
**diligence** 57:16
**direct** 2:17 5:4
**directly** 23:10 50:8
**discovery** 1:20
**discussed** 38:15
   75:8
**discussion** 27:3
**discussions** 35:4,16
**disposed** 66:6
**distillery** 16:10
**district** 1:1,1
**division** 1:2
**divorce** 33:17
   38:24 51:15,17
   52:4
**docket** 64:3
**doctor** 27:20,23
   57:12
**document** 3:6 44:2
   44:5 58:5,16,19,23
   59:10,20,22,25
   63:11,18,21 64:6
   77:19 85:9,11,16
   85:21 87:1,14,24
   88:18 89:24 90:11
   90:21 91:14,21,24
   92:1,10,18,20 93:5
   94:13,20,20 95:2
   95:16,21 96:4,5,15
**documents** 10:13
   44:15,16,23 45:1
   58:21 63:14 86:10
   86:14 89:20 90:16
   92:2,4,24 93:4,11
**dog** 34:22
**doing** 8:16 10:18
   16:2 43:18 57:15
   61:24 89:4 96:12
**dollar** 1:10 62:9

**dose** 30:19
**doses** 30:10,11 66:3
   66:14
**dr** 15:8 32:24 33:5
**dream** 98:18
**driver's** 100:18
**drop** 8:8 69:6,7
**dropper** 69:5
**drops** 8:20,21
**drove** 29:25
**drug** 98:25
**duly** 5:2 100:7
**dun** 18:3,4,11,21
**dwelling** 34:21

**e**

**e** 2:16 3:1 17:18
   19:23 20:4,9,20
   21:2,7,25 22:8,18
   23:20,24 24:10,11
   24:13,17,25 25:4
   25:10,20 26:1 27:9
   27:24 28:22,25
   29:1,2 30:1,3 31:25
   32:12 33:8 34:24
   35:6,13,16,18 36:1
   38:19 52:18,20,21
   55:1,7,22 56:6,17
   56:24 57:4,6,16
   58:1 64:11,25
   66:19 67:15,21
   72:12,21,21 73:21
   74:9 84:16 87:6,14
   87:18 89:6 90:17
**earlier** 46:16 49:11
   68:17 88:14 95:17
**earliest** 42:8,9,10
   42:12
**early** 49:12
**easier** 35:2 79:14
   93:24

**easily** 68:8
**eastern** 38:7 97:9
**education** 47:22
**effective** 8:13 31:18 31:18
**effectiveness** 14:10
**effects** 56:23
**efficacy** 24:1
**eight** 14:4 69:16
**eighties** 18:10 49:12
**either** 87:19 89:11
**eleven** 38:9
**email** 37:8,19 75:1 75:11,12
**emails** 36:6 37:11 42:5
**employed** 5:16,17
**employee** 101:13 101:14
**employees** 7:24
**emu** 14:4,5,5
**ends** 43:19
**engage** 75:15
**englewood** 15:19 16:10
**ensure** 9:19 14:23
**enter** 39:24 40:8
**entered** 40:4 64:2
**entire** 6:7 91:22
**entirely** 84:4
**eos** 17:16,18
**epsom** 6:2 15:7
**eric** 1:4 61:1,3
**errata** 2:22 103:14
**esquire** 2:2,5,8,12 103:1,21,21,22
**essential** 8:7,8,9,16 9:7,20,21 14:4 98:12,13
**essentially** 15:7
**et** 102:3 103:4
**eucalyptus** 7:7
**eugene** 50:19
**event** 71:20
**everyone's** 17:19
**exact** 74:20
**exactly** 16:22
**examination** 2:17 2:18,19 5:4 43:4 97:15
**examined** 5:3
**example** 53:13 73:11 89:9 93:16
**excuse** 47:13 50:15 71:8
**exercise** 72:6
**exhibit** 3:3,4,5,6 58:7,13 64:10 85:11,13,23 86:6 86:25 88:5,9 91:6,6 91:7 94:8,14,16 96:16
**exhibits** 3:7
**expand** 6:5
**experience** 16:21 16:23
**experiencing** 28:1 70:22
**expert** 31:14 56:8 56:19 57:1 66:23 67:17,24 69:22 71:1 74:4
**expertise** 26:23 34:17 51:6,24 56:8 56:19,21 57:1 62:16 63:5 66:23 67:17,24 69:22 71:1 72:24 73:9 74:3,15 77:14 78:3 78:18 79:17 80:22 81:16 82:2,12 83:7 83:12 95:23
**expires** 100:16
**explain** 30:23
**extent** 23:12 46:17 76:24 78:24 79:18 85:23

**f**

**f** 2:6
**faces** 44:7
**fact** 87:19 89:14
**factor** 29:25
**factual** 82:20
**failed** 46:16
**fair** 24:22 42:4 68:10 69:14 76:10 82:8
**false** 83:18
**familiar** 55:15 62:3 81:1
**far** 11:9 43:18 71:8
**fault** 16:6
**fda** 34:15 98:24
**february** 42:16
**fed** 11:4
**federal** 103:12
**feel** 30:20,22 71:18 83:24
**feeling** 37:18
**feels** 36:2
**filed** 19:21 77:12 77:21
**filled** 6:1
**fillers** 53:21 68:3,4
**finally** 11:4 36:14
**financially** 101:16
**find** 68:10,13 76:25
**fine** 71:22 77:10
**finish** 16:4,5
**finished** 14:22 23:12
**firm** 4:19 39:25 41:2 43:12 47:10 75:16
**first** 5:2 48:18 51:1 58:19 59:5,10 62:15 63:10 79:3 91:21,23
**fish** 53:9
**fishon** 1:4 61:1,4
**five** 37:23 45:13 47:2 71:19,23 96:20
**float** 19:7
**florida** 1:1,21,24 2:6 77:17 100:3,16 101:3 103:12
**flotation** 5:19,21,24 18:9 52:16
**flsd** 64:3
**follow** 98:2
**following** 39:22
**follows** 5:3
**food** 98:24
**foot** 49:19
**foregoing** 102:17
**forgive** 16:19
**form** 20:2,21 22:11 22:21 23:5 24:18 25:6,14,22 26:5,9 26:22 27:15 29:9 29:19 30:6,24 31:13 32:5,13,16 33:1,9,25 34:16 35:19 36:19,24 38:20 39:1 40:1 42:15 44:12 45:17 47:12 51:5,13,23 52:10,24 53:8,17 54:7,20 55:4,8,13 55:20,24 56:7,18 57:7,11,17 58:2

