# EXHIBIT E

```
 1                  UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
 3                Case Number:  1:19-CV-22702-KMW
 4      MIAMI DIVISION; NOAH MALGERI;
        KAYLYN WOLF; BILL WILSON;
 5      SHANNON HOOD; ERIC FISHON;
        and ROBERT MCKEOWN, on behalf
 6      of themselves and
        all others similarly situated,
 7
                    Plaintiffs,
 8        vs.
 9      VITAMINS BECAUSE, LLC;
        CT HEALTH SOLUTIONS, LLC;
10      GMAX CENTRAL; INSPIRE NOW PTY,
        LTD d/b/a BoostCeuticals;
11      RX, LLC; KHAKIWARE, INC.;
        and JOLLY DOLLAR SUPPLY
12      COMPANY, LLC,
13                  Defendants.
        _____/
14
15
16                   VIDEO CONFERENCE DEPOSITION
17                              OF
18                         SHANNON HOOD
                      (Appearing via Zoom.)
19
20         TAKEN BY:    VITAMINS BECAUSE AND
                        CT HEALTH SOLUTIONS
21
22         DATE:        Friday, November 19, 2021
23         TIME:        9:32 a.m. - 12:55 p.m.
24         PLACE:       Video Conference (ZOOM)
25
```

Page 2

```
 1        APPEARANCES
 2
   APPEARING VIA ZOOM ON BEHALF OF ASQUARED BRANDS, LLC:
 3
      SEAN BRODY, ESQUIRE
 4
 5 APPEARING VIA ZOOM ON BEHALF OF VITAMINS BECAUSE AND CT
 6 HEALTH SOLUTIONS:
 7      SCOTT W ANDERSON, ESQUIRE
 8
 9 APPEARING VIA ZOOM ON BEHALF OF SHANNON HOOD:
10
      JAY BRODY, ESQUIRE
11
12 APPEARING VIA ZOOM ON BEHALF OF GMAX CENTRAL, LLC
13      RICHARD J OPARIL, ESQUIRE
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   Direct Examination by Mr. O'Brien        4
 3   Cross Examination by Mr. Oparil         101
 4 CERTIFICATE OF OATH                59
 5 CERTIFICATE OF REPORTER               60
 6 READ & SIGN COVER PAGE               61
 7 ERRATA SHEET              62
 8        E X H I B I T S
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1          P R O C E E D I N G S
 2          DEPONENT, SHANNON HOOD
 3   testified on her oath as follows:
 4          DIRECT EXAMINATION
 5 BY MR. O'BRIEN:
 6   Q.  Good morning, Ms. Hood.  My name is Sean O'Brien.
 7 Ms. Hood, before we get started I'm going to run through
 8 a couple of instructions for the deposition today.  The
 9 first is obviously we're all not together, we're doing this
10 deposition by Zoom, so it's even harder for the court
11 reporter to get down everything that's being said; as a
12 result, it's important that, much like Kindergarten, one
13 person speaks at a time.  So once my question is over and
14 your attorney asserts an objection, if he does, then you can
15 answer.  I'll do my best not to interrupt you, and hopefully
16 we can get a clean record for the reporter.
17      Does that sound good?
18   A.  Understood, yes.
19   Q.  If you don't understand a question that I'm asking
20 you, please let me know.
21      If you need to take a break, let me know; we'll
22 finish the last question on the record and you can take
23 a break for whatever reason you need.
24   A.  Okay.
25   Q.  I'm assuming you're familiar with Zoom but I might
```

Page 5

```
 1 show you some documents today and if I do, they'll come up
 2 on the screen -- and we'll walk through that process -- but
 3 to the extent I ask you any question that's not based on a
 4 document I'm showing you, I am going to ask you to answer
 5 that question to the best of your recollection.  Okay?
 6   A.  Okay.
 7   Q.  So I know you have your phone up to your ear but
 8 to the extent you have other documents sitting around you,
 9 I'm going to ask that you don't rely on those documents to
10 give me your answers.
11      The only other instructions are keep all of your
12 answers verbal.  If you shrug your shoulders or nod your
13 head or give a non-verbal answer, then Ms. Manning won't
14 able to take it down for the record.
15      There will be circumstances in this deposition when
16 I ask a question and he gives an objection.  If he gives an
17 objection, I just ask that you wait until the conclusion to
18 answer.  Is that fair?
19   A.  Yes.
20   Q.  Ms. Hood, are you taking any medication today that
21 would prevent you from testifying truthfully?
22   A.  No.
23   Q.  When did you find out you were going to be deposed
24 today?
25   A.  I don't remember the date exactly.  It was when
```

2 (Pages 2 - 5)

Page 6

1 Jay, my attorney, sent me an e-mail a while back. I can't
2 remember the date.
3     Q.  I did forget to mention one instruction that's
4 important.  I might ask you a lot of questions about your
5 interactions with Mr. Brody and it's important when you
6 answer those questions, it's important you do not tell me
7 anything about the substance of those conversations.
8     A.  Okay.
9     Q.  When you say "a while back", within the last three
10 months?
11     A.  Again, I can't recall exactly when.
12     Q.  Sometime before November of 2021?
13     A.  It was before November of 2021.
14     Q.  Ms. Hood, before I ask you some questions about
15 this document, are you generally familiar with Zoom?
16     A.  Yes.
17     Q.  I can control the document.  If you need something
18 bigger or smaller or need me to go to a different page, just
19 let me know and I will accommodate your request.  Okay?
20     A.  Yes.
21     Q.  I'm showing you what has been marked for this
22 deposition as Exhibit One.  Have you ever seen this legal
23 document before?
24     A.  It's a legal document; they all tend to look the
25 same.

Page 7

1     Q.  Have you ever seen this legal document before?
2     A.  I can't say that I've seen this one specifically
3 but I recognize it.
4     Q.  Do you recognize it because you recognize what it
5 says or because you've seen it before?
6     A.  I can't say that I have seen this one before or if
7 I haven't seen this one before.
8     Q.  After you found out you were going to be deposed,
9 what did you did for the deposition?
10     A.  Nothing, really.
11     Q.  Did you review any documents?
12     A.  I mean my attorney has sent me documents throughout
13 the course of this and I reviewed them as he sent them to me
14 but I didn't take any measures to go back and review
15 anything specifically.
16     Q.  Did you speak to your attorney at all in
17 preparation to the deposition?
18     A.  We had a phone call.
19        MR. BRODY:  And I'm just going to instruct the
20 witness not to reveal any communications we've had.
21 You can say if spoke or if you didn't speak but not
22 to reveal any contents of the communications that
23 you've had with your attorney.
24        Go ahead.
25     A.  We had a phone call.

Page 8

1 BY MR. O'BRIEN:
2     Q.  When was that phone call, approximately?
3        MR. BRODY:  Same objection.
4        Go ahead.
5     A.  I can't recall.  It was sometime this month.
6 BY MR. O'BRIEN:
7     Q.  And, Ms. Hood, obviously I'm asking you questions
8 about your recollection and this case spans a long period of
9 time so if you don't in the answer, that's okay.  I'm
10 only asking you the questions that you know and if you don't
11 know, that's a perfectly acceptable answer.
12        Do you remember about how long that phone call
13 lasted?
14     A.  No.
15     Q.  Other than talking with your attorney, did you do
16 anything else to prepare for your deposition?
17        MR. BRODY:  Same objection.
18     A.  No.
19 BY MR. O'BRIEN:
20     Q.  Where do you currently live?
21     A.  I live in Baldwinsville, New York.
22     Q.  What's the address of your house or home?
23     A.  ██████████.
24     Q.  Do you rent at the Hammock?
25     A.  Yes.

Page 9

1     Q.  How long have you lived in Baldwinsville for?
2     A.  I have lived in Baldwinsville Proper for about
3 20 years.  It may not have always been a Baldwinsville
4 mailing address but it's still considered Baldwinsville.
5     Q.  How long have you lived at the ██████████ drive
6 location?
7     A.  A little over two years.
8     Q.  Do you live there by yourself?
9     A.  Yes.
10     Q.  Prior to the ████████ Drive address, where did you
11 live?
12     A.  ██████████.
13     Q.  Did you own or rent at that address?
14     A.  I still own the home jointly with my ex-husband.
15     Q.  I didn't ask you this.  What is your date of birth?
16     A.  ████████.
17     Q.  How long did you live at the 3000 West Bridge
18 address?
19     A.  A little over ten years.
20     Q.  That brings us back to approximately 2009.
21     A.  I believe we closed on that in the year 2008.
22     Q.  Is it fair to assume you lived there with your now
23 ex-husband during that time?
24     A.  Correct.
25     Q.  Anyone else live in that home?

3 (Pages 6 - 9)

Page 10

1    A.   Our daughter.
2    Q.   How old is your daughter?
3    A.   21.
4    Q.   What's your now ex-husband's name?
5    A.   Excuse me?
6    Q.   What is your now ex-husband's name?
7    A.   Anthony McEwen.
8    Q.   What's your highest level of education?
9    A.   Four years of college.
10   Q.   Where did you go to college?
11   A.   Onondaga Community College and finished out at
12   Syracuse University.
13   Q.   Do you have a degree from Syracuse University?
14   A.   Yes.
15   Q.   What's your degree in?
16   A.   Information Systems.
17   Q.   What does that mean?
18   A.   Technical computer.
19   Q.   When did you receive your degree?
20   A.   2006.
21   Q.   Is it safe to assume you graduated from high school
22   before going to an a does a community college?
23   A.   I have my GED.
24   Q.   Where did you get your GED from?
25   A.   I honestly cannot recall.

Page 11

1    Q.   Somewhere in or around where you grew up?
2    A.   Yes, somewhere in the tri-county area.
3    Q.   Outside of your bachelor's degree, do you have any
4    other certificates or licenses?
5    A.   I have two or three dozen technical certifications
6    relative to my career.
7    Q.   I'm sorry, you said two or three dozen?
8    A.   Correct.
9    Q.   And are those certifications you get through your
10   current employment?
11   A.   There are things that I have done on my own over
12   the years and there are things I have gotten through
13   employers.  It's common in the field to have certifications.
14   Q.   Could you list to the best of your memory the
15   certifications that you have.
16        MR. BRODY:  Form.
17   A.   CSSP, N-plus.
18
19        THE COURT REPORTER:  Counsel, Ms. Hood
20   sounds very muffled.
21        MR. O'BRIEN:  Ms. Hood, please try to speak
22   a tiny bit little louder into the phone.
23   Ms. Manning has to take this all down.
24   BY MR. O'BRIEN:
25   Q.   Go through a list if you can.

Page 12

1    A.   I have several Cisco-branded certifications.
2    Chaka (phonetic) Network Administration.
3    I have a CE certification.
4    Q.   What is a CE certification?
5    A.   Certified Ethical Hacking.
6    Q.   Thanks.  Anything else?
7    A.   I have -- I have a lot and they're just acronyms
8    that are going to mean nothing.  They're all computer
9    certifications.
10   Q.   Where are you currently employed?
11   A.   I work for the Department Of Veterans Affairs.
12   Q.   Where are you located?
13   A.   Syracuse, New York.
14   Q.   How long have you worked in that position for?
15   A.   Approximately four years.
16   Q.   Do you have a job title?
17   A.   Information systems analyst.
18   Q.   Roughly speaking, what do you do as an information
19   systems analyst?
20   A.   I basically analyze our department.  I bring forth
21   technical solutions.  I work with a lots of different
22   departments in the hospital between budget departments and
23   other powers that be in the Federal government to make sure
24   their needs are met from a technology perspective and
25   something that will fit into our environment.  I do database

Page 13

1    information.  I do software programs.  It's a bit of a mixed
2    bag.
3    Q.   A jack of of all trades.
4    A.   And a master or none.
5    Q.   Do you work as part of a team?
6    A.   Yes.
7    Q.   Do you have a direct supervisor?
8    A.   I report to our area manager.
9    Q.   And what's the area manager's name?
10        THE DEPONENT:  Jay, do I have to give
11   the name?
12        MR. BRODY:  Counsel, is this necessary to
13   give --
14        MR. O'BRIEN:  Yes.
15        MR. BRODY:  -- the details?
16        MR. O'BRIEN:  Yeah, it is.
17        MR. BRODY:  All right.  If you recall the
18   name, you can give it.  If it's private information
19   for governmental reasons, then I would understand
20   if you don't want to give it.
21        THE DEPONENT:  I would rather not.
22        MR. O'BRIEN:  Jay, what's the basis for
23   telling her she doesn't have to give the name of
24   her supervisor?
25        MR. BRODY:  In case there's some governmental

4 (Pages 10 - 13)

Page 14

1 confidentiality; I don't know that there is.
2    MR. O'BRIEN:  I'd like you to articulate --
3    MR. BRODY:  Again, --
4    MR. O'BRIEN:  -- what confidential
5 information --
6    MR. BRODY:  Again, I can't.
7    THE DEPONENT:  We are subject to security
8 clearance.
9    MR. O'BRIEN:  Ms. Hood, I am going to direct
10 you to answer the question; if you refuse, that's
11 entirely within your right but go ahead and give
12 the answer.
13    MR. BRODY:  Again, if you cannot answer, we'll
14 take it up with the judge at the next conference if
15 it's that important.
16    THE DEPONENT:  I would rather not answer
17 because I do not know if that has any implication
18 on his security clearance for anything, which is
19 much higher than mine.
20 BY MR. O'BRIEN:
21    Q.  You understand why you're here today; right?
22    A.  Yes.
23    Q.  During your four years at the DVA, have you always
24 been an information analyst?
25    A.  Yes.

Page 15

1    Q.  Where did you work before that?
2    A.  I worked for a private real estate, a commercial
3 real estate developer.
4    Q.  What's the name of that company?
5    A.  Pyramid Management Group.
6    Q.  How long did you work there for?
7    A.  Approximately 12 years.
8    Q.  Did you have one title the entire time you were
9 there or no?
10    A.  I had -- I held duel roles the whole time I was
11 there.
12    Q.  What were those roles?
13    A.  Information systems analyst and IT manager.
14    Q.  Were there different functions with those duel
15 roles?
16    A.  The IT management, I managed a team of Tier 1 and
17 Tier 2 computer techs.  So it was all information technology
18 that was more of a management administrative role, and
19 then I still held my role doing the actual technical
20 application.
21    Q.  Why did you leave Pyramid Management Group and go
22 to the DVA?
23    A.  It was an environment that was not conducive to my
24 mental well being.
25    Q.  Did you Pyramid voluntarily?

Page 16

1    MR. BRODY:  Object to form.
2    A.  Yes.
3 BY MR. O'BRIEN:
4    Q.  Did you report to anybody at Pyramid?
5    MR. BRODY:  Object to form.
6    A.  I reported to the chief financial officer.
7 BY MR. O'BRIEN:
8    Q.  What is his name?
9    A.  He's deceased.
10    Q.  What is his name, if you remember?
11    A.  Austin Hoffman.
12    Q.  What kind of work did Pyramid Management do,
13 generally?
14    A.  They developed and managed shopping centers,
15 hotels, and restaurants in the northeast end in the state of
16 Virginia.
17    Q.  Did you have any employment between graduating from
18 Syracuse and working at Pyramid Management Group?
19    A.  Did I have any what?
20    Q.  Employment.  Did you work anywhere else?
21    A.  Yes.  Yes, I worked full-time while I was obtaining
22 my degree.
23    Q.  Where did you work while you were obtaining your
24 degree?
25    A.  I worked for a small home construction company

Page 17

1 called National Home.
2    Q.  I forgot to ask you this:  Where was Pyramid
3 Management located?
4    A.  Syracuse, New York.
5    Q.  And small home construction company, is that also
6 in the general Syracuse area?
7    A.  It's no longer a company but it was, correct.
8    Q.  What did you do for the construction company?
9    A.  Computer technical support.
10    Q.  Outside of this lawsuit, have you ever been
11 a plaintiff in any other litigation?
12    A.  Yes.
13    Q.  How many times?
14    A.  Once, excluding my divorce proceedings.
15    Q.  Starting with the most recent before this lawsuit,
16 what case were you plaintiff in?
17    A.  I don't know how you want me to answer that, what
18 case.
19    Q.  Do you remember the name or who you sued?
20    A.  I don't remember their name.
21    Q.  Was it an individual or was it a company?
22    A.  It was a company and an individual, I believe.
23    Q.  Did you have an attorney in that lawsuit?
24    A.  Yes.
25    Q.  Do you remember that attorney's name?

5 (Pages 14 - 17)

Page 18

1    A.  I can't recall.
2    Q.  Was your attorney in the Syracuse area?
3    A.  I mean probably you could drive.  It wasn't out of
4    state, I don't think.  I think it might have been downstate.
5    Q.  I'm sorry, I think the question was unclear.  The
6    attorney that you had in that case, was he or she located in
7    the Syracuse area?
8    A.  No.
9    Q.  Somewhere in the New York state, you might be
10   thinking downstate?
11   A.  Yes.
12   Q.  Do you remember if the lawsuit was in state or in
13   Federal Court?
14   A.  I don't.
15   Q.  Very generally speaking, what were suing the
16   individual and the company for?
17   A.  It was false advertising.
18
19        THE COURT REPORTER:  Counsel, I did not
20   understand Ms. Hood's answer.  She is very muffled.
21        THE DEPONENT:  False advertising.
22   BY MR. O'BRIEN:
23   Q.  I know I said broadly, but can you give me a little
24   more detail.  What were you claiming was falsely advertised?
25        MR. BRODY:  Objection to form.

Page 19

1    A.  It was a long time ago.  I don't recall the
2    specifics of the case.
3    BY MR. O'BRIEN:
4    Q.  Approximately when did the lawsuit happen?
5    A.  I don't remember.  It was year ago.
6    Q.  Sometime before 2010?
7    A.  No.
8    Q.  Sometime before 202015?
9    A.  I don't know.
10   Q.  So sometime before 2010 and the present?
11   A.  Correct.
12   Q.  And it's your testimony you don't recall the
13   details of what you sued over in that case?
14   A.  Not really.
15   Q.  And you don't recall the name of your attorney in
16   that case?
17   A.  No.
18   Q.  Do you recall the result of that case?
19   A.  What do you mean "the result"?
20   Q.  Is the case over?
21        MR. BRODY:  Object to form.
22   A.  Yes.
23   BY MR. O'BRIEN:
24   Q.  What happened?  Do you remember if you won or you
25   lost?

Page 20

1        MR. BRODY:  Object to form.
2    A.  I -- I can't really recall.
3        THE DEPONENT:  I do -- I do have memory-recall
4    issues because of a brain injury so some of it is
5    relative to that.  I'm not being difficult.
6        MR. O'BRIEN:  Okay.  It's okay if you don't
7    recall.  I can't make you remember something that
8    you can't remember.  I just have to ask these
9    questions to get a clear record.
10   BY MR. O'BRIEN:
11   Q.  I want to make sure you have the ability to answer
12   all the questions in the deposition.  You said that you have
13   a brain injury.  Does that impact your ability to recollect
14   things that happened in the past?
15   A.  It affects my ability to recollect specific details
16   from years ago.  I don't have recall on long-term memory.
17   Q.  So the product that's in question in this lawsuit
18   was purchased by you between February 2018 and March 2019.
19   Do you feel that you're going to be able to testify fully as
20   to the details of those purchases?
21        MR. BRODY:  Object to form.
22   A.  Absolutely.
23   BY MR. O'BRIEN:
24   Q.  And why is it different?  Is that too far back?
25   Q.  It's that far back.  Do you have a specific memory.

Page 21

1    A.  I have a hard recollection on things that were some
2    time ago.  I don't have difficulties with short-term recall.
3    Q.  Do you have in your possession any other documents
4    other than this false advisement lawsuit that you brought?
5    A.  No.
6    Q.  You didn't keep any documents from that lawsuit?
7    A.  No.
8    Q.  Would you be able to contact your attorney and get
9    any of those documents?
10        MR. BRODY:  Object to form.
11   A.  I could go through my e-mail and see if I have
12   a record of contact information but I don't think I have
13   that because I delete e-mails.
14   BY MR. O'BRIEN:
15   Q.  Were you ever asked to conduct a search in that
16   case?
17   A.  No.
18   Q.  Do you know if you were ever deposed similar to
19   today in that lawsuit?
20   A.  I was not.
21   Q.  I believe you said you've been a plaintiff in two
22   other lawsuits excluding your divorce.  What was the first
23   one, the oldest?
24   A.  They were both landlord-tenant court.  I had
25   (unintelligible)...

6 (Pages 18 - 21)

Page 22

1    InaduUed tenants, former tenants to remove them
2  there property that I owned.  So the other one was some sort
3  of eviction proceeding?
4    A.  Yes.
5    Q.  That was in the state of New York, I'm assuming?
6    A.  Yes.
7    Q.  I know you indicated that you own the home at
8  ██████████ with your ex-husband.  Do you own
9  any other properties?
10    A.  Yes.
11    MR. BRODY:  Object to form.
12  BY MR. O'BRIEN:
13    Q.  How many?
14    A.  One.
15    Q.  What's the address of that property?
16    A.  ██████████████████.
17    Q.  Is that a rental property?
18    A.  Correct.
19    Q.  Do you own it by yourself or with anyone else?
20    A.  I own it by myself.
21    Q.  We talked about previous litigation where you've
22  been a plaintiff.  Have you ever been a defendant in any
23  lawsuit outside of your divorce?
24    A.  Yes.  Yes.
25    Q.  How many times?

Page 23

1    A.  One.
2    Q.  Approximately when was that lawsuit?
3    A.  Within the last ten years.
4    Q.  Do you recall the name of the person or entity that
5  sued you?
6    A.  No.
7    Q.  Do you recall if that lawsuit was in New York
8  state?
9    A.  It was.
10    Q.  And do you recall if that lawsuit was in the
11  Syracuse area?
12    A.  It was.
13    Q.  Procedurally speaking, do you remember why you
14  were sued?
15    MR. BRODY:  Object to form.
16    A.  It was a motorcycle accident but it was dismissed.
17    Q.  Were you ever deposed in that lawsuit?
18    A.  Yes.
19    Q.  Approximately when was that deposition?
20    A.  I don't know.
21    Q.  Before or after 2010?
22    A.  After 2010.
23    Q.  Was it before or after 2015?
24    A.  I don't know.
25    Q.  Did you have an attorney in that case?

Page 24

1    A.  Yes.
2    Q.  What was your attorney's name?
3    A.  I remember her first name was Teresa.  I don't
4  remember her last name.
5    Q.  Do you recall what law enforcement law Teresa
6  worked for?
7    A.  No.
8    Q.  Did you communicate with Teresa at all about that
9  case about the motorcycle case?
10    A.  Yes.
11    Q.  Were any of those communications by e-mail?
12    A.  I don't remember.
13    Q.  If they were, would you be able to search your
14  e-mail and find out Teresa's last name and the law firm that
15  she worked at?
16    A.  No because I don't keep e-mails have far back.
17    Q.  You've said that a few times.  What do you mean by
18  you don't keep e-mails very far back?
19    MR. BRODY:  Object to form.
20    A.  I just -- I clean out my in-box and delete them.
21  I don't hold onto e-mails.
22    Q.  How often do you do that?
23    A.  I probably clean out my in-box once a month.
24    Q.  Were you ever asked to search your e-mail relative
25  to documents in this case?

Page 25

1    MR. BRODY:  Object to form.
2    A.  I can't recall.
3  BY MR. O'BRIEN:
4    Q.  And if there were documents relevant to this
5  lawsuit, would you have since deleted them?
6    MR. BRODY:  Object to form.
7    A.  Everything that I had relative to this, I turned
8  over to my attorneys; and if they were older documents, I no
9  longer have them personally.
10    Q.  So you turned the documents over and then deleted
11  them?
12    A.  That's part of getting my mailbox clean, delete
13  everything.
14    Q.  So you didn't keep a copy of any documents you
15  turned over to your counsel?
16    A.  No.
17    Q.  And I know you said you turned over everything
18  relevant, but you also that you didn't search your e-mail
19  for other documents; is that correct?
20    MR. BRODY:  Objection to form.  Misstates
21    prior testimony.
22  BY MR. O'BRIEN:
23    Q.  Do you understand the question?
24    A.  I guess when you asked that, I thought you meant
25  after I turned over the documents that I had.

7 (Pages 22 - 25)

Page 26

1    Q.  Let me ask it a different way, see if I can clear
2  it up for you.  We'll get into specifics of discovery
3  a little later but my client has asked you to produce
4  all relevant communication between you and any third party
5  relating to this lawsuit and I'm asking you if you ever
6  conducted a search of your e-mails for potentially relevant
7  documents.
8         MR. BRODY:  Counsel, can you just clarify, not
9  talking about any communications with an attorney.
10        MR. O'BRIEN:  Outside of any communications
11  with Mr. Brody, yes.
12        MR. BRODY:  So you're asking if she searched
13  for any e-mails to a third party other than her
14  attorney?
15        MR. O'BRIEN:  That's correct.
16        MR. BRODY:  Object to form.
17        But go ahead.
18
19    A.  No, no.  Nobody other than my attorney.  And the
20  documents I turned over, I believe, were receipts and bank
21  records and they would have not been part of my e-mail.
22  BY MR. O'BRIEN:
23    Q.  And so my point is:  If there had been a relevant
24  e-mail, you didn't search for it and it's likely that that
25  e-mail is now deleted?

Page 27

1         MR. BRODY:  Object to form, vague.
2         You can answer if understand what's being asked.
3     A.  I think the only actual e-mail that I would have
4  had relative to this would be like an order confirmation
5  e-mail and I did not turn over any order confirmation
6  e-mails and I don't have any.
7     Q.  And you don't have those because you deleted your
8  e-mails?
9     A.  I've always deleted my e-mails.  That's something
10  else I've always done.
11    Q.  About what year did your divorce occur?
12    A.  Can you clarify.
13    Q.  Finalized.  2021.  This year.
14    A.  2021.
15    Q.  Have you ever been convicted of a crime?
16    A.  No.
17    Q.  Have you ever been arrested?
18    A.  No.
19    Q.  Are you aware of any outstanding judgments against
20  you?
21    A.  There are none.
22    Q.  Have you ever filed for bankruptcy?
23    A.  No.
24    Q.  What does the word "supplement" mean to you?
25        MR. BRODY:  Object to form, calls for expert.

Page 28

1         You can answer if you know.
2         MR. O'BRIEN:  Jay, I'm asking her what
3  interpretation of what the word is.  How does that
4  call for an expert answer.
5         MR. BRODY:  Well, she's not an expert so maybe
6  she shouldn't be giving an interpretation of it.
7     Q.  I'm asking what the word supplement means to her.
8  Why don't you clarify your objection.
9         MR. BRODY:  I did and I instructed her to
10  answer if she knows.
11        MR. O'BRIEN:  What's the objection?
12        MR. BRODY:  I stated the objection and you did
13  hear me and she can answer if she knows the answer.
14        MR. O'BRIEN:  Do you want me to have the
15  reporter read it back.  I really didn't hear it
16  clearly.
17        MR. O'BRIEN:  Yes, I do.
18        Ms. Manning, would you please read back Mr.
19  Brody's objection.  I want to make sure I understand
20  what he's objection to.
21        (Court reporter complies.)
22  BY MR. O'BRIEN:
23    Q.  Ms. Hood, you can answer the question.
24    A.  Would you give me context.
25    Q.  In terms of supplements that are consumed by the

Page 29

1  general public, what does that word mean to you?
2         MR. BRODY:  Same objection.  Go ahead.
3     A.  It means to add something additional.
4  BY MR. O'BRIEN:
5     Q.  Do you currently take any supplements?
6     A.  Regularly, yes.  And daily or generally?
7     Q.  Generally.
8     A.  Generally, yes.
9     Q.  What supplements do you take?
10    A.  The B vitamin...(unintelligible) complex, usually.
11        THE COURT REPORTER:  I'm sorry.  I could not
12  understand your answer.
13        MR. O'BRIEN:  Me neither.
14  BY MR. O'BRIEN:
15    Q.  Did you say B or D, Ms. Hood?
16    A.  I said B as in "bravo".
17    Q.  How much do you take B vitamin supplements?
18    A.  Very irregularly.  At least weekly.
19    Q.  How long have you been taking that supplement for?
20    A.  25 years.
21    Q.  What are B vitamin supplements supposed to help
22  with?
23    A.  This is all personal health information.
24        Can I answer?
25    Q.  Yes.

Page 30

1     MR. BRODY: You can answer. You don't have
2  reveal any communications you've had with any
3  physicians, but you can answer the question to the
4  extent that you know.
5     A. They're relative to a blood disorder that I have.
6  BY MR. O'BRIEN:
7     Q. And where do you purchase the B vitamin supplements
8  from?
9     A. These are online on Amazon or my local grocer.
10    Q. Do you have a specific company that you purchase
11 the vitamin from, or do you bounce back and forth?
12    MR. BRODY: Object to form.
13    A. I'm not loyal to a brand.
14 BY MR. O'BRIEN:
15    Q. How do you decide what brand to purchase?
16    A. Basically, I go by the dose. I look for a specific
17 dose that I need, and that's my deciding factor.
18
19    Q. Outside of the vitamin supplement, do you take any
20 other supplements or vitamins?
21    A. Sometimes I'll take a vitamin C supplement that's
22 even much regularly than the B.
23    Q. What are vitamin C supplements supposed to help
24 with?
25    A. I take Adderall for ADHD, and vitamin C will kind

Page 31

1  of curve the effects of that to help me sleep at night.
2     Q. Outside of vitamin B and vitamin C, do you take any
3  other vitamins or supplements?
4     A. No.
5     Q. Is it safe to assume that you made your purchases
6  of vitamin C similar to vitamin B in that you're looking for
7  dosage, not necessarily the company that sells it?
8     MR. BRODY: Object to form.
9     A. Yes.
10 BY MR. O'BRIEN:
11    Q. Do you know what SAM-e is?
12    MR. BRODY: Object to form.
13    A. I don't know what it stands for.
14 BY MR. O'BRIEN:
15    Q. Yeah, not what it stands for. Do you know
16 what it is?
17    MR. BRODY: Object to form, vague.
18    A. It's a supplement.
19 BY MR. O'BRIEN:
20    Q. Do you know what benefits SAM-e is supposed to
21 provide for people to take it?
22    MR. BRODY: Objection. Calls for expert
23 testimony. You can answer if you know.
24    A. No.
25 BY MR. O'BRIEN:

Page 32

1     Q. So you don't have any idea what the benefit of
2  SAM-e is, is that fair?
3     A. I really it having to do with integrity. I'm not
4  a scientist and I don't know how these things work. I think
5  it's for Overall wore for wellness.
6     Q. At some point you purchase SAM-e for consumption;
7  right?
8     MR. BRODY: Object to form.
9     A. Yes.
10    MR. O'BRIEN: And do you remember why you
11 decided to do that?
12    MR. BRODY: Object to form.
13    A. I believe that I had seen it somewhere and --
14 probably online -- and it was advertised to me and peaked
15 my interest.
16 BY MR. O'BRIEN:
17    Q. You don't recall what peaked your interest?
18    A. No.
19    Q. And sitting here today you don't recall why you
20 took it?
21    MR. BRODY: Object to form. Misstatements
22 prior testimony. And vague. You can answer if you
23 understand the question.
24    A. I took it for my over all well-being.
25 BY MR. O'BRIEN:

Page 33

1     Q. And outside of your over all well-being, you
2  weren't trying to benefit in any way from SAM-e?
3     A. I was trying to improve my health.
4     Q. Do you know if SAM-e has any side effects?
5     MR. BRODY: Object to form. Calls for an
6  expert answer.
7     A. I don't know. Negative sides effects, you mean?
8  BY MR. O'BRIEN:
9     Q. Yes.
10    MR. BRODY: Same objection.
11    A. I don't know.
12 BY MR. O'BRIEN:
13    Q. Do you know what ingredients go into SAM-e?
14    MR. BRODY: Same objection. Calls for an
15 expert answer.
16    A. I don't know. They're listed on the bottle.
17 But I'm not a scientist.
18
19 BY MR. O'BRIEN:
20    Q. Again, Ms. Hood, if you don't know the answer, you
21 can say that you don't know.
22    A. I don't know.
23 BY MR. O'BRIEN:
24    Q. Was there a period of time where you were talking
25 SAM-e regularly?

9 (Pages 30 - 33)

Page 34

1     A.  Yes.
2     Q.  Roughly when was that period of time?
3     A.  Approximately the year 2019.  I took it for
4  a while.
5     Q.  Approximately, when did you stop?
6     A.  I feel like it was maybe a two-year period, a one-
7  to two-year period within the last three or four years.
8     Q.  So sometime in 2019 until sometime in, roughly,
9  2021?  Is that fair?
10     MR. BRODY:  Object to form, misstates
11  testimony,
12     A.  No, not that recently.
13  BY MR. O'BRIEN:
14     Q.  I'm sorry, I thought you said that you believe that
15  you said you started taking SAM-e in 2019.  Was I incorrect?
16     MR. BRODY:  Object to form.
17     A.  That may have been the end of it.  2018, 2019
18  sounds right to me.
19  BY MR. O'BRIEN:
20     Q.  Okay.
21     Am I correct in saying you took it for over
22  a year's period of period of time?
23     A.  Yes.
24     Q.  During that period of time were you taking SAM-e
25  consistently?

Page 35

1     A.  Yes.
2     Q.  And by "consistently", would that be daily?
3  Weekly?  Or something else?
4     A.  Almost daily.  It would be five times a week.
5     Q.  And during that time, did you generally notice any
6  positive benefits from taking SAM-e?
7     MR. BRODY:  Object to form.  Calls for an
8  expert.
9     A.  I -- I can't say.
10  BY MR. O'BRIEN:
11     Q.  So why did you continue to take it during that
12  period of them if you weren't noticing a benefit?
13     MR. BRODY:  Object to form.
14     A.  Sometimes these things take a while to kick in.
15  I don't know how it works, so I wanted to give it an
16  opportunity.
17     Q.  Am I correct that at no point during the entire
18  time you were taking SAM-e that you experienced no negative
19  benefits from taking it?
20     MR. BRODY:  Object to form.
21     A.  I -- I can't say specifically.
22  BY MR. O'BRIEN:
23     Q.  Well, can you say at all?
24     A.  I experienced positive benefits directly from
25  taking that.  I mean there were periods of time during that

Page 36

1  when I felt better taking that and there were periods when
2  I felt worse; what would cause it specifically, I don't
3  know.
4     Q.  Sure.  I guess I'm just trying to understand why
5  you said that you took that SAM-e  supplement for an
6  extended period of time if you didn't feel like you were
7  experiencing some positive reaction to it.
8     MR. BRODY:  Object to form.
9     A.  I don't know if this is something that you see
10  a benefit from down the road as you're older.  I don't know
11  if this is something that you feel immediate benefits from.
12  I know that all sorts of medicines and supplements are
13  different and sometimes you take something so that you feel
14  good when you're old.
15  BY MR. O'BRIEN:
16     Q.  Did you look into that before you purchased and
17  consumed SAM-e?
18     MR. BRODY:  Object to form.
19     A.  I did a little bit of research online.
20  BY MR. O'BRIEN:
21     Q.  And was one of the items that you researched what
22  benefits SAM-e might provide and the timeline for SAM-e?
23     A.  You broke up.
24     MR. BRODY:  Object to form.
25  BY MR. O'BRIEN:

Page 37

1     Q.  Let me state it again.
2     You stated that you did some research before you
3  started taking SAM-e; is that right?
4     A.  Yes.
5     Q.  Was one of the items that you researched the
6  timeline under which SAM-e can help you?
7     MR. BRODY:  Object to form.
8     A.  No.
9  BY MR. O'BRIEN:
10     Q.  Are you able to approximate how many bottles of
11  SAM-e you've purchased in your life?
12     A.  No but I have the order information that
13  I sent to Jay.
14     Q.  Outside of the SAM-e that's the subject of this
15  lawsuit, did you purchase any other bottles of SAM-e?
16     MR. BRODY:  Object to form.
17     A.  No.
18
19  BY MR. O'BRIEN:
20     Q.  Do you recall when you purchased the SAM-e from?
21     A.  Amazon.
22     Q.  So generally, Amazon is a third party wholesaler
23  where they sell both their own but other companies product.
24  Did you recall whether you bought an Amazon brand SAM-e or
25  some other company?

10 (Pages 34 - 37)

Page 38

1    Q.  The seller is ASquared.
2    A.  Outside of purchasing SAM-e from ASquared, had you
3  ever heard of the company before?
4    A.  No.
5    Q.  Have you ever purchased any other product besides
6  the SAM-e from ASquared?
7    A.  Not that I of.
8    Q.  Did you do any research into ASquared before you
9  purchased the SAM-e?
10    A.  No.
11    Q.  Did you do any reviews on Amazon or anything like
12  that?
13    A.  That was part of my research.
14    Q.  What did you see, generally?
15    A.  I saw a preponderance of reviews.
16    Q.  Obviously, Mr. Brody is here representing you
17  today.  Do you have any other attorneys beside besides
18  Mr. Brody representing you in this lawsuit?
19    A.  I know that there are usually a few other people
20  copied on our e-mails; I don't know if if they are
21  paralegals or attorneys.  I've really only had communication
22  with Jay personally.
23    Q.  You answered my next question.  Outside of
24  Mr. Brody and the other people copied on the e-mails, have
25  you ever communicated with anyone else as your attorney

Page 39

1  regarding this case?
2    A.  Not as an attorney.
3    Q.  Have you spoken to anyone who is not an attorney
4  about this case?
5    A.  Maybe once or twice his paralegal or an
6  administrative assistant might have sent me something.
7  I can't recall.
8    Q.  Abd so that would still be somebody in Mr. Brody's
9  law firm?
10    A.  Yes.
11    Q.  Outside of Mr. Brody's law firm, have you spoken
12  to anyone about this lawsuit?
13    A.  No.
14    Q.  When did you decide to do bring lawsuit?
15    MR. BRODY:  Object to form, vague.
16    A.  I can't recall the date specifically.  I could
17  probably check documents, but I can't specifically recall.
18
19  BY MR. O'BRIEN:
20    Q.  Do you recall the year?
21    MR. BRODY:  Object to form.
22    A.  Might have been 2019 or 2020.
23  BY MR. O'BRIEN:
24    Q.  How did you find your attorneys?
25    MR. BRODY:  Object to form.  Again, I would

Page 40

1  instruct the witness not to reveal any
2  attorney-client communications.
3  BY MR. O'BRIEN:
4    Q.  The question, Ms. Hood, is how did you find your
5  attorneys in this lawsuit?
6    A.  I reached out.  How I specifically got in contact
7  with Jay, I can't recall.  But I saw something online about
8  that supplement.
9    Q.  All right.  We'll start with timing and then go
10  into substance.  You said you reached out to Mr. Brody's law
11  firm?
12    MR. BRODY:  Object to form.
13    A.  Yes, I believe so.
14  BY MR. O'BRIEN:
15    Q.  Let's start broadly.  What year did you reach out
16  to Mr. Brody's law firm?
17    MR. BRODY:  Object to form.
18    A.  I don't recall.  Maybe 2019, maybe 2020.
19  BY MR. O'BRIEN:
20    Q.  How did you reach out to them?  Was it by phone?
21  By e-mail?  Something else?
22    A.  I believe it was e-mail.
23    Q.  And were you ever asked search for a copy of that
24  e-mail?
25    MR. BRODY:  Object to form.

Page 41

1    A.  No.
2  BY MR. O'BRIEN:
3    Q.  Do you still have a copy of that e-mail?
4    MR. BRODY:  Object to form.  Calls for legal
5  expertise and legal advice.
6    MR. O'BRIEN:  Jay, I'm asking her why she
7  doesn't have a copy of that e-mail.
8    MR. BRODY:  And that pertains to a legal issue
9  as to attorney-client communications.
10    MR. O'BRIEN:  What legal issue?
11    MR. BRODY:  Attorney-client communications,
12  like I said.
13    MR. O'BRIEN:  I'm not asking of the substance.
14  The question has nothing to do with your
15  communication.  It has nothing to do with legal
16  advice that you've provided.
17    Jay, your objection is not based in merit.
18    MR. BRODY:  Counsel --
19    MR. O'BRIEN:  I understand, but --
20    MR. BRODY:  Counsel, you don't have to agree
21  with every legal position that I take.  You just
22  have to continue.
23    MR. O'BRIEN:  I understand that, but when you
24  constantly object without a basis it's hard for
25  the --

11 (Pages 38 - 41)

Page 42

1     MR. O'BRIEN:
2     MR. O'BRIEN:
3     MS. SCHOENTHAL:
4     MR. BRODY: I have not objected on this basis
5 very many times and I think you know that. So just
6 cut it out and move on. Just cut it out and move
7 on. Okay? Look, this is not a big deal.
8 You don't need to give a speech. Just move on.
9 I don't make this objection a lot. It's not
10 disrupting your deposition. Just move on.
11     MR. O'BRIEN: I appreciate you telling me what
12 is and what is not disrupting the deposition.
13 BY MR. O'BRIEN:
14     Q. Ms. Hood, do you remember the question?
15     A. Repeat it again.
16     Q. Okay. The question is we were talking about when
17 you first reached out to Mr. Brody, you think you did it by
18 e-mail; correct?
19     A. Correct.
20     Q. And you said that you were never asked to search
21 for a copy of that e-mail; correct
22     A. Not that I recall.
23     Q. And you don't still have a copy of that e-mail?
24     MR. BRODY: Same objection.
25     A. I stated before that I don't keep any e-mails, and

Page 43

1 not just specific to this but at all. I don't keep my
2 e-mails, I never have.
3 BY MR. O'BRIEN:
4     Q. And so the next question that I asked was: Why
5 don't you have a copy of the e-mail and your answer was
6 because you deleted it; is that correct?
7     MR. BRODY: Same objection.
8     A. My standard practice for e-mails is to get rid of
9 all of them. I don't keep things like that. To me in my
10 mind, it's clutter. And when I see 100 e-mails in my
11 in-box, I don't like it.
12 BY MR. O'BRIEN:
13     Q. And so are you willing to say within any degree of
14 certainty whether this e-mail existed or was deleted?
15     MR. BRODY: Objection, asked a answered.
16     A. Well, being that I delet my e-mails, it doesn't
17 exist. Right?
18 Q     (By Mr. O'Brien) :
19 BY MR. O'BRIEN:
20     Q. I don't know. I'm asking you. I think you've
21 answered the question.
22     A. Okay.
23     Q. You gave a short answer about why you reached out
24 to an attorney. You believe you saw something about this
25 supplement on the internet; is that right?

Page 44

1     A. About some controversy, yes, and I thought that
2 I was part of that type of supplement that was being talked
3 about and so I reached out and it turned out it was.
4 I think that's how that went.
5     Q. So when you say there was some controversy, what
6 medium or platform were you reading about that controversy
7 on?
8     A. I don't know if it was a news website. It was
9 some website that I happened upon.
10     Q. Was it associated with Mr. Brody'sy law firm?
11     A. No.
12     Q. So it wasn't an advisement for being a plaintiff in
13 a potential lawsuit?
14     A. It wasn't anything like that. It was some kind of
15 news article or... I don't recall.
16     Q. And I'm assuming you didn't print out or keep
17 a screenshot or any other verifiable to look at that website
18 or that communication?
19     A. No, I would have had no need to do that.
20     Q. At some point did you sign a retainer or an
21 engagement letter with Mr. Brody's's law firm?
22     A. Again, I don't know. I've seen a lot of documents.
23 I believe I lost count. I can look at my recent paperwork
24 and see.
25     Q. It's okay. Ms. Hood, I'm asking you questions off

Page 45

1 your recollection, so if you don't know that's okay.
2     A. I don't recall. I know I find things. What the
3 title of the document was, I'm not sure.
4     Q. When did you sign a retainer or engagement with
5 Mr. Brody's law firm?
6     MR. BRODY: Object to form. Misstates prior
7 testimony. Asked and answered.
8     A. Sometime in 2019, maybe. Maybe early 2020.
9 I don't recall specifically.
10 BY MR. O'BRIEN:
11     Q. And I know you said that you did one phone call
12 with Mr. Brody to prep for today's deposition. Prior to
13 that phone call, when was the last time you thought about
14 this lawsuit?
15     A. Thought about it?
16     Q. Yes.
17     MR. BRODY: Objection, vague.
18     A. Like would it come into to my head what's going on?
19 That's so vague. I need clarification, please.
20 BY MR. O'BRIEN:
21     Q. When is the last time the concept of you becoming
22 a plaintiff in this lawsuit came into your head?
23     MR. BRODY: Object to form.
24     A. I don't know, probably a week prior to this.
25 BY MR. O'BRIEN:

12 (Pages 42 - 45)

Page 46

1    Q.  Do you think about this lawsuit often?
2    A.  Not every day.
3        MR. BRODY: Same objection.
4  BY MR. O'BRIEN:
5    Q.  Every month?
6        MR. BRODY: Same objection.
7    A.  Probably.  I'm a member of a lawsuit; that's kind
8  of a big deal, it's not normal for me.
9  BY MR. O'BRIEN:
10   Q.  Your basis can be whatever you want it to be.
11 I'm just trying to get a feel for --
12   A.  I'm just trying to explain my state of mind.
13   Q.  Prior to your phone call with Mr. Brody in
14 preparation for the deposition, when was the last time you
15 spoke with him?
16   A.  Probably within a few months prior to that.
17 I can't recall the date.
18   Q.  Do you speak with him regularly about this lawsuit?
19   A.  What do you mean by "regularly"?
20   Q.  Let's start with this.  Monthly.
21   A.  I mean I think it comes in waves.  There might
22 being maybe two months or a period of time when nothing is
23 happening and then the next month I talk to him.  I can't
24 say.
25   Q.  Do you know if there are any upcoming court

Page 47

1  appearances in this lawsuit?
2        MR. BRODY: Object to form.
3    A.  I don't know.  Like does this count as a court
4  appearance?  What kind of court appearance?  I -- I don't
5  know.
6  BY MR. O'BRIEN:
7    Q.  Do you know what a court appearance is?
8    A.  When the attorneys go in front of the judge.
9        MR. BRODY: Same objection.
10   A.  But I don't know if this is considered like part
11 of that.
12 BY MR. O'BRIEN:
13   Q.  Okay.  I don't know if a perfectly okay answer.
14       Do you know if there's a trial scheduled in
15 this case?
16       MR. BRODY: Object to form, calls for legal
17   expertise.
18
19   A.  I tend to know about things.  Like I keep an
20 eye out on what's going on like if things happen.  I know
21 there was some sort of mediation -- I don't know if I'm
22 using the right word -- a little while ago.  But as far as
23 what is going to happen like on the schedule, I don't know
24 what's going to happen.
25 BY MR. O'BRIEN:

Page 48

1    Q.  Do you know what is trial is?
2        MR. BRODY: Object to form.
3    A.  Yes.
4  BY MR. O'BRIEN:
5    Q.  Do you know if there's a trial scheduled or not?
6        MR. BRODY: Object to form, asked and
7    answered.
8    A.  I don't know if there's a trial scheduled.
9  BY MR. O'BRIEN:
10   Q.  You mentioned a mediation.  Can you talk to me to
11 little bit further about that.  Did you participate in the
12 mediation in this case?
13       MR. BRODY: Object to form.  I would just
14   counsel the witness not to reveal any
15   attorney-client communications.
16       MR. O'BRIEN: Your objection is noted,
17   Mr. Brody.
18
19 BY MR. O'BRIEN:
20   Q.  Ms. Hood, can you answer the question.
21   A.  I maybe using an incorrect term.  I know that the
22 attorneys on both sides have talked to each other at some
23 point without me.  I haven't been a part of anything until
24 up until now, so...
25   Q.  Is it fair to say you didn't participate in that

Page 49

1  process at all?
2        MR. BRODY: Object to form.
3    A.  Not at all.
4    Q.  Do you know what a class action lawsuit is?
5        MR. BRODY: Object to form.
6    A.  No.
7  BY MR. O'BRIEN:
8    Q.  What does a class action lawsuit mean to you?
9        MR. BRODY: Object to form.
10   A.  It's where there are so many people who are
11 claiming damages that you just have to get a couple of
12 people to represent them.
13 BY MR. O'BRIEN:
14   Q.  And you know that information because of this
15 lawsuit or because of your previous false advertisement
16 lawsuit or some combination of both?
17   A.  I think just having lived 41 years, you run across
18 that term.
19   Q.  The other lawsuit that you were a plaintiff in, was
20 that a class action lawsuit?
21   A.  Yes.
22   Q.  What does being a class representative mean to you?
23       MR. BRODY: Same objection.  Calls for legal
24   expertise.
25   A.  Are you talking what does it mean legally or what

13 (Pages 46 - 49)

1 does it mean to me personally?
2 BY MR. O'BRIEN:
3   Q.  The question is what does it mean to you.  I'm not
4 asking you to pretend to be an attorney or give me the legal
5 answer.  I'm just asking to the best of your knowledge and
6 ability to tell me what being a class representative means
7 to you.
8   A.  I -- I think it means to me to do my best to
9 represent everybody who might be in the same type of
10 situation as me because they can't all go in front of
11 a judge and speak for themselves and a million times for
12 however many people there might be.  Just to do a good job
13 for everybody involved.
14   Q.  Do you know what their responsibilities of being
15 a class representative are?
16      MR. BRODY:  Object to form. calls for legal
17   expertise.  You can answer.
18
19   A.  To give my experience and facts and details as they
20 are and the things that I can remember so that -- be
21 truthful and tell my experience.  Really, that's my only
22 responsibility, I think.
23      MR. O'BRIEN:  Ms. Hood, Mr. Brody's objections
24   seem to be making you uncomfortable.  There's not a
25   right or a wrong answer here.  I just want to know

1   what your understanding of a class representative
2   is and that's it.  Okay?
3      THE DEPONENT:  I'm not uncomfortable.  I'm
4   just trying to make sure I understand exactly what
5   you're asking before I answer.
6      MR. O'BRIEN:  As I said earlier, if you don't
7   understand the question, tell me and I will ask it
8   a different way.
9      MR. ANDERSON:  And, guys, before we get the
10   answer -- This is Scott Anderson.  Mr. Brody,
11   I think you need to make your objections to the
12   form rather than say "it's a legal conclusion",
13   otherwise, it's guiding the witness.  Thank you.
14      MR. BRODY:  I think that's an appropriate
15   objection.
16      MR. O'BRIEN:  Mr. Brody, we all you you think
17   it's an appropriate objection but it's not.  I'm
18   just going to push forward because I'd like to get
19   through the deposition.
20 BY MR. O'BRIEN:
21   Q.  Do you know whether you're a class representative
22 in this lawsuit?
23   A.  I am.
24   Q.  Why did you agree to be a class representative in
25 this lawsuit?

1   A.  Um, I -- I -- I feel like the general claims are
2 mine too.  I didn't setout to be a representative but I'm
3 part of the same class and I'm having the same experience
4 that other people are having so it makes sense.
5   Q.  What's your understanding of who the class is that
6 you're trying to represent?
7      MR. BRODY:  Same objection.
8   A.  People that have purchased the same thing as I did.
9   Q.  The same thing being what?
10   A.  The SAM-e.
11   Q.  Are you willing to appear in court in front of the
12 judge as a class representative?
13      MR. BRODY:  Object to form.
14   Q.  I am.  I mean logistically, I would have to make
15 arrangements with my employment, but I don't have any
16 personal issue doing it in person.
17 BY MR. O'BRIEN:
18   Q.  Are you willing to go to travel down to Florida for a
19 trial if there is one in this case?
20   A.  I would be.  I don't know if that's my
21 (unintelligible); that would be my only concern.
22   Q.  That leads me to the next question.  Are you
23 willing to pay the cost and expenses of being a class
24 representative in this lawsuit?
25      MR. BRODY:  Object to form.  Calls for legal

1   expertise.
2   A.  I don't know what those costs are.  I can't say if
3 I'm willing to pay X amount of dollars.  I can't answer
4 that.
5 BY MR. O'BRIEN:
6   Q.  Are you willing to pay any costs associated with
7 being a class representative?
8      MR. BRODY:  Same objection.  Requires legal
9   advice.
10   A.  I'm not opposed to that but I can't say with any
11 degree of certainty that I would not know what the costs
12 would be.  That's kind of an open-ended question.
13 BY MR. O'BRIEN:
14   Q.  Let's assume the costs were $500.  Would that be
15 something that you'd be willing to spend?
16   A.  No.
17      MR. BRODY:  Same objection.
18   Q.  2
19 BY MR. O'BRIEN:
20   Q.  How about $5,000?
21      MR. BRODY:  Same objection.
22   A.  Not really, I don't have five grand laying around
23 like that.
24 BY MR. O'BRIEN:
25   Q.  So somewhere between $500 and $5,000 is your range?

14 (Pages 50 - 53)

Page 54

1      MR. BRODY:  Same objection.
2      A.  I can't answer that.
3  BY MR. O'BRIEN:
4      Q.  So you're just unable to say with any degree of
5  certainty right now?
6      A.  I can't say that I would spend an unknown amount of
7  money at some point in the future.
8      Q.  But certainly if that number was $5,000 today,
9  that's something that wouldn't work for you?
10     MR. BRODY:  Same objection.
11     It would be a stretch to come up with an extra
12 $5,000 that wasn't set aside for savings or bills.
13 I'm a regular working person.
14 BY MR. O'BRIEN:
15     Q.  Are you willing to testify at trial under oath
16 about your claims any lawsuit?
17     A.  Yes.  I'm under oath right now; right?
18     Q.  You are.
19     A.  Yes.
20     Q.  Can you think of any reason that you cannot
21 be a class representative in this lawsuit?
22     MR. BRODY:  Object to form.
23     A.  I don't know what reasons would prevent somebody
24 from doing that.  I don't think so.
25     Q.  Okay.

Page 55

1      I'm going to move into the specific issues
2  regarding the lawsuit.
3      MR. O'BRIEN:  Jay, do you want to pull through
4  and keep going?
5      MR. BRODY:  Shannon, are you doing okay?
6      THE DEPONENT:  Yes, I'm okay.
7      MR. BRODY:  Let's do another 10, 15 minutes.
8  BY MR. O'BRIEN:
9      Q.  If I use the word "Complaint" in the text of the
10 law suit, do you know what I mean?
11     A.  That's the reason you're bringing the lawsuit.
12     Q.  I will show you the Complaint in this lawsuit a
13 little later but do you know how many purchases of SAM-e you
14 allege were defective in the Complaint?
15     MR. BRODY:  Object to form.
16     A.  The exact number of bottles, I can't recall but it
17 was the entirety of what I purchased, whatever that number
18 is.
19 BY MR. O'BRIEN:
20     Q.  Do you remember if you purchased all of that same
21 SAM-e from the same company or from different companies?
22     MR. BRODY:  Object to form.
23     A.  I can't recall but all that documentation is -- is
24 somewhere in -- in the file.
25 BY MR. O'BRIEN:

Page 56

1      Q.  You're not able to say sitting here today without
2  looking at a document to refresh your recollection?
3      A.  I think it was the same seller.
4      Q.  Which seller was that?
5      A.  ASquared.
6      Q.  The Complaint alleges that your first purchase of
7  SAM-e from ASquared was on February 5th of 2018.  Do you
8  remember making that purchase?
9      A.  Not specifically.  I can't attribute any one to any
10 particular date.
11     Q.  Do you have any recollection how you purchased the
12 SAM-e from ASquared on February 5th of 2018?
13     A.  I found it on Amazon.  Is that what you're asking?
14     Q.  That's exactly what I'm asking.  Do you recall
15 actually receiving that purchase of SAM-e from ASquared on
16 Amazon?
17     A.  I don't recall receiving the first purchase
18 specifically.  I recall the boxes big shipped to my home.
19     Q.  I am going to ask you questions about each
20 purchase.  It may feel a little monotonous, but I want to go
21 through facts relating to each purchase.
22     Do you recall noticing anything unusual or wrong
23 about the SAM-e you purchased it February of 2018 when you
24 received it?
25     MR. BRODY:  Object to the form.

Page 57

1      A.  Anything wrong with it?  Like damaged packaging?2.
2  BY MR. O'BRIEN:
3      Q.  Anything.
4      A.  No.
5      Q.  Did you take the SAM-e that you purchased in
6  February of 2018?
7      A.  Yes.
8      Q.  Did you take the entire bottle?
9      A.  Yes.
10     Q.  We touched on this earlier but you have no
11 recollection of feeling any positive side effects from
12 taking that SAM-e; is that right?
13     A.  I -- I can't say.
14     Q.  What did you do with the bottle after you took all
15 of the product that was in it?
16     A.  Recycled it.
17     Q.  Did you take any pictures of the bottle?
18     A.  No.
19     Q.  Do you recall the dosage of the bottle?
20     A.  The milligrams?
21     Q.  Yes.
22     A.  I believe it was 400.  It could have been 500.
23 It was 400 or 500.
24     Q.  Okay.
25     So why do you claim that that bottle of SAM-e that

15 (Pages 54 - 57)

Page 58

1  you purchased had less active ingredients than was on the
2  label?
3      MR. BRODY:  Object to form.  Calls for
4  expertise.
5      A.  I believe they were tested in a lab and it turned
6  turned out that they were like not testing out to what the
7  label said.
8  BY MR. O'BRIEN:
9      Q.  Why do you believe that?
10     A.  Because they were tested in an independent lab and
11  that's how it came back.  I checked and the lab was right.
12     Q.  My question is:  Why do you think the product was
13  tested?
14     MR. BRODY:  I'm going to instruct the witness
15  not to reveal any attorney-client information.  You
16  can answer.
17     A.  I believe they were tested in an independent lab.
18  I believe when they came back, the dosage wasn't what was on
19  the label.  I didn't like hire the lab, so...
20  BY MR. O'BRIEN:
21     Q.  Sure.  And obviously you took all of this first
22  bottle, so you couldn't have that product tested; is that
23  right?
24     A.  That would be correct.
25     Q.  The third Amended Complaint on your behalf alleges

Page 59

1  that you made a second purchase of SAM-e on May 14th of
2  2018.  Do you have any recollection of making that purchase?
3      MR. BRODY:  Same objection.
4      A.  Not specific to that date.
5  BY MR. O'BRIEN:
6      Q.  Do you recall receiving the second bottle of SAM-e
7  sometime in May 2018?
8      A.  I recall receiving bottles as I ordered them.
9  I don't recall specifically receiving one in that.
10     Q.  Was the second purchase also made through Amazon?
11     A.  Yes.
12     Q.  Do you recall noticing anything unusual about the
13  second purchase?
14     A.  No.
15     Q.  Do you remember why you made a second purchase?
16  Was that because you had used all of the first bottle?
17     A.  Yes.
18     Q.  So you made some sort of decision to continue to
19  use the product?
20     A.  Yes.
21     Q.  Did you take all of the pills in the second bottle
22  of SAM-e purchased from ASquared?
23     A.  Yes.
24     Q.  What did you do with the bottle?
25     A.  I would have recycled it.

Page 60

1      Q.  Did you take any pictures of the bottle?
2      A.  No.  I would have no reason to do that.
3      Q.  And again, because you took all of the pills in the
4  bottle, you wouldn't have been able to have any of that
5  tested for potency or anything like that?
6      A.  Correct.
7      Q.  Do you think it would be important to have the
8  product you consumed to be checked for potency?
9      MR. BRODY:  Object to form.  Calls for legal
10  expertise.
11     A.  For me to personally have it tested?
12  BY MR. O'BRIEN:
13     Q.  Not you personally.  Anyone.
14     A.  I think by the time something is available for sale
15  it should have been tested.
16     Q.  I'm talking about your individual purchases.
17  Do you think it's important to have the pills that you
18  purchased tested for potency?
19     MR. BRODY:  Object to the form.
20     A.  The ones that I had shipped to my house?
21  BY MR. O'BRIEN:
22     Q.  Yes.
23     A.  No because I don't see why they would be any
24  different than the other pills.
25     Q.  Would it surprise you to know there could be some

Page 61

1  variance between bottles of supplements in terms of potency?
2      MR. BRODY:  Object to form. lack of
3  foundation.  Counsel, do you want to restate and
4  give a foundation question?
5      MR. O'BRIEN:  No.
6  BY MR. O'BRIEN:
7      Q.  Ms. Hood, you can answer the question.
8      A.  I think that with anything, there's probably
9  a certain threshold of, you know, what's accessible.
10  Like when you get blood work done, there's a threshold with
11  a margin of error.  I mean it's negligible.  I'm sure
12  there's some degree of difference but I would think that
13  there's some mechanism in place to make sure that everything
14  is meeting a threshold as to what it says on the label.
15  BY MR. O'BRIEN:
16     Q.  So how do you know whether the SAM-e purchased you
17  met or didn't meet that threshold?
18
19     MR. BRODY:  Object to form.  Asked and
20  answered and calls for expertise.
21     A.  How do I know?
22  BY MR. O'BRIEN:
23     Q.  Yeah.
24     A.  I don't know.  I'm trust what I'm purchasing.
25  If something says 400 milligrams on the label, I trust that.

16 (Pages 58 - 61)

Page 62

1    Q.  What would you do if you were going to verify that
2    that was the case?
3        MR. BRODY:  Object to form.
4    A.  I don't understand.
5    BY MR. O'BRIEN:
6    Q.  Could you have have product tested to confirm the
7    label is accurate?
8    A.  I wouldn't know how to do that.
9    Q.  Could you reach out to a lab?
10       MR. BRODY:  Object to form.
11   A.  Probably not a vitamin lab.  I don't know.
12   I wouldn't know how to do that.
13   BY MR. O'BRIEN:
14   Q.  I liked the answer that you gave about the
15   threshold; I think I can ask the question a little clearer
16   that way.
17       So with any product or item that you receive, there
18   is some, like you said, threshold level; is that right?
19       MR. BRODY:  Object to form.
20   A.  A negligible threshold.
21   BY MR. O'BRIEN:
22   Q.  Okay.  And so my question is:  How do you know the
23   SAM-e that you purchased was under that threshold?
24       MR. BRODY:  Object to form.  Calls for
25       expertise.

Page 63

1    A.  Can I answer?
2    BY MR. O'BRIEN:
3    Q.  Yes.
4    A.  How do I know?  Because I don't know that the
5    individual pill that I consumed not exceeded or fell below
6    whatever threshold would be acceptable.  There's no way to
7    tell.  I opened the bottle and consumed the pills.
8    BY MR. O'BRIEN:
9    Q.  The Complaint alleges your third purchase of SAM-e
10   from ASquared was on August 7th, 2018; so about three months
11   after the May purchase.  Do you have any recollection of
12   making that may purchase?
13   A.  No.
14   Q.  Had you hired your attorneys yet?
15       MR. O'BRIEN:  Object to form.
16   A.  I don't recall.
17   BY MR. O'BRIEN:
18   Q.  At any point after hiring your attorneys, did you
19   buy additional SAM-e from ASquared?
20       MR. BRODY:  Object to form.
21   A.  I believe when I saw that news article on online,
22   I stopped taking it or stopped buying it. I don't know if
23   I still had any left over when I saw that.  I can't recall.
24   BY MR. O'BRIEN:
25   Q.  Do you have any recollection of receiving the third

Page 64

1    purchase in August of 2018?
2    A.  Not specifically.
3    Q.  Do you remember noticing anything unusual about the
4    packaging, the bottle, the pills when you opened it?
5    A.  I've never received an unusual package.
6    Q.  Your knocking out my questions proactively now.
7    I appreciate it.  Did you take all of the SAM-e in that
8    purchase?
9    A.  I believe I did.
10   Q.  What did you do with the bottle?  Did you recycle
11   it like the previous two?
12   A.  Yes.
13   Q.  Did you take any pictures of the bottle at all?
14   A.  No.
15   Q.  And obviously because you took all of that bottle,
16   you didn't have any of that bottle of SAM-e tested for
17   potency; is that correct?
18   A.  Correct.
19   Q.  The Complaint alleges your fourth purchase was in
20   December of 2018, again, four months after the third
21   purchase.  Do you have any independent recollection of
22   making that purchase?
23   A.  No.
24   Q.  Would that also have been through Amazon?
25   A.  Yes.

Page 65

1    Q.  Do you have any recollection of receiving the
2    SAM-e from ASquared in December of 2018?
3    A.  No.
4    Q.  Do you remember seeing anything unusual when about
5    the the bottle or the pills upon opening it?
6    A.  No.
7    Q.  Did you take all of this fourth bottle of
8    SAM-e from ASquared?
9    A.  I believe so.
10   Q.  And did you recycle this bottle similar to the
11   other ones?
12   A.  Yes.
13   Q.  Did you take any pictures of this fourth bottle?
14   A.  No.
15   Q.  And as you took all of the product in the fourth
16   bottle, is it fair to say you didn't have any pills in that
17   bottle tested for potency?
18   A.  That is correct.
19   Q.  So at this point from February of 2018 through
20   December of 2018 you've purchased four separate bottles of
21   ASquared SAM-e and consumed all of the product; is that
22   correct?
23   A.  That sounds correct.
24   Q.  And still, despite taking all that, is it your
25   testimony that you experienced no positive side effects from

17 (Pages 62 - 65)

Page 66

1 this product?
2     MR. BRODY: Objection, asked and answered
3     multiple times.
4     A.   Again, over the course of the year, you feel good
5 sometimes.  You feel lousy sometimes.  I can't specifically
6 attribute anything to any one thing.
7 BY MR. O'BRIEN:
8     Q.   Is it fair to say that you continued to take the
9 product because you thought it could have been helping you?
10     A.   Yes.
11     MR. BRODY: Object to form.  Misstates prior
12     testimony.
13 BY MR. O'BRIEN:
14     Q.   All right.  The Complaint alleges your final
15 purchase of SAM-e from ASquared was in March of 2019.  Do
16 you have any recollection of making that purchase?
17     A.   No.
18     Q.   Was that from Amazon?
19     A.   Yes.
20     Q.   Do you recall receiving that purchase?
21     A.   Not specifically.
22     Q.   Do you recall anything unusual about the bottles or
23 ally pills when you received it?
24     A.   No.
25     Q.   Did you take all of the SAM-e that you purchased?

Page 67

1 And I'm referring to the fifth purchase.
2     A.   I can't recall if I took any of the last bottle.
3     Q.   Do you have any of the last bottle at present?
4     A.   No.  That would mean I took it all.
5     Q.   Fair.  What did you do with the five bottle?
6     A.   If there were any left, I'm sure I threw away the
7 medication out recycled the bottle but I can't say if it was
8 an empty bottle or not.  The bottle itself would have been
9 recycled.
10     Q.   And this was in March of 2019.  Do you remember if
11 you had hired your attorneys at this point?
12     A.   When I purchased it?
13     Q.   Yeah.  As of the time of the purchase of March
14 2019.
15     A.   I don't believe I would have but I can't say with
16 100 percent certainty.  I don't believe so.
17     Q.   And did you have any of that product, being the
18 fifth purchase, tested for potency?
19     A.   No.
20     MR. BRODY: Let's take a five-minute break.
21     MR. O'BRIEN: Yes, let's take a break.
22     (At 11:24 a.m. a break was taken.)
23     (At 11:38 a.m. the following proceedings
24     were resumed.)
25 BY MR. O'BRIEN:

Page 68

1     Q.   Ms. Hood, I'm showing you a document that I've
2 marked for today's deposition as Exhibit Two.  This is
3 titled an Amended Class Action Complaint From The United
4 States District Court In The Eastern District Of
5 Pennsylvania.  Do you recognize this exhibit?
6     MR. BRODY: Counsel, I'm just going to object
7     to the use of this exhibit.
8     MR. O'BRIEN: Why?
9     MR. BRODY: Just because it hasn't been
10     produced in discovery.
11     Go ahead.
12 BY MR. O'BRIEN:
13     Q.   Ms. Hood, do you recognize this document?
14     A.   Is this the one you showed me earlier?
15     Q.   No, this is a different document.  Take a second
16 and take a look at the first page.  Do you want me to Zoom
17 in a little bit?
18     A.   No, that's good where it's at.  Do I need to pay
19 specific attention section of the... (unintelligible)
20     Q.   No.  Just look at the first page and see if any of
21 the substance your memory as to whether you've ever seen
22 this document before.
23     A.   I know that my Complaint has been amended.
24     Q.   So I'm going to represent to you that this is not
25 a document from this lawsuit.

Page 69

1     A.   What is it?  Coverage (phonetic)...(unintelligible)
2     THE COURT REPORTER: Counsel, Ms. Hood is
3 breaking up.
4     MR. O'BRIEN: Let's go off the record.
5     (Off the record.)
6     (On the record.)
7 BY MR. O'BRIEN:
8     Q.   So, Ms. Hood, I was asking you to review the first
9 page of this document and let me know if you recognize the
10 document; and I did so with the qualification that this is
11 not related to your current lawsuit that you're being
12 deposed about today.
13     A.   Obviously I recognize my name.  I'm not sure what
14 healthy beverage is.
15     Q.   Do you know why your name is included as a
16 plaintiff in this lawsuit?
17     A.   My understanding -- and I don't understand the
18 details -- but the general way things are set up is there
19 are distributers, there are sellers, there are logistics
20 people.  I'm not clear on exactly who plays what part ih
21 everything.  So maybe that company has something to do with
22 the company that I've dealt with in purchasing that, is my
23 best guess.
24     Q.   Do you have understanding of whether you're seeking
25 to be a class representative in this other lawsuit that's

18 (Pages 66 - 69)

Page 70

1 pictured on the first page of Exhibit Two?
2     MR. BRODY: Counsel, can you show the date in
3 the document.
4     MR. O'BRIEN: Sure.
5 BY MR. O'BRIEN:
6   Q. So, Ms. Hood, up at the top of the document, do you
7 see some blue-type font?
8   A. Yes. I see the case number and...
9   Q. And so do you see this document was filed on
10 January 29th, 2021.
11   A. Yes.
12   Q. And so the question is: Do you know if you're
13 seeking to be a class representative in this other lawsuit?
14   A. I'm sure it has something do to -- When I think of
15 like the lawsuit, I know there are a lot of working parts
16 that are involved and I don't know which part is what.
17 I don't know what these have to do with each other.
18   Q. Is it your understanding that this amended class
19 action is related to the lawsuit you're testifying about
20 today?
21   A. I can't say how.
22   Q. Okay, but somehow?
23     MR. BRODY: Object to form. Misstates prior
24 testimony.
25   A. Yeah.

Page 71

1 BY MR. O'BRIEN:
2   Q. I'm going to scroll down to Page 6 of the class
3 action complaint, and I'm going to direct your attention to
4 Paragraph 33.
5   A. I don't know what this is.
6   Q. Do you have any recollection of seeing in document
7 before today?
8   A. No. This has nothing to do with the vitamin.
9   Q. I don't know. You tell me.
10   A. I don't know. I don't know. I've never signed
11 anything about this.
12   Q. Paragraph 33 states: Plaintiff, Shannon Hood, is
13 is a citizen of New York residing in Baldwinsville.
14     That's where you currently reside; right?
15   A. Yes.
16   Q. I will go down to the bottom of the document.
17 I'm sorry, it's a long document. I'm going to direct your
18 attention to the bottom half of Page 44 of Exhibit 2; and
19 do you see in the middle of the page "respectfully
20 submitted" with a bunch of names after it?
21   A. Yes. I know what this is. I recognize these
22 names.
23   Q. Who do you recognize David Majana (phonetic) as?
24   A. No. I recognize Gary Mason.
25   Q. Why do you recognize the name Gary Mason?

Page 72

1   A. Because I had told them that I was dropping out of
2 this and my e-mail had bounced back and and I had to get in
3 contact with this guy and he never responded to me.
4   Q. So now that your recollection is jogged, what is
5 this document about?
6   A. So this was something about some sweet tea and
7 it turned out that what I thought I purchased wasn't what
8 this is about and the attorney that I had worked with, when
9 I e-mailed him my e-mail bounced back and the phone number
10 returned a fast busy. So I tried to get ahold of somebody
11 in the firm which I think was Gary Mason and I said:
12 Can somebody call me on this? I'm not part of this anymore.
13 My e-mails are getting bounced back. And I haven't heard
14 anything from anybody.
15   Q. Is this the class action lawsuit that you testified
16 about earlier or is this a different one?
17   A. This is something else. It turned out that I was
18 not part of what they were talking about. And nobody has
19 returned calls for months.
20   Q. You're trying to get out of being a plaintiff in
21 this lawsuit.
22   A. I sent an e-mail telling them that I wasn't part of
23 it. I e-mailed the paralegal. I e-mailed the original guy;
24 I don't know what his name is, but he's no longer affiliated
25 with that firm. Nobody has returned my calls.

Page 73

1   Q. Do you know anything about the status of this
2 lawsuit outside of the fact that you want to get out of it?
3   A. No because I'm not part of it.
4   Q. Okay.
5   A. I had...(unintelligible) forgotten about that.
6     THE COURT REPORTER: Ms. Hood, please say your
7 answer again; it was very muffled.
8     THE DEPONENT: I had completely forgotten
9 about that.
10 BY MR. O'BRIEN:
11   Q. Okay, Ms. Hood, I'm sharing on the screen
12 a document that I've marked as Exhibit 3 for the purposes
13 of this deposition.
14   A. Yes, this is the one I'm remembering from before.
15     MR. BRODY: Counsel, can you again show the
16 ECF number at the top, just for reference.
17     I'm going to, again, make the same objection as
18 before. Go ahead.
19     MR. O'BRIEN: Noted.
20 BY MR. O'BRIEN:
21   Q. The first question is this the same as the last
22 document. It sounds like you have. Take a look at it and
23 let me know if you recognize this document.
24   A. Can you Zoom in a little and go to the second page.
25 Yes, this is the one I talked about before.

19 (Pages 70 - 73)

Page 74

1    Q.  When you said there was a case that was a false
2    advertisement case, this is the one?
3    A.  This is the one, yeah.
4    Q.  I will scroll down quickly to the bottom.
5        Does looking at this document, albeit quickly,
6    refresh your recollection as to what the lawsuit is about?
7    A.  Yeah, I see the screenshots and I recognize one of
8    the names.
9    Q.  Okay.  So why don't you walk me through what the
10   claim in this lawsuit is.
11       MR. BRODY:  Object to form.
12   A.  I can't -- I can't specifically remember.
13   BY MR. O'BRIEN:
14   Q.  Let me ask it this way:  Was this about a product?
15   A.  Yes.
16   Q.  What was the product?
17   A.  Coconut oil.
18   Q.  Do you remember what you're claiming was wrong with
19   the Coconut oil?
20   A.  I want to use the right terms.  The way that it was
21   marketed made be to believe that it would be more beneficial
22   to my cholesterol level instead of using butter or vegetable
23   oil when I cooked and it actually had adverse affect and my
24   cholesterol went up and I actually ended up with some
25   doctors' visits because of that.

Page 75

1    Q.  So this is a false advertisement claim?
2    A.  Yes.
3    Q.  At the bottom of the this page it's dated and
4    signed by an attorney?
5    A.  Is that a signature?
6    Q.  Yes.  The S slash, I guess, is what I would say.
7    Q.  Does this name jog your memory as to who the
8    attorney was in this lawsuit?
9    A.  I believe the name Paul Joseph is the person who
10   was my attorney that I was in communication with.  I can't
11   say for sure.
12   Q.  Do you know if you're seeking also to be a class
13   representative in this lawsuit, too?
14       MR. BRODY:  Object to form.
15   A.  This is...(unintelligible)
16   BY MR. O'BRIEN:
17   Q.  Do you remember if a class was certified in this
18   case?
19   A.  I don't know what that means.
20   Q.  Fair enough.
21       Now that you've seen the document and you remember
22   the claims, do you remember how this case ended?
23   A.  Like who won?
24   Q.  Anything.
25   A.  I don't know if the winning is the right term.

Page 76

1    Q.  It is.
2    A.  Then I gets the plaintiffs won, if that's the right
3    term.  That seems wrong.
4    Q.  I'm sorry what seems wrong?
5    A.  The term winning.  I feel like there's a better way
6    to answer that question.
7    Q.  Do you recall if you had to go to a jury trial in
8    this case?
9    A.  I did not have to go anywhere.
10   Q.  Do you recall if the case settled?
11       MR. BRODY:  Object to form.
12   A.  Isn't that what winning means?  I guess, to me, if
13   somebody wins, either side, that's a settlement.  Is that
14   correct?
15   BY MR. O'BRIEN:
16   Q.  I can't answer your questions, Ms. Hood.  We are
17   talking about a legal document in a legal lawsuit.  If you
18   don't know the answer to my question, you can just say you
19   don't know.
20   A.  I don't know.
21   Q.  All right, Ms. Hood, I've shared on my scene what
22   I've marked as Exhibit 4 for the purposes of this
23   deposition.  It's titled Third Amended Class Action
24   Complaint, and the lead plaintiff's name is Cori Ann
25   Ginsberg.  Do you recognize the first page of this document?

Page 77

1    A.  I recognize the ASqyuared and a couple of the
2    plaintiff's names on top I do recognize from other
3    documents.
4    Q.  Have you ever seen this document before today?
5        MR. BRODY:  Object to form.
6    A.  I know I've seen my amended complaint.
7    BY MR. O'BRIEN:
8    Q.  Do you see how this is titled Third Amended Class
9    Action Complaint?
10   A.  Yes.
11   Q.  So you've believe you seen amended complaints, but
12   you can say specifically this document because you don't
13   know what this document is?
14   A.  Well, I've seen all of my amended complaints.
15   Whether I remember seeing the first one, the third one it's
16   hard to say because they all look the same.
17   Q.  I'm going to Zoom in on the caption which
18   identifies all the parties.  Are you familiar with the name
19   Cori Ann Ginsberg?
20   A.  I'm not sure.  I recognize the Robert name, the
21   last name.
22   Q.  Do you recognize the name Cori Ann Ginsberg?
23   A.  I can't say.
24   Q.  Have you ever spoken to somebody named Cori Ann
25   Ginsberg?

20 (Pages 74 - 77)

Page 78

1    A. No.
2    Q. The next name is Noah Malgeri. Do you recognize
3  the name know hall?
4    A. I don't think so.
5    Q. Have you ever spoken to someone named Noah Malgeri?
6    A. No.
7    Q. The next name is Kaylyn Wolf. Do you have
8  recognize the name Kaylyn Wolf?
9    A. I don't think so.
10    Q. Have you ever spoken to someone named Kaylyn Wolf
11  about this lawsuit?
12    A. No.
13    Q. The next name is Bill Wilson. Do you recognize the
14  name Bill Wilson?
15    A. I think I might. That's a generic name.
16    Q. In your lawsuit with the other defendants, do you
17  recognize the name Bill Wilson?
18    A. I feel I have seen his name on some of my
19  documents, yes.
20    Q. And the only way you would recognize his name is
21  because you've seen his name on documents related to this
22  lawsuit?
23    A. Yes.
24    Q. Do you recognize the name Eric Fishon?
25    A. No.

Page 79

1    Q. Have you ever spoken to someone named Eric Fishon
2  about this lawsuit?
3    A. No.
4    Q. And finally Robert McKeown. I believe you said you
5  recognize this name.
6    A. Yes, I have seen that name. It has been next to my
7  name on some other documents.
8    Q. So similar to Mr. Wilson, you recognize it as
9  a name on documents you've received in this lawsuit?
10    A. Yes.
11    Q. Do you recognize the name Vitamins Because, LLC?
12    A. Yes.
13    Q. How do you recognize that name?
14    A. Again I'm not really sure who's the labeler, who's
15  the manufacturer; so I might get those mixed up but
16  something like that of the ones that I've purchased.
17  They're either a manufacturer or a distributer.
18  I know ASquared and Vitamins Because both are related to the
19  ones that I purchased but I can't say in what capacity.
20  I don't understand how all of that works.
21    Q. And so why do you think Vitamins Because is the
22  manufacturer?
23    A. I didn't say that.
24    Q. Ah, I'm sorry. You just know they play some sort
25  of a role in processing SAM-e or selling it?

Page 80

1    A. Right and I think that's kind of common practice.
2  Like one company will make bottles and labels and the other
3  company will make a product. That's how things go. They
4  might not have anything to do with each other, maybe they
5  do -- I don't know.
6    Q. And in terms of you buying the product, you have no
7  idea what Vitamins Because's role was in that process?
8         MR. BRODY: Object to form. Misstates prior
9    testimony.
10    A. I know that the manufacturer and the distributor
11  are two different business entities, I guess, but I don't
12  know which one did what thing right now. I can't say either
13  ASquared was the distributor or the manufacturer or
14  Vitamins Because.
15  BY MR. O'BRIEN:
16    Q. That's completely okay.
17    A. I'm just trying to clarify that I do recognize them
18  but I can't say in what capacity.
19    Q. How about the company GMAX Central, LLC?
20    A. I'm not sure.
21    Q. I will skip ASquared because we've covered that
22  already.
23       How about the company Inspire Now, Limited d/b/a,
24  doing business as, Used Cuticles?
25    A. I can't say.

Page 81

1    Q. How about Healthy Way RX, LLC?
2    A. I don't recognize that one.
3    Q. How about Khaki Wear, Inc.
4    A. No.
5    Q. And how about Jolly Dollar Supply Company, LLC?
6    A. I can't say on that one.
7    Q. In your own words, can you describe for me what
8  ASquared did wrong in this lawsuit.
9         MR. BRODY: Object to form. Calls for legal
10    expertise.
11    A. I'm not sure who, between the two, what role each
12  of them played. To me, I went and bought it on Amazon.
13    Q. What are you seeking to get at the end of this
14  lawsuit?
15         MR. BRODY: Object to form.
16    A. I would like to get my money back because I feel
17  that I purchased something that I didn't get.
18
19  BY MR. O'BRIEN:
20    Q. Anything else besides your money back?
21    A. I don't know if they're still selling anything, but
22  I would like them to change their labels to reflect what's
23  actually in them so that other people don't run into this.
24  It's pretty scary.
25    Q. Ms. Hood, outside of getting your money money back

21 (Pages 78 - 81)

**Page 82**

1  and having the defendants change their label, are you
2  seeking anything else at the end of this lawsuit?
3      MR. BRODY: Same objection. Calls for legal
4  expertise.
5      A. That's my main goal, to get my money back and to
6  make sure that they don't represent what might be in the
7  bottle.
8  BY MR. O'BRIEN:
9      Q. This is another long document. Give me a chance to
10 get to the points that I want to talk about.
11     Ms. Hood, are you familiar with the Florida
12 Deceptive And Unfair Trade Practices Act?
13     MR. BRODY: Object to form. Calls for legal
14 expertise.
15     A. No.
16 BY MR. O'BRIEN:
17     Q. Are you aware if you're asserting a claim under the
18 Florida Deceptive And Unfair Trade Practices Act?
19     A. I don't recognize that phrase.
20     Q. All right, Ms. Hood, I'm referring to Page 78 of
21 the third amended Complaint. Are you familiar with the
22 New York Deceptive Trade Practices And False Advertising
23 Act?
24     MR. BRODY: Same objection.
25     A. I have seen that phrase in documentation. Whatever

**Page 83**

1  the general business law it violates, I don't know.
2  BY MR. O'BRIEN:
3      Q. And do you know if you're bringing a cause of
4  action under the New York Deceptive Trade Practices And
5  False Advertising Act?
6      MR. BRODY: Same objection.
7      A. Yes, because it's says that right in front of me.
8  BY MR. O'BRIEN:
9      Q. Outside of reading it on page just now, do you have
10 any recollection of whether you were bringing this claim or
11 not?
12     A. Yes, but I could not have that it was this Trade
13 Practices Act.
14     Q. Do you know what a claim for breach of implied
15 warranty is?
16     MR. BRODY: Same objection. Calls for legal
17 expertise.
18     A. I'm not speculating because I don't know.
19 BY MR. O'BRIEN:
20     Q. I would prefer you didn't.
21     Do you know what a claim for breach of express
22 warranty is?
23     MR. BRODY: Same objection.
24     A. I think when you say something is 100 percent
25 natural and it's 50 percent natural.

**Page 84**

1  BY MR. O'BRIEN:
2      Q. Do you know what the Magnus In Maus Warranty
3  Act is?
4      MR. BRODY: Same objection.
5      A. No.
6  BY MR. O'BRIEN:
7      Q. Do you know what a claim for intentional
8  misrepresentation is?
9      MR. BRODY: Same objection.
10     A. I would have to speculate. No.
11 BY MR. O'BRIEN:
12     Q. Do you know what a claim for negligent
13 misrepresentation is?
14     A. I think these last two are, obviously, legal terms.
15 I mean it was never asked to me so I can't say my answer is
16 right but I think any regular person can read those words
17 and come to the conclusion of what it means.
18 BY MR. O'BRIEN:
19     Q. Outside of reading Paragraph 293, are you aware
20 that you're bringing a claim for negligent misrepresentation
21 in this lawsuit?
22     MR. O'BRIEN: Object to form.
23     A. Yes. I wouldn't have used misrepresentation as the
24 phase but that's the idea, the concept that I would have.
25 BY MR. O'BRIEN:

**Page 85**

1      Q. Okay, we are done with the Complaint.
2      A. Thank God. That's too much for me.
3      Q. A few more documents to go.
4      Okay, Ms. Hood, I'm showing you a document
5  marked as Exhibit 5. The document is titled The Plaintiff's
6  Response To Defendant ASquared Brand First Set Of
7  Interrogatories To Shannon Hood.
8      Do you see that title?
9      A. I do.
10     MR. BRODY: Counsel, I'm just going to ask
11 that you show her the full document including in
12 this signature that may or may not be omitted.
13     MR. O'BRIEN: Before I ask questions?
14     MR. BRODY: Yes.
15     MR. O'BRIEN: Do you want me to just show the
16 signature page or every document?
17     MR. BRODY: Unless the witness requests.
18     MR. O'BRIEN: What do you want me to show her?
19     MR. BRODY: If there's any signature that may
20 or may not be included.
21     MR. O'BRIEN: You're asking me to show her
22 whether she verified the document before I ask her
23 questions about it?
24     MR. BRODY: No. I'm asking you to show her
25 the full document.

22 (Pages 82 - 85)

Page 86

1  BY MR. O'BRIEN:
2      Q.  Ms. Hood, do you recognize this document?
3          MR. BRODY:  Counsel, can you show her the
4  document before you ask the question.  That's how
5  a deposition works.
6  BY MR. O'BRIEN:
7      Q.  Ms. Hood, do you need to see the whole document
8  before you answer questions?
9      A.  I recognize the signature page.
10     Q.  And so you know, you're going to see three
11 different iterations of this document so we're going to be
12 to go a lot of repetitive questions for the next ten minutes
13 or so.
14     A.  Just scroll to the end.  Thank you.
15     Q.  Did you see what you need to see, Ms. Hood?
16     A.  I did.
17     Q.  Why did you want to look at the signature page?
18     A.  I don't understand a lot of these documents like
19 the legalese.
20     Q.  What did you think the signature page would help
21 you understand?
22     A.  It would give me an idea of what was involved and
23 who typed it up and was involved.  I want to make sure my
24 attorney's names was on it.
25     A.  I recognize her name.

Page 87

1      Q.  Do you remember the name Jason as one of your
2  attorneys?
3      A.  I don't know.
4      Q.  Is it okay if I go back up to the top of the
5  document now?
6      A.  Absolutely.
7      Q.  So the same question before you asked to look at
8  the signature page.  Do you recognize this document?
9      A.  Again, I've looked at a lot of these documents?
10 A lot of these documents looning the same to he me.
11     Q.  Do you recollect reading reading this document
12 before?
13         MR. BRODY:  Object to form.
14     A.  I remember sets of interrogation, I remember that
15 phrase and something relevant to that.
16 BY MR. O'BRIEN:
17     Q.  Do you remember reading the section of
18 interrogatories that you saw were accurate?
19         MR. BRODY:  Object to form.
20     A.  Yes.
21 BY MR. O'BRIEN:
22     Q.  I'm scrolling down to the date.
23     A.  August 26th, 2021.
24     Q.  We are going to move to Exhibit Six, Ms. Hood, and
25 this is a document titled Plaintiff's Second Supplemental

Page 88

1  Responses And Objections to Defendant ASquared Brands, LLC,
2  First Set Of Interrogatories To Shannon Hood.
3          Would you like to see the signature page of this
4  document before I ask you any questions as well?
5      A.  Yes, please.  The date will be down there, too;
6  right?
7      Q.  Yes.
8      A.  That's helpful.
9      Q.  So there's the date, November 3rd of 2021.
10     A.  Yup.
11     Q.  There are your signature pages.  The service list
12 and way down at the bottom is a verification page.
13     A.  I do remember this one.
14     Q.  I'm going to scroll back up to the top, if you
15 don't mind.
16     A.  No problem.
17     Q.  Ms. Hood, do you recognize this document?
18     A.  Yes.
19     Q.  How do you recognize this document?
20     A.  It was something that Jay asked me to review for
21 accuracy not that long ago.
22     Q.  And did you do so?
23     A.  Yes.
24     Q.  Do you recall the first time you saw this document?
25         MR. BRODY:  Object to form.

Page 89

1  BY MR. O'BRIEN:
2      Q.  Page 16 of 16 of Exhibit 5 is labeled verification.
3  Do you know why you signed this verification page?
4          MR. BRODY:  Object to form.
5      A.  Because everything that it contained was true to my
6  knowledge otherwise, I wouldn't have signed it if it was not
7  accurate.
8  BY MR. O'BRIEN:
9      Q.  We are going to move to Exhibit 7.  Ms. Hood,
10 I'm showing you a document that's labeled Plaintiff's Third
11 Supplemental Responses And Objections To Defendant ASquared
12 Brand's, LLC First Set Of Interrogatories To Shannon Hood.
13         Do you want me to scroll down to the bottom first?
14     A.  Yes, please.
15     Q.  We have a date of November 11th of 2021.  And we
16 have a verification page that appears to be S slashed on
17 11-11-21.
18     A.  I remember this one.
19     Q.  How do you remember this document?
20     A.  It was something Jay let me review and I verified
21 that it was accurate to the best of my memory.
22     Q.  And so I can toggle to go to go back and forth if
23 you like but do you recall on Exhibit 6 of the declaration
24 page you have an electronic signature and on Exhibit 7 you
25 have an S slash?

23 (Pages 86 - 89)

Page 90

1   A.  Yes.
2   Q.  Why are those different?
3   A.  I'm not sure.
4   Q.  Did you S slash this?
5   A.  Did I create the document?
6   Q.  I'm asking you if you put this S slash in.
7   A.  I did not physically type this document.
8   Q.  This is a verification that you reviewed the
9   document for accuracy and I'm asking how your signature got
10  on your verification page.
11      MR. BRODY:  Objection.  Do not reveal any
12  attorney-client information.
13  A.  I reviewed it for accuracy and that was my
14  verification.
15  BY MR. O'BRIEN:
16  Q.  Okay, Ms. Hood, I'm showing you Exhibit 8.
17  It's Plaintiff's Second Supplemental Response To Defendant
18  ASquared Brand's, LLC Request For Production Of Documents
19  To Shannon Hood.  It's dated November 3rd, 2021.  It has
20  your attorney's signature, a certificate of service, a
21  service list.  And that's the end of the document.  Are you
22  okay if I ask you some questions about it now?
23  A.  Yes.
24  Q.  Do you recognize this document?
25  A.  Yes.

Page 91

1   Q.  Okay, how do you recognize this document?
2   A.  Again, it would have been something that Jay sent
3   me to review.
4   Q.  This document is called a Request For Production of
5   documents and in it my client, ASquared, has asked you to
6   conduct searches for relevant documents and provide them to
7   its counsel.  Does that make sense?
8   A.  Yes.
9   Q.  Do you recall reviewing this document and
10  conducting searches for the documents requested?
11      MR. BRODY:  Object to form.
12  A.  I -- I believe that anything was requested, I had
13  already given to my attorney.
14  BY MR. O'BRIEN:
15  Q.  I'm going to direct your attention to Number 6
16  which is on Page 3.  I'm not going to go through every one
17  of them.  This demands says all communications between
18  Shannon Hood and ASquared.
19  A.  Yes, that mix sense.
20  Q.  Do you recall doing a search for whether or not you
21  had in your possession any communication between yourself
22  and ASquared?
23      MR. BRODY:  Object to form.
24  A.  I believe I was was asked and I do not have because
25  it's my SOP to not keep e-mail.  I also do not believe there

Page 92

1   was any communication between anybody other than with an
2   order confirmation with Amazon.  I never reached out to the
3   company.  No communication existed.
4   Q.  These questions are not about whether they existed
5   but whether you were asked to conduct a search for the
6   documents requested.
7       And in response to doing the searches for the
8   documents, do you remember what types of documents you found
9   and turned over in this lawsuit?
10      MR. BRODY:  Object to form.
11  A.  The only thing that I found and turned over were
12  bank statements and order confirmations from Amazon.
13  BY MR. O'BRIEN:
14  Q.  Ms. Hood, I'm showing you an 11-page document and
15  it's bate-stamped at the bottom right Plaintiff's 23 and
16  runs to Plaintiff's 33.
17      MR. BRODY:  Counsel, are these all the
18  papering pages that were produced by Plaintiff
19  Hood?
20      MR. O'BRIEN:  Your responses don't specify.
21  I believe that's the case.
22      MR. BRODY:  I think we sent an e-mail as to
23  what documents are being produced.
24      MR. O'BRIEN:  This is from your initial
25  disclosures, Plaintiff's 1 through 50.

Page 93

1       Do you think it's in your e-mail exchanging  the
2   documents you produced in supplementing your initial
3   disclosures?
4       MR. BRODY:  I think so.
5   BY MR. O'BRIEN:
6   Q.  I will mark this as Exhibit 10.  I will put it up
7   on the screen.  It's different than Exhibit 9.  It's just
8   discovery, so that we have a clear record.  Ms. Hood, I'm
9   showing you a 14-page document that I've marked as Exhibit
10  10 to the deposition.  I'm going to scroll through the pages
11  slowly and you look at them.  Ms. Hood, did you have
12  a chance to review the documents although be it briefly?
13  A.  Yes.
14  Q.  Startling with Page 1, do you recognize this
15  document?
16  A.  That's how it looked when I purchased it.
17  Q.  Did you take this picture?
18  A.  I don't think I took it.
19  Q.  Did you pull this picture off the website and give
20  it to your attorney attorneys anything lawsuit?
21      MR. BRODY:  Object to form.
22  A.  I believe I did but that sounds like part of what
23  I turned over.
24  BY MR. O'BRIEN:
25  Q.  Do you remember it is or are you saying that's what

24 (Pages 90 - 93)

Page 94

1   you would have done?
2      A.  This is what it looks like.  I don't have the
3   original in front of me.  It looks familiar.
4      Q.  You testified earlier you didn't take any pictures
5   of bottle but this appears to be a printout.  Did you print
6   it out and turn it in for the lawsuit?
7      A.  Yes.  That's a screenshot from the picture on
8   Amazon.  I would have went online and took the picture.
9      Q.  Using a snippet of your computer?
10     A.  No.  This was a screenshot directly from the
11  computer.
12     Q.  I will Zoom in on page two a little bit.
13     A.  Yes, I recognize page two.  It looks like another
14  screenshot from Amazon.
15     Q.  Did you take this screenshot?
16     A.  I believe I did.
17     Q.  All right, Ms. Hood, onto Page 3.
18     A.  It's an order confirmation for one of the bottles.
19     Q.  Is this one of the bottles that you turned over in
20  relates to this lawsuit?
21     A.  Yes.
22     Q.  This is a document you were able to obtain by going
23  on your Amazon account?
24     A.  Yes.
25     Q.  Was it difficult to go into Amazon and download

Page 95

1   documents related to your purchases?
2      MR. O'BRIEN:  Object to form.
3      A.  What do you mean?
4   BY MR. O'BRIEN:
5      Q.  Was it easy to do or was it hard to do?
6      MR. BRODY:  Object to form.
7      A.  It was not hard.
8      Q.  When you're on Amazon are you able to access an
9   account summary of all the purchases you make on Amazon?
10     A.  I don't know of any such function.  I have to find
11  details on orders I have made and I go and do a search
12  however far Amazon goes and search for the orders.
13     Q.  So you go on your account, pull up the key word,
14  and you will see all of your purchases?
15     A.  Correct.  I think you think you can see everything
16  you purchased in that year.
17     Q.  And this is all done by logging into your Amazon
18  account?
19     A.  Yes.
20     Q.  Is it fair to say this document correspondence to
21  March 15th of 2019 order we talked about earlier?
22     A.  Yes.
23     Q.  So the next page is a redacted Chase record.  I'm
24  going to scroll forward to see if we can make this easier
25  for you.  I don't think we can.  Okay, Ms. Hood, Page 14.

Page 96

1   Do you see this document?
2      A.  Yes.
3      Q.  Do you recognize this document?
4      A.  I can't really see the numbers very well.  I do
5   have a Chase card.
6      Q.  Okay.  So this is obviously some sort of document
7   related to someone's chase account; is that right?
8      A.  Yes.  It is mine.  I just couldn't see it.
9      Q.  How do you know it's yours?
10     A.  The last four.
11     Q.  So you have a Chase account number that ends in
12  2883?
13     A.  I believe the account number is different now but,
14  yes, that is a credit card that I have.
15     Q.  When did the number change?  Between when you made
16  this purchase and today?
17     A.  Yes,.
18     Q.  The account number ending in, was that your credit
19  card?
20     A.  Yes.
21     Q.  Were you the only one to make purchases on that
22  credit card?
23     A.  Yes.
24     Q.  And you can see on the next page, which is
25  Page 5, the only item not redacted is a line in the middle

Page 97

1   which is a 3999 purchase from Amazon on March 2019.  Do you
2   see that?
3      A.  I do.
4      Q.  Page Six is another Amazon document order placed on
5   December 12th of 2018 of SAM-e.  Do you recognize this
6   document?
7      A.  Yes.
8      Q.  Is this one of the purchases of the Amazon
9   documents you referred to earlier that you had exchanged in
10  this lawsuit?
11     A.  Yes.
12     Q.  The next page is a document from August 7th of
13  2018.  Do you recognize this document?
14     A.  Yes.
15     Q.  Is this an Amazon purchase document that you
16  referenced in the lawsuit?
17     A.  Yes.
18     Q.  Ms. Hood, moving to Page 8, you can see that this
19  is a redacted page with information in the middle relating
20  to account number 3818.
21     A.  Yes.
22     Q.  Do you see that?
23     A.  I do.
24     Q.  And is that a different number or the same number
25  as the chase information?

25 (Pages 94 - 97)

Page 98

1    A.  The case was 2883.
2    Q.  Is this a different bank?
3    A.  Yes.  I can't recall completely what that is
4    because everything is blacked out and I can't tell you what
5    bank it was but my name is on the statement.
6    Q.  Do you have an account ending this these four
7    numbers?
8    A.  I can't tell you right now but accounts change and
9    get different accounts.
10   Q.  And you can see her at the bottom of the page
11   there's a purchase on 8-7 to Amazon.com in the amount of
12   $34.99.  Do you see that?
13   A.  I do.
14   Q.  Moving onto Page 9 you have an order placed to
15   Amazon on May 14th of 2018.  Do you recognize this document?
16   A.  Yes.
17   Q.  Do you recognize this document as one of the Amazon
18   purchased documents that you produced any lawsuit?
19   A.  Yes.
20   Q.  Moving to Page 10, you have a redacted Chase
21   document with an account number ending in 3818.
22   A.  Is that the same as the last one?
23   Q.  Correct.
24   A.  Yes.  So that is chase as well, yes.
25   Q.  So does that clarify that that second account

Page 99

1    number is related to a Chase account?
2    A.  Yes, I recognize the last four.
3    Q.  Do you see on Page 11 you have a $29.99e Amazon
4    purchase?
5    A.  Could you Zoom in on that, please.  It's not clear.
6    Yes.  Yes, that's what it says.
7    Q.  So it's the associated purchase of SAM-e?
8    A.  Yes.
9    Q.  Moving to Page 12 we have an Amazon document order
10   placed February 25.
11   A.  Yes, I recognize this document.
12   Q.  Is this an Amazon purchased document related to
13   this lawsuit that you turned over to us?
14   A.  Yes.
15   Q.  Sticking with Page 12, if you move to Page 13,
16   it's another picture of SAM-e.  Do you know if there's
17   a corresponding chase purchase for the February 24 purchase
18   of SAM-e?
19   A.  If there isn't one, then I didn't obtain it.  If
20   it's not in the document, then I was unable to get it.
21   Q.  Do you know why the payment method is redacted on
22   Page 1?
23   Q.  Do you know that information would confirm you paid
24   for this with your Chase credit card?
25       MR. BRODY:  Object to form.

Page 100

1    A.  It's the same account number.
2    BY MR. O'BRIEN:
3    Q.  Would you be able to obtain this order number still
4    from your Amazon account if needed?
5    A.  I don't know how far back you can find orders for.
6    If it's there, I can get it.
7    Q.  Page 13 is another snippet of the SAM-e with Page
8    14 being the corresponding second page.  Did you take this
9    picture of the ASquared SAM-e?
10   A.  Is that the same picture as the other one you
11   showed me?
12   Q.  It looks to be the same but it has been produced
13   differently.
14   A.  Yes.  I took screen shots.  I just thought it was
15   the same one I looked at first.
16   Q.  And the correspondings second page is just the back
17   of the bottle?
18   A.  Correct.
19   Q.  Thank you for bearing with me through that,
20   Ms. Hood.
21       Do you know what the judge is that's assigned to
22   this lawsuit?
23   A.  No.
24   Q.  Do you know what court this lawsuit is going
25   forward in?

Page 101

1    A.  Object to form. calls for legal expertise.
2    A.  With all the districts and everything, I couldn't
3    tell you that.  I know with Florida, it has some
4    jurisdiction, I think.  When you as far as the circuits, I
5    don't know.
6    Q.  Completely okay.
7        MR. O'BRIEN:  That's all I have for you.
8
9                CROSS EXAMINATION
10   BY MR. OPARIL:
11   Q.  I'm Richard Oparil.  We represent GMAX that sells
12   under the brand name New Supera.  You did not purchase any
13   products from GMAX or from New Supera?
14       MR. OPARIL:  Object to form.
15   A.  Again, I purchased all of them from Amazon.  As far
16   as the specific seller, I don't believe so.
17       MR. OPARIL:  Thank you.
18       MR. BRODY:  She's going to read.
19       (Signatures and formalities were not waived.)
20       (The video conference deposition concluded
21   at 12:55 p m.)
22       - - - - -
23
24
25

26 (Pages 98 - 101)

Page 102

1        CERTIFICATE OF OATH

2

3    STATE OF FLORIDA   )
     COUNTY OF PINELLAS )

4

5        I, Gina M. Manning, certify that SHANNON HOOD appeared

6    before me via video conference on Friday, November 19, 2021

7    and was duly sworn.

8

9        Signed this 13th day of December 2021.

10

11              *Gina M. Manning*

12       _____

     GINA M. MANNING

13       Shorthand Reporter
         Notary Public - State of Florida

14       My Commission Number: #GG250426
         Expires:  September 5, 2022

15

16

17

18

19

20

21

22

23

24

25

Page 103

1        CERTIFICATE

2

3    STATE OF FLORIDA   )
     COUNTY OF PINELLAS )

4

5        I, GINA M. MANNING, Shorthand Reporter

6    and Notary Public, certify that I was authorized to and

7    did stenographically report the video conference deposition

8    of SHANNON HOOD pages 1 through 105, that signatures and

9    formalities were not waived; and that the transcript

10   is a true and complete record of my stenographic notes.

11       I further certify that I am not a relative,

12   employee, attorney, or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties'

14   attorney or counsel connected with the action, nor am

15   I financially interested in the action.

16       Dated this 13th day of December 2021.

17

18

19              *Gina M. Manning*

20       _____

     GINA M. MANNING
         Shorthand Reporter

21       Notary Public - State of Florida
         My Commission Number: #GG250426

22       Expires:  September 5, 2022

23

24

25

Page 104

1        READ AND SIGN
             COVER PAGE

2

3        I have read the foregoing pages, and, except for the

4    corrections or amendments I have indicated on the sheet

5    attached for such purposes, I hereby subscribe to the

6    accuracy of this transcript.

7

8        _____

     SIGNATURE OF DEPONENT

9    SHANNON HOOD

10

11       _____

     DATE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 105

1

     PLEASE READ THE TRANSCRIPT OF YOUR DEPOSITION  IF YOU FEEL

2    YOU NEED TO MAKE CORRECTIONS, PLEASE NOTE ON THIS PAGE
     DO NOT MARK ON THE TRANSCRIPT ITSELF

3

     PAGE      LINE          ERROR OR AMENDMENT

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   Under penalties of perjury, I declare that I have read the

     foregoing document and that the facts stated are true

17

18       _____

     NAME OF DEPONENT        TODAY'S DATE

19

20

21

22

23

24

25

27 (Pages 102 - 105)

Page 106

1  JAY BRODY, ESQUIRE
   jbrody@kgglaw.com
2
3              December 12th, 2021
4  RE: Ginsberg v. Vitamins Because, LLC Et Al.
      11/19/2021 - Shannon Hood - Job# 4848708
5
6      The above-referenced transcript is available for
7  review.
8      Shannon Hood should read the testimony to
9  verify its accuracy. If there are any changes,
10 Shannon Hood should note those with the reason
11 on the attached Errata Sheet.
12     Shannon Hood should, please, date and sign the
13 Errata Sheet and email to the deposing attorney as well as
14 to Veritext at Transcripts-fl@veritext.com and copies will
15 be emailed to all ordering parties.
16     It is suggested that the completed errata be returned 30
17 days from receipt of testimony, as considered reasonable
18 under Federal rules*, however, there is no Florida statute
19 to this regard.
20     If the witness fails to do so, the transcript may be used
21 as if signed.
22          Yours,
23          Veritext Legal Solutions
24
      *Federal Civil Procedure Rule 30(e)/Florida Civil Procedure
25   Rule 1.310(e).

Veritext Legal Solutions
800-726-7007                                              305-376-8800

| & |
| --- |
| **&**   3:6 |

| 1 |
| --- |
| **1**   15:16 92:25 93:14 99:22 103:8 |
| **1.310**   106:25 |
| **10**   55:7 93:6,10 98:20 |
| **100**   43:10 67:16 83:24 |
| **101**   3:3 8:23 |
| **105**   103:8 |
| **11**   92:14 99:3 |
| **11-11-21**   89:17 |
| **11/19/2021**   106:4 |
| **11:24**   67:22 |
| **11:38**   67:23 |
| **11th**   89:15 |
| **12**   15:7 99:9,15 |
| **12:55**   1:23 101:21 |
| **12th**   97:5 106:3 |
| **13**   99:15 100:7 |
| **13069**   22:16 |
| **13th**   102:9 103:16 |
| **14**   93:9 95:25 100:8 |
| **14th**   59:1 98:15 |
| **15**   55:7 |
| **15th**   95:21 |
| **16**   89:2,2 |
| **19**   1:22 102:6 |
| **1980**   9:16 |
| **1:19**   1:3 |

| 2 |
| --- |
| **2**   15:17 53:18 57:1 71:18 |
| **20**   9:3 |
| **2006**   10:20 |
| **2008**   9:21 |
| **2009**   9:20 |

| 2010 |
| --- |
| **2010**   19:6,10 23:21 23:22 |
| **2015**   23:23 |
| **2018**   20:18 34:17 56:7,12,23 57:6 59:2,7 63:10 64:1 64:20 65:2,19,20 97:5,13 98:15 |
| **2019**   20:18 34:3,8 34:15,17 39:22 40:18 45:8 66:15 67:10,14 95:21 97:1 |
| **2020**   39:22 40:18 45:8 |
| **202015**   19:8 |
| **2021**   1:22 6:12,13 27:13,14 34:9 70:10 87:23 88:9 89:15 90:19 102:6 102:9 103:16 106:3 |
| **2022**   102:14 103:22 |
| **21**   10:3 |
| **22702**   1:3 |
| **23**   92:15 |
| **24**   99:17 |
| **25**   29:20 99:10 |
| **25331**   102:11 103:19 |
| **25th**   9:16 |
| **26th**   87:23 |
| **2883**   96:12 98:1 |
| **29.99e**   99:3 |
| **293**   84:19 |
| **29th**   70:10 |

| 3 |
| --- |
| **3**   73:12 91:16 94:17 |
| **30**   106:16,24 |
| **3000**   9:12,17 22:8 |
| **33**   71:4,12 92:16 |

| 3396   8:23 9:5 |
| --- |
| **34.99.**   98:12 |
| **369**   22:16 |
| **3818**   97:20 98:21 |
| **3999**   97:1 |
| **3rd**   22:16 88:9 90:19 |

| 4 |
| --- |
| **4**   3:2 76:22 |
| **400**   57:22,23 61:25 |
| **41**   49:17 |
| **44**   71:18 |
| **4848708**   106:4 |

| 5 |
| --- |
| **5**   85:5 89:2 96:25 102:14 103:22 |
| **5,000**   53:20,25 54:8 54:12 |
| **50**   83:25 92:25 |
| **500**   53:14,25 57:22 57:23 |
| **59**   3:4 |
| **5th**   56:7,12 |

| 6 |
| --- |
| **6**   71:2 89:23 91:15 |
| **60**   3:5 |
| **61**   3:6 |
| **62**   3:7 |

| 7 |
| --- |
| **7**   89:9,24 |
| **78**   82:20 |
| **7th**   63:10 97:12 |

| 8 |
| --- |
| **8**   90:16 97:18 |
| **8-7**   98:11 |

| 9 |
| --- |
| **9**   93:7 98:14 |
| **9:32**   1:23 |

| a |
| --- |
| **a.m.**   1:23 67:22,23 |
| **abd**   39:8 |
| **ability**   20:11,13,15 50:6 |
| **able**   5:14 20:19 21:8 24:13 37:10 56:1 60:4 94:22 95:8 100:3 |
| **absolutely**   20:22 87:6 |
| **acceptable**   8:11 63:6 |
| **access**   95:8 |
| **accessible**   61:9 |
| **accident**   23:16 |
| **accommodate**   6:19 |
| **account**   94:23 95:9 95:13,18 96:7,11 96:13,18 97:20 98:6,21,25 99:1 100:1,4 |
| **accounts**   98:8,9 |
| **accuracy**   88:21 90:9,13 104:6 106:9 |
| **accurate**   62:7 87:18 89:7,21 |
| **acronyms**   12:7 |
| **act**   82:12,18,23 83:5,13 84:3 |
| **action**   49:4,8,20 68:3 70:19 71:3 72:15 76:23 77:9 83:4 103:14,15 |
| **active**   58:1 |
| **actual**   15:19 27:3 |
| **add**   29:3 |
| **adderall**   30:25 |
| **additional**   29:3 63:19 |

**address**  8:22 9:4,10
  9:13,18 22:15
**adhd**  30:25
**administration**
  12:2
**administrative**
  15:18 39:6
**adverse**  74:23
**advertised**  18:24
  32:14
**advertisement**
  49:15 74:2 75:1
**advertising**  18:17
  18:21 82:22 83:5
**advice**  41:5,16 53:9
**advisement**  21:4
  44:12
**affairs**  12:11
**affect**  74:23
**affiliated**  72:24
**ago**  19:1,5 20:16
  21:2 47:22 88:21
**agree**  41:20 51:24
**ah**  79:24
**ahead**  7:24 8:4
  14:11 26:17 29:2
  68:11 73:18
**ahold**  72:10
**al**  106:4
**albeit**  74:5
**allege**  55:14
**alleges**  56:6 58:25
  63:9 64:19 66:14
**ally**  66:23
**amazon**  30:9 37:21
  37:22,24 38:11
  56:13,16 59:10
  64:24 66:18 81:12
  92:2,12 94:8,14,23
  94:25 95:8,9,12,17
  97:1,4,8,15 98:15

**amazon.com**  98:11
**amended**  58:25
  68:3,23 70:18
  76:23 77:6,8,11,14
  82:21
**amendment**  105:3
**amendments**  104:4
**amount**  53:3 54:6
  98:11
**analyst**  12:17,19
  14:24 15:13
**analyze**  12:20
**anderson**  2:7 51:9
  51:10
**ann**  76:24 77:19,22
  77:24
**answer**  4:15 5:4,13
  5:18 6:6 8:9,11
  14:10,12,13,16
  17:17 18:20 20:11
  27:2 28:1,4,10,13
  28:13,23 29:12,24
  30:1,3 31:23 32:22
  33:6,15,20 43:5,23
  47:13 48:20 50:5
  50:17,25 51:5,10
  53:3 54:2 58:16
  61:7 62:14 63:1
  73:7 76:6,16,18
  84:15 86:8
**answered**  38:23
  43:15,21 45:7 48:7
  61:20 66:2
**answers**  5:10,12
**anthony**  10:7
**anybody**  16:4
  72:14 92:1
**anymore**  72:12

**apartment**  8:23
**appear**  52:11
**appearance**  47:4,4
  47:7
**appearances**  2:1
  47:1
**appeared**  102:5
**appearing**  1:18 2:2
  2:5,9,12
**appears**  89:16 94:5
**application**  15:20
**appreciate**  42:11
  64:7
**appropriate**  51:14
  51:17
**approximate**  37:10
**approximately**  8:2
  9:20 12:15 15:7
  19:4 23:2,19 34:3,5
**area**  11:2 13:8,9
  17:6 18:2,7 23:11
**arrangements**
  52:15
**arrested**  27:17
**article**  44:15 63:21
**articulate**  14:2
**aside**  54:12
**asked**  21:15 24:24
  25:24 26:3 27:2
  40:23 42:20 43:4
  43:15 45:7 48:6
  61:19 66:2 84:15
  87:7 88:20 91:5,24
  92:5
**asking**  4:19 8:7,10
  26:5,12 28:2,7 41:6
  41:13 43:20 44:25
  50:4,5 51:5 56:13
  56:14 69:8 85:21
  85:24 90:6,9

**asquared**  2:2 38:1
  38:2,6,8 56:5,7,12
  56:15 59:22 63:10
  63:19 65:2,8,21
  66:15 79:18 80:13
  80:21 81:8 85:6
  88:1 89:11 90:18
  91:5,18,22 100:9
**asqyuared**  77:1
**asserting**  82:17
**asserts**  4:14
**assigned**  100:21
**assistant**  39:6
**associated**  44:10
  53:6 99:7
**assume**  9:22 10:21
  31:5 53:14
**assuming**  4:25 22:5
  44:16
**attached**  104:5
  106:11
**attention**  68:19
  71:3,18 91:15
**attorney**  4:14 6:1
  7:12,16,23 8:15
  17:23 18:2,6 19:15
  21:8 23:25 26:9,14
  26:19 38:25 39:2,3
  40:2 41:9,11 43:24
  48:15 50:4 58:15
  72:8 75:4,8,10
  90:12 91:13 93:20
  103:12,14 106:13
**attorney's**  17:25
  24:2 86:24 90:20
**attorneys**  25:8
  38:17,21 39:24
  40:5 47:8 48:22
  63:14,18 67:11
  87:2 93:20

**attribute** 56:9 66:6
**august** 63:10 64:1
  87:23 97:12
**austin** 16:11
**authorized** 103:6
**available** 60:14
  106:6
**aware** 27:19 82:17
  84:19

**b**

**b** 1:10 3:8 29:10,15
  29:16,17,21 30:7
  30:22 31:2,6 80:23
**bachelor's** 11:3
**back** 6:1,9 7:14
  9:20 20:24,25
  24:16,18 28:15,18
  30:11 58:11,18
  72:2,9,13 81:16,20
  81:25 82:5 87:4
  88:14 89:22 100:5
  100:16
**bag** 13:2
**baldwinsville** 8:21
  9:1,2,3,4 71:13
**bank** 26:20 92:12
  98:2,5
**bankruptcy** 27:22
**based** 5:3 41:17
**basically** 12:20
  30:16
**basis** 13:22 41:24
  42:4 46:10
**bate** 92:15
**bearing** 100:19
**because's** 80:7
**becoming** 45:21
**behalf** 1:5 2:2,5,9
  2:12 58:25
**believe** 9:21 17:22
  21:21 26:20 32:13

34:14 40:13,22
  43:24 44:23 57:22
  58:5,9,17,18 63:21
  64:9 65:9 67:15,16
  74:21 75:9 77:11
  78:18 79:4 91:12
  91:24,25 92:21
  93:22 94:16 96:13
  101:16
**beneficial** 74:21
**benefit** 32:1 33:2
  35:12 36:10
**benefits** 31:20 35:6
  35:19,24 36:11,22
**best** 4:15 5:5 11:14
  50:5,8 69:23 89:21
**better** 36:1 76:5
**beverage** 69:14
**big** 42:7 46:8 56:18
**bigger** 6:18
**bill** 1:4 78:13,14,17
**bills** 54:12
**birth** 9:15
**bit** 11:22 13:1
  36:19 48:11 68:17
  94:12
**blacked** 98:4
**blood** 30:5 61:10
**blue** 70:7
**boostceuticals** 1:10
**bottle** 33:16 57:8
  57:14,17,19,25
  58:22 59:6,16,21
  59:24 60:1,4 63:7
  64:4,10,13,15,16
  65:5,7,10,13,16,17
  67:2,3,5,7,8,8 82:7
  94:5 100:17
**bottles** 37:10,15
  55:16 59:8 61:1
  65:20 66:22 80:2

94:18,19
**bottom** 71:16,18
  74:4 75:3 88:12
  89:13 92:15 98:10
**bought** 37:24 81:12
**bounce** 30:11
**bounced** 72:2,9,13
**box** 24:20,23 43:11
**boxes** 56:18
**brain** 20:4,13
**brand** 30:13,15
  37:24 85:6 101:12
**brand's** 89:12
  90:18
**branded** 12:1
**brands** 2:2 88:1
**bravo** 29:16
**breach** 83:14,21
**break** 4:21,23
  67:20,21,22
**breaking** 69:3
**bridge** 9:12,17 22:8
**briefly** 93:12
**bring** 12:20 39:14
**bringing** 55:11
  83:3,10 84:20
**brings** 9:20
**broadly** 18:23
  40:15
**brody** 2:3,10 6:5
  7:19 8:3,17 11:16
  13:12,15,17,25
  14:3,6,13 16:1,5
  18:25 19:21 20:1
  20:21 21:10 22:11
  23:15 24:19 25:1,6
  25:20 26:8,11,12
  26:16 27:1,25 28:5
  28:9,12 29:2 30:1
  30:12 31:8,12,17
  31:22 32:8,12,21

33:5,10,14 34:10
  34:16 35:7,13,20
  36:8,18,24 37:7,16
  38:16,18,24 39:15
  39:21,25 40:12,17
  40:25 41:4,8,11,18
  41:20 42:4,17,24
  43:7,15 45:6,12,17
  45:23 46:3,6,13
  47:2,9,16 48:2,6,13
  48:17 49:2,5,9,23
  50:16 51:10,14,16
  52:7,13,25 53:8,17
  53:21 54:1,10,22
  55:5,7,15,22 56:25
  58:3,14 59:3 60:9
  60:19 61:2,19 62:3
  62:10,19,24 63:20
  66:2,11 67:20 68:6
  68:9 70:2,23 73:15
  74:11 75:14 76:11
  77:5 80:8 81:9,15
  82:3,13,24 83:6,16
  83:23 84:4,9 85:10
  85:14,17,19,24
  86:3 87:13,19
  88:25 89:4 90:11
  91:11,23 92:10,17
  92:22 93:4,21 95:6
  99:25 101:14,18
  106:1
**brody's** 28:19 39:8
  39:11 40:10,16
  45:5 50:23
**brody's's** 44:21
**brody'sy** 44:10
**broke** 36:23
**brought** 21:4
**budget** 12:22
**bunch** 71:20

**business** 80:11,24
83:1
**busy** 72:10
**butter** 74:22
**buy** 63:19
**buying** 63:22 80:6

**c**

**c** 4:1 30:21,23,25
31:2,6
**call** 7:18,25 8:2,12
28:4 45:11,13
46:13 72:12
**called** 17:1 91:4
**calls** 27:25 31:22
33:5,14 35:7 41:4
47:16 49:23 50:16
52:25 58:3 60:9
61:20 62:24 72:19
72:25 81:9 82:3,13
83:16 101:1
**capacity** 79:19
80:18
**caption** 77:17
**card** 96:5,14,19,22
99:24
**career** 11:6
**case** 1:3 8:8 13:25
17:16,18 18:6 19:2
19:13,16,18,20
21:16 23:25 24:9,9
24:25 39:1,4 47:15
48:12 52:19 62:2
70:8 74:1,2 75:18
75:22 76:8,10
92:21 98:1
**cause** 36:2 83:3
**ce** 12:3,4
**centers** 16:14
**central** 1:10 2:12
80:19

**certain** 61:9
**certainly** 54:8
**certainty** 43:14
53:11 54:5 67:16
**certificate** 3:4,5
90:20 102:1 103:1
**certificates** 11:4
**certification** 12:3,4
**certifications** 11:5
11:9,13,15 12:1,9
**certified** 12:5 75:17
**certify** 102:5 103:6
103:11
**chaka** 12:2
**chance** 82:9 93:12
**change** 81:22 82:1
96:15 98:8
**changes** 106:9
**chase** 95:23 96:5,7
96:11 97:25 98:20
98:24 99:1,17,24
**check** 39:17
**checked** 58:11 60:8
**chief** 16:6
**cholesterol** 74:22
74:24
**circuits** 101:4
**circumstances** 5:15
**cisco** 12:1
**citizen** 71:13
**civil** 106:24,24
**claim** 57:25 74:10
75:1 82:17 83:10
83:14,21 84:7,12
84:20
**claiming** 18:24
49:11 74:18
**claims** 52:1 54:16
75:22
**clarification** 45:19

**clarify** 26:8 27:12
28:8 80:17 98:25
**class** 49:4,8,20,22
50:6,15 51:1,21,24
52:3,5,12,23 53:7
54:21 68:3 69:25
70:13,18 71:2
72:15 75:12,17
76:23 77:8
**clean** 4:16 24:20,23
25:12
**clear** 20:9 26:1
69:20 93:8 99:5
**clearance** 14:8,18
**clearer** 62:15
**clearly** 28:16
**client** 26:3 40:2
41:9,11 48:15
58:15 90:12 91:5
**closed** 9:21
**clutter** 43:10
**coconut** 74:17,19
**college** 10:9,10,11
10:22
**combination** 49:16
**come** 5:1 45:18
54:11 84:17
**comes** 46:21
**commercial** 15:2
**commission** 102:14
103:21
**common** 11:13
80:1
**communicate** 24:8
**communicated**
38:25
**communication**
26:4 38:21 41:15
44:18 75:10 91:21
92:1,3

**communications**
7:20,22 24:11 26:9
26:10 30:2 40:2
41:9,11 48:15
91:17
**community** 10:11
10:22
**companies** 37:23
55:21
**company** 1:12 15:4
16:25 17:5,7,8,21
17:22 18:16 30:10
31:7 37:25 38:3
55:21 69:21,22
80:2,3,19,23 81:5
92:3
**complaint** 55:9,12
55:14 56:6 58:25
63:9 64:19 66:14
68:3,23 71:3 76:24
77:6,9 82:21 85:1
**complaints** 77:11
77:14
**complete** 103:10
**completed** 106:16
**completely** 73:8
80:16 98:3 101:6
**complex** 29:10
**complies** 28:21
**computer** 10:18
12:8 15:17 17:9
94:9,11
**concept** 45:21
84:24
**concern** 52:21
**concluded** 101:20
**conclusion** 5:17
51:12 84:17
**conducive** 15:23
**conduct** 21:15 91:6
92:5

**conducted** 26:6
**conducting** 91:10
**conference** 1:16,24
  14:14 101:20 102:6
  103:7
**confidential** 14:4
**confidentiality**
  14:1
**confirm** 62:6 99:23
**confirmation** 27:4
  27:5 92:2 94:18
**confirmations**
  92:12
**connected** 103:14
**considered** 9:4
  47:10 106:17
**consistently** 34:25
  35:2
**constantly** 41:24
**construction** 16:25
  17:5,8
**consumed** 28:25
  36:17 60:8 63:5,7
  65:21
**consumption** 32:6
**contact** 21:8,12
  40:6 72:3
**contained** 89:5
**contents** 7:22
**context** 28:24
**continue** 35:11
  41:22 59:18
**continued** 66:8
**control** 6:17
**controversy** 44:1,5
  44:6
**conversations** 6:7
**convicted** 27:15
**cooked** 74:23
**copied** 38:20,24

**copies** 106:14
**copy** 25:14 40:23
  41:3,7 42:21,23
  43:5
**cori** 76:24 77:19,22
  77:24
**correct** 9:24 11:8
  17:7 19:11 22:18
  25:19 26:15 34:21
  35:17 42:18,19,21
  43:6 58:24 60:6
  64:17,18 65:18,22
  65:23 76:14 95:15
  98:23 100:18
**corrections** 104:4
  105:2
**correspondence**
  95:20
**corresponding**
  99:17 100:8
**correspondings**
  100:16
**cost** 52:23
**costs** 53:2,6,11,14
**counsel** 11:19
  13:12 18:19 25:15
  26:8 41:18,20
  48:14 61:3 68:6
  69:2 70:2 73:15
  85:10 86:3 91:7
  92:17 103:12,14
**count** 44:23 47:3
**county** 11:2 102:3
  103:3
**couple** 4:8 49:11
  77:1
**course** 7:13 66:4
**court** 1:1 4:10
  11:19 18:13,19
  21:24 28:21 29:11
  46:25 47:3,4,7

52:11 68:4 69:2
  73:6 100:24
**cover** 3:6 104:1
**coverage** 69:1
**covered** 80:21
**create** 90:5
**credit** 96:14,18,22
  99:24
**crime** 27:15
**cross** 3:3 101:9
**cssp** 11:17
**ct** 1:9,20 2:5
**current** 11:10
  69:11
**currently** 8:20
  12:10 29:5 71:14
**curve** 31:1
**cut** 42:6,6
**cuticles** 80:24
**cv** 1:3

**d**

**d** 1:10 4:1 29:15
  80:23
**daily** 29:6 35:2,4
**damaged** 57:1
**damages** 49:11
**database** 12:25
**date** 1:22 5:25 6:2
  9:15 39:16 46:17
  56:10 59:4 70:2
  87:22 88:5,9 89:15
  104:11 105:18
  106:12
**dated** 75:3 90:19
  103:16
**daughter** 10:1,2
**david** 71:23
**day** 46:2 102:9
  103:16
**days** 106:17

**deal** 42:7 46:8
**dealt** 69:22
**deceased** 16:9
**december** 64:20
  65:2,20 97:5 102:9
  103:16 106:3
**deceptive** 82:12,18
  82:22 83:4
**decide** 30:15 39:14
**decided** 32:11
**deciding** 30:17
**decision** 59:18
**declaration** 89:23
**declare** 105:16
**defective** 55:14
**defendant** 22:22
  85:6 88:1 89:11
  90:17
**defendants** 1:13
  78:16 82:1
**degree** 10:13,15,19
  11:3 16:22,24
  43:13 53:11 54:4
  61:12
**delet** 43:16
**delete** 21:13 24:20
  25:12
**deleted** 25:5,10
  26:25 27:7,9 43:6
  43:14
**demands** 91:17
**department** 12:11
  12:20
**departments** 12:22
  12:22
**deponent** 4:2 13:10
  13:21 14:7,16
  18:21 20:3 51:3
  55:6 73:8 104:8
  105:18

**deposed** 5:23 7:8
21:18 23:17 69:12
**deposing** 106:13
**deposition** 1:16 4:8
4:10 5:15 6:22 7:9
7:17 8:16 20:12
23:19 42:10,12
45:12 46:14 51:19
68:2 73:13 76:23
86:5 93:10 101:20
103:7 105:1
**describe** 81:7
**despite** 65:24
**detail** 18:24
**details** 13:15 19:13
20:15,20 50:19
69:18 95:11
**developed** 16:14
**developer** 15:3
**difference** 61:12
**different** 6:18
12:21 15:14 20:24
26:1 36:13 51:8
55:21 60:24 68:15
72:16 80:11 86:11
90:2 93:7 96:13
97:24 98:2,9
**differently** 100:13
**difficult** 20:5 94:25
**difficulties** 21:2
**direct** 3:2 4:4 13:7
14:9 71:3,17 91:15
**directly** 35:24
94:10
**disclosures** 92:25
93:3
**discovery** 26:2
68:10 93:8
**dismissed** 23:16
**disorder** 30:5

**disrupting** 42:10
42:12
**distributer** 79:17
80:10
**distributers** 69:19
**distributor** 80:13
**district** 1:1,1 68:4,4
**districts** 101:2
**division** 1:2,4
**divorce** 17:14
21:22 22:23 27:11
**doctors** 74:25
**document** 5:4 6:15
6:17,23,24 7:1 45:3
56:2 68:1,13,15,22
68:25 69:9,10 70:3
70:6,9 71:6,16,17
72:5 73:12,22,23
74:5 75:21 76:17
76:25 77:4,12,13
82:9 85:4,5,11,16
85:22,25 86:2,4,7
86:11 87:5,8,11,25
88:4,17,19,24
89:10,19 90:5,7,9
90:21,24 91:1,4,9
92:14 93:9,15
94:22 95:20 96:1,3
96:6 97:4,6,12,13
97:15 98:15,17,21
99:9,11,12,20
105:16
**documentation**
55:23 82:25
**documents** 5:1,8,9
7:11,12 21:3,6,9
24:25 25:4,8,10,14
25:19,25 26:7,20
39:17 44:22 77:3
78:19,21 79:7,9
85:3 86:18 87:9,10

90:18 91:5,6,10
92:6,8,8,23 93:2,12
95:1 97:9 98:18
**doing** 4:9 15:19
52:16 54:24 55:5
80:24 91:20 92:7
**dollar** 1:11 81:5
**dollars** 53:3
**dosage** 31:7 57:19
58:18
**dose** 30:16,17
**download** 94:25
**downstate** 18:4,10
**dozen** 11:5,7
**drive** 8:23 9:5,10
18:3
**dropping** 72:1
**duel** 15:10,14
**duly** 102:7
**dva** 14:23 15:22

**e**

**e** 3:8 4:1,1 6:1
21:11,13 24:11,14
24:16,18,21,24
25:18 26:6,13,21
26:24,25 27:3,5,6,8
27:9 31:11,20 32:2
32:6 33:2,4,13,25
34:15,24 35:6,18
36:5,17,22,22 37:3
37:6,11,14,15,20
37:24 38:2,6,9,20
38:24 40:21,22,24
41:3,7 42:18,21,23
42:25 43:2,5,8,10
43:14,16 52:10
55:13,21 56:7,12
56:15,23 57:5,12
57:25 59:1,6,22
61:16 62:23 63:9
63:19 64:7,16 65:2

65:8,21 66:15,25
72:2,9,9,13,22,23
72:23 79:25 91:25
92:22 93:1 97:5
99:7,16,18 100:7,9
106:24,25
**ear** 5:7
**earlier** 51:6 57:10
68:14 72:16 94:4
95:21 97:9
**early** 45:8
**easier** 95:24
**eastern** 68:4
**easy** 95:5
**ecf** 73:16
**education** 10:8
**effects** 31:1 33:4,7
57:11 65:25
**either** 76:13 79:17
80:12
**electronic** 89:24
**email** 106:13
**emailed** 106:15
**employed** 12:10
**employee** 103:12
103:13
**employers** 11:13
**employment** 11:10
16:17,20 52:15
**empty** 67:8
**ended** 53:12 74:24
75:22
**ends** 96:11
**enforcement** 24:5
**engagement** 44:21
45:4
**entire** 15:8 35:17
57:8
**entirely** 14:11
**entirety** 55:17

entities  80:11
entity  23:4
environment  12:25
  15:23
eric  1:5 78:24 79:1
errata  3:7 106:11
  106:13,16
error  61:11 105:3
esquire  2:3,7,10,13
  106:1
estate  15:2,3
et  106:4
ethical  12:5
everybody  50:9,13
eviction  22:3
ex  9:14,23 10:4,6
  22:8
exact  55:16
exactly  5:25 6:11
  51:4 56:14 69:20
examination  3:2,3
  4:4 101:9
exceeded  63:5
exchanged  97:9
exchanging  93:1
excluding  17:14
  21:22
excuse  10:5
exhibit  6:22 68:2,5
  68:7 70:1 71:18
  73:12 76:22 85:5
  87:24 89:2,9,23,24
  90:16 93:6,7,9
exist  43:17
existed  43:14 92:3
  92:4
expenses  52:23
experience  50:19
  50:21 52:3
experienced  35:18
  35:24 65:25

experiencing  36:7
expert  27:25 28:4,5
  31:22 33:6,15 35:8
expertise  41:5
  47:17 49:24 50:17
  53:1 58:4 60:10
  61:20 62:25 81:10
  82:4,14 83:17
  101:1
expires  102:14
  103:22
explain  46:12
express  83:21
extended  36:6
extent  5:3,8 30:4
extra  54:11
eye  47:20

**f**

fact  73:2
factor  30:17
facts  50:19 56:21
  105:16
fails  106:20
fair  5:18 9:22 32:2
  34:9 48:25 65:16
  66:8 67:5 75:20
  95:20
false  18:17,21 21:4
  49:15 74:1 75:1
  82:22 83:5
falsely  18:24
familiar  4:25 6:15
  77:18 82:11,21
  94:3
far  20:24,25 24:16
  24:18 47:22 95:12
  100:5 101:4,15
fast  72:10
february  20:18
  56:7,12,23 57:6
  65:19 99:10,17

federal  12:23 18:13
  106:18,24
feel  20:19 34:6 36:6
  36:11,13 46:11
  52:1 56:20 66:4,5
  76:5 81:16 105:1
feeling  57:11
fell  63:5
felt  36:1,2
field  11:13
fifth  67:1,18
file  55:24
filed  27:22 70:9
final  66:14
finalized  27:13
finally  79:4
financial  16:6
financially  103:15
find  5:23 24:14
  39:24 40:4 45:2
  95:10 100:5
finish  4:22
finished  10:11
firm  24:14 39:9,11
  40:11,16 44:10,21
  45:5 72:11,25
first  4:9 21:22 24:3
  42:17 56:6,17
  58:21 59:16 68:16
  68:20 69:8 70:1
  73:21 76:25 77:15
  85:6 88:2,24 89:12
  89:13 100:15
fishon  1:5 78:24
  79:1
fit  12:25
five  35:4 53:22 67:5
  67:20
fl  106:14
florida  1:1 52:18
  82:11,18 101:3

102:3,13 103:3,21
  106:18,24
following  67:23
follows  4:3
font  70:7
foregoing  104:3
  105:16
forget  6:3
forgot  17:2
forgotten  73:5,8
form  11:16 16:1,5
  18:25 19:21 20:1
  20:21 21:10 22:11
  23:15 24:19 25:1,6
  25:20 26:16 27:1
  27:25 30:12 31:8
  31:12,17 32:8,12
  32:21 33:5 34:10
  34:16 35:7,13,20
  36:8,18,24 37:7,16
  39:15,21,25 40:12
  40:17,25 41:4 45:6
  45:23 47:2,16 48:2
  48:6,13 49:2,5,9
  50:16 51:12 52:13
  52:25 54:22 55:15
  55:22 56:25 58:3
  60:9,19 61:2,19
  62:3,10,19,24
  63:15,20 66:11
  70:23 74:11 75:14
  76:11 77:5 80:8
  81:9,15 82:13
  84:22 87:13,19
  88:25 89:4 91:11
  91:23 92:10 93:21
  95:2,6 99:25 101:1
  101:14
formalities  101:19
  103:9

**former** 22:1
**forth** 12:20 30:11
  89:22
**forward** 51:18
  95:24 100:25
**found** 7:8 56:13
  92:8,11
**foundation** 61:3,4
**four** 10:9 12:15
  14:23 34:7 64:20
  65:20 96:10 98:6
  99:2
**fourth** 64:19 65:7
  65:13,15
**friday** 1:22 102:6
**front** 47:8 50:10
  52:11 83:7 94:3
**full** 16:21 85:11,25
**fully** 20:19
**fulton** 22:16
**function** 95:10
**functions** 15:14
**further** 48:11
  103:11
**future** 54:7

**g**

**g** 4:1
**gary** 71:24,25
  72:11
**ged** 10:23,24
**general** 17:6 29:1
  52:1 69:18 83:1
**generally** 6:15
  16:13 18:15 29:6,7
  29:8 35:5 37:22
  38:14
**generic** 78:15
**getting** 25:12 72:13
  81:25
**gg250426** 102:14
  103:21

**gina** 102:5,12 103:5
  103:20
**ginsberg** 76:25
  77:19,22,25 106:4
**give** 5:10,13 13:10
  13:13,18,20,23
  14:11 18:23 28:24
  35:15 42:8 50:4,19
  61:4 82:9 86:22
  93:19
**given** 91:13
**gives** 5:16,16
**giving** 28:6
**gmax** 1:10 2:12
  80:19 101:11,13
**go** 6:18 7:14,24 8:4
  10:10 11:25 14:11
  15:21 21:11 26:17
  29:2 30:16 33:13
  40:9 47:8 50:10
  52:18 56:20 68:11
  69:4 71:16 73:18
  73:24 76:7,9 80:3
  85:3 86:12 87:4
  89:22,22 91:16
  94:25 95:11,13
**goal** 82:5
**god** 85:2
**goes** 95:12
**going** 4:7 5:4,9,23
  7:8,19 10:22 12:8
  14:9 20:19 45:18
  47:20,23,24 51:18
  55:1,4 56:19 58:14
  62:1 68:6,24 71:2,3
  71:17 73:17 77:17
  85:10 86:10,11
  87:24 88:14 89:9
  91:15,16 93:10
  94:22 95:24 100:24
  101:18

**good** 4:6,17 36:14
  50:12 66:4 68:18
**gotten** 11:12
**government** 12:23
**governmental**
  13:19,25
**graduated** 10:21
**graduating** 16:17
**grand** 53:22
**grew** 11:1
**grocer** 30:9
**group** 15:5,21
  16:18
**guess** 25:24 36:4
  69:23 75:6 76:12
  80:11
**guiding** 51:13
**guy** 72:3,23
**guys** 51:9

**h**

**h** 3:8
**hacking** 12:5
**half** 71:18
**hall** 78:3
**hammock** 8:23,24
  9:5,10
**happen** 19:4 47:20
  47:23,24
**happened** 19:24
  20:14 44:9
**happening** 46:23
**hard** 21:1 41:24
  77:16 95:5,7
**harder** 4:10
**head** 5:13 45:18,22
**health** 1:9,20 2:6
  29:23 33:3
**healthy** 69:14 81:1
**hear** 28:13,15
**heard** 38:3 72:13

**held** 15:10,19
**help** 29:21 30:23
  31:1 37:6 86:20
**helpful** 88:8
**helping** 66:9
**high** 10:21
**higher** 14:19
**highest** 10:8
**hire** 58:19
**hired** 63:14 67:11
**hiring** 63:18
**hoffman** 16:11
**hold** 24:21
**home** 8:22 9:14,25
  16:25 17:1,5 22:7
  56:18
**honestly** 10:25
**hood** 1:5,18 2:9 4:2
  4:6,7 5:20 6:14 8:7
  11:19,21 14:9
  28:23 29:15 33:20
  40:4 42:14 44:25
  48:20 50:23 61:7
  68:1,13 69:2,8 70:6
  71:12 73:6,11
  76:16,21 81:25
  82:11,20 85:4,7
  86:2,7,15 87:24
  88:2,17 89:9,12
  90:16,19 91:18
  92:14,19 93:8,11
  94:17 95:25 97:18
  100:20 102:5 103:8
  104:9 106:4,8,10
  106:12
**hood's** 18:20
**hopefully** 4:15
**hospital** 12:22
**hotels** 16:15
**house** 8:22 60:20

**husband**  9:14,23
 22:8
**husband's**  10:4,6

**i**

**idea**  32:1 80:7
 84:24 86:22
**identifies**  77:18
**ih**  69:20
**immediate**  36:11
**impact**  20:13
**implication**  14:17
**implied**  83:14
**important**  4:12 6:4
 6:5,6 14:15 60:7,17
**improve**  33:3
**inaduued**  22:1
**included**  69:15
 85:20
**including**  85:11
**incorrect**  34:15
 48:21
**independent**  58:10
 58:17 64:21
**indicated**  22:7
 104:4
**individual**  17:21,22
 18:16 60:16 63:5
**information**  10:16
 12:17,18 13:1,18
 14:5,24 15:13,17
 21:12 29:23 37:12
 49:14 58:15 90:12
 97:19,25 99:23
**ingredients**  33:13
 58:1
**initial**  92:24 93:2
**injury**  20:4,13
**inspire**  1:10 80:23
**instruct**  7:19 40:1
 58:14

**instructed**  28:9
**instruction**  6:3
**instructions**  4:8
 5:11
**integrity**  32:3
**intentional**  84:7
**interactions**  6:5
**interest**  32:15,17
**interested**  103:15
**internet**  43:25
**interpretation**  28:3
 28:6
**interrogation**
 87:14
**interrogatories**
 85:7 87:18 88:2
 89:12
**interrupt**  4:15
**involved**  50:13
 70:16 86:22,23
**irregularly**  29:18
**issue**  41:8,10 52:16
**issues**  20:4 55:1
**item**  62:17 96:25
**items**  36:21 37:5
**iterations**  86:11

**j**

**j**  2:13
**jack**  13:3
**january**  70:10
**jason**  87:1
**jay**  2:10 6:1 13:10
 13:22 28:2 37:13
 38:22 40:7 41:6,17
 55:3 88:20 89:20
 91:2 106:1
**jbrody**  106:1
**job**  12:16 50:12
 106:4
**jog**  75:7

**jogged**  72:4
**jointly**  9:14
**jolly**  1:11 81:5
**joseph**  75:9
**judge**  14:14 47:8
 50:11 52:12 100:21
**judgments**  27:19
**jurisdiction**  101:4
**jury**  76:7

**k**

**kaylyn**  1:4 78:7,8
 78:10
**keep**  5:11 21:6
 24:16,18 25:14
 42:25 43:1,9 44:16
 47:19 55:4 91:25
**key**  95:13
**kgglaw.com**  106:1
**khaki**  81:3
**khakiware**  1:11
**kick**  35:14
**kind**  16:12 30:25
 44:14 46:7 47:4
 53:12 80:1
**kindergarten**  4:12
**kmw**  1:3
**knocking**  64:6
**know**  4:20,21 5:7
 6:19 8:10,11 14:1
 14:17 17:17 18:23
 19:9 21:18 22:7
 23:20,24 25:17
 28:1 30:4 31:11,13
 31:15,20,23 32:4
 33:4,7,11,13,16,20
 33:21,22 35:15
 36:3,9,10,12 38:19
 38:20 42:5 43:20
 44:8,22 45:1,2,11
 45:24 46:25 47:3,5
 47:7,10,13,14,19

 47:20,21,23 48:1,5
 48:8,21 49:4,14
 50:14,25 51:21
 52:20 53:2,11
 54:23 55:10,13
 60:25 61:9,16,21
 61:24 62:8,11,12
 62:22 63:4,4,22
 68:23 69:9,15
 70:12,15,16,17
 71:5,9,10,10,21
 72:24 73:1,23
 75:12,19,25 76:18
 76:19,20 77:6,13
 78:3 79:18,24 80:7
 80:10,12 81:21
 83:1,3,14,18,21
 84:2,7,12 86:10
 87:3 89:3 95:10
 96:9 99:16,21,23
 100:5,21,24 101:3
 101:5
**knowledge**  50:5
 89:6
**knows**  28:10,13

**l**

**lab**  58:5,10,11,17
 58:19 62:9,11
**label**  58:2,7,19
 61:14,25 62:7 82:1
**labeled**  89:2,10
**labeler**  79:14
**labels**  80:2 81:22
**lack**  61:2
**landlord**  21:24
**lasted**  8:13
**law**  24:5,5,14 39:9
 39:11 40:10,16
 44:10,21 45:5
 55:10 83:1

**lawsuit** 17:10,15,23
18:12 19:4 20:17
21:4,6,19 22:23
23:2,7,10,17 25:5
26:5 37:15 38:18
39:12,14 40:5
44:13 45:14,22
46:1,7,18 47:1 49:4
49:8,15,16,19,20
51:22,25 52:24
54:16,21 55:2,11
55:12 68:25 69:11
69:16,25 70:13,15
70:19 72:15,21
73:2 74:6,10 75:8
75:13 76:17 78:11
78:16,22 79:2,9
81:8,14 82:2 84:21
92:9 93:20 94:6,20
97:10,16 98:18
99:13 100:22,24
**lawsuits** 21:22
**laying** 53:22
**lead** 76:24
**leads** 52:22
**leave** 15:21
**left** 63:23 67:6
**legal** 6:22,24 7:1
41:4,5,8,10,15,21
47:16 49:23 50:4
50:16 51:12 52:25
53:8 60:9 76:17,17
81:9 82:3,13 83:16
84:14 101:1 106:23
**legalese** 86:19
**legally** 49:25
**letter** 44:21
**level** 10:8 62:18
74:22
**licenses** 11:4

**life** 37:11
**liked** 62:14
**limited** 80:23
**line** 96:25 105:3
**list** 11:14,25 88:11
90:21
**listed** 33:16
**litigation** 17:11
22:21
**little** 9:7,19 11:22
18:23 26:3 36:19
47:22 48:11 55:13
56:20 62:15 68:17
73:24 94:12
**live** 8:20,21 9:8,11
9:17,25
**lived** 9:1,2,5,22
49:17
**llc** 1:9,9,11,12 2:2
2:12 79:11 80:19
81:1,5 88:1 89:12
90:18 106:4
**local** 30:9
**located** 12:12 17:3
18:6
**location** 9:6
**logging** 95:17
**logistically** 52:14
**logistics** 69:19
**long** 8:8,12 9:1,5,17
12:14 15:6 19:1
20:16 29:19 71:17
82:9 88:21
**longer** 17:7 25:9
72:24
**look** 6:24 30:16
36:16 42:7 44:17
44:23 68:16,20
73:22 77:16 86:17
87:7 93:11

**looked** 87:9 93:16
100:15
**looking** 31:6 56:2
74:5
**looks** 94:2,3,13
100:12
**looning** 87:10
**lost** 19:25 44:23
**lot** 6:4 12:7 42:9
44:22 70:15 86:12
86:18 87:9,10
**lots** 12:21
**louder** 11:22
**lousy** 66:5
**loyal** 30:13

**m**

**m** 102:5,12 103:5
103:20
**magnus** 84:2
**mail** 6:1 21:11
24:11,14,24 25:18
26:21,24,25 27:3,5
40:21,22,24 41:3,7
42:18,21,23 43:5
43:14 72:2,9,22
91:25 92:22 93:1
**mailbox** 25:12
**mailed** 72:9,23,23
**mailing** 9:4
**mails** 21:13 24:16
24:18,21 26:6,13
27:6,8,9 38:20,24
42:25 43:2,8,10,16
72:13
**main** 82:5
**majana** 71:23
**making** 50:24 56:8
59:2 63:12 64:22
66:16
**malgeri** 1:4 78:2,5

**managed** 15:16
16:14
**management** 15:5
15:16,18,21 16:12
16:18 17:3
**manager** 13:8
15:13
**manager's** 13:9
**manning** 5:13
11:23 28:18 102:5
102:12 103:5,20
**manufacturer**
79:15,17,22 80:10
80:13
**march** 20:18 66:15
67:10,13 95:21
97:1
**margin** 61:11
**mark** 93:6 105:2
**marked** 6:21 68:2
73:12 76:22 85:5
93:9
**marketed** 74:21
**mason** 71:24,25
72:11
**master** 13:4
**maus** 84:2
**mcewen** 10:7
**mckeown** 1:5 79:4
**mean** 7:12 10:17
12:8 18:3 19:19
24:17 27:24 29:1
33:7 35:25 46:19
46:21 49:8,22,25
50:1,3 52:14 55:10
61:11 67:4 84:15
95:3
**means** 28:7 29:3
50:6,8 75:19 76:12
84:17

**meant** 25:24
**measures** 7:14
**mechanism** 61:13
**mediation** 47:21
  48:10,12
**medication** 5:20
  67:7
**medicines** 36:12
**medium** 44:6
**meet** 61:17
**meeting** 61:14
**member** 46:7
**memory** 11:14 20:3
  20:16,25 68:21
  75:7 89:21
**mental** 15:24
**mention** 6:3
**mentioned** 48:10
**merit** 41:17
**met** 12:24 61:17
**method** 99:21
**miami** 1:2,4
**middle** 71:19 96:25
  97:19
**milligrams** 57:20
  61:25
**million** 50:11
**mind** 43:10 46:12
  88:15
**mine** 14:19 52:2
  96:8
**minute** 67:20
**minutes** 55:7 86:12
**misrepresentation**
  84:8,13,20,23
**misstatements**
  32:21
**misstates** 25:20
  34:10 45:6 66:11
  70:23 80:8

**mix** 91:19
**mixed** 13:1 79:15
**money** 54:7 81:16
  81:20,25,25 82:5
**monotonous** 56:20
**month** 8:5 24:23
  46:5,23
**monthly** 46:20
**months** 6:10 46:16
  46:22 63:10 64:20
  72:19
**morning** 4:6
**motorcycle** 23:16
  24:9
**move** 42:6,6,8,10
  55:1 87:24 89:9
  99:15
**moving** 97:18
  98:14,20 99:9
**muffled** 11:20
  18:20 73:7
**multiple** 66:3

**n**

**n** 4:1 11:17
**name** 4:6 10:4,6
  13:9,11,18,23 15:4
  16:8,10 17:19,20
  17:25 19:15 23:4
  24:2,3,4,14 69:13
  69:15 71:25 72:24
  75:7,9 76:24 77:18
  77:20,21,22 78:2,3
  78:7,8,13,14,15,17
  78:18,20,21,24
  79:5,6,7,9,11,13
  86:25 87:1 98:5
  101:12 105:18
**named** 77:24 78:5
  78:10 79:1
**names** 71:20,22
  74:8 77:2 86:24

**national** 17:1
**natural** 83:25,25
**necessarily** 31:7
**necessary** 13:12
**need** 4:21,23 6:17
  6:18 30:17 42:8
  44:19 45:19 51:11
  68:18 86:7,15
  105:2
**needed** 100:4
**needs** 12:24
**negative** 33:7 35:18
**negligent** 84:12,20
**negligible** 61:11
  62:20
**neither** 29:13
**network** 12:2
**never** 42:20 43:2
  64:5 71:10 72:3
  84:15 92:2
**new** 8:21 9:12
  12:13 17:4 18:9
  22:5,16 23:7 71:13
  82:22 83:4 101:12
  101:13
**news** 44:8,15 63:21
**night** 31:1
**noah** 1:4 78:2,5
**nod** 5:12
**non** 5:13
**normal** 46:8
**northeast** 16:15
**notary** 102:13
  103:6,21
**note** 105:2 106:10
**noted** 48:16 73:19
**notes** 103:10
**notice** 35:5
**noticing** 35:12
  56:22 59:12 64:3

**november** 1:22
  6:12,13 88:9 89:15
  90:19 102:6
**number** 1:3 54:8
  55:16,17 70:8 72:9
  73:16 91:15 96:11
  96:13,15,18 97:20
  97:24,24 98:21
  99:1 100:1,3
  102:14 103:21
**numbers** 96:4 98:7

**o**

**o** 4:1
**o'brien** 3:2 4:5,6
  8:1,6,19 11:21,24
  13:14,16,22 14:2,4
  14:9,20 16:3,7
  18:22 19:3,23 20:6
  20:10,23 21:14
  22:12 25:3,22
  26:10,15,22 28:2
  28:11,14,17,22
  29:4,13,14 30:6,14
  31:10,14,19,25
  32:10,16,25 33:8
  33:12,19,23 34:13
  34:19 35:10,22
  36:15,20,25 37:9
  37:19 39:19,23
  40:3,14,19 41:2,6
  41:10,13,19,23
  42:1,2,11,13 43:3
  43:12,18,19 45:10
  45:20,25 46:4,9
  47:6,12,25 48:4,9
  48:16,19 49:7,13
  50:2,23 51:6,16,20
  52:17 53:5,13,19
  53:24 54:3,14 55:3
  55:8,19,25 57:2
  58:8,20 59:5 60:12

60:21 61:5,6,15,22
62:5,13,21 63:2,8
63:15,17,24 66:7
66:13 67:21,25
68:8,12 69:4,7 70:4
70:5 71:1 73:10,19
73:20 74:13 75:16
76:15 77:7 80:15
81:19 82:8,16 83:2
83:8,19 84:1,6,11
84:18,22,25 85:13
85:15,18,21 86:1,6
87:16,21 89:1,8
90:15 91:14 92:13
92:20,24 93:5,24
95:2,4 100:2 101:7
**oath**   3:4 4:3 54:15
54:17 102:1
**object**   16:1,5 19:21
20:1,21 21:10
22:11 23:15 24:19
25:1,6 26:16 27:1
27:25 30:12 31:8
31:12,17 32:8,12
32:21 33:5 34:10
34:16 35:7,13,20
36:8,18,24 37:7,16
39:15,21,25 40:12
40:17,25 41:4,24
45:6,23 47:2,16
48:2,6,13 49:2,5,9
50:16 52:13,25
54:22 55:15,22
56:25 58:3 60:9,19
61:2,19 62:3,10,19
62:24 63:15,20
66:11 68:6 70:23
74:11 75:14 76:11
77:5 80:8 81:9,15
82:13 84:22 87:13
87:19 88:25 89:4

91:11,23 92:10
93:21 95:2,6 99:25
101:1,14
**objected**   42:4
**objection**   4:14 5:16
5:17 8:3,17 18:25
25:20 28:8,11,12
28:19,20 29:2
31:22 33:10,14
41:17 42:9,24 43:7
43:15 45:17 46:3,6
47:9 48:16 49:23
51:15,17 52:7 53:8
53:17,21 54:1,10
59:3 66:2 73:17
82:3,24 83:6,16,23
84:4,9 90:11
**objections**   50:23
51:11 88:1 89:11
**obtain**   94:22 99:19
100:3
**obtaining**   16:21,23
**obviously**   4:9 8:7
38:16 58:21 64:15
69:13 84:14 96:6
**occur**   27:11
**october**   9:16
**officer**   16:6
**oil**   74:17,19,23
**okay**   4:24 5:5,6 6:8
6:19 8:9 20:6,6
34:20 42:7,16
43:22 44:25 45:1
47:13,13 51:2
54:25 55:5,6 57:24
62:22 70:22 73:4
73:11 74:9 80:16
85:1,4 87:4 90:16
90:22 91:1 95:25
96:6 101:6

**old**   10:2 36:14
**older**   25:8 36:10
**oldest**   21:23
**omitted**   85:12
**once**   4:13 17:14
24:23 39:5
**ones**   60:20 65:11
79:16,19
**online**   30:9 32:14
36:19 40:7 63:21
94:8
**onondaga**   10:11
**oparil**   2:13 3:3
101:10,11,17
**open**   53:12
**opened**   63:7 64:4
**opening**   65:5
**opportunity**   35:16
**opposed**   53:10
**order**   27:4,5 37:12
92:2,12 94:18
95:21 97:4 98:14
99:9 100:3
**ordered**   59:8
**ordering**   106:15
**orders**   95:11,12
100:5
**original**   72:23 94:3
**outside**   11:3 17:10
22:23 26:10 30:19
31:2 33:1 37:14
38:2,23 39:11 73:2
81:25 83:9 84:19
**outstanding**   27:19
**overall**   32:5
**owned**   22:2

**p**

**p**   4:1
**p.m.**   1:23 101:21
**package**   64:5

**packaging**   57:1
64:4
**page**   3:6 6:18 68:16
68:20 69:9 70:1
71:2,18,19 73:24
75:3 76:25 82:20
83:9 85:16 86:9,17
86:20 87:8 88:3,12
89:2,3,16,24 90:10
91:16 92:14 93:9
93:14 94:12,13,17
95:23,25 96:24,25
97:4,12,18,19
98:10,14,20 99:3,9
99:15,15,22 100:7
100:7,8,16 104:1
105:2,3
**pages**   88:11 92:18
93:10 103:8 104:3
**paid**   99:23
**papering**   92:18
**paperwork**   44:23
**paragraph**   71:4,12
84:19
**paralegal**   39:5
72:23
**paralegals**   38:21
**part**   13:5 25:12
26:21 38:13 44:2
47:10 48:23 52:3
69:20 70:16 72:12
72:18,22 73:3
93:22
**participate**   48:11
48:25
**particular**   56:10
**parties**   77:18
103:12,13 106:15
**parts**   70:15
**party**   26:4,13 37:22

paul 75:9
pay 52:23 53:3,6
  68:18
payment 99:21
peaked 32:14,17
penalties 105:16
pennsylvania 68:5
people 31:21 38:19
  38:24 49:10,12
  50:12 52:4,8 69:20
  81:23
percent 67:16
  83:24,25
perfectly 8:11
  47:13
period 8:8 33:24
  34:2,6,7,22,22,24
  35:12 36:6 46:22
periods 35:25 36:1
perjury 105:16
person 4:13 23:4
  52:16 54:13 75:9
  84:16
personal 29:23
  52:16
personally 25:9
  38:22 50:1 60:11
  60:13
perspective 12:24
pertains 41:8
phase 84:24
phoenix 9:12
phone 5:7 7:18,25
  8:2,12 11:22 40:20
  45:11,13 46:13
  72:9
phonetic 12:2 69:1
  71:23
phrase 82:19,25
  87:15

physically 90:7
physicians 30:3
picture 93:17,19
  94:7,8 99:16 100:9
  100:10
pictured 70:1
pictures 57:17 60:1
  64:13 65:13 94:4
pill 63:5
pills 59:21 60:3,17
  60:24 63:7 64:4
  65:5,16 66:23
pinellas 102:3
  103:3
place 1:24 61:13
placed 97:4 98:14
  99:10
plaintiff 17:11,16
  21:21 22:22 44:12
  45:22 49:19 69:16
  71:12 72:20 92:18
plaintiff's 76:24
  77:2 85:5 87:25
  89:10 90:17 92:15
  92:16,25
plaintiffs 1:7 76:2
platform 44:6
play 79:24
played 81:12
plays 69:20
please 4:20 11:21
  28:18 45:19 73:6
  88:5 89:14 99:5
  105:1,2 106:12
plus 11:17
point 26:23 32:6
  35:17 44:20 48:23
  54:7 63:18 65:19
  67:11
points 82:10

position 12:14
  41:21
positive 35:6,24
  36:7 57:11 65:25
possession 21:3
  91:21
potency 60:5,8,18
  61:1 64:17 65:17
  67:18
potential 44:13
potentially 26:6
powers 12:23
practice 43:8 80:1
practices 82:12,18
  82:22 83:4,13
prefer 83:20
prep 45:12
preparation 7:17
  46:14
prepare 8:16
preponderance
  38:15
present 19:10 67:3
pretend 50:4
pretty 81:24
prevent 5:21 54:23
previous 22:21
  49:15 64:11
print 44:16 94:5
printout 94:5
prior 9:10 25:21
  32:22 45:6,12,24
  46:13,16 66:11
  70:23 80:8
private 13:18 15:2
proactively 64:6
probably 18:3
  24:23 32:14 39:17
  45:24 46:7,16 61:8
  62:11

problem 88:16
procedurally 23:13
procedure 106:24
  106:24
proceeding 22:3
proceedings 17:14
  67:23
process 5:2 49:1
  80:7
processing 79:25
produce 26:3
produced 68:10
  92:18,23 93:2
  98:18 100:12
product 20:17
  37:23 38:5 57:15
  58:12,22 59:19
  60:8 62:6,17 65:15
  65:21 66:1,9 67:17
  74:14,16 80:3,6
production 90:18
  91:4
products 101:13
programs 13:1
proper 9:2
properties 22:9
property 22:2,15
  22:17
provide 31:21
  36:22 91:6
provided 41:16
pty 1:10
public 29:1 102:13
  103:6,21
pull 55:3 93:19
  95:13
purchase 30:7,10
  30:15 32:6 37:15
  56:6,8,15,17,20,21
  59:1,2,10,13,15
  63:9,11,12 64:1,8

64:19,21,22 66:15
66:16,20 67:1,13
67:18 96:16 97:1
97:15 98:11 99:4,7
99:17,17 101:12
**purchased** 20:18
36:16 37:11,20
38:5,9 52:8 55:17
55:20 56:11,23
57:5 58:1 59:22
60:18 61:16 62:23
65:20 66:25 67:12
72:7 79:16,19
81:17 93:16 95:16
98:18 99:12 101:15
**purchases** 20:20
31:5 55:13 60:16
95:1,9,14 96:21
97:8
**purchasing** 38:2
61:24 69:22
**purposes** 73:12
76:22 104:5
**push** 51:18
**put** 90:6 93:6
**pyramid** 15:5,21
15:25 16:4,12,18
17:2

**q**

**qualification** 69:10
**question** 4:13,19,22
5:3,5,16 14:10 18:5
20:17 25:23 28:23
30:3 32:23 38:23
40:4 41:14 42:14
42:16 43:4,21
48:20 50:3 51:7
52:22 53:12 58:12
61:4,7 62:15,22
70:12 73:21 76:6
76:18 86:4 87:7

**questions** 6:4,6,14
8:7,10 20:9,12
44:25 56:19 64:6
76:16 85:13,23
86:8,12 88:4 90:22
92:4
**quickly** 74:4,5

**r**

**r** 4:1
**range** 53:25
**reach** 40:15,20
62:9
**reached** 40:6,10
42:17 43:23 44:3
92:2
**reaction** 36:7
**read** 3:6 28:15,18
84:16 101:18 104:1
104:3 105:1,16
106:8
**reading** 44:6 83:9
84:19 87:11,11,17
**real** 15:2,3
**really** 7:10 19:14
20:2 28:15 32:3
38:21 50:21 53:22
79:14 96:4
**reason** 4:23 54:20
55:11 60:2 106:10
**reasonable** 106:17
**reasons** 13:19
54:23
**recall** 6:11 8:5
10:25 13:17 18:1
19:1,12,15,18 20:2
20:3,7,16 21:2 23:4
23:7,10 24:5 25:2
32:17,19 37:20,24
39:7,16,17,20 40:7
40:18 42:22 44:15
45:2,9 46:17 55:16

55:23 56:14,17,18
56:22 57:19 59:6,8
59:9,12 63:16,23
66:20,22 67:2 76:7
76:10 88:24 89:23
91:9,20 98:3
**receipt** 106:17
**receipts** 26:20
**receive** 10:19 62:17
**received** 56:24 64:5
66:23 79:9
**receiving** 56:15,17
59:6,8,9 63:25 65:1
66:20
**recognize** 7:3,4,4
68:5,13 69:9,13
71:21,23,24,25
73:23 74:7 76:25
77:1,2,20,22 78:2,8
78:13,17,20,24
79:5,8,11,13 80:17
81:2 82:19 86:2,9
86:25 87:8 88:17
88:19 90:24 91:1
93:14 94:13 96:3
97:5,13 98:15,17
99:2,11
**recollect** 20:13,15
87:11
**recollection** 5:5 8:8
21:1 45:1 56:2,11
57:11 59:2 63:11
63:25 64:21 65:1
66:16 71:6 72:4
74:6 83:10
**record** 4:16,22 5:14
20:9 21:12 69:4,5,6
93:8 95:23 103:10
**records** 26:21
**recycle** 64:10 65:10

**recycled** 57:16
59:25 67:7,9
**redacted** 95:23
96:25 97:19 98:20
99:21
**reference** 73:16
**referenced** 97:16
106:6
**referred** 97:9
**referring** 67:1
82:20
**reflect** 81:22
**refresh** 56:2 74:6
**refuse** 14:10
**regard** 106:19
**regarding** 39:1
55:2
**regular** 54:13
84:16
**regularly** 29:6
30:22 33:25 46:18
46:19
**related** 69:11 70:19
78:21 79:18 95:1
96:7 99:1,12
**relates** 94:20
**relating** 26:5 56:21
97:19
**relative** 11:6 20:5
24:24 25:7 27:4
30:5 103:11,13
**relevant** 25:4,18
26:4,6,23 87:15
91:6
**rely** 5:9
**remember** 5:25 6:2
8:12 16:10 17:19
17:20,25 18:12
19:5,24 20:7,8
23:13 24:3,4,12
32:10 42:14 50:20

55:20 56:8 59:15
64:3 65:4 67:10
74:12,18 75:17,21
75:22 77:15 87:1
87:14,14,17 88:13
89:18,19 92:8
93:25
**remembering**
73:14
**remove** 22:1
**rent** 8:24 9:13
**rental** 22:17
**repeat** 42:15
**repetitive** 86:12
**report** 13:8 16:4
103:7
**reported** 16:6
**reporter** 3:5 4:11
4:16 11:19 18:19
28:15,21 29:11
69:2 73:6 102:13
103:5,20
**represent** 49:12
50:9 52:6 68:24
82:6 101:11
**representative**
49:22 50:6,15 51:1
51:21,24 52:2,12
52:24 53:7 54:21
69:25 70:13 75:13
**representing** 38:16
38:18
**request** 6:19 90:18
91:4
**requested** 91:10,12
92:6
**requests** 85:17
**requires** 53:8
**research** 36:19
37:2 38:8,13

**researched** 36:21
37:5
**reside** 71:14
**residing** 71:13
**respectfully** 71:19
**responded** 72:3
**response** 85:6
90:17 92:7
**responses** 88:1
89:11 92:20
**responsibilities**
50:14
**responsibility**
50:22
**restate** 61:3
**restaurants** 16:15
**result** 4:12 19:18
19:19
**resumed** 67:24
**retainer** 44:20 45:4
**returned** 72:10,19
72:25 106:16
**reveal** 7:20,22 30:2
40:1 48:14 58:15
90:11
**review** 7:11,14 69:8
88:20 89:20 91:3
93:12 106:7
**reviewed** 7:13 90:8
90:13
**reviewing** 91:9
**reviews** 38:11,15
**richard** 2:13
101:11
**rid** 43:8
**right** 13:17 14:11
14:21 32:7 34:18
37:3 40:9 43:17,25
47:22 50:25 54:5
54:17,17 57:12
58:11,23 62:18

66:14 71:14 74:20
75:25 76:2,21 80:1
80:12 82:20 83:7
84:16 88:6 92:15
94:17 96:7 98:8
**road** 36:10
**robert** 1:5 77:20
79:4
**role** 15:18,19 79:25
80:7 81:11
**roles** 15:10,12,15
**roughly** 12:18 34:2
34:8
**rule** 106:24,25
**rules** 106:18
**run** 4:7 49:17 81:23
**runs** 92:16
**rx** 1:11 81:1

**s**

**s** 3:8 4:1 75:6 89:16
89:25 90:4,6
**safe** 10:21 31:5
**sale** 60:14
**sam** 31:11,20 32:2
32:6 33:2,4,13,25
34:15,24 35:6,18
36:5,17,22,22 37:3
37:6,11,14,15,20
37:24 38:2,6,9
52:10 55:13,21
56:7,12,15,23 57:5
57:12,25 59:1,6,22
61:16 62:23 63:9
63:19 64:7,16 65:2
65:8,21 66:15,25
79:25 97:5 99:7,16
99:18 100:7,9
**savings** 54:12
**saw** 38:15 40:7
43:24 63:21,23
87:18 88:24

**saying** 34:21 93:25
**says** 7:5 61:14,25
83:7 91:17 99:6
**scary** 81:24
**scene** 76:21
**schedule** 47:23
**scheduled** 47:14
48:5,8
**schoenthal** 42:3
**school** 10:21
**scientist** 32:4 33:17
**scott** 2:7 51:10
**screen** 5:2 73:11
93:7 100:14
**screenshot** 44:17
94:7,10,14,15
**screenshots** 74:7
**scroll** 71:2 74:4
86:14 88:14 89:13
93:10 95:24
**scrolling** 87:22
**sean** 2:3 4:6
**search** 21:15 24:13
24:24 25:18 26:6
26:24 40:23 42:20
91:20 92:5 95:11
95:12
**searched** 26:12
**searches** 91:6,10
92:7
**second** 59:1,6,10
59:13,15,21 68:15
73:24 87:25 90:17
98:25 100:8,16
**section** 68:19 87:17
**security** 14:7,18
**see** 21:11 26:1 36:9
38:14 43:10 44:24
60:23 68:20 70:7,8
70:9 71:19 74:7
77:8 85:8 86:7,10

86:15,15 88:3
95:14,15,24 96:1,4
96:8,24 97:2,18,22
98:10,12 99:3
**seeing** 65:4 71:6
77:15
**seeking** 69:24
70:13 75:12 81:13
82:2
**seen** 6:22 7:1,2,5,6
7:7 32:13 44:22
68:21 75:21 77:4,6
77:11,14 78:18,21
79:6 82:25
**sell** 37:23
**seller** 38:1 56:3,4
101:16
**sellers** 69:19
**selling** 79:25 81:21
**sells** 31:7 101:11
**sense** 52:4 91:7,19
**sent** 6:1 7:12,13
37:13 39:6 72:22
91:2 92:22
**separate** 65:20
**september** 102:14
103:22
**service** 88:11 90:20
90:21
**set** 54:12 69:18
85:6 88:2 89:12
**setout** 52:2
**sets** 87:14
**settled** 76:10
**settlement** 76:13
**shannon** 1:5,18 2:9
4:2 55:5 71:12 85:7
88:2 89:12 90:19
91:18 102:5 103:8
104:9 106:4,8,10
106:12

**shared** 76:21
**sharing** 73:11
**sheet** 3:7 104:4
106:11,13
**shipped** 56:18
60:20
**shopping** 16:14
**short** 21:2 43:23
**shorthand** 102:13
103:5,20
**shots** 100:14
**shoulders** 5:12
**show** 5:1 55:12
70:2 73:15 85:11
85:15,18,21,24
86:3
**showed** 68:14
100:11
**showing** 5:4 6:21
68:1 85:4 89:10
90:16 92:14 93:9
**shrug** 5:12
**side** 33:4 57:11
65:25 76:13
**sides** 33:7 48:22
**sign** 3:6 44:20 45:4
104:1 106:12
**signature** 75:5
85:12,16,19 86:9
86:17,20 87:8 88:3
88:11 89:24 90:9
90:20 102:11
103:19 104:8
**signatures** 101:19
103:8
**signed** 71:10 75:4
89:3,6 102:9
106:21
**similar** 21:18 31:6
65:10 79:8

**similarly** 1:6
**sitting** 5:8 32:19
56:1
**situated** 1:6
**situation** 50:10
**six** 87:24 97:4
**skip** 80:21
**slash** 75:6 89:25
90:4,6
**slashed** 89:16
**sleep** 31:1
**slowly** 93:11
**small** 16:25 17:5
**smaller** 6:18
**snippet** 94:9 100:7
**software** 13:1
**solutions** 1:9,20 2:6
12:21 106:23
**somebody** 39:8
54:23 72:10,12
76:13 77:24
**someone's** 96:7
**sop** 91:25
**sorry** 11:7 18:5
29:11 34:14 71:17
76:4 79:24
**sort** 22:2 47:21
59:18 79:24 96:6
**sorts** 36:12
**sound** 4:17
**sounds** 11:20 34:18
65:23 73:22 93:22
**southern** 1:1
**spans** 8:8
**speak** 7:16,21
11:21 46:18 50:11
**speaking** 12:18
18:15 23:13
**speaks** 4:13
**specific** 20:15,25
30:10,16 43:1 55:1

59:4 68:19 101:16
**specifically** 7:2,15
35:21 36:2 39:16
39:17 40:6 45:9
56:9,18 59:9 64:2
66:5,21 74:12
77:12
**specifics** 19:2 26:2
**specify** 92:20
**speculate** 84:10
**speculating** 83:18
**speech** 42:8
**spend** 53:15 54:6
**spoke** 7:21 46:15
**spoken** 39:3,11
77:24 78:5,10 79:1
**stamped** 92:15
**standard** 43:8
**stands** 31:13,15
**start** 40:9,15 46:20
**started** 4:7 34:15
37:3
**starting** 17:15
**startling** 93:14
**state** 16:15 18:4,9
18:12 22:5 23:8
37:1 46:12 102:3
102:13 103:3,21
**stated** 28:12 37:2
42:25 105:16
**statement** 98:5
**statements** 92:12
**states** 1:1 68:4
71:12
**status** 73:1
**statute** 106:18
**stenographic**
103:10
**stenographically**
103:7

sticking  99:15
stop  34:5
stopped  63:22,22
street  9:12 22:8,16
stretch  54:11
subject  14:7 37:14
submitted  71:20
subscribe  104:5
substance  6:7
  40:10 41:13 68:21
sued  17:19 19:13
  23:5,14
suggested  106:16
suing  18:15
suit  55:10
summary  95:9
supera  101:12,13
supervisor  13:7,24
supplement  27:24
  28:7 29:19 30:19
  30:21 31:18 36:5
  40:8 43:25 44:2
supplemental
  87:25 89:11 90:17
supplementing
  93:2
supplements  28:25
  29:5,9,17,21 30:7
  30:20,23 31:3
  36:12 61:1
supply  1:11 81:5
support  17:9
supposed  29:21
  30:23 31:20
sure  12:23 20:11
  28:19 36:4 45:3
  51:4 58:21 61:11
  61:13 67:6 69:13
  70:4,14 75:11
  77:20 79:14 80:20
  81:11 82:6 86:23

90:3
surprise  60:25
sweet  72:6
sworn  102:7
syracuse  10:12,13
  12:13 16:18 17:4,6
  18:2,7 23:11
systems  10:16
  12:17,19 15:13

**t**

t  3:8
take  4:21,22 5:14
  7:14 11:23 14:14
  29:5,9,17 30:19,21
  30:25 31:2,21
  35:11,14 36:13
  41:21 57:5,8,17
  59:21 60:1 64:7,13
  65:7,13 66:8,25
  67:20,21 68:15,16
  73:22 93:17 94:4
  94:15 100:8
taken  1:20 67:22
talk  46:23 48:10
  82:10
talked  22:21 44:2
  48:22 73:25 95:21
talking  8:15 26:9
  33:24 42:16 49:25
  60:16 72:18 76:17
tea  72:6
team  13:5 15:16
technical  10:18
  11:5 12:21 15:19
  17:9
technology  12:24
  15:17
techs  15:17
tell  6:6 50:6,21
  51:7 63:7 71:9 98:4
  98:8 101:3

telling  13:23 42:11
  72:22
ten  9:19 23:3 86:12
tenant  21:24
tenants  22:1,1
tend  6:24 47:19
teresa  24:3,5,8
teresa's  24:14
term  20:16 21:2
  48:21 49:18 75:25
  76:3,5
terms  28:25 61:1
  74:20 80:6 84:14
tested  58:5,10,13
  58:17,22 60:5,11
  60:15,18 62:6
  64:16 65:17 67:18
testified  4:3 72:15
  94:4
testify  20:19 54:15
testifying  5:21
  70:19
testimony  19:12
  25:21 31:23 32:22
  34:11 45:7 65:25
  66:12 70:24 80:9
  106:8,17
testing  58:6
text  55:9
thank  51:13 85:2
  86:14 100:19
  101:17
thanks  12:6
thing  52:8,9 66:6
  80:12 92:11
things  11:11,12
  20:14 21:1 32:4
  35:14 43:9 45:2
  47:19,20 50:20
  69:18 80:3

think  18:4,4,5
  21:12 27:3 32:4
  42:5,17 43:20 44:4
  46:1,21 49:17 50:8
  50:22 51:11,14,16
  54:20,24 56:3
  58:12 60:7,14,17
  61:8,12 62:15
  70:14 72:11 78:4,9
  78:15 79:21 80:1
  83:24 84:14,16
  86:20 92:22 93:1,4
  93:18 95:15,15,25
  101:4
thinking  18:10
third  26:4,13 37:22
  58:25 63:9,25
  64:20 76:23 77:8
  77:15 82:21 89:10
thought  25:24
  34:14 44:1 45:13
  45:15 66:9 72:7
  100:14
three  6:9 11:5,7
  34:7 63:10 86:10
threshold  61:9,10
  61:14,17 62:15,18
  62:20,23 63:6
threw  67:6
tier  15:16,17
time  1:23 4:13 8:9
  9:23 15:8,10 16:21
  19:1 21:2 33:24
  34:2,22,24 35:5,18
  35:25 36:6 45:13
  45:21 46:14,22
  60:14 67:13 88:24
timeline  36:22 37:6
times  17:13 22:25
  24:17 35:4 42:5
  50:11 66:3

**timing**  40:9
**tiny**  11:22
**title**  12:16 15:8
45:3 85:8
**titled**  68:3 76:23
77:8 85:5 87:25
**today**  4:8 5:1,20,24
14:21 21:19 32:19
38:17 54:8 56:1
69:12 70:20 71:7
77:4 96:16
**today's**  45:12 68:2
105:18
**toggle**  89:22
**told**  72:1
**top**  70:6 73:16 77:2
87:4 88:14
**touched**  57:10
**trade**  82:12,18,22
83:4,12
**trades**  13:3
**transcript**  103:9
104:6 105:1,2
106:6,20
**transcripts**  106:14
**travel**  52:18
**tri**  11:2
**trial**  47:14 48:1,5,8
52:19 54:15 76:7
**tried**  72:10
**true**  89:5 103:10
105:16
**trust**  61:24,25
**truthful**  50:21
**truthfully**  5:21
**try**  11:21
**trying**  33:2,3 36:4
46:11,12 51:4 52:6
72:20 80:17
**turn**  27:5 94:6

**turned**  25:7,10,15
25:17,25 26:20
44:3 58:5,6 72:7,17
92:9,11 93:23
94:19 99:13
**twice**  39:5
**two**  9:7 11:5,7
21:21 34:6,7 46:22
64:11 68:2 70:1
80:11 81:11 84:14
94:12,13
**type**  44:2 50:9 70:7
90:7
**typed**  86:23
**types**  92:8

**u**

**um**  52:1
**unable**  54:4 99:20
**unclear**  18:5
**uncomfortable**
50:24 51:3
**understand**  4:19
13:19 14:21 18:20
25:23 27:2 28:19
29:12 32:23 36:4
41:19,23 51:4,7
62:4 69:17 79:20
86:18,21
**understanding**
51:1 52:5 69:17,24
70:18
**understood**  4:18
**unfair**  82:12,18
**unintelligible**  21:25
29:10 52:21 68:19
69:1 73:5 75:15
**united**  1:1 68:3
**university**  10:12,13
**unknown**  54:6
**unusual**  56:22
59:12 64:3,5 65:4

66:22
**upcoming**  46:25
**use**  55:9 59:19 68:7
74:20
**usually**  29:10 38:19

**v**

**v**  106:4
**vague**  27:1 31:17
32:22 39:15 45:17
45:19
**variance**  61:1
**vegetable**  74:22
**verbal**  5:12,13
**verifiable**  44:17
**verification**  88:12
89:2,3,16 90:8,10
90:14
**verified**  85:22
89:20
**verify**  62:1 106:9
**veritext**  106:14,23
**veritext.com**
106:14
**veterans**  12:11
**video**  1:16,24
101:20 102:6 103:7
**violates**  83:1
**virginia**  16:16
**visits**  74:25
**vitamin**  29:10,17
29:21 30:7,11,19
30:21,23,25 31:2,2
31:6,6 62:11 71:8
**vitamins**  1:9,20 2:5
30:20 31:3 79:11
79:18,21 80:7,14
106:4
**voluntarily**  15:25
**vs**  1:8

**w**

**w**  2:7
**wait**  5:17
**waived**  101:19
103:9
**walk**  5:2 74:9
**want**  13:20 17:17
20:11 28:14,19
46:10 50:25 55:3
56:20 61:3 68:16
73:2 74:20 82:10
85:15,18 86:17,23
89:13
**wanted**  35:15
**warranty**  83:15,22
84:2
**waves**  46:21
**way**  26:1 33:2 51:8
62:16 63:6 69:18
74:14,20 76:5
78:20 81:1 88:12
**we've**  7:20 80:21
**wear**  81:3
**website**  44:8,9,17
93:19
**week**  35:4 45:24
**weekly**  29:18 35:3
**wellness**  32:5
**went**  44:4 74:24
81:12 94:8
**west**  9:12,17 22:8
22:16
**wholesaler**  37:22
**willing**  43:13 52:11
52:23 53:3,6,15
54:15
**wilson**  1:4 78:13,14
78:17 79:8
**winning**  75:25 76:5
76:12

**wins** 76:13
**witness** 7:20 40:1
  48:14 51:13 58:14
  85:17 106:20
**wolf** 1:4 78:7,8,10
**won** 19:24 75:23
  76:2
**word** 27:24 28:3,7
  29:1 47:22 55:9
  95:13
**words** 81:7 84:16
**wore** 32:5
**work** 12:11,21 13:5
  15:1,6 16:12,20,23
  32:4 54:9 61:10
**worked** 12:14 15:2
  16:21,25 24:6,15
  72:8
**working** 16:18
  54:13 70:15
**works** 35:15 79:20
  86:5
**worse** 36:2
**wrong** 50:25 56:22
  57:1 74:18 76:3,4
  81:8

**x**

**x** 3:8 53:3

**y**

**yeah** 13:16 31:15
  61:23 67:13 70:25
  74:3,7
**year** 9:21 19:5
  27:11,13 34:3,6,7
  39:20 40:15 66:4
  95:16
**year's** 34:22
**years** 9:3,7,19 10:9
  11:12 12:15 14:23
  15:7 20:16 23:3

  29:20 34:7 49:17
**york** 8:21 9:12
  12:13 17:4 18:9
  22:5,16 23:7 71:13
  82:22 83:4
**yup** 88:10

**z**

**zoom** 1:18,24 2:2,5
  2:9,12 4:10,25 6:15
  68:16 73:24 77:17
  94:12 99:5

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of



the deposition wholly or partly, on motion under

rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.