# EXHIBIT J

**Lippes Mathias LLP**
Sean O'Brien
Brendan Little
50 Fountain Plaza, Suite 1700
Buffalo NY 14202-2216
Telephone: (716) 853 5100
Facsimile: (716) 853 5199

Attorneys for Defendants

in the case of

CORI ANN GINSBERG, NOAH MALGERI,

KALYN WOLF, BILL WILSON, SHANNON

HOOD, ERIC FISHON and ROBERT

MCKEOWN on behalf of themselves and all

others similarly situated,

Plaintiffs,

vs.

VITAMINS BECAUSE LLC, CT HEALTH

SOLUTIONS LLC, GMAX CENTRAL LLC,

ASQUARED BRANDS LLC, INSPIRE NOW

PTY LTD d/b/a BoostCeuticals, HEALTHY

WAY RX LLC, KHAKIWARE INC, and

JOLLY DOLLAR SUPPLY COMPANY, LLC,

Defendants.

## DECLARATION OF NATHALIE CHEVREAU, PH.D., R.D.

I, NATHALIE CHEVREAU, PhD, RD declare as follows:

I make this Declaration based upon my personal knowledge and would testify to the same in open court, if asked to do so. I declare under penalty of perjury under the laws of the United States of America that the following is true and correct.

### I.  Assignment

I was retained by Lippes Mathias LLP ("Counsel"), the counsel for one defendant, aSquared Brands LLC ("aSquared") in the case "Ginsberg et al vs Vitamin Because LLC et al, Case No 19-cv-22702-KMW" ("the Litigation").

I was asked to provide an Expert Report and Testimony in response to the disclosure reports that four experts submitted on behalf of the plaintiffs. Noah Malgeri, Kalyn Wolf, Bill Wilson, Shannon Hood, Eric Fishon and Robert McKeown (Collectively the "Plaintiffs"). The experts are Dr. Catherine Hutt, PhD, Dr Douglas Kalman, PhD, Kevin Yan and Dr. Sharp, PhD. In brief, several reports described the results of the analytical testing of S-adenosyl-L-Methionine ("SAM-e") contained in the dietary supplements sold by aSquared and the other defendants. Other reports presented the conclusions these four experts expressed on the basis of the analytical testing and other documents produced in this litigation.

I have read the Third Amended Complaint (the "Complaint"), other discovery documents in the litigation and the four experts' reports, and I have provided a professional opinion based on my own pre-existing knowledge and expertise.

### II.  Qualifications as Expert Witness

1.      I received a B.S. in organic chemistry from the University of Bordeaux, France, in July 1979, and I received a PhD in inorganic chemistry from the University of Bordeaux in July

2

1982.  After receiving my PhD, I did a two years post-doctoral fellowship in the chemistry

department at Cornell University.  I received a Master's Degree in Food and Nutrition from the

University of Utah in May 1993.

2.      I have been a registered dietitian in the State of Utah since August 1994 and have

maintained my registration ever since.  I have been an adjunct instructor at the Food and

Nutrition Division of the College of Health, University of Utah since 1993 (now called the

Department of Nutrition and Integrated Physiology), where I taught courses in: (a) fundamentals

of nutrition, (b) food analysis & development, and (c) dietary supplements related topics.

3.      I have over 38 years of research and development experience, and over 22 years

of specific experience in pharmaceutical and nutritional development including dietary

supplements, functional foods and beverages, and skin care products.

4.      I have held a variety of positions from working as a research and development

chemist for E.I Dupont de Nemours Co in 1988 to being the Senior Vice President of Research

and Development for a publicly traded dietary supplement company until 2019.   The list of the

positions I have held can be found in my Curriculum Vitae, a copy of which is attached hereto to

Appendix A.

5.      Since 2010, I have been the principal at Chevreau Consulting Corp, a consulting

firm specialized in regulatory compliance, development of dietary supplements, of functional

foods and beverages, and spearheading the necessary activities to set up and evaluate research

and testing pertaining to these supplements and create intellectual property for the clients. I

provide technical expertise for the scientific substantiation and safety of products from

conceptualization to market readiness for clients in the US and in Europe. I currently serve on

the science advisory board of a privately owner dietary supplements manufacturer and marketer.

6.      Much of my career has focused on developing, conducting or evaluating scientific research, presenting results, building intellectual property dossier (including patent applications) to support truthful and documented activities and benefits. My experience has involved extensive, hands-on research (i.e., primary investigator, lab work, etc.) as well as archival research, which entails the review of both unpublished and published scientific papers.

7.      I am a member of the Academy of Nutrition and Dietetics and of the American Herbal Product Association (AHPA). I regularly attend trade shows, scientific conferences, seminars and webinars to keep my skills relevant and extend my knowledge base. I regularly read and review several scientific and trade show publications. All these activities contribute to maintaining my expertise in the field of dietary supplements, nutrition science, molecular biology, analytical testing and to the continuing education hours that I need to maintain my credential as a registered dietitian.

8.      During my career, I have been involved in many scientific studies and in intellectual property development resulting in numerous technical presentations to scientific conferences, in peer-reviewed, published papers, patent applications and granted patents. The list can be found on my Curriculum Vitae, a copy of which is attached hereto as Exhibit A.

## III. Statement of Compensation

9.      My testimony in the litigation and the outcome of the case does not affect my compensation rate for work in this case. Review of all materials related to case, including all research in support of the retaining party will be billed at $250 per hour. Trial preparation (email, videoconferencing and telephone) will be billed at $300 per hour. In-person work, including expert consultation, investigation assistance, deposition, and court testimony will be billed at $380 per hour. Travel time will be billed at $250 per hour, not to exceed $2,000 per day.

## IV. Previous Expert Work and Testimony

10.   I have provided expert reports, testified at deposition and/or at trial(s) or other related legal proceedings as an expert or fact witness in or for the following cases:

| Event Name | Number and Date |
|---|---|
| Chevreau Testimony at Hearing Before the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce House of representatives | Serial No. 108-93; June 16, 2004 |
| Chevreau deposition in front of FTC | Docket No. 9318; December 9, 2004 |
| Chevreau Witness Statement for Klein-Becker LLC in Allergan Inc v. Klein-Becker LLC | October 2006 |
| Chevreau Expert Declaration for Dynakor in Nicole Forlenza and Shaiden Monroe v. Dynakor Pharmacal LLC | Case No CV-09-3730-MMM-(SSX); June 26, 2009 |
| Chevreau Expert Declaration for Dynakor in Nicole Forlenza and Shaiden Monroe v. Dynakor Pharmacal LLC | Case No CV-09-3730 AG (SSX); Oct 19, 2009 |
| Chevreau Expert Declaration for Basic Research LLC in Gary Lawton v. Basic Research LLC | Case No. 1:10-cv-06341-NHL-AMD; December 21, 2010 |
| Lee v. Carter-Reed Complaint | Docket No. 64,808; June 2011 |
| Chevreau Declaration against Lee for Lee v. Carter-Reed complaint | Docket No. UNN-L-3969-04; October 24, 2011 |
| Expert Witness Declaration for Dennis Gay in Sarah Morgan v. Dennis Gay et al | April 25 2011 |
| Chevreau testimony for Thincare International LLC v. Empowered Media LLC Jillian et al | Civil action No. 2:11CV00092; August 5, 2013 |
| Chevreau deposition for Vascular Health Science in Daniels Health Sciences LLC v. Vascular Health Sciences LLC | Case No: 4:12-cv-01896; Sept 19 2013 |
| Chevreau Expert Report for Vascular Health Science in Daniels Health Sciences LLC v. Vascular Health Sciences LLC | Case No: 4:12-cv-01896; April 4, 2014 |

## V. Statement of Opinions

11.   For this case, I am being asked to share my expert opinion in evaluating the basis by which the Plaintiffs' experts assessed and concluded that the SAM-e dietary supplements

manufactured by Vitamin Because ("VB") and sold by the defendants were uniformly mislabeled. The Plaintiffs' experts assessed that the amount of SAM-e was significantly lower than indicated on the dietary supplement's label and thus the manufacturer and retailers distributed an inferior and defective product.

### A. *Review of the Complaint*

12.     Before I dive into my review of the experts' disclosure report and present my statement of opinion, I would like to summarize the position that the plaintiffs' experts are taking. This is a case brought by six plaintiffs against eight defendants. The product in question is a dietary supplement that contains the active ingredient S-adenosyl-L-methionine ("SAM-e"). SAM-e is a well characterized compound that is made in the human body from the amino acid methionine and adenosine triphosphate ("ATP"). It has been used orally since the 1970s in Italy and later in the US as a dietary supplement. SAM-e plays a role in the immune system, maintains cell membranes, and helps produce and break down brain chemicals, such as serotonin, melatonin, and dopamine.  It is a key methyl donor and exerts its influence on central nervous system functions. Research has shown that supplementing the diet with SAM-e helps maintain stable mood and joint functions among many other benefits.

13.     One should be aware that SAM-e in itself is known to be very unstable. It will easily absorb water from the ambient air, a problematic characteristic during testing, manufacturing, shipping and storage. If exposed to significant water and increasing high temperatures, SAM-e will degrade into other molecules that are no longer SAM-e. These molecules are 5'-methylthioadenosine (MTA) and homoserine lactone, or adenine and S-(5'-deoxy-ribosyl)-l-methionine. SMA-e may also transform (epimerize) into the biologically inactive racemic compound R,S-SAM-e. (Appendix A: Desiderio 2005; Sitton 2003). As a result

of this known instability, lots of effort has been focused on creating more stable forms of SAM-e. Several US patents as early as 1976 described how to produce SAM-e in a salt form which has helped its stability (Appendix A: US patents 3,954,726; 4,057,686; 4,465,672; 8,258,115 B2). The most commonly used salt is SAM-e disulfate p-toluene sulfonate (synonyms: SAM-e disulfate tosylate or adenometionine tosylate) where SAM-e is 52% by weight and sulfates salts and p-toluene sulfonate make up the difference or 48%. It is the tosylate that is widely used in the manufacturing of dietary supplement. With that said, I should add that SAM-e disulfate tosylate still needs to be protected from ambient moisture and temperature to ensure its long-term stability and integrity.

14.    The product that is the object of this complaint contains SAM-e disulfate tosylate salt as the source of the active compound SAM-e. The product is manufactured by one of the defendants (VB) and sold either by VB on its own website or by retailers who purchased the finished product from VB on which their brand, logo and label are placed on the bottles. As stated in the complaint, the generalized claim is that VB has made SAM-e supplements in such a way that VB uniformly distributed products with less active ingredient than was listed on the label. It is my professional opinion that there are major flaws in the plaintiffs' experts' conclusions. The flaws are as follows:

15.    First of all, the Plaintiffs did not retain the bottles or record the lot number of the SAM-e supplements they bought. Thus, none of the products that the Plaintiffs purchased were actually tested. The conclusions of the experts are in no way shape or form based on what the Plaintiffs bought and used.

16.    Second, because they did not have the Plaintiffs' actual products, the experts purchased similar SAM-e products either from the VB website and from Amazon choosing the

brand of the other defendants. They purchased a total of twenty-one bottles - two from VB website and the rest from the other retailers' brands - and submitted these twenty-one samples for analysis. They chose three analytical labs who tested a few of the twenty-one products each. Thus, based on the result of the testing of those twenty-one bottles and in light of their knowledge of the manufacturing practices of VB, the plaintiffs' experts concluded that VB uniformly distributed products with less active ingredient than listed on the label and that the products were uniformly defective. In my professional opinion, this assertion is scientifically very flawed because it lacks statistical rigor. Let me describe what I mean.

    a.  The complaint lists the approximate number of bottles that were sold by VB directly on their website (between 3,053 and 5,388) or via the defendants' retailer sites (We Like Vitamins: approximately 20,042 bottles; G-Max Central 32,493 bottles; aSquared 18,398 bottles; BoostCeuticals 16,202; Healthy Way 12,092; Jolly Dollar 12, 431). The number of bottles sold during the time period indicated in the complaint (2015 and 2020) ranges from 86,417 and 88,752 bottles. So, I will use 86,400 bottles for the calculation below.

    b.  Only twenty-one bottles were tested out of 86,400 bottles sold by VB. This translates into testing 0.024% of products that VB distributed (21 divided by 86,417 bottles=0.024% or 21/88,752=0.0237%). It would be unpractical and very costly to test all bottles sold on the market, even though it would be the absolutely best way to verify and conclude that the product produced by VB was uniformly defective. Thus, one should use statistical tools to help make prediction and allow generalization from a sample to a population.  The first step should have been to calculate the number of bottles needed out of this population of 86,400 bottles to have a representative sample

and be able to draw conclusion for the overall population. There are plenty of statistical packages that allow you to calculate an appropriate sample size. I used the simplest sample size calculator from the internet that should help convey the point I want to make. Using a population of 86,400, a 95% confidence interval and a 5% margin of error, the sample size should have been at least 383 bottles. In other words, testing at least 383 bottles would have given a larger degree of statistical confidence to draw more general conclusions with regard to the product. The plaintiffs' experts failed to follow basic statistical rigor to draw their conclusions.

17.     Therefore, in my professional opinion, even setting aside that these were not the bottles that were actually purchased by the Plaintiffs, relying on the testing of twenty-one bottles is not scientifically robust enough to draw a generalized conclusion. There is absolutely no direct evidence that the SAM-e products that the Plaintiffs bought were defective in any shape or form. There is no scientific evidence that the product made by VB is uniformly defective.  All the conclusions brought by the experts are based on unsound and incorrect inference and not on evidence.

19.     I would like to point out an interesting detail. Four of the Plaintiffs bought 1 single bottle of SAM-e between 2016 and 2017. The three other Plaintiffs had multiple repeat purchases of SAM-e between 2018 and 2019. In my opinion, the repeat purchase of the same supplement by 43% of the Plaintiffs is a sign that the product delivered the benefits the consumer was expecting.

20.     Regardless of the above, there are several areas in the experts' reports that further questions the accuracies of the results of those meager twenty-one bottles and thus the conclusions expressed by the experts. It is my opinion that the reports in which the experts summarize the analytical testing done on SAM-e bottles were unclear enough that it made it difficult to draw accurate conclusions and provide evidence of defective products even in this sample of twenty-one products. The twenty-one products were tested using different methods by the labs using either published methods (i.e., USP 33 NF 28 – Appendix A) or their own internal method. A lab that uses their own internal method should not necessarily be disqualified but enough information should be shared so an expert can determine the validity, accuracy and robustness of the method. However, I find that there is insufficient information in the experts' reports and supporting documents to establish that the analytical laboratories used appropriate or solid testing methodology for this particular assignment. I can only opine on what I read and based on my expertise, but there is a sufficient number of discrepancies in the experts' report to cause me to question the accuracy of the results and thus the legitimacy of the experts' conclusions.

**B.      *Review of Dr. Catherine Hutt's Declaration***

21.     I will start with Dr. Hutt's report that includes Pages 0001 to 0033. The first thing that jumped at me was the inconsistency in the lot codes format of the twelve bottles she purchased from Amazon and other defendants' websites. Seven bottles had lot codes made of eight numerical characters. They included the two bottles that were bought from VB website which is the direct retail outlet of VB manufacturer. Based on my experience, this format is common and usually represents the day, the month, the year and the production batch number. It looks like VB used this format on the products they manufacture and sell on their website. Five

10

of the other products have a 6-digit lot code which indicates to me that those products may not

have been manufactured by VB.

22.     All the products are supposedly manufactured by VB. In my experience, a

contract manufacturer adopts one format for their lot code and keeps the same format across the

board including for the production batches that are made for other retailers' brands. The

circumstances in which I have seen a change of lot code format is when the products were not

truly made by the original manufacturer but <u>counterfeit</u> by a competing manufacturer. I do

question whether all the products purchased by Dr. Hutt were genuinely made by VB. It would

obviously put in question the legitimacy of the results unless this lot code format difference is

explained.

23.     Dr. Hutt sent the samples to be tested at one branch of Eurofins located in

Madison, Wisconsin. She reported that the method the lab used was UPLC (Ultra Performance or

High-Pressure Liquid Chromatography) with no other details. Eurofins submitted the results of

three of the products in the form of a certificate of analysis (CoA) (Pages 0028-0033). A CoA

represents a summary of the results and should include elements such as i) name of the analyte

(in our case, SAM-e), ii) the intended level of the analyte (based on the bottle's label or the

manufacturer's specs), iii) the level of the analyte that is actually measured and iv) the method

used to determine the level of the analyte. A CoA is a document that is required by the rules of

Good Manufacturing Practices (GMPs) for dietary supplements (more details can be found in 21

CFR Section 111.130 and 111.320).  Interestingly, the CoAs submitted by Eurofins to Dr. Hutt

not only indicated one method but two which are very different. The first referenced method

reads "Nuclear Magnetic Resonance Spectroscopic Method for determination of S-Adenosyl-L-

Methionine in tablets". The second one was referenced via a paper authored by Edwards, R. and

is described as ion-pair reversed phase high performance liquid chromatography. To the educated reader, it raises the question of what method was truly used or how they were modified and validated, and thus, whether the results can be trusted.

24. I also noticed some discrepancies in how Dr. Hutt reported the test results. For example, for BoostCeutical 2: lot #11021902 (Page 0004), she writes "labeled as 500 mg per capsule" and "analyzed to contain 135 mg per capsule". The picture of the Supplement Fact Box (SFB) shows serving size of 3 capsules and 1500 mg of SAM-e. The blue table that seems to come from Eurofins reads "sample serving size 1 Cap" and below "136 mg per serving size". Is the 136 mg for one capsule or for 3? It is very confusing.

25. Similarly, Dr. Hutt reported that the aSquared lot #209051830 bottle was a "labeled as 400 mg per capsule" and "analyzed to contain 15.9 mg per capsule". However, the blue table provided by Eurofins does <u>not</u> indicate the lot number of the product tested. There was additional information about the analysis below the blue table that was <u>not</u> included on the BoostCeutical 2 sample.

26. In conclusion, I find that the report submitted by Dr. Hutt lacks the basic information necessary to assess the accuracy of the results. A more detailed method description, including sample preparation, reference compound used, etc., an explanation about the different lot code format and a longer narrative to explain the findings would have gone a long way to help interpret the results and to provide greater confidence in the findings.

C.   *Review of Documents from Pages 0041 to 0132*

27. Experts' disclosure pages 0041 to 0132 consist of documents produced by Nutrasource Pharmaceutical and Nutraceutical Services ("Nutrasource"), a consulting firm, that spearheaded the testing of nine other bottles that were bought only from Amazon. Again, the lot

codes of these bottles were a 5-digit number which are completely different from the lot codes of the bottles that Dr. Hutt bought and different from how VB identifies its lot number. And yet Plaintiffs' experts apparently assumed that VB manufactured all the products. This raises the question as to whether the products tested were even manufactured by VB in the first place.

28.     Nutrasource submitted three different bottles with the same 5-digit lot code to 3 different analytical labs (Merieux Nutrisciences, Eurofins Central Analytical Lab in New Orleans (different branch from the one Dr Hutt used), and Labs-Mart in Edmonton Canada).  Each lab used a different method. Merieux followed the validated method described in the US Pharmacopeia and National Formulary Volume 33/28. A copy of the method can be found in Appendix A. This is a liquid chromatography method using an external standard. Labs-Mart used an in-house (internally) developed HPLC-UV method with an external standard. Eurofins in New Orleans also used an in-house developed method based on Capillary Electrophoresis with UV detection and external standard. It is puzzling to see that the same named lab (Eurofins) uses different methods for the same analyte. It renders their results difficult to interpret.

29.     Before I dive into the details of the data and results given by the three labs, I would like to say that I have had extensive experience working with analytical labs over the years. I have submitted many dietary samples for analysis and when I obtained the write ups of the testing of the samples, I routinely requested the following elements in the write up. I consider these elements to be the basis for good reporting. I would ask that the following be included or at least verbally shared so I could feel confident in the results:

        a.   The type of method and equipment used (liquid chromatography (LC), HPLC, LC coupled with a Mass Spectrometer, etc.)

b. How was the sample prepared? I asked how the analyte was extracted out of the matrix of the finished product. This is an area that differentiates a great lab from a decent one. If the analyte is not properly extracted from the matrix, then the results will not match the amount of analyte that was put in the finished product during manufacturing. What solvents were used to dissolve or suspend the analyte and what techniques were used to show the analyte was stable in the chosen solvent.

c. What types of reference compound and standard were used so I knew they were appropriate for the analyte tested?

d. Were the reference compound and standard fresh especially if they were a chance that they were susceptible to degradation?

e. Was a standard curve of at least 3 known concentrations of standard done and what was the correlation coefficient for linearity?

f. Was spiking of the sample to be analyzed done and what was the recovery percentage?

g. Number of replications of the test per each sample (typically at least 3).

30. In my greater than twenty years' experience in the dietary supplement industry, I have asked clarification in the testing procedures many times and found great cooperation from the scientists at the lab to clarify what was done. These back-and-forth discussions were very useful and yield greater confidence in the results.

31. Analytical methods that the labs used can be hard to understand by the layperson. Thus, I will try to explain how liquid chromatograph ("LC") works in a simpler way. Think of a LC instrument as a river with rocks and bends. The water flows through the river at different

speeds depending whether it flows over rocks or around a bend. Let's say that we mark a segment of the river with a start and an end point and we use this segment for the experiment. At the start point, we throw compound A (It could be a leather balloon filled with a known amount of water and sand - we will call it reference compound). Compound A moves down the river at a speed based on its size, chemical makeup, weight, buoyancy etc. and reach the end point in X minutes or $TR_A$. $TR_A$ is called retention time for compound A. The amount of water that was displaced by compound A arriving at the end point corresponds to how much there is of compound A. We have now compound A concentration ($C_A$). Next, we triple the amount of compound A thrown in the river (3 balloons). They all show up at the end at the same time ($TR_A$) but the concentration is now 3 times $C_A$. We then experiment with another compound consisting of a smaller balloon (compound B; our standard compound). After we thrown compound B in the river, we record the time it took to reach the end point ($TR_B$) and the volume it displaced in the river ($C_B$). A third compound which consists of bundling compounds A and B loosely together (compound C) is thrown into the river. As compound C travels downstream, it releases A and B which move along the current at different speeds. Each arrives at a different time at the end point and displaced different amount of water. They will arrive at the retention time that was recorded in the earlier experiments when each was tested individually ($TR_A$ and $TR_B$). Sometimes two compounds arrive too close to each other to be able to accurately record their individual arrival time and volume displaced. One way to allow for better separation is to modify the conditions through which they travel; in the case of our river, we change its topology by adding more rocks or more bends and we repeat the experiment. This is why method development and validation are so important. Whenever you test compounds A, B and C with a validated method, you should get similar results. Going from the river analogy to the lab, how are the retention times and

15

concentrations displayed by the LC instrument and its associated computer in the lab? They are represented in a graphical manner with peaks along a time axis. The position of the peaks are the retention time of a particular compound and the surface area of the peak the concentration of the compound. The chromatogram example below shows compound 1 and compound 2 that were tested. It could that compound 1 is a reference compound and compound 2 is SAM-e that was in one of the commercial products. A reliable method would exhibit a flat baseline and symmetrical peaks.



Figure 1. Chromatographic separation of two substances.

32.     My review of the Data Generated by Labs-Mart (Pages 0075-0097) points out to multiple inaccuracies that render the experts' conclusions questionable.

    a.   Page 0095 from Labs-Mart shows what the lab refers to as a <u>typical chromatogram of SAM-e.</u> The peak labeled SAM-e appears at <u>4.498</u> minutes retention time (RT). The chart caption indicates that the peak assignment was done using the external standard SAM-e chloride and measured by HPLC-UV.

b.  On page 0079, the lab technician prepared standard solutions of SAM-e chloride dihydrochloride at 2 concentrations in water (std=97.776 ppm and std=9.4776 ppm) on Sept 23. The 97.776 ppm std was run in the LC twice on Sept 23. The peak labeled SAM-e now comes out at a <u>2.947 minutes RT</u> using the same method (page 0082 and 0083). Going back to the river analogy, if the conditions remain the same, the item (SAM-e) should have arrived at the end point of the river at the same time. What was the point to show a typical chromatogram for SAM-e on page 0095 if it does not match the RT on page 0082? No explanation for this discrepancy was given.

c.  The 9.4776 ppm Std was made on Sept 23 according to the record and was put through the LC instrument 2 days later on Sept 25 (page 0084 and 0085). We know that water degrades SAM-e salt. Can we trust that the surface area of the peak truly represents the concentration that the technician prepared 2 days earlier? A better approach would have been to run the standards on the same day right after they were freshly made. Adding a third concentration for the standard is typically standard operating procedure and would have strengthen the accuracies of the results.

d.  To add to the confusion, page 0091 and 0092 shows the results for <u>Std L</u>. What is Std L? it is not found on the technician hand written page (page 0079).

e.  Continuing with Std L, Std L is run through the LC instrument on Sept 23 (page 0091). Std L is also measured on Sept 25 and the peak is much smaller.

Is this an indication that Std L degraded over the course of 2 days? (Page 0092).

f.  The records show that the technician mixed two commercial samples (92403 and 92435) in water on Sept 23 (page 0079); 92403 in triplicate and 92435 in duplicate. Samples 92435-4 and 92435-4d were run on Sept 23 whereas samples 92403-1, -2 and -3 on Sept 25. With the known instability of SAM-e in water, this could contribute to detecting lower concentration of SAM-e than expected.

g.  In my opinion, based on the submitted documents, I do not trust that the numbers reported are an accurate representation of the level of SAM-e in those 2 commercial samples. I suspect that the results underestimate the actual amount of SAM-e.

33.     I reviewed the information from pages 0063 to 0074 that I assumed are from Eurofins. There are no details about the methodology, the reference compounds or standard, or sample preparation. The sample identifiers do not jive from document to document. For example, the sample name indicated on the top page 0068 that reads 9876626 does not jive with sample code on any of the Eurofins CoA (page 0063) or any Nutrasource code number on page 0043. From these documents, it is impossible to assign any of the results to any of the commercial samples.

34.     Furthermore, I noticed that the chromatograms on pages 0068, 0070 and 0072 show 4 peaks between 2.7- and 3.8-min RTs and only one is labeled with the analyte (SAM-e) at 3.48 min. (Pages 0068-0072). These unassigned peaks clearly represent compounds that went

18

through the instrument but no explanation has been given to explain the presence of these peaks. How one can evaluate the accuracy of the results in absence of so many important details?

35.     In conclusion, based on the information provided in these documents, the testing did not establish an accurate level of SAM-e in these commercial samples.

**D.     *Review of Dr. Douglas Kalman's Declaration***

36.     I raised the issue of lot code format when I reviewed Dr. Hutt's declaration. A foot note in Dr. Kalman's declaration confirmed that the lot code of products manufactured by VB and its alter ego CT Health Solutions are month, day and year as in ddmmyy with two additional digits if more than one batch is made on the same day. This confirmation increases the suspicion that the bottles with lot code different from this above format are not products manufactured by VB. Thus, in my opinion, none of the testing on these bottles should be included in this suit. This would bring the number of products pertinent to this suit to only seven.

37.     As I explained earlier in my declaration, it is necessary to use statistical rigor to be able to make the generalized statement that the product produced by VB was uniformly defective. To affirm that one has evidence of product deficiency on a class-wide basis after testing twenty-one bottles was already far reaching and not scientifically sound. Assuming that only seven bottles are truly manufactured by VB, this generalization is totally invalid.

**E.     *Review of Dr. Sharp's Declaration***

38.     In his declaration, Dr Sharp proposed a method to estimate class-wide damages under a deficiency theory of damages.  He used the information from the three other experts and used a 83% average deficiency level that he extrapolated from Dr. Kalman's declaration.  As I said before, based on all the information provided to me, I concluded that the testing did not

establish an accurate level of SAM-e in the samples tested. Thus, in my professional opinion, it is not possible to determine a deficiency score.

## VI. Conclusions

39.     It is my professional opinion that the individual Plaintiff cannot demonstrate that the SAM-e they purchased was defective. They did not have the SAM-e they purchased tested, and Plaintiffs' experts did not conduct sufficient or reliable testing to conclude that all SAM-e manufactured by VB was uniformly mislabeled.

40.     In my professional opinion, there is no evidence that the products the Plaintiffs bought were mislabeled.

41.     It is my professional opinion that the number of samples tested were too low to make a generalized conclusion that SAM-e products made by VB are uniformly defective.

42.     In my professional opinion, there are numerous deficiencies and inconsistencies in the testing documentation that make difficult to determine the true level of SAM-e in the products.  Thus, using a 83% deficiency level in all products should not be used to calculate damage.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

DATED this 29th day of  November, 2021.


N. C⎯⎯

_____
Nathalie Chevreau, Ph.D., R.D.