62:14 63:4,12 64:8 64:21 65:2,7,12,22 66:22 67:16,23 68:12,24 69:3,15 69:21 70:8,14,25 72:16,23 73:7,16 73:24 74:3,14,23 75:2,17,22 76:16 77:3,13 78:17 79:5 80:8,16,21 81:4 82:11,21 83:5 84:9 84:19 87:21 88:2 88:24 90:6,19,24 91:2 92:6,15 93:12 93:20 94:5 95:22 96:7 99:3
**formally** 75:15 99:8
**forward** 43:15
**forwarded** 103:14 103:15
**found** 11:9 40:25 41:4 58:1 62:21
**foundational** 72:8
**fountain** 2:9
**four** 8:3 35:1 47:2
**francisco** 48:1
**frankincense** 7:7
**free** 71:18
**front** 9:5
**frozen** 9:1
**full** 5:6
**fumble** 56:4
**further** 97:5,13 101:12

**g**

**general** 59:6
**generally** 54:17
**gentleman** 32:24
**getting** 43:25 80:2
**ginsberg** 1:3 60:5,9 102:3 103:4
**give** 10:14 26:2 41:19 43:25 58:20 87:24 91:11 97:1
**given** 63:13
**glanced** 63:23
**gmax** 1:8 2:14 4:14 61:20 97:24
**go** 8:1 14:7 18:22 20:14 22:6 23:15 27:1,11 43:10 48:18 53:15 58:25 67:20 71:15 74:18 78:10,19 80:11 85:5 86:3,7,17,20 89:18 91:11,13 94:1 96:2 97:2
**goal** 70:9 96:25
**god** 12:17 15:10
**goes** 14:2 67:14 71:9
**going** 12:20 16:2 18:20 26:19 27:16 27:21 29:7 31:1 35:23 36:5,12 38:1 42:23 43:14 44:5 52:18 53:16,20 64:10 66:6 68:16 76:19,23 78:8,11 78:12 80:2 81:22 85:9,22 86:6 88:15 91:18 95:11
**golden** 2:12 4:14
**goldhamer** 2:2 4:20 103:2
**good** 19:4,5 21:22 28:6 39:16 43:6,7 43:18 63:8
**google** 17:4 18:16
**gotcha** 13:21 16:25
**gotta** 54:15,16
**governmental** 34:15
**graduated** 48:8
**graifman** 2:2 4:20 103:2
**grammatical** 72:6
**great** 6:9,23 15:16 43:22
**greet** 6:6
**gregory** 2:12 4:14
**ground** 86:16
**guess** 62:22 63:6 83:19 99:8
**guessing** 63:7,7
**guy** 16:24
**guys** 9:1,2 21:15,20 58:7 71:15

**h**

**h** 3:1
**haha** 39:16
**half** 13:14
**hand** 100:9
**hands** 41:23
**handy** 76:7
**hangings** 17:14
**happened** 18:15
**happening** 39:20
**happy** 19:10
**hard** 21:11 30:14 30:16 31:2,4,19 65:6,16
**he'll** 96:19
**head** 44:24 56:14
**health** 1:8 2:7 4:12 61:17
**healthy** 1:9 54:19 62:2
**hear** 12:4 17:2 21:9 21:15,19 42:19 84:11 97:17,19
**heard** 26:14,16 47:14 55:11 61:13 61:16,19,23 62:1,5 62:8 84:13
**hearing** 21:11
**help** 6:4 9:12 43:20
**helps** 7:6,10 9:9
**hey** 21:10
**hh104767** 100:17
**hi** 94:10,11
**high** 48:8,12
**highest** 47:21
**hold** 6:22 8:23 9:14 15:17
**hollow** 8:5
**honest** 38:14 63:14
**honestly** 20:15 41:21
**honey** 14:4
**hood** 1:3 60:21,24
**horrific** 19:14,16
**hour** 96:23
**house** 34:21 50:17
**huh** 18:6
**hum** 19:24 60:1 64:1,4 72:7 75:9 85:19 98:4
**hypericum** 14:3

**i**

**idea** 63:8 79:1
**identification** 58:14 85:14 91:8 94:17
**identify** 53:15 91:14
**imagine** 89:3
**immune** 9:15
**impact** 66:15
**important** 74:19

**improve** 9:16
**inches** 6:2
**includes** 85:24
**independent** 25:19 55:17 77:20 92:17
**indicate** 4:8
**indicated** 54:25 65:5 66:2 102:18
**indicating** 58:12
**individual** 67:8 68:22
**information** 24:7 57:25 68:11 86:12 88:23,24 89:5 90:15
**infused** 13:23
**ingested** 98:6
**ingredient** 14:16 25:12,21 28:18 62:23,24 66:20 71:5 72:13 73:21 74:10
**ingredients** 10:3,7 12:11 14:8,18,19 32:8 68:21 69:5,11 72:22 79:24 82:16 98:11
**inhale** 7:4
**inhaler** 6:16 9:8 68:20,20,22 69:12 69:12 98:9,10
**inhalers** 6:14 9:18 13:3,5 17:7 34:13 68:16,20
**initial** 75:15 76:12
**inspire** 1:8 61:24
**instructions** 43:17
**intent** 24:16
**intentional** 97:21
**intents** 49:19
**interest** 84:7
**interested** 101:16
**internet** 57:23 58:1
**interrupt** 11:15 16:1
**interrupted** 16:19
**intricacies** 83:21
**introduction** 91:12
**involved** 38:23 39:6 94:23
**involvement** 20:1
**isolate** 15:25
**issue** 55:1
**issues** 27:22 28:1 56:12

**j**

**j** 2:12 103:22
**january** 36:18,23
**jay** 2:2 4:19 20:7 21:4,10 22:24 32:15 40:21 41:18 42:6 44:16 58:6 85:6 86:8 103:1
**jay's** 42:2
**job** 43:18 102:4
**jogging** 16:18
**johnson** 2:5
**jojoba** 14:5
**jolly** 1:10 62:9
**judge** 77:25
**judgments** 80:14
**justice** 79:15,22

**k**

**k** 1:23 100:15 101:5 101:24 103:18
**kalman** 32:25 33:5
**kalyn** 1:14 5:1,8 40:24 42:22 52:14 52:14 92:25 100:6 101:7 102:1,22
103:1,4
**kantrowitz** 2:2 4:20 103:2
**kathleen** 1:23 100:15 101:5,24 103:18
**kaylyn** 1:3
**keep** 77:1
**kept** 11:2
**khakiware** 1:10 62:6
**kidding** 19:5
**kind** 11:21 17:1 19:19 54:21
**kmw** 1:6
**knew** 18:19 37:12
**know** 6:21 8:2,19 15:12,12,13 16:18 16:21 19:17 20:8 20:15,22 22:22 23:13 26:18,20,24 26:25 29:11 30:19 30:25 33:5,12 34:4 34:14 35:22 36:20 37:3,6,7,18 39:10 39:12 40:13 42:3 42:10 44:18,25 45:22 46:12,17 51:7,25 55:6,22 56:9,10,13,21 59:2 59:7,16 60:5,11,16 60:21 61:1,6 62:23 67:3,14,25 68:7 69:24,25 70:1,16 72:25 74:5,20 75:6 75:10,24,25 76:2,3 76:6 77:8,11,25 78:6,24 79:12,19 79:25 80:23,24 81:12,13,17,19,20 81:22,25 82:3,4 83:20 84:3 86:14 89:3,4,12,14 90:7 95:20,24,25 97:4
**knowledge** 25:19 78:10 98:24
**known** 5:25

**l**

**lab** 11:8 12:7 17:5
**label** 8:10 10:7 14:7 14:9,12 28:19 62:25 66:21 68:11 68:14 72:13,22 73:22 74:11 79:24 82:17 84:17,22
**labeled** 59:11,20 98:21
**labeling** 83:18
**labs** 11:2,3 62:22
**lag** 43:18 47:14,19
**lagged** 21:21
**large** 6:1
**lately** 18:17
**law** 4:19 43:12 47:10 83:4,16,21
**laws** 83:9
**lawsuit** 19:21 20:1 22:1,9,19 23:21,25 25:1,5,9 26:8,20 28:10 32:24 43:13 45:16 46:3,11,23 47:7,10 51:3,9,12 51:21 52:4,6,17 55:1 60:9,14,19,24 61:4,10 63:3 72:11 74:19 77:2,11 78:10,16 79:2 80:19 81:3,24 82:5 82:10 83:10 84:8 87:25 89:18 94:3
**lawsuits** 38:24,25

**lawyer**  25:17 38:17
  81:20 92:3
**lawyers**  35:17
**lay**  41:23
**leading**  32:17
**leave**  27:18 71:10
**left**  38:14 71:12
  72:5 96:21
**legal**  3:6 23:7 26:23
  34:1,17 51:6,24
  52:12 62:16 63:5
  77:4,14 78:3,18
  79:17 80:22,22
  81:16,16 82:2,2,9
  82:12,22 83:7,12
  83:12 95:23 103:18
**letter**  2:23 103:7,12
**letting**  16:4
**level**  47:21
**liberty**  9:22 10:2
**license**  100:18
**licenses**  48:16
**life**  12:1
**light**  17:14
**liked**  29:21
**line**  86:10 94:19
  102:5
**lip**  17:16,17,21
**lippes**  2:9 4:16
  43:12
**listed**  28:18 60:2
  82:16
**listening**  19:8
**litigation**  81:14
**little**  9:11 19:20
  53:21 64:12 72:5
  74:17 93:23 97:2
**live**  5:9 35:11 50:3
  50:3
**lived**  5:14 50:5,12
  50:13,14

**liver**  56:11,12
**living**  5:18 35:9
  50:5,8
**llc**  1:8,8,9,9,10 2:10
  4:17 43:13 61:14
  61:17,20 62:2
  102:3 103:4
**llp**  2:9,12 43:12
**locally**  10:24
**long**  5:14,20 10:17
  10:18 11:18 13:10
  22:18 23:20 36:2
  45:11 47:14 66:9
  75:14 76:3
**longest**  13:13 47:14
**look**  15:15 21:3
  22:2,5 36:3 40:17
  41:24 44:1 57:20
  68:3 77:5 89:13
  91:22 95:14
**looked**  17:4 29:11
  65:19
**looking**  24:7 41:19
  43:24 88:18,22
  89:24 96:13,14
**looks**  15:21 18:17
  88:25
**los**  50:1
**lost**  96:18
**lot**  12:12 16:3
  63:13
**lotion**  98:7
**love**  54:15,16
**loved**  18:10
**lusa**  97:25

**m**

**m**  2:8 103:21
**ma'am**  26:8 103:6
**magnesium**  14:3,21
  14:24 15:5,7

**major**  37:10,14
**making**  8:1 23:7
  25:9 32:7 89:16
**malgeri**  1:3 60:11
  60:14
**manage**  6:6
**manatee**  100:4
  101:4
**manipulated**  85:24
**manner**  4:8
**manufacturer**
  15:11,12 19:22
  29:2 34:13
**marked**  3:2 58:13
  85:11,13 91:7
  94:14,16
**massage**  49:19
**matched**  72:22
**materials**  15:5
  16:12,16
**mathias**  2:9 4:17
  43:12
**matter**  52:5
**mckeown**  1:4 61:7
  61:10
**mcshea**  98:18
**mean**  5:23 10:1
  11:15 13:8 16:1
  19:5 25:16 26:17
  30:23 31:1 33:18
  37:9,16 39:11
  41:20 49:5 51:4,22
  54:3 59:15,16 70:5
  70:12,19,24 72:20
  75:23 79:22 80:20
  83:20 86:2
**meaning**  83:23
**means**  22:23 23:1,5
  26:18 81:12,14,25
**measure**  32:8

**measured**  69:7
**mediation**  33:12,14
  33:21,24 34:6,8
  39:18,19
**members**  7:23
**memory**  9:12,15
  16:19
**mention**  46:16
**mentioned**  44:18
**merit**  101:5
**method**  49:25
  72:19 73:2,4,5
**miami**  1:2
**middle**  44:7 87:8
  93:22
**milligrams**  11:1
  29:13,21,24 85:3,7
**mind**  6:5 45:24
**mine**  13:19 89:15
**minerals**  53:10
**minute**  36:7 37:23
  71:19
**minutes**  38:6 43:9
  45:13 71:12,24
**misleading**  86:5
**misrepresented**
  79:23,25
**misstates**  62:15
  79:5,7
**moment**  24:19
  86:17
**month**  37:16
**months**  23:23
  66:11,12 92:13
**morning**  43:6,7,8
**move**  64:11 91:6
**moving**  43:15
  61:12
**multivitamin**  53:13
  53:14,16

**multivitamins**  53:9

**n**

**n**  2:16
**name**  4:9 5:6 14:7
15:11,12,12,14
32:24 41:18 42:3
43:11 52:12 60:2
89:9 97:25
**names**  59:25
**narrow**  52:20
**nasal**  6:14,16 9:8
9:18 13:3,5 17:7
34:13
**natural**  9:22 10:2
17:13
**neat**  5:20 15:21
**need**  22:4 31:10
33:19 53:22 58:25
77:1 81:10 91:22
96:22
**needed**  32:7 37:12
**needs**  59:6
**never**  10:16 12:1,2
20:17,24 38:18
65:17 79:11
**new**  2:3,3,10 103:3
103:3
**nice**  9:13
**nine**  9:7 38:6 52:16
**noah**  1:3 60:11,13
**nope**  7:25
**nose**  7:4
**notary**  1:23 100:16
**notes**  97:2 101:10
**notice**  1:19 66:15
**noticed**  30:13
43:22
**november**  1:16
41:9 100:6 102:2
103:4

**number**  58:13
85:13 91:7 93:22
94:16
**nutritional**  19:22
87:19
**nw**  2:13

**o**

**o**  17:18 103:1
**o'brien**  2:8,18 4:16
4:16 21:20 42:21
42:25 43:3,5,11
44:14 45:19,25
46:25 47:3,18
51:10,16 52:3,11
52:25 53:5,12,25
54:11,23 55:5,10
55:16,21 56:1,15
56:22 57:3,9,14,19
57:24 58:4,6,15
59:8,9,16,18 62:17
63:9,16 64:9,23
65:4,9,14 66:1,25
67:6,13,19 68:9,15
68:25 69:9,17 70:2
70:10,18 71:6,13
71:17,21 72:2,17
73:3,10,18 74:1,7
74:16,25 75:4,19
76:1,18 77:6,18,24
78:5,14,23 79:9,21
80:13,18,25 81:9
81:23 82:7,18 83:2
83:8,14,25 84:11
84:14,15,21 85:8
85:15 86:1,8,21,22
87:23 88:4,9,12
90:9,20,25 91:4,9
91:13,17,19 92:8
92:16 93:15,21
94:7,10,12,18,24
95:1,5 96:1,9,24

97:12 103:21
**o'clock**  38:4,7,9
**oath**  2:20 4:5 5:2
100:1
**object**  20:2,11,21
22:11,21 24:18
25:6,14,22 26:5,9
26:22 27:15,17
29:9,19 30:6,24
31:13 32:5,13 33:1
33:9,25 34:16
35:19 36:19,24
38:20 39:1 40:1
42:15 44:12 45:17
47:12 51:5,13,23
52:10,24 53:8,17
54:7,20 55:4,8,13
55:20,24 56:7,18
57:7,11,17 58:2
62:14 63:4,12 64:8
64:21 65:2,7,12,22
66:22 67:16,23
68:12,24 69:3,15
69:21 70:8,14,25
72:16,23 73:7,16
73:24 74:3,14,23
75:2,17,22 76:16
77:3,13 78:11,13
78:17 79:5 80:8,16
80:21 81:4 82:11
82:21 83:5 84:9,19
85:23 86:6 87:21
88:2 90:6,19,24
91:2 92:6,15 93:12
93:20 94:5 95:22
96:7 99:3
**objecting**  86:16
**objection**  4:12,15
4:18,21 23:5 25:24
27:10 28:2,11 29:4
29:9 31:21 32:19

34:10 53:3 56:25
57:22 58:10,11
67:11 77:23 78:2
79:16 81:15 82:1
83:11,17 85:4
**objections**  4:7
21:11 23:7,8
**objective**  70:5,7,11
70:12 72:6 73:5
74:9
**obtain**  90:15
**obvious**  54:21
**obviously**  52:17
**occurred**  35:23
**october**  24:6 30:4
34:24 55:2 64:20
84:17 87:8 89:6
**offered**  29:12
**office**  103:8
**official**  100:9
**oh**  9:15 12:17 13:7
15:10 20:23 23:6
35:7 37:9,20 42:14
49:11 50:12 52:23
54:2 63:19,22
70:13 89:11
**ohman**  1:23 84:11
100:15 101:5,24
103:18
**oil**  8:7 11:3 14:4,5,5
14:5 15:24 53:9
**oils**  8:8,9,13,16 9:8
9:20,21 14:4 98:13
98:13
**okay**  6:16,22 9:5
13:15,21 15:9,18
16:23 17:2,6,11,15
18:23 23:14 24:10
25:16 28:9,14
30:17,22 31:4
32:10 34:23 35:4

36:12 37:5,14 38:4 40:21 41:10,11 42:4 43:3,15,17,21 44:3,9,21 46:18,20 47:21 50:11 51:21 54:4 56:2 58:7,19 59:3,8,21 60:5 62:8 63:22 64:2,14 65:10 66:5,9,12 67:4,20 68:18 69:12 70:4,23 71:3 71:7,14,17,25 73:19 75:5,10,14 75:20 76:4,5,10,14 76:19,23 77:9,11 79:13 80:4,14 81:1 81:13,24 82:8 83:3 84:1,4,5,14,22 87:3 87:5,7,17,24 88:7 88:18,22 89:1,5,16 90:10,14 91:5 92:4 92:9,21,23 93:7,16 94:8 95:10,20 96:16,24 97:18 98:2 99:6,7
**once** 31:10 103:15
**one's** 17:19
**ones** 7:12 42:13
**ongoing** 37:16
**online** 10:10 50:2
**oparil** 2:12,19 4:13 4:13 58:10 97:4,7 97:14,16,21,22 99:4 103:22
**open** 13:9 19:7
**operating** 30:5
**operator** 6:8
**opposed** 58:8
**options** 29:18
**orange** 7:8,10 9:10
**order** 3:4 16:9 31:8 73:13 87:4,5,13 89:14
**ordered** 24:6 84:25
**ordering** 103:14,15
**oregon** 9:22 50:19 50:19,21
**organic** 53:24
**original** 36:15 103:14
**outside** 48:11 51:17 52:4 76:21 77:19 90:14 93:9
**overdosing** 53:23
**owned** 5:20
**owner** 6:8,8

**p**

**p.c.** 2:2 103:2
**p.m.** 1:17,17 99:10
**packaging** 83:13
**page** 2:17,18,19,20 2:21,22,23 3:3,4,5 3:6 59:1,5,5,10,13 59:14,19 85:16,16 85:17,18 86:25 87:8,17,17 88:5,9 88:19 89:10,12 91:20,21 95:11 96:2 102:5
**pages** 1:25 18:12 58:24 63:15,21 87:20 102:17
**paid** 80:1
**pain** 6:14 12:3,24 13:13,22,22 17:6 34:14
**pamphlet** 18:18
**paper** 88:24
**part** 8:4,4,4,4,22 19:21
**participating** 4:1
**particular** 29:1,1 29:16 30:1
**parties** 4:6 101:14 101:15 103:15
**parts** 8:2,3,3
**party** 9:19 14:23 25:1 54:6 67:9 73:14 103:14
**pass** 42:20
**patient** 27:17 28:4
**pendency** 40:23
**pending** 23:3,17 80:14
**pennsylvania** 2:13
**people** 6:6 38:24 62:20 78:9
**peppermint** 7:7
**percent** 9:7,20 41:22 55:15 70:1 81:19 98:12
**perform** 25:3
**period** 50:6
**permitted** 1:21
**person** 26:3 35:5 35:17 50:2 51:8 52:1 56:17
**personal** 37:19
**personally** 70:21 80:15
**phone** 18:12,17 43:24 45:9 46:6
**phonetic** 97:25
**physical** 6:4
**physician** 27:12,14 27:17 28:4,21,24 35:15 38:17 57:12
**picture** 87:18
**piece** 31:2,5
**pill** 65:11 72:21,21
**pills** 67:8
**place** 41:24 79:3
**plaintiff** 26:10 51:4 51:11 60:3 86:15 93:25 94:1
**plaintiff's** 86:9,19 88:8,10
**plaintiffs** 1:6 2:4 4:21 62:20 85:25 86:5
**plan** 7:17
**planeta** 5:12
**plaza** 2:9
**please** 4:8 5:6 44:2 102:1 103:8
**pllc** 2:5
**point** 20:13 44:19 50:4 57:5 58:25 66:5 68:17 76:8 78:10 89:23 97:12
**points** 74:19
**portland** 9:22
**possible** 53:21 68:19 69:18 75:11 75:13,24
**possibly** 68:7
**potency** 23:25 70:24 71:4
**potential** 73:12
**pounds** 6:2
**powder** 15:25 16:9 30:15
**prefer** 68:6
**preparation** 45:5 46:2,7 92:5
**prepare** 44:10
**prepared** 45:20
**preparing** 45:14
**present** 4:3 82:17
**preside** 78:1

**previous**  64:25
**price**  29:22,24 54:2
  54:2,4 80:1
**prices**  29:12
**printout**  88:19
**prior**  18:1 45:14
  46:1,9 50:5,8,18,21
  50:25 64:6 79:6
**privilege**  27:17
**privileged**  28:3
**probably**  49:10
**problem**  73:12,12
**procedure**  1:21
  68:2
**proceedings**  4:4
**process**  53:15
  69:11 91:14
**produced**  100:18
**product**  8:22 9:17
  10:4,23 11:3,8
  14:10,13,16,22
  22:15 26:12 28:17
  29:7,16 30:1,9 31:4
  31:9,17 32:7 33:8
  55:18 62:21 64:11
  64:16,19 65:6,10
  65:21 66:10,17
  67:14 68:7 69:13
  69:20,20 71:5 73:6
  73:14,20,23,25
  74:12 80:5 82:17
  84:7,18,25 98:10
  98:19
**production**  3:5
  86:9 87:25 91:18
  92:24
**productions**  85:24
  86:4
**products**  6:9,13
  10:19,21 11:23
  13:11 17:8 29:13

68:6 69:19 97:24
  98:3,5,15,16,21
**program**  50:2
**promise**  36:5 37:2
**promised**  78:25
**proof**  93:6,9
**properly**  13:1
**proven**  9:12
**provide**  10:6,7
  15:23 16:11
**provided**  86:15
**providing**  10:3
**pty**  1:9
**public**  1:23 100:16
**pulled**  95:17
**purchase**  9:21
  20:20 24:10 27:8,9
  29:7 30:1 32:11,12
  35:5,13,25 38:18
  53:6,14 54:1,5,25
  57:5 64:11 66:9
  67:21 86:11,19
  87:11,14 88:15
  89:6,20 90:16 93:6
  93:10 97:23
**purchased**  20:4,8
  21:2,7,25 22:7,8,18
  23:20 24:3,11,14
  24:25 25:4,11,20
  26:2,12 29:17 30:3
  31:25 32:1 34:23
  55:6 62:21 64:16
  65:1 66:20 67:9
  72:12 73:20 74:10
  80:6 87:12
**purchases**  39:8
**purchasing**  10:24
  24:16 55:18 57:16
**pure**  8:8 10:3 97:25
  98:12

**purge**  36:13 37:8
  37:15
**purged**  42:17
**purposes**  1:19,20
  49:20 53:6 58:13
  85:13 91:7 94:14
  94:16
**pursuant**  1:19
**put**  8:10 69:5,6,11
  72:13 86:4
**putting**  41:17 42:2

**q**

**question**  16:4 21:9
  21:23 23:3,10,11
  23:17 28:12 40:22
  40:23,25 41:12
  43:19 45:17 46:5
  47:16 69:18 72:24
  74:2,6 78:12 81:10
  81:11 82:24 83:24
  91:23 95:6 96:3
**questions**  32:18
  38:14 42:23 43:23
  44:1,19 46:19
  52:19 54:25 64:13
  72:8 78:7,9 84:1
  88:14 94:19 96:4
  97:8,13
**quick**  27:2 37:23
**quickly**  97:6
**quiet**  6:3

**r**

**rarely**  45:24
**ratio**  8:12,19
**ratios**  53:22
**raw**  15:5,23
**reach**  75:1
**reached**  74:21 84:6
**read**  2:23 9:11
  81:10 93:24 102:17

103:9
**reading**  77:19
**really**  19:7 30:13
  39:11,11,12 52:15
  75:18 78:12
**reason**  10:15 11:6
  12:19 31:5,17
  102:5
**reasonable**  103:12
**rebuild**  19:16
**recall**  7:9,10 9:9
  21:2,25 38:21 40:9
  57:15,25 59:23
  74:20,21 75:18,20
  84:17 86:17 88:1
  90:2,21 91:1 92:9
  92:12 93:3,7,10,14
  96:14
**receipt**  65:5 84:23
  103:12
**receive**  10:11 16:12
  47:24 48:2,23,25
  49:8,13,21,24
  56:17 64:25 78:15
  79:3
**received**  42:11 48:6
  84:16 96:15 103:15
**receiving**  79:12
**recession**  18:16
**recipe**  8:15
**recognize**  85:21
  87:1,3 91:23 92:1
  94:20 95:2
**recollection**  44:3
  46:19 55:17 64:5
  77:20 84:2 90:10
  92:17,19
**recommend**  29:1
**recommended**
  24:20 28:24 35:15

**record**  4:10 5:7
  27:1,3,4 43:20
  62:15 72:4 89:17
  101:10
**recovery**  6:4,5
**recruited**  18:21
**refer**  43:14
**reference**  68:17
**referenced**  103:7
**referring**  95:17
**reflexology**  49:6,9
  49:18
**regard**  80:19
  103:13
**regarding**  58:1
  78:9
**regimen**  28:22,25
**registered**  101:5
**regularly**  46:13
  53:2
**regulations**  34:15
  98:25
**reiki**  49:7,22
**related**  20:20 32:23
  33:7 35:25 39:8
  86:12 89:6,20
  90:16 94:3
**relative**  101:12,14
**rely**  16:14
**remainder**  66:7
**remember**  9:9 14:6
  15:13 20:23 52:15
  92:21 96:12,13
**remotely**  4:5 5:3
  100:6
**remove**  65:10
**repeat**  21:8 23:17
**rephrase**  28:12
  81:6
**report**  101:7

**reporter**  4:1,3
  84:13 101:6
**reporter's**  2:21
  101:1
**reporting**  4:4,8
**represent**  39:25
  75:16
**representations**
  14:9
**representative**
  26:15,21 78:8
**representing**  4:14
  62:19
**represents**  43:12
  47:10
**request**  3:5 90:3,12
  91:17 92:24 93:24
  95:10
**requested**  101:8
**requisite**  25:21
**research**  57:15,21
**reset**  6:3
**reside**  34:20
**residence**  34:21
**respire**  7:6
**respond**  93:4
**response**  12:7
  90:11
**result**  78:16
**retailers**  19:22
**retained**  3:7
**retainer**  40:14
  41:13 76:7,8,11,15
  77:1 93:16,18
**retire**  19:18
**retirement**  19:17
**reveal**  20:12 27:19
  28:4 36:9 40:2 41:1
  80:10
**revealing**  28:7

**review**  44:15,23
  45:1 59:6,6 65:20
  84:22 96:3 101:8
  103:8,9,11
**reviewed**  44:17
  92:5 95:9
**reviewing**  64:5
  84:17 92:18,19
**rich**  58:6
**richard**  2:12 4:13
  103:22
**rid**  64:10 91:5
**ridge**  2:3 103:2
**right**  6:22 12:4
  15:4,22 19:19,23
  22:4 25:13 30:20
  30:23 31:11 34:9
  34:11 38:12 41:10
  42:6,12 43:8 46:7
  50:16 53:10,22
  54:14 55:2,23 56:5
  57:6 63:11 64:17
  65:1,6,24 66:3,8
  72:3 73:15 80:3
  85:10 86:10 87:7,9
  88:16 91:5 93:1,2
  96:20 97:21 98:14
**rmr**  1:23 101:24
  103:18
**road**  2:3 103:2
**robert**  1:4 61:7,9
**rock**  30:16 31:19
  65:16
**role**  26:7
**roll**  71:11
**rosemary**  7:10 9:10
  9:10,11
**ross**  49:1
**rough**  11:22
**rules**  1:21 103:12

**rx**  1:9 62:2

**s**

**s**  3:1 17:18 49:25
**safe**  50:4
**safety**  17:19
**sake**  89:17
**sales**  18:5,13
**salt**  6:2
**salts**  15:8
**sam**  19:23 20:4,9
  20:20 21:2,7,25
  22:8,18 23:20,24
  24:10,11,13,17,25
  25:4,10,20 26:1
  27:9,24 28:22,25
  29:1,2 30:1,3 31:25
  32:12 33:8 34:24
  35:6,13,16,18 36:1
  38:19 52:18,20,21
  55:1,7,22 56:6,17
  56:24 57:4,6,16
  58:1 64:11,25
  66:19 67:15,21
  72:12,21,21 73:21
  74:9 84:16 87:6,14
  87:18 89:6 90:17
**san**  48:1
**saw**  18:19
**saying**  86:3,18,21
**says**  9:7,9 22:24
  25:12 64:2 87:8
**scale**  32:1,7,11 87:6
  89:15
**scanned**  63:14
**school**  48:8,12 49:1
**scientific**  56:3 73:2
  73:4
**scientifically**  9:12
**scott**  2:5 4:11 21:22
  58:6 94:10 103:21

**scratch** 14:1
**screen** 15:22 44:6 58:5,17 59:11 85:11 88:23 93:23
**scroll** 58:24 59:12 85:17 94:25 95:7 95:11
**seal** 100:9
**sean** 2:8 4:16 43:11 51:15 59:4 71:10 103:21
**search** 41:18 76:15 89:24 93:3,10,17 94:2
**searching** 42:5
**second** 27:2 41:19
**seconds** 47:17
**section** 59:24 60:3
**see** 6:25 9:13 11:2 32:2 40:17,21 41:8 42:9 44:6 58:16 59:24 60:2 63:24 64:2 65:18 68:3 85:17 86:21 87:7 89:9,13 92:23 93:22 97:20
**seeking** 78:15 79:3 79:7,11,13
**seen** 18:17 33:7 58:20 59:22 63:11 65:17 87:19
**self** 5:17
**sell** 6:9,12,13 7:14 12:20 17:7,8,8,10 98:3,21
**selling** 11:5 12:22 13:7,11,12,18,19 13:19
**send** 11:10,10,18 15:2
**sense** 26:17 82:15
**sensory** 5:25
**sent** 9:17 11:23 14:22 44:16 63:22 73:13 90:21 91:1 92:2,9 95:8
**seven** 19:1,2 69:13
**shannon** 1:3 60:21 60:23
**share** 44:6 58:5 85:9
**sharing** 85:10 91:10
**shea** 14:3
**sheet** 2:22
**shipped** 87:8
**short** 38:12
**shot** 88:23
**show** 6:18 11:5 44:5 59:4,13 91:15 94:22
**showed** 11:2 63:20 77:19
**shower** 6:15 17:10 17:12,23
**showing** 59:11 91:20 94:13
**shows** 81:20 87:14
**side** 56:23 61:12
**sign** 2:23 41:6 95:13,21 103:9,9
**signature** 91:16 95:12 100:14 101:23 102:24
**signatures** 94:22
**signed** 76:8,11 95:13
**signing** 96:5
**similar** 94:19
**similarly** 1:5 80:6
**sincerely** 103:16
**single** 63:17
**sitting** 62:11
**situated** 1:5
**six** 7:1,12 13:10 18:25 45:2 92:13 93:22,24
**sixteen** 50:17
**sixth** 5:22
**slightly** 68:21 69:19
**small** 39:2,5,10 51:19 52:5
**smaller** 58:24 59:1
**smell** 72:20
**sold** 12:24 13:6 97:24
**solution** 18:20
**solutions** 1:8 2:7 61:17 103:18
**somebody** 10:24
**sorry** 11:14 16:6 22:23 23:15 30:18 37:3 49:11 51:17 54:3 63:17 69:10 71:8 76:21 77:8 78:20 85:6 96:17
**sort** 9:18,18 10:7 16:11 25:3 87:18 88:19
**sought** 20:17,24
**sounds** 55:15
**source** 15:4
**sources** 54:10
**south** 5:12
**southern** 1:1
**soy** 68:5
**speak** 21:12,14 45:4
**speaking** 46:1 54:17
**specific** 8:18 29:6 33:19 63:1 73:23 73:25 74:2
**specifically** 86:19
**specifics** 94:1
**spoke** 46:3,6,10,22 47:4,5
**stands** 17:18
**start** 48:18 91:21
**started** 13:7
**starting** 18:1 58:7 86:25
**state** 1:23 5:6 48:1 100:3,16 101:3
**stated** 62:24
**states** 1:1
**stating** 4:9
**statute** 81:13,21 103:13
**stay** 54:19
**steamers** 6:15 17:10,24
**stenographic** 101:10
**stenographically** 101:7
**stick** 7:4
**stone** 17:13 31:2,5
**stop** 13:18 43:1 71:13
**stopped** 12:22 18:14,14,22
**store** 7:15 17:9
**street** 2:6
**strength** 71:8
**stress** 6:5
**strike** 21:1 27:8 28:23 39:22,23 47:5 57:5
**stuff** 39:8

**subject** 22:1,9,19
  23:21,25 25:1,5
  34:15
**subjective** 70:11,19
  72:6,19
**subscribe** 102:19
**substance** 35:22
  72:9
**sudden** 11:7
**sued** 62:12
**suggest** 27:14
**suggested** 27:12,23
  57:13 103:11
**suite** 2:6,9,13
**supplement** 19:23
  27:23 28:22,25
  52:18 54:22 70:23
**supplements** 52:19
  52:22 53:1,7,10
  54:5,9,18 98:22
  99:1
**supply** 1:10 62:9
**supposed** 8:13 19:7
**sure** 6:18,20 8:22
  17:20 24:5 36:4
  40:20 41:20,22
  42:1 43:16,19 45:3
  49:6 55:15 56:2
  65:18 68:5 69:23
  70:1 75:6 81:19
  82:19 84:25 91:17
  94:24 95:8
**suspect** 56:10
**sweet** 7:8,10 9:10
**sworn** 5:2 100:7
**system** 9:16

**t**

**t** 3:1
**take** 7:3 8:9 19:17
  31:10 37:22 53:13
  54:17 57:4 71:19

88:23 93:16 96:20
**taken** 38:10 52:21
  72:1 97:11 98:6
  102:2
**talk** 44:7 46:12
  72:9
**talked** 13:23 38:18
  68:17 98:14
**talking** 55:23 76:2
  87:11
**tampa** 2:6
**tangent** 19:20
**tank** 5:19,21,24
  18:1,9 30:5 52:12
**tanks** 6:1,1
**taste** 72:21
**teal** 15:8
**team** 7:23
**tease** 82:2
**tell** 8:18,20 22:25
  23:10 44:20 49:15
  62:3
**telling** 31:2
**ten** 6:2 45:13 69:13
**tend** 16:8
**term** 26:14 56:3
  80:20 81:6,7,12
**terminology** 82:22
  82:24
**terms** 49:4 69:10
  70:11,23
**terrible** 66:13
  70:15
**test** 11:8 73:22
  74:11
**tested** 12:14,20
  16:20 17:21 23:25
  28:17 67:9
**testified** 46:6 50:14
**testimony** 79:6
  98:3

**testing** 9:19 10:8
  11:11,19,24 14:23
  16:12,16 25:3 33:7
  73:6,14,25
**tests** 17:5
**thank** 36:4 64:15
  97:17 99:4,7
**thanks** 42:1 88:11
  97:13
**theater** 48:4,12
**therefor** 102:5
**thing** 13:23 19:5,6
  83:19 91:22
**things** 6:15 7:5
  18:15 37:12 38:15
  56:13 57:20 83:21
  85:1 97:3
**think** 10:25 13:6,10
  17:18 19:7 23:4
  24:23,24 26:17
  35:3 36:17,22 39:3
  43:24 45:2,18
  46:22 49:3 68:19
  69:1 71:7,12 72:18
  72:20 73:1 77:16
  81:20,21 82:19
  86:5 89:18 96:20
  97:14
**thinking** 26:18
  80:2
**third** 3:3 9:19
  14:23 25:1 54:6
  59:11,20 67:9
  73:14
**thought** 45:15,20
  63:19,20 65:24
**three** 8:3,20 11:20
  40:12 85:16,18
  87:17
**threw** 22:17 26:1

**throw** 22:19 23:21
  66:10
**time** 1:17 10:17,18
  12:24 21:11 27:22
  36:2 37:9 38:5
  42:25 45:15,20
  46:3,10 47:14 50:6
  51:1 63:10 76:3
  97:2,9,13
**times** 43:22 44:19
  45:7 46:21 47:2
**title** 92:23
**today** 19:20 62:11
  63:11 67:22 76:20
  76:21 87:15 89:25
  92:5 93:19
**today's** 44:10 85:12
**told** 12:16,17 67:5
**ton** 96:21
**top** 7:4 44:24 45:23
  56:14 59:24 63:24
  85:20 96:2
**total** 18:6 45:2
**transcript** 101:8,9
  102:19 103:7,9,11
  103:14
**trial** 1:20
**true** 101:9
**trust** 9:23 10:2 11:6
  11:8 17:1 73:2,5
**trusting** 25:17
**truth** 83:13
**try** 35:2,16 40:19
  53:19 76:25
**trying** 19:16 35:8
  72:9
**tube** 8:5
**tucson** 5:10,12
  11:12 17:5 50:15
**turn** 6:24 89:20

**twenties** 39:12
51:19
**twice** 30:20 31:10
45:8 46:6 50:12,13
**two** 8:21 11:20
13:14,16,16 18:15
18:16 30:10,11
37:23 40:10 46:9
66:3,14 69:16 75:7
85:17 87:12,17
**type** 13:23 29:1
53:16 85:1
**types** 29:11 39:5
53:6 57:20 69:13

**u**

**u** 18:3 49:25,25
**um** 19:24 60:1 64:1
64:4 72:7 75:9
85:19 98:4
**unclear** 46:5
**undersigned** 100:5
**understand** 23:2
28:15 38:16 53:18
66:14 81:5,7,11
82:23,24 86:1
**understanding**
19:25 26:7 28:9,16
31:16 56:5,16
62:12,19 63:1
72:14 80:5 82:9,14
**unfair** 10:1
**united** 1:1
**unpackaged** 30:13
**unread** 37:10
**use** 1:20 8:8,15
15:5,8 22:9,13,16
30:9,11 35:5,13,17
38:19 55:22 56:3
66:7 68:1,2,6,16
86:6,12

**usui** 49:25

**v**

**v** 61:12 72:6 102:3
103:4
**vague** 27:10 28:11
53:17 54:20 57:11
57:22 74:15 81:4
82:21 85:4
**verification** 11:24
**verified** 72:19
91:18
**verify** 26:11 73:13
73:20 74:9 88:15
**veritext** 102:4
103:18
**versus** 70:11
**videoconference**
1:14
**violated** 83:4,10
**vitamins** 1:8 2:7
4:12 61:13 102:3
103:4
**vocal** 16:8
**vs** 1:7

**w**

**w** 2:5 103:21
**wait** 23:11 47:15,17
66:12
**waiting** 11:4
**waive** 4:7 103:9
**walk** 15:21 58:21
**walking** 15:22
**wall** 18:19
**walmart** 12:18
13:23
**want** 6:18 22:3,25
23:1 24:4 35:22
38:14 39:18 47:15
56:2 68:5 75:6
91:15

**wanted** 65:18,18
84:24 98:2
**wants** 27:19
**warranties** 14:10
**washington** 2:14
**watch** 81:19
**water** 6:2
**way** 1:9 62:2 69:4
70:3 73:19 74:9
79:14 83:21 89:4
**we've** 21:21 38:1
38:15 87:11
**weird** 19:6,6
**went** 29:10 39:10
67:21,21 89:11,12
**west** 2:6
**wheat** 68:6
**wick** 8:6,9 69:8
**wilson** 1:3 60:16,19
**window** 17:14
**winning** 18:20
**withdraw** 27:8
**witness** 4:3 5:2
20:3,11,15,23 21:4
21:16 22:22 23:14
24:19 25:7,16,23
26:10,25 27:12,18
27:21 28:3,6,16
29:10,21 30:7,25
32:6,14 33:2,10
34:2,5,11,18 35:20
36:9,12,20 37:1
38:5,9,21 39:2 40:2
40:6 41:4,9,14,16
41:17 42:16,20
44:13 45:23 47:2
47:13 51:8,15 52:1
53:4,9,19 54:8,21
55:9,14,25 56:10
56:20 57:2,8,12,18
57:23 58:3 63:6,13

64:22 65:3,8,13,23
66:24 67:4,18 68:1
68:13 69:4,16,23
69:25 70:9,15 71:3
71:25 73:1,8,17
74:6,24 75:3,18,23
76:17 77:5,16 78:4
78:20 79:20 80:9
80:12,17,24 81:18
82:4,14 83:1,6,13
83:18 84:10,20
85:6 87:22 88:3
90:7 91:3 92:7
93:13 94:6 95:25
96:8 99:6 100:9
102:24
**wolf** 1:3,14 5:1,8,9
27:7 38:13 43:6
46:18 52:14,14
58:16 59:10,19
62:18 63:17 64:14
72:3 76:2 77:8 78:6
84:2 85:10,10
86:23 87:1 88:14
91:10,20 92:25
94:13 95:2 96:17
96:21 97:17,23
100:6 101:8 102:1
102:22 103:1,4
**wolf's** 86:11
**word** 10:1 51:4,22
55:22 56:4 70:5,12
70:19,24 81:13,25
83:22
**worded** 83:22
**words** 98:6
**work** 8:14 12:7
13:1 18:2 58:21
**worked** 18:3,11,11
18:12

**working** 18:14,15 18:22
**worried** 31:19
**worry** 23:8 86:24
**writing** 18:19 63:24
**wrong** 32:15 82:6
**wrote** 9:14

**x**

**x** 2:16 3:1

**y**

**ya** 42:19
**yeah** 8:24 12:10,21 14:17 15:17,19 17:1 18:24 19:3,15 28:6 30:25 34:3 35:3 37:7,19,21 41:4,14,17 42:7 44:17 45:19 49:6 49:10 52:23 59:17 66:4 67:2 68:14 71:13 77:10 79:20 80:12 83:20 87:2 87:12 89:11 91:13 91:15 93:13 95:15 95:19 96:23
**year** 5:22 19:3 42:16 48:5 74:22 75:21 91:1
**years** 5:15 8:17 11:20 13:10,14,16 13:16 18:25 22:2 33:18 35:1 36:3 39:7,14 40:10,12 50:15,17,17,20
**yellow** 18:12
**yep** 12:5 95:14
**yesterday** 46:4
**york** 2:3,3,10 103:3 103:3
**young** 39:11

**z**

**zoom** 16:2 58:21 93:23

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under

rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.