# EXHIBIT B

Page 1

1                UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF FLORIDA
2                      MIAMI DIVISION
3    CORI ANN GINSBERG, NOAH
     MALGERI, KAYLYN WOLF, BILL
4    WILSON, SHANNON HOOD, ERIC
     FISHON, and ROBERT MCKEOWN, on
5    behalf of themselves and all
     others similarly situated,        CASE NO.:
6                                      1:19-CV-22702-KMW
          Plaintiffs,
7
     v.
8
     VITAMINS BECAUSE, LLC; CT
9    HEALTH SOLUTIONS, LLC; GMAX
     CENTRAL; INSPIRE NOW PTY, LTD
10   D/B/A BOOSTCEUTICALS; ASQUARED
     BRANDS, LLC; HEALTHY WAY RX,
11   LLC; KHAKIWARE, INC.; AND JOLLY
     DOLLAR SUPPLY COMPANY, LLC,
12
          Defendants.
13   ------------------------------/
14
15    DEPOSITION OF DOUGLAS S. KALMAN, PHD, RD, FACN, FISSN
               (Conducted Via Videoconference)
16
17
        DATE:            November 24, 2021
18
        TIME:            9:06 a.m. - 5:18 p.m.
19
20      PURSUANT TO:     Notice by counsel for
                         Defendants for purposes of
21                       discovery, use at trial, or
                         such other purposes as are
22                       permitted under the Florida
                         Rules of Civil Procedure
23
        BEFORE:          Rhonda Ellison, Notary Public
24                       State of Florida
25                        PAGES 1 - 252

Page 2

```
 1   APPEARANCES:
 2
     JAY I. BRODY, ESQUIRE
 3   Kantrowitz, Goldhamer & Graifman, P.C.
     747 Chestnut Ridge Road
 4   Chestnut Ridge, New York 10977
         Attorney for Plaintiff
 5
 6
     SCOTT W. ANDERSON, ESQUIRE
 7   DAVID S. JOHNSON, ESQUIRE
     Johnson Daboll Anderson, PLLC
 8   2011 West Cleveland Street
     Suite F
 9   Tampa, Florida 33606
         Attorneys for Defendants Vitamins
10       Because and CT Health Solutions
11   BRETTON I. POLLACK, ESQUIRE
     Pollack, Pollack & Kogan, LLC
12   Courthouse Tower
     44 West Flagler Street
13   Suite 2050
     Miami, Florida 33130
14       Attorney for Defendant Inspire Now
15   SEAN M. O'BRIEN, ESQUIRE
     Lippes Mathias LLP
16   50 Fountain Plaza
     Suite 1700
17   Buffalo, New York 14202
         Attorney for Defendant aSquared
18       Brands LLC
19   RICHARD J. OPARIL, ESQUIRE
     Arnall Golden Gregory
20   1775 Pennsylvania Avenue NW
     Suite 1000
21   Washington, DC 20006
         Attorney for Defendant GMAX Central,
22       LLC
23
24
25
```

Page 3

```
 1          I N D E X
 2   DIRECT EXAMINATION BY MR. ANDERSON        Page  5
 3   CROSS-EXAMINATION BY MR. POLLACK          Page 153
 4   CROSS-EXAMINATION BY MR. O'BRIEN          Page 234
 5   CERTIFICATE OF OATH                       Page 249
 6   REPORTER'S CERTIFICATE                    Page 250
 7   ERRATA LETTER                             Page 251
 8   ERRATA PAGE                               Page 252
 9
          E X H I B I T S
10
     Exhibit No. 1              Page  11
11   (Renotice of Taking Deposition Duces Tecum)
     Exhibit No. 2              Page  19
12   (Excel Spreadsheet)
     Exhibit No. 3              Page  36
13   (Dr. Kalman's Notes)
     Exhibit No. 4              Page  41
14   (Declaration of Douglas S. Kalman)
     Exhibit No. 5              Page 103
15   (Certificate of Analysis Vitamins Because 2)
     Exhibit No. 6              Page 105
16   (Certificate of Analysis aSquared 1)
     Exhibit No. 7              Page 106
17   (Certificate of Analysis Nusapure 2)
     Exhibit No. 8              Page 106
18   (Certificate of Analysis Naturetrition)
     Exhibit No. 9              Page 109
19   (Certificate of Analysis Boostceuticals 2)
     Exhibit No. 10             Page 118
20   (Certificate of Analysis Eurofins)
     Exhibit No. 11             Page 173
21   (Certificate of analysis of raw material of SAM-e)
     Exhibit No. 12             Page 187
22   (Certificate of Analysis)
     Exhibit No. 13             Page 213
23   (Ring Testing Report)
     Exhibit No. 14             Page 234
24   (Expert Disclosures)
     Exhibit No. 15             Page 245
25   (Email)
```

Page 4

```
 1            P R O C E E D I N G S
 2        THE COURT REPORTER:  The attorneys
 3   participating in this deposition acknowledge that I,
 4   the court reporter, am not present with the witness
 5   and that I will be reporting the proceedings and
 6   administering the oath remotely.  This agreement is
 7   pursuant to Florida Supreme Court Administrative
 8   Order AOSC20-16.  The parties and their counsel
 9   consent to this arrangement and waive any objections
10   to this manner of reporting.
11        Will counsel please indicate your agreement by
12   stating your name and your agreement for the record?
13        MR. BRODY:  Jay Brody from the law firm of
14   Kantrowitz, Goldhamer & Graifman, for the
15   plaintiffs.  We agree.
16        MR. ANDERSON:  Scott Anderson here on behalf
17   of Vitamins Because and CT Health Solutions, and I
18   agree.
19        MR. OPARIL:  This is Richard Oparil
20   representing defendant GMAX, and we agree.
21        MR. POLLACK:  Bretton Irving Pollack of
22   B. Irving Pollack, P.A.  I represent the defendant
23   Inspire Now, doing business as BoostCeuticals, and I
24   confirm the stipulation.
25        MR. O'BRIEN:  Sean O'Brien, representing
```

Page 5

```
 1   aSquared Brands, LLC.  I consent too.
 2   THEREUPON,
 3          DOUGLAS S. KALMAN,
 4   the witness herein, being first duly sworn upon oath, was
 5   examined and testified as follows:
 6          DIRECT EXAMINATION
 7   BY MR. ANDERSON:
 8     Q.  Good morning, Mr. Kalman.  My name is Scott
 9   Anderson, and I'm with the law firm Johnson Daboll
10   Anderson, and I represent Vitamins Because and CT Health
11   Solutions in a lawsuit filed by a number of plaintiffs
12   alleging certain things related to a dietary supplement
13   called SAM-e.  You've been identified as an expert by the
14   plaintiffs in this case, and we're here to take your
15   deposition and ask you questions about that.
16        You understand that's why you're here today?
17     A.  Yes.
18     Q.  Okay.  Have you ever had your deposition taken
19   before?
20     A.  Yes.
21     Q.  How many times?
22     A.  Somewhere in between five and ten.
23     Q.  When's the last time you've had your
24   deposition taken?
25     A.  Right prior to the pandemic closedown.
```

2 (Pages 2 - 5)

Page 6

1   Q.   Is this your first Zoom deposition?
2   A.   Yes.  No, I'm sorry.  The last -- the last
3   deposition was a Zoom deposition but the difference was I
4   was in the -- I was in either -- it was a court
5   reporter's office or a law firm's office where they had
6   me go.  But everybody else was remote by Zoom.
7   Q.   Okay.  And that was about -- okay.  Would you
8   say that was approximately two years ago?
9   A.   It feels like a hundred, but yes.
10  Q.   All right.  Well, you have a little bit of
11  experience giving depositions, so I'm just going to go
12  over quickly some of the rules.  I'm going to be asking
13  you questions.  I ask that you answer them to the best of
14  your ability.  Because we're on Zoom and because
15  Ms. Ellison's taking down everything that we say, it's
16  very important that you and I do our very best not to
17  talk over each other.  I'd appreciate if you could let me
18  finish asking my questions before you answer, and I'd
19  appreciate if you could answer verbally rather than with
20  nods of the heads and uh-huhs and uh-uhs.  Is that okay?
21  A.   Yes.
22  Q.   Great.  This is going to take a little while
23  today, so if you need a break, just let me know and we
24  would be happy to accommodate you.
25        Do you have any questions for me?

Page 7

1   A.   Not at this time.
2   Q.   All right.  Well, why don't we get rolling
3   here.  You said you've had your deposition taken between
4   five and ten times, the last time approximately two years
5   ago.  What was that related to?
6   A.   That was related to a lawsuit in the state of
7   California.
8   Q.   What was the lawsuit related to?
9   A.   Unfair business practices.  If I had to put it
10  in my summary, it was something related to substantiation
11  of claims surrounding marketing.  But I think it was
12  under, I think, California unfair business practices kind
13  of act or something.
14  Q.   Sure.  Who retained you in that case?
15  A.   If I have -- if you allow me a moment to look.
16  I do not have the name memorized, but if you allow me --
17  it was -- I can give you the name of the law firm.  I
18  believe it's actually on my information sheet that was
19  shared of the recent cases I've worked on in the past --
20  what? -- four years or so.  Sorry.  I don't have the name
21  memorized, but I'm happy to look it up if you like.
22  Q.   Did you represent the plaintiffs or the
23  defendants in that case?
24  A.   Defendant.
25  Q.   Who was the defendant?

Page 8

1   A.   Without pulling it up on my laptop or -- I
2   don't have that memorized.  Again, it is on the sheet --
3   no, I don't have it memorized.  I don't remember, but
4   it's on the information that you already have of listings
5   of cases I've worked on.
6   Q.   Well, what list are you referring to?
7   A.   The list that's part of the expert report
8   wherein part of the federal report you're supposed to
9   list your most recent or last cases over the past four
10  years, I believe it is.  I'm happy to open up my own
11  document and take a look if you would like.
12  Q.   No, no, we don't need to do that yet, because
13  I'm going to backtrack for a second here.  You were asked
14  to bring certain things to the deposition with you today;
15  correct?
16  A.   I didn't bring anything to the deposition.
17  I'm sitting at my house.
18  Q.   Okay.  I was going to pull --
19  A.   I assumed a reading room or something similar
20  would be available if we were showing documents.  I do
21  have, of course, since I'm doing this on my computer and
22  laptop, I have the documents that I utilized from my
23  report saved on a file.  And they were all shared, of
24  course, with counsel.  But I assumed in my prior
25  experiences if you are aiming to ask me about a specific

Page 9

1   sentence and specific paragraph, et cetera, that you
2   would actually show the document.
3        MR. ANDERSON:  Okay.  Can we enable share
4   screening, Ms. Ellison?
5        THE COURT REPORTER:  It's enabled.
6   BY MR. ANDERSON:
7   Q.   All right.  Let's see if I can work it.  Share
8   screen.  All right.  Can you see my screen, Mr. Kalman?
9   A.   Yes.
10  Q.   Okay.  And I don't know your experience with
11  Zoom depositions, but the way it has to work is I'm the
12  one who has control of the documents.  You're not allowed
13  to push it up and down, so I'm going to slowly scroll so
14  that you can review the document.  And let me know if I'm
15  going too fast or too slow or anything like that; okay?
16       Have you seen this document before,
17  Mr. Kalman?  Have you seen that document before?
18       MR. ANDERSON:  Did we lose him?
19       THE COURT REPORTER:  Let me see.  I don't see
20  him.  Do you want to go off the record until he
21  comes back?
22       MR. ANDERSON:  Yeah, let's.
23       THE COURT REPORTER:  Sure.
24       (Recess.)
25  BY MR. ANDERSON:

3 (Pages 6 - 9)

Page 10

1    Q.  Doctor, have you seen this document that's on
2  my screen?  It's on your screen too.
3         MR. POLLACK:  We lost him again.
4         THE COURT REPORTER:  Yep.  Well, I have him
5  still on here.  No.
6         THE WITNESS:  I'm here.  I'm -- I'm -- hello.
7  This is Dr. Kalman.  I'm here, but what happened is
8  when -- I believe it's Mr. Anderson was asking me
9  did I see the document, and I said, "I see the top
10  third," then it froze and dropped.  Second time.  I
11  don't know if it's when he's scrolling a document
12  that I'm having a -- that there is an issue or not,
13  but I'm back.
14        MR. ANDERSON:  Can everyone else see when I
15  scroll the document?
16        THE COURT REPORTER:  Yes.
17        MR. POLLACK:  Yes.  This is Attorney Brett
18  Pollack.  There's no lag.  The only -- the only
19  issue I'm experiencing is from Dr. Kalman, and it
20  appears to be his Internet connection.
21        THE COURT REPORTER:  Yes.  And he's froze
22  right now on my end.
23        (Recess.)
24  BY MR. ANDERSON:
25    Q.  Doctor, I've been showing you on the screen

Page 11

1  here what's called a renotice of taking deposition duces
2  tecum by Zoom.  Do you see that?  Doctor?
3         THE COURT REPORTER:  I believe he's off again.
4         (Recess.)
5  BY MR. ANDERSON:
6    Q.  All right.  Mr. Kalman, I have a document on
7  my screen, and we're going to mark this as Exhibit 1 to
8  the deposition.
9         (Thereupon, Exhibit Number 1 was marked for
10  purposes of identification.)
11  BY MR. ANDERSON:
12    Q.  It's called Defendant's Vitamins Because and
13  CT Health Solution's renotice of taking deposition duces
14  tecum by Zoom.  Do you see that?
15    A.  Yes, sir.
16    Q.  Have you ever seen that document before?
17    A.  I do not believe I've actually seen the whole
18  document.  I've gotten snapshot pictures of the document
19  inside an email, from what I remember, telling me, you
20  know, to mark off the date and time on the calendar.
21  There was two emails that I received.  And I -- from my
22  recollection at the moment, I do not believe there was
23  any attachments, but it was, like, a snapshot of this
24  first part that you're showing.
25    Q.  Okay.  When you say you received two emails,

Page 12

1  describe each of them.
2    A.  Well, one was an email with the -- I can tell
3  you with some Veritext information enclosed in a box.
4    Q.  Okay.
5    A.  And then the other email was, you know,
6  something that included the box that's here that says
7  deponent's name, date and time, location and -- but I do
8  not remember any attached document to that.
9    Q.  Okay.  And I'm going to scroll through Exhibit
10  A -- or 1.
11        MR. ANDERSON:  How did we mark it,
12  Ms. Ellison?  I'm sorry.
13        THE COURT REPORTER:  1.
14        MR. ANDERSON:  1.
15  BY MR. ANDERSON:
16    Q.  All right.  And there's an Exhibit A to the
17  notice of deposition, and it includes a list of 11 items
18  that we ask that you bring with you to your deposition
19  today.  Do you see that?
20    A.  Yes.
21    Q.  And I'm correct -- right? -- that you didn't
22  bring anything with you to your deposition today;
23  correct?
24    A.  No, that would be incorrect, because I have --
25  since I'm doing this deposition on a Zoom and in front of

Page 13

1  my laptop, I have documents that are saved to the desktop
2  on my laptop that are specific to this.
3    Q.  Did you bring any physical documents with you
4  today?
5    A.  No.  I didn't bring anything physically to my
6  own home, no.
7    Q.  Do you work out of your home?
8    A.  Yes.  I have more than one job, but my main
9  job is working from the -- is a home office, yes.
10    Q.  As it relates to this case, do you do all the
11  work on this case from your home?
12    A.  Correct.
13    Q.  Okay.  So do you have your entire file related
14  to this matter there at your home?
15    A.  Yes, on my laptop.
16    Q.  Okay.  What is that entire file comprised of?
17    A.  That entire file is comprised of a copy of
18  the -- I think it's the third amended complaint, but a
19  copy of the lawsuit, drafts of my report that were sent
20  to Mr. Brody, and some of the materials that I relied
21  upon for my report.
22    Q.  Anything else in that file?
23    A.  An Excel sheet where I document the days or
24  times that I work on aspects of this.
25    Q.  Anything else in that file?

4 (Pages 10 - 13)

Page 14

1    A.   Not that I can think of.
2    Q.   So what I have as the entire file that you
3  have on this matter is the third amended complaint,
4  drafts of some of the reports, and some of the materials
5  you rely upon for your report, and an Excel spreadsheet.
6  Is that correct?
7    A.   Pretty much.  And I would add to it that the
8  materials that I use to read as related to this case,
9  specifically those that have already been introduced into
10  the lawsuit were shared by Mr. Brody on a -- a -- you
11  know, a secure server where box.com, I believe it was,
12  that I would look at the documents that -- you know, from
13  prior aspects of this case.  Those I did not download to
14  save since they were already there.
15    Q.   Do you still have access to box.com?  Those
16  documents?
17    A.   I would think so.
18    Q.   Okay.  What documents were on the box.com that
19  you relied upon but didn't save?
20    A.   That would be all -- that would be the testing
21  that was done by various laboratories on the products in
22  question here, along with, you know, other things that
23  are typical and related to a court case.  Somebody -- you
24  know, like a -- transcripts, depositions, information
25  that was shared regarding manufacturing, regarding,

Page 15

1  again, analysis from Eurofins, analysis from different
2  laboratories of the products.
3    Q.   Well, here's the problem with that is you've
4  been retained as an expert and we ask that you bring all
5  of your reliance materials with you, everything that
6  you've reviewed in preparation of your report, your
7  entire file related to this matter, your billing, any
8  journals, textbooks, articles that you relied upon.  And
9  it doesn't sound like you can identify all of that.  Am I
10  correct?
11    A.   I don't know if I agree with that.
12    Q.   What do you --
13    A.   What I can easily -- so, for example, in my
14  report -- what you call exhibits, in science we call
15  references or bibliography.  Everything is identifial --
16  identifiable.  So I can identify everything.
17    Q.   It's a different question.
18    A.   So I don't necessarily know if I necessarily
19  agree with you.  Again, as I also stated when we started
20  this aspect is I cannot confirm to you with a hundred
21  percent confidence and honesty and integrity that I
22  received the pdf attachment to the two emails that told
23  me about this deposition today.  One was a Veritext-based
24  thing that said I would be receiving something that I
25  never received.  And another email, like I said, was a

Page 16

1  snapshot of the top third of the one page that you
2  showed.
3    Q.   And, I'm sorry, Mr. Kalman.  I -- I sincerely
4  believe that you received what you say you received.  I'm
5  not saying that you received Exhibit A and intentionally
6  didn't bring anything with you to the deposition.  I
7  don't mean to imply that at all.  I'm sorry if I did.
8    A.   Thank you.
9    Q.   But what we do as lawyers is we give notice of
10  depositions and we provide document lists.  And without
11  the production of the document lists that we ask for, it
12  makes proceeding with depositions extraordinarily
13  difficult.  And if you didn't receive it, it's certainly
14  not your fault for not bringing the documents.  We
15  couldn't expect that.
16    Doctor, did you know that your deposition had
17  previously been set on November 15th of 2021?
18    A.   Not that I recall, no.
19    Q.   What were you doing on November 15th, 2021?
20    A.   That was a Monday; right?
21    Q.   Yes, sir.
22    A.   So, working.
23    Q.   And where do you -- where were you working?
24    A.   Physically, that would be my home office for
25  the majority of the day.

Page 17

1    Q.   All right.  I'm going to go through this
2  Exhibit A with you, Mr. Kalman, and we're going to see
3  what we can -- what we can do here.  We've talked about
4  1, which is your entire file related to this matter.  And
5  we're going to keep that open for a second and go through
6  the rest of these.
7    Number 2 says the deponent's contract with
8  plaintiffs or plaintiff's counsel and the deponent's
9  entire billing file related to this matter.  Do you have
10  access to your contract with plaintiff's counsel or
11  plaintiffs?
12    A.   No, I do not.
13    Q.   Did you enter into one?
14    A.   As an individual, I did not.
15    Q.   How were you retained in this case?
16    A.   Through my employer.
17    Q.   Okay.  Who's your employer?
18    A.   Nutrasource Pharmaceutical and Nutraceutical
19  Services is the corporate name.
20    Q.   And they're based in Canada?
21    A.   Correct.
22    Q.   Okay.  They keep the contracts with Mr. Brody
23  and his firm; is that correct?
24    A.   To the best of my knowledge.
25    Q.   Have you ever seen a contract between

5 (Pages 14 - 17)

Page 18

1 Nutraceuticals or Nutrasource and Mr. Brody or his law
2 firm?
3    A.   No, sir.
4    Q.   Have you ever signed a contract between
5 Nutraceuticals and Mr. Brody or his law firm?
6    A.   Nutrasource.  And, no.
7    Q.   How did you find out that you had been
8 retained in this case as an expert?
9    A.   The CEO of the company that I work for
10 approached myself and one other doctor and asked us
11 about -- asked us about our experience and -- in this
12 area.  And that's how.
13    Q.   Okay.  When was that?
14    A.   Couple months ago.
15    Q.   If you were asked to obtain a copy of that
16 contract, could you?
17    A.   Here's my answer for that:  In theory, there
18 should be no reason why not; right?  I would ask for it,
19 but I can't see a reason why the CEO or anybody in the
20 company would not give it to me.
21    Q.   What's the name of the CEO of your company?
22    A.   William Rowe, R-O-W-E.
23    Q.   Where does he reside?
24    A.   General area would be Guelph, or the greater
25 area of Ontario.  I don't know the exact town, but

Page 19

1 somewhere in Ontario near Guelph.
2    Q.   Okay.  And that's in Canada?
3    A.   Yes, sir.  Outside of Toronto, still in
4 Canada.
5    Q.   And you said your CEO approached you and
6 another person.  Who is the other person your CEO
7 approached?
8    A.   Dr. Susan Hewlings.
9    Q.   Has she done any work on this file?
10    A.   No.
11        THE COURT REPORTER:  Can you spell her last
12 name?
13        THE WITNESS:  Yes, H-E-W-L-I-N-G-S.
14        THE COURT REPORTER:  Thank you.
15        THE WITNESS:  You're welcome.
16 BY MR. ANDERSON:
17    Q.   Do you keep a billing file?
18    A.   Yes.  And that's what I meant when I said
19 earlier I keep an Excel sheet where I document the days
20 and times or times and days that I worked on this case --
21 or worked on this matter.
22    Q.   I'm going to attach that as Exhibit B to the
23 deposition -- or 2, rather.  Sorry.
24        (Thereupon, Exhibit Number 2 was marked for
25    purposes of identification.)

Page 20

1        MR. ANDERSON:  Mr. Kalman and Mr. Brody, you
2    guys will have to get that to the court reporter.
3 BY MR. ANDERSON:
4    Q.   How many hours have you spent on this matter?
5    A.   Total?  Approximate?  If I can give you a
6 ballpark.
7    Q.   Ballpark's fine.
8    A.   Probably around -- around 50 hours.  5-0.
9 Cumulative, you know.
10    Q.   And if I saw in your report you bill at $450
11 an hour?
12    A.   Yes.
13    Q.   Have you been paid for any of your work to
14 date?
15    A.   That's a funny question because I have an
16 employer.  The employer has an agreement with Mr. Brody's
17 law firm.  The employer invoices based upon the time that
18 I spent that I input into our accounting software.  And I
19 assume that Nutrasource gets paid.  I personally have
20 not like -- it's not like Mr. Brody sent me a check in
21 the mail.  So I would assume that normal machinations of
22 business are going through.
23    Q.   Do you know whether or not Nutrasource has
24 been paid for any of the time you spent on this case?
25    A.   I do not know.

Page 21

1    Q.   Who's in charge of billing at Nutrasource?
2    A.   I believe that a person's name would be Sue
3 Saman, S-A-M-A-N.
4    Q.   Okay.  Does she also work up there in Canada?
5    A.   Yes.
6    Q.   All right.  Number 3 is "All correspondence
7 sent to deponent from anyone acting on any plaintiffs'
8 behalf, including but not limited to plaintiffs' counsel
9 or any other expert, whether a consulting or testifying
10 expert, relating in any way to any issue in this case."
11        Do you see that?
12    A.   Yes, I do.  Number 3.
13    Q.   All right.  Do you have any correspondence
14 between you and Mr. Brody or his law firm?
15    A.   I have it in the Microsoft Outlook email
16 system, but I don't have anything specifically saved from
17 emails or communications, no.
18    Q.   Could you gather all of the emails between you
19 and Mr. Brody or his law firm related to his case?
20    A.   I would assume.  The answer is I can attempt
21 to.  Don't know if I would be a hundred percent accurate
22 in collecting all from the minute I met Mr. Brody a
23 couple months back and today, but most certainly with --
24 you know, on Outlook, you put in somebody's name and you
25 get a history of sent emails.

6 (Pages 18 - 21)

Page 22

1    Q.   What would make it difficult to gather all of
2  the correspondence between you and Mr. Brody?
3    A.   Being a human, making an error, missing one by
4  accident.
5    Q.   If you had been asked prior to today's
6  deposition to gather all that information, would you have
7  made your best efforts to do so?
8    A.   Yes, sir.
9       MR. BRODY:  Object to form.  I'm going to
10  object.  Privileged.
11       MR. ANDERSON:  A hypothetical communication is
12  privileged?
13       MR. BRODY:  I'm not talking about the
14  hypothetical.  I'm talking about the actual.
15       MR. ANDERSON:  Your emails to Mr. Kalman,
16  you're saying, are privileged?
17       MR. BRODY:  That's the position I'm taking at
18  this time.
19  BY MR. ANDERSON:
20    Q.   Have you had any correspondence with anyone
21  other than Mr. Brody and his law firm related to this
22  case?
23       MR. BRODY:  Object to form.
24    A.   Yes, internally at Nutrasource with Will Rowe,
25  the CEO, when he informed me, you know, that I would be

Page 23

1  meeting Mr. Brody.  So, in that vein, there's mention of
2  the case but not the particulars.  And then second,
3  there's a gentleman that also works at Nutrasource named
4  Kevin Yan, Y-A-N, that -- that I've emailed about asking
5  for some clarification on some items that he worked on.
6    Q.   What did Mr. Yan work on?
7    A.   Prior to me becoming involved, Mr. Yan, from
8  my understanding, organized and coordinated ring testing
9  of the products.  So he worked on coordinating with
10  analytical labs, receiving products, sending products,
11  having products analyzed and, you know, collating their
12  results.  So I had questions to him on the -- something,
13  and so I've emailed with Kevin.
14    Q.   Would you be able to track those emails down?
15    A.   Yes.
16    Q.   And if you had been asked to track those
17  emails down prior to today's deposition, would you have
18  done so?
19    A.   To my best of my ability, yes.
20    Q.   Have you had any communications with a
21  Catherine Adams Hutt?
22    A.   No.
23    Q.   Do you know who Catherine Adams Hutt is?
24    A.   I know the name not the person.
25    Q.   What's your -- who's your understanding of

Page 24

1  who -- strike that.
2       What is your understanding of who she is?
3    A.   That Catherine is a -- a PhD nutrition expert
4  from what I recall that also coordinated some independent
5  testing of the products that are the cause of this case,
6  if you will, or part of this case.
7    Q.   Have you had any correspondence with any of
8  the plaintiffs in this case?
9    A.   Meaning somebody like you?
10    Q.   No.  Have you ever spoken to or otherwise
11  communicated with Cori Ann Ginsberg?
12    A.   No.
13    Q.   Have you ever spoken to or otherwise
14  communicated with Noah Malgeri?
15       MR. BRODY:  Form objection.
16    A.   No.
17    Q.   Have you ever spoken to or otherwise
18  communicated with Kaylyn Wolf?
19       MR. BRODY:  Same objection.
20    A.   No.
21    Q.   Have you ever spoken to or otherwise
22  communicated with Bill Wilson?
23       MR. BRODY:  Same objection.
24    Q.   Have you ever spoken to or otherwise
25  communicated with Shannon Hood?

Page 25

1    A.   No.
2    Q.   Have you ever spoken to or otherwise
3  communicated with Eric Fishon?
4    A.   No.
5    Q.   Have you ever spoken to or otherwise
6  communicated with Robert McKeown?
7       MR. BRODY:  Same objection.
8    A.   No.
9       THE COURT REPORTER:  I'm sorry.  Mr. Brody, if
10  that's you objecting, I can barely hear you, and I
11  think I heard two objections.
12       MR. BRODY:  Okay.  I'll try to speak clear.
13  I'm just trying not to disturb you guys.
14       THE COURT REPORTER:  I know.  I'm sorry.  I
15  just want to make sure I get them.
16       MR. BRODY:  I apologize.
17       MR. ANDERSON:  You can object, Jay, and it
18  will never disturb me.
19       MR. BRODY:  What was that?
20       MR. ANDERSON:  You can speak up.
21       MR. BRODY:  Okay.
22  BY MR. ANDERSON:
23    Q.   Number 4 --
24       MR. BRODY:  (Inaudible) -- I will.
25    Q.   -- is "All correspondence sent by deponent to

7 (Pages 22 - 25)

Page 26

1 anyone acting on any plaintiff's behalf, including but
2 not limited to plaintiff's counsel or any other expert,
3 whether a consulting or testifying expert relating in any
4 way to any issue in this case."
5     Do you have emails that you have sent to
6 Mr. Brody's law firm or Mr. Brody?
7     MR. BRODY: Object to form.
8     A. I think that's been asked and answered.
9     Q. I asked about info that he had sent you, but
10 have you responded to emails from Mr. Brody and sent him
11 correspondence?
12     MR. BRODY: Same objection.
13     A. Yes.
14     Q. If you were asked to have gathered those
15 before today's deposition, would you have been able to?
16     A. Best efforts to do so, yes.
17     Q. And I assume you've also responded to emails
18 from Mr. Rowe and Mr. Yan?
19     A. Yes.
20     Q. Number 5 is "All records, files, and other
21 documents which deponent has reviewed with reference to
22 this case." Do you see that?
23     A. Yes.
24     Q. Do you have access to that information as we
25 sit here today?

Page 27

1     A. Yes.
2     Q. Okay. What records did you review in
3 developing your opinions today?
4     A. Records reviewed would have included prior
5 court proceedings, testing of the products that are part
6 of this lawsuit, FDA documents, published articles, and
7 peer-reviewed journals, published articles regarding the
8 intersection of law and nutrition, if you will, or law
9 and supplements. Those type, yes.
10     Q. Well, I'm not asking for the type. I'm asking
11 for the actual -- actual records. What articles did you
12 review in reference to this case?
13     A. If we can pull up my expert report, everything
14 in the bibliography is what I reviewed. And I'm happy to
15 go one by one with you just like you're doing here with
16 me.
17     Q. You reviewed everything in the bibliography?
18     A. Everything that's in my bibliography, yes.
19 Otherwise, how would -- why would you cite it if you
20 didn't -- if you didn't actually read it?
21     Q. And could you put your hands on all that
22 material?
23     A. Sure.
24     Q. If you were asked to put your hands on all
25 that material prior to today's deposition, would you have

Page 28

1 been able to do so?
2     A. Yes.
3     Q. Now you also said prior court proceedings were
4 part of the records you reviewed. What prior court
5 proceedings did you review?
6     A. That would be -- again, if my terminology is
7 wrong, I'm not a lawyer so the best I can do is the -- I
8 think it was the third amended complaint and the depo- --
9 and depositions I read.
10     Q. Okay. What depositions have you read?
11     A. With -- with respect to the individuals, I
12 don't want to get their names wrong. I think one was
13 Chapman and the other one Cynthia or something.
14     Q. Valenca?
15     A. That sounds about right.
16     Q. When did you review the deposition of
17 Mr. Chapman?
18     A. Last night.
19     Q. When did you receive the deposition of
20 Mr. Chapman?
21     A. Over the -- either yesterday or the day
22 before.
23     Q. When did you review the deposition of
24 Ms. Valenca?
25     A. Same time. Last night and this morning.

Page 29

1     Q. And when did you receive that deposition?
2     A. At the same time as Mr. Chapman's, so within
3 the past two days.
4     Q. How long did it take you to read those
5 depositions?
6     A. I honestly did not read all of it, but I gave
7 about an hour and a half of reading.
8     Q. Total for the both of them?
9     A. Yes, sir.
10     Q. Why didn't you read them all?
11     A. Got tired. It was late last night. I wanted
12 to go to sleep. So then this morning I picked up on
13 segments or sections of it that I felt were more
14 important.
15     Q. How did you determine what sections or
16 segments you thought were important and weren't?
17     A. Combination of communication with Mr. Brody
18 and looking at sections of the deposition that may have
19 mentioned aspects where my -- let me say that again,
20 please. I'm sorry. A combination of communication with
21 Mr. Brody, along with doing a compare and contrast with
22 items of interest or items of concern that I mentioned in
23 my report as compared to how those issues were mentioned
24 or answered or described by Ms. Valenca or Mr. Chapman.
25     Q. Okay. So am I correct that Mr. Brody pointed

8 (Pages 26 - 29)

Page 30

1 you to certain sections of the deposition to review?
2    A.   Yes.
3    Q.   What sections did he point you to to review?
4        MR. BRODY:  Object to the form.  Objection.
5 Go ahead.
6    A.   Good manufacturing practices section,
7 education level of Mr. Chapman, prior manufacturing
8 experience with S-Adenosyl methionine.  Those were the
9 areas that stick out to me at this moment.
10   Q.   Did he tell you why he wanted you to focus on
11 those parts of the deposition?
12       MR. BRODY:  Objection based on privilege.  Go
13 ahead.
14   A.   No.
15   Q.   Any answer?
16   A.   Yeah.
17       THE COURT REPORTER:  Again, Mr. Brody, I can
18 barely hear you.  I got "objection" then I don't
19 know what else you said.
20       MR. BRODY:  I was objecting based upon the
21 privilege in the federal rules.
22       THE WITNESS:  Mr. Anderson, can you repeat the
23 question?
24 BY MR. ANDERSON:
25   Q.   Do you know why Mr. Brody pointed you to

Page 31

1 certain sections to review?
2        MR. BRODY:  Same objection.
3    A.   I do not know specifically his motivation.  I
4 can surmise that these were areas that I mentioned and
5 that we mentioned of concern with respect to your clients
6 or the plaintiffs, if you will.
7    Q.   Who's your understanding of who the plaintiffs
8 are in this lawsuit?
9        MR. BRODY:  Object to form.
10   Q.   I'm sorry.  The defendants.  And I meant
11 the -- you know, the defendants here.  Sorry.  I meant by
12 the companies that you're representing.
13   A.   Again, going back to you asking what is the
14 motivation that, these were areas that I highlighted
15 to Mr. Brody in my early assessments and ongoing
16 assessments and in my report concerns regarding the
17 manufacturing practices of Vitamins Because and so forth.
18   Q.   Approximately when did you get involved in
19 this case?
20   A.   I'm going to give you a best guesstimate of
21 three months.
22   Q.   Three months ago from today?
23   A.   Again, it's a best guesstimate.  If you give
24 me a minute, I can actually look up -- I could look it
25 up, but --

Page 32

1    Q.   How would you find it out?
2    A.   Because on my Excel document that I use
3 internally to track my own time will give me the
4 approximate date that I started tracking time.  And that
5 would tell anybody, or at least me, that that would be
6 the approximate time that I got involved.
7    Q.   Okay.  Let's do that.  And we've marked that
8 as Exhibit 2.
9    A.   So am I supposed to share screen now?  Like
10 what -- what happens?
11   Q.   You can just tell me when.
12   A.   Oh, okay.  So hold on one second.  I need to
13 minimize my screen so I can look at this.  August.
14   Q.   August of 2021?
15   A.   Excuse me.  Yes.
16   Q.   Great.  Thank you.
17       All right.  Number 6 was all -- actually, I
18 have a question about Number 5 still.  You had mentioned
19 testing -- quote, "Testing of the products that are part
20 of this lawsuit."  You said those were part of the
21 records that you reviewed; is that correct?
22   A.   Yes.
23   Q.   Have you reviewed any testing of any of the
24 plaintiffs' product that they actually purchased?
25   A.   I have reviewed testing that was organized,

Page 33

1 for lack of a better term, by the -- by the Vitamins
2 Because and other companies of their products as well.
3 Was that your question?
4    Q.   No.
5    A.   Oh, sorry.
6    Q.   That's okay.  I'll do better.  Have you
7 reviewed any testing that was conducted of the products
8 that were purchased by the plaintiffs identified in this
9 lawsuit?
10       MR. BRODY:  Object to form.
11   A.   Well, the products which have been identified
12 by the plaintiffs in this lawsuit have -- were tested,
13 and, yes, I have looked at those tests as part of my
14 review.
15       MR. BRODY:  Counsel, are you asking about the
16 unsealed bottles that were -- the physical unsealed
17 bottles that were purchased by the individual
18 plaintiffs?  Is that what you're asking?
19       MR. ANDERSON:  I'm asking what I asked, and
20 I'll ask -- I'll ask another question.
21       MR. BRODY:  I'm not sure he understands the
22 question.
23       THE WITNESS:  Yes.  Excuse me.  I would say
24 that, you know, I cannot -- I don't know about
25 individual -- like, I don't -- I reviewed data on

9 (Pages 30 - 33)

Page 34

1 products that were -- that are part of this lawsuit
2 identified by the plaintiffs. I don't -- you know,
3 so I'm not sure if that's a trick question or not.
4 BY MR. ANDERSON:
5 Q. It's not.
6 A. Okay.
7 Q. Noah Malgeri is identified as a plaintiff in
8 this lawsuit. Have you reviewed any of -- have you
9 reviewed any of the product that Noah Malgeri purchased?
10 MR. BRODY: Object to form.
11 A. For that specific individual, I do not know
12 what they purchased or did not purchase, so I cannot
13 comment whether I reviewed their purchase habits or
14 analysis of their purchase.
15 Q. Is all of the testing that you reviewed
16 identified in your expert report?
17 A. Correct.
18 Q. We'll talk a lot about the expert report and
19 the individual testing that you reviewed as we go
20 through. I just want to make sure out of the universe of
21 stuff that we had asked you to bring today.
22 Number 6 is "All textbooks, journals,
23 articles, or similar literature which deponent has
24 consulted in connection with this matter." Is your
25 answer the same as that as it was for 5, which would be

Page 35

1 those are all listed in the bibliography?
2 A. Yes, sir.
3 Q. Would that hold true for Number 7, also?
4 A. Yes, sir.
5 Q. Number 8 is "All records, memoranda, or
6 similar writings which deponent or any member of his
7 office has made concerning this case." Do you have
8 access to those documents?
9 A. Yes.
10 Q. Have you made any notes?
11 A. Any of the documents that are part or
12 encompassed under Number 8 were also listed as part of my
13 bibliography specifically, so that's provided to you.
14 Q. Okay. Did you make any notes during your
15 review of any of the materials in this case?
16 A. You mean notes in, like, my notebook?
17 Q. Or however you keep notes, yes.
18 A. Let me see. Nothing extensive.
19 Q. Did you keep any notes?
20 A. No.
21 Q. Nothing extensive or nothing at all?
22 A. I'm actually looking through my notebook now
23 to see if I have any notes that I took. I'm happy to
24 show on screen. I do see notes, yes. And I see notes --
25 yes, I do see a couple of pages of notes. Scribble that

Page 36

1 only I would understand. But, yes, they're notes.
2 Q. Okay. We're going to attach those as Exhibit
3 Number 3 to the deposition.
4 (Thereupon, Exhibit Number 3 was marked for
5 purposes of identification.)
6 MR. BRODY: And I'm going to make the same
7 objection.
8 THE COURT REPORTER: I think we already have
9 Exhibit Number 3.
10 MR. ANDERSON: Okay. I'll make it Exhibit
11 Number 4.
12 THE COURT REPORTER: Hang on.
13 MR. ANDERSON: What's the objection to his
14 notes, Jay?
15 MR. BRODY: Again, to the extent they're
16 privileged, but we're going to reserve our right to
17 the extent they're not privileged, then we'll
18 produce them.
19 MR. ANDERSON: Can you help me understand why
20 his notes would be privileged?
21 MR. BRODY: I think Rule 26 has some rules on
22 that, so I would direct your attention to that.
23 MR. ANDERSON: Okay. Anything more specific
24 or just -- just privilege?
25 MR. BRODY: Not at this time.

Page 37

1 MR. ANDERSON: I'm going to attach those as
2 Exhibit Number 4 to the deposition.
3 MR. O'BRIEN: Scott, before you keep going --
4 Ms. Ellison, what do you have as Exhibit 3? Because
5 I have Mr. Anderson on Exhibit 3 right now.
6 THE COURT REPORTER: Okay. Let me check.
7 MR. O'BRIEN: Sorry, Scott. I just want to
8 make sure we have the exhibits right.
9 THE COURT REPORTER: I was trying to make sure
10 as well. You're correct. Let me just keep a
11 running tab. Sorry. It's hard when I'm not doing
12 them. Go ahead.
13 MR. ANDERSON: No, it's okay. It's tough in
14 Zoom.
15 MR. O'BRIEN: And, Ms. Ellison, so you know,
16 I'll be keeping a running tab too, so if you need to
17 cross-check, I have it.
18 THE COURT REPORTER: Perfect. Thank you.
19 MR. ANDERSON: Thanks, Sean.
20 All right. So we're going to mark those notes
21 as Exhibit Number 3 to the deposition.
22 BY MR. ANDERSON:
23 Q. Please make sure to get those to Mr. Brody and
24 the court reporter so we can attach them.
25 We asked you to bring a current CV. Did you

10 (Pages 34 - 37)

Page 38

1 bring one with you?
2     A.   Yes.  I believe it's been provided to you, and
3 I have one on my laptop.  Yes.
4     Q.   Okay.  Is the CV that was provided as Appendix
5 80 of your report current and up to date?
6     A.   The only reason I am hesitating at the answer
7 for that is I may have had one more peer-reviewed
8 publication come out in between the time that that CV was
9 provided to Mr. Brody and today's deposition.  But it is,
10 you know, 99.99 percent up to date, maybe missing one
11 publication.
12     Q.   Okay.  If it's missing a publication, what
13 publication is it missing?
14     A.   If it is missing a publication, there was
15 recently a study that we published regarding creatine.
16 And so that one, I just don't remember at the moment if
17 it came out before or after I sent this over.
18     Q.   You're currently employed by Nutrasource; is
19 that correct?
20     A.   Yes, sir.
21     Q.   How long have you been employed with
22 Nutrasource?
23     A.   I think it's about three years, maybe three
24 and a half.
25     Q.   What do you do there at Nutrasource?  What are

Page 39

1 your roles and responsibilities?
2     A.   My title is vice president of scientific
3 affairs.
4     Q.   Okay.  And as the vice president of scientific
5 affairs, what do you do on a daily basis?
6     A.   I do a number of different things on a daily
7 basis.  And some of this encompasses working with sponsor
8 companies, also known as clients, and putting together
9 research study designs and then working with our group to
10 price out what that study would be, and then engaging the
11 sponsor to -- for engagement and execution of such.  I
12 also work to analyze data, statistical data, and do
13 interpretive reports from that data.  I also write
14 scientific -- or cowrite -- coauthor scientific papers
15 based upon the studies that we do or reviews of topics
16 within the nutrition area.  I also work with our
17 regulatory group for U.S. regulatory and Canadian
18 regulatory and a little bit EFSA regulatory, European
19 regulatory, as related to foods, beverages, dietary
20 supplements, natural health products, botanical drugs,
21 and over-the-counter pharmaceutical drugs, as well as
22 prescription drugs.  Those areas of science and
23 regulatory keep me busy.
24     Q.   Have you ever been employed by the FDA?
25     A.   No.

Page 40

1     Q.   Are you a chemist?
2     A.   No.
3     Q.   Are you a statistician?
4     A.   No.
5     Q.   Are you an epidemiologist?
6     A.   No.
7     Q.   Are you a physician?
8     A.   No.
9     Q.   Are you a biologist?
10     A.   No.
11     Q.   What did you do prior to working for
12 Nutrasource?
13     A.   I was working for a company known as QPS.
14     Q.   What did you do at QPS?
15     A.   Pretty much the same job as I do here except
16 QPS does a lot -- the difference with QPS as compared to
17 Nutrasource is QPS's main emphasis is on pharmaceutical
18 drug development and research.  So I headed up or led the
19 nutrition and the endocrinology group where we would do
20 nutrition studies.  But, also, part of my responsibility
21 were phase one through three pharma development and
22 studies.
23         MR. ANDERSON:  All right.  Can you stop share
24     screen for just a moment, Ms. Ellison?  Or can I?
25     Do I do that?  Sorry.

Page 41

1         THE COURT REPORTER:  Yeah.  You have to stop
2     sharing.
3         MR. ANDERSON:  Sorry.
4 BY MR. ANDERSON:
5     Q.   All right.  Now as part of your work on this
6 case, you submitted what's called a declaration of
7 Douglas S. Kalman.  Do you see that?  Or are you aware of
8 that?
9     A.   You're not sharing screen, so I don't see it,
10 but I'm aware of it.
11     Q.   Okay.  Do you have access to that?
12     A.   Yes.
13     Q.   With you there today?
14     A.   I should.  Yes, on my computer.
15     Q.   I'm going to share screen in a moment here.
16 All right.  I'm going to mark as Exhibit Number 4 the
17 declaration of Douglas S. Kalman, and I'm going to share
18 my screen here.  I think.  Maybe not.
19         (Thereupon, Exhibit Number 4 was marked for
20     purposes of identification.)
21 BY MR. ANDERSON:
22     Q.   All right.  Can you see that, Mr. Kalman?
23     A.   Yes.
24     Q.   This is going to be Exhibit Number 4 to the
25 deposition.  And I'll scroll all the way through it, if

11 (Pages 38 - 41)

Page 42

1 you want me to, but does this appear to be -- is this the
2 declaration that you submitted in this case?
3    A.   I would say it looks like it, yes, from what I
4 see you scrolling through.
5    Q.   Okay.  Do you want me to scroll all the way?
6    A.   Yes.
7    Q.   Okay.  All right.  Is that the report there?
8    A.   Yes, sir.
9    Q.   All right.  Did you draft that report?
10   A.   Yes.
11   Q.   From start to finish?
12   A.   Yes.
13   Q.   We're going to go through the report, and
14 we're not going to discuss every single paragraph, but
15 we're going to go through a lot of it.  All right.  So
16 paragraph one describes that you were retained to, quote,
17 "Provide an expert report and testimony regarding the
18 deficiency of same contained in the subject product
19 dietary supplements manufactured by Defendants Vitamins
20 Because, LLC, and CT Health Solutions, LLC, and their
21 defective nature."  Is that correct?
22   A.   Yes, sir.
23   Q.   You'd agree by the time you had been retained
24 in August of 2021, someone had already told you that the
25 product was deficient and defective; is that correct?

Page 43

1        MR. BRODY:  Object to form.
2    A.   No, that's incorrect.
3    Q.   What's incorrect about it?
4    A.   I believe what you actually said was that by
5 the time or approximately around August of 2021 that
6 somebody told me that the defendant's products were
7 deficient and defective.
8    Q.   Right.  I did.
9    A.   Right.  So the way I interpret that is
10 analogues to me telling you the sun is out today where my
11 response is they believed that -- I was told that they
12 believed that the products were defective and deficient
13 or deficient and defective.  I'm making a kind of line in
14 the sand of somebody telling me with a hundred percent
15 certainty versus me saying:  Okay.  You believe it; let
16 me verify it.
17   Q.   Do you agree that the report says you were
18 retained to, quote, "To provide an expert report and
19 testimony regarding the deficiency of SAM-e" --
20   A.   Yes.
21   Q.   -- "contained in the subject product"; right?
22   A.   Yes.  And I agree with that statement.  They
23 are deficient and defective.
24   Q.   Okay.  All right.  In paragraph two, it says,
25 "Counselor's requested that I prepare this report to

Page 44

1 explain the deficiency and defective nature of the
2 subject product SAM-e supplements, the testing process
3 used to determine that all SAM-e capsules manufactured by
4 defendants Vitamins Because and CT Health were deficient
5 and thus uniformly mislabeled.  The common deficiencies
6 which were found and the effective worth of the subject
7 SAM-e to reasonable consumers in the U.S."  Is that
8 correct?
9    A.   Yes, sir.
10   Q.   All right.  I'd like to start focusing on the
11 testing process.  Okay?  Am I correct that you've seen
12 the results of approximately 22 to 30 tests on SAM-e?
13   A.   Correct.
14   Q.   How much SAM-e did Vitamins Because
15 manufacture?
16        MR. BRODY:  Object to form.
17   A.   In metric tons or in pounds?  I'm not sure of
18 your question, and that's beyond my scope.
19   Q.   So is your answer you don't know?
20   A.   No, I do not know what -- how much of a
21 product they manufactured.  No.
22   Q.   Do you know how many bottles of SAM-e Vitamins
23 Because manufactured?
24        MR. BRODY:  Object to form.
25   A.   No.

Page 45

1    Q.   Do you know what percentage of the bottles
2 that you tested of the total amount that Vitamins Because
3 has manufactured -- strike that.
4        Do you know what percentage of the bottles
5 that Vitamins Because manufactured you tested or saw test
6 results for?
7    A.   No, I do not.
8    Q.   Do you know if it was more or less than
9 1 percent?
10   A.   I do not know.  I do not wish to guess.
11   Q.   Are you an economist?
12   A.   No, just frugal.
13   Q.   That's a good answer.
14   A.   Sorry.
15   Q.   Now, describe the testing process that was
16 undertaken as it relates to the 22 to 30 bottles of SAM-e
17 you've seen the testing results for.
18        MR. BRODY:  Objection.  Vague.  Objection.
19   A.   I'll give you a -- or share a description of
20 the testing -- the typical testing processes that are
21 used.
22   Q.   Well, hold on.  I -- maybe I asked the wrong
23 question.  You wrote here that you were retained to
24 explain the testing process used to determine that all
25 SAM-e capsules manufactured were deficient and uniformly

1 mislabeled; right?

2　A.　Correct.

3　Q.　I want you to describe the testing process

4 used.

5　　　MR. BRODY:　Same objection.

6　A.　The testing process that was used is called

7 analytical testing where an analytical laboratory such as

8 Lab Mark, Eurofins, as examples, run an analytical

9 process to determine what you're asking them to determine

10 or to look for.

11　　So, in general -- I say specific because

12 there's actually specific protocols used for different

13 types of testing, but the testing process is the

14 analytical laboratory analyzing the S-Adenosyl methionine

15 products for actual content versus label content.

16　Q.　Okay.　So if I can boil that down, what I hear

17 you saying is the testing process was that SAM-e was sent

18 to a laboratory and they did analytical testing on it; is

19 that correct?

20　A.　A little bit deeper than that.　And why I say

21 deeper is that three bottles from the same lot of product

22 were sent to three different laboratories meaning that

23 bottle A, B, and C went to three different laboratories

24 but they all came from the same lot that was manufactured

25 by the defendants.

1　Q.　Okay.

2　A.　That part of that process was -- in

3 biochemistry or bioanalytical labs, when you test

4 something you -- typically you test it in triplicate

5 so -- because sometimes -- just like when you may get on

6 your scale in the morning, you step on once, you say,

7 "Oh, I don't believe you.　I'm lighter than that."　And

8 then you step up on the scale again.　In chemistry you

9 test everything three times in order to make sure that

10 you have an accurate assessment.　And, also, in doing

11 in-depth process testing you send the same product from

12 the same lot number to two different or three different

13 laboratories to see if those separate laboratories get or

14 obtain the same or similar results.　So testing process

15 that was done was, you know, typical procedures for

16 analyzing product and verifying that the analysis is real

17 or correct.

18　Q.　Okay.　So the testing process that you're

19 writing about here is taking a certain number between 22

20 and 30 bottles of SAM-e and sending them to a laboratory

21 or laboratories for analytical testing?

22　　　MR. BRODY:　Object to form.

23　A.　Yes.

24　Q.　And then you said there's specific protocols

25 for the testings; correct?

1　A.　Yes.

2　Q.　What are those specific protocols?

3　A.　The specific protocols that are used are

4 laboratory specific and noted on their certificate of

5 analysis sheets.　And what I mean by that is whether the

6 laboratory used a procedure known as high performance

7 liquid chromatography or whether they used mass spec- --

8 mass spectroscopy.　So those are the part of the

9 protocols of how you're going to analyze something.　You

10 know you're going to analyze it and that you have process

11 and then how it's going to be executed and how that

12 compares to label claim and all of those other things as

13 previously mentioned.

14　Q.　Were you involved in any aspect of the testing

15 of the 22 to 30 bottles of SAM-e?

16　　　MR. BRODY:　Object to form.

17　A.　No.　Reviewing the results thereof, but

18 nothing more than that.

19　Q.　So I'm correct that the extent of your

20 involvement of the testing of the 22 to 30 bottles of

21 SAM-e is reading the test results; correct?

22　A.　That's a pretty good summary.

23　Q.　Have you seen photographs of any of the

24 testing process?　And by photos of the testing process, I

25 mean photos from the laboratories as they're conducting

1 the testing.

2　A.　No, not photos of the laboratory doing their

3 work.

4　Q.　Have you spoken with any of the scientists

5 that performed the testing of the 22 to 30 bottles of

6 SAM-e?

7　　　MR. BRODY:　Object to form.

8　A.　No.

9　Q.　To move on.　Was the testing process used to

10 determine that all SAM-e capsules manufactured by

11 Defendant Vitamins Because and CT Health were deficient

12 and uniformly mislabeled?　And I just want to make sure I

13 have this -- this down.　Based on the results of the

14 testing of the 22 to 30 bottles that you read the results

15 of, it's your opinion that all SAM-e manufactured by

16 Vitamins Because is defective; correct?

17　A.　It is my opinion that all of the SAM-e

18 capsules as manufactured by the defendants were

19 defective.

20　Q.　Okay.　You answered a different question than

21 I asked.

22　A.　Oh, really?　I'm sorry.　Please ask it again

23 then.

24　Q.　I will.　It's your opinion based on the

25 results of the 20 -- the testing of 22 to the 30 --

Page 50

1 strike that.
2      It's your opinion based on the results of the
3 testing of 22 to 30 bottles of SAM-e that all of
4 Defendant Vitamins Because's SAM-e manufactured is
5 defective; correct?
6   A.   Yes.
7   Q.   I'm also correct that you don't have any idea
8 how much SAM-e Vitamins Because actually manufactured;
9 correct?
10   A.   That is correct.  I do not know how much or
11 how little has been manufactured by your client.
12   Q.   Your report in paragraph two goes on to say,
13 "The effective worth of the subject SAM-e to reasonable
14 consumers in the U.S."  Do you see that?
15   A.   Yes.
16   Q.   Okay.  You would agree you're not an
17 economist; right?
18      MR. BRODY:  Object to form.
19   A.   I'm not an economist.
20   Q.   Have you spoken to any consumers of SAM-e as
21 it relates to this lawsuit?
22      MR. BRODY:  Object to form.
23   A.   No.
24   Q.   Have you spoken to any consumers as it relates
25 to the amount of SAM-e present in any of the products

Page 51

1 manufactured by Vitamins Because?
2      MR. BRODY:  Object to form.
3   A.   No.
4   Q.   Have you ever used SAM-e?
5   A.   Yes.
6   Q.   How long ago?
7   A.   Give me a second, please.  I had surgery last
8 February.  I probably -- July or August was my last --
9   Q.   Of 2021?
10   A.   Yes.  Was my last, quote, dosing of it.
11   Q.   What product did you use?
12   A.   I actually have it in my kitchen if you want
13 the exact name; otherwise, I don't remember the exact
14 name.  But I can -- I'm happy to -- to -- to share.
15   Q.   Okay.  And what were you hoping to -- what
16 benefit were you hoping to derive from your use of SAM-e?
17   A.   Hoping that it would assist with my recovery
18 from surgery.
19   Q.   Did it?
20   A.   I have no idea.
21   Q.   Why do you --
22   A.   But I recovered.  I don't have anything to
23 compare it with.  I can't compare surgery on my left arm
24 versus no surgery on my right arm to see how well my
25 biceps tendon feels reattached to my forearm, so...

Page 52

1   Q.   Despite using it, you don't know whether it
2 was effective or not?
3   A.   All I know is that I felt okay through three,
4 four months of physical therapy, and I felt better taking
5 the product than I did not taking it.  I believe the
6 brand is -- or was -- if they're still in existence --
7 called Doctor's Best.
8   Q.   Doctor's Best?
9   A.   I believe that's the brand I bought.
10   Q.   Okay.  All right.  We're going to continue on
11 through this report.  It says you've read the third
12 amended complaint and numerous documents produced in this
13 litigation.  Do you see that?
14   A.   Yes.
15   Q.   Okay.  When you say numerous documents, what
16 are you referring to?
17   A.   I'm referring to the analysis or variety of
18 analyses that were done on the tested products.  I'm
19 referring to the complaint itself, the depositions, and
20 so -- and the related items.
21   Q.   Did you identify all of the documents you
22 relied upon and reviewed in the bibliography of your
23 report?
24   A.   Yes, sir.
25   Q.   It goes on to say in preparing this report, I

Page 53

1 have relied on plaintiffs' expert disclosures and the
2 records listed in Appendix B.  Do you see that?
3   A.   Not at the moment, but I trust you it says it
4 there.  Oh, now I found it.  Yes.
5   Q.   When you say you relied on plaintiffs' expert
6 disclosures, what are you referring to?
7   A.   I'm referring to the information that's been
8 shared with me.
9   Q.   By who?
10   A.   Mr. Jay Brody.
11   Q.   Then when you say plaintiffs' expert
12 disclosures, what specific expert disclosures did you
13 review and rely on?
14   A.   Those that are -- the written report by
15 Catherine Hutt -- and if I'm forgetting her last name,
16 please excuse me; the ring report as produced by Kevin
17 Yan are just some of the examples.
18   Q.   Moving through the report.  Number three says,
19 "I am a registered and state-licensed
20 dietician/nutritionist in the state of Florida."  Do you
21 see that?
22   A.   No, I don't see it.  You didn't scroll up, but
23 yes, that is true.
24   Q.   I thought you also had a report in front of
25 you.  I'm sorry.

14 (Pages 50 - 53)

Page 54

1     A.   I don't have another document opened. I'm
2  trying to stay focused and not be, you know, on what's
3  here. But, yes, thank you. I'm sorry.
4     Q.   Do you hold any other state licenses?
5     A.   No.
6     Q.   And you're a registered and certified
7  dietician/nutritionist in the state of New York also; is
8  that correct?
9     A.   Correct.
10    Q.   Do you hold any other certifications in the
11  state of New York?
12    A.   Phlebotomy.
13    Q.   Anything else?
14    A.   No.
15    Q.   Do you hold any licenses or certifications in
16  any state other than Florida or New York?
17    A.   No.
18    Q.   The next sentence says you're a doctorate
19  level researcher and educator?
20    A.   Yes.
21    Q.   And I see on your CV somewhere that you have a
22  PhD; is that correct?
23    A.   Yes, I do have a PhD.
24    Q.   And is that -- that's in philosophy; right?
25    A.   All PhDs are doctors of philosophy. It's not

Page 55

1  in philosophy. It's actually in nutritional and exercise
2  biochemistry.
3     Q.   Right. Doctor of philosophy in nutrition;
4  correct?
5     A.   It's actually in research and education, but
6  the topic of my dissertation was nutritional and exercise
7  biochemistry. Again, a doctor of philosophy is what all
8  PhDs stand for.
9     Q.   Right.
10    A.   You have a EDD or a doctor of education.
11  It -- so...
12    Q.   Right. I got ya.
13    A.   Yeah. All right. But it doesn't sound like
14  such.
15    Q.   Number 4 says, "I have obtained a doctor of
16  philosophy from Touro University International, a
17  master's degree in nutrition from Hunter College
18  University of New York, and a bachelor's degree in food
19  and nutrition from Florida State University; right?
20    A.   Yes.
21    Q.   Did I read that right from your report?
22    A.   Very good.
23    Q.   Thank you. When did you receive your PhDs?
24    A.   2007.
25    Q.   And I believe you said your dissertation was

Page 56

1  on nutrition?
2     A.   Yes. It was -- if you -- it's in the area of
3  nutritional and exercise biochemistry was my
4  dissertation, yes.
5     Q.   And what was the name of your dissertation?
6     A.   Give me one second. I actually have the
7  textbook here. Okay. All right. The name of my
8  dissertation was The Effects of Feeding Protein as
9  Compared to Carbohydrate or the two Combined on Athletic
10  Performance, Perceived Exertion and Biochemical Markers
11  of Anabolism and Catabolism in Trained Athletes Under
12  Glycogen Depleted Conditions.
13    Q.   Great. What was that published in?
14    A.   It was published in a journal that's called
15  FASEB, F-A-S-E-B, better known as Experimental Biology.
16  This is published -- I'm reading -- I don't know. My
17  picture's up from a textbook that I published, or that is
18  published. When you do a PhD, you have to publish with
19  ProQuest. So I was just reading from the actual title.
20    Q.   Perfect. Thank you. Moving on through the
21  report. And I'll --
22    A.   All right. Sorry. I was just trying to put
23  it away.
24         MR. BRODY:   Counsel, we've been going for over
25  an hour. Can we take a ten-minute break?

Page 57

1         MR. ANDERSON:   Sure.
2         (Recess.)
3  BY MR. ANDERSON:
4     Q.   All right. Doctor, we are in paragraph nine
5  of your report.
6     A.   Okay.
7     Q.   And it's a list of ten cases. And I'll scroll
8  so you can see -- or other legal proceedings that you've
9  been involved with in the last seven years.
10    A.   Yes.
11    Q.   Okay. Number 1 says, "Expert witness for
12  Round Table Group." What does that mean?
13    A.   Well, the Round Table Group used to be known
14  as Thomson Reuters Expert Witness Service, and I serve as
15  a expert witness on their service so far when law firms,
16  for example, that you work for are seeking legal or
17  experts in certain areas, they often engage Round Table
18  Group to connect them with the experts. So I've been
19  working with Round Table Group serving as an expert
20  through them for various court cases since 2015 or legal
21  proceedings.
22    Q.   Okay. Have -- has your involvement with the
23  Round Table Group resulted in you being retained in cases
24  that are not otherwise listed here?
25    A.   If I rephrase your question -- if I understand

15 (Pages 54 - 57)

Page 58

1  you, correct me -- if I understand you correctly --
2  sorry -- you're basically asking are -- for the groups
3  that Round Table -- for the law firms or court cases that
4  Round Table Group, are those listed here and is there any
5  outside this list?  And, no, this list includes those
6  that have been through RTG or Round Table Group.
7      Q.   Okay, great.  Number 2 is Frank Capaci and
8  Cynthia Ford v. Sports Research, Inc.  Do you see that?
9      A.   Yes.  And that was the California court case
10  that I was mentioning earlier that I thought was
11  approximately -- what? -- two, three years ago.  That's
12  when it started, and it resolved in 2020.
13     Q.   Okay.  And in that case, you represented the
14  defendants Sports Research, Inc.; is that correct?
15     A.   Yes.
16     Q.   And I think I asked you, but I can't find my
17  note.  What was that about?  Was it about a -- you said
18  it was substantiation work.  What was the product?
19     A.   I believe -- I -- I cannot say with a hundred
20  percent certainty what the exact product was.  I'd rather
21  not guess.
22     Q.   Sure.  Number 3 is Aldridge v. 310 Nutrition
23  in Superior Court for New Jersey.  What was that case
24  about?
25     A.   That case was about an alleged side effect or

Page 59

1  an alleged adverse event experienced by Ms. Aldridge.  So
2  that was regarding the -- in part, regarding the safety
3  of the product.
4      Q.   What side of the fence were you on in that
5  case, Dr. Kalman?
6      A.   I worked -- the law firm I worked with, Cole
7  Schotz, they represented 310 Nutrition.
8      Q.   What was the result of that case?
9      A.   It was dropped by Aldridge because it was
10  discovered that she actually never purchased the product
11  that she alleged in the lawsuit caused her harm.
12     Q.   Number 4 is intellectual property patent
13  infringement case.
14     A.   Can you scroll?
15     Q.   Yes.  Sorry.
16     A.   It's okay.  It's a lot to multitask.
17     Q.   Especially for me.  I'm not the brightest bulb
18  on the tree.
19     A.   Don't let your clients hear you say that.
20     Q.   Number 4 is intellectual property patent
21  infringement case.  What was that about?
22     A.   Exactly what it says.  Whether a patent was
23  infringed upon based upon the marketing and advertising
24  of one product.
25     Q.   What was the product?

Page 60

1      A.   I'm not at liberty to say.
2      Q.   Was it a nutritional supplement?
3      A.   It is what is -- it is a nutritional product
4  that is available by prescription, so typically those are
5  called medical foods.
6      Q.   What was your role?
7      A.   My role was in helping to discern whether,
8  again, the claims being made by one company were
9  overstepping the patents on the -- of the other company.
10     Q.   Have you ever been -- has your testimony ever
11  been challenged in any of the cases you've testified in?
12     A.   You mean like a Daubert challenge?
13     Q.   Yes.
14     A.   If I'm saying that right.
15     Q.   Yes, sir.
16     A.   Not to my recollection.
17     Q.   I'm just trying to figure out what you were
18  testifying about in Number 4 here, if it was the amount
19  of product present, whether it was -- whether the product
20  worked or how it was being marketed or --
21     A.   It was very specific.  There is a product that
22  has patents on it and intellectual property regarding its
23  ability to have -- to help certain types of
24  antidepressants work better.  And so it was specifically
25  regarding, you know, that.

Page 61

1      Q.   Number 5 is: "Substantiation lawsuit.  Worked
2  with the firm of Jackson Walker, LLP, of Dallas."  What
3  was that about?
4      A.   I'm not at liberty to say.
5      Q.   Was it about a product?
6      A.   Yes.
7      Q.   What was your role?
8      A.   My role was to work with -- or my role was to
9  help illustrate through peer-reviewed literature
10  substantiation of claims regarding a product.
11     Q.   Were you on the plaintiff's side or
12  defendant's side?
13     A.   Defendant.
14     Q.   Was this a lawsuit that was actually filed in
15  court somewhere?
16     A.   Yes.
17     Q.   Was it filed in Dallas, Texas?
18     A.   I believe it was Texas.  I cannot tell you
19  Dallas.  All I know is that whatever I agreed to, I'm
20  very limited about what I can say.
21     Q.   Did you have to submit an expert report in
22  that case?
23     A.   Yes, I did.
24     Q.   Number 6 is "A multi-action case including
25  substantiation.  Worked with the same law firm there in

16 (Pages 58 - 61)

Page 62

1 Dallas." What was that about?
2    A.   That was -- that was a lawsuit that involved a
3 dietary supplement company, a television company, a
4 production company, and things of that nature.
5    Q.   What was your role?
6    A.   My role was helping to discern through science
7 and published peer-reviewed literature what -- what
8 claims could be substantiated and what was not
9 substantiated.
10    Q.   Did you have to serve an expert report in that
11 case?
12    A.   Yes.
13    Q.   Number 7 is FTC v. XXXXX, Inc. What was that
14 about?
15    A.   That was a -- the federal trade commission,
16 which I'm sure you know, governs advertising and
17 marketing as part of their regulatory oversight in this
18 country. Had a -- started a civil inquiry -- a CID,
19 civil inquiry demand, with a food company, and I was
20 retained by the law firm that works with that food
21 company to help with substantiation for FTC questions
22 regarding marketing.
23    Q.   When you use the word "substantiation," can
24 you tell me what you mean?
25    A.   Substantiation is -- what I'm meaning by

Page 63

1 substantiation is having the proof and reliance that the
2 claims or statements you're going to -- that you're going
3 to make or are being made are vetted in well-grounded
4 science and regulatory.
5    Q.   Number 8 is Nestle Health Science-Pamlab,
6 Inc., and Breckenridge Pharmaceutical v. Virtus
7 Pharmaceuticals. What was your role in there?
8    A.   My role was as an expert witness as related to
9 the science of -- the science of the ingredient that was
10 made by Virtus Pharmaceuticals.
11    Q.   All right. Were you on the plaintiff side or
12 the defendant side?
13    A.   Defendant.
14         And this was also -- I'm sorry -- not only --
15 this also included intellectual property assessment.
16    Q.   Did you give an expert report?
17    A.   Yes.
18    Q.   Did you testify at trial?
19    A.   Deposition.
20    Q.   Have you ever testified at trial?
21    A.   Yes.
22    Q.   In which of these cases did you testify at
23 trial?
24    A.   None that are listed here. Older ones.
25    Q.   Was everything -- everything else has only

Page 64

1 been depositions?
2    A.   Like for the Nestle Health Science, that was,
3 you know, a deposition. Federal Trade Commission, you
4 can call it testifying, but it's not really a -- I don't
5 know if you consider that -- they did not go to trial.
6 They resolved before the FDC took them to case -- took
7 them to the Department of Justice.
8    Q.   Okay. Now, you said you've testified at trial
9 but in none of these cases. Does that mean that those
10 cases were more than seven years ago?
11    A.   Correct.
12    Q.   Okay. How many times --
13    A.   Everything -- everything else has pretty much
14 been settled before they ever actually get to -- to the
15 actual court case. Depositions, yes, but never actually
16 get to -- in front of a judge. Most of these have been
17 settled.
18    Q.   Sure. How many times have you testified at
19 trial?
20    A.   I believe three.
21    Q.   And they were all more than seven years ago;
22 is that right?
23    A.   Correct.
24    Q.   Number 9 is Joey Herron and Sherry Herron v.
25 Paul Suture -- Gregory Paul Suture. What was that about?

Page 65

1    A.   That was an unfortunate incident for a issue
2 that Mr. Herron -- the word "received" is wrong.
3 Mr. Herron received an injury as a result of the
4 practices and policies and procedures of the NonStop
5 Fitness and the gym that was associated with that. It
6 was -- yeah, that, you know, was that case.
7    Q.   Okay. What was your role?
8    A.   My role was to act as an expert as with
9 relation to the nutritional aspects of the case because
10 it was an allegation that there was a supplement that was
11 taken and that was part of the reason why the gentleman
12 had an injury occur. I was actually -- I actually served
13 as an expert for the plaintiffs not for the defendants --
14 for the plaintiff on this case.
15    Q.   Great. And, now, Number 10 is ERSP v. Direct
16 Digital. What was that about?
17    A.   That is -- if you're familiar with the Better
18 Business Bureau, they operate the national advertising
19 division, and they also operate the electronic retailers
20 sellers program, which is self-regulation, if you will,
21 in the industry. So this was -- I was -- this was a --
22 exactly what the hyperlink says. This was a
23 substantiation claims-related case. And I worked with --
24 I worked with the law firm Venable out of Washington,
25 D.C., for that.

17 (Pages 62 - 65)

1    Q.   And I'm sorry.  I didn't mean to interrupt
2 you.  Who at Venable did you work with?
3    A.   Todd Harrison.
4    Q.   All right.  We're going to move on through
5 here.  We've basically talked about that.  Talked about
6 that.  Regulatory background.  Do you have any legal
7 training, sir?
8    A.   Would that -- would -- I'm not exactly sure
9 how to answer your question.
10    Q.   Okay.  I'll ask a different one.  Are you a
11 lawyer?
12    A.   No.
13    Q.   Have you ever worked with the FDA?
14    A.   Yes.
15    Q.   I thought you had said you'd never worked at
16 the FDA.
17    A.   You asked two different things.  You just
18 asked "Have you ever worked with the FDA?"
19    Q.   Oh, gotcha.  Sorry about that.  Have you ever
20 worked at the FDA?
21    A.   No.
22    Q.   Now, I want to ask you a little bit about your
23 knowledge of the 483 process; okay?  Now, you'd agree
24 that receiving a 483 form is a reflection of the
25 inspector's findings following an inspection of a

1 facility; correct?
2    A.   I'm sorry.  Can you restate that?
3    Q.   Sure.  The 483 form is intended to reflect
4 the --
5    A.   I'm going --
6    Q.   Go ahead.
7    A.   I'm sorry.  I was just going to interrupt and
8 say I'm shutting off my microphone for a second because I
9 hear the dog barking at the FedEx guy or whoever is here.
10 I'm sorry about that.
11    Q.   Just let me know when he's done.  It's no
12 problem.  We all have that.  My dog does it all the time.
13    A.   Sounds like he's done.
14    Q.   Okay.  Which -- sorry.  You'd agree that the
15 4 -- 483 form is intended to reflect an inspector's
16 findings following an inspection of the manufacturing
17 facility; correct?
18       MR. BRODY:  Object to form.
19    A.   Yes.
20    Q.   A 483 form is not a warning letter; correct?
21       MR. BRODY:  Object to form.
22    A.   That's incorrect.
23    Q.   What's --
24    A.   A 4 -- a 483 can be considered a warning
25 letter.  It depends upon the contents of the 483 that you

1 receive.
2    Q.   Okay.  A 483 form is different than an FDA
3 warning letter; correct?
4       MR. BRODY:  Object to form.
5    A.   Correct.
6    Q.   A warning letter reflects findings of an
7 inspector following an inspection; correct?
8    A.   Correct.
9    Q.   An FDA warning letter is a form that is sent
10 by someone higher up than the inspector taking -- making
11 a formal agency determination that something is not
12 correct at the facility; correct?
13       MR. BRODY:  Object to form.
14    A.   I cannot answer that.
15    Q.   Why not?
16    A.   Because you just said it's -- that a warning
17 letter is sent by somebody higher up than the person
18 doing the inspection.  I don't know that factually.  I
19 don't know the organizational chart of the FDA.  I do
20 know some organizational chart of the FDA.  That level of
21 detail, I do know not.
22    Q.   You know that a 483 form is not a formal
23 agency determination; correct?
24       MR. BRODY:  Object to form.
25    A.   I would state that the 483 form is a FDA

1 letter or warning letter about their findings or concerns
2 of their inspection or as a result of their inspection.
3 They do give you the opportunity -- they, being the FDA,
4 you being the company that receives it, to respond to the
5 issues that they raise, and you have a certain amount of
6 days that you have to respond and supply what your action
7 plan will be.  The 483 is most certainly considered by
8 the industry to be a -- to be used and -- as guidance and
9 warning by the FDA.
10    Q.   Oh, you'd agree that a 483 letter is not a
11 formal agency determination of anything; correct?
12       MR. BRODY:  Object to form.
13    A.   No, I will not agree with that.
14    Q.   What do you disagree with about that
15 statement?
16    A.   That after the FDA gives the company or the
17 individual receiving the 483 opportunity to respond, the
18 FDA finalizes their findings on such.  And that's
19 typically an FDA correspondence when a company's cited
20 with a 483, they're given usually 15 days or 10 days to
21 respond, and then the FDA usually within that period
22 responds about their assessment of the response.
23    Q.   You'd agree that a company is not required to
24 respond to a 483 letter; correct?
25       MR. BRODY:  Object to form.

18 (Pages 66 - 69)

Page 70

1    A.   It is my understanding that there is no legal
2  compelling -- nothing to compel a person to have to
3  respond.  However, it does not necessarily look good if
4  you don't respond to the regulatory agency.
5    Q.   You would agree that a form 483 does not
6  sanction a manufacturing facility in any way; correct?
7        MR. BRODY:  Object to form.
8    A.   A 483 letter gives -- is not a sanctioning
9  letter.  It is a letter that cites the issues that the
10  FDA has with the individual or company receiving it.
11    Q.   Well, let's try to be more specific.  What the
12  483 letter is -- it explains what the inspector's
13  findings are; correct?  Not the FDAs.
14        MR. BRODY:  Object to form.
15    A.   The inspector works for the FDA, so it's one
16  and the same.
17    Q.   Is it your testimony -- your expert testimony
18  sitting here today that a 483 letter is a formal agency
19  determination of an issue?
20        MR. BRODY:  Object to form.
21    A.   A 483 letter is an indication of an issue that
22  the FDA has with the company or respondent to such.
23    Q.   It looked like you were looking at something
24  when you were answering that question.  Were you looking
25  at something?

Page 71

1    A.   Yes.  I was looking down at my -- I was
2  looking down.  Not at anything -- I could show you what I
3  was looking at, but I wasn't looking at anything to do
4  with this.
5    Q.   And as we're talking here and doing the
6  deposition, I'd ask that you do your best to just answer
7  from memory and knowledge.  If you don't know the answer,
8  just say you don't know.  I don't want you looking up
9  anything or anything; okay?  And I'm not saying you were.
10  I'm just --
11    A.   No, not a problem.
12    Q.   Okay.
13    A.   I was looking at a piece of bagel that I was
14  going to try to sneak a bite of.
15    Q.   Oh, go for it.
16    A.   So, I'm sorry.
17    Q.   We'll take a second.  Go for it.
18    A.   No, we're good.  Let's -- nope, nope.  I don't
19  want you guys to get hungry and jealous.
20    Q.   All right.  Now, a 483 -- a form 483 letter is
21  a summary of the inspector's findings following an
22  inspection; correct?
23    A.   Yes.
24    Q.   Following that, the manufacturing facility or
25  representative of the manufacturing facility has the

Page 72

1  opportunity to respond to the 483 letter; correct?
2        MR. BRODY:  I'm going to object.
3    A.   Correct.
4    Q.   Following the manufacturer's response to the
5  483 letter, the FDA has a number of options available to
6  it; correct?
7        MR. BRODY:  Object to form.
8    A.   Yes.
9    Q.   One of those options is to do nothing;
10  correct?
11        MR. BRODY:  Object to form.
12    A.   Yes.
13    Q.   One of those options is to issue a formal
14  warning letter; correct?
15        MR. BRODY:  Object to form.
16    A.   Yes.
17        MR. ANDERSON:  What's the objection to form
18  there, Jay?
19        MR. BRODY:  As I previously explained.
20        MR. ANDERSON:  Say that again.
21        MR. BRODY:  It was as I previously explained.
22        MR. ANDERSON:  Well, what did you previously
23  explain?  I didn't get it, I guess.
24        MR. BRODY:  Again, it's the form of the
25  leading kind of question.

Page 73

1        MR. ANDERSON:  Are you saying I can't lead
2  your expert?
3        MR. BRODY:  No.  I've never said that and I've
4  explained that to you many times.
5        MR. ANDERSON:  So what's the form objection?
6        MR. BRODY:  I've explained it many times.  I
7  don't -- I'm not going to get into this again.  I'll
8  refer you back to our prior conversations at
9  previous depositions.
10        MR. ANDERSON:  Well, you got to tell me what
11  your form objection is.
12        MR. BRODY:  I've explained this to you, so
13  just refer back to those -- those depositions and
14  you'll understand to the extent that you can.
15        MR. ANDERSON:  Thanks.  Patronize me and
16  explain it again for me since I seem to have
17  difficulty understanding.
18        MR. BRODY:  No, thank you.  I'll decline.
19        MR. ANDERSON:  So you're objecting to the form
20  but not explaining what the form objection is; is
21  that correct?
22        MR. BRODY:  I've explained as I've noted.
23        MR. ANDERSON:  Okay.  Is the form objection
24  leading?
25        MR. BRODY:  Yeah, I've explained that.

19 (Pages 70 - 73)

Page 74

1        MR. ANDERSON:  Is there another objection?
2        MR. BRODY:  No.
3        MR. ANDERSON:  Any other objection besides
4    leading?
5        MR. BRODY:  Not at this time.
6        MR. ANDERSON:  Okay.
7    BY MR. ANDERSON:
8        Q.   So option number two, Doctor, was to issue a
9    formal warning letter; correct?
10       A.   Yes.
11       Q.   And the warning letter is intended to further
12   explore the items that were raised in the 483 letter;
13   correct?
14       MR. BRODY:  Same objection.
15       A.   I don't know if I would term it as to further
16   explore, but it elevates the issue if the FDA is now
17   giving you a specific direct warning.
18       Q.   Right.  And there's repercussions for not
19   complying with the warning letter; correct?
20       A.   Yes.  Yes.
21       Q.   And there's repercussions for not completing
22   the acts requested of you by the FDA in the warning
23   letter; correct?
24       A.   I would precede my answer or I would add in
25   the word -- is that there are potential consequences of

Page 75

1    not following the FDA's actions, whether it's a warning
2    letter or other.  There are potential consequences for
3    the company or individual that don't comply.  Whether
4    they're actually enforced is another issue.
5        Q.   Do you agree or disagree with this statement:
6    A form 483 is not considered final agency action or a
7    final agency determination of whether any condition is
8    actually a violation of the FDCA or any other act?
9        MR. BRODY:  Object to form.
10       A.   I would have to see where that's coming from
11   to understand the context.  And I say that because
12   that -- unfortunately because of litigation how
13   regulatory is sometimes promulgated has been impacted.
14   So when FDA, for example, publishes a guidance document,
15   or some people take it as guidance, but once it's written
16   into the code of federal regulations then it becomes law.
17   So I can't answer that in black and white as you're
18   stating.  I'd have to see the context.
19       Q.   The context it's a standalone statement
20   that I'm asking if you agree or disagree with.  And I'll
21   try one more time.
22       A.   Is it a standalone of you making it up or
23   standalone coming from FDA?
24       Q.   Does it matter?
25       A.   To me it does.

Page 76

1        Q.   It matters -- so you can't agree or disagree
2    with a statement unless you know where it's coming from
3    because you don't know the answer or what's the -- I'm
4    having a hard time understanding.
5        MR. BRODY:  Object to form.  Misstates prior
6    testimony.
7        A.   I'm unsure of -- of why, per se, it's hard to
8    understand that, yes, I like to verify things, so knowing
9    context makes a difference.  So just blindly agreeing to
10   some statement that I don't have the where it came from
11   in front of me or memorized like a, you know -- it makes
12   it hard to just easily say yes to you or easily say no to
13   you.
14       Q.   Okay.  I'll ask a different question.  Do you
15   know whether a form 483 is considered a final agency
16   determination of whether any condition is a violation of
17   a law?
18       MR. BRODY:  Same objection.
19       A.   I believe on the FDA perspective while
20   something in a 483 may read as a violation of the law,
21   it's not until they actually prosecute it in concert with
22   the Department of Justice do they actually state it
23   publicly that it is a violation of the law.
24       Q.   Do you know whether a 483 letter constitutes
25   an agency determination of any issue?

Page 77

1        MR. BRODY:  Same objection.
2        A.   The 483 letter is used by the FDA to note an
3    issue, so it is raising an issue not a final
4    determination of the issue.  It raises an issue or issues
5    that they see when they inspect whether it's a
6    manufacturing facility or a food store.
7        Q.   You'd agree that following a 483 letter being
8    received or a form 483 being received by a manufacturer,
9    even if they didn't respond, the FDA can't take any
10   formal action based on a 483 letter?
11       MR. BRODY:  Object to form.
12       A.   I would disagree that the FDA most certainly
13   can take a formal action.  Especially in the instance if
14   somebody or a company did not reply to the 483 that they
15   received, they most certainly can elevate it to a
16   department of justice issue who they, you know, typically
17   work with when they would like to prosecute or threaten
18   to prosecute an issue.
19       Q.   Okay.  But first there would have to be a
20   warning letter; correct?
21       MR. BRODY:  Object to form.
22       A.   Typically, the FDA will start out with one
23   last -- one last effort to get you to comply before we
24   take you to court, yes.
25       Q.   Well, I'm not saying typically.  The 483 in

20 (Pages 74 - 77)

Page 78

1 order to constitute -- let me strike that.
2          In order for the FDA to take any formal
3 action, it needs to send a warning letter; correct?
4          MR. BRODY: Object to form.
5     A.   No. That is incorrect. If it deems something
6 is a public health risk, it may take immediate action.
7 It depends upon what the issue is.
8     Q.   Okay. Now in our case, the one you and I are
9 here to talk about, an inspection happened at a Vitamins
10 Because facility; correct?
11    A.   Yes. It was an FDA inspection of the
12 manufacturer.
13    Q.   And that manufacturing inspection occurred in
14 January of 2018; correct?
15    A.   Best of my recollection. I don't have the
16 document in front of me, but that sounds, from what I
17 remember, correct.
18    Q.   Following the inspection, the inspector gave
19 the manufacturing facility a 483 letter; correct?
20    A.   Yes.
21    Q.   And the manufacturer responded to the 483
22 letter; correct?
23    A.   Correct.
24    Q.   And following that the agency took no action;
25 correct?

Page 79

1          MR. BRODY: Object to form.
2     A.   As far as I could tell, there was no FDA
3 follow-up action that occurred.
4     Q.   And that means there was no FDA warning letter
5 issued; correct?
6     A.   Outside of the 483, there was not a warning
7 letter as a follow-up by the FDA that I'm aware of.
8     Q.   You'd agree that the 483 form and a formal FDA
9 warning letter are two different documents; correct?
10         MR. BRODY: Objection. Asked and answered.
11    A.   Yes, they are two different documents.
12    Q.   Okay. So following the response, the 483
13 letter by the manufacturer, the FDA did not issue a
14 warning letter; correct?
15         MR. BRODY: Object to form.
16    A.   Correct.
17    Q.   They didn't even go back and reinspect the
18 facility; correct?
19    A.   As far as I'm aware, the facility has not yet
20 been reinspected.
21    Q.   They took no action at all; right?
22    A.   Not surprising.
23    Q.   Am I correct?
24    A.   From what I could tell there was not FDA
25 follow-up after the warning letter was sent and your

Page 80

1 client responded to such.
2     Q.   Hold on. Because we need to be careful here
3 because we're mixing terms. The FDA never sent my client
4 a formal warning letter; correct?
5     A.   Correct.
6     Q.   There was a 483 form given?
7     A.   A pretty heavy 483 form, yes.
8     Q.   There was a response; correct?
9     A.   Yes, a pretty anemic response.
10    Q.   And then no action was taken at all?
11    A.   Correct. From what I can tell; correct.
12    Q.   You've read the 483 form; correct?
13    A.   Yes.
14    Q.   The 483 form doesn't reference SAM-e in any
15 way; right?
16    A.   Not specifically.
17    Q.   Well, does it reference SAM-e or does it not?
18    A.   It --
19         MR. BRODY: Form.
20    A.   It does not reference SAM-e.
21    Q.   Okay.
22    A.   To be fair, it references all of the
23 manufacturing and production and activities that were
24 observed by the inspector but not a specific name of a
25 product or ingredient.

Page 81

1     Q.   Okay. And the inspector's name was Aaron
2 J. Fox; is that right?
3     A.   Yes, Mr. Fox.
4     Q.   Do you know Mr. Fox?
5     A.   No.
6     Q.   Have you ever spoken to Mr. Fox?
7     A.   No.
8     Q.   Do you know if Mr. Fox still works there at
9 the FDA?
10    A.   I do not know.
11    Q.   Now, following through with the report here.
12 Paragraph 20 says, "While defendant was inspected by the
13 FDA regarding its manufacturing and received corrective
14 instruction for their cited deficits and flaws, it is my
15 opinion that defendant failed after January 30, 2018, to
16 update and upgrade their policies and practices to follow
17 what the GMP law requires for a dietary supplement
18 manufacturer." Do you see that?
19    A.   Yes.
20    Q.   What's the basis of your opinion that
21 defendant failed after January 30th, 2018, to update and
22 upgrade their policies and practices?
23    A.   The basis of my opinion for Item Number 20 is
24 that the products that were purchased and analyzed in
25 2019 and '20 still illustrated that there were

21 (Pages 78 - 81)

Page 82

1  manufacturing issues because they were not meeting label
2  claims or not even coming close to meeting label claims,
3  and so that to me was an indication that the GMP aspects
4  that were outlined by Mr. Fox -- excuse me -- as being
5  issues were still not resolved. Because, for example --
6  for example, my opinion on that, you know, rested on
7  that -- or was part of that if the manufacturer actually
8  had the specifications and if they actually did premium
9  post testing of their product and they actually did these
10 things, then they would have realized that they were not
11 meeting label claims in their products and that they were
12 not -- and other issues that they had.
13     Q.   And that's -- I get it that that's your
14 opinion, and we'll talk a lot about what the testing
15 reflects and doesn't reflect in a minute here. But does
16 that -- does that surmise the basis of why you don't
17 think anything was upgraded or updated?
18     A.   It serves as a good basis along with what you
19 read in Number 21 and probably following that.
20     Q.   Okay.
21     A.   The GMP issues are really a -- a flag here.
22     Q.   Okay. You'd agree that a product could have
23 GMP issues and still test and meet specs; right?
24     A.   It is feasible.
25     Q.   Have you ever -- you've never been to Vitamins

Page 83

1  Because manufacturing facilities, have you?
2      A.   I have not.
3      Q.   You've never read any inspection report
4  following January 30th, 2018, have you?
5          MR. BRODY: Objection to form. Misstates the
6  record.
7      A.   Can you repeat the question, please, sir?
8      Q.   Sure. Are you aware -- are you aware at all
9  of any inspection of Vitamins Because's facilities that
10 occurred after January 30th, 2018?
11     A.   Not that I can recollect at this moment, no.
12     Q.   So, in 2018, the FDA sent a 483 letter and
13 they cited eight different things; correct? And we can
14 go through them right here.
15     A.   At least eight from what I can count.
16     Q.   Well, go ahead and count them.
17     A.   I did. A through H is eight; right? A, B, C,
18 D, E, F, G.
19     Q.   Right. And that's what they found; right?
20 They didn't find more than that; correct?
21     A.   Without the report in front of me, I do not
22 know if I only limited it to eight issues. So I cannot
23 tell you whether the 483 had more than eight issues.
24 These were eight issues that I picked up that stand out
25 to me as being very centric and very important.

Page 84

1      Q.   Okay. Let's look at A real quick. You did
2  not establish product specifications for the finished
3  dietary supplements. Do you see that?
4      A.   Yes.
5      Q.   That could be true and the product could still
6  meet specs; correct?
7          MR. BRODY: Object to form.
8      A.   Happenstance and yes. Meaning that can occur
9  by happenstance and yes it can occur. You might not have
10 specs but maybe by luck you still meet whatever the
11 label's claiming.
12     Q.   So you would agree that A can occur and you
13 can still meet what the label's claiming; correct?
14     A.   Correct.
15     Q.   B, you did not establish component
16 specifications for purity and then strength is your
17 emphasis added in composition. B could be true and the
18 product could still meet the label; correct?
19         MR. BRODY: Same objection.
20     A.   Yes, correct.
21     Q.   C could be -- C could be true and the product
22 could still meet the label requirements; correct?
23         MR. BRODY: Same objection.
24     A.   Correct.
25         MR. ANDERSON: What's the objection, Jay?

Page 85

1          MR. BRODY: I think these are misleading
2  questions. He explained that it could only occur
3  through happenstance, so...
4          I'm not sure if that's what you intended or
5  were asking the question, but that's my objection.
6          MR. ANDERSON: Okay.
7  BY MR. ANDERSON:
8      Q.   D -- D could occur and the product could still
9  meet label specifications; correct?
10         MR. BRODY: Same objection.
11     A.   I have some issues here, and the issues are
12 that --
13     Q.   Is that a true statement or not?
14         MR. BRODY: Counsel, let him finish his
15 answer; okay?
16     A.   The issue that I have here, sir, is that
17 nobody puts a claim on their product that there is extra
18 metal included; right? So -- or a foreign component.
19 That's not something that's on a supplement facts label,
20 so it's not really an honest question. So somebody can
21 be in violation or not have effective measures to protect
22 against the inclusion of materials that are not
23 necessarily claimed on a supplement facts label and yet
24 the way that you're promulgating it, that person would be
25 okay. But I'm saying that it's not. So I'm not agreeing

Page 86

1 with you.
2    Q.   Okay.  Well, let's really read what this says.
3 D does not say anywhere that there was metal or other
4 foreign material in the components; correct?
5    A.   D says you did not use effective measures to
6 protect against the inclusion of metal or other foreign
7 material in components or should be of dietary
8 supplements.  But it says, "You did not use effective
9 measures to protect against the inclusion of metal or
10 other foreign materials in your product."
11    Q.   But it doesn't say that there was foreign
12 material or metals in the components or dietary
13 supplements; correct?
14    A.   You are correct but that's not what you first
15 started asking me.
16    Q.   It actually is.
17    A.   No, it's not, sir.
18    Q.   No --
19    A.   You asked me -- you asked specifically, "Can
20 you -- can you still meet label claim and have an issue
21 with Number 4?"  Right?  Like just -- letter D.  And
22 the answer is the supplement facts label doesn't
23 necessarily include things that you can still have wrong
24 in your product.
25    Q.   Okay.

Page 87

1    A.   You wouldn't claim it if it had arsenic in it,
2 you would just hope it doesn't.
3    Q.   You'd agree that you could use ineffective
4 measures and inspector's opinions to protect against the
5 inclusion of metal or other foreign material and still
6 meet the label claim; correct?
7       MR. BRODY:  Object to form.
8    A.   By happenstance.  I would agree that you could
9 still meet label claim or label, but it would be by pure
10 luck or happenstance.
11    Q.   You've reviewed a lot.  You've reviewed 22 to
12 30 testing reports of SAM-e manufactured by Vitamins
13 Because; correct?
14    A.   That would be correct.
15    Q.   None of those -- none of those said there was
16 metals or other foreign materials or components in the
17 product; correct?
18       MR. BRODY:  Object to form.
19    A.   That's not a fair statement by you, sir,
20 because none of those measured were looking for whether
21 there was led, for example.  So like, for example, if
22 you're selling your -- if your client is selling their
23 products in California, they're supposed to have all of
24 their products Prop 65 tested to verify to the state of
25 California that they're Prop 65 compliant, but it doesn't

Page 88

1 necessarily state that, hey, this product may have a
2 carcinogen known to the state of California hence this
3 Prop 65 issue.  So I think this is sort of like a
4 conflation and misleading questions or statements that
5 are being made here by you.
6    Q.   Okay.  I move to strike all of that.  I'm
7 going to ask you another question.
8    A.   Okay.
9       MR. BRODY:  Object to that -- that motion.
10    Q.   Quote, unquote, "Experts in this litigation or
11 people that purported to be experts coordinated the
12 testing of the products that you reviewed"; correct?
13    A.   Correct.  Two different people knowledgeable
14 about nutrition and testing coordinated testing of
15 supplements made by your product -- made by your clients.
16    Q.   At the time that they did that testing, they
17 had access to the 483 form; correct?
18       MR. BRODY:  Object to form.
19    A.   I cannot speak to what other people had or did
20 not have.
21    Q.   It existed; correct?
22    A.   Yes.
23    Q.   And they chose not to test the products for
24 any metal or other foreign material; correct?
25       MR. BRODY:  Object to form.

Page 89

1    A.   I don't know if the thought crossed their
2 minds to actually test for it because the central aspect
3 of this case is -- or central aspect is label claim
4 versus actual product.
5    Q.   That's my exact point.  You could meet D -- D
6 can exist -- you can be cited for D in a 483 form and the
7 product can still meet label; correct?
8       MR. BRODY:  Same objection.
9    A.   But it does not meet good manufacturing
10 practices so then hence it would be an adulterated
11 product under FDA.
12    Q.   You've read the third amended complaint;
13 right?
14    A.   Yes.
15    Q.   You just summarized what this case was about
16 that the product label is different than the amount of
17 SAM-e in it; correct?
18    A.   Yes, very consistently underdosed.
19    Q.   Yes or no?
20    A.   Yes.
21    Q.   You can have D occur and the product can still
22 meet label claims; correct?
23       MR. BRODY:  Object to form.  Asked and
24 answered.  And same objection as prior.
25    A.   Given if -- given if the label is only making

23 (Pages 86 - 89)

Page 90

1 a claim about the dose of the nutritional ingredient.
2     Q.   And then that's what you just said the lawsuit
3 was about; correct?
4         MR. BRODY:  Object to form.  Misstates prior
5     testimony.
6     A.   What I said in part was that the -- the crux
7 or the lawsuit is about product making a claim of having
8 X amount of SAM-e versus what was actually in the
9 product.  That's the major deficiency and defectiveness
10 that we're dealing -- or discussing.
11     Q.   Okay.  You would agree that you could be cited
12 for D and the active amount of SAM-e in a product could
13 meet what the label says; correct?
14        MR. BRODY:  Object to form.
15     A.   Correct.
16     Q.   "E:  You did not take necessary precautions
17 during the manufacture of a dietary supplement to prevent
18 contamination of components."
19        You could be cited for E and the active
20 ingredient could still meet what the label says; correct?
21        MR. BRODY:  Object to form.
22     A.   Yes.
23     Q.   "F:  You did not establish specifications for
24 the packaging and labeling of the finished dietary
25 supplement to ensure you use the specified packaging and

Page 91

1 to ensure you have complied with the specified label."
2        You could be cited for F and the active
3 ingredient of the product could still meet the label
4 requirement; correct?
5        MR. BRODY:  Object to form.
6     A.   Correct.
7     Q.   "G:  You did not collect and hold reserve
8 samples of packaged and labeled dietary supplements that
9 you distributed."
10        The manufacturing facility could be cited for
11 G and the active ingredient of their product could still
12 meet the label requirements; correct?
13     A.   Correct.
14     Q.   And "H:  Your handwashing facilities are not
15 convenient."
16        You could be cited for H and your product
17 could still be perfectly fine; correct?
18        MR. BRODY:  Object to form.  Misstates prior
19     testimony.
20     A.   You could -- what do you mean by perfectly
21 fine?
22     Q.   I mean -- I'll ask a better question.  Your
23 handwashing facilities could be in the most inconvenient
24 spot on earth, and your product could be perfect in every
25 way; correct?

Page 92

1        MR. BRODY:  Same objection.
2     A.   With that kind of statement, it could also be
3 imperfect in every way.
4     Q.   So is that yes?
5     A.   No, that's a no.  "Perfect in every way" were
6 the exact words that you used.
7     Q.   Right.
8     A.   So since this is all theoretical, it can also
9 be the opposite.  You can have handwashing facilities an
10 hour away from wherever you manufacture, that doesn't
11 mean that you're still manufacturing correctly.  This is
12 just an item that Mr. Fox noted as for whatever reason
13 being an issue.
14     Q.   Right.  But you would agree that because your
15 handwashing facilities are not convenient does not render
16 the active ingredient in SAM-e to be less than what's
17 stated on the label; correct?
18        MR. BRODY:  Form objection.
19     A.   Correct.
20     Q.   And, again, in response to these eight items
21 that Mr. Fox put on the 483 form, Vitamins Because
22 responded; correct?
23     A.   They did send a response letter.
24     Q.   And the FDA took no action following receiving
25 the response; correct?

Page 93

1        MR. BRODY:  Object to form.  Misstates facts.
2     A.   As far as I am aware, the FDA has not taken
3 action yet -- or follow-up action yet as related to the
4 483 and the response that they received.
5     Q.   All right.  To continue on through the report
6 here, you'd agree -- it's your opinion that all SAM-e
7 manufactured by Vitamins Because did not meet the label
8 requirement for active ingredient; correct?
9     A.   Can you repeat the question?  The first couple
10 of words, I did not hear clearly.  I'm sorry.
11     Q.   It is your opinion that all of the SAM-e
12 manufactured by Vitamins Because failed to meet the label
13 requirement as it relates to the active amount of SAM-e;
14 correct?
15     A.   No, incorrect.  I did -- I did see and read
16 perhaps two or three certificates of analysis by
17 third-party analytical labs that did find the label claim
18 was met or nearly met.  So that would be 2 or 3 tests out
19 of 30-plus tests found a label claim or near label claim
20 was made.
21     Q.   Okay.  Would you agree that 3 out of 30 is
22 10 percent?
23        MR. BRODY:  Form.
24     A.   If I can do the math with my fingers, I would
25 agree.  Yes.  Sorry about the bad joke.  Yes.

24 (Pages 90 - 93)

Page 94

1    Q.   So you would agree that this statement is not
2  true?  All SAM-e capsules manufactured by the defendant
3  Vitamins Because and CT Health were uniformly mislabeled?
4       MR. BRODY:  Object to form.
5    A.   I cannot say all, but given the inconsistency
6  and that at least 90 percent of the testing showed or
7  demonstrated severe issues with regards to purity and
8  strength and composition of the products, it's a huge red
9  flag of inconsistency in manufacturing processes and
10  quality.
11    Q.   Okay.  So you'd agree that some of the SAM-e
12  that you're aware of met the label requirements for
13  active ingredient; correct?
14    A.   I would agree that up to about 10 percent of
15  what I am aware of regarding the SAM-e products met or
16  nearly met label claim.
17    Q.   So it's true that some of Vitamins Because's
18  SAM-e product met label claims; correct?
19       MR. BRODY:  Object to form.
20    A.   It is true.  And if my memory serves me
21  correctly that a couple of products from 2020 did meet
22  label claim.  Again, still less than 10 percent or less
23  of all of the products that were tested.
24    Q.   But even in your expert opinion, not all;
25  correct?

Page 95

1       MR. BRODY:  Object to form.
2    A.   Correct.
3       MR. ANDERSON:  What do you-all want to do
4  about lunch?
5       (Recess.)
6  BY MR. ANDERSON:
7    Q.   All right.  Dr. Kalman, we've been talking
8  about the 483 letter, the inspection, and the testing.
9  I'm going to stop sharing for a second here and I might
10  switch it up.  You -- strike that.
11       The people that you're relying on for the
12  testing shows Eurofins as the testing facility; correct?
13  One of the testing facilities.
14    A.   It would be correct to say that the people who
15  coordinated testing -- one of the testing facilities that
16  they utilized was Eurofins.
17    Q.   Why did they choose Eurofins, if you know?
18    A.   I cannot speak to other people's motivations.
19    Q.   I wrote it down.  You purchased the SAM-e that
20  you took -- I wrote it down.  I think you said it was
21  Doctor's Choice or something.  What was it?
22    A.   I thought it was Doctor's Best.
23    Q.   Doctor's --
24    A.   And I looked.  I don't have it here with me.
25  And it wasn't just a SAM-e, itself, capsule.  It was a

Page 96

1  multi-ingredient product with ingredients that are geared
2  or thought to have positive impacts on bone and
3  cartilage.
4    Q.   Okay.  Now when you purchased that product
5  that included at least -- it included some SAM-e; am I
6  right?
7    A.   Correct.
8    Q.   How did you determine what manufacturer you
9  were going to purchase from?
10    A.   I wasn't looking to determine which
11  manufacturer.  As you may or may not know, companies that
12  sell products don't always manufacture them.  Like I
13  don't -- so -- however, big picture is I was looking for
14  a product that had some specific ingredients that science
15  says should have some benefits towards recovery after a
16  muscle tendon cartilage bone surgery and liked the
17  product that I saw.  Second to that is knowing the name
18  of the company and that they have been around and have a
19  decent reputation was helpful in me deciding let me try
20  this product that has these three or four key ingredients
21  I'm looking for.
22    Q.   Did you read any customer reviews prior to
23  choosing Doctor's Best?
24    A.   No.
25    Q.   Did you review the certificate of analyses

Page 97

1  prior to purchasing the product from Doctor's Best?
2    A.   No.
3    Q.   Did you do any testing on the product you
4  purchased from Doctor's Best?
5    A.   No.
6    Q.   Have you ever done testing on any SAM-e
7  product that you personally purchased for personal use?
8    A.   As an individual consumer, no.  However,
9  separate to that as a research scientist, I have
10  published research on S-Adenosyl methionine or SAM-e, and
11  in that we did have testing as part of the QA of that
12  study.
13    Q.   Okay.  Is that the study that was -- that was
14  comparing SAM-e and another drug for effects on
15  depression?
16    A.   Yes and no.  I say yes but the incorrect word
17  that you used is drug.
18    Q.   Okay.
19    A.   That was a study that was looking to compare
20  the potential antianxiety or antidepressive effects of
21  SAM-e as compared to something -- a specific extract out
22  of corn.
23    Q.   Okay.  Aside from that article, have you been
24  involved in any publications or research projects not
25  related to litigation that involved SAM-e?

25 (Pages 94 - 97)

Page 98

1    A.   Not that I recall, no.
2    Q.   Now we talked about your review of some of the
3  testing and your review of the declarations of Ms. Hutt
4  and Mr. Con.  Remember that?  Or Can?
5    A.   It was Yan.  Yan with a Y.
6    Q.   Y, Yan.  Okay.  Do you recall that?
7    A.   I recall stating that I reviewed their
8  reports.
9    Q.   You'd agree that neither Mrs. Hutt nor Mr. Yan
10  conducted any testing of SAM-e themselves; correct?
11    A.   Correct.  They coordinated it.  They did not
12  actually do it.
13    Q.   And when you say "coordinated," what you mean
14  is -- and we'll just start with Ms. Hutt.  Ms. Hutt went
15  on the Internet, went to Amazon and purchased nine
16  bottles of SAM-e from Amazon; correct?
17    A.   I believe so.
18    Q.   She had those bottles of SAM-e shipped to her
19  where she works at RDR in Texas; correct?
20        MR. BRODY:  Object to form.
21    A.   That's my understanding.
22    Q.   Do you know how those products were shipped
23  from Amazon to Texas?
24        MR. BRODY:  Scott, I'm sorry.  I don't mean to
25  cut you off, but it says your bandwidth is low and

Page 99

1  you're getting a little drag.  It's a little hard to
2  understand you.  So if there's -- I don't know if
3  there's anything you can do, but if there is...
4        THE WITNESS:  Is it -- wait.  You're saying
5  that's happening to me?
6        MR. BRODY:  No, my computer is telling me it's
7  Scott Anderson.
8        THE WITNESS:  Okay.  Because he's coming sort
9  of in and out like a movie.
10        MR. POLLACK:  This is Brett Pollack.  I was --
11  I heard him.
12        THE WITNESS:  Okay.
13        MR. ANDERSON:  Yeah.  I don't see -- it
14  doesn't say it on my computer.
15        THE WITNESS:  There was a moment or two where
16  your words dragged on where you were in slow motion.
17  So who knows?  We're at the privilege of the
18  Internet.
19        MR. ANDERSON:  Let me know if it happens again
20  and I'll do what I can.
21        MR. BRODY:  All right.  Thanks.
22  BY MR. ANDERSON:
23    Q.   Do you know how the Amazon product that
24  Ms. Hutt ordered on the Internet was shipped to her in
25  Texas?

Page 100

1        MR. BRODY:  Object to form.
2    A.   No, I do not.
3    Q.   Do you know how Amazon stored the SAM-e that
4  Ms. Hutt purchased on the Internet?
5        MR. BRODY:  Object to form.  Same objection.
6    A.   No, I do not know Amazon's SOPs for how they
7  store vitamins or other products in their local
8  warehouses or mega warehouses for shipping to individual
9  consumers.
10    Q.   When Ms. Hutt received the product, do you
11  know how she stored it?
12        MR. BRODY:  Object to form.
13    A.   No.  I believe in her narrative report it
14  said, you know, kept at room temperature, away from
15  light.  But, no, I don't know specifics.
16    Q.   Okay.  Do you know -- when you hear "room
17  temperature," what does that mean to you?
18    A.   Typically that means something that's going to
19  be anywhere depending upon the house, but generally 75 to
20  78 degrees.
21    Q.   75 to 78?  Is that what you said?
22    A.   Yeah, somewhere in there.  That's typical room
23  temperature for a house.
24    Q.   So after Ms. Hutt received the product from
25  Amazon, she then shipped it to a laboratory; correct?

Page 101

1        MR. BRODY:  Object to form.
2    A.   Correct.
3    Q.   Do you know how she shipped it to the
4  laboratory?
5    A.   I do not.
6    Q.   Do you know how it was stored once it was
7  received by the laboratory?
8    A.   I do not.
9    Q.   Do you know how long it was kept by the
10  laboratory before it was tested?
11    A.   Excuse me.  I believe that that information is
12  actually on the Eurofins and other reports where it says
13  date received, date tested, final report.  So I don't
14  have that offhand, but I do believe it's somewhere within
15  one to three days of receipt.  And, again, it's in those
16  reports, I believe, where Eurofins noted when the sample
17  was received, when they tested it, and when final
18  report's issued.
19    Q.   Sitting here today, you don't know; right?
20    A.   Correct.
21    Q.   All right.  Sorry, guys.  I'm just trying to
22  grab a document here.  Are you aware of test- -- strike
23  that.
24        All right.  Do you know -- strike that.
25        You would agree that Ms. Hutt wasn't present

26 (Pages 98 - 101)

1 when the product was tested; correct?
2      MR. BRODY: Object to form.
3      A.   To the best -- to my knowledge, that is
4 correct.
5      Q.   Do you know whether Ms. Hutt tested product
6 other than the product for which she forwarded you the
7 reports?
8      A.   If I understand your question correctly,
9 you're asking me do I know if Ms. Hutt tested the
10 products for the -- that were in the report that she sent
11 me?
12      Q.   No.  That was a bad question.  I'm sorry.
13 I'll try that again.
14      A.   Thank you.
15      Q.   Do you know if Ms. Hutt purchased and tested
16 product other than the product that she sent you testing
17 reports for?
18      A.   I do not know that.
19      Q.   In other words, it's possible that Ms. Hutt
20 purchased more than nine bottles of SAM-e and had more
21 than nine bottles of SAM-e tested; correct?
22      MR. BRODY: Object to form.
23      A.   Theoretically, it's possible.
24      Q.   I'm going to mark this as Exhibit Number 5 to
25 the deposition, I think.

1      MR. ANDERSON:  Is that right?
2      MR. POLLACK:  That's right.
3      (Thereupon, Exhibit Number 5 was marked for
4 purposes of identification.)
5 BY MR. ANDERSON:
6      Q.   And this is Exhibit Number 10 to your report,
7 Dr. Kalman.  And I would like to direct your attention
8 just to the very top here where the hand is.  Do you see
9 that? where it says Vitamins Because 2?
10      A.   Yes, I see that.
11      Q.   In your work on this case, have you ever seen
12 a Vitamins Because 1?
13      MR. BRODY: Object to form.
14      A.   Not that I recollect, no.
15      Q.   Do you know why Ms. Hutt would produce a
16 certificate of analysis for Vitamins Because 2 but not a
17 certificate of analysis for Vitamins Because 1?
18      A.   First off, Ms. Hutt did not produce the
19 certificate of analysis.  It was produced by Eurofins,
20 the testing laboratory, and so your question really goes
21 to them.  Why would they label it Vitamins Because 2?
22 I.e., was there a 1, or did they just do -- the first
23 product was Vitamins Because and the second one they
24 called it Vitamins Because 2.  So I don't have an answer,
25 but I also believe that it's not Ms. Hutt that your

1 question is, it's Eurofins, because they produced the
2 certificate of analysis.
3      Q.   Did you receive the certificate of analysis
4 from Eurofins?
5      A.   I received it from Mr. Brody.
6      Q.   Do you have any idea where he received it
7 from?
8      A.   I would imagine Catherine Hutt and Eurofins.
9      Q.   Would you agree that Catherine Hutt works at
10 RDR Solutions in Aubrey, Texas?
11      A.   It's my understanding that's her company.
12      Q.   Have you seen a Vitamins Because l or just a
13 Vitamins Because certificate of analysis, or have you
14 only seen the Vitamins Because 2?
15      A.   I cannot say from memory.  I would have to
16 look through them all and then I would be able to tell
17 you.  I cannot tell you with any certainty by memory.
18      Q.   Okay.  What would you need to look at?
19      A.   The certificates of analysis.  The other ones.
20      Q.   The ones that are attached to your report?
21      MR. BRODY: Object to form.
22      A.   Well, any and all.  Could be my report or it
23 could be, you know, more than my report.  But the ones --
24 you know, any and all of them.
25      Q.   Okay.  Are there certificates of analysis that

1 you relied upon that aren't attached to your report?
2      A.   There are certificates of analysis that I read
3 that are not attached to my report.  I did not want to
4 attach every certificate of analysis.
5      Q.   Why not?
6      A.   I thought the theme was pretty consistent that
7 the product just did not meet label claim for SAM-e no
8 matter which lab tested it.
9      Q.   Now you'd agree that what you didn't attach to
10 your report are the certificates of analysis that showed
11 the SAM-e did, in fact, meet the label claim; correct?
12 Those aren't attached to your report; right?
13      A.   Without going through my report with you or
14 without you at this moment, I'm not going to agree to
15 that.
16      Q.   Do you recall attaching certificates of
17 analysis showing that the label met -- met label
18 requirements as we discussed earlier to your report?
19      A.   I do not think so.
20      Q.   Okay.  You drafted your report; right?
21      A.   Right.  I don't remember including those.
22      Q.   All right.  I'm going to show you now, and
23 we're going to mark this as Deposition Exhibit Number 6.
24      (Thereupon, Exhibit Number 6 was marked for
25 purposes of identification.)

27 (Pages 102 - 105)

Page 106

BY MR. ANDERSON:

1 BY MR. ANDERSON:
2    Q.   And this is a certificate of analysis for
3 aSquared 1; correct?
4    A.   Correct.  Showing 15.9 milligrams of product
5 in a 400-milligram labeled product, yeah.
6    Q.   And then as Exhibit Number 7, we're going to
7 attach a Nusapure Number 2.  Do you see that?
8    A.   Yes, sir.
9        (Thereupon, Exhibit Number 7 was marked for
10    purposes of identification.)
11 BY MR. ANDERSON:
12    Q.   Have you seen one?
13    A.   I have not seen a 1.  What's the correct
14 English?  I have not seen the number one written next to
15 Nusapure.
16    Q.   I'm going to make this Exhibit Number 8.
17        (Thereupon, Exhibit Number 8 was marked for
18    purposes of identification.)
19 BY MR. ANDERSON:
20    Q.   This is Naturetition.  Do you see that?
21    A.   Oh, now I do.  Naturetition 1.
22    Q.   Do you know who manufactures that product?
23    A.   Not offhand.  Vitamins Because.
24    Q.   Do you know whether or not Vitamins Because
25 manufactured that product?

Page 107

1    A.   No, I don't know offhand.
2    Q.   With all due respect, Mr. Kalman, and I'm not
3 trying to be difficult here.  This is the one chance I
4 get to ask you questions.  You've been identified as an
5 expert and this is a report that you drafted and put
6 together.  I need to be able to ask -- ask you questions
7 about it and know that you're answering the questions to
8 the best of your ability.
9    A.   Right.  So part of my hesitancy in answering
10 you is not having memorized Vitamins Because/CT Health
11 and which plethora of other products came from whom.  So
12 if we want to work on the assumption that it's
13 manufactured by your client or else it would not be part
14 of this lawsuit, I'm good with that.
15    Q.   Well, that's, in fact, what I'm asking you
16 about this product.  Do you have any idea of whether it
17 was manufactured by my client or not?
18    A.   I do not.
19    Q.   You'd agree that there's no month in the year
20 that has 91 days in it; right?
21    A.   Not on earth.
22    Q.   You'd agree that there's no year that's ever
23 had 61 months in it; right?
24    A.   Not in the way we count years on earth.
25    Q.   Now in your report you'd agree that you

Page 108

1 identified how Vitamins Because identifies its lot
2 numbers; right?  It goes by day, month, year, and then
3 batch; is that right?
4    A.   I believe so.  But this product that you're
5 showing here analyzed at 90 milligrams a serving for
6 something that's labeled as 500, meaning less than 25
7 percent of what the label claim is actually what they
8 found.
9    Q.   Yeah, I get what Eurofins said.
10    A.   That's the problem.
11    Q.   I get that that's what Eurofins says
12 Natureticians product tested as.  I understand that.
13 What I'm asking is do you have any idea who manufactured
14 this product that we're looking at the certificate of
15 analysis for?
16        MR. BRODY:  Objection.  Asked and answered.
17    A.   I would assume Vitamins Because.
18    Q.   Why do you assume that?
19    A.   Because it's Vitamins Because/CT Health that
20 are the defendants in the action.  And there's a variety
21 of SAM-e products with different names that have been
22 identified as being sold by them on the Internet and
23 elsewhere.
24    Q.   Did you do any research to determine whether
25 or not CT Health Solutions or Vitamins Because

Page 109

1 manufactured this product that we're looking at the
2 certificate of analysis of in Exhibit 8?
3    A.   No, I did not.
4    Q.   You just assumed it was manufactured by
5 Vitamins Because; correct?
6    A.   Yes, sir.
7    Q.   And you assumed it was manufactured by
8 Vitamins Because because you received it in relation to
9 this lawsuit; correct?
10    A.   Correct.
11    Q.   I'm going to mark this as Number 9.
12        (Thereupon, Exhibit Number 9 was marked for
13    purposes of identification.)
14 BY MR. ANDERSON:
15    Q.   Have you ever seen a Boostceutical 1?
16    A.   No, sir.
17    Q.   Do you know why you would receive
18 Boostceutical 2, Nusapure 2, Vitamins Because 2, but not
19 any of the 1's?
20        MR. BRODY:  Object to form.  Misstates the
21    record.
22    A.   I would only make assumptions.
23    Q.   What would your assumption be?
24    A.   That whoever decided to make the label for the
25 certificate of analysis report had a Boostceutical

Page 110

1 product, and then once they saw that there was another
2 bottle or another Boostceutical, they decided to call it
3 2.
4    Q.   Exactly right.  And that's why I'm asking have
5 you ever seen a Boostceutical that doesn't have the 2
6 next to it?  Have you seen a Boostceutical --
7    A.   No.
8    Q.   -- with no number or a Boostceutical with just
9 the 1?
10    A.   No, not that I recollect.
11    Q.   All right.  Now we are back to your report
12 here.  Are you aware of any testing that has taken place
13 that is not included -- strike that.
14        Are you aware of any testing that has been
15 commissioned by the plaintiff or the plaintiff's
16 representatives that is not included in the expert
17 disclosures that you've reviewed?
18        MR. BRODY:  Object to form and objection based
19 on privilege.
20    A.   No.
21        MR. ANDERSON:  Guys, I'm about to go down a
22 series of questions that I don't really want to
23 split up through lunch.  Can we go ahead and take
24 lunch now?
25        MR. BRODY:  I'd prefer we just keep going

Page 111

1 until 1:00 o'clock.
2        MR. O'BRIEN:  No, let's -- I'm -- I'm pretty
3 hungry, Scott.  We should stop.
4        MR. ANDERSON:  I'm going to stop for lunch.
5        (Lunch recess.)
6 BY MR. ANDERSON:
7    Q.   All right.  We've been talking about the
8 report and the testing that was commissioned by Ms. Hutt,
9 and as we were kind of walking through the report.  And
10 I'm going to share my screen again and I'm going to put
11 up the report perhaps.  And we're going to go down here.
12 We're going to talk about Footnote 5 there.  And we've
13 talked a little bit about this, Dr. Kalman, before.  This
14 is a description of how Vitamins Because does their lot
15 numbers; correct?
16    A.   Correct.  You previously spoke about how they
17 do their lot numbers.
18    Q.   Okay.  Well, this is the new report; right?
19 Footnote 5?
20    A.   Yes, it is.
21    Q.   And that's your understanding of how Vitamins
22 Because does their lot numbers; correct?
23    A.   Correct.  CT Health.
24    Q.   Can we have an agreement that when I say
25 Vitamins Because I'm talking about both CT Health and

Page 112

1 Vitamins Because?
2    A.   I like that, yes.
3    Q.   Okay, great.  Now you would agree that if the
4 lot numbers don't follow that format, it's likely that
5 those products were not manufactured by Vitamins Because;
6 right?
7        MR. BRODY:  Object to form.
8    A.   No, I would not necessarily agree to that.
9 Context -- context would matter.
10    Q.   Okay.
11        MR. ANDERSON:  Jay, was your -- was your
12 objection just that it calls for expert witness
13 testimony?
14        MR. BRODY:  No.  I think it's outside the
15 scope of the present expert -- expert's expertise.
16 But that was my objection.
17        MR. ANDERSON:  Okay.  I understand.
18 BY MR. ANDERSON:
19    Q.   Did you write Footnote 5, Dr. Kalman?
20    A.   Yes.  Footnote 5 was written by me, and my
21 answer to you was -- to your question is that -- two-part
22 question:  Yes, that's how Vitamins Because/CT Health
23 Solutions marked their lot numbers using the format of
24 day, month, and year.  However, that does not always
25 equal across the board lot numbers.

Page 113

1    Q.   Okay.  And what do you base that second part
2 of your sentence on that there's lot -- that doesn't --
3 it wasn't always the case?
4    A.   Okay.  So I base that on when you go -- or if,
5 rather, you go take a look at the Eurofins reports that
6 you showed earlier --
7    Q.   Yes, sir.
8    A.   -- if you note on those Eurofins' report,
9 Eurofins assigns its own -- or puts a lot number in that
10 does not necessarily agree with a lot number that's on
11 the bottle; however, they use their own lot numbers and
12 other systems to make sure that their report is tied to
13 the actual bottle in question.  So my point in bringing
14 that up is that, yes, there is a discrepancy if you look
15 at the Eurofins' report you showed earlier and the way
16 that this is, and that has to do with how each individual
17 company defines what a lot number is and so forth.  And
18 what they're using for their systems as either
19 identifiers or deidentifiers.
20    Q.   Okay.  Would you agree that in order to
21 identify Vitamins Because's lot number you would need to
22 look at the bottle of product being tested?
23    A.   If we were looking for -- if we were looking
24 at the bottles of products and, I guess, if they had no
25 label on them, then we would look for a lot number on the

29 (Pages 110 - 113)

Page 114

1 bottle.
2    Q.   Okay.  Or the label.  But you would need the
3 physical bottle; right?
4    A.   It would be helpful, I guess.
5    Q.   So when you are looking at these Eurofins'
6 documents that have whatever lot numbers they have on
7 them, you're just making an assumption that those are
8 Vitamins Because's products; right?
9    A.   No.  If you can show a Eurofins' report, I --
10 I can discuss, but -- what I will answer is I take at
11 face value that when Eurofins says on their report that
12 it's product X made by company Y that they are -- that
13 it's face valid or true.
14    Q.   Well, we're going to have to explore that a
15 little bit.  Hold on.
16    A.   Or it depends upon your computer's memory.
17       MR. O'BRIEN:  Scott, if it's an Adobe issue,
18 try opening and closing the document perhaps.
19       MR. ANDERSON:  Sean, do you have -- okay.
20 We'll use this.  This is actually the one I wanted.
21 BY MR. ANDERSON:
22    Q.   All right.  Here's a Eurofins document.
23 Explain.
24    A.   The only -- all I could demonstrate or
25 illustrate on here is if you read the lot number that's

Page 115

1 here, 916-186, that is not in concert or format as
2 Vitamins Because manufacturing practices or labeling.
3 However, this -- this is how Eurofins is instituting it.
4       There was one that you had on the screen for a
5 minute there that you pulled off that under lot number it
6 said "See bottle or see notes for details."  So that is a
7 Euro -- I am taking this on face line -- face value
8 validity that the Eurofins' report is on the product and
9 sample that was sent to them.  And that if you notice
10 here, it says, "Please" -- under lot number, "Please note
11 from bottle" -- that your question is more geared towards
12 them.  This is demonstrating, you know, that their sample
13 name and receipt and processes and analyses.
14    Q.   Okay.
15    A.   For example, this product demonstrated 15.9
16 milligrams of product as what should have been 400
17 milligrams of product.
18    Q.   Okay.  So you'd agree you have no personal
19 knowledge about whether or not this product was
20 manufactured by Vitamins Because?
21       MR. BRODY:  Object to form.
22    A.   Correct.
23    Q.   And you have no personal knowledge regarding
24 whether the Naturetition Eurofins certificate of analysis
25 is related to products manufactured by Vitamins Because?

Page 116

1    A.   Correct.
2       MR. BRODY:  Object to form.
3    Q.   Do you have any personal knowledge about
4 whether any of the products' certificate of analyses that
5 you attached to your report were manufactured by Vitamins
6 Because?
7       MR. BRODY:  Object to form.
8    A.   Without firsthand watching each product
9 manufactured by Vitamins Because, the answer's going to
10 be no.  Meaning if I did not personally witness it, I
11 would just have to be -- trust that it is the fact that
12 these were produced by Vitamins Because.
13    Q.   Has anyone told you that the product that is
14 the subject of any of these certificate of analyses was
15 manufactured by Vitamins Because?
16    A.   It's my understanding in reading the third
17 amended complaint that Vitamins Because/CT Health is the
18 manufacturer of these products.  Other people -- you
19 know, the names I can't discuss -- you know, mention but
20 I'm saying that it comes from the manufacturer here.
21    Q.   Well, you'd agree that Vitamins Because and CT
22 Health Solutions aren't the only manufacturers of SAM-e
23 in the country; right?
24    A.   That would be correct.
25    Q.   And you'd agree that the third amended

Page 117

1 complaint does not identify any particular lot number or
2 product number; right?
3    A.   From the best of my memory, that is correct.
4    Q.   And you don't have any independent knowledge
5 about who manufactured any of the product that is
6 reflected by the certificate of analyses that are
7 attached to your report; right?
8    A.   There are other -- there are also other
9 certificates of analyses of products that came from
10 the -- the certificates of analyses came from Vitamins
11 Because of product sampling that and analysis that they
12 orchestrated.  So, you know -- and some of that
13 testing -- yeah, so I'm not sure of your question.  So if
14 I'm going to -- I'm not sure of that question.
15    Q.   You'd agree that there's a number of
16 certificate of analyses attached to your expert report;
17 correct?
18    A.   Yes.
19    Q.   And you'd agree that you don't have knowledge
20 about who manufactured the product that is reflected in
21 any of those certificate of analyses; correct?
22       MR. BRODY:  Object to form.
23    A.   I don't have direct knowledge of who
24 manufactured those products.
25    Q.   What knowledge do you have?

30 (Pages 114 - 117)

Page 118

1    A.   What's in the report and -- or what's in the
2 lawsuit, which means that Vitamins Because/CT Health
3 manufactured the products.
4    Q.   Can you show me in the complaint -- in the
5 lawsuit where it says that Vitamins Because manufactured
6 this product that we're looking at right now?
7    MR. BRODY:  Object to form.
8    A.   No, I don't believe I could specifically tie
9 that together in that -- in that amended report.  I would
10 need time to read through it again.  But my answer to you
11 is no, I don't think so.
12    MR. ANDERSON:  Dave, is there a way you could
13 put up 601?  Can I give up my screen share,
14 Ms. Ellison?
15    MR. O'BRIEN:  Yes.  If you just stop sharing,
16 someone else should be able to share their screen.
17    THE COURT REPORTER:  That's correct.
18    MR. ANDERSON:  And I'm sorry.  What exhibit
19 number are we on?
20    MR. O'BRIEN:  This is 10.
21 BY MR. ANDERSON:
22    Q.   Okay.  This is going to be marked as Exhibit
23 Number 10.
24    (Thereupon, Exhibit Number 10 was marked for
25 purposes of identification.)

Page 119

1 BY MR. ANDERSON:
2    Q.   Dr. Kalman, this is a certificate of analysis.
3 And as you mentioned, this is one of the certificate of
4 analysis that have been performed at the behest of
5 Vitamins Because.  Do you see that?
6    A.   Yes.
7    Q.   And then you see the lot number there?
8    A.   Under description, Lot Number 09071903?
9    Q.   Right.  And that means it was manufactured on
10 July 7th -- or sorry -- July 9th, 2019, and this is the
11 third batch; correct?
12    A.   I believe so, yes.
13    Q.   And this is Eurofins, the same company that
14 Ms. Hutt and Mr. Yan commissioned some of the testing
15 too; correct?
16    A.   Same global company, different physical
17 laboratory.  If you noticed when you pulled up the other
18 Eurofins sheets, you would notice a different address.
19 Excuse me one second, please.
20    Eurofins is a global company, and they have
21 more than one analytical lab.  If you notice in the upper
22 right-hand corner, Tara Smothers was communicating with
23 their Petaluma, California, office as opposed -- or
24 differently than some of the earlier ones which were at a
25 Brea, California, or ultimately sent to the Brea location

Page 120

1 and emanated somewhere else.
2    So just point being is that Eurofins is a
3 large company with different divisions, and this is not
4 the same address as the Eurofins other office that did
5 those other analyses.
6    Q.   Okay.  And then there was also some that
7 Mr. Yan sent to Eurofins in Canada; right?
8    A.   There was Eurofins Canada and California as
9 well.
10    Q.   Yeah.  But Eurofins is the same company that
11 Ms. Hutt sent the testing out for; right?
12    A.   Same global company.  It's like saying Pepsi
13 is a global company but you could be buying their
14 Gatorade, so -- which is one of their brands, or you
15 could be going to Pizza Hut, which is one of their
16 investments.  So, again, my point -- the same global
17 company.  You got your yes there.  Just different
18 division.
19    Q.   Okay.  So --
20    A.   Each -- if I can finish my sentence, please.
21 Also meaning to state that different offices without, as
22 I implied it -- different offices within the same company
23 may have different standards for how they -- different
24 procedures for how they label as long as they're globally
25 accepted.  So if you notice this certificate of analysis

Page 121

1 looks vastly different than the certificate of analysis
2 from the other Eurofins office that you shared.
3    Now to answer your second part:  On this
4 product, if you can -- I don't know if you can actually
5 show the whole page, because I get cut off at the
6 theoretical mark on my screen here.  The second
7 theoretical.
8    MR. BRODY:  Scott, can you scroll down?  Show
9 him the whole document?
10    MR. ANDERSON:  Dave?
11    THE WITNESS:  There are -- there are a little
12 bit of issues with this product -- with this
13 analysis.  You have a result that says that it's
14 34.3 percent weight; right?  And then it's giving
15 you a calculated value.  So what should be the
16 calculated serving size, then it gives you a
17 theoretical level, and then it gives you a result
18 that is wide -- wide in its variance.  And then it
19 actually gives you a theoretical Number 4.  It
20 doesn't tell you the actual analysis.  So it says an
21 internal method but they don't define the internal
22 method.  But when you look at the other Eurofins
23 analyses, it indicated it either was by UPLC or HPLC
24 or mass spec.  Here, it says internal method.
25 That's fine.  That's not unheard of in analytical

31 (Pages 118 - 121)

Page 122

1    laboratories.  But typically it tells you what the
2    machinery, if you will, that was used for the
3    testing.
4        The issue I have with this specific
5    certificate of analysis is it does not look standard
6    with other certificates up from an analytical lab.
7    And this results shows you the variance here, which
8    you know a little bit going upon.  So this is
9    actually in my opinion not the best certificate of
10   analysis but kind of foot forward to try and
11   demonstrate that it met label claim because there's
12   issues with the -- how this is laid out.  But on
13   paper, it says that it's calculated theoretical, but
14   it doesn't actually show you the analysis except to
15   show, again, that it's -- that there's four units
16   per serving.
17       Q.   Doctor, according to this test the product
18   that was tested met the label claim; correct?
19       MR. BRODY:  Object to form.  Misstates prior
20   testimony.
21       A.   Well, I don't believe that this is a standard
22   way of a certificate of analysis, so I actually do not --
23   I cannot say yes to it, because calculated and
24   theoretical isn't the same as actually analyzed.  If you
25   compare and contrast with the other Eurofins analyses

Page 123

1    that were shared with you or that you actually showed
2    earlier, you will see a difference in how it is done.
3    And then if you say:  Oh, well, some, you know, units
4    within the same company may report things differently,
5    you can also look at the analysis that was done by
6    Labs-Mart or Merieux Labs, which was the Canadian lab --
7    the other Canadian lab that did analyses.
8        Q.   Right.  And you'd agree that those look vastly
9    different than this and the Eurofins testing as well;
10   right?
11       A.   Well, I would say that -- I would agree that
12   this looks vastly different than all those others.
13       Q.   And you'd agree that the Labs-Mart looks
14   vastly different than the other Eurofins and that the
15   Canadian companies looks vastly different than the --
16       A.   No, I would not agree with that whatsoever,
17   sir.
18       Q.   Okay.
19       A.   There's much more -- there's much more
20   consistency in between Labs-Mart, Merieux, and
21   Eurofins -- the other Eurofins analyses as compared to
22   this one.  All I'm saying is that this one is not clear
23   that anything was actually analyzed and what the methods
24   were and what the actual result is.  You don't have to
25   have theory if you have an actual.

Page 124

1        Q.   You'd agree that this particular test was done
2    in the normal course of business back in 2019; correct?
3        A.   It appears.
4        MR. BRODY:  Object to form.  Vague.
5        Q.   And you'd agree that the Eurofins and
6    Labs-Mart were done in the context of litigation in 2020;
7    correct?
8        MR. BRODY:  Object to form.  Vague and also
9    misstates prior -- prior record.  This is dated
10   July 15th, 2019.
11       MR. ANDERSON:  Correct.
12       MR. BRODY:  After the lawsuit began, wasn't
13   it?  So I think your question misstates the record.
14   BY MR. ANDERSON:
15       Q.   You can answer, Mr. Kalman.
16       A.   Can you scroll back to the top of this?  Or,
17   you know, that's -- that's -- that's good.
18       All right.  I believe that this analysis was
19   done after the litigation was already enacted.  I do not
20   believe that necessarily, though, independently that this
21   was not -- I'd rather not -- excuse me.  I believe that
22   this analysis was done after the litigation started.
23   However, I also believe that it could have been done as
24   part of an attempt at improvement in quality procedures
25   and checks of products being manufactured.  But, again,

Page 125

1    it can also have been done in result to try to illustrate
2    after the fact:  Hey, we're meeting label claims.
3        Q.   Do you have any knowledge at all that this was
4    done in the context of litigation?
5        MR. BRODY:  Object to form.
6        A.   I only have the belief and knowledge that the
7    initial litigation started before July 15th, 2019.
8        Q.   I'll even confirm that for you.
9        A.   So then it would be in the course of
10   litigation, but I also said it could have been part of
11   their attempt at improving their processes as a result of
12   getting a 483 from the FDA that indicates as part of your
13   quality control and procedures.  When you're a
14   manufacturer of supplements you have to have certain
15   types of testing before, along, and after the product is
16   made, which includes a label claim review.
17       Q.   Okay.  Do you have basis besides conjecture to
18   make any of those statements?
19       A.   No, I don't believe it's conjecture.  I
20   believe it's just factual by the time -- date.  This
21   occurred after, and it could've either been a result of
22   litigation or a result of FDA 483 that they were
23   trying to -- this is a good thing, that they're trying to
24   improve their processes or it was a result of litigation
25   and they wanted to show that:  Hey, we have some product

Page 126

1 that meets label claim; we're not all bad.

2 Q. Okay. So to the extent that you believe it

3 was done as a result of the 483 letter, this would be a

4 good thing; correct?

5 A. Yes, it would be.

6 MR. BRODY: Object to form.

7 Q. And this would be a test that reflected at

8 least on the face of the test the product met label

9 claim; right?

10 MR. BRODY: Object -- object to form. Asked

11 and answered.

12 A. Based upon face value that this would indicate

13 meeting label claim just because of the word "calculated"

14 just as being in there. However, again, my issue with

15 this certificate is it does not appear to be standard.

16 Q. All right.

17 MR. ANDERSON: Dave, can you give me the wheel

18 back?

19 BY MR. ANDERSON:

20 Q. All right. Doctor, would you agree that

21 pursuant to your review of Ms. Hutt's declarations and

22 testing that she ordered a total of 12 bottles of SAM-e

23 that she alleges was manufactured by Vitamins Because?

24 MR. BRODY: Object to form.

25 A. I believe the number is about right. I think

Page 127

1 it was 10 to 12, but...

2 Q. And would you agree that Mr. Yan purchased

3 nine bottles?

4 MR. BRODY: Object to form.

5 A. At least nine.

6 Q. Are you aware of him purchasing more than

7 nine?

8 MR. BRODY: Object to form.

9 A. No.

10 Q. So if Miss -- if Mr. Yan purchased nine and

11 Ms. Hutt purchased 12, you would have a total of 21

12 bottles that were tested; right?

13 A. That would be correct.

14 Q. You'd agree if none of the bottles that

15 Mr. Yan ordered were manufactured by Vitamins Because,

16 that would bring the ratio down to there's 12 bottles;

17 correct?

18 A. Correct.

19 Q. And if five of the bottles purchased by

20 Ms. Hutt were not manufactured by Vitamins Because, we'd

21 be down to seven bottles; correct?

22 MR. BRODY: Object to form.

23 A. Twelve minus five is seven.

24 Q. And we're aware of four tests that show

25 Vitamins Because's product met the label; correct?

Page 128

1 MR. BRODY: Object to form. Misstates prior

2 testimony.

3 A. We're aware that there are some. I don't know

4 if it's four. I thought it was three. But there are

5 some that demonstrate that they met label claim, at least

6 theoretically.

7 Q. You'd agree that there were three by ABC and

8 one by Eurofins; correct?

9 MR. BRODY: Object to form.

10 A. That would be correct, yes. That's four.

11 Q. That brings it up to almost 45 percent of the

12 product that you're aware of being tested here met label

13 claims; right?

14 MR. BRODY: Object to form. Misstates his

15 prior testimony. Improper predicate.

16 A. No, I'm not saying that at all.

17 Q. Okay. If there were 11 bottles that we're

18 aware that were manufactured by Vitamins Because, 7 of

19 them tested not label and 4 tested label, you'd agree

20 that that ratio is approximately 40 percent?

21 A. No. Your -- your -- your -- you just took

22 out -- you just took out -- in your setup, you took out a

23 good proportion of the samples, so when you reduce the

24 sample size you're going to have an overinflated or false

25 number because out of the total volume of samples that

Page 129

1 were tested that were, you know, purchased, coordinated,

2 and tested by different laboratories -- again, triplicate

3 testing of the same lot by different laboratories and

4 testing of multiple lots, which means not all

5 manufactured on the same day, same week, same month, same

6 year, illustrated that about 90 percent of the time the

7 product did not meet label claim. That's an issue.

8 Q. I agree with you, but what if -- what if 14 of

9 those products that were tested by Ms. Hutt and Mr. Yan

10 were not manufactured by Vitamins Because?

11 MR. BRODY: Objection. Improper hypothetical.

12 Q. That changes the numbers, does it not?

13 A. Well, hypothetically, that would change the

14 numbers and hypothetically whoever manufactured those

15 products has issues.

16 Q. But as we've talked about, we have no -- you

17 have no idea who manufactured the products that were

18 tested on the COAs that you attached to your report;

19 right?

20 MR. BRODY: Object to form. Misstates prior

21 testimony.

22 A. I believe I answered earlier that without

23 direct observation, I go by what I've read and it would

24 be Vitamins Because/CT Health as the manufacturer.

25 Q. On what do you rely upon for your

33 (Pages 126 - 129)

Page 130

1 understanding -- and I want every source -- for your
2 understanding that Vitamins Because manufactured the
3 products that are subject to your expert report and
4 manufactured the products that the COAs that you attached
5 to your report?
6     MR. BRODY:  Object to form.
7   A.   Or whether it was private label or their own
8 label, what gives me the belief would be reading the
9 original -- reading the complaint.
10   Q.   Any other source?
11   A.   No.  No other source.  No other source to
12 believe that -- to believe otherwise.
13   Q.   I'm going to reshare my screen here.  And
14 we're just going to go back to the report.  And,
15 specifically, we're going to focus on Footnote 3 there.
16 You wrote "While the uniformity of the subject matter
17 SAM-e and its manufacturing processes has not been
18 disputed by defendant."  Do you see where you wrote that?
19   A.   Yes, sir.
20   Q.   What are you relying upon in making that
21 statement?
22   A.   I'm relying upon the information that I read.
23   Q.   What did you read that said defendants do not
24 dispute the uniformity of the subject matter SAM-e and
25 its manufacturing processes?

Page 131

1   A.   Yeah.  That would be the impression that I
2 read when reading into -- reading the complaint, reading
3 the -- the 483 response letter.
4   Q.   You write "Has not been disputed by
5 defendant."  What are you relying upon for that
6 statement?
7   A.   I haven't seen anything that -- that -- I have
8 not -- I rely upon the information that's been shared,
9 and I have not seen any shared from -- any information
10 shared from the defendants that they do not argue about
11 the quality of their manufacturing processes.  In fact,
12 in their response to the 483, they agree that they need
13 to make improvements if you want to summarize all the
14 line items that they answered.
15   Q.   Sure.  Making improvements is not the same as
16 not disputing something; correct?
17     MR. BRODY:  Object to form.
18   A.   Well, you only make an improvement when --
19 listen.  You make an improvement or a change in something
20 because you can't dispute what's just been pointed out to
21 you.
22   Q.   I'm not sure I follow, but I'll move on a
23 little bit.  This sentence says, "The uniformity of the
24 subject matter SAM-e and its manufacturing processes has
25 not been disputed by defendant."

Page 132

1     Where does --
2   A.   Okay.  Also -- I'm sorry.  Also -- where --
3 and also --
4   Q.   I'm not done with my question, sir.
5   A.   Oh, sorry.
6   Q.   Where does it say that in their response to
7 the 483 letter?
8     MR. BRODY:  Object to form.
9   A.   The 483 letter -- in their response to the 483
10 letter, it -- they indicate what areas -- what changes
11 they are making and what areas they are making them in.
12 Also, I wanted to bring up as it related to the SAM-e and
13 uniformity of the subject matter is the raw material
14 that -- that was used in the contract manufacturing --
15 right? -- has been according to the certificates of
16 analysis of received items by the contract manufacturer
17 S-Adenosyl methionine sodium tosylate and the uniformity
18 of that has to do with the chemical composition of the
19 ingredients.  So they've always had and appear to use the
20 same raw material that they would obtain from, like,
21 Jiaherbs is one of your client's raw material suppliers.
22 And when you look at the certificates of analyses of the
23 raw material that have been shared at least as part of
24 this lawsuit that I read, the actual material has been
25 the same.  That's also part of the definition of

Page 133

1 uniformity.
2   Q.   Are you talking about the certificate of
3 analyses that are approximately a hundred pages long from
4 a hundred different orders?
5     MR. BRODY:  Object to form.
6   A.   No.  I'm not talking about a hundred different
7 pages.  I'm giving an example of -- Jiaherbs is one that
8 comes to mind as one of the suppliers of SAM-e to VB.
9 And, geez, what was this other one?  I'm sorry.  I'm
10 blanking on the name of another Chinese raw material
11 supplier that they use.
12   Q.   Yeah, Shandong?
13   A.   Might be.  And all I'm saying is the
14 uniformity of that ingredient when you look at its
15 chemical name S-Adenosyl methionine sodium tosylate is
16 consistent.  That's part of uniformity; right?
17   Q.   Right.  But what you say --
18   A.   And the manufacturing process, how your
19 company makes -- not your company.  How the VB makes the
20 product, ultimately meaning the finished product that
21 they're bottling for somebody or themselves, you know,
22 that's not been disputed.  And, in fact, so Number 3 or
23 letter 3, subset, whatever you want to call it, is
24 factual and true in what I wrote.
25     So part of -- part of the -- part of the issue

34 (Pages 130 - 133)

Page 134

1 here is understanding the certificate of analysis that
2 your -- that your contract manufacturer receives from its
3 raw material supplier.
4    Q.    Okay. I'm going to go back to Footnote 3
5 again. What you write is "The subject matter SAM-e and
6 its manufacturing process has not been disputed by
7 defendant."
8    A.    Right. You guys have not said that the
9 uniformity of the subject matter, the composition of
10 SAM-e, and your manufacturing process is -- you don't
11 dispute how you obtain raw material from somebody else
12 and then manufacture it into an end product.
13    Q.    How do you know that?
14        MR. BRODY: Object to form.
15    A.    From everything that I've read.
16    Q.    Right. Tell me what that is.
17        MR. BRODY: Object to form. Asked and
18    answered.
19    A.    I've asked and answered.
20    Q.    Is it just from the third amended complaint?
21    A.    And, also -- again, I've asked and answered
22 from looking at certificates of analyses that have been
23 supplied by, you know, as part of this litigation,
24 looking at raw materials certificate of analysis, product
25 label, and end analyses. And, again, like you said, the

Page 135

1 amended complaint.
2    Q.    Have you ever talked to anyone from Vitamins
3 Because?
4    A.    No. Not that I know of.
5    Q.    Aside from reading part of their depositions
6 last night and this morning, are you aware of any
7 testimony they've given in this case?
8        MR. BRODY: Object to form.
9    A.    I've never spoken to anybody at Vitamins
10 Because that I know of and I've read their depositions
11 like I said.
12    Q.    Well, you didn't read it. You spent an hour
13 and a half looking over them; right?
14    A.    That's an hour and a half of -- yes, an hour
15 and a half reading through them.
16    Q.    But you didn't read all of either of them;
17 right?
18    A.    No. One of them was 131 pages, and you guys
19 put 4 -- 4 pages on an actual page. It's a lot of
20 reading, so I looked at material parts that I was
21 interested in.
22    Q.    Right.
23    A.    And, again, like I said earlier, you know,
24 that's what part of the -- reading I did.
25    Q.    Right. And when you wrote Footnote 3, that

Page 136

1 was long before you ever read those depositions; right?
2    A.    Correct.
3    Q.    All right. In your discussions -- in email
4 discussions and in oral discussions with Mr. Yan, did you
5 ever ask him whether this product was manufactured by
6 Vitamins Because?
7    A.    No.
8    Q.    Did you ever ask Ms. Hutt whether these
9 products were manufactured by Vitamins Because?
10    A.    No.
11    Q.    It would affect your opinion, would it not, if
12 between half and a third of the product that you are
13 relying upon was not manufactured by Vitamins Because?
14    A.    No.
15    Q.    It wouldn't affect your opinion?
16    A.    No. More likely than not, it would not. And
17 there's very obvious and easy reasons why from my --
18    Q.    If 75 --
19    A.    -- from my experience.
20        MR. BRODY: Counsel, let him finish. Counsel,
21    let him finish. Go ahead.
22    A.    You know, the regulatory issues alone and the
23 lack of consistent -- the regulatory issues alone, the
24 lack of consistent meeting label claim, plus not even
25 meeting the 80 percent requirement by the FDA of label

Page 137

1 claim when using food as an indicator -- food laws. So
2 when I put together regulatory issues, questionable
3 analyses -- questionable results observed from objective
4 analyses and also seeing the certificates of analysis of
5 raw material that the manufacturer used and relied upon
6 would all give me reason to say more likely than not my
7 conclusions would be exactly the same.
8    Q.    Okay. So I want to make sure I'm
9 understanding what you're saying. If half the product
10 that you have COAs for, including the product that was
11 triplicate tested was not manufactured by Vitamins
12 Because, you would have the same opinion?
13        MR. BRODY: Object to form. Misstates prior
14    testimony. Improper hypothetical.
15    Q.    You can answer, Dr. Kalman. As an expert,
16 it's your job to deal in hypotheticals.
17        MR. BRODY: Objection.
18    A.    Thank you. It's my statement that there would
19 still be an issue with Vitamins Because or VB.
20    Q.    Okay. But that's -- that's not what I asked.
21 I asked if your opinions would be changed.
22    A.    No, my opinions would not change.
23    Q.    You would still have the opinion that -- we've
24 already discarded your opinion, but you would still have
25 the opinion --

35 (Pages 134 - 137)

Page 138

1    A.    I haven't discarded my opinion.
2    Q.    You would still have the opinion that up to 90
3  percent of the SAM-e manufactured by Vitamins Because did
4  not meet label claims?
5        MR. BRODY: Object to form.
6    A.    I would have the same opinion that products
7  manufactured by Vitamins Because did not meet label
8  claim.
9    Q.    I don't think anyone sitting here is saying
10  that every product by Vitamins Because met label claim.
11  Are you aware of anybody saying that?
12        MR. BRODY: Object to form. I don't
13    understand the question.
14    A.    Not specifically.
15    Q.    Well, are you aware of anyone generally saying
16  that?
17    A.    I mean, that's your intimation.
18    Q.    Well, you read -- I mean, you said you read
19  Mr. Chapman's deposition this morning and last night;
20  right?
21    A.    Correct. But you're asking anyone here. He's
22  not here, so you're the one speaking. You're the one
23  that intimate such.
24    Q.    You heard him say that there's some products
25  that left Vitamins Because that didn't meet label

Page 139

1  requirements; right?
2        MR. BRODY: Object to form.
3    A.    I read it. I did not hear him say it.
4    Q.    Are you aware of Vitamins Because making any
5  changes in between the time when the FDA inspection
6  occurred in January of 2018 and the present as it relates
7  to their manufacture of SAM-e?
8        MR. BRODY: Object to form.
9    A.    No, I am not.
10    Q.    Would whether they made any changes affect
11  your opinion?
12        MR. BRODY: Object to form.
13    A.    One thing that would have an impact on my
14  decision is if they were independently certified as being
15  compliant with good manufacturing practices. Something
16  called certified GMP, you know, by an organization such
17  as NSF and many of the other good operators out there
18  that help with the systems of checks and balances. So
19  independently taking their word for it without paying a
20  visit to their manufacturing facility and doing an audit,
21  no. However, what may impact my feeling about them would
22  be if they were independently certified, again, by NSF as
23  being GMP certified.
24    Q.    Okay. You said what would affect your feeling
25  about them. What is your feeling about Vitamins Because?

Page 140

1    A.    I'm sorry. That was a poor choice of word.
2  What would affect my perception regarding --
3    Q.    Okay. What's your perception?
4    A.    My perception is that it's a manufacturing
5  company that does not have good quality controls and that
6  seems like a very much a mom and pop shop.
7    Q.    Are you aware that since having the
8  manufacturing facility inspected, that they have moved
9  locations and built a 20,000-square-foot manufacturing
10  facility and warehouse?
11        MR. BRODY: Object to form. Misstates the
12    record.
13    A.    No, I'm not. I'm not aware that since this
14  court case started that they have moved to a different
15  manufacturing facility or different location.
16    Q.    Did I say -- I'm unaware that I said that.
17  Since it was inspected in January of 2018, are you aware
18  that Vitamins Because has moved facilities at all?
19    A.    I'm not aware of their address to tell you the
20  truth. I know that I've seen a Florida address, but I --
21  I have not -- I haven't -- no, I'm not aware of their
22  address or whether they moved down the block or not.
23    Q.    And you're not aware of the machines they use
24  to manufacture the product?
25    A.    Not specifically. I would assume that they're

Page 141

1  standard manufacturing processes for making capsules,
2  powders, pills, and so forth.
3    Q.    You've never asked to visit Vitamins Because
4  facility, have you?
5    A.    No, I have not.
6    Q.    Have you ever asked to speak to any of the
7  plaintiffs that actually purchased the product that we're
8  here to talk about?
9    A.    No, I have not.
10    Q.    Why not?
11    A.    Hasn't crossed my mind as something standard
12  to go review. It would not appear to be appropriate to
13  me to speak to somebody that if I'm being hired or
14  working with as an expert witness for one side to go
15  interview people on the other side.
16    Q.    Don't you represent the plaintiffs?
17        MR. BRODY: Form.
18    A.    I'm an expert witness that is here sharing my
19  expertise as part of Mr. Brody and associates plaintiff
20  group. Again, my legalese might be a little bit wrong,
21  but I hope that you get what I'm trying to share.
22    Q.    Well, I think I do. I get why you wouldn't
23  want to call Mr. Chapman up.
24    A.    I have no fear -- I have no fear of calling
25  him up and I would have no fear of going there and using

36 (Pages 138 - 141)

Page 142

1 one of the standard checklists for a manufacturing audit.
2 None whatsoever. It's just not something that crossed my
3 mind, one. And, two, it's not something that without
4 direct approval of a lawyer or the law firm I would be
5 working with, I wouldn't do.
6    Q.   Now as part of your job as an expert witness
7 in rendering testimony that the products manufactured by
8 Vitamins Because don't meet their label claims, don't you
9 think it would be important to look at the actual product
10 that the plaintiffs purchased?
11       MR. BRODY: Object to form. You're speaking
12 about the individual bottles purchased from --
13       MR. ANDERSON: I'm just asking him the
14 questions I asked him.
15       MR. BRODY: Yeah, but you gotta explain what
16 you're talking about. It's not fair to --
17       MR. ANDERSON: If he understands, he
18 understands, man.
19       MR. BRODY: All right. If you understand it,
20 you can answer the question. I don't think it's
21 very clear.
22       THE WITNESS: I have seen -- I have not
23 thought of asking to see actual bottles of products,
24 you know, by the plaintiffs. I've seen pictures of
25 the bottles that were purchased and tested. But

Page 143

1    beyond that -- and going on beyond that, there's
2    nothing more I have to add.
3 BY MR. ANDERSON:
4    Q.   Did you review the documents that were
5 produced by Vitamins Because in this case?
6       MR. BRODY: Object to the form. Can you
7    clarify which documents?
8       MR. ANDERSON: No.
9       MR. BRODY: You want him to answer without
10   clarifying which documents you're talking about?
11      MR. ANDERSON: Yep.
12      MR. BRODY: You can answer to the extent you
13   understand what he's talking about.
14      THE WITNESS: My answer to you is: I have
15   read documents that have been produced by Vitamins
16   Because. Whether it's the entirety of all of the
17   documents produced, that I do not know.
18 BY MR. ANDERSON:
19   Q.   Would you want to review the entirety of the
20 documents produced by Vitamins Because?
21   A.   Not if it's -- not if it's not pertinent to
22 what I do or what I'm here for. I really do not like
23 wasting my time. And I don't mean that to be offensive,
24 but I would only want to review what was pertinent to the
25 case not something that's not pertinent. But pertinent

Page 144

1 to my area of what I'm here for.
2    Q.   But do you rely on the lawyers to tell you
3 what's pertinent or not pertinent to your expert
4 testimony?
5       MR. BRODY: Object to form.
6    A.   Typically, expert work in my experience has
7 been defined by scope and not necessarily the same thing
8 as a detective at a police force that may have a wide
9 scope, so I like to stay within my defined scope. It
10 helps me do better work.
11   Q.   And your defined scope here, as it says in
12 your report, was to describe why the products are
13 deficient; right?
14   A.   Correct. From everything from issues on GMPs
15 to FDA violations to FDC violations and other issues
16 here.
17   Q.   Have you reviewed all the COAs produced by
18 Vitamins Because?
19      MR. BRODY: Objection.
20   A.   I believe I've asked and answered. I can't --
21 again, I'll just reanswer you the same way. I've
22 reviewed what was provided to me. Whether that's the
23 entirety of the set, I do not know that.
24   Q.   You'd agree that the CEOs [sic] reflect a
25 significant variation in the composition of the raw

Page 145

1 materials used, wouldn't you?
2       MR. BRODY: Object to form. Misstates the
3    record.
4    A.   I would -- I would not agree to that or
5 anything unless I had the documents in front of me.
6    Q.   Well --
7    A.   So if you want to share screen with what you
8 mean -- you called them CEOs, but they are COAs. But if
9 you want to discuss, you know, those, please share them.
10 It's fair.
11   Q.   Okay. Well, and herein lies the problem is
12 you were asked to bring every single thing that you
13 relied upon and reviewed in making your determination
14 with you today. And I know that it's not your fault that
15 you didn't, but you don't have any of them.
16      MR. BRODY: Object to form. Misstates --
17   Q.   And if I can ask you about the statements
18 that you make in the deposition and what you bring to the
19 deposition, it makes this process nearly impossible for
20 an expert witness.
21      MR. BRODY: Counsel, I'm going to object
22   because he says he has his file on the computer. So
23   I think you're misstating the record.
24      MR. ANDERSON: He said he had some of his file
25   on his computer.

37 (Pages 142 - 145)

Page 146

1  THE WITNESS: Yes, that is true. I do have
2  some of the files on the computer. The rest I go
3  into -- again, I don't want to say it wrong. The
4  rest I go into the box.com box where it's, you know,
5  been put by Mr. Brody and associates because it's
6  secure and other issues. I don't have -- I only
7  kept on my computer what was pertinent to what this
8  is because everything else is available through the
9  cloud. And, honestly, it's not your issue. Part of
10 it is mine. It's a memory issue on a ten-year-old
11 Mac. So I only kept what I was using most recently.
12 Everything else is always easily grabable by box.com
13 through Mr. Brody's office and, you know, so forth.
14 BY MR. ANDERSON:
15   Q.  In your job as an expert witness in this case,
16 did you notice variations in the composition of the raw
17 materials used in the manufacturer of Vitamins Because's
18 SAM-e?
19      MR. BRODY: Object to form. Vague. Misstates
20   prior testimony.
21   A.  Can you define what you mean by "variations"?
22   Q.  You had testified earlier that the raw
23 materials were uniform. What I'm asking you is if you
24 noticed variation in the composition of the raw materials
25 in preparing for your expert testimony today?

Page 147

1      MR. BRODY: Object to form.
2   A.  Without having them in front of me, I am not
3  going to make a firm conclusion on that. And having a
4  better understanding of what you mean by variations or
5  variability because there are many different aspects to a
6  raw material certificate of analysis. There could be
7  variability that one might see on the microbiological
8  analysis that's part of a COA. There might be some
9  variability that one might see on the humidity portion,
10 so -- and, naturally, you're going to have some. I'm
11 sorry.
12   Q.  You know what variations means.
13   A.  Yes, but when it comes to a COA, let's be a
14 little bit more specific. Are you talking about
15 variation in the SAM-e ion? Are you talking about
16 variation in the pH, varia-- there's a lot of details
17 that are in a COA, so blanketly giving you an answer
18 would not be the best thing to do.
19   Q.  Okay. Well, help me then. What did you mean
20 when you said uniformity?
21   A.  That -- what I meant by uniformity was the
22 name of the raw material chemical that was being used by
23 VB through their supplier. The most consistent name,
24 even though I may muck it up at this second, was the
25 S-Adenosyl methionine sodium tosylate. That was the most

Page 148

1  consistent form of SAM-e that they were using.
2   Q.  So if I were to rewrite with your definition
3  of the word uniformity Footnote 3, would this be a fair
4  statement: While the name of the subject matter SAM-e
5  and its manufacturing process has not been disputed by
6  defendant, it is worth noting that any lack of the name
7  in defendants' manufacturing or end product results would
8  itself render the SAM-e supplement values, et cetera,
9  et cetera?
10      MR. BRODY: Object to form. Misstates prior
11   testimony.
12   A.  Let me better explain or revisit Number 3.
13 And part of that's over being looked here -- or being
14 overlooked here.
15   Q.  Can you answer the question? I don't need an
16 explanation. I just need you to answer the question I
17 asked.
18      MR. BRODY: Same objection.
19   A.  Then please ask it again.
20   Q.  You said by the word "uniformity," you meant
21 name of the component, name of the active chemical, name
22 of the SAM-e iomer -- isomer or whatever it was that you
23 were saying. And so what I'm asking is when you say
24 uniformity of the subject matter SAM-e, is what you're
25 really saying while the name of the subject matter SAM-e?

Page 149

1   A.  No.
2   Q.  Okay. How do you define uniformity?
3   A.  So uniformity would have consistency. So
4  uniformity would be consistency of results. Uniformity
5  would be every time you step on that scale that day that
6  you decided to weigh yourself within five minutes,
7  getting on and off, that it always said 150 or whatever
8  magic number is in your head. That's --
9   Q.  And then --
10   A.  -- kind of uniformity. Now the issue with --
11 the issue with the manufacturing here is the end product
12 results. The strength and quality did not demonstrate
13 uniformity. So if you don't have the strength or quality
14 of a product -- the strength of a product meaning dosage
15 being consistent. You don't have uniformity to the end
16 user. So it's worth noting that any lack of uniformity
17 in the manufacturing or end product results, i.e., as
18 illustrated by certificates of analysis from analytical
19 labs showing not meeting label claims about 90 percent of
20 the time would demonstrate that -- that you're -- that
21 the product is not worthwhile.
22   Q.  Okay. I'm going to strike all that. Move to
23 strike.
24      MR. BRODY: I'm going to object to that
25   motion.

38 (Pages 146 - 149)

Page 150

1    Q.   Uniformity -- you started off on the right
2  track.  Uniformity, you said, met consistency; right?
3    A.   That's one aspect of uniformity is
4  consistency.
5    Q.   Okay.  What are other aspects of uniformity as
6  you use them?  Or let me ask a better -- a different
7  question.  If uniformity means consistency, what does
8  variability mean?
9    A.   Changes in such consistency.
10   Q.   Okay.  Have you seen any changes in the
11 consistency of the raw material in the COAs that you
12 reviewed in preparation for your expert testimony today?
13        MR. BRODY:  Object to form.
14   A.   Now to --
15   Q.   Yes or no?
16   A.   For fairness, there's two different types of
17 COAs.  Right?  We have the certificates of analysis from
18 the Eurofins-type laboratory and we've mentioned the
19 certificate of analysis of the raw material that Vitamins
20 Because obtained in order to make their finished product.
21   Q.   You were referring in your use of uniformity
22 to the raw product that they use?
23   A.   Okay.
24   Q.   So I'm talking about the COAs of the raw
25 product.  Did you see any change in consistency of the

Page 151

1  raw product used by Vitamins Because when you reviewed
2  all the COAs in preparation for your expert testimony
3  today?
4    A.   I think not.
5    Q.   Dr. Kalman, I think you said in your report
6  that you believe that 400 milligrams is the amount of
7  SAM-e that is required for the product to reap the
8  benefits.  Is that a fair statement?
9        MR. BRODY:  Object to form.  Misstates the
10        record.
11   A.   It is fair to say that as part of my report, I
12 shared evidence-based information indicating that at
13 least 400 milligrams of SAM-e per day were needed to
14 demonstrate or find any efficacy or effectiveness, if you
15 will, when you look at -- again, at the literature.  So
16 meaning that minimal dosage per day needed to be at least
17 400 milligrams per day.  And when you look at the
18 research that has done positive impacts.  Lower than that
19 is inconsistent to no effects.
20   Q.   So you wouldn't recommended to anybody that
21 they took a single dose of 200 milligrams of SAM-e, let's
22 say?
23        MR. BRODY:  Object to form.  Misstates the
24        testimony.
25   A.   I wouldn't recommend to anybody to take a

Page 152

1  single dose if they were using SAM-e because a single
2  dose -- it's not like taking an Advil to get your
3  headache to go away.  There's a different physiologic
4  response and goal that one is looking for when one
5  utilizes nutritional supplements as part of a health
6  routine.
7    Q.   I'll ask a better question.  You wouldn't
8  recommend that anyone would take a 200 milligram dose a
9  day if they wanted to reap the benefits of SAM-e;
10 correct?
11   A.   That would be correct.  That would not be a
12 dosage that I was recommending based upon the current
13 literature.
14   Q.   You'd recommend at least 400 milligrams a day;
15 right?
16   A.   I believe so.  I believe that's what I wrote
17 in my report too.
18        MR. ANDERSON:  Guys, we can do this two ways.
19 I can take five minutes and review my notes.  I
20 think I'm done.  Or someone else can go, and I'll
21 review my notes and --
22        MR. BRODY:  No.  Let's -- let's finish it up.
23 If you need five minutes, you can take five minutes
24 now.
25        MR. ANDERSON:  All right.  Let's do it.

Page 153

1        (Recess.)
2        MR. ANDERSON:  All right.  Dr. Kalman, I don't
3  have any additional questions for you at this time,
4  and I'm going to pass you off to Mr. Pollack.
5        But I do want to make the statement that we
6  noticed this deposition duces tecum.  The duces
7  tecum was not responded to.  It wasn't maybe given
8  to the expert.  He didn't bring any documents, and
9  I'm not going to release the witness until we get a
10 court ruling on that, but I am done asking
11 questions.  I'm going to pass him to Mr. Pollack.
12        MR. BRODY:  I'll object to that, and we'll
13 reserve the rights -- we will not be producing
14 Dr. Kalman again for deposition without a court
15 order, so...
16        MR. ANDERSON:  I get it.
17        MR. BRODY:  Understood.  Great.  Go ahead.
18 Which attorney is -- will be deposing him?
19        MR. POLLACK:  (Indicating.)
20        MR. BRODY:  Okay.
21             CROSS-EXAMINATION
22 BY MR. POLLACK:
23   Q.   I think I'm on mute.  Hello.  Good afternoon,
24 Dr. Kalman.
25        MR. BRODY:  This is the attorney for one of

39 (Pages 150 - 153)

Page 154

1    the defendants in the case.  One of the private
2    label defendants in the case.  Go ahead.
3    Q.   Hello.  Good afternoon, Dr. Kalman.  My name
4  is Bretton Pollack.  I represent Defendant Inspire Now.
5       MR. BRODY:  Brett, sorry to cut you off.  Can
6  I ask you just to raise your volume?  I can hear
7  you.  It's just faint.
8       THE COURT REPORTER:  I can barely hear you.
9       MR. POLLACK:  I'll go ahead and speak up a
10  little bit.
11       MR. BRODY:  All right.
12  BY MR. POLLACK:
13    Q.   Good afternoon.  My name is Brett Pollack.
14  I'm the attorney for Inspire Now doing business as
15  BoostCeuticals.  Can you hear me all right, Dr. Kalman?
16    A.   Yes.
17    Q.   Am I pronouncing your name correctly, sir?
18    A.   It's okay.  Yes.
19    Q.   Very good.  It seems like you've had your
20  deposition taken before and we already had depositions.
21  I would just state that the same rules apply that
22  Mr. Anderson went over with you.  Do you have any
23  questions about the general procedure or the deposition
24  before we begin?
25    A.   No, sir.

Page 155

1    Q.   I'm going to go ahead and pull up some
2  documents.  If you can bear with me for a moment, please.
3  Sir, you stated that your employer is Nutrasource and you
4  also mentioned a Nutraceuticals.  Can you elaborate on
5  the specific name of the company that employs you,
6  please?
7    A.   Yes.  The full or whole name of Nutrasource is
8  actually Nutrasource Pharmaceutical and Nutraceutical
9  Services.  I'm -- I have more than one job, but my -- I'm
10  the vice president of scientific affairs at Nutrasource.
11  Nutrasource is a short name versus saying Nutrasource
12  Pharmaceutical and Nutraceutical Services all the time.
13  No different than some law firms just become initials
14  after a little while; right?
15    Q.   Just want to be clear on that.  Does -- and if
16  I refer to your employer as Nutrasource, we'll understand
17  who I'm speaking about; is that correct?
18    A.   Yes.  And just so you're aware, I'm also
19  employed at Nova Southeastern University.
20    Q.   I'll be clear if I'm asking you questions
21  about Nova Southeastern, but for now the questions about
22  your employer are referring to Nutrasource.
23    A.   Yes, sir.
24    Q.   Do you know if Nutrasource has a United States
25  subsidiary or affiliate?

Page 156

1    A.   Yes.
2    Q.   And what is the name of that company, sir?
3    A.   GRAS associates, G-R-A-S.  Stands for
4  Generally Regarded As Safe.  GRAS Associates.  It's a
5  legacy company.
6    Q.   And does -- who actually -- which company
7  actually sends you a paycheck?  Is that GRAS Associates
8  or Nutrasource?
9    A.   GRAS Associates.  And just for fairness, the
10  differences are that healthcare in Canada is different
11  than healthcare in America, so when you work for a
12  Canadian company but you're an American, they can't give
13  you healthcare because it's not part of what they do
14  there.  But if they have an American subsidiary or other
15  arm, they can give you the, you know, typical -- well,
16  what we hope are typical benefits with any job.  So
17  that's one of the reasons why anybody that lives in the
18  U.S. is -- their paychecks are physically through GRAS
19  Associates, but we all work for the parent company.
20    Q.   Understood.  I just want to wrap my head
21  around this and --
22    A.   Sure.
23    Q.   Looking at the Nutrasource website, the
24  company holds itself out as providing consulting services
25  to several industries including the supplement industry;

Page 157

1  is that correct?
2    A.   The supplement industry is one of the
3  industries that Nutrasource serves and consulting is one
4  of the buckets, if you will, or groups of services that
5  are offered within the suite of services that Nutrasource
6  has.
7    Q.   Does Nutrasource provide consulting services
8  to any other supplement companies in North America that
9  have a SAM-e product?
10    A.   Some of the consulting work that Nutrasource
11  has are with multinational companies.  And within those
12  multinational companies, they may have a supplement brand
13  that has a SAM-e ingredient in it, but I have no idea.
14  So I can't answer you wholeheartedly because, for
15  example -- hypothetically, we could be doing consulting
16  work for Nestle, and Nestle owns I think it's somewhere,
17  like, 22 different supplement companies in North America.
18  And so just because we're doing work for Nestle doesn't
19  mean that -- so to answer your question is I don't
20  necessarily know.  I know that since I've been employed
21  at Nutrasource there has not been a single project that
22  I'm aware of or have been active in that has the
23  ingredient SAM-e involved.
24    Q.   Understood.  And, sir, just for the deposition
25  as we move forward, if you don't know the answer, please

40 (Pages 154 - 157)

Page 158

1 state that, and that maybe -- you know, if I need to ask
2 a follow-up question, I will, but that also sometimes is
3 going to be a perfectly good answer if you don't know. I
4 mean, I'll just tell you I'm inquiring as to bias,
5 prejudice, conflicts, that type of thing.
6    A.   Yes, sir.
7    Q.   For example, I'll ask you this question:  Do
8 you know if Nutrasource currently has any business
9 relationships with any company that's a direct competitor
10 with VB?
11   A.   No, there is not.  Nutrasource does not have
12 any work that is going on with any contract manufacturer
13 globally anywhere in the world.
14   Q.   When you say "contract manufacturer," do you
15 mean of any supplement or specifically with SAM-e?
16   A.   Any supplement.
17   Q.   And also a point of clarification, if I say
18 VB, can we agree that we're referring to Vitamins Because
19 and CT Health together?
20   A.   Confirmed.
21   Q.   That we're treating them as one entity.
22        When you talk about the manufacturing aspect,
23 let me ask you another question:  Does Nutrasource
24 provide consulting services to supplement companies in
25 other regards of the business other than the

Page 159

1 manufacturing processes?
2    A.   Yes.
3    Q.   For example, do you know whether Nutrasource
4 provides consulting services for compliance purposes to
5 clients that are direct competitors with VB?
6    A.   No.
7    Q.   And to clarify the answer, you don't know or
8 it does not?
9    A.   Nutrasource does not have any business
10 consulting or otherwise with competitors of VB.
11   Q.   All right.  Let's switch over to yourself,
12 sir.  Do you have any investments or financial interests
13 in any company you know to be a competitor with VB?
14   A.   No.
15   Q.   I'll just ask you the same question for the
16 other individuals at your company that we spoke about.
17 Kevin Yan; do you know whether he has any investment or
18 financial interest in competitors of VB?
19   A.   I do not know.
20   Q.   Same question for the CEO William Rowe?
21   A.   I do not know.
22   Q.   I'd like to discuss your payment structure.
23 What is your salary, sir?
24   A.   My salary at Nutrasource?
25   Q.   Yes.

Page 160

1        MR. BRODY:  Outside the scope.
2    A.   How is that related to this?
3    Q.   Compensation of an expert is explicitly
4 allowed to be discovered.
5        MR. BRODY:  Counsel --
6        MR. POLLACK:  He stated that he was being paid
7 generally as his salary was my recollection, so I
8 would like to know what his salary is.
9        MR. BRODY:  Counsel, I'm going to object to
10 that.  You're entitled to ask about the payment for
11 his work in the case.  That you can ask about.  I
12 think it's already been stated in the report.  But
13 you can't question him about his compensation in
14 general.  That I'm not going to allow.  You can --
15 you can try to -- you can go to the judge and ask
16 for it.  Good luck to you, but that's not happening
17 right now.
18       MR. POLLACK:  (Inaudible) -- interpretation,
19 Mr. Brody.  I'll --
20       (Talking over each other.)
21       MR. BRODY:  Well, take it up with the judge
22 like you did the last time.
23       MR. POLLACK:  For the sake of not arguing with
24 you, I'll see if we can ask some additional
25 questions.

Page 161

1        MR. BRODY:  Sure.
2 BY MR. POLLACK:
3    Q.   Dr. Kalman, is my recollection correct that
4 you said you were receiving $450 per hour as the rate for
5 services related to serving as an expert in this case?
6    A.   The rate that is the billable rate or the
7 billed rate is $450 an hour.  And, again, Nutrasource
8 bills it and receives it.  I don't personally bill it or
9 receive it.
10   Q.   How much of the $450 per hour do you
11 personally receive?
12   A.   I don't know.  I never broke down my salary
13 into what I earn per hour.  I kind of stopped doing that
14 20-something years ago.
15   Q.   Do you receive any additional pay from
16 Nutrasource for serving as an expert in general in any
17 capacity?
18       MR. BRODY:  Object to form.
19   A.   No.
20   Q.   All right.  Do you receive any bonuses from
21 your employment at Nutrasource ever?
22       MR. BRODY:  Object to form.
23   A.   An insulting one last year.
24   Q.   I'm sorry.  Could you repeat that?
25   A.   I said -- probably incorrectly -- but I said

Page 162

1  "an insulting one last year."
2      Q.   Sir, are your bonuses related to your
3  performance at work?
4      A.   The -- the bonuses are tied to performance;
5  correct?  And in part -- tied to performance, yes.
6      Q.   Dr. Kalman, do you receive a bonus for your --
7  relating to your expert testimony?
8           MR. BRODY:  Object to form.
9      A.   No.
10     Q.   I believe that you stated that you could tell
11 us which records you had reviewed but you'd need to look
12 at your computer files; is that correct?
13     A.   I said that I have some on my computer that I
14 could look at and that everything else, I would just
15 access through box.com from Mr. Brody's firm.
16     Q.   All right.  I'll try to ask you some questions
17 and we'll see if we need to spend the time.
18     A.   Sure.
19     Q.   Because I need to get through things.
20          First off, did you ever receive any
21 certificates of analysis for the raw SAM-e ingredients?
22     A.   Can you repeat the question?  I didn't hear.
23     Q.   Yes.  And if I'm not using the correct
24 terminology, you know, please feel free to correct me.
25 But let's maybe -- we'll take a step back.  And just so

Page 163

1  you can understand, I had to revise my outline so I'm
2  not -- I'm trying not to ask the same questions that we
3  asked before.  So I'll start this way.  Doctor, are you
4  aware that VB does not actually manufacture the SAM-e at
5  issue in this case?
6           MR. BRODY:  Object to form.  Misstates the
7  record.
8      A.   I don't think I understand the question.
9      Q.   Sure.  And -- (Talking over each other.)
10     A.   It sounded like a statement.
11     Q.   -- point of confusion.  Maybe if I phrase it
12 this way.  Do you know whether VB -- is the correct term
13 synthesized the SAM-e?
14     A.   From my reading of the records, VB acquired
15 the raw material of SAM-e from a raw material supplier or
16 suppliers meaning that they did not make the material or
17 extract it in their own facility or synthesize it in
18 their own facility, they purchased it like many contract
19 manufacturers do, from somebody else.
20     Q.   Understood.  I just want to make sure that
21 we're clear on that, because the word "manufacture," I
22 think, has different connotations.  But we will try to
23 use the word create or synthesize.  I think that could be
24 helpful here.
25     A.   Supplier -- typically -- honestly, though,

Page 164

1  those people that are supplying raw material -- part of
2  the supply chain; right?  They're supplying raw material.
3  Now whether that raw material is SAM-e or whether it's
4  vitamin C, that ultimately goes to a local contract
5  manufacturer that will then take parts A, B, C, D, and E
6  and put them together in a pill, powder, potion, or
7  whatever is being -- the ultimate goal that is being
8  produced.
9           So you have raw material suppliers, and you
10 have the contract manufacturers that actually make the
11 end products.  If that's helpful to you.
12     Q.   Thank you.  What are the materials -- what are
13 the different ingredients that went into the VB products
14 at issue?
15     A.   Well, I focused on the active nutritional
16 ingredient of S-Adenosyl methionine, meaning I do not
17 have a specific memory of the fillers and other
18 ingredients and additives that would be used in contract
19 manufacturing by VB in order to make their final product.
20 So, typically, if you have SAM-e as one component,
21 there's other items that are typically mixed into a
22 capsule or a tablet in order to make it bind as a tablet
23 or to fill the capsule or to help stabilize the
24 ingredients therein.
25     Q.   This is a scientific question, and if I don't

Page 165

1  use the right terminology, would you please correct me?
2  Now my understanding is that there's different ions of
3  SAM-e that have slightly different names.  Could you
4  perhaps elaborate on that and explain it, please?
5           MR. BRODY:  Object to form.
6      A.   Well, I think what you're trying to actually
7  ask -- are there -- or is there more than one form of
8  A-Adenosyl methionine?  And the answer is yes.  Now the
9  ions -- when we're talking about ions -- and let's go
10 specifically to your -- like the Jiaherbs, which sticks
11 in my mind, certificate of analysis of a raw material
12 supplied to VB to be used for contract manufacturing is
13 that you would see on that certificate of analyses the
14 name of the ingredient as S-Adenosyl methionine sodium
15 tosylate, and then when you look further in the
16 certificate of analysis, you'll see the words S-A-M,
17 typically in capital letters, and "e" in small, or Sam-e,
18 and then you would have what percentage of the -- of the
19 S-Adenosyl methionine sodium tosylate was actually in the
20 SAM-e.  And that is the SAM-e ions, if you will.
21          So it wasn't -- and ions have to do with a
22 ionic charge, how many positive electrons, negative ions.
23 But my point here is that S-Adenosyl methionine only
24 makes up a portion of the S-Adenosyl methionine sodium
25 tosylate.

42 (Pages 162 - 165)

1    Q.   When you say that -- and I'm not trying to
2  trick you -- the word that I had written down was
3  disulfate tosylate.
4    A.   Yes.
5    Q.   Is that --
6    A.   It's the same --
7    Q.   -- what you're referring to?
8    A.   Yes.  Disulfate actually is -- is -- is --
9  means that there's two sulfate molecules alone that are
10  also used as bound to the SAM-e material or as part of
11  the material.  So sodium or -- or looking at, you know,
12  the dye nature, again, that's just illustrating exactly
13  what you just said.  There's more parts than just the
14  SAM-e for what your -- what the VB company acquired from
15  their raw material suppliers.
16    Q.   And, also, just to -- I guess so it'll be
17  clear going forward, when we talk about the active
18  ingredient of the SAM-e, that would essentially be the --
19  and I may not pronounce this correctly -- the
20  S-Adenosyl-L-methionine disulfate tosylate?
21    A.   No.  The active portion, if you will -- that
22  wasn't bad.  But the active portion, if you will, is
23  S-Adenosyl methionine.  Just break it down in slower
24  words.  S-Adenosyl methionine.  That's SAM-e.  That is
25  actually the nutritional active component.  The disodium

1  tosylate is not -- besides giving you salt as part of the
2  pill -- sodium -- is not giving you anything.  So it is
3  not an active.  It is part of the raw material that was
4  synthesized by Jiaherbs and other companies as part of
5  the chemical.
6    Q.   And can you explain briefly what's the
7  difference between the SAM-e isomer and the SAM-e ion?
8    A.   Would you be kind enough to pull up the
9  certificate of analysis or one of them from the raw
10  materials supplier like Jiaherbs or another so we can go
11  through?  I'm better with pictures than I am with --
12    Q.   I just -- yeah, sure.  Let me pull one up
13  here.
14    A.   Thank you.
15    Q.   I just grabbed whichever one I found.  We'll
16  zoom in here and -- in some of these questions, I'm
17  asking -- I'm putting my mouse over it.  And I guess I
18  need to identify this.  Certificate of analysis.  It's
19  got a date of September 21st, 2018.  It's got a batch
20  number in the upper right corner.  C160905.  I guess I'll
21  ask you, sir, do you recall if you've ever seen this
22  document before?
23    A.   Yeah.  Shandong.  Yes.
24    Q.   Can you tell me what is this document?
25    A.   This is a certificate of analysis of the raw

1  material of S-Adenosyl methionine disulfate tosylate.
2    Q.   I'm going to go ahead and zoom in a little
3  bit, and if you want me to move to a different part of
4  the document, please let me know.
5    A.   This is more than enough.
6    Q.   I was asking about the difference between the
7  isomer and the ion.
8    A.   Okay.  So the easiest way to explain isomer is
9  take a look at your hands.  Right?  You have a left hand
10  and a right hand, and these are two isomers of each
11  other.  They're mirror reflections of each other.  And
12  that's an isomer.
13       And typically we have an isomer depending upon
14  a little bit of the chemical nature and how -- you'll
15  have more than one isomer, so almost each molecule will
16  have a sister molecule that is similar to it but
17  opposite.  So that's one way of looking at the isomers,
18  if you will.
19    Q.   I guess what I'm trying to get at is I just
20  want to make sure when we go and we talk about the active
21  ingredient that we're all clear.  And one of the general
22  questions I have is -- let's look -- for example, we can
23  look at this one.  What numbers here would tell us what
24  is the active ingredient in this particular --
25    A.   Well, not in -- none of these numbers will

1  tell you what the active ingredient is.  That's not the
2  right -- that's -- that's -- what these numbers will tell
3  you is when you look -- these don't tell you what's
4  active or inactive.  That's kind of a different question.
5  But what this tells you is what is the actual content of
6  this raw material or what is the actual contribution of
7  S-Adenosyl methionine.  So what proportion or what
8  portion of S-Adenosyl-L-methionine disulfate tosylate is
9  actually SAM-e.  And that -- when you look here, that
10  would be the one that says SAM-e ion by HPLC.  By
11  high-performance liquid chromatography.  And that would
12  tell you that 50 percent of the material is actually the
13  SAM-e molecule.
14    Q.   So then on this test, the -- would it be safe
15  to say the important line to look at is the SAM-e ion,
16  and that's going to tell us the amount of the active
17  ingredient in this particular sample?
18    A.   Well, I would look at two lines.  I would look
19  at the line a couple below that that says S-Adenosyl-L-
20  methionine disulfate tosylate.  And it gives you that
21  their -- that their scope range is 95 to 103 percent and
22  that their testing, they came out at 96.7 percent of
23  having that total molecule.
24       And the SAM-e ion -- the SAM-e portion, that
25  that's not holding hands with the disulfate tosylate is

Page 170

1 about 50 percent of that or on analysis was 50.4 percent
2 of that. In other words of saying that, if you had
3 1 gram of S-Adenosyl-L-methionine disulfate tosylate,
4 you'll actually have about 500 milligrams of actual SAM-e
5 compound. The other 50 percent is a combination of other
6 acids: Disulfate tosylate and sulfonic acid.
7      So, again, the point pointing out here is that
8 the S-Adenosyl methionine portion of S-Adenosyl
9 methionine disulfate tosylate is about 50 percent of the
10 total molecule.
11   Q.  Understood. All right.
12   A.  So if you bought this and you were selling it
13 to a client and you thought you were getting 100
14 milligrams of SAM-e, you're actually really only getting
15 about 50 milligrams of SAM-e because you're not
16 accounting for the disulfate tosylate portion of it.
17 Disulfate tosylate portion of it. That's a -- kind of a
18 big error.
19   Q.  Well, that particular part, I don't -- I think
20 that's just conjecture with the last thing that you
21 stated because that wasn't part of my question. But
22 I'll --
23      MR. BRODY: Object to form. Object to form.
24 Misstates prior testimony.
25      MR. POLLACK: And then I'll move to strike his

Page 171

1 last sentence. Instead I was just trying to be
2 polite.
3      MR. BRODY: I'll object to that motion.
4      MR. POLLACK: Are you done?
5      MR. BRODY: What was that? Am I done with my
6 objection? Yeah.
7      MR. POLLACK: Yeah? Okay, great.
8 BY MR. POLLACK:
9   Q.  Dr. Kalman, you mentioned something -- I think
10 you used the word scope. I see a category that is
11 perhaps -- it says specifications. It looks like the
12 center column on this document.
13   A.  Yes, I see in the second column right after
14 the column next to test items says "specifications" under
15 USP37.
16   Q.  Yes. I think you referred to it as perhaps
17 the scope. Is that how you would reference it?
18   A.  No.
19   Q.  Okay. Perhaps I misheard you. But the
20 specifications, I just want to ask you about that in
21 general with the -- we see some ranges. For example, on
22 the SAM-e ion, it says 49.5 to 54.7 percent. My question
23 for you is with the specifications category on this COA,
24 do you see anything that's abnormal or incorrect to you?
25   A.  Not offhand. No. But, again -- thank you.

Page 172

1 Now you can see a little bit more of it. When I say "not
2 offhand," I do not necessarily know the guidances from
3 USDA and FDA regarding heavy metals. So I don't
4 necessarily know offhand if it's supposed to be not more
5 than one part per million for capium (phonetic). But
6 typically this column of specifications is actually set
7 by the -- set by the company that is making the
8 ingredient. So this is what they shoot for. If they
9 want a product, for example, that is going to have a pH
10 that's going to be in between 1 and 2, and that will be
11 acceptable if that's what the end product comes to. So
12 they had 1.4 as their pH on their sample. If it were to
13 came out as 2.4, they would reject the batch -- or should
14 reject the batch, retest it, and go from there.
15      So generally the specifications are what the
16 manufacturer, whether it's a raw material maker or a
17 contract manufacturer, are shooting for in their item.
18   Q.  Thank you. The question was simply if you saw
19 anything abnormal or incorrect with the specifications.
20 And I just want to confirm your answer was that you
21 didn't see anything; is that correct?
22      MR. BRODY: Objection. Misstates prior
23 testimony.
24   A.  I would answer you correct.
25   Q.  I don't think I need to -- I think I'm going

Page 173

1 to go ahead and take this down. I'm not going to ask
2 you --
3      MR. BRODY: Counselor, can you just -- can you
4 just note the -- the Bates stamp number on this
5 page?
6      MR. POLLACK: I don't know. I just grabbed
7 one from my file. I don't have a Bates stamp. I
8 identified it -- can you tell me what exhibit we're
9 on, Madam Court Reporter, please?
10      MR. O'BRIEN: It's 11, Brett.
11      MR. POLLACK: Eleven?
12      MR. O'BRIEN: Yeah.
13      (Thereupon, Exhibit Number 11 was marked for
14 purposes of identification.)
15      MR. POLLACK: I'll go ahead and save this
16 right now, if you'll give me a moment.
17 BY MR. POLLACK:
18   Q.  All right. Dr. Kalman, I think you noted that
19 you were aware that VB used more than one supplier for
20 its raw materials; is that correct?
21   A.  Correct.
22   Q.  And did you review multiple certificates of
23 analysis for the raw materials used by VB in
24 manufacturing its SAM-e products?
25   A.  Yes.

44 (Pages 170 - 173)

Page 174

1    Q.   And did you note that there were variations in
2  the consistency of the raw materials?
3         MR. BRODY:  Objection.
4    A.   No, I did not.
5    Q.   Do you know what --
6         I'm sorry.  Did someone say something?
7         Okay.  Do you know whether the -- the
8  certificates of analysis for VB raw materials
9  consistently showed the same amount of the active
10 ingredient?
11   A.   In the COAs that I reviewed, they appear to be
12 pretty consistent, similar to the COA that you just
13 showed previously on the screen.
14   Q.   Sir, what is -- when you use the words "pretty
15 consistent," could you explain that?  What does that mean
16 to you?
17   A.   What that means to me is if I'm focusing on
18 the SAM-e ion content, that the range that was deemed for
19 the specifications as being acceptable was either
20 identical or pretty consistent.  You know, 47 to 52, 48
21 to 51, and then coming in around 50 or 51 percent.
22   Q.   We just talked about two different things, the
23 range being consistent and the results being consistent.
24 And I just want to drill down a little bit and clarify.
25 Dr. Kalman, isn't it true that in every single

Page 175

1  certificate of analysis for VB raw materials, the amount
2  of the active ingredient was differed?
3         MR. BRODY:  Object to form.  Misstates --
4         misstates prior testimony.
5         Can you explain what you mean by active
6  ingredient?
7         MR. POLLACK:  We just had a whole discussion
8  about active ingredient.
9         MR. BRODY:  Yeah.  And I think he explained to
10 you that --
11        MR. POLLACK:  Mr. Brody, please --
12        MR. BRODY:  I think he explained to you
13 that -- (inaudible) --
14        MR. POLLACK:  -- please stop making speaking
15 objections.
16        (Talking over each other.)
17        MR. BRODY:  -- so can you explain what you
18 mean?
19 BY MR. POLLACK:
20   Q.   Dr. Kalman, do you understand the phrase --
21 the term "active ingredient"?
22   A.   Yes, but I'm -- I'm a little hesitant to give,
23 like, a scoping answer or one -- or one answer because
24 one can say that these certificates of analysis varied
25 because the amount that was purchased from the raw

Page 176

1  material supplier were different.  Like, you showed one
2  that was taken from a 20-kilogram drum of material.  So
3  there are others that were not always from 20-kilogram
4  samples or from other samples.  So I'm -- I'm -- and when
5  we say active ingredient, I'm only actually talking about
6  the S-Adenosyl methionine portion because that's what the
7  consumers were purchasing, or looking to purchase, hoping
8  to purchase.  And, you know, that is the actual
9  nutritional ingredient that has physiologic effects.
10   Q.   Understood.  We had just discussed the active
11 ingredient.  I think we made it clear.  I'll go ahead and
12 repeat back the question as best I can.  Isn't it true
13 that amongst every single COA for VB raw materials the
14 amount of the active ingredient tested was different?
15        MR. BRODY:  Object to form.  Misstates the
16        record.
17   A.   They were not identical so in that way they
18 were different.  From the best of my recollection, again,
19 certificates of analysis for the full S-Adenosyl
20 methionine disulfate tosylate compound were pretty
21 consistent for the SAM-e portion in -- for the specs,
22 meaning the range that was found acceptable, and the end
23 result.
24   Q.   I just want to clarify the -- as far as what
25 you reviewed were certificates of analysis for the VB raw

Page 177

1  materials, are you saying that the results for the active
2  ingredient were similar; however, each test was somewhat
3  different with the result; is that correct?
4         MR. BRODY:  Objection.  Vague.
5    A.   What I'm saying is you could have one test
6  that was, for example, 50.4 percent, and then another one
7  that was, you know, 51.1 percent.  That would be
8  numerically different but they're actually kind of
9  similar if they meet this -- the -- the range that's
10 being a part of the specs.  So, yes, I will say that they
11 are not identical across every different raw material
12 supplier that VB engaged with.
13   Q.   All right.  Thank you.  I'm just trying to --
14 we're trying to ask it for the same -- you can add that
15 you thought they were similar.  I think we got the
16 answer.  I'll move on.  Doctor, do you know whether the
17 water contents in the VB raw materials was the same in
18 each batch that was tested?
19        MR. BRODY:  Object to form.
20   A.   Offhand, I do not.
21   Q.   Do you know whether the certificates analysis
22 for the VB raw materials showed a different pH value for
23 the test?
24   A.   Offhand, I do not.
25   Q.   Is it fair to say that the different batches

45 (Pages 174 - 177)

Page 178

1 in raw materials had some inconsistency?
2        MR. BRODY: Object to form. What -- what
3  inconsistencies are you referring to?
4        MR. POLLACK: Any inconsistency.
5        THE WITNESS: Yes. Yes.
6 BY MR. POLLACK:
7    Q.   Sir, I'm looking at your report, and you
8 reference -- and I can tell you where it is, but I just
9 want to ask you a general question. In your paragraph
10 30, you reference the uniform nature of supplement
11 manufacturing. And then you later go on to, I believe,
12 extrapolate that the results from a small subset of tests
13 can be used to show that all of the VB products are
14 defective. Is that generally correct?
15        MR. BRODY: Object to form.
16    A.   Either can you share that or can I open up
17 my --
18    Q.   I'm happy -- I'm happy to share it. I wanted
19 to ask you a general statement about your report first.
20    A.   Sure. Thank you for sharing it.
21    Q.   No, it's not a problem. I really just want to
22 understand and go over also -- we need to go over the
23 assumptions that you made which allowed you to reach the
24 conclusion that you did.
25        Okay. You'll have to bear with me. I wasn't

Page 179

1 necessarily planning on showing all of these, but I will
2 pull them up. So one of the things I was just looking
3 at -- oh, I got it. Okay. One of the things I was
4 generally looking at was -- and I'm not even trying to go
5 over necessarily something specific. It's a general
6 question. And maybe I can break it down a little bit
7 better. Was one of your assumptions, sir, that the raw
8 materials for the VB product were uniform?
9        MR. BRODY: Form.
10    A.   Part of my assumption was that the raw
11 material that VB was collecting or utilizing would be
12 similar or uniform across their own suppliers.
13    Q.   Sir, was one of the assumptions that you
14 relied upon in reaching your opinion that each batch of
15 SAM-e products manufactured by VB was uniform amongst
16 other batches?
17    A.   No, VB's manufacturing was not uniform.
18    Q.   All right. Is it correct, then, that one
19 batch of VB product might vary in the amount of the
20 active ingredient from another batch?
21    A.   Correct.
22    Q.   I'll just stop the screen sharing. And I have
23 to do that because I've got documents with my notes up
24 here. And I need to reference it so we can -- I can get
25 to these quickly. But if you do, sir -- if you do want

Page 180

1 to see something at some point when we're discussing it,
2 please let me know.
3    A.   Okay.
4    Q.   I'd like to discuss the BoostCeuticals
5 testing, so I guess we're going to put your report back
6 up. First off, sir, have you ever held a bottle of
7 BoostCeuticals brand SAM-e in your hand?
8    A.   No.
9    Q.   Have you ever looked at photographs of the
10 label of a bottle of Boostceutical SAM-e?
11    A.   I believe so, but I cannot answer it with a
12 hundred percent certainty at this moment. I looked at
13 photographs of more than a couple of different bottles of
14 the products that were sent for testing. But
15 specifically the BoostCeuticals that you just named, I
16 cannot answer you with a hundred percent certainty.
17    Q.   Understood. And that answer's acceptable.
18 It's not a trick question.
19        Do you recall whether the BoostCeuticals
20 product that was tested included gelatin in the product?
21        MR. BRODY: Object to form.
22    A.   I do not recall the other ingredients that
23 were part of the Boostceuticals' finished product.
24    Q.   Just, generally, if a supplement includes
25 gelatin in it, would it be properly labeled as a vegan

Page 181

1 product?
2        MR. ANDERSON: Object to form.
3    A.   In general, if a product has gelatin in it,
4 whether the capsule is made from gelatin or gelatin is
5 used as a filler, it would not be considered vegan.
6    Q.   And I'm screen sharing, sir. So I'm showing
7 you your expert report. We're currently on page -- with
8 Bates stamp 174. I'm directing your attention to
9 paragraph 31. Can you -- can you read it? Is it large
10 enough to read?
11    A.   Yes, I see it well.
12    Q.   The first question that -- and may I ask
13 another question? I just switched the screen on my
14 computer. Can you still see the report?
15    A.   Yes. Number 31 is up.
16    Q.   Okay. I just wanted to make sure I'm not
17 interfering with your view.
18        Can you tell me, sir, how many test reports
19 for Boostceutical brand product did you review in the
20 course of forming your opinion in this case?
21    A.   At maximum, it would have been three.
22    Q.   You say three, and I just want to draw your
23 attention to about halfway through paragraph 31. It
24 appears to have the information for one test. And so I
25 would like you to elaborate on the other potentially two

46 (Pages 178 - 181)

1 tests that you may have reviewed. Could you tell me
2 anything about that that you may recall, please?
3    A.   Yes, that if there was more than one test on a
4 product that had similar results, I did not necessarily
5 report them all, so -- because there was consistency in
6 the findings. So for this specific BoostCeuticals that
7 was listed as Boostceutical 2 as noted in the parens with
8 sample number 9007930. Again, that was -- I stayed
9 specific to that because the other analyses were not
10 really different.
11    Q.   And I just want to be very clear here. I --
12 plaintiff's counsel did not disclose any additional
13 reports, so -- and we have a BoostCeuticals Number 2 but
14 I don't see Number 1 and I don't see Number 3. Could you
15 actually, please, take the time to look through your file
16 to see if you were provided with an additional
17 BoostCeuticals testing report? And if you'd like we can
18 take a five-minute break, however, you'd like to proceed
19 or we can -- we can sit here and take a look, but this is
20 quite important for me.
21    A.   Sure. I'll take a look for you. Give me a
22 minute.
23    Q.   Sir, I'm not rushing you. Just let us know
24 when you're done with your review, please.
25    A.   Okay.

1    Q.   Yes, Doctor. Would you tell us what you're
2 looking at now?
3    A.   Yes. I'm looking at the reports analysis by
4 Dr. Catherine Hutt. And I think I'm missing part of her
5 name there. And in that, there was only, actually,
6 BoostCeuticals 2. There was no BoostCeuticals 1 or
7 BoostCeuticals -- other BoostCeuticals, or a 3. However,
8 I did remember reviewing a document that I discarded,
9 meaning did not use, that also had independent testing of
10 BoostCeuticals.
11    Q.   Now you say you did not use, however you
12 reviewed the document; correct?
13    A.   Yes. There was a public document that was
14 released by a company called NOW Foods, N-O-W, and where
15 NOW Foods, for whatever their reason was, back in March
16 of 2020 bought various SAM-e products from Amazon and had
17 it analyzed and then published the results. So I took a
18 look at that, also, but did not include it because that
19 wasn't necessarily part of this. But I did see that
20 there was an issue that they raised in their -- in the
21 analysis that they did.
22    Q.   Do you have a clear recollection whether there
23 was a BoostCeuticals brand tested in the NOW report?
24    A.   Yes. I have a specific recollection that
25 BoostCeuticals was one of the products mentioned.

1    Q.   And can you elaborate, please, on your
2 decision to exclude those testing reports from your own
3 report?
4    A.   Yes. The best way I can explain it is that I
5 have a view that NOW Foods is kind of a competitor of
6 some of these brands that are part of this lawsuit
7 because NOW Foods sells a variety of products. So while
8 they sponsored and paid for analysis and their -- and for
9 whatever their motivations are, they're also a competitor
10 to some of the companies on some level here. So I wasn't
11 so sure about the veracity of bringing in their
12 document -- bringing in their publicly discussed document
13 that you see in what I'll call nutritional trade
14 magazines. You know, when it came out, when it was
15 discussed. It's an ongoing action that NOW Foods has
16 with Amazon and some other companies, some things that
17 they're testing and then publicizing the results of.
18    Q.   Sir, do you recall whether the BoostCeuticals
19 test results in the NOW report indicated a higher or
20 lower amount of active ingredient compared to the one
21 Boostceuticals test that you relied on?
22    A.   They were both low. The NOW Foods analysis
23 was low and the analysis that I read from Eurofins as
24 organized by Catherine Hutt was also low. They were both
25 low.

1    Q.   Do you have knowledge --
2         I'm sorry. Were -- did you -- I didn't mean
3 to interrupt you.
4    A.   Nah, I just repeated myself. Never mind.
5    Q.   So you paused there. But if you ever need to
6 finish, you just let me know. I'm just trying to move us
7 along because I -- it's also -- I've got family, and I'm
8 going to want to go hang out with them.
9    A.   I have my son calling me asking me when I'm
10 going to be ready to get him, so I understand.
11    Q.   I'll try to move it along. All right. So for
12 the Boostceuticals brand testing, how many test reports
13 did you rely on for your own expert opinion in this case?
14         MR. BRODY: Object to form. You're asking him
15 about the Boostceutical testing?
16         MR. POLLACK: I think it was a clear question.
17         MR. BRODY: I mean, his opinion isn't -- isn't
18 just about that, so it's not a clear question.
19         Can you clarify?
20         MR. POLLACK: I'm going to stand with the
21 question that I asked. I think it's a clear
22 question.
23         MR. BRODY: All right. I'm going to object.
24         MR. POLLACK: I think it got a clear answer,
25 and I -- I -- Dr. Kalman (inaudible) I think he can

Page 186

1  answer the question.
2     MR. BRODY: Well, he can answer the question
3  if he wants or he can ask for a clarification.
4     MR. POLLACK: I'm going to respectfully
5  instruct him to answer the question if he can.
6     THE WITNESS: That would be -- I believe it
7  would just be the one from Catherine Hutt from
8  Eurofins.
9  BY MR. POLLACK:
10    Q.   That's the only one I'm aware of. I want to
11 make sure in the universe of test results that we're
12 going over that I'm not missing something.
13       I'm going to show you a certificate analysis
14 that was produced to me from your attorneys along with
15 your expert report and other disclosures. Let me share
16 the screen here. I've got a couple certificates of
17 analysis. The one that I first want to focus on is Bates
18 stamped as Number 21 of plaintiff's expert disclosures.
19 Can you see this clearly, Doctor?
20    A.   Yes.
21    Q.   And, by the way, you don't have any issue with
22 me referring to you as "Doctor" from time to time? I
23 just want to make sure that I'm respectful.
24    A.   You are, sir.
25    Q.   Thank you.

Page 187

1        Have you reviewed this certificate of analysis
2  that -- oh, you know what? We also need to mark this as
3  an exhibit. I think we're on 12, or are we on 13?
4     MR. O'BRIEN: You're on 12.
5     MR. POLLACK: Because we already marked the
6  plaintiff's expert report as an exhibit, so thank
7  you.
8        So we'll mark this as 12.
9        (Thereupon, Exhibit Number 12 was marked for
10 purposes of identification.)
11 BY MR. POLLACK:
12    Q.   For the record, this is the Bates stamped from
13 13 to 21. And I'll go back to this. The question for
14 you, Dr. Kalman, is: Do you recognize this certificate
15 of analysis?
16    A.   Yes.
17    Q.   Is this a certificate of analysis that you
18 relied on in part in coming to your opinion in this case?
19    A.   It looks like it.
20    Q.   I want to direct your attention to about
21 halfway through the page. It says "calculated sample
22 weight," and we see there's entity weight and entity fill
23 weight, and I see there's -- there's two numbers here.
24 What I want to do is actually ask you a question that
25 compares this to the other certificates of analysis. I'm

Page 188

1  going to go ahead and scroll up. And this is something
2  that we'll see in -- in, I believe, each of the tests.
3  All the other certificates of analysis I see that
4  there -- it looks like there's two entity weights, two
5  entity fill weights. And right now we're looking at
6  page 20. I'll go ahead and scroll up a little bit. We
7  see this again on page 19.
8        If you would like me to slow down, please let
9  me know. I'm just making one specific point that the
10 other results -- the other testing results show that
11 there's multiple entity weights and fill weights.
12       Would you like to see the rest, Dr. Kalman?
13    A.   I see this one here. Entity weight .276,
14 entity weight .6335. When you look at these two
15 comparative entity weights, and then what was the actual
16 fill weight, you know, .5291. I see these. Yes.
17    Q.   And for the record, we were just looking at
18 page 17, Bate stamp 17 of plaintiff's expert disclosures.
19       Let me draw your attention back to page 21 of
20 plaintiff's expert disclosures. Can you explain why we
21 only have one entity weight and one entity fill weight on
22 the BoostCeuticals report, please?
23    A.   No. I can only give you a hypothetical as to
24 why you only have one here. Your question is actually
25 better answered by the individual or company that did it.

Page 189

1        So my hypothetical answer is that they
2  either -- that -- that they -- after they weighed the
3  material once and tested it once, they did not feel the
4  need for whatever reason to do it a second time. Either
5  they did not have enough material leftover for an entity
6  weight and an entity fill weight or they only thought the
7  need to do it for a single time as being good enough.
8     Q.   Dr. Kalman, is my understanding correct that
9  the certificate of analysis for Boostceutical 2 appears
10 to indicate that one single pill of the SAM-e was tested?
11    A.   No. This does not tell you whether -- whether
12 it was a single pill that was tested. What this tells
13 you is that the bottle labels -- the Boostceutical
14 product label is a sample serving size of one capsule.
15 This does not mean that only one capsule was tested. In
16 order to calculate and test for this specific aspect of
17 entity weight and entity fill weight, that would be one
18 capsule that was tested. But that does not mean that the
19 whole of this -- the rest of the certificate of analysis
20 is only from one capsule. Typically, they take a
21 homogenation (phonetic), meaning more than one pill or
22 one capsule from that bottle, empty it, and then take a
23 certain amount of that for the testing so they can get an
24 average across the sample or the bottle.
25    Q.   Sir, is it correct that we don't know how

Page 190

1  many -- looking at this report, we do not know how many
2  of the Boostceutical -- excuse me -- brand SAM-e pills
3  were tested for -- to come to the conclusions in this
4  certificate of analysis?
5      MR. BRODY: Object to form.
6   Q.   Did you understand the question, sir?
7   A.   No.
8   Q.   I can repeat it. Is it correct that you do
9  not know how many of the Boostceutical pills were tested
10  relating to this certificate of analysis that we're
11  looking at?
12  A.   I would need to see a little bit more than
13  what is able -- or than what you're sharing on screen or
14  is able to be seen on the screen to give you an answer.
15  Q.   Sure. Where would you like me to scroll to?
16  A.   To the first page of the report that was on
17  the specific product.
18  Q.   Is it your understanding, sir, that there's
19  reports that have more information other than what I'm
20  showing you now?
21  A.   No. I only said that because I see that it
22  says that this is nine pages long. So I have no idea
23  whether this particular COA was two pages of that nine.
24      (Talking over each other.)
25  Q.   In fairness, you can -- I'm happy to show you,

Page 191

1  but these are certificates of analysis --
2   A.   Right. Right. Exactly. So just go to the
3  Boostceutical 2. That's fine. I just wanted to make --
4  is that only one page of this? Is that only page 9 of
5  the 9, or is it on page 8? You would know that by
6  scrolling to page 8.
7   Q.   This is what I was provided --
8   A.   No, no, it's a simple -- it's a simple
9  solution, sir. If you -- simple -- listen, please. If
10  you go to page 8, what we'll see is -- go to page 8.
11  Okay. So now we know that page 9 is the -- the
12  Boostceutical. Just wanted to make sure that it wasn't
13  overlapping on pages. Okay. And then if we scroll
14  slow -- don't -- you're scrolling too fast for my -- my
15  eyes.
16  Q.   I will scroll very slow for you. So we'll
17  start at the top. And you let me know when I can go
18  down.
19  A.   All right. Can you slow down a little bit,
20  please? All right. Can you keep scrolling?
21  Q.   Absolutely.
22  A.   From this -- from this certificate of analysis
23  page -- 1 -- I or 1 -- cannot tell how many -- how much
24  of the bottle was tested, whether it was only one or two
25  capsules out of the whole bottle or 30 or 60. It's --

Page 192

1  it's not specifically written here what their starting
2  weight was.
3   Q.   That was the question, whether you could tell.
4  I can't -- I personally can't tell.
5   A.   No, from here -- from here, you're not. It
6  would give you the indication that -- it's not uncommon
7  for laboratories to not specifically always write out
8  that they take, you know, half the bottle and homogenize
9  it and then they take a representative sample out of
10  that.
11  Q.   But we don't know if that was done in this
12  case?
13  A.   No, we don't. I agree with you there. It's
14  not specifically stated here.
15  Q.   And these aren't trick questions. I get to
16  ask you the methodologies. I don't know the answer. If
17  you don't know it, then I guess we have to ask someone
18  else. Maybe Ms. Hutt knows it. I'll try to -- try to
19  move on.
20  A.   Or the gentleman that signed the report.
21  Q.   That would also be -- who is -- who is --
22  A.   Robert Gan, it looks like -- or Gran. Or
23  Edward Ladwig, the director.
24  Q.   So those two individuals would likely know the
25  methodology that was used for this testing on certificate

Page 193

1  of analysis that's marked (inaudible) --
2      (Talking over each other.)
3   A.   Yes. Yes. If not, they should be fired.
4   Q.   Let's just briefly look -- we discussed the
5  entity weight and fill weight. Sir, am I correct that
6  for each of the sample weights listed in these nine
7  certificates of analysis that there was a different
8  entity weight and fill weight?
9   A.   The entity weight and fill weight are not --
10  yes, are always going to be different. That's like you
11  weighing yourself with your jacket on and you weighing
12  yourself with your jacket off.
13  Q.   Perhaps that -- that's actually a very good
14  point. I understand, but let's maybe -- let me ask my
15  question a little clearer. For each of the entity
16  weights amongst the different samples, each one of those
17  is different. So if we look at the BoostCeuticals,
18  that's 6184. If we look at the Healthy Way, that's 6025,
19  6163. And I'm happy to go through each one. If we look
20  at the Vitamins Because, it's 8787. Then -- and there's
21  other -- you know, I'll concede some of these are 200
22  milligrams. But none of the entity weights are identical
23  in these reports; is that correct?
24  A.   That is correct.
25  Q.   One brief moment, please. All right. Thirty

49 (Pages 190 - 193)

Page 194

1 seconds.
2        (Recess.)
3 BY MR. POLLACK:
4    Q.   Can we go back to the test report here?  I've
5 got a couple more questions then we can move on.  Sir,
6 the -- looking at the report that's the Boostceutical 2,
7 can you tell me what was the amount of the active
8 ingredient?
9    A.   Eurofins determined that this particular
10 product had 136 milligrams of SAM-e per serving size,
11 which the labeled serving size is 500 milligrams of
12 SAM-e.  So meaning that just by a rough estimate, it's --
13 it's, you know, 25, 28 percent of what it should be.
14    Q.   And if I told you that the -- each pill is
15 listed as 500 but the serving size on the label says
16 1,500, do you know if that would refresh your
17 recollection as to the BoostCeuticals label?
18    A.   So --
19        MR. BRODY:  Object to form.  Misstates the
20 record.
21        MR. POLLACK:  I could do it in a different way
22 if you want, Jay.  We could look at the bottle if
23 you'd like.
24        MR. BRODY:  The issue's not the bottle.  The
25 issue is how much is in cap- --

Page 195

1        MR. POLLACK:  Yeah.  This says that in each
2 pill there was 136 milligrams.
3        THE WITNESS:  Right.  So even if the product
4 was labeled as a 1,500 milligram serving size or
5 that you needed three pills, you would still be only
6 getting three times 136 or approximately 400
7 milligrams of actual product of what you're supposed
8 to be getting 1,500 milligrams of.
9 BY MR. POLLACK:
10    Q.   I -- I agree.
11    A.   Right, so --
12    Q.   I -- I -- I understand -- well, let me just
13 say I --
14    A.   That's like going to the -- that's like going
15 to the gas station --
16        (Talking over each other.)
17    A.   All right.  Go ahead, sir.
18    Q.   I understand what you said.  So my question
19 is:  If the bottle told you to take three pills and you
20 followed the instructions -- then I'll get my calculator
21 out here you the consumer would receive 408 milligrams of
22 SAM-e, the active ingredient; is that correct?
23    A.   Yes.
24    Q.   I'm going to jump around to your report, but
25 without even having to look at it, I'll just ask you the

Page 196

1 question:  You have participated in a study where the --
2 part of the findings was that 400 milligrams of SAM-e may
3 be a sufficient dosage to -- let's see -- how would we
4 phrase this? -- beneficial results.  Would that generally
5 be fair to say?
6    A.   It would be fair to say that I participated as
7 a researcher in a study that evaluated SAM-e as part of
8 the study, and in the study the findings indicated a
9 dosage of 400 milligrams imparted some effects as related
10 to mood states.  I.e., mild depression, mild anxiety.
11 That's what we were examining specifically.  So there was
12 an improvement in mood states and that dose that was
13 needed to -- found to correlate with the improvement was
14 at least 400 milligrams.
15    Q.   Look at page 17 -- page 18.  I'll share my
16 screen.  Sir, your report is better to look at this -- if
17 you'd like, the whole paragraph.  You can read it.  I'm
18 going to draw your attention -- I'm on paragraph 48.  So
19 the question I have is asking if there is perhaps a
20 (inaudible) error, or if you'd like to explain the last
21 sentence of paragraph 48.  You state that, "Moreover,
22 because the subject product labels are false and
23 misleading to reasonable consumers, consumers of the
24 subject product SAM-e cannot and do not know to increase
25 their intake of SAM-e supplements in order to achieve 400

Page 197

1 milligrams or any other requisite amount of SAM-e which
2 is necessary to achieve their dosage health or
3 supplemental goals."
4        Do you see where it says that, sir?
5    A.   Yes.
6    Q.   Isn't it correct that the BoostCeuticals would
7 actually have had a dosage based upon the one sample that
8 was tested of 408 milligrams?
9        MR. BRODY:  Object to form.
10    A.   It --
11    Q.   Well, we just did the math.  We did 136 -- and
12 if you'd like, I could show you the -- I could show you
13 the --
14        MR. BRODY:  Counsel, why don't you let him
15 answer the question before you interrupt.
16        MR. POLLACK:  I thought you said "Did it."
17        THE WITNESS:  I can answer if I'm allowed.
18 BY MR. POLLACK:
19    Q.   Yeah.
20    A.   The statement that looks kind of highlighted
21 now -- or what was -- is true, meaning that the data
22 shows us that you need to have at least 400 milligrams
23 consistent intake of SAM-e to infer or confer a benefit
24 especially as related to mood states.  Second to that, it
25 is also true that if somebody took three pills or

Page 198

1 capsules of the BoostCeuticals product that contained a
2 136 milligrams per pill, that they would be taking in a
3 little over 400 milligrams per day of the product, which
4 would then be consistent potentially with some benefit as
5 related to mood or mood states.
6        The issue for the BoostCeuticals product is
7 you're still not meeting label claim, which is issues
8 regarding good manufacturing practices, FDA, FDC, and
9 other issues that I've outlined in this whole report.
10    Q.   Doctor, we agreed that potentially taking the
11 BoostCeuticals as identified in the certificate of
12 analysis that could potentially have some beneficial
13 results to the consumer.
14    A.   Correct.
15    Q.   Is it still your opinion given that the
16 BoostCeuticals that we've tested had 408 milligrams per
17 dosage that the BoostCeuticals had no value whatsoever to
18 consumers --
19        MR. BRODY:  Object to form.
20    Q.   -- who purchased that product?
21        MR. BRODY:  Object to form.  Misstates the
22 report.  Misstates the prior testimony.
23    A.   It would be my opinion that a product that is
24 underdose and does not meet label claim does not have
25 value to the consumer.  And, therefore, even this product

Page 199

1 that may have 408 milligrams of SAM-e per three pills
2 when it's supposed to be 1,500 milligrams would not add
3 value to the consumer because it's still false and
4 misleading.
5    Q.   Just to clarify, it's your opinion that the
6 product we just discussed would have zero value to the
7 consumer?
8    A.   If you're a consumer that thinks that you're
9 buying a product that has 1,500 milligrams of product in
10 it and you're only getting 400 milligrams, rounding, of
11 product in it, you would -- the impression -- net
12 impression is that it would not be one that was tolerated
13 well or acceptable.  Oh, I still get some benefit, but
14 I'm paying for 1,500 milligrams and only getting 400.
15 No, so that would be deemed as not something of value.
16    Q.   I'm not sure if you answered my question.
17 Would -- is it your opinion that the value of the
18 Boostceutical product we just discussed would be zero
19 dollars?
20        MR. BRODY:  Object to form.
21    A.   Yes.  Admittedly, I'm not an economist but I
22 am a consumer and I am an expert and a specialist in the
23 area.  But if a product doesn't meet label claim and
24 cannot even meet within the 20 percent variation for
25 Class II nutrients per the FDA, then it's worthless.

Page 200

1 Even if it may have some type of potential benefit, it's
2 not meeting its intended claim.
3    Q.   Sir, do you believe that a sample size of one
4 can produce statistically significant results?
5        MR. BRODY:  Object to form.  Misstates the
6 records.  There's a lot more --
7        MR. POLLACK:  Stop, stop, stop.  Mr. Brody,
8 please don't make your speaking objections.  You can
9 state your objection.  There's nothing wrong with
10 the question.
11        MR. BRODY:  You can answer.  Go ahead.
12        THE WITNESS:  If it was a research study, a
13 sample size of one would -- see, the question you're
14 asking is actually a little bit conflated.  And so
15 you can do an analysis of a sample of one and get
16 statistical results depending upon how many times
17 something was analyzed.  However, I will fairly say
18 that a one-bottle sample size is not representative
19 of all bottles.
20 BY MR. POLLACK:
21    Q.   Do you understand how to calculate the P-value
22 for determining the statistical significance of
23 scientific study results?
24    A.   Yes.  I do know how to execute statistical
25 techniques.  And a P-value is just an answer to part of a

Page 201

1 question.
2    Q.   Is it correct if I -- if I said that the
3 P-value is a measure of the probability that an
4 observation could be caused by random chance?  Is that a
5 fair definition?
6    A.   Yes, it's a fair definition.  And part of that
7 definition that we use is P-value is less than or equal
8 to 0.05 are considered significant or meaningful, which
9 is generally another way of saying that this result
10 happens at, you know, 1 out of 20 tests.
11    Q.   All right.  So did you calculate a P-value at
12 any time for any of the tests -- any or all of the test
13 results that were used to come to your opinion in this
14 case?
15        MR. BRODY:  Object to form.
16    A.   No.  It wouldn't be appropriate to run
17 statistical analysis of that kind here.
18    Q.   Can you explain why it would not be
19 appropriate, sir?
20    A.   In order to -- in order to run statistical
21 analyses, if you wanted to see is something significant,
22 you have to in part define what significance will be.  So
23 what is a meaningful change.  And, also, in part you have
24 to have multiple tests that are testing the same thing
25 and then something to compare it to.  In typical

51 (Pages 198 - 201)

Page 202

1 analytical sciences meaning where analysis of active and
2 inactive ingredients in a product, whether it's a food,
3 drug, dietary supplement, or others being conducted,
4 those data results are just interpreted as such, which
5 are different than if we were running an interventional
6 trial to see whether supplementing with SAM-e as compared
7 to a placebo helped induce or did induce any meaningful
8 changes in quality of life as measured by validated
9 psychometric scales.
10      So it's not -- just because one can analyze
11 does not mean it's always appropriate to analyze are
12 these results statistically significant?  Especially more
13 in light of that there are specific FDA regulations that
14 one could compare and contrast the results to in order to
15 see is the product being compliant.  And you don't
16 necessarily need to have statistical analysis to know
17 whether a product is being compliant with manufacturing
18 practices and all that's incorporated within GMPs.
19      Q.   You referenced a few things.  I'm going to try
20 to go over my questions about your answer.  First off,
21 are you aware of the procedures or practices of the FDA,
22 if it's going to conduct testing on a product, do you
23 know whether the FDA will test more than one batch of a
24 supplement product?
25      A.   I have not been involved with FDA analyses of

Page 203

1 products; however, I can also say if we look at the
2 analogy of foodborne illness that the FDA monitors, like
3 salmonella contamination of salads.  And, typically, the
4 FDA will utilize more than one sample or more than one
5 sample from more than one lot in the analysis to try to
6 determine an origin of something.
7      Q.   You also just made a comparison to the type of
8 testing done in this case versus -- I don't know if you
9 said clinical trial or some sort of trial on efficacy of
10 for the pharmacological substance.  Can you just briefly
11 explain what you said?  You know what?  Strike that.
12      Isn't it true that you still can use
13 statistical analysis with a single variable experiment?
14      MR. BRODY:  Object to form.
15      A.   One can run analysis on a single item but the
16 single item has to have multiple tests in order for you
17 to analyze.  So in other words, I can run a fissures
18 exact test or some other kind of statistical technique to
19 see is -- is actual claim -- I mean, is actual value
20 statistically different than the label value.  So is 136
21 different than 500?  And you can ask that and analyze
22 that by statistical techniques, yes.  But you don't need
23 to when there's also FDA guidance that says that you have
24 to be within 20 percent of label claim.
25      Q.   Well, sir, is one single test on one single

Page 204

1 subject going to give us a reliable answer?
2      MR. BRODY:  Objection.  Improper hypothetical.
3      A.   I think a single test executed by a reputable
4 group gives an inkling or an idea that there is an
5 issue -- and an issue at hand.
6      I will state that ideally there would be more
7 than one single bottle that would be tested.  However,
8 the confidence in the results because they're so uniform
9 with all of the other results surrounding or the majority
10 of these results surrounding SAM-e testing made me feel
11 more confident that this was just another indication on
12 another product of a quality control issue of mislabeling
13 and a defective product.
14      Q.   Sir, how would you know that all the test
15 results are quote/unquote uniform?
16      A.   I said consistent.
17      MR. BRODY:  Object to form.
18      A.   I said consistent.
19      Q.   I thought you said uniform, but if -- we
20 can --
21      A.   I mean, it depends upon what time today you're
22 asking me what I said.  So let's be fair.
23      Q.   I misspeak, so if you meant to say consistent,
24 that's fine.  I can ask the question:  How do you
25 personally know that the laboratory test results of the

Page 205

1 SAM-e manufactured by VB are consistent?
2      A.   Through -- through the analyses that were done
3 by four different laboratories gave me indication that
4 the products that were manufactured or produced were
5 defective and had -- and had dosing issues.  So the
6 analysis that was done by Merieux in Canada, by Eurofins,
7 by Labs-Mart -- I feel like I'm blanking on one.  Sorry.
8 Merieux, Labs-Mart, Eurofins.
9      Q.   I don't need the name right now.  We can --
10 we'll both move on.
11      A.   Thank you.
12      Q.   So if we look at the -- if we look at the
13 testing results for the BoostCeuticals, it has a lot
14 number -- I think the lot number's probably also in your
15 report.  Maybe that's --
16      MR. BRODY:  Counsel, what's the question?
17      MR. POLLACK:  Sir, please don't interrupt me.
18 I'm trying --
19      MR. BRODY:  I mean, now, here's the problem.
20 You're just meandering on with your own opinions
21 like you did in the last deposition.
22      (Talking over each other.)
23      (Unintelligible.)
24      MR. BRODY:  Just ask the question.
25      MR. POLLACK:  I'm not going to allow you to --

52 (Pages 202 - 205)

Page 206

1    (Talking over each other.)
2    MR. BRODY: Just ask the question, please.
3    MR. POLLACK: I believe that -- Mr. Brody,
4  please stop interrupting me and please stop
5  making -- rolling your eyes and making faces during
6  this deposition.
7    MR. BRODY: Just ask the question, please.
8    (Unintelligible.)
9    MR. BRODY: That's your job. Your job is to
10 ask the questions --
11   MR. POLLACK: Do not yell at me and do not --
12   MR. BRODY: I'm not yelling. I'm not yelling.
13 I am not yelling. I'm just asking you to ask the
14 question because you're not doing that. And that's
15 your only job right now is to ask questions.
16   MR. POLLACK: Sir, I can direct his attention
17 to something. Do you want us to be here all day?
18   MR. BRODY: So do that. So do that.
19   MR. POLLACK: I can show him what I'm talking
20 about.
21   MR. BRODY: So just do that if you need to,
22 but ask questions. You're not asking questions.
23   MR. POLLACK: Well, you interrupted my train
24 of thought, so I'm going to try to go back to where
25 I was and I'd ask you to please be respectful during

Page 207

1  the deposition, Mr. Brody.
2    MR. BRODY: It's not an issue of respect or
3  not respect. It's an issue of you need to ask the
4  questions. That's all.
5    MR. POLLACK: Sir, if you don't like the way I
6  ask the question, you're welcome to --
7    (Talking over each other.)
8    MR. BRODY: No, it's not how you're asking the
9  questions. You're not asking questions. That's the
10 problem. You're not asking questions.
11   MR. POLLACK: I believe I've asked a few
12 questions.
13   MR. BRODY: Yeah, with some extracurricular
14 meandering in the middle. So just ask the questions
15 and he'll answer them. That's it.
16   MR. POLLACK: For the record, I object to the
17 characterization of my questions of meandering, but
18 I will move on.
19   MR. BRODY: Counsel, we can't hear you. Are
20 you asking a question now?
21   MR. POLLACK: No, sir. You interrupted me.
22 I'm trying to pull up a document, but I'm not going
23 to sit here and tell you what I'm pulling up,
24 because you have a problem with it. So I will pull
25 up the document, I will show it to the witness and

Page 208

1  we'll go through it. Please just bear with me for a
2  moment. I don't believe that I've been conducting
3  the depo for more than an hour. I was --
4    (Talking over each other.)
5    MR. BRODY: Just ask the question. Please,
6  I'm begging you. Please just ask a question.
7    MR. POLLACK: You're the one who said that we
8  all had to do the depo on the same date. So if I
9  need a few hours to do my examination, we're going
10 to need to take the time. I will try to get us out
11 of here because I also want to go be with my family.
12 BY MR. POLLACK:
13   Q.  Dr. Kalman, I'm showing you what is marked as
14 Plaintiff's Expert Disclosures 174 as part of your
15 report. This is paragraph 31. In this paragraph you
16 discuss the BoostCeuticals two tests. I'll draw your
17 attention to the center of paragraph 31. There's a lot
18 number here. If you can take a look at that. That's Lot
19 Number 11021902. And, sir, my question is: How many
20 tests are you aware of that were conducted on this
21 particular lot number?
22   A.  I believe one.
23   Q.  Sir, were you provided with the BoostCeuticals
24 Number 1 test report?
25   A.  I believe asked and answered. We went through

Page 209

1  that earlier. That's why we took a break so I could look
2  through the documents to see if there was a
3  BoostCeuticals 1 or a BoostCeuticals 3, and I came back
4  and told you I did not see that. And the only other
5  BoostCeuticals that I was aware of testing was what NOW
6  Foods announced publicly in March 2020.
7    Q.  Sir, do you know who withheld the
8  BoostCeuticals Number 1 test report from you?
9    MR. BRODY: Object to form.
10   A.  I don't know if they were withheld. That's an
11 intimation by you, sir.
12   Q.  Fair enough. Dr. Kalman, if the
13 BoostCeuticals Number 1 testing report was withheld from
14 you, isn't it true that you were not able to use your own
15 discretion to decide which samples to use or include
16 within your opinion?
17   MR. BRODY: Object to form. Improper
18 hypothetical.
19   A.  Hypothetically, if anything was withheld from
20 me, then I would not be as informed as one could be or I
21 could be in rendering a report.
22   Q.  All right. Dr. Kalman, if the BoostCeuticals
23 1 testing report shows that the amount of active
24 ingredient was compliant with the label claims, would
25 that change your opinion as set forth in your expert

53 (Pages 206 - 209)

Page 210

1 report?

2     MR. BRODY: Same objection.

3     A. It would not change my overall opinion about

4 the -- it would not change my overall opinion.

5     Q. Would it change your opinion as to the

6 BoostCeuticals brand?

7     MR. BRODY: Object to form. Misstates the

8     record.

9     A. As related to the Boostceutical brand, it

10 would make me ask the question or request for a third

11 test.

12     Q. Dr. Kalman, if there is variance between

13 different batches of the VB-produced SAM-e, then testing

14 one single bottle from one lot would not produce

15 statistically significant results; is that correct?

16     MR. BRODY: Object to form. Misstates prior

17     testimony.

18     A. I don't know if I could agree to that. It

19 really depends upon the type of question that's being

20 asked whether testing one bottle could produce

21 statistically significant results.

22     Q. Sir, my understanding is that you've been --

23 you've had some work published in peer-reviewed

24 scientific journals; is that correct?

25     A. Thankfully, yes.

Page 211

1     Q. Do you know of any peer-reviewed scientific

2 journal that would accept testing with one single test

3 done on one single sample for any reason whatsoever?

4     A. Sometimes in medicine and science, you can

5 publish what you would call a case study. So, yes, there

6 have been publications in the human realm and also in

7 other realms of quote/unquote N of 1. It is atypical.

8     Q. Sir, if there were SAM-e that were

9 manufactured by VB and were tested and those test results

10 were provided to you, do you believe that that is a

11 sufficient basis to come to your conclusions in your

12 expert opinion?

13     A. Yes.

14     Q. You previously discussed testing in

15 triplicate. Isn't it true that testing in triplicate is

16 required for accurate results?

17     MR. BRODY: Object to form. Misstates prior

18     testimony.

19     A. It depends upon what you are testing. So, for

20 example, if -- if you have a blood test, that laboratory

21 that's analyzing your blood test, ideally, in a ideal

22 world, would run your bloods in triplicate. At minimal,

23 in duplicate, but typically in triplicate to see if the

24 first two values agree, then they have no reason to do a

25 third test.

Page 212

1     In bench science, that is typical to do in

2 triplicate. It's not always standard in other types of

3 analyses. It is also -- I'm sorry -- it is also one

4 reason why the ring testing that was coordinated by

5 Mr. Kevin Yan did triplicate testing from the same lot by

6 three different laboratories.

7     Q. Could you explain briefly what is the ring

8 testing?

9     A. Ring is a term. Okay. So it's just a term to

10 help describe a form of organizing testing. And it's --

11 it's -- if you think about it, you have one lab.

12 Consider them the circle. You have one product, and you

13 take that one product or you take samples from one lot

14 and you send those samples from one lot to three

15 different laboratories. And those three different

16 laboratories conduct the analysis, but it's considered a

17 ring analysis because you have three different

18 laboratories analyzing the results, and then you're

19 comparing and contrasting to see how close or identical

20 or near identical are they. And if you find that two of

21 the three laboratories have very similar findings or all

22 three have similar findings, it is another way of

23 demonstrating that the issue is real and not by chance.

24     Q. Do you know whether any ring testing was done

25 on the Boostceutical brand product?

Page 213

1     A. I do not know that.

2     Q. Go ahead and mark the -- I'm not keeping

3 track. Sorry.

4     MR. O'BRIEN: You're on -- you're on 13,

5     Brett. I got you. Don't worry.

6     MR. POLLACK: I probably should save these

7     also. We may have to go back to make sure we're

8     clear, but I did cite the pages for the record, so

9     we've got that going for us.

10     (Thereupon, Exhibit Number 13 was marked for

11     purposes of identification.)

12 BY MR. POLLACK:

13     Q. Are you able to see? I put up the ring

14 testing report.

15     A. Yes.

16     Q. It's a simple question. I will show you this

17 whole report, if you like. The question is: Do you know

18 whether any ring testing was done on BoostCeuticals

19 products?

20     A. To the best of my awareness and knowledge, no.

21     Q. I don't see it on the report. Dr. Kalman, can

22 you tell me what is the approximate estimate of the

23 variation in the different results between the samples

24 and this ring testing report?

25     A. I'm sorry. What was the variation that was

54 (Pages 210 - 213)

Page 214

1 observed?  So, for --
2    Q.   I could rephrase it simpler.  Sir, isn't it
3 true that between the highest and lowest samples in the
4 ring testing, there's over 600 percent variation?
5    A.   At least.  And, listen, admittedly, I'm
6 assuming your math is correct.  You can see for
7 example --
8    Q.   You can divide --
9    A.   You can see, for example, the Healthy Way
10 product, Lot Number 20299, product lot number 20299, of
11 the three different analyses from that specific lot, you
12 could see that there was a low of 85.6 milligrams and a
13 high of 177 milligrams.  None of which was close to the
14 1,500 milligrams per serving label claim.  Then you can
15 see on the next triplicate testing done on Healthy Way
16 SAM-e 400 the same kind of things.
17    Q.   I'm sorry.  I moved the screen.
18    A.   No, that's okay.  You want to -- okay.  So on
19 this one -- I'm sorry.  You could see with the Healthy
20 Way SAM-e, lot numbers 20122, that the testing in
21 Merieux, Eurofins, and Labs-Mart realized a low of 14.3
22 milligrams per serving and a high of 32.8, which is still
23 more than 90 percent away of where it was supposed to be
24 approximately at 400 milligrams per serving.
25    Q.   Would you agree there's a significant

Page 215

1 variation between the results of these different samples?
2    A.   These would be -- I would say the word
3 significant, not necessarily in the statistical exact
4 definition.  But I would say significant, meaningful,
5 deviation.  These should be failed products based upon
6 QA.  They should have never been able to make it to
7 market.
8    Q.   Do you know whether Dr. Yan tested any
9 Boostceutical product?
10    A.   I do not know if Mr. Kevin Yan tested any
11 Boostceutical product or organized such.
12    Q.   If you want, you can object.  If I told you,
13 Dr. Kalman, that Dr. Yan did not reference any
14 Boostceutical product, would you have any reason to
15 believe that he had Boostceutical test results which he
16 did not disclose?
17       MR. BRODY:  Object to form.
18    A.   No.  Mr. Yan.  He's not a doctor.  Mr. Yan.
19    Q.   Oh, I was giving him the benefit of the doubt.
20    A.   Listen.  It's holiday time.  We should all be
21 giving.  But I have no reason to believe nor information
22 I read that said that Mr. Yan had a Boostceutical product
23 tested.
24    Q.   We talked about the Eurofins -- I was going to
25 say Eurofins of Florida.  I believe it was out of

Page 216

1 Petaluma, California, office of Eurofins.  We looked at
2 the Aubrey, Texas, Eurofins' reports.  You noted a
3 difference in the reports.  My question for you is:  Do
4 you know any differences in the methodologies that the
5 two different Eurofins offices would have used for
6 testing SAM-e in the last four years?
7       MR. BRODY:  Object to form.
8    A.   We would have to look specifically at their
9 certificate of analyses, which would tell you in part
10 their methodology.  So in part.  So what reference
11 standards they used and then whether the testing was done
12 by ultra high-performance liquid chromatography or
13 high-performance liquid chromatography or gas
14 chromatography-mass spectroscopy.  So their reports
15 indicate the machinery that was used along with the
16 standards.  And they're pretty similar across testing
17 organizations, meaning across Eurofins, Labs-Mart, and
18 Merieux.
19    Q.   Do you sitting here right now, today, know
20 what the difference is in the California Eurofins office
21 and Texas Eurofins office are for their testing
22 procedures for testing SAM-e in, let's say, the last four
23 years?
24       MR. BRODY:  Object to form.
25    A.   If I had their reports in front of me, I could

Page 217

1 tell you.  Otherwise, I cannot off the top of my head.
2    Q.   Do you know of any reason why the Eurofins
3 testing done at the Petaluma, California, facility would
4 be incorrect or inaccurate?
5       MR. BRODY:  Object to form.
6    A.   I'm sorry.  I lost you on that question.
7    Q.   Sure.  I'll back up a little bit.  In your
8 expert report, I think we had a discussion about ABC
9 Testing Laboratory; is that correct?
10    A.   We haven't had a discussion.  They were
11 mentioned earlier, but no discussion.
12    Q.   I'm not going to -- I'll try to really move
13 this along.  You said ABC's unreliable, to paraphrase.
14 Do you know of any reason why the Eurofins Petaluma,
15 California, facility would provide inaccurate or
16 incorrect test results for a certificate of analysis of
17 SAM-e?
18       MR. BRODY:  Object to form.
19    A.   No, I -- no, I do not.
20    Q.   If -- if testing of the BoostCeuticals
21 Number 1 showed that the product had the active
22 ingredient within 80 percent of the advertised amount,
23 would you say that product had any value to consumers?
24    A.   So if the hypothetical BoostCeuticals product
25 had at least 80 percent of the label claim, would I say

55 (Pages 214 - 217)

1 that it had value to a consumer?  Was that the question?

2    Q.   Yeah.

3    A.   Yes.  Given that the label claim was still

4 above 400 milligrams or above and the actual amount was

5 above 400 milligrams, yes.

6    Q.   And just to clarify that, the way you answered

7 the question, in that hypothetical the value would be

8 greater than zero?

9    A.   But it doesn't work like that.  So the way it

10 works is that you have a product and you have your dosage

11 that you label that you're going to sell that product,

12 i.e., ibuprofen is 200 milligrams; right?  Advil.  You

13 have SAM-e, your company A, B, or C might decide that

14 they're selling it at 400 milligrams or a thousand

15 milligrams.  My point is that you have to be -- it's a

16 two -- it has two aspects.  You have to be at least 80

17 percent compliant with label claim in order to be

18 considered within the regulations for the Class II

19 nutrient.  Then separately you asked would it have value

20 to a consumer.  And my answer was:  As long as the label

21 claim and actual value was above 400 milligrams, yes.

22          So if you had a hundred milligram product and

23 you still only had 80 milligrams in it, it's worthless

24 all across the board.

25    Q.   At what point does the supplement become

1 worthless?  Let's just go this way.  A supplement

2 deviates by 1 percent from the stated label claim.  Does

3 it add zero value to the consumer?

4          MR. BRODY:  Object to form.

5    A.   According to my understanding -- again, it was

6 made clear to me I'm not a lawyer, but according to my

7 understanding of federal regulations, that aspect would

8 be when it had less than 80 percent of claimed value.

9          I also included within my report from a

10 scientific perspective of where the data shows us in

11 start of efficacy or effectiveness for the SAM-e

12 supplement.

13    Q.   I maybe misheard you with your answer.  In the

14 hypothetical, BoostCeuticals' sample where

15 BoostCeuticals 1 turns out to have had between 80

16 percent -- let's just call it 81 percent of the active

17 ingredient, and it still is more than the 400-milligram

18 threshold per serving, does that product have a value to

19 consumers that's greater than zero dollars?

20          MR. BRODY:  Object to form.  Improper

21 hypothetical.

22    A.   Yes.

23    Q.   And is it your opinion that any supplement

24 that has less than 80 percent of the stated active

25 ingredient adds zero value to consumers?

1    A.   Yes.

2    Q.   Sir, did I hear you right that the first time

3 that you read the depositions of the -- the corporate

4 representative and the -- I'm forgetting her name, but

5 the doctor at VB was -- was it last evening?

6    A.   That was the -- I believe that was the first

7 time that I read both of their depositions.  Maybe not

8 cover to cover, but just don't tell Mr. Brody.

9    Q.   Fair enough.  I understand.  I recall you

10 saying that you read them.  I didn't -- I wasn't trying

11 to trick you that you read them in their entirety.  The

12 question for you is how did you write Footnote 5 if you

13 hadn't read the deposition previously?  I'm going to try

14 to find that.

15    A.   No, I read -- there was -- there was one

16 deposition that I -- that was -- that I did read that was

17 shared with me.  However, these two -- maybe I -- the

18 Chapman and -- I forget her name already.  I'm sorry.  As

19 Cynthia Valenca, or whatever.  I don't recall reading

20 Cynthia's.  I read one partial -- or I partially read one

21 of the depositions earlier and then never finished

22 reading.  So I fully read it yesterday when -- or

23 yesterday when -- or more completely read it when

24 Mr. Brody sent them to me.

25          Now, yes, there was one that's been shared

1 previously and that's why you have my footnote.  However,

2 again, as shared previously, also, there were -- the

3 rationale for reading and rescinding these is to -- to --

4 that there were specific areas in their depositions to be

5 aware of.

6    Q.   Is it correct that you came to the conclusion

7 that the SAM-e manufactured by VB was a uniform product

8 based upon reviewing only the corporate representative

9 deposition of VB and no other VB testimony?

10          MR. BRODY:  Object to form.  Misstates prior

11 testimony.

12    A.   I don't believe that I need to read all of the

13 individuals that either worked for or are leaders, or

14 whatever the right word is, of VB.  I believe relying

15 upon FDA inspection, relying upon the response, relying

16 upon the -- the -- the post FDA or ex-FDA analyses of

17 product on market were more than enough for me to put

18 together the basis of my report.

19    Q.   You referenced at some point that you come to

20 the conclusion with a quote/unquote reasonable degree of

21 professional certainty.  Would that certainty in your

22 opinion have been affected had you have known about the

23 variations in the VB raw materials?

24    A.   No.  I don't believe my report and conclusions

25 would have been changed based upon anything else.  It is

Page 222

1 pretty consistent information and data here of defective
2 product.
3    Q.   Sir, you chose to exclude test results for a
4 VB product that showed that certain VB products was
5 manufactured with the correct amount of the active
6 ingredient as stated on the label; correct?
7    A.   I believe there was one or two certificates of
8 analysis that I did read that I did find meeting label
9 claim that I did not include in my report nor did I
10 reference in my report nor did I mention in my report.
11    Q.   Could you explain the basis for your decision
12 to exclude tests which showed VB product was compliant
13 with the correct amount of the active ingredient?
14    A.   Yes, because only 2 or 3 tests out of more
15 than 30 demonstrated some semblance of meeting label
16 claim that the overwhelming theme was clear to me.  And
17 that overwhelming theme being quality control and quality
18 assurance issues in manufacturing and product production.
19    Q.   Let me find the right paragraph here.  By the
20 way, we're getting towards the end of my outline just to
21 let you know.  Does anybody need to take a break?  I'm
22 happy to power through but...
23    MR. BRODY:  What time do we anticipate
24 finishing for the day?
25    MR. POLLACK:  I want to tell you that I will

Page 223

1 be done in 15 minutes.  However, do not take this
2 the wrong way.  Sometimes your answers are a little
3 bit lengthy, so I'm not going to hold myself to
4 that, but I think I can be done in 15.  However, we
5 have possibly Sean, who may be asking questions.
6 He's unmuting.
7    MR. O'BRIEN:  Yeah, I have a couple but
8 nothing substantial.
9    THE WITNESS:  By 6:00 o'clock we'll be done?
10 Eastern.  It's 4:35 now.
11    MR. O'BRIEN:  That's pretty reasonable.
12    MR. POLLACK:  I hope so.  It is my goal to do
13 so, but I can't promise you.  I also don't know how
14 long of a cross Mr. Brody's going to have if he has
15 any.
16    Can you give us an idea, Mr. Brody?  Do you
17 have a small cross?  Any cross?
18    MR. BRODY:  Just let's move this on.  Let's
19 move this forward.
20    MR. POLLACK:  Okay.  So no break?
21    THE WITNESS:  Let's power through.
22    MR. BRODY:  Unless he needs a break, let's
23 move forward.
24    THE WITNESS:  I don't need a break.
25    MR. POLLACK:  Great.

Page 224

1 BY MR. POLLACK:
2    Q.   Let me find -- Dr. Kalman, I'm showing you
3 what's marked as page 184.  It's page 22 of your expert
4 report.  I want to focus on where it says "degradation."
5 You're welcome -- if you would like me to show you any
6 other parts of the report, please let me know.  But I'm
7 going to ask you questions about degradation.  I'd ask
8 that you please look at the second half of paragraph 59
9 and let me know when you're ready.
10    A.   Ready.  I read it.
11    Q.   Okay.  I apologize.  I'm trying to go with
12 multiple documents that denotes to -- sir, are you
13 providing an expert opinion on the degradation rate of
14 SAM-e?
15    MR. BRODY:  Object to form.
16    Q.   Doctor, you're on mute.
17    A.   Yes.  I'm sorry.  I was coughing, so I was
18 trying to -- trying to be -- so, anyway, yes, I am
19 providing expert opinion that according to the
20 information that I have and that was shared with me that
21 there's no reason to believe that there was degradation
22 experienced in or of the SAM-e products from the shipping
23 and receiving of the products in between Nutrasource and
24 the contract analytical laboratories it worked with and
25 Dr. Catherine Hutt and the contract analytical

Page 225

1 laboratories that she worked with.
2    Q.   What factors contributed to the degradation
3 rate of SAM-e?
4    A.   Typically that would be the -- the -- the --
5 exactly what I wrote, what the ambient conditions are,
6 the environmental conditions.  So it has to do with how
7 much sunlight, heat, humidity.  Those aspects play a role
8 in -- and, of course, temperature.  So, for example,
9 there's a big difference in between something, you know,
10 that you'll leave out exposed to 115 degree heat as
11 compared to 75 degrees in your house.
12    Q.   What is the half-life of the active ingredient
13 in SAM-e when stored at room temperature and ambient
14 humidity?
15    MR. BRODY:  Object to form.
16    A.   That's a great question.  And I actually have
17 not seen data on -- it wouldn't be half.  It would be
18 degradation rate.  But anyway, I haven't -- half-life is
19 when you ingest it, how long does it take for half of it
20 to get out of your body?  That's what half-life is.
21 So -- but my answer to you is I have not seen specific
22 data on that, but I have read from -- I have read the
23 material safety data sheets, MSDS sheets, that are part
24 and parcel from raw material suppliers on how SAM-e is
25 supposed to be stored, held, and treated.

57 (Pages 222 - 225)

Page 226

1    Q.   What, generally -- if you need a moment -- if
2  you would like one moment --
3    A.   Yeah.  Just give me two minutes, please.
4       MR. POLLACK:  Oh, no.  I understand about
5  families.  Do you want a two-minute break or a
6  five-minute break?
7       MR. O'BRIEN:  Let's take a five-minute break.
8       MR. BRODY:  Yeah.  Let's take five minutes.
9       (Recess.)
10 BY MR. POLLACK:
11   Q.   Dr. Kalman, I was asking you about the
12 degradation of SAM-e.  And, sir, the question is:  You
13 were just mentioning some sort of test results or
14 guidelines as far as -- it was either SAM-e degradation
15 or something along those lines.  I didn't -- I'm sorry.
16 I didn't jot them down when we took a break.  Could you
17 briefly repeat what you said?
18   A.   Yes.  I said as S-Adenosyl methionine
19 disulfate tosylate is considered a chemical, it has
20 associated with it by the various chemical and other
21 manufacturers that make the raw material a material
22 safety data sheet known as a MSDS.  The material safety
23 data sheet is something that is, I guess, required by
24 OSHA and standard globally.  And it's a document that
25 describes the -- the relative safety of an ingredient,

Page 227

1  whether you could breathe it in, what happens if it gets
2  in your eye, and including storage and handling.  And so
3  my comments regarding degradation of SAM-e come from, in
4  part, the instructions on the MSDS sheets for this
5  chemical about -- excuse me -- proper storage and proper
6  holding.
7    Q.   Is it correct that SAM-e degrades over time?
8       MR. BRODY:  Object to the form.
9    A.   Well, everything degrades over time.
10 Unfortunately, none of us outlive time.
11   Q.   I just want to get a clear answer to that one.
12 Is it correct that SAM-e degrades over time?
13   A.   I believe that to be so, yes.
14   Q.   And if SAM-e was stored in a particularly hot
15 and/or humid location, that could affect the amount of
16 the active ingredient in SAM-e; correct?
17   A.   Potentially, yes.
18   Q.   Did you rely on Dr. Hutt's statements as to
19 the storage of the SAM-e that was tested in forming your
20 opinion in this case?
21       MR. BRODY:  Object to form.
22   A.   In part -- excuse me.  In part, I relied upon
23 her description of how she received the product, held the
24 product, and then shipped the product.  So from her
25 report, in part, yes.

Page 228

1    Q.   If it turned out that Dr. Hutt was incorrect
2  and that she had held the product for significantly
3  longer than the approximate month time period that she
4  cites to in her report, would that potentially affect the
5  test results?
6       MR. BRODY:  Object to form.
7    A.   Potentially the test results would be impacted
8  if Dr. Hutt held product and if that product was already
9  near or -- excuse me -- near or at its anticipated
10 expiration date.  You would note that these bottles,
11 besides having a lot number, they have a best by or an
12 expire- -- expiratory -- expirory -- whatever the right
13 word is -- date.
14   Q.   Does SAM-e also -- is oxidation a factor in
15 the degradation of SAM-e?
16       MR. BRODY:  Object to form.
17   A.   It can be.
18   Q.   So -- just to be clear -- so exposure to air
19 could also affect the degradation rate of SAM-e?
20       MR. BRODY:  Object to form.
21   A.   Depending upon the environment of that air.
22 So if that air is 120 degrees with 85 percent humidity,
23 which I'm not sure if that's possible, that combo, but
24 that would give you an issue.  But if it's, again, a
25 capsule that you left out on your kitchen counter, it's

Page 229

1  not going to be significant.  It might be over a year's
2  time but over a month time, no.  It's a pretty stable
3  molecule.
4    Q.   Just to confirm, you did no independent
5  research into the degradation rates of SAM-e; correct?
6    A.   Correct.
7    Q.   And the only information that you're relying
8  on as to the degradation rate of SAM-e is what you've
9  just described to us; correct?
10       MR. BRODY:  Object.
11   A.   Yes.
12   Q.   All right.  I presented to you at the
13 beginning of the deposition a case.  I believe it's the
14 Aldridge case where you were an expert.  Do you recall
15 that matter?
16   A.   Yes.
17   Q.   And, again, I'm going by my notes here.  If I
18 don't -- if I -- correct me if I'm wrong, but I believe
19 you mentioned that the plaintiff did not purchase the
20 product; is that correct?
21   A.   Ultimately, that case was resolved when it was
22 found that FedEx actually never delivered her the product
23 that she claimed that she took.
24   Q.   Do you have any information as to the
25 plaintiff Eric Fishon altering any records in this case?

Page 230

1    MR. BRODY: Object to form. This is way
2  outside the scope of the expert deposition, so I'm
3  going to -- I'm going to instruct the witness not to
4  answer unless it's within the scope of the expert
5  deposition.
6    MR. POLLACK: You're instructing the witness
7  not to answer that question?
8    MR. BRODY: Not unless you can explain how
9  it's --
10    MR. POLLACK: Are you sure you don't want to
11  let him answer the question, Mr. Brody?
12    MR. BRODY: Unless you can explain how that is
13  within the scope of an expert deposition, yeah.
14    MR. POLLACK: I'm asking him about his
15  knowledge as to this --
16    MR. BRODY: Of his expert opinion? How does
17  this relate to his expert opinion?
18    MR. POLLACK: If he's been informed that
19  Mr. Fishon altered evidence in this case, then that
20  would affect the --
21    MR. BRODY: His expert opinion in his report?
22  I don't think so.
23    MR. POLLACK: Yes.
24    MR. BRODY: I don't think so. There's nothing
25  in his report about that.

Page 231

1    MR. POLLACK: Are you instructing him not to
2  answer?
3    MR. BRODY: Because you haven't provided a
4  basis of why it's in the scope, yeah.
5    MR. POLLACK: I don't believe that I have to.
6  What is the basis for your instruction --
7    MR. BRODY: I -- I already explained this.
8  Don't ask me again. You just --
9    MR. POLLACK: So if it's not privilege, you're
10  basing it on relevance?
11    MR. BRODY: No. There's a scope of the
12  deposition; right? This is an expert deposition
13  within Rule 26; correct?
14    MR. POLLACK: I'll just note your repeated
15  instruction to the witness --
16    MR. BRODY: Did you notice the deposition?
17  Did you notice this deposition?
18    MR. POLLACK: -- to not answer.
19    MR. BRODY: Counsel, did you notice the
20  deposition?
21    MR. POLLACK: No, I didn't.
22    MR. BRODY: Okay. So -- so then aren't you
23  relying upon the scope of the notice?
24    MR. POLLACK: Didn't you require that all of
25  the attorneys conduct the deposition on the same

Page 232

1  date, sir?
2    MR. BRODY: Yeah. What does that have to do
3  with what I'm talking about? I'm talking about the
4  scope of the deposition.
5    MR. POLLACK: You've been instructing him not
6  to answer.
7    MR. BRODY: We went through this. What does
8  that have to do with the scope?
9    MR. POLLACK: I'm going to go ahead -- and
10  based upon that, I'm going to cease asking
11  questions. I'm going to turn it over -- I'm not
12  going to conclude. I'm going to turn it over to --
13    MR. BRODY: No. Counsel --
14    MR. POLLACK: -- whatever other attorney --
15    MR. BRODY: Counsel, we are not producing him
16  again. If you want to ask more questions, this is
17  your one and last time. Ask all the questions you
18  want.
19    MR. POLLACK: Sir, you instructed the witness
20  not to answer questions.
21    MR. BRODY: Not to answer that one question
22  because it was outside the scope, but I'm not
23  producing him again. If you want to continue to ask
24  him questions about his expert opinion, you're free
25  to do so. If you choose not to do so, that's your

Page 233

1  own choice and that's your own -- that's your own
2  choice. But the opportunity is in front of you.
3  I'm not stopping you from asking him about his
4  expert opinion and I'm giving you notice right now.
5  We're not producing him again. So go ahead if you
6  want to ask more questions about his expert opinion,
7  or you can choose to pass the witness, but we're not
8  producing him again.
9    MR. POLLACK: Well, I'm also not able to fully
10  conduct my examination due to the witness not having
11  all the records with him, so I'm just going to go
12  ahead and --
13    MR. BRODY: Well, I'm going to object to that
14  also (unintelligible) --
15    (Talking over each other.)
16    MR. POLLACK: -- you instructing him to not
17  answer.
18    MR. BRODY: Again, it mischaracterizes what I
19  said.
20    (Talking over each other.)
21    MR. POLLACK: (Unintelligible.) I appreciate
22  it. I hope that you have a very nice Thanksgiving
23  holiday with your family. That will -- that will be
24  the questions that I'm asking you today. And the
25  lawyers will deal with that objection, so thank you

59 (Pages 230 - 233)

Page 234

1  very much.
2      THE WITNESS:  And thank you, sir.  And happy
3  holidays to you too.
4      MR. POLLACK:  Thanks.  Take care.
5      MR. BRODY:  Counsel, can you just state who
6  you represent?  I think you're going to do that
7  anyway.
8      MR. O'BRIEN:  Yeah.
9          CROSS-EXAMINATION
10 BY MR. O'BRIEN:
11     Q.   Dr. Kalman, my name is Sean O'Brien.  I'm an
12 attorney at Lippes Mathias, LLP.  Our law firm represents
13 one of the defendants aSquared Brands, LLC, in this
14 lawsuit.  I'm going to bounce around.  Most of my
15 questions are either follow-up or supplemental questions
16 to answers you've already provided.  So bear with me if
17 we're not in chronological order; okay?
18     All right.  I'm showing you a document that I
19 marked as Exhibit 14.
20     (Thereupon, Exhibit Number 14 was marked for
21 purposes of identification.)
22 BY MR. O'BRIEN:
23     Q.   Mr. Pollack showed you different iterations of
24 pieces of this document.  This is Plaintiff's 41, and it
25 goes to 128.  I'm not going to ask you substantive

Page 235

1  questions, but I want to show you something in the
2  documents that I'm just looking for a quick answer to.
3  So you can see plaintiff's expert disclosures starts on
4  page 41, goes to page 42, goes to page 43, goes to page
5  44, and then the next page is page 63.  Do you have any
6  idea why there is no pages 45 to 62 in your expert report
7  disclosure?
8      A.   No.
9      Q.   Do you remember seeing pages 45 to 62 -- I'm
10 going to let the background noise stop.  Do you remember
11 seeing pages 45 to 62 at any point when you were
12 preparing, reviewing, and finalizing your expert report?
13     A.   No.  However, I also state I was not
14 necessarily looking for the bolded statements or, you
15 know, qualifier on the bottom with the Bates number or
16 whatever they're called.  I wasn't looking for that
17 either.
18     Q.   Sure.  Yeah.  I'm just more making sure that
19 there's not documents that you had reviewed as part of
20 this report that weren't there?
21     A.   No, sir.
22     Q.   Okay.  So you've been asked some questions
23 today about both Catherine Hutt and Kevin Yan.  And,
24 broadly speaking, can you explain to me why you consulted
25 with both of them to do testing instead of just one of

Page 236

1  them?
2      MR. BRODY:  Object to form.
3      A.   Well, part of due diligence and part of doing
4  a little bit more thorough of a job is even though that
5  we were engaging in ring testing at Nutrasource
6  coordinated by Mr. Yan, the idea was let's have an
7  outside party that's outside of us also do something
8  similar.  So --
9      THE COURT REPORTER:  The witness froze on my
10 end.  You guys cut out for me.  I'm not sure if it
11 did for you.
12     MR. O'BRIEN:  Ms. Ellison, did you get -- I
13 heard Dr. Kalman's answer from start to finish.  Did
14 you hear it?
15     THE COURT REPORTER:  Let me -- let me tell him
16 where I left off.  He said, "Let's have an outside
17 party that's outside of us.  Also, do something
18 similar."  And then that's when he froze, or I
19 froze.  Something froze.
20     MR. O'BRIEN:  I'm pretty sure that's the
21 substance of the answer.
22 BY MR. O'BRIEN:
23     Q.   Mr. Kalman, do you have anything to add to
24 that?
25     A.   No, I don't.  No.  I don't think so.

Page 237

1      Q.   Okay.
2      THE COURT REPORTER:  Okay.
3      A.   I don't remember what all I said before that.
4  Sorry, Ms. Ellison.
5      Q.   No, it's okay.  I think we got it.
6      A.   Sorry.
7      Q.   And so I can show you the certificates of
8  analysis from Ms. Hutt and also from Nutrasource, but I
9  think you've gone over them enough today to remember
10 generally.  Is it accurate to say that the -- the testing
11 processes were somewhat different between Ms. Hutt's test
12 and Mr. Yan's test at Nutrasource?
13     A.   No.  I think the testing processes and how
14 they were executed were -- were similar.  But, yes, there
15 is a difference.  Where Mr. Yan engaged in ring testing
16 and Dr. Catherine Hutt engaged more in what you would
17 call SKU testing, testing a single SKU at the laboratory,
18 a single bottle.  Where Kevin would take three bottles
19 from the same lot and then ship them different places.
20 Similarities in all of the types of analysis.  How it
21 came about was slightly different.
22     Q.   Thank you.  And in the -- in the Nutrasource
23 ring testing documents, there's a -- there's a good deal
24 of detailed, what I would call, analytical results that
25 include charts with spikes on them for SAM-e, et cetera,

60 (Pages 234 - 237)

Page 238

1 et cetera. And I'm not going to get into the details of
2 any of that, but I don't see those documents accompanied
3 with Ms. Hutt's declaration. And I was wondering if you
4 have any understanding of why that supporting documat- --
5 documentation -- excuse me -- would be in the Nutrasource
6 documents and not in Ms. Hutt's documents?
7     A.   I do not have any independent knowledge or
8 awareness of was there an extra testing request? Was
9 there more in-depth work? I don't have any independent
10 knowledge of why Catherine or Dr. Hutt received and
11 shared just, let's say, a single page per analyses versus
12 more. I would have to defer to you to ask them for that
13 question.
14     Q.   That's understandable. Is it possible that
15 Catherine Hutt received more documents in response to the
16 testing that she sent out than what we've received at
17 this point in the disclosure?
18     A.   I would actually highly doubt it. And I'm
19 just going by my own experience where I have purchased
20 products and sent them to what is now Eurofins for
21 analysis. And I received the same types of documents or
22 reports back that Dr. Hutt did versus Kevin's. Kevin's
23 is -- or Mr. Yan. His is a little bit more in depth and
24 was more than what has been my experience typically
25 received back from an analytical lab. So there was no --

Page 239

1 there was nothing surprising to me in that way.
2     Q.   This is a somewhat broad question. But when
3 you were first engaged to provide expert services and you
4 learned of the facts at issue in this lawsuit, is there
5 any authoritative or overarching academic or published
6 authority that you would go to to educate or research the
7 issues in the case?
8     A.   Well, I saw -- I saw issues -- I'm sorry. I
9 saw that in my opinion there was more than one issue.
10 There was multiple issues at hand. From a regulatory
11 perspective, it was looking at -- for me, looking at the
12 food and drug administration code of federal regulations
13 and guidance documents as related to foods and dietary
14 supplements because dietary supplements are regulated as
15 a subset of foods. Then it was also looking at the
16 federal trade commission with respect to marketing and
17 advertising and interplay with dietary supplement
18 regulation in between FDC and FDA. So those are
19 authorities, if you will, because it's government. From
20 a -- another government agency called the Agency of
21 Healthcare Quality Research -- and I may have just
22 mangled that name. I apologize. But the Agency For
23 Healthcare Quality and Research, they have also published
24 a book years ago on SAM-e. And that was another
25 authorative document or book that was used as with

Page 240

1 respect to where SAM-e has shown benefit or efficacy
2 in -- meaning which conditions or uses and what doses
3 have been commonly studied and found to have benefits.
4         So from a regulatory perspective, FDA, FDC,
5 from science perspective looking through the
6 peer-reviewed literature.
7     Q.   You were asked a couple times about the ten
8 lawsuits that you listed as providing prior expert
9 services in the last seven years. It's on pages 166 and
10 167 of the disclosure. I don't have any specific
11 questions except that you did note that you were deposed
12 a few times in those cases. Do you keep a copy of any of
13 the transcripts from those depositions?
14         MR. BRODY: Object to form.
15     A.   No, I do not.
16     Q.   Okay.
17     A.   My most recent experiences have been
18 transcripts were sent electronically. What? Two, three
19 years ago last time. And I had to mark it up that way.
20 But, no, I never keep it.
21     Q.   The expert report that you finalized and
22 disclosed in this case, were there drafts of that report
23 before it was finalized?
24     A.   Yes.
25     Q.   Okay. Do you have copies of your drafts?

Page 241

1     A.   Yes.
2     Q.   Did anyone else besides you participate in
3 drafting those drafts?
4     A.   No. I drafted my own drafts.
5     Q.   It wasn't edited by anyone else?
6     A.   No, unfortunately not. So all the typos are
7 mine. All the missing commas are mine.
8     Q.   I didn't catch very many to be honest.
9     A.   I'm trying to get better.
10     Q.   And those drafts, are they in redline form on
11 your computer or is it just different saved versions of
12 the same document?
13         MR. BRODY: Object to form.
14     A.   Different saved versions. To give you an
15 example, if I'm working on something today, I save it
16 with today's date. And then if I start tomorrow, I
17 change it to tomorrow's date so this way I can remember
18 which is most recent.
19     Q.   All right. I'm going to ask you a few
20 questions about specific paragraphs in your report, and
21 we should be done.
22     A.   Okay, sir.
23     Q.   Okay. So this document was marked by
24 Mr. Anderson as Exhibit 4. We'll keep it that way. I'm
25 going to direct your attention to paragraph 49, if we can

61 (Pages 238 - 241)

Page 242

1 get there. So I'll highlight the first half of the
2 sentence here. It reads, "In my opinion that while the
3 federal guidance under 21CFR101.9G, Class 1 and 2
4 nutrient rules may not apply to the subject product."
5 Can you explain to me why you think that those
6 rules might not apply to the subject product?
7 A. Class I has to do with macronutrients, what
8 you and I may know as carbohydrates, proteins, and fats.
9 So that's separate. Class II has to do with
10 micronutrients. This is where the FDA gives specific
11 guidance regarding what is the acceptable margin of error
12 for dosing claims as related to nutrients.
13 So, in general, the diet- -- dietary
14 supplements -- not in general -- are specifically
15 regulated as a subset of foods. And the industry, as a
16 matter of good practices, follows the Class II nutrient
17 rules but it's not necessarily specifically written that
18 that is the federal law for -- for specific dietary
19 supplements as related to nutrients.
20 So I share here the analogy is if it was a
21 food product, which is a different nutrition facts label
22 versus supplement facts label, the guidance is that you
23 have to be at least 80 percent of -- of -- for your
24 nutrient to meet the claim. And so -- even -- so my
25 point in sharing that was the analogy of even if we

Page 243

1 applied this threshold that the FDA says that you're
2 allowed to be up to 20 percent off, the majority of these
3 products as per the analytical testing were more than 20
4 percent off. Anywhere from 70 -- you know, up to 96
5 percent off. So the -- again, that's shared from my --
6 those specific reasons.
7 Q. Understood. All the way down to the last
8 paragraph in your report -- or declaration, more
9 specifically -- paragraph 78 reads, "It's my opinion to a
10 reasonable degree of professional certainty that any
11 entity that labeled or sold any SAM-e supplements
12 manufactured by defendant to consumers were intentional
13 or, at minimum, negligent in making false and deceptive
14 claims to the consumer public." Do you see that?
15 A. Yes.
16 Q. Okay. Have you reviewed any discovery in this
17 case from any of what I'll call the retailer defendants?
18 And by retailer defendants, I'm defining them as
19 defendants in the case that sold Vitamins Because
20 product.
21 MR. BRODY: Object to form.
22 Q. I can -- do you want me to break that question
23 down?
24 A. No. I believe I have. I believe I have. I
25 remember reading some -- something from a storefront, but

Page 244

1 maybe that storefront was associated with Vitamins
2 Because in the greater Hermosa area or Tampa area of
3 Florida as part of somebody's deposition.
4 Q. Okay. Have you ever reviewed deposition
5 testimony from my client Defendant aSquared Brands, LLC?
6 MR. BRODY: Object to the form.
7 Misstates (inaudible) --
8 A. No.
9 Q. Okay. How about any of the other defendants
10 outside of Vitamins Because?
11 MR. BRODY: Same objection.
12 A. Not that I could recollect at this moment.
13 Q. Okay.
14 A. I also don't have everybody's names and
15 connections memorized.
16 Q. Fair enough. It's a lot of parties.
17 A. It's not a party.
18 (Recess.)
19 BY MR. O'BRIEN:
20 Q. All right. Mr. Kalman, you mentioned briefly
21 at some point that you saw either a report or some
22 testing from a company NOW testing or something along --
23 NOW Foods, I believe?
24 A. Right.
25 Q. And I might be slightly misquoting you, but

Page 245

1 that information was not incorporated into your report
2 because of concerns that they could have been a
3 competitor?
4 A. Yes. I did not include or rely upon or use
5 the NOW published studies meaning analysis they did of
6 products in the market because I thought it could
7 potentially be viewed as conflicted. Meaning SAM-e sells
8 products that may or may not compete with the products
9 that are -- not SAM-e. I'm sorry. NOW Foods sells
10 products that may or may not compete with products sold
11 by the company's manufacturer here as party to this
12 lawsuit. So, while NOW Foods publicly has stated that
13 they're trying to make changes on how Amazon does their
14 vetting and certification, I didn't think that was fair
15 to bring in here, but I did take note that the testing by
16 NOW Foods did also show consistent low SAM-e in some of
17 the same products that were party to this lawsuit.
18 Q. Do you have any knowledge about whether anyone
19 from NOW Foods -- or NOW Foods being asked to either
20 participate in or fund the litigation that we're here
21 about today?
22 A. I have no knowledge of such.
23 Q. I'm going to show you a document that we'll
24 mark as Exhibit 15.
25 (Thereupon, Exhibit Number 15 was marked for

62 (Pages 242 - 245)

Page 246

1     purposes of identification.)
2 BY MR. O'BRIEN:
3     Q.  I'll represent to you that it's an email
4 communication that was received in response to a subpoena
5 from NOW Foods. Take a look. It's -- I'm going to ask
6 you about page 329.
7     MR. BRODY: I'm going to object. I don't
8 think I ever received these documents in the course
9 of litigation. Have you produced them to all
10 parties?
11     MR. O'BRIEN: It's not my subpoena, Jay.
12     MR. BRODY: Whose subpoena was it?
13     MR. O'BRIEN: I -- I don't know.
14     MR. BRODY: Well, how did you get it?
15     MR. O'BRIEN: I think it -- I think you
16 received notice of subpoena. I believe it was from
17 Vitamins Because a couple months ago.
18     MR. BRODY: Yeah, but I don't think I received
19 the actual documents.
20     MR. O'BRIEN: Did you -- did you request the
21 response to the subpoena?
22     MR. BRODY: Well, isn't -- those are supposed
23 to be shared with everyone. Are they not?
24     MR. O'BRIEN: I don't know. It doesn't sound
25 like my fight.

Page 247

1     MR. BRODY: Okay.
2     MR. O'BRIEN: You can note your objection. I
3 don't mind.
4     MR. BRODY: I'll note my objection. Go ahead.
5     MR. O'BRIEN: Yeah. It's not -- I don't think
6 it's material to the case.
7 BY MR. O'BRIEN:
8     Q.  Mr. Kalman, could you just take a second and
9 review page 329, and let me know when you're done.
10     A.  I actually read it while you guys were
11 talking.
12     Q.  There you go. You're one step ahead of me.
13 Just one question. Have you ever seen this email before?
14     A.  No.
15     Q.  Okay. Mr. Kalman, that's all I have for you.
16 Thanks for your time. I appreciate your patience through
17 the entirety of the day.
18     A.  Thank you, sir. Also, have a happy holiday.
19     MR. BRODY: Richard, are you asking any
20 questions?
21     MR. OPARIL: No, not at this time because of
22 some of the instructions and objections and the
23 documents issue. We'll reserve all rights, but no
24 questions at this point.
25     MR. BRODY: Okay. Plaintiffs will reserve

Page 248

1 their rights as stated previously. All right.
2 Thank you, Counsel. I appreciate everyone's time.
3     Thank you, Dr. Kalman.
4     THE WITNESS: Thank you.
5     (Deposition concluded at 5:18 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 249

1           CERTIFICATE OF OATH
         (VIDEOCONFERENCE PROCEEDINGS)
2
3 STATE OF FLORIDA )
  COUNTY OF PASCO )
4
5     I, Rhonda Ellison, Shorthand Reporter and
6 Notary Public, State of Florida, certify that DOUGLAS S.
7 KALMAN, PHD, RD, FACN, FISSN appeared before me via
8 videoconference on the 24th day of November 2021, and was
9 duly sworn.
10
11     WITNESS my hand and official seal this 9th day
12 of December, 2021.
13
14
15       _Rhonda Ellison_
      _____
16     Rhonda Ellison, Court Reporter
    Notary Public - State of Florida
17     My Commission Expires: 12/29/21
    My Commission No: GG 166056
18
19
20
21
22
    Personally known _____
23 OR Produced Identification X
    Type of Identification Produced Driver's License
24
25

63 (Pages 246 - 249)

Page 250

```
1        REPORTER'S CERTIFICATE
2
  STATE OF FLORIDA     )
3 COUNTY OF HILLSBOROUGH)
4
5        I, Rhonda Ellison, certify that I was
6 authorized and did stenographically report the
7 videoconference deposition of DOUGLAS S. KALMAN, PHD, RD,
8 FACN, FISSN; and that the transcript is a true and
9 complete record of my stenographic notes.
10       I further certify that I am not a relative,
11 employee, attorney, or counsel of any of the parties, nor
12 am I a relative or employee of any of the parties'
13 attorney or counsel connected with the action, nor am I
14 financially interested in the outcome of the foregoing
15 action.
16
17       DATED this 9th day of December 2021.
18
19
20
21   _____
22   RHONDA ELLISON
23
24
25
```

Page 251

```
1 Douglas S. Kalman
  Dkalman@nutrasource.ca
2
3            December 10, 2021
4 RE:  Ginsberg, et al. v. Vitamins Because, LLC, et al.
     11/24/21 Douglas S. Kalman #4963906
5
6     The above-referenced transcript is available for
7 review.
8     You should read the testimony to verify its
9 accuracy.  If there are any changes, you should note
10 those with the reason on the attached Errata Sheet.
11    You should, please, date and sign the Errata Sheet
12 and email to the deposing attorney as well as to Veritext
13 at Transcripts-fl@veritext.com and copies will be emailed
14 to all ordering parties.
15    It is suggested that the completed errata be
16 returned 30 days from receipt of testimony, as considered
17 reasonable under Federal rules*, however, there is no
18 Florida statute to this regard.
19    If the witness fails to do so, the transcript may be
20 used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25 *Federal Civil Procedure Rule 30(e)/Florida Civil
   Procedure Rule 1.310(e).
```

Page 252

```
1 Ginsberg, et al. v. Vitamins Because, LLC, et al.
2 11/24/21 Douglas S. Kalman
3         E R R A T A  S H E E T
4 PAGE_____LINE_____CHANGE_____
5 REASON_____
6 PAGE_____LINE_____CHANGE_____
7 REASON_____
8 PAGE_____LINE_____CHANGE_____
9 REASON_____
10 PAGE_____LINE_____CHANGE_____
11 REASON_____
12 PAGE_____LINE_____CHANGE_____
13 REASON_____
14 PAGE_____LINE_____CHANGE_____
15 REASON_____
16 PAGE_____LINE_____CHANGE_____
17 REASON_____
18
19 Under penalties of perjury, I declare that I have read
   the foregoing document and that the facts stated in it
20 are true.
21
22 _____  _____
   DOUGLAS S. KALMAN              DATE
23
24
25
```

64 (Pages 250 - 252)

[& - 30]                                                                              Page 253

| & |
| --- |
| **&**  2:3,11 4:14 |

| **0** |
| --- |
| **0.05**  201:8 |
| **09071903**  119:8 |

| **1** |
| --- |
| **1**  1:25 3:10,16 11:7 |
| 11:9 12:10,13,14 |
| 17:4 45:9 57:11 |
| 103:12,17,22 106:3 |
| 106:13,21 109:15 |
| 110:9 170:3 172:10 |
| 182:14 183:6 |
| 191:23,23 201:10 |
| 208:24 209:3,8,13 |
| 209:23 211:7 |
| 217:21 219:2,15 |
| 242:3 |
| **1's**  109:19 |
| **1,500**  194:16 195:4 |
| 195:8 199:2,9,14 |
| 214:14 |
| **1.310**  251:25 |
| **1.4**  172:12 |
| **10**  3:19 65:15 69:20 |
| 93:22 94:14,22 |
| 103:6 118:20,23,24 |
| 127:1 251:3 |
| **100**  170:13 |
| **1000**  2:20 |
| **103**  3:14 169:21 |
| **105**  3:15 |
| **106**  3:16,17 |
| **109**  3:18 |
| **10977**  2:4 |
| **11**  3:10,20 12:17 |
| 128:17 173:10,13 |
| **11/24/21**  251:4 |
| 252:2 |

| **11021902**  208:19 |
| --- |
| **115**  225:10 |
| **118**  3:19 |
| **12**  3:21 126:22 |
| 127:1,11,16 187:3 |
| 187:4,8,9 |
| **12/29/21**  249:17 |
| **120**  228:22 |
| **128**  234:25 |
| **13**  3:22 187:3,13 |
| 213:4,10 |
| **131**  135:18 |
| **136**  194:10 195:2,6 |
| 197:11 198:2 |
| 203:20 |
| **14**  3:23 129:8 |
| 234:19,20 |
| **14.3**  214:21 |
| **14202**  2:17 |
| **15**  3:24 69:20 223:1 |
| 223:4 245:24,25 |
| **15.9**  106:4 115:15 |
| **150**  149:7 |
| **153**  3:3 |
| **15th**  16:17,19 |
| 124:10 125:7 |
| **166**  240:9 |
| **166056**  249:17 |
| **167**  240:10 |
| **17**  188:18,18 |
| 196:15 |
| **1700**  2:16 |
| **173**  3:20 |
| **174**  181:8 208:14 |
| **177**  214:13 |
| **1775**  2:20 |
| **18**  196:15 |
| **184**  224:3 |
| **187**  3:21 |
| **19**  3:11 188:7 |

| **1:00**  111:1 |
| --- |
| **1:19**  1:6 |

| **2** |
| --- |
| **2**  3:11,15,17,19 |
| 17:7 19:23,24 32:8 |
| 58:7 93:18 103:9 |
| 103:16,21,24 |
| 104:14 106:7 |
| 109:18,18,18 110:3 |
| 110:5 172:10 182:7 |
| 182:13 183:6 189:9 |
| 191:3 194:6 222:14 |
| 242:3 |
| **2.4**  172:13 |
| **20**  49:25 81:12,23 |
| 81:25 161:14 176:2 |
| 176:3 188:6 199:24 |
| 201:10 203:24 |
| 243:2,3 |
| **20,000**  140:9 |
| **200**  151:21 152:8 |
| 193:21 218:12 |
| **20006**  2:21 |
| **2007**  55:24 |
| **2011**  2:8 |
| **20122**  214:20 |
| **2015**  57:20 |
| **2018**  78:14 81:15 |
| 81:21 83:4,10,12 |
| 139:6 140:17 |
| 167:19 |
| **2019**  81:25 119:10 |
| 124:2,10 125:7 |
| **2020**  58:12 94:21 |
| 124:6 183:16 209:6 |
| **2021**  1:17 16:17,19 |
| 32:14 42:24 43:5 |
| 51:9 249:8,12 |
| 250:17 251:3 |
| **20299**  214:10,10 |

| **2050**  2:13 |
| --- |
| **21**  82:19 127:11 |
| 186:18 187:13 |
| 188:19 |
| **213**  3:22 |
| **21cfr101.9g**  242:3 |
| **21st**  167:19 |
| **22**  44:12 45:16 |
| 47:19 48:15,20 |
| 49:5,14,25 50:3 |
| 87:11 157:17 224:3 |
| **22702**  1:6 |
| **234**  3:4,23 |
| **24**  1:17 |
| **245**  3:24 |
| **249**  3:5 |
| **24985**  249:15 |
| 250:20 |
| **24th**  249:8 |
| **25**  108:6 194:13 |
| **250**  3:6 |
| **251**  3:7 |
| **252**  1:25 3:8 |
| **26**  36:21 231:13 |
| **276**  188:13 |
| **28**  194:13 |

| **3** |
| --- |
| **3**  3:12 21:6,12 36:3 |
| 36:4,9 37:4,5,21 |
| 58:22 93:18,21 |
| 130:15 133:22,23 |
| 134:4 135:25 148:3 |
| 148:12 182:14 |
| 183:7 209:3 222:14 |
| **30**  44:12 45:16 |
| 47:20 48:15,20 |
| 49:5,14,25 50:3 |
| 81:15 87:12 93:19 |
| 93:21 178:10 |
| 191:25 222:15 |
| 251:16,24 |

**30th**  81:21 83:4,10
**31**  181:9,15,23
    208:15,17
**310**  58:22 59:7
**32.8**  214:22
**329**  246:6 247:9
**33130**  2:13
**33606**  2:9
**34.3**  121:14
**36**  3:12

**4**

**4**  3:13 25:23 36:11
    37:2 41:16,19,24
    55:15 59:12,20
    60:18 67:15,24
    86:21 121:19
    128:19 135:19,19
    241:24
**40**  128:20
**400**  106:5 115:16
    151:6,13,17 152:14
    195:6 196:2,9,14
    196:25 197:22
    198:3 199:10,14
    214:16,24 218:4,5
    218:14,21 219:17
**408**  195:21 197:8
    198:16 199:1
**41**  3:13 234:24
    235:4
**42**  235:4
**43**  235:4
**44**  2:12 235:5
**45**  128:11 235:6,9
    235:11
**450**  20:10 161:4,7
    161:10
**47**  174:20
**48**  174:20 196:18
    196:21

**483**  66:23,24 67:3
    67:15,20,24,25
    68:2,22,25 69:7,10
    69:17,20,24 70:5,8
    70:12,18,21 71:20
    71:20 72:1,5 74:12
    75:6 76:15,20,24
    77:2,7,8,10,14,25
    78:19,21 79:6,8,12
    80:6,7,12,14 83:12
    83:23 88:17 89:6
    92:21 93:4 95:8
    125:12,22 126:3
    131:3,12 132:7,9,9
**49**  241:25
**49.5**  171:22
**4963906**  251:4
**4:35**  223:10

**5**

**5**  3:2,14 26:20
    32:18 34:25 61:1
    102:24 103:3
    111:12,19 112:19
    112:20 220:12
**5-0**  20:8
**50**  2:16 20:8 169:12
    170:1,5,9,15
    174:21
**50.4**  170:1 177:6
**500**  108:6 170:4
    194:11,15 203:21
**51**  174:21,21
**51.1**  177:7
**52**  174:20
**5291**  188:16
**54.7**  171:22
**59**  224:8
**5:18**  1:18 248:5

**6**

**6**  3:15 32:17 34:22
    61:24 105:23,24
**60**  191:25
**600**  214:4
**601**  118:13
**6025**  193:18
**61**  107:23
**6163**  193:19
**6184**  193:18
**62**  235:6,9,11
**63**  235:5
**6335**  188:14
**65**  87:24,25 88:3
**6:00**  223:9

**7**

**7**  3:16 35:3 62:13
    106:6,9 128:18
**70**  243:4
**747**  2:3
**75**  100:19,21
    136:18 225:11
**78**  100:20,21 243:9
**7th**  119:10

**8**

**8**  3:17 35:5,12 63:5
    106:16,17 109:2
    191:5,6,10,10
**80**  38:5 136:25
    217:22,25 218:16
    218:23 219:8,15,24
    242:23
**81**  219:16
**85**  228:22
**85.6**  214:12
**8787**  193:20

**9**

**9**  3:18 64:24 109:11
    109:12 191:4,5,11

**90**  94:6 108:5 129:6
    138:2 149:19
    214:23
**9007930**  182:8
**91**  107:20
**916-186**  115:1
**95**  169:21
**96**  243:4
**96.7**  169:22
**99.99**  38:10
**9:06**  1:18
**9th**  119:10 249:11
    250:17

**a**

**a.m.**  1:18
**aaron**  81:1
**abc**  128:7 217:8
**abc's**  217:13
**ability**  6:14 23:19
    60:23 107:8
**able**  23:14 26:15
    28:1 104:16 107:6
    118:16 190:13,14
    209:14 213:13
    215:6 233:9
**abnormal**  171:24
    172:19
**absolutely**  191:21
**academic**  239:5
**accept**  211:2
**acceptable**  172:11
    174:19 176:22
    180:17 199:13
    242:11
**accepted**  120:25
**access**  14:15 17:10
    26:24 35:8 41:11
    88:17 162:15
**accident**  22:4
**accommodate**  6:24

accompanied   238:2
accounting   20:18
  170:16
accuracy   251:9
accurate   21:21
  47:10 211:16
  237:10
achieve   196:25
  197:2
acid   170:6
acids   170:6
acknowledge   4:3
acquired   163:14
  166:14
act   7:13 65:8 75:8
acting   21:7 26:1
action   61:24 69:6
  75:6 77:10,13 78:3
  78:6,24 79:3,21
  80:10 92:24 93:3,3
  108:20 184:15
  250:13,15
actions   75:1
active   90:12,19
  91:2,11 92:16 93:8
  93:13 94:13 148:21
  157:22 164:15
  166:17,21,22,25
  167:3 168:20,24
  169:1,4,16 174:9
  175:2,5,8,21 176:5
  176:10,14 177:1
  179:20 184:20
  194:7 195:22 202:1
  209:23 217:21
  219:16,24 222:5,13
  225:12 227:16
activities   80:23
acts   74:22
actual   22:14 27:11
  27:11 46:15 56:19

64:15 89:4 113:13
121:20 123:24,25
132:24 135:19
142:9,23 169:5,6
170:4 176:8 188:15
195:7 203:19,19
218:4,21 246:19
adams   23:21,23
add   14:7 74:24
  143:2 177:14 199:2
  219:3 236:23
added   84:17
additional   153:3
  160:24 161:15
  182:12,16
additives   164:18
address   119:18
  120:4 140:19,20,22
adds   219:25
adenosyl   30:8
  46:14 97:10 132:17
  133:15 147:25
  164:16 165:8,14,19
  165:23,24 166:20
  166:23,24 168:1
  169:7,8,19 170:3,8
  170:8 176:6,19
  226:18
administering   4:6
administration
  239:12
administrative   4:7
admittedly   199:21
  214:5
adobe   114:17
adulterated   89:10
adverse   59:1
advertised   217:22
advertising   59:23
  62:16 65:18 239:17

advil   152:2 218:12
affairs   39:3,5
  155:10
affect   136:11,15
  139:10,24 140:2
  227:15 228:4,19
  230:20
affiliate   155:25
afternoon   153:23
  154:3,13
agency   68:11,23
  69:11 70:4,18 75:6
  75:7 76:15,25
  78:24 239:20,20,22
ago   6:8 7:5 18:14
  31:22 51:6 58:11
  64:10,21 161:14
  239:24 240:19
  246:17
agree   4:15,18,20
  15:11,19 42:23
  43:17,22 50:16
  66:23 67:14 69:10
  69:13,23 70:5 75:5
  75:20 76:1 77:7
  79:8 82:22 84:12
  87:3,8 90:11 92:14
  93:6,21,25 94:1,11
  94:14 98:9 101:25
  104:9 105:9,14
  107:19,22,25 112:3
  112:8 113:10,20
  115:18 116:21,25
  117:15,19 123:8,11
  123:13,16 124:1,5
  126:20 127:2,14
  128:7,19 129:8
  131:12 144:24
  145:4 158:18
  192:13 195:10
  210:18 211:24

214:25
agreed   61:19
  198:10
agreeing   76:9
  85:25
agreement   4:6,11
  4:12 20:16 111:24
ahead   30:5,13
  37:12 67:6 83:16
  110:23 136:21
  153:17 154:2,9
  155:1 168:2 173:1
  173:15 176:11
  188:1,6 195:17
  200:11 213:2 232:9
  233:5,12 247:4,12
aiming   8:25
air   228:18,21,22
al   251:4,4 252:1,1
aldridge   58:22 59:1
  59:9 229:14
allegation   65:10
alleged   58:25 59:1
  59:11
alleges   126:23
alleging   5:12
allow   7:15,16
  160:14 205:25
allowed   9:12 160:4
  178:23 197:17
  243:2
altered   230:19
altering   229:25
amazon   98:15,16
  98:23 99:23 100:3
  100:25 183:16
  184:16 245:13
amazon's   100:6
ambient   225:5,13
amended   13:18
  14:3 28:8 52:12

89:12 116:17,25
118:9 134:20 135:1
**america** 156:11
157:8,17
**american** 156:12
156:14
**amount** 45:2 50:25
60:18 69:5 89:16
90:8,12 93:13
151:6 169:16 174:9
175:1,25 176:14
179:19 184:20
189:23 194:7 197:1
209:23 217:22
218:4 222:5,13
227:15
**anabolism** 56:11
**analogues** 43:10
**analogy** 203:2
242:20,25
**analyses** 52:18
96:25 115:13 116:4
116:14 117:6,9,10
117:16,21 120:5
121:23 122:25
123:7,21 132:22
133:3 134:22,25
137:3,4 165:13
182:9 201:21
202:25 205:2 212:3
214:11 216:9
221:16 238:11
**analysis** 3:15,16,17
3:18,19,20,21,22
15:1,1 34:14 47:16
48:5 52:17 93:16
103:16,17,19 104:2
104:3,13,19,25
105:2,4,10,17
106:2 108:15 109:2
109:25 115:24

117:11 119:2,4
120:25 121:1,13,20
122:5,10,14,22
123:5 124:18,22
132:16 134:1,24
137:4 147:6,8
149:18 150:17,19
162:21 165:11,16
167:9,18,25 170:1
173:23 174:8 175:1
175:24 176:19,25
177:21 183:3,21
184:8,22,23 186:13
186:17 187:1,15,17
187:25 188:3 189:9
189:19 190:4,10
191:1,22 193:1,7
198:12 200:15
201:17 202:1,16
203:5,13,15 205:6
212:16,17 217:16
222:8 237:8,20
238:21 245:5
**analytical** 23:10
46:7,7,8,14,18
47:21 93:17 119:21
121:25 122:6
149:18 202:1
224:24,25 237:24
238:25 243:3
**analyze** 39:12 48:9
48:10 202:10,11
203:17,21
**analyzed** 23:11
81:24 108:5 122:24
123:23 183:17
200:17
**analyzing** 46:14
47:16 211:21
212:18

**anderson** 2:6,7 3:2
4:16,16 5:7,9,10
9:3,6,18,22,25 10:8
10:14,24 11:5,11
12:11,14,15 19:16
20:1,3 22:11,15,19
25:17,20,22 30:22
30:24 33:19 34:4
36:10,13,19,23
37:1,5,13,19,22
40:23 41:3,4,21
57:1,3 72:17,20,22
73:1,5,10,15,19,23
74:1,3,6,7 84:25
85:6,7 95:3,6 99:7
99:13,19,22 103:1
103:5 106:1,11,19
109:14 110:21
111:4,6 112:11,17
112:18 114:19,21
118:12,18,21 119:1
121:10 124:11,14
126:17,19 142:13
142:17 143:3,8,11
143:18 145:24
146:14 152:18,25
153:2,16 154:22
181:2 241:24
**anemic** 80:9
**ann** 1:3 24:11
**announced** 209:6
**answer** 6:13,18,19
18:17 21:20 30:15
34:25 38:6 44:19
45:13 66:9 68:14
71:6,7 74:24 75:17
76:3 85:15 86:22
103:24 112:21
114:10 118:10
121:3 124:15
137:15 142:20

143:9,12,14 147:17
148:15,16 157:14
157:19,25 158:3
159:7 165:8 172:20
172:24 175:23,23
177:16 180:11,16
185:24 186:1,2,5
189:1 190:14
192:16 197:15,17
200:11,25 202:20
204:1 207:15
218:20 219:13
225:21 227:11
230:4,7,11 231:2
231:18 232:6,20,21
233:17 235:2
236:13,21
**answer's** 116:9
180:17
**answered** 26:8
29:24 49:20 79:10
89:24 108:16
126:11 129:22
131:14 134:18,19
134:21 144:20
188:25 199:16
208:25 218:6
**answering** 70:24
107:7,9
**answers** 223:2
234:16
**antianxiety** 97:20
**anticipate** 222:23
**anticipated** 228:9
**antidepressants**
60:24
**antidepressive**
97:20
**anxiety** 196:10
**anybody** 18:19
32:5 135:9 138:11

151:20,25 156:17
222:21
**anyway** 224:18
225:18 234:7
**aosc20-16** 4:8
**apologize** 25:16
224:11 239:22
**appear** 42:1 126:15
132:19 141:12
174:11
**appearances** 2:1
**appeared** 249:7
**appears** 10:20
124:3 181:24 189:9
**appendix** 38:4 53:2
**applied** 243:1
**apply** 154:21 242:4
242:6
**appreciate** 6:17,19
233:21 247:16
248:2
**approached** 18:10
19:5,7
**appropriate** 141:12
201:16,19 202:11
**approval** 142:4
**approximate** 20:5
32:4,6 213:22
228:3
**approximately** 6:8
7:4 31:18 43:5
44:12 58:11 128:20
133:3 195:6 214:24
**area** 18:12,24,25
39:16 56:2 144:1
199:23 244:2,2
**areas** 30:9 31:4,14
39:22 57:17 132:10
132:11 221:4
**argue** 131:10

**arguing** 160:23
**arm** 51:23,24
156:15
**arnall** 2:19
**arrangement** 4:9
**arsenic** 87:1
**article** 97:23
**articles** 15:8 27:6,7
27:11 34:23
**aside** 97:23 135:5
**asked** 8:13 18:10
18:11,15 22:5
23:16 26:8,9,14
27:24 33:19 34:21
37:25 45:22 49:21
58:16 66:17,18
79:10 86:19,19
89:23 108:16
126:10 134:17,19
134:21 137:20,21
141:3,6 142:14
144:20 145:12
148:17 163:3
185:21 207:11
208:25 210:20
218:19 235:22
240:7 245:19
**asking** 6:12,18 10:8
23:4 27:10,10
31:13 33:15,18,19
46:9 58:2 75:20
85:5 86:15 102:9
107:15 108:13
110:4 138:21
142:13,23 146:23
148:23 153:10
155:20 167:17
168:6 185:9,14
196:19 200:14
204:22 206:13,22
207:8,9,10,20

223:5 226:11
230:14 232:10
233:3,24 247:19
**aspect** 15:20 48:14
89:2,3 150:3
158:22 189:16
219:7
**aspects** 13:24 14:13
29:19 65:9 82:3
147:5 150:5 218:16
225:7
**asquared** 1:10 2:17
3:16 5:1 106:3
234:13 244:5
**assessment** 47:10
63:15 69:22
**assessments** 31:15
31:16
**assigns** 113:9
**assist** 51:17
**associated** 65:5
226:20 244:1
**associates** 141:19
146:5 156:3,4,7,9
156:19
**assume** 20:19,21
21:20 26:17 108:17
108:18 140:25
**assumed** 8:19,24
109:4,7
**assuming** 214:6
**assumption** 107:12
109:23 114:7
179:10
**assumptions**
109:22 178:23
179:7,13
**assurance** 222:18
**athletes** 56:11
**athletic** 56:9

**attach** 19:22 36:2
37:1,24 105:4,9
106:7
**attached** 12:8
104:20 105:1,3,12
116:5 117:7,16
129:18 130:4
251:10
**attaching** 105:16
**attachment** 15:22
**attachments** 11:23
**attempt** 21:20
124:24 125:11
**attention** 36:22
103:7 181:8,23
187:20 188:19
196:18 206:16
208:17 241:25
**attorney** 2:4,14,17
2:21 10:17 153:18
153:25 154:14
232:14 234:12
250:11,13 251:12
**attorneys** 2:9 4:2
186:14 231:25
**atypical** 211:7
**aubrey** 104:10
216:2
**audit** 139:20 142:1
**august** 32:13,14
42:24 43:5 51:8
**authoratative**
239:25
**authoritative** 239:5
**authorities** 239:19
**authority** 239:6
**authorized** 250:6
**available** 8:20 60:4
72:5 146:8 251:6
**avenue** 2:20

**average** 189:24
**aware** 41:7,10 79:7
  79:19 83:8,8 93:2
  94:12,15 101:22
  110:12,14 127:6,24
  128:3,12,18 135:6
  138:11,15 139:4
  140:7,13,17,19,21
  140:23 155:18
  157:22 163:4
  173:19 186:10
  202:21 208:20
  209:5 221:5
**awareness** 213:20
  238:8

**b**

**b** 1:10 3:9 4:22
  19:22 46:23 53:2
  56:15 83:17 84:15
  84:17 164:5 218:13
**bachelor's** 55:18
**back** 9:21 10:13
  21:23 31:13 73:8
  73:13 79:17 110:11
  124:2,16 126:18
  130:14 134:4
  162:25 176:12
  180:5 183:15
  187:13 188:19
  194:4 206:24 209:3
  213:7 217:7 238:22
  238:25
**background** 66:6
  235:10
**backtrack** 8:13
**bad** 93:25 102:12
  126:1 166:22
**bagel** 71:13
**balances** 139:18
**ballpark** 20:6

**ballpark's** 20:7
**bandwidth** 98:25
**barely** 25:10 30:18
  154:8
**barking** 67:9
**base** 113:1,4
**based** 15:23 17:20
  20:17 30:12,20
  39:15 49:13,24
  50:2 59:23 77:10
  110:18 126:12
  151:12 152:12
  197:7 215:5 221:8
  221:25 232:10
**basically** 58:2 66:5
**basing** 231:10
**basis** 39:5,7 81:20
  81:23 82:16,18
  125:17 211:11
  221:18 222:11
  231:4,6
**batch** 108:3 119:11
  167:19 172:13,14
  177:18 179:14,19
  179:20 202:23
**batches** 177:25
  179:16 210:13
**bate** 188:18
**bates** 173:4,7 181:8
  186:17 187:12
  235:15
**bear** 155:2 178:25
  208:1 234:16
**because's** 50:4 83:9
  94:17 113:21 114:8
  127:25 146:17
**becoming** 23:7
**began** 124:12
**begging** 208:6
**beginning** 229:13

**behalf** 1:5 4:16
  21:8 26:1
**behest** 119:4
**belief** 125:6 130:8
**believe** 7:18 8:10
  10:8 11:3,17,22
  14:11 16:4 21:2
  38:2 43:4,15 47:7
  52:5,9 55:25 58:19
  61:18 64:20 76:19
  98:17 100:13
  101:11,14,16
  103:25 108:4 118:8
  119:12 122:21
  124:18,20,21,23
  125:19,20 126:2,25
  129:22 130:12,12
  144:20 151:6
  152:16,16 162:10
  178:11 180:11
  186:6 188:2 200:3
  206:3 207:11 208:2
  208:22,25 211:10
  215:15,21,25 220:6
  221:12,14,24 222:7
  224:21 227:13
  229:13,18 231:5
  243:24,24 244:23
  246:16
**believed** 43:11,12
**bench** 212:1
**beneficial** 196:4
  198:12
**benefit** 51:16
  197:23 198:4
  199:13 200:1
  215:19 240:1
**benefits** 96:15
  151:8 152:9 156:16
  240:3

**best** 6:13,16 17:24
  22:7 23:19 26:16
  28:7 31:20,23 52:7
  52:8 71:6 78:15
  95:22 96:23 97:1,4
  102:3 107:8 117:3
  122:9 147:18
  176:12,18 184:4
  213:20 228:11
**better** 33:1,6 52:4
  56:15 60:24 65:17
  91:22 144:10 147:4
  148:12 150:6 152:7
  167:11 179:7
  188:25 196:16
  241:9
**beverages** 39:19
**beyond** 44:18
  143:1,1
**bias** 158:4
**bibliography** 15:15
  27:14,17,18 35:1
  35:13 52:22
**biceps** 51:25
**big** 96:13 170:18
  225:9
**bill** 1:3 20:10 24:22
  161:8
**billable** 161:6
**billed** 161:7
**billing** 15:7 17:9
  19:17 21:1
**bills** 161:8
**bind** 164:22
**bioanalytical** 47:3
**biochemical** 56:10
**biochemistry** 47:3
  55:2,7 56:3
**biologist** 40:9
**biology** 56:15

**bit**  6:10 39:18
46:20 66:22 111:13
114:15 121:12
122:8 131:23
141:20 147:14
154:10 168:3,14
172:1 174:24 179:6
188:6 190:12
191:19 200:14
217:7 223:3 236:4
238:23
**bite**  71:14
**black**  75:17
**blanketly**  147:17
**blanking**  133:10
205:7
**blindly**  76:9
**block**  140:22
**blood**  211:20,21
**bloods**  211:22
**board**  112:25
218:24
**body**  225:20
**boil**  46:16
**bolded**  235:14
**bone**  96:2,16
**bonus**  162:6
**bonuses**  161:20
162:2,4
**book**  239:24,25
**boostceutical**
109:15,18,25 110:2
110:5,6,8 180:10
181:19 182:7
185:15 189:9,13
190:2,9 191:3,12
194:6 199:18 210:9
212:25 215:9,11,14
215:15,22
**boostceuticals**  1:10
3:19 4:23 154:15

180:4,7,15,19,23
182:6,13,17 183:6
183:6,7,7,10,23,25
184:18,21 185:12
188:22 193:17
194:17 197:6 198:1
198:6,11,16,17
205:13 208:16,23
209:3,3,5,8,13,22
210:6 213:18
217:20,24 219:14
219:15
**botanical**  39:20
**bottle**  46:23 110:2
113:11,13,22 114:1
114:3 115:6,11
180:6,10 189:13,22
189:24 191:24,25
192:8 194:22,24
195:19 200:18
204:7 210:14,20
237:18
**bottles**  33:16,17
44:22 45:1,4,16
46:21 47:20 48:15
48:20 49:5,14 50:3
98:16,18 102:20,21
113:24 126:22
127:3,12,14,16,19
127:21 128:17
142:12,23,25
180:13 200:19
228:10 237:18
**bottling**  133:21
**bottom**  235:15
**bought**  52:9 170:12
183:16
**bounce**  234:14
**bound**  166:10
**box**  12:3,6 146:4

**box.com**  14:11,15
14:18 146:4,12
162:15
**brand**  52:6,9
157:12 180:7
181:19 183:23
185:12 190:2 210:6
210:9 212:25
**brands**  1:10 2:18
5:1 120:14 184:6
234:13 244:5
**brea**  119:25,25
**break**  6:23 56:25
166:23 179:6
182:18 209:1
222:21 223:20,22
223:24 226:5,6,7
226:16 243:22
**breathe**  227:1
**breckenridge**  63:6
**brett**  10:17 99:10
154:5,13 173:10
213:5
**bretton**  2:11 4:21
154:4
**brief**  193:25
**briefly**  167:6 193:4
203:10 212:7
226:17 244:20
**brightest**  59:17
**bring**  8:14,16 12:18
12:22 13:3,5 15:4
16:6 34:21 37:25
38:1 127:16 132:12
145:12,18 153:8
245:15
**bringing**  16:14
113:13 184:11,12
**brings**  128:11
**broad**  239:2

**broadly**  235:24
**brody**  2:2 4:13,13
13:20 14:10 17:22
18:1,5 20:1,20
21:14,19,22 22:2,9
22:13,17,21,23
23:1 24:15,19,23
25:7,9,12,16,19,21
25:24 26:6,7,10,12
29:17,21,25 30:4
30:12,17,20,25
31:2,9,15 33:10,15
33:21 34:10 36:6
36:15,21,25 37:23
38:9 43:1 44:16,24
45:18 46:5 47:22
48:16 49:7 50:18
50:22 51:2 53:10
56:24 67:18,21
68:4,13,24 69:12
69:25 70:7,14,20
72:2,7,11,15,19,21
72:24 73:3,6,12,18
73:22,25 74:2,5,14
75:9 76:5,18 77:1
77:11,21 78:4 79:1
79:10,15 80:19
83:5 84:7,19,23
85:1,10,14 87:7,18
88:9,18,25 89:8,23
90:4,14,21 91:5,18
92:1,18 93:1,23
94:4,19 95:1 98:20
98:24 99:6,21
100:1,5,12 101:1
102:2,22 103:13
104:5,21 108:16
109:20 110:18,25
112:7,14 115:21
116:2,7 117:22
118:7 121:8 122:19

124:4,8,12 125:5
126:6,10,24 127:4
127:8,22 128:1,9
128:14 129:11,20
130:6 131:17 132:8
133:5 134:14,17
135:8 136:20
137:13,17 138:5,12
139:2,8,12 140:11
141:17,19 142:11
142:15,19 143:6,9
143:12 144:5,19
145:2,16,21 146:5
146:19 147:1
148:10,18 149:24
150:13 151:9,23
152:22 153:12,17
153:20,25 154:5,11
160:1,5,9,19,21
161:1,18,22 162:8
163:6 165:5 170:23
171:3,5 172:22
173:3 174:3 175:3
175:9,11,12,17
176:15 177:4,19
178:2,15 179:9
180:21 185:14,17
185:23 186:2 190:5
194:19,24 197:9,14
198:19,21 199:20
200:5,7,11 201:15
203:14 204:2,17
205:16,19,24 206:2
206:3,7,9,12,18,21
207:1,2,8,13,19
208:5 209:9,17
210:2,7,16 211:17
215:17 216:7,24
217:5,18 219:4,20
220:8,24 221:10
222:23 223:16,18

223:22 224:15
225:15 226:8 227:8
227:21 228:6,16,20
229:10 230:1,8,11
230:12,16,21,24
231:3,7,11,16,19
231:22 232:2,7,13
232:15,21 233:13
233:18 234:5 236:2
240:14 241:13
243:21 244:6,11
246:7,12,14,18,22
247:1,4,19,25
**brody's** 20:16 26:6
146:13 162:15
223:14
**broke** 161:12
**buckets** 157:4
**buffalo** 2:17
**built** 140:9
**bulb** 59:17
**bureau** 65:18
**business** 4:23 7:9
7:12 20:22 65:18
124:2 154:14 158:8
158:25 159:9
**busy** 39:23
**buying** 120:13
199:9

**c**

**c** 4:1 46:23 83:17
84:21,21 164:4,5
218:13
**c160905** 167:20
**calculate** 189:16
200:21 201:11
**calculated** 121:15
121:16 122:13,23
126:13 187:21
**calculator** 195:20

**calendar** 11:20
**california** 7:7,12
58:9 87:23,25 88:2
119:23,25 120:8
216:1,20 217:3,15
**call** 15:14,14 64:4
110:2 133:23
141:23 184:13
211:5 219:16
237:17,24 243:17
**called** 5:13 11:1,12
41:6 46:6 52:7
56:14 60:5 103:24
139:16 145:8
183:14 235:16
239:20
**calling** 141:24
185:9
**calls** 112:12
**canada** 17:20 19:2
19:4 21:4 120:7,8
156:10 205:6
**canadian** 39:17
123:6,7,15 156:12
**cap** 194:25
**capaci** 58:7
**capacity** 161:17
**capital** 165:17
**capium** 172:5
**capsule** 95:25
164:22,23 181:4
189:14,15,18,20,22
228:25
**capsules** 44:3 45:25
49:10,18 94:2
141:1 191:25 198:1
**carbohydrate** 56:9
**carbohydrates**
242:8
**carcinogen** 88:2

**care** 234:4
**careful** 80:2
**cartilage** 96:3,16
**case** 1:5 5:14 7:14
7:23 13:10,11 14:8
14:13,23 17:15
18:8 19:20 20:24
21:10,19 22:22
23:2 24:5,6,8 26:4
26:22 27:12 31:19
35:7,15 41:6 42:2
58:9,13,23,25 59:5
59:8,13,21 61:22
61:24 62:11 64:6
64:15 65:6,9,14,23
78:8 89:3,15
103:11 113:3 135:7
140:14 143:5,25
146:15 154:1,2
160:11 161:5 163:5
181:20 185:13
187:18 192:12
201:14 203:8 211:5
227:20 229:13,14
229:21,25 230:19
239:7 240:22
243:17,19 247:6
**cases** 7:19 8:5,9
57:7,20,23 58:3
60:11 63:22 64:9
64:10 240:12
**catabolism** 56:11
**catch** 241:8
**category** 171:10,23
**catherine** 23:21,23
24:3 53:15 104:8,9
183:4 184:24 186:7
224:25 235:23
237:16 238:10,15
**cause** 24:5

caused 59:11 201:4
cease 232:10
center 171:12
  208:17
central 1:9 2:21
  89:2,3
centric 83:25
ceo 18:9,19,21 19:5
  19:6 22:25 159:20
ceos 144:24 145:8
certain 5:12 8:14
  30:1 31:1 47:19
  57:17 60:23 69:5
  125:14 189:23
  222:4
certainly 16:13
  21:23 69:7 77:12
  77:15
certainty 43:15
  58:20 104:17
  180:12,16 221:21
  221:21 243:10
certificate 3:5,6,15
  3:16,17,18,19,20
  3:21,22 48:4 96:25
  103:16,17,19 104:2
  104:3,13 105:4
  106:2 108:14 109:2
  109:25 115:24
  116:4,14 117:6,16
  117:21 119:2,3
  120:25 121:1 122:5
  122:9,22 126:15
  133:2 134:1,24
  147:6 150:19
  165:11,13,16 167:9
  167:18,25 175:1
  186:13 187:1,14,17
  189:9,19 190:4,10
  191:22 192:25
  198:11 216:9

217:16 249:1 250:1
certificates 93:16
  104:19,25 105:2,10
  105:16 117:9,10
  122:6 132:15,22
  134:22 137:4
  149:18 150:17
  162:21 173:22
  174:8 175:24
  176:19,25 177:21
  186:16 187:25
  188:3 191:1 193:7
  222:7 237:7
certification
  245:14
certifications 54:10
  54:15
certified 54:6
  139:14,16,22,23
certify 249:6 250:5
  250:10
cetera 9:1 148:8,9
  237:25 238:1
chain 164:2
challenge 60:12
challenged 60:11
chance 107:3 201:4
  212:23
change 129:13
  131:19 137:22
  150:25 201:23
  209:25 210:3,4,5
  241:17 252:4,6,8
  252:10,12,14,16
changed 137:21
  221:25
changes 129:12
  132:10 139:5,10
  150:9,10 202:8
  245:13 251:9

chapman 28:13,17
  28:20 29:24 30:7
  141:23 220:18
chapman's 29:2
  138:19
characterization
  207:17
charge 21:1 165:22
chart 68:19,20
charts 237:25
check 20:20 37:6
  37:17
checklists 142:1
checks 124:25
  139:18
chemical 132:18
  133:15 147:22
  148:21 167:5
  168:14 226:19,20
  227:5
chemist 40:1
chemistry 47:8
chestnut 2:3,4
chinese 133:10
choice 95:21 140:1
  233:1,2
choose 95:17
  232:25 233:7
choosing 96:23
chose 88:23 222:3
chromatography
  48:7 169:11 216:12
  216:13,14
chronological
  234:17
cid 62:18
circle 212:12
cite 27:19 213:8
cited 69:19 81:14
  83:13 89:6 90:11
  90:19 91:2,10,16

cites 70:9 228:4
civil 1:22 62:18,19
  251:24,24
claim 48:12 85:17
  86:20 87:1,6,9 89:3
  90:1,7 93:17,19,19
  94:16,22 105:7,11
  108:7 122:11,18
  125:16 126:1,9,13
  128:5 129:7 136:24
  137:1 138:8,10
  198:7,24 199:23
  200:2 203:19,24
  214:14 217:25
  218:3,17,21 219:2
  222:9,16 242:24
claimed 85:23
  219:8 229:23
claiming 84:11,13
claims 7:11 60:8
  61:10 62:8 63:2
  65:23 82:2,2,11
  89:22 94:18 125:2
  128:13 138:4 142:8
  149:19 209:24
  242:12 243:14
clarification 23:5
  158:17 186:3
clarify 143:7 159:7
  174:24 176:24
  185:19 199:5 218:6
clarifying 143:10
class 199:25 218:18
  242:3,7,9,16
clear 25:12 123:22
  142:21 155:15,20
  163:21 166:17
  168:21 176:11
  182:11 183:22
  185:16,18,21,24
  213:8 219:6 222:16

227:11 228:18
**clearer** 193:15
**clearly** 93:10
   186:19
**cleveland** 2:8
**client** 50:11 80:1,3
   87:22 107:13,17
   170:13 244:5
**client's** 132:21
**clients** 31:5 39:8
   59:19 88:15 159:5
**clinical** 203:9
**close** 82:2 212:19
   214:13
**closedown** 5:25
**closing** 114:18
**cloud** 146:9
**coa** 147:8,13,17
   171:23 174:12
   176:13 190:23
**coas** 129:18 130:4
   137:10 144:17
   145:8 150:11,17,24
   151:2 174:11
**coauthor** 39:14
**code** 75:16 239:12
**cole** 59:6
**collating** 23:11
**collect** 91:7
**collecting** 21:22
   179:11
**college** 55:17
**column** 171:12,13
   171:14 172:6
**combination** 29:17
   29:20 170:5
**combined** 56:9
**combo** 228:23
**come** 38:8 190:3
   201:13 211:11
   221:19 227:3

**comes** 9:21 116:20
   133:8 147:13
   172:11
**coming** 75:10,23
   76:2 82:2 99:8
   174:21 187:18
**commas** 241:7
**comment** 34:13
**comments** 227:3
**commission** 62:15
   64:3 239:16 249:17
   249:17
**commissioned**
   110:15 111:8
   119:14
**common** 44:5
**commonly** 240:3
**communicated**
   24:11,14,18,22,25
   25:3,6
**communicating**
   119:22
**communication**
   22:11 29:17,20
   246:4
**communications**
   21:17 23:20
**companies** 31:12
   33:2 39:8 96:11
   123:15 157:8,11,12
   157:17 158:24
   167:4 184:10,16
**company** 1:11 18:9
   18:20,21 40:13
   60:8,9 62:3,3,4,19
   62:21 69:4,16,23
   70:10,22 75:3
   77:14 96:18 104:11
   113:17 114:12
   119:13,16,20 120:3
   120:10,12,13,17,22

123:4 133:19,19
   140:5 155:5 156:2
   156:5,6,12,19,24
   158:9 159:13,16
   166:14 172:7
   183:14 188:25
   218:13 244:22
**company's** 69:19
   245:11
**comparative**
   188:15
**compare** 29:21
   51:23,23 97:19
   122:25 201:25
   202:14
**compared** 29:23
   40:16 56:9 97:21
   123:21 184:20
   202:6 225:11
**compares** 48:12
   187:25
**comparing** 97:14
   212:19
**comparison** 203:7
**compel** 70:2
**compelling** 70:2
**compensation**
   160:3,13
**compete** 245:8,10
**competitor** 158:9
   159:13 184:5,9
   245:3
**competitors** 159:5
   159:10,18
**complaint** 13:18
   14:3 28:8 52:12,19
   89:12 116:17 117:1
   118:4 130:9 131:2
   134:20 135:1
**complete** 250:9

**completed** 251:15
**completely** 220:23
**completing** 74:21
**compliance** 159:4
**compliant** 87:25
   139:15 202:15,17
   209:24 218:17
   222:12
**complied** 91:1
**comply** 75:3 77:23
**complying** 74:19
**component** 84:15
   85:18 148:21
   164:20 166:25
**components** 86:4,7
   86:12 87:16 90:18
**composition** 84:17
   94:8 132:18 134:9
   144:25 146:16,24
**compound** 170:5
   176:20
**comprised** 13:16
   13:17
**computer** 8:21
   41:14 99:6,14
   145:22,25 146:2,7
   162:12,13 181:14
   241:11
**computer's** 114:16
**con** 98:4
**concede** 193:21
**concern** 29:22 31:5
**concerning** 35:7
**concerns** 31:16
   69:1 245:2
**concert** 76:21
   115:1
**conclude** 232:12
**concluded** 248:5
**conclusion** 147:3
   178:24 221:6,20

[conclusions - correct]

**conclusions** 137:7 190:3 211:11 221:24
**condition** 75:7 76:16
**conditions** 56:12 225:5,6 240:2
**conduct** 202:22 212:16 231:25 233:10
**conducted** 1:15 33:7 98:10 202:3 208:20
**conducting** 48:25 208:2
**confer** 197:23
**confidence** 15:21 204:8
**confident** 204:11
**confirm** 4:24 15:20 125:8 172:20 229:4
**confirmed** 158:20
**conflated** 200:14
**conflation** 88:4
**conflicted** 245:7
**conflicts** 158:5
**confusion** 163:11
**conjecture** 125:17 125:19 170:20
**connect** 57:18
**connected** 250:13
**connection** 10:20 34:24
**connections** 244:15
**connotations** 163:22
**consent** 4:9 5:1
**consequences** 74:25 75:2
**consider** 64:5 212:12

**considered** 67:24 69:7 75:6 76:15 181:5 201:8 212:16 218:18 226:19 251:16
**consistency** 123:20 149:3,4 150:2,4,7,9 150:11,25 174:2 182:5
**consistent** 105:6 133:16 136:23,24 147:23 148:1 149:15 174:12,15 174:20,23,23 176:21 197:23 198:4 204:16,18,23 205:1 222:1 245:16
**consistently** 89:18 174:9
**constitute** 78:1
**constitutes** 76:24
**consulted** 34:24 235:24
**consulting** 21:9 26:3 156:24 157:3 157:7,10,15 158:24 159:4,10
**consumer** 97:8 195:21 198:13,25 199:3,7,8,22 218:1 218:20 219:3 243:14
**consumers** 44:7 50:14,20,24 100:9 176:7 196:23,23 198:18 217:23 219:19,25 243:12
**contained** 42:18 43:21 198:1
**contamination** 90:18 203:3

**content** 46:15,15 169:5 174:18
**contents** 67:25 177:17
**context** 75:11,18,19 76:9 112:9,9 124:6 125:4
**continue** 52:10 93:5 232:23
**contract** 17:7,10,25 18:4,16 132:14,16 134:2 158:12,14 163:18 164:4,10,18 165:12 172:17 224:24,25
**contracts** 17:22
**contrast** 29:21 122:25 202:14
**contrasting** 212:19
**contributed** 225:2
**contribution** 169:6
**control** 9:12 125:13 204:12 222:17
**controls** 140:5
**convenient** 91:15 92:15
**conversations** 73:8
**coordinated** 23:8 24:4 88:11,14 95:15 98:11,13 129:1 212:4 236:6
**coordinating** 23:9
**copies** 240:25 251:13
**copy** 13:17,19 18:15 240:12
**cori** 1:3 24:11
**corn** 97:22
**corner** 119:22 167:20

**corporate** 17:19 220:3 221:8
**correct** 8:15 12:21 12:23 13:12 14:6 15:10 17:21,23 29:25 32:21 34:17 37:10 38:19 42:21 42:25 44:8,11,13 46:2,19 47:17,25 48:19,21 49:16 50:5,7,9,10 54:8,9 54:22 55:4 58:1,14 64:11,23 67:1,17 67:20 68:3,5,7,8,12 68:12,23 69:11,24 70:6,13 71:22 72:1 72:3,6,10,14 73:21 74:9,13,19,23 77:20 78:3,10,14 78:17,19,22,23,25 79:5,9,14,16,18,23 80:4,5,8,11,11,12 83:13,20 84:6,13 84:14,18,20,22,24 85:9 86:4,13,14 87:6,13,14,17 88:12,13,17,21,24 89:7,17,22 90:3,13 90:15,20 91:4,6,12 91:13,17,25 92:17 92:19,22,25 93:8 93:14 94:13,18,25 95:2,12,14 96:7 98:10,11,16,19 100:25 101:2,20 102:1,4,21 105:11 106:3,4,13 109:5,9 109:10 111:15,16 111:22,23 115:22 116:1,24 117:3,17 117:21 118:17

119:11,15 122:18
124:2,7,11 126:4
127:13,17,18,21,25
128:8,10 131:16
136:2 138:21
144:14 152:10,11
155:17 157:1 161:3
162:5,12,23,24
163:12 165:1
172:21,24 173:20
173:21 177:3
178:14 179:18,21
183:12 189:8,25
190:8 193:5,23,24
195:22 197:6
198:14 201:2
210:15,24 214:6
217:9 221:6 222:5
222:6,13 227:7,12
227:16 229:5,6,9
229:18,20 231:13
**corrective** 81:13
**correctly** 58:1
92:11 94:21 102:8
154:17 166:19
**correlate** 196:13
**correspondence**
21:6,13 22:2,20
24:7 25:25 26:11
69:19
**coughing** 224:17
**could've** 125:21
**counsel** 1:20 4:8,11
8:24 17:8,10 21:8
26:2 33:15 56:24
85:14 136:20,20
145:21 160:5,9
182:12 197:14
205:16 207:19
231:19 232:13,15
234:5 248:2 250:11

250:13
**counselor** 173:3
**counselor's** 43:25
**count** 83:15,16
107:24
**counter** 39:21
228:25
**country** 62:18
116:23
**county** 249:3 250:3
**couple** 18:14 21:23
35:25 93:9 94:21
169:19 180:13
186:16 194:5 223:7
240:7 246:17
**course** 8:21,24
124:2 125:9 181:20
225:8 246:8
**court** 1:1 4:2,4,7
6:4 9:5,19,23 10:4
10:16,21 11:3
12:13 14:23 19:11
19:14 20:2 25:9,14
27:5 28:3,4 30:17
36:8,12 37:6,9,18
37:24 41:1 57:20
58:3,9,23 61:15
64:15 77:24 118:17
140:14 153:10,14
154:8 173:9 236:9
236:15 237:2
249:16
**courthouse** 2:12
**cover** 220:8,8
**cowrite** 39:14
**create** 163:23
**creatine** 38:15
**cross** 3:3,4 37:17
153:21 223:14,17
223:17 234:9

**crossed** 89:1
141:11 142:2
**crux** 90:6
**ct** 1:8 2:10 4:17
5:10 11:13 42:20
44:4 49:11 94:3
107:10 108:19,25
111:23,25 112:22
116:17,21 118:2
129:24 158:19
**cumulative** 20:9
**current** 37:25 38:5
152:12
**currently** 38:18
158:8 181:7
**customer** 96:22
**cut** 98:25 121:5
154:5 236:10
**cv** 1:6 37:25 38:4,8
54:21
**cynthia** 28:13 58:8
220:19
**cynthia's** 220:20

**d**

**d** 1:10 3:1 4:1
83:18 85:8,8 86:3,5
86:21 89:5,5,6,21
90:12 164:5
**d.c.** 65:25
**daboll** 2:7 5:9
**daily** 39:5,6
**dallas** 61:2,17,19
62:1
**data** 33:25 39:12
39:12,13 197:21
202:4 219:10 222:1
225:17,22,23
226:22,23
**date** 1:17 11:20
12:7 20:14 32:4
38:5,10 101:13,13

125:20 167:19
208:8 228:10,13
232:1 241:16,17
251:11 252:22
**dated** 124:9 250:17
**daubert** 60:12
**dave** 118:12 121:10
126:17
**david** 2:7
**day** 16:25 28:21
108:2 112:24 129:5
149:5 151:13,16,17
152:9,14 198:3
206:17 222:24
247:17 249:8,11
250:17
**days** 13:23 19:19
19:20 29:3 69:6,20
69:20 101:15
107:20 251:16
**dc** 2:21
**deal** 137:16 233:25
237:23
**dealing** 90:10
**december** 249:12
250:17 251:3
**decent** 96:19
**deceptive** 243:13
**decide** 209:15
218:13
**decided** 109:24
110:2 149:6
**deciding** 96:19
**decision** 139:14
184:2 222:11
**declaration** 3:14
41:6,17 42:2 238:3
243:8
**declarations** 98:3
126:21

**declare**  252:19
**decline**  73:18
**deemed**  174:18
  199:15
**deems**  78:5
**deeper**  46:20,21
**defective**  42:21,25
  43:7,12,13,23 44:1
  49:16,19 50:5
  178:14 204:13
  205:5 222:1
**defectiveness**  90:9
**defendant**  2:14,17
  2:21 4:20,22 7:24
  7:25 49:11 50:4
  61:13 63:12,13
  81:12,15,21 94:2
  130:18 131:5,25
  134:7 148:6 154:4
  243:12 244:5
**defendant's**  11:12
  43:6 61:12
**defendants**  1:12,20
  2:9 7:23 31:10,11
  42:19 44:4 46:25
  49:18 58:14 65:13
  108:20 130:23
  131:10 148:7 154:1
  154:2 234:13
  243:17,18,19 244:9
**defer**  238:12
**deficiencies**  44:5
**deficiency**  42:18
  43:19 44:1 90:9
**deficient**  42:25
  43:7,12,13,23 44:4
  45:25 49:11 144:13
**deficits**  81:14
**define**  121:21
  146:21 149:2
  201:22

**defined**  144:7,9,11
**defines**  113:17
**defining**  243:18
**definition**  132:25
  148:2 201:5,6,7
  215:4
**degradation**  224:4
  224:7,13,21 225:2
  225:18 226:12,14
  227:3 228:15,19
  229:5,8
**degrades**  227:7,9
  227:12
**degree**  55:17,18
  221:20 225:10
  243:10
**degrees**  100:20
  225:11 228:22
**deidentifiers**
  113:19
**delivered**  229:22
**demand**  62:19
**demonstrate**
  114:24 122:11
  128:5 149:12,20
  151:14
**demonstrated**  94:7
  115:15 222:15
**demonstrating**
  115:12 212:23
**denotes**  224:12
**department**  64:7
  76:22 77:16
**depending**  100:19
  168:13 200:16
  228:21
**depends**  67:25 78:7
  114:16 204:21
  210:19 211:19
**depleted**  56:12

**depo**  28:8 208:3,8
**deponent**  21:7
  25:25 26:21 34:23
  35:6
**deponent's**  12:7
  17:7,8
**deposed**  240:11
**deposing**  153:18
  251:12
**deposition**  1:15
  3:11 4:3 5:15,18,24
  6:1,3,3 7:3 8:14,16
  11:1,8,13 12:17,18
  12:22,25 15:23
  16:6,16 19:23 22:6
  23:17 26:15 27:25
  28:16,19,23 29:1
  29:18 30:1,11 36:3
  37:2,21 38:9 41:25
  63:19 64:3 71:6
  102:25 105:23
  138:19 145:18,19
  153:6,14 154:20,23
  157:24 205:21
  206:6 207:1 220:13
  220:16 221:9
  229:13 230:2,5,13
  231:12,12,16,17,20
  231:25 232:4 244:3
  244:4 248:5 250:7
**depositions**  6:11
  9:11 14:24 16:10
  16:12 28:9,10 29:5
  52:19 64:1,15 73:9
  73:13 135:5,10
  136:1 154:20 220:3
  220:7,21 221:4
  240:13
**depression**  97:15
  196:10

**depth**  47:11 238:9
  238:23
**derive**  51:16
**describe**  12:1 45:15
  46:3 144:12 212:10
**described**  29:24
  229:9
**describes**  42:16
  226:25
**description**  45:19
  111:14 119:8
  227:23
**designs**  39:9
**desktop**  13:1
**despite**  52:1
**detail**  68:21
**detailed**  237:24
**details**  115:6
  147:16 238:1
**detective**  144:8
**determination**
  68:11,23 69:11
  70:19 75:7 76:16
  76:25 77:4 145:13
**determine**  29:15
  44:3 45:24 46:9,9
  49:10 96:8,10
  108:24 203:6
**determined**  194:9
**determining**
  200:22
**developing**  27:3
**development**  40:18
  40:21
**deviates**  219:2
**deviation**  215:5
**diet**  242:13
**dietary**  5:12 39:19
  42:19 62:3 81:17
  84:3 86:7,12 90:17
  90:24 91:8 202:3

**[dietary - doing]**

239:13,14,17
242:13,18
**dietician** 53:20
54:7
**differed** 175:2
**difference** 6:3
40:16 76:9 123:2
167:7 168:6 216:3
216:20 225:9
237:15
**differences** 156:10
216:4
**different** 15:1,17
39:6 46:12,22,23
47:12,12 49:20
66:10,17 68:2
76:14 79:9,11
83:13 88:13 89:16
108:21 119:16,18
120:3,17,21,22,23
120:23 121:1 123:9
123:12,14,15 129:2
129:3 133:4,6
140:14,15 147:5
150:6,16 152:3
155:13 156:10
157:17 163:22
164:13 165:2,3
168:3 169:4 174:22
176:1,14,18 177:3
177:8,11,22,25
180:13 182:10
193:7,10,16,17
194:21 202:5
203:20,21 205:3
210:13 212:6,15,15
212:17 213:23
214:11 215:1 216:5
234:23 237:11,19
237:21 241:11,14
242:21

**differently** 119:24
123:4
**difficult** 16:13 22:1
107:3
**difficulty** 73:17
**digital** 65:16
**diligence** 236:3
**direct** 3:2 5:6 36:22
65:15 74:17 103:7
117:23 129:23
142:4 158:9 159:5
187:20 206:16
241:25
**directing** 181:8
**director** 192:23
**disagree** 69:14 75:5
75:20 76:1 77:12
**discarded** 137:24
138:1 183:8
**discern** 60:7 62:6
**disclose** 182:12
215:16
**disclosed** 240:22
**disclosure** 235:7
238:17 240:10
**disclosures** 3:24
53:1,6,12,12
110:17 186:15,18
188:18,20 208:14
235:3
**discovered** 59:10
160:4
**discovery** 1:21
243:16
**discrepancy** 113:14
**discretion** 209:15
**discuss** 42:14
114:10 116:19
145:9 159:22 180:4
208:16

**discussed** 105:18
176:10 184:12,15
193:4 199:6,18
211:14
**discussing** 90:10
180:1
**discussion** 175:7
217:8,10,11
**discussions** 136:3,4
136:4
**disodium** 166:25
**dispute** 130:24
131:20 134:11
**disputed** 130:18
131:4,25 133:22
134:6 148:5
**disputing** 131:16
**dissertation** 55:6
55:25 56:4,5,8
**distributed** 91:9
**district** 1:1,1
**disturb** 25:13,18
**disulfate** 166:3,8
166:20 168:1 169:8
169:20,25 170:3,6
170:9,16,17 176:20
226:19
**divide** 214:8
**division** 1:2 65:19
120:18
**divisions** 120:3
**dkalman** 251:1
**doctor** 10:1,25 11:2
16:16 18:10 55:3,7
55:10,15 57:4 74:8
122:17 126:20
163:3 177:16 183:1
186:19,22 198:10
215:18 220:5
224:16

**doctor's** 52:7,8
95:21,22,23 96:23
97:1,4
**doctorate** 54:18
**doctors** 54:25
**documat** 238:4
**document** 8:11 9:2
9:14,16,17 10:1,9
10:11,15 11:6,16
11:18,18 12:8
13:23 16:10,11
19:19 32:2 54:1
75:14 78:16 101:22
114:18,22 121:9
167:22,24 168:4
171:12 183:8,12,13
184:12,12 207:22
207:25 226:24
234:18,24 239:25
241:12,23 245:23
252:19
**documentation**
238:5
**documents** 8:20,22
9:12 13:1,3 14:12
14:16,18 16:14
26:21 27:6 35:8,11
52:12,15,21 79:9
79:11 114:6 143:4
143:7,10,15,17,20
145:5 153:8 155:2
179:23 209:2
224:12 235:2,19
237:23 238:2,6,6
238:15,21 239:13
246:8,19 247:23
**dog** 67:9,12
**doing** 4:23 8:21
12:25 16:19 27:15
29:21 37:11 47:10
49:2 68:18 71:5

139:20 154:14
157:15,18 161:13
206:14 236:3
**dollar** 1:11
**dollars** 199:19
219:19
**dosage** 149:14
151:16 152:12
196:3,9 197:2,7
198:17 218:10
**dose** 90:1 151:21
152:1,2,8 196:12
**doses** 240:2
**dosing** 51:10 205:5
242:12
**doubt** 215:19
238:18
**douglas** 1:15 3:14
5:3 41:7,17 249:6
250:7 251:1,4
252:2,22
**download** 14:13
**dr** 3:13 10:7,19
19:8 59:5 95:7
103:7 111:13
112:19 119:2
137:15 151:5 153:2
153:14,24 154:3,15
161:3 162:6 171:9
173:18 174:25
175:20 183:4
185:25 187:14
188:12 189:8
208:13 209:12,22
210:12 213:21
215:8,13,13 224:2
224:25 226:11
227:18 228:1,8
234:11 236:13
237:16 238:10,22
248:3

**draft** 42:9
**drafted** 105:20
107:5 241:4
**drafting** 241:3
**drafts** 13:19 14:4
240:22,25 241:3,4
241:10
**drag** 99:1
**dragged** 99:16
**draw** 181:22
188:19 196:18
208:16
**drill** 174:24
**driver's** 249:23
**dropped** 10:10
59:9
**drug** 40:18 97:14
97:17 202:3 239:12
**drugs** 39:20,21,22
**drum** 176:2
**duces** 3:11 11:1,13
153:6,6
**due** 107:2 233:10
236:3
**duly** 5:4 249:9
**duplicate** 211:23
**dye** 166:12

**e**

**e** 3:1,9,21 4:1,1
5:13 18:22 19:13
43:19 44:2,3,7,12
44:14,22 45:16,25
46:17 47:20 48:15
48:21 49:6,10,15
49:17 50:3,4,8,13
50:20,25 51:4,16
56:15 80:14,17,20
83:18 87:12 89:17
90:8,12,16,19
92:16 93:6,11,13
94:2,11,15,18

95:19,25 96:5 97:6
97:10,14,21,25
98:10,16,18 100:3
102:20,21 105:7,11
108:21 116:22
126:22 130:17,24
131:24 132:12
133:8 134:5,10
138:3 139:7 146:18
147:15 148:1,4,8
148:22,24,25 151:7
151:13,21 152:1,9
157:9,13,23 158:15
162:21 163:4,13,15
164:3,5,20 165:3
165:17,17,20,20
166:10,14,18,24
167:7,7 169:9,10
169:13,15,24,24
170:4,14,15 171:22
173:24 174:18
176:21 179:15
180:7,10 183:16
189:10 190:2
194:10,12 195:22
196:2,7,24,25
197:1,23 199:1
202:6 204:10 205:1
210:13 211:8
214:16,20 216:6,22
217:17 218:13
219:11 221:7
224:14,22 225:3,13
225:24 226:12,14
227:3,7,12,14,16
227:19 228:14,15
228:19 229:5,8
237:25 239:24
240:1 243:11 245:7
245:9,16 251:24,25
252:3,3,3

**earlier** 19:19 58:10
105:18 113:6,15
119:24 123:2
129:22 135:23
146:22 209:1
217:11 220:21
**early** 31:15
**earn** 161:13
**earth** 91:24 107:21
107:24
**easiest** 168:8
**easily** 15:13 76:12
76:12 146:12
**eastern** 223:10
**easy** 136:17
**economist** 45:11
50:17,19 199:21
**edd** 55:10
**edited** 241:5
**educate** 239:6
**education** 30:7
55:5,10
**educator** 54:19
**edward** 192:23
**effect** 58:25
**effective** 44:6 50:13
52:2 85:21 86:5,8
**effectiveness**
151:14 219:11
**effects** 56:8 97:14
97:20 151:19 176:9
196:9
**efficacy** 151:14
203:9 219:11 240:1
**effort** 77:23
**efforts** 22:7 26:16
**efsa** 39:18
**eight** 83:13,15,17
83:22,23,24 92:20
**either** 6:4 28:21
113:18 121:23

125:21 135:16
174:19 178:16
189:2,4 221:13
226:14 234:15
235:17 244:21
245:19
**elaborate** 155:4
165:4 181:25 184:1
**electronic** 65:19
**electronically**
240:18
**electrons** 165:22
**elevate** 77:15
**elevates** 74:16
**eleven** 173:11
**ellison** 1:23 9:4
12:12 37:4,15
40:24 118:14
236:12 237:4 249:5
249:16 250:5,22
**ellison's** 6:15
**email** 3:25 11:19
12:2,5 15:25 21:15
136:3 246:3 247:13
251:12
**emailed** 23:4,13
251:13
**emails** 11:21,25
15:22 21:17,18,25
22:15 23:14,17
26:5,10,17
**emanated** 120:1
**emphasis** 40:17
84:17
**employed** 38:18,21
39:24 155:19
157:20
**employee** 250:11
250:12
**employer** 17:16,17
20:16,16,17 155:3

155:16,22
**employment**
161:21
**employs** 155:5
**empty** 189:22
**enable** 9:3
**enabled** 9:5
**enacted** 124:19
**enclosed** 12:3
**encompassed** 35:12
**encompasses** 39:7
**endocrinology**
40:19
**enforced** 75:4
**engage** 57:17
**engaged** 177:12
237:15,16 239:3
**engagement** 39:11
**engaging** 39:10
236:5
**english** 106:14
**ensure** 90:25 91:1
**enter** 17:13
**entire** 13:13,16,17
14:2 15:7 17:4,9
**entirety** 143:16,19
144:23 220:11
247:17
**entitled** 160:10
**entity** 158:21
187:22,22 188:4,5
188:11,13,14,15,21
188:21 189:5,6,17
189:17 193:5,8,9
193:15,22 243:11
**environment**
228:21
**environmental**
225:6
**epidemiologist**
40:5

**equal** 112:25 201:7
**eric** 1:4 25:3
229:25
**errata** 3:7,8 251:10
251:11,15
**error** 22:3 170:18
196:20 242:11
**ersp** 65:15
**especially** 59:17
77:13 197:24
202:12
**esquire** 2:2,6,7,11
2:15,19
**essentially** 166:18
**establish** 84:2,15
90:23
**estimate** 194:12
213:22
**et** 9:1 148:8,9
237:25 238:1 251:4
251:4 252:1,1
**euro** 115:7
**eurofins** 3:20 15:1
46:8 95:12,16,17
101:12,16 103:19
104:1,4,8 108:9,11
113:5,8,9,15 114:5
114:9,11,22 115:3
115:8,24 119:13,18
119:20 120:2,4,7,8
120:10 121:2,22
122:25 123:9,14,21
123:21 124:5 128:8
150:18 184:23
186:8 194:9 205:6
205:8 214:21
215:24,25 216:1,2
216:5,17,20,21
217:2,14 238:20
**european** 39:18

**evaluated** 196:7
**evening** 220:5
**event** 59:1
**everybody** 6:6
**everybody's** 244:14
**everyone's** 248:2
**evidence** 151:12
230:19
**ex** 221:16
**exact** 18:25 51:13
51:13 58:20 89:5
92:6 203:18 215:3
**exactly** 59:22 65:22
66:8 110:4 137:7
166:12 191:2 225:5
**examination** 3:2,3
3:4 5:6 153:21
208:9 233:10 234:9
**examined** 5:5
**examining** 196:11
**example** 15:13
57:16 75:14 82:5,6
87:21,21 115:15
133:7 157:15 158:7
159:3 168:22
171:21 172:9 177:6
211:20 214:7,9
225:8 241:15
**examples** 46:8
53:17
**excel** 3:12 13:23
14:5 19:19 32:2
**exclude** 184:2
222:3,12
**excuse** 32:15 33:23
53:16 82:4 101:11
119:19 124:21
190:2 227:5,22
228:9 238:5
**execute** 200:24

executed  48:11
204:3 237:14
execution  39:11
exercise  55:1,6
56:3
exertion  56:10
exhibit  3:10,11,12
3:13,14,15,16,17
3:18,19,20,21,22
3:23,24 11:7,9 12:9
12:16 16:5 17:2
19:22,24 32:8 36:2
36:4,9,10 37:2,4,5
37:21 41:16,19,24
102:24 103:3,6
105:23,24 106:6,9
106:16,17 109:2,12
118:18,22,24 173:8
173:13 187:3,6,9
213:10 234:19,20
241:24 245:24,25
exhibits  15:14 37:8
exist  89:6
existed  88:21
existence  52:6
expect  16:15
experience  6:11
9:10 18:11 30:8
136:19 144:6
238:19,24
experienced  59:1
224:22
experiences  8:25
240:17
experiencing  10:19
experiment  203:13
experimental  56:15
expert  3:24 5:13
8:7 15:4 18:8 21:9
21:10 24:3 26:2,3
27:13 34:16,18

42:17 43:18 53:1,5
53:11,12 57:11,14
57:15,19 61:21
62:10 63:8,16 65:8
65:13 70:17 73:2
94:24 107:5 110:16
112:12,15 117:16
130:3 137:15
141:14,18 142:6
144:3,6 145:20
146:15,25 150:12
151:2 153:8 160:3
161:5,16 162:7
181:7 185:13
186:15,18 187:6
188:18,20 199:22
208:14 209:25
211:12 217:8 224:3
224:13,19 229:14
230:2,4,13,16,17
230:21 231:12
232:24 233:4,6
235:3,6,12 239:3
240:8,21
expert's  112:15
expertise  112:15
141:19
experts  57:17,18
88:10,11
expiration  228:10
expiratory  228:12
expire  228:12
expires  249:17
expirory  228:12
explain  44:1 45:24
72:23 73:16 114:23
142:15 148:12
165:4 167:6 168:8
174:15 175:5,17
184:4 188:20
196:20 201:18

203:11 212:7
222:11 230:8,12
235:24 242:5
explained  72:19,21
73:4,6,12,22,25
85:2 175:9,12
231:7
explaining  73:20
explains  70:12
explanation  148:16
explicitly  160:3
explore  74:12,16
114:14
exposed  225:10
exposure  228:18
extensive  35:18,21
extent  36:15,17
48:19 73:14 126:2
143:12
extra  85:17 238:8
extract  97:21
163:17
extracurricular
207:13
extraordinarily
16:12
extrapolate  178:12
eye  227:2
eyes  191:15 206:5

f

f  2:8 56:15 83:18
90:23 91:2
face  114:11,13
115:7,7 126:8,12
faces  206:5
facilities  83:1,9
91:14,23 92:9,15
95:13,15 140:18
facility  67:1,17
68:12 70:6 71:24
71:25 77:6 78:10

78:19 79:18,19
91:10 95:12 139:20
140:8,10,15 141:4
163:17,18 217:3,15
facn  1:15 249:7
250:8
fact  105:11 107:15
116:11 125:2
131:11 133:22
factor  228:14
factors  225:2
facts  85:19,23
86:22 93:1 239:4
242:21,22 252:19
factual  125:20
133:24
factually  68:18
failed  81:15,21
93:12 215:5
fails  251:19
faint  154:7
fair  80:22 87:19
142:16 145:10
148:3 151:8,11
177:25 196:5,6
201:5,6 204:22
209:12 220:9
244:16 245:14
fairly  200:17
fairness  150:16
156:9 190:25
false  128:24 196:22
199:3 243:13
familiar  65:17
families  226:5
family  185:7
208:11 233:23
far  57:15 79:2,19
93:2 176:24 226:14
faseb  56:15

**fast** 9:15 191:14
**fats** 242:8
**fault** 16:14 145:14
**fda** 27:6 39:24
  66:13,16,18,20
  68:2,9,19,20,25
  69:3,9,16,18,19,21
  70:10,15,22 72:5
  74:16,22 75:14,23
  76:19 77:2,9,12,22
  78:2,11 79:2,4,7,8
  79:13,24 80:3 81:9
  81:13 83:12 89:11
  92:24 93:2 125:12
  125:22 136:25
  139:5 144:15 172:3
  198:8 199:25
  202:13,21,23,25
  203:2,4,23 221:15
  221:16,16 239:18
  240:4 242:10 243:1
**fda's** 75:1
**fdas** 70:13
**fdc** 64:6 144:15
  198:8 239:18 240:4
**fdca** 75:8
**fear** 141:24,24,25
**feasible** 82:24
**february** 51:8
**federal** 8:8 30:21
  62:15 64:3 75:16
  219:7 239:12,16
  242:3,18 251:17,24
**fedex** 67:9 229:22
**feeding** 56:8
**feel** 162:24 189:3
  204:10 205:7
**feeling** 139:21,24
  139:25
**feels** 6:9 51:25

**felt** 29:13 52:3,4
**fence** 59:4
**fight** 246:25
**figure** 60:17
**file** 8:23 13:13,16
  13:17,22,25 14:2
  15:7 17:4,9 19:9,17
  145:22,24 173:7
  182:15
**filed** 5:11 61:14,17
**files** 26:20 146:2
  162:12
**fill** 164:23 187:22
  188:5,11,16,21
  189:6,17 193:5,8,9
**filler** 181:5
**fillers** 164:17
**final** 75:6,7 76:15
  77:3 101:13,17
  164:19
**finalized** 240:21,23
**finalizes** 69:18
**finalizing** 235:12
**financial** 159:12,18
**financially** 250:14
**find** 18:7 32:1
  58:16 83:20 93:17
  151:14 212:20
  220:14 222:8,19
  224:2
**findings** 66:25
  67:16 68:6 69:1,18
  70:13 71:21 182:6
  196:2,8 212:21,22
**fine** 20:7 91:17,21
  121:25 191:3
  204:24
**fingers** 93:24
**finish** 6:18 42:11
  85:14 120:20
  136:20,21 152:22

185:6 236:13
**finished** 84:2 90:24
  133:20 150:20
  180:23 220:21
**finishing** 222:24
**fired** 193:3
**firm** 4:13 5:9 7:17
  17:23 18:2,5 20:17
  21:14,19 22:21
  26:6 59:6 61:2,25
  62:20 65:24 142:4
  147:3 162:15
  234:12
**firm's** 6:5
**firms** 57:15 58:3
  155:13
**first** 5:4 6:1 11:24
  77:19 86:14 93:9
  103:18,22 162:20
  178:19 180:6
  181:12 186:17
  190:16 202:20
  211:24 220:2,6
  239:3 242:1
**firsthand** 116:8
**fishon** 1:4 25:3
  229:25 230:19
**fissn** 1:15 249:7
  250:8
**fissures** 203:17
**fitness** 65:5
**five** 5:22 7:4 127:19
  127:23 149:6
  152:19,23,23
  182:18 226:6,7,8
**fl** 251:13
**flag** 82:21 94:9
**flagler** 2:12
**flaws** 81:14
**florida** 1:1,22,24
  2:9,13 4:7 53:20

54:16 55:19 140:20
  215:25 244:3 249:3
  249:6,16 250:2
  251:18,24
**focus** 30:10 130:15
  186:17 224:4
**focused** 54:2
  164:15
**focusing** 44:10
  174:17
**follow** 79:3,7,25
  81:16 93:3 112:4
  131:22 158:2
  234:15
**followed** 195:20
**following** 66:25
  67:16 68:7 71:21
  71:24 72:4 75:1
  77:7 78:18,24
  79:12 81:11 82:19
  83:4 92:24
**follows** 5:5 242:16
**food** 55:18 62:19
  62:20 77:6 137:1,1
  202:2 239:12
  242:21
**foodborne** 203:2
**foods** 39:19 60:5
  183:14,15 184:5,7
  184:15,22 209:6
  239:13,15 242:15
  244:23 245:9,12,16
  245:19,19 246:5
**foot** 122:10 140:9
**footnote** 111:12,19
  112:19,20 130:15
  134:4 135:25 148:3
  220:12 221:1
**force** 144:8
**ford** 58:8

forearm   51:25
foregoing   250:14
    252:19
foreign   85:18 86:4
    86:6,10,11 87:5,16
    88:24
forget   220:18
forgetting   53:15
    220:4
form   22:9,23 24:15
    26:7 30:4 31:9
    33:10 34:10 43:1
    44:16,24 47:22
    48:16 49:7 50:18
    50:22 51:2 66:24
    67:3,15,18,20,21
    68:2,4,9,13,22,24
    68:25 69:12,25
    70:5,7,14,20 71:20
    72:7,11,15,17,24
    73:5,11,19,20,23
    75:6,9 76:5,15 77:8
    77:11,21 78:4 79:1
    79:8,15 80:6,7,12
    80:14,19 83:5 84:7
    87:7,18 88:17,18
    88:25 89:6,23 90:4
    90:14,21 91:5,18
    92:18,21 93:1,23
    94:4,19 95:1 98:20
    100:1,5,12 101:1
    102:2,22 103:13
    104:21 109:20
    110:18 112:7
    115:21 116:2,7
    117:22 118:7
    122:19 124:4,8
    125:5 126:6,10,24
    127:4,8,22 128:1,9
    128:14 129:20
    130:6 131:17 132:8

133:5 134:14,17
    135:8 137:13 138:5
    138:12 139:2,8,12
    140:11 141:17
    142:11 143:6 144:5
    145:2,16 146:19
    147:1 148:1,10
    150:13 151:9,23
    161:18,22 162:8
    163:6 165:5,7
    170:23,23 175:3
    176:15 177:19
    178:2,15 179:9
    180:21 181:2
    185:14 190:5
    194:19 197:9
    198:19,21 199:20
    200:5 201:15
    203:14 204:17
    209:9,17 210:7,16
    211:17 212:10
    215:17 216:7,24
    217:5,18 219:4,20
    221:10 224:15
    225:15 227:8,21
    228:6,16,20 230:1
    236:2 240:14
    241:10,13 243:21
    244:6
formal   68:11,22
    69:11 70:18 72:13
    74:9 77:10,13 78:2
    79:8 80:4
format   112:4,23
    115:1
forming   181:20
    227:19
forth   31:17 113:17
    141:2 146:13
    209:25

forward   122:10
    157:25 166:17
    223:19,23
forwarded   102:6
found   44:6 53:4
    83:19 93:19 108:8
    167:15 176:22
    196:13 229:22
    240:3
fountain   2:16
four   7:20 8:9 52:4
    96:20 122:15
    127:24 128:4,10
    205:3 216:6,22
fox   81:2,3,4,6,8
    82:4 92:12,21
frank   58:7
free   162:24 232:24
front   12:25 53:24
    64:16 76:11 78:16
    83:21 145:5 147:2
    216:25 233:2
froze   10:10,21
    236:9,18,19,19
frugal   45:12
ftc   62:13,21
full   155:7 176:19
fully   220:22 233:9
fund   245:20
funny   20:15
further   74:11,15
    165:15 250:10

|       g       |
| :-----------: |

g   4:1 19:13 83:18
    91:7,11 156:3
gan   192:22
gas   195:15 216:13
gather   21:18 22:1,6
gathered   26:14
gatorade   120:14

geared   96:1 115:11
geez   133:9
gelatin   180:20,25
    181:3,4,4
general   18:24
    46:11 154:23
    160:14 161:16
    168:21 171:21
    178:9,19 179:5
    181:3 242:13,14
generally   100:19
    138:15 156:4 160:7
    172:15 178:14
    179:4 180:24 196:4
    201:9 226:1 237:10
gentleman   23:3
    65:11 192:20
getting   99:1 125:12
    149:7 170:13,14
    195:6,8 199:10,14
    222:20
gg   249:17
ginsberg   1:3 24:11
    251:4 252:1
give   7:17 16:9
    18:20 20:5 31:20
    31:23 32:3 45:19
    51:7 56:6 63:16
    69:3 118:13 126:17
    137:6 156:12,15
    173:16 175:22
    182:21 188:23
    190:14 192:6 204:1
    223:16 226:3
    228:24 241:14
given   69:20 80:6
    89:25,25 94:5
    135:7 153:7 198:15
    218:3
gives   69:16 70:8
    121:16,17,19 130:8

169:20 204:4
242:10
**giving**   6:11 74:17
121:14 133:7
147:17 167:1,2
215:19,21 233:4
**global**   119:16,20
120:12,13,16
**globally**   120:24
158:13 226:24
**glycogen**   56:12
**gmax**   1:9 2:21 4:20
**gmp**   81:17 82:3,21
82:23 139:16,23
**gmps**   144:14
202:18
**go**   6:6,11 9:20 17:1
17:5 27:15 29:12
30:5,12 34:19
37:12 42:13,15
64:5 67:6 71:15,17
79:17 83:14,16
110:21,23 111:11
113:4,5 129:23
130:14 134:4
136:21 141:12,14
146:2,4 152:3,20
153:17 154:2,9
155:1 160:15 165:9
167:10 168:2,20
172:14 173:1,15
176:11 178:11,22
178:22 179:4 185:8
187:13 188:1,6
191:2,10,10,17
193:19 194:4
195:17 200:11
202:20 206:24
208:1,11 213:2,7
219:1 224:11 232:9
233:5,11 239:6

247:4,12
**goal**   152:4 164:7
223:12
**goals**   197:3
**goes**   50:12 52:25
103:20 108:2 164:4
234:25 235:4,4,4
**going**   6:11,12,22
8:13,18 9:13,15
11:7 12:9 17:1,2,5
19:22 20:22 22:9
31:13,20 36:2,6,16
37:1,3,20 41:15,16
41:17,24 42:13,14
42:15 48:9,10,11
52:10 56:24 63:2,2
66:4 67:5,7 71:14
72:2 73:7 88:7 95:9
96:9 100:18 102:24
105:13,14,22,23
106:6,16 109:11
110:25 111:4,10,10
111:11,12 114:14
116:9 117:14
118:22 120:15
122:8 128:24
130:13,14,15 134:4
141:25 143:1
145:21 147:3,10
149:22,24 153:4,9
153:11 155:1 158:3
158:12 160:9,14
166:17 168:2
169:16 172:9,10,25
173:1 180:5 185:8
185:10,20,23 186:4
186:12,13 188:1
193:10 195:14,14
195:24 196:18
202:19,22 204:1
205:25 206:24

207:22 208:9 213:9
215:24 217:12
218:11 220:13
223:3,14 224:7
229:1,17 230:3,3
232:9,10,11,12,12
233:11,13 234:6,14
234:25 235:10
238:1,19 241:19,25
245:23 246:5,7
**golden**   2:19
**goldhamer**   2:3 4:14
**good**   5:8 30:6 45:13
48:22 55:22 70:3
71:18 82:18 89:9
107:14 124:17
125:23 126:4
128:23 139:15,17
140:5 153:23 154:3
154:13,19 158:3
160:16 189:7
193:13 198:8
237:23 242:16
**gotcha**   66:19
**gotta**   142:15
**gotten**   11:18
**government**   239:19
239:20
**governs**   62:16
**grab**   101:22
**grabable**   146:12
**grabbed**   167:15
173:6
**graifman**   2:3 4:14
**gram**   170:3
**gran**   192:22
**gras**   156:3,4,7,9,18
**great**   6:22 32:16
56:13 58:7 65:15
112:3 153:17 171:7
223:25 225:16

**greater**   18:24
218:8 219:19 244:2
**gregory**   2:19 64:25
**grounded**   63:3
**group**   39:9,17
40:19 57:12,13,18
57:19,23 58:4,6
141:20 204:4
**groups**   58:2 157:4
**guelph**   18:24 19:1
**guess**   45:10 58:21
72:23 113:24 114:4
166:16 167:17,20
168:19 180:5
192:17 226:23
**guesstimate**   31:20
31:23
**guidance**   69:8
75:14,15 203:23
239:13 242:3,11,22
**guidances**   172:2
**guidelines**   226:14
**guy**   67:9
**guys**   20:2 25:13
71:19 101:21
110:21 134:8
135:18 152:18
236:10 247:10
**gym**   65:5

**h**

**h**   3:9 19:13 83:17
91:14,16 252:3
**habits**   34:13
**half**   29:7 38:24
135:13,14,15
136:12 137:9 192:8
224:8 225:12,17,18
225:19,20 242:1
**halfway**   181:23
187:21

**hand** 103:8 119:22 168:9,10 180:7 204:5 239:10 249:11

**handling** 227:2

**hands** 27:21,24 168:9 169:25

**handwashing** 91:14,23 92:9,15

**hang** 36:12 185:8

**happened** 10:7 78:9

**happening** 99:5 160:16

**happens** 32:10 99:19 201:10 227:1

**happenstance** 84:8 84:9 85:3 87:8,10

**happy** 6:24 7:21 8:10 27:14 35:23 51:14 178:18,18 190:25 193:19 222:22 234:2 247:18

**hard** 37:11 76:4,7 76:12 99:1

**harm** 59:11

**harrison** 66:3

**he'll** 207:15

**head** 149:8 156:20 217:1

**headache** 152:3

**headed** 40:18

**heads** 6:20

**health** 1:9 2:10 4:17 5:10 11:13 39:20 42:20 44:4 49:11 63:5 64:2 78:6 94:3 107:10 108:19,25 111:23 111:25 112:22

**healthcare** 156:10 156:11,13 239:21 239:23

**healthy** 1:10 193:18 214:9,15,19

**hear** 25:10 30:18 46:16 59:19 67:9 93:10 100:16 139:3 154:6,8,15 162:22 207:19 220:2 236:14

**heard** 25:11 99:11 138:24 236:13

**heat** 225:7,10

**heavy** 80:7 172:3

**held** 180:6 225:25 227:23 228:2,8

**hello** 10:6 153:23 154:3

**help** 36:19 60:23 61:9 62:21 139:18 147:19 164:23 212:10

**helped** 202:7

**helpful** 96:19 114:4 163:24 164:11

**helping** 60:7 62:6

**helps** 144:10

**hermosa** 244:2

**herron** 64:24,24 65:2,3

**hesitancy** 107:9

**hesitant** 175:22

**hesitating** 38:6

**hewlings** 19:8

**hey** 88:1 125:2,25

**high** 48:6 169:11 214:13,22 216:12

**216**:13

**higher** 68:10,17 184:19

**highest** 214:3

**highlight** 242:1

**highlighted** 31:14 197:20

**highly** 238:18

**hillsborough** 250:3

**hired** 141:13

**history** 21:25

**hold** 32:12 35:3 45:22 54:4,10,15 80:2 91:7 114:15 223:3

**holding** 169:25 227:6

**holds** 156:24

**holiday** 215:20 233:23 247:18

**holidays** 234:3

**home** 13:6,7,9,11 13:14 16:24

**homogenation** 189:21

**homogenize** 192:8

**honest** 85:20 241:8

**honestly** 29:6 146:9 163:25

**honesty** 15:21

**hood** 1:4 24:25

**hope** 87:2 141:21 156:16 223:12 233:22

**hoping** 51:15,16,17 176:7

**hot** 227:14

**hour** 20:11 29:7 56:25 92:10 135:12 135:14,14 161:4,7 161:10,13 208:3

**hours** 20:4,8 208:9

**house** 8:17 100:19 100:23 225:11

**hplc** 121:23 169:10

**huge** 94:8

**huhs** 6:20

**human** 22:3 211:6

**humid** 227:15

**humidity** 147:9 225:7,14 228:22

**hundred** 6:9 15:20 21:21 43:14 58:19 133:3,4,6 180:12 180:16 218:22

**hungry** 71:19 111:3

**hunter** 55:17

**hut** 120:15

**hutt** 23:21,23 53:15 98:3,9,14,14 99:24 100:4,10,24 101:25 102:5,9,15,19 103:15,18,25 104:8 104:9 111:8 119:14 120:11 127:11,20 129:9 136:8 183:4 184:24 186:7 192:18 224:25 228:1,8 235:23 237:8,16 238:10,15 238:22

**hutt's** 126:21 227:18 237:11 238:3,6

**hyperlink** 65:22

**hypothetical** 22:11 22:14 129:11 137:14 188:23 189:1 204:2 209:18 217:24 218:7 219:14,21

**hypothetically**
129:13,14 157:15
209:19
**hypotheticals**
137:16

**i**

**i.e.** 103:22 149:17
196:10 218:12
**ibuprofen** 218:12
**idea** 50:7 51:20
104:6 107:16
108:13 129:17
157:13 190:22
204:4 223:16 235:6
236:6
**ideal** 211:21
**ideally** 204:6
211:21
**identical** 174:20
176:17 177:11
193:22 212:19,20
**identifiable** 15:16
**identifial** 15:15
**identification**
11:10 19:25 36:5
41:20 103:4 105:25
106:10,18 109:13
118:25 173:14
187:10 213:11
234:21 246:1
249:23,23
**identified** 5:13 33:8
33:11 34:2,7,16
107:4 108:1,22
173:8 198:11
**identifiers** 113:19
**identifies** 108:1
**identify** 15:9,16
52:21 113:21 117:1
167:18

**ii** 199:25 218:18
242:9,16
**illness** 203:2
**illustrate** 61:9
114:25 125:1
**illustrated** 81:25
129:6 149:18
**illustrating** 166:12
**imagine** 104:8
**immediate** 78:6
**impact** 139:13,21
228:7
**impacted** 75:13
228:7
**impacts** 96:2
151:18
**imparted** 196:9
**imperfect** 92:3
**implied** 120:22
**imply** 16:7
**important** 6:16
29:14,16 83:25
142:9 169:15
182:20
**impossible** 145:19
**impression** 131:1
199:11,12
**improper** 128:15
129:11 137:14
204:2 209:17
219:20
**improve** 125:24
**improvement**
124:24 131:18,19
196:12,13
**improvements**
131:13,15
**improving** 125:11
**inaccurate** 217:4
217:15
**inactive** 169:4
202:2

**inaudible** 25:24
160:18 175:13
185:25 193:1
196:20 244:7
**incident** 65:1
**include** 86:23
183:18 209:15
222:9 237:25 245:4
**included** 12:6 27:4
63:15 85:18 96:5,5
110:13,16 180:20
219:9
**includes** 12:17 58:5
125:16 180:24
**including** 21:8 26:1
61:24 105:21
137:10 156:25
227:2
**inclusion** 85:22
86:6,9 87:5
**inconsistencies**
178:3
**inconsistency** 94:5
94:9 178:1,4
**inconsistent** 151:19
**inconvenient** 91:23
**incorporated**
202:18 245:1
**incorrect** 12:24
43:2,3 67:22 78:5
93:15 97:16 171:24
172:19 217:4,16
228:1
**incorrectly** 161:25
**increase** 196:24
**independent** 24:4
117:4 183:9 229:4
238:7,9
**independently**
124:20 139:14,19
139:22

**indicate** 4:11
126:12 132:10
189:10 216:15
**indicated** 121:23
184:19 196:8
**indicates** 125:12
**indicating** 151:12
153:19
**indication** 70:21
82:3 192:6 204:11
205:3
**indicator** 137:1
**individual** 17:14
33:17,25 34:11,19
69:17 70:10 75:3
97:8 100:8 113:16
142:12 188:25
**individuals** 28:11
159:16 192:24
221:13
**induce** 202:7,7
**industries** 156:25
157:3
**industry** 65:21
69:8 156:25 157:2
242:15
**ineffective** 87:3
**infer** 197:23
**info** 26:9
**information** 7:18
8:4 12:3 14:24 22:6
26:24 53:7 101:11
130:22 131:8,9
151:12 181:24
190:19 215:21
222:1 224:20 229:7
229:24 245:1
**informed** 22:25
209:20 230:18
**infringed** 59:23

**infringement** 59:13
59:21
**ingest** 225:19
**ingredient** 63:9
80:25 90:1,20 91:3
91:11 92:16 93:8
94:13 96:1 133:14
157:13,23 164:16
165:14 166:18
168:21,24 169:1,17
172:8 174:10 175:2
175:6,8,21 176:5,9
176:11,14 177:2
179:20 184:20
194:8 195:22
209:24 217:22
219:17,25 222:6,13
225:12 226:25
227:16
**ingredients** 96:1,14
96:20 132:19
162:21 164:13,18
164:24 180:22
202:2
**initial** 125:7
**initials** 155:13
**injury** 65:3,12
**inkling** 204:4
**input** 20:18
**inquiring** 158:4
**inquiry** 62:18,19
**inside** 11:19
**inspect** 77:5
**inspected** 81:12
140:8,17
**inspection** 66:25
67:16 68:7,18 69:2
69:2 71:22 78:9,11
78:13,18 83:3,9
95:8 139:5 221:15

**inspector** 68:7,10
70:15 78:18 80:24
**inspector's** 66:25
67:15 70:12 71:21
81:1 87:4
**inspire** 1:9 2:14
4:23 154:4,14
**instance** 77:13
**instituting** 115:3
**instruct** 186:5
230:3
**instructed** 232:19
**instructing** 230:6
231:1 232:5 233:16
**instruction** 81:14
231:6,15
**instructions** 195:20
227:4 247:22
**insulting** 161:23
162:1
**intake** 196:25
197:23
**integrity** 15:21
**intellectual** 59:12
59:20 60:22 63:15
**intended** 67:3,15
74:11 85:4 200:2
**intentional** 243:12
**intentionally** 16:5
**interest** 29:22
159:18
**interested** 135:21
250:14
**interests** 159:12
**interfering** 181:17
**internal** 121:21,21
121:24
**internally** 22:24
32:3
**international** 55:16

**internet** 10:20
98:15 99:18,24
100:4 108:22
**interplay** 239:17
**interpret** 43:9
**interpretation**
160:18
**interpreted** 202:4
**interpretive** 39:13
**interrupt** 66:1 67:7
185:3 197:15
205:17
**interrupted** 206:23
207:21
**interrupting** 206:4
**intersection** 27:8
**interventional**
202:5
**interview** 141:15
**intimate** 138:23
**intimation** 138:17
209:11
**introduced** 14:9
**investment** 159:17
**investments** 120:16
159:12
**invoices** 20:17
**involved** 23:7
31:18 32:6 48:14
57:9 62:2 97:24,25
157:23 202:25
**involvement** 48:20
57:22
**iomer** 148:22
**ion** 147:15 167:7
168:7 169:10,15,24
171:22 174:18
**ionic** 165:22
**ions** 165:2,9,9,20
165:21,22

**irving** 4:21,22
**isomer** 148:22
167:7 168:7,8,12
168:13,15
**isomers** 168:10,17
**issue** 10:12,19
21:10 26:4 65:1
70:19,21 72:13
74:8,16 75:4 76:25
77:3,3,4,4,16,18
78:7 79:13 85:16
86:20 88:3 92:13
114:17 122:4
126:14 129:7
133:25 137:19
146:9,10 149:10,11
163:5 164:14
183:20 186:21
194:25 198:6 204:5
204:5,12 207:2,3
212:23 228:24
239:4,9 247:23
**issue's** 194:24
**issued** 79:5 101:18
**issues** 29:23 69:5
70:9 77:4 82:1,5,12
82:21,23 83:22,23
83:24 85:11,11
94:7 121:12 122:12
129:15 136:22,23
137:2 144:14,15
146:6 198:7,9
205:5 222:18 239:7
239:8,10
**it'll** 166:16
**item** 81:23 92:12
172:17 203:15,16
**items** 12:17 23:5
29:22,22 52:20
74:12 92:20 131:14
132:16 164:21

171:14
iterations  234:23

**j**

**j**  2:19 81:2
**jacket**  193:11,12
**jackson**  61:2
**january**  78:14
  81:15,21 83:4,10
  139:6 140:17
**jay**  2:2 4:13 25:17
  36:14 53:10 72:18
  84:25 112:11
  194:22 246:11
**jealous**  71:19
**jersey**  58:23
**jiaherbs**  132:21
  133:7 165:10 167:4
  167:10
**job**  13:8,9 40:15
  137:16 142:6
  146:15 155:9
  156:16 206:9,9,15
  236:4
**joey**  64:24
**johnson**  2:7,7 5:9
**joke**  93:25
**jolly**  1:11
**jot**  226:16
**journal**  56:14
  211:2
**journals**  15:8 27:7
  34:22 210:24
**judge**  64:16 160:15
  160:21
**july**  51:8 119:10,10
  124:10 125:7
**jump**  195:24
**justice**  64:7 76:22
  77:16

**k**

**kalman**  1:15 3:14
  5:3,8 9:8,17 10:7
  10:19 11:6 16:3
  17:2 20:1 22:15
  41:7,17,22 59:5
  95:7 103:7 107:2
  111:13 112:19
  119:2 124:15
  137:15 151:5 153:2
  153:14,24 154:3,15
  161:3 162:6 171:9
  173:18 174:25
  175:20 185:25
  187:14 188:12
  189:8 208:13
  209:12,22 210:12
  213:21 215:13
  224:2 226:11
  234:11 236:23
  244:20 247:8,15
  248:3 249:7 250:7
  251:1,4 252:2,22
**kalman's**  3:13
  236:13
**kantrowitz**  2:3
  4:14
**kaylyn**  1:3 24:18
**keep**  17:5,22 19:17
  19:19 35:17,19
  37:3,10 39:23
  110:25 191:20
  240:12,20 241:24
**keeping**  37:16
  213:2
**kept**  100:14 101:9
  146:7,11
**kevin**  23:4,13 53:16
  159:17 212:5
  215:10 235:23
  237:18

**kevin's**  238:22,22
**key**  96:20
**khakiware**  1:11
**kilogram**  176:2,3
**kind**  7:12 43:13
  72:25 92:2 111:9
  122:10 149:10
  161:13 167:8 169:4
  170:17 177:8 184:5
  197:20 201:17
  203:18 214:16
**kitchen**  51:12
  228:25
**kmw**  1:6
**know**  6:23 9:10,14
  10:11 11:20 12:5
  14:11,12,22,24
  15:11,18 16:16
  18:25 20:9,23,25
  21:21,24 22:25
  23:11,23,24 25:14
  30:19,25 31:3,11
  33:24,24 34:2,11
  37:15 38:10 44:19
  44:20,22 45:1,4,8
  45:10 47:15 48:10
  50:10 52:1,3 54:2
  56:16 60:25 61:19
  62:16 64:3,5 65:6
  67:11 68:18,19,20
  68:21,22 71:7,8
  74:15 76:2,3,11,15
  76:24 77:16 81:4,8
  81:10 82:6 83:22
  89:1 95:17 96:11
  98:22 99:2,19,23
  100:3,6,11,14,15
  100:16 101:3,6,9
  101:19,24 102:5,9
  102:15,18 103:15
  104:23,24 106:22

106:24 107:1,7
  109:17 115:12
  116:19,19 117:12
  121:4 122:8 123:3
  124:17 128:3 129:1
  133:21 134:13,23
  135:4,10,23 136:22
  139:16 140:20
  142:24 143:17
  144:23 145:9,14
  146:4,13 147:12
  155:24 156:15
  157:20,20,25 158:1
  158:3,8 159:3,7,13
  159:17,19,21 160:8
  161:12 162:24
  163:12 166:11
  168:4 172:2,4
  173:6 174:5,7,20
  176:8 177:7,16,21
  180:2 182:23
  184:14 185:6 187:2
  188:9,16 189:25
  190:1,9 191:5,11
  191:17 192:8,11,16
  192:17,24 193:21
  194:13,16 196:24
  200:24 201:10
  202:16,23 203:8,11
  204:14,25 209:7,10
  210:18 211:1
  212:24 213:1,17
  215:8,10 216:4,19
  217:2,14 222:21
  223:13 224:6,9
  225:9 235:15 242:8
  243:4 246:13,24
  247:9
**knowing**  76:8
  96:17

**knowledge** 17:24
  66:23 71:7 102:3
  115:19,23 116:3
  117:4,19,23,25
  125:3,6 185:1
  213:20 230:15
  238:7,10 245:18,22
**knowledgeable**
  88:13
**known** 39:8 40:13
  48:6 56:15 57:13
  88:2 221:22 226:22
  249:22
**knows** 99:17
  192:18
**kogan** 2:11

**l**

**l** 19:13 104:12
  166:20 169:8,19
  170:3
**lab** 46:8 105:8
  119:21 122:6 123:6
  123:7 212:11
  238:25
**label** 46:15 48:12
  82:1,2,11 84:18,22
  85:9,19,23 86:20
  86:22 87:6,9,9 89:3
  89:7,16,22,25
  90:13,20 91:1,3,12
  92:17 93:7,12,17
  93:19,19 94:12,16
  94:18,22 103:21
  105:7,11,17,17
  108:7 109:24
  113:25 114:2
  120:24 122:11,18
  125:2,16 126:1,8
  126:13 127:25
  128:5,12,19,19
  129:7 130:7,8

  134:25 136:24,25
  138:4,7,10,25
  142:8 149:19 154:2
  180:10 189:14
  194:15,17 198:7,24
  199:23 203:20,24
  209:24 214:14
  217:25 218:3,11,17
  218:20 219:2 222:6
  222:8,15 242:21,22
**label's** 84:11,13
**labeled** 91:8 106:5
  108:6 180:25
  194:11 195:4
  243:11
**labeling** 90:24
  115:2
**labels** 189:13
  196:22
**laboratories** 14:21
  15:2 46:22,23
  47:13,13,21 48:25
  122:1 129:2,3
  192:7 205:3 212:6
  212:15,16,18,21
  224:24 225:1
**laboratory** 46:7,14
  46:18 47:20 48:4,6
  49:2 100:25 101:4
  101:7,10 103:20
  119:17 150:18
  204:25 211:20
  217:9 237:17
**labs** 23:10 47:3
  93:17 123:6,6,13
  123:20 124:6
  149:19 205:7,8
  214:21 216:17
**lack** 33:1 136:23,24
  148:6 149:16

**ladwig** 192:23
**lag** 10:18
**laid** 122:12
**laptop** 8:1,22 13:1
  13:2,15 38:3
**large** 120:3 181:9
**late** 29:11
**law** 4:13 5:9 6:5
  7:17 18:1,5 20:17
  21:14,19 22:21
  26:6 27:8,8 57:15
  58:3 59:6 61:25
  62:20 65:24 75:16
  76:17,20,23 81:17
  142:4 155:13
  234:12 242:18
**laws** 137:1
**lawsuit** 5:11 7:6,8
  13:19 14:10 27:6
  31:8 32:20 33:9,12
  34:1,8 50:21 59:11
  61:1,14 62:2 90:2,7
  107:14 109:9 118:2
  118:5 124:12
  132:24 184:6
  234:14 239:4
  245:12,17
**lawsuits** 240:8
**lawyer** 28:7 66:11
  142:4 219:6
**lawyers** 16:9 144:2
  233:25
**lead** 73:1
**leaders** 221:13
**leading** 72:25
  73:24 74:4
**learned** 239:4
**leave** 225:10
**led** 40:18 87:21
**left** 51:23 138:25
  168:9 228:25

  236:16
**leftover** 189:5
**legacy** 156:5
**legal** 57:8,16,20
  66:6 70:1 251:23
**legalese** 141:20
**lengthy** 223:3
**letter** 3:7 67:20,25
  68:3,6,9,17 69:1,1
  69:10,24 70:8,9,9
  70:12,18,21 71:20
  72:1,5,14 74:9,11
  74:12,19,23 75:2
  76:24 77:2,7,10,20
  78:3,19,22 79:4,7,9
  79:13,14,25 80:4
  83:12 86:21 92:23
  95:8 126:3 131:3
  132:7,9,10 133:23
**letters** 165:17
**level** 30:7 54:19
  68:20 121:17
  184:10
**liberty** 60:1 61:4
**license** 249:23
**licensed** 53:19
**licenses** 54:4,15
**lies** 145:11
**life** 202:8 225:12,18
  225:20
**light** 100:15 202:13
**lighter** 47:7
**liked** 96:16
**limited** 21:8 26:2
  61:20 83:22
**line** 43:13 115:7
  131:14 169:15,19
  252:4,6,8,10,12,14
  252:16
**lines** 169:18 226:15

**lippes**  2:15 234:12
**liquid**  48:7 169:11
   216:12,13
**list**  8:6,7,9 12:17
   57:7 58:5,5
**listed**  35:1,12 53:2
   57:24 58:4 63:24
   182:7 193:6 194:15
   240:8
**listen**  131:19 191:9
   214:5 215:20
**listings**  8:4
**lists**  16:10,11
**literature**  34:23
   61:9 62:7 151:15
   152:13 240:6
**litigation**  52:13
   75:12 88:10 97:25
   124:6,19,22 125:4
   125:7,10,22,24
   134:23 245:20
   246:9
**little**  6:10,22 39:18
   46:20 50:11 66:22
   99:1,1 111:13
   114:15 121:11
   122:8 131:23
   141:20 147:14
   154:10 155:14
   168:2,14 172:1
   174:24 175:22
   179:6 188:6 190:12
   191:19 193:15
   198:3 200:14 217:7
   223:2 236:4 238:23
**lives**  156:17
**llc**  1:8,9,10,11,11
   2:11,18,22 5:1
   42:20,20 234:13
   244:5 251:4 252:1

**llp**  2:15 61:2
   234:12
**local**  100:7 164:4
**location**  12:7
   119:25 140:15
   227:15
**locations**  140:9
**long**  29:4 38:21
   51:6 101:9 120:24
   133:3 136:1 190:22
   218:20 223:14
   225:19
**longer**  228:3
**look**  7:15,21 8:11
   14:12 31:24,24
   32:13 46:10 70:3
   84:1 104:16,18
   113:5,14,22,25
   121:22 122:5 123:5
   123:8 132:22
   133:14 142:9
   151:15,17 162:11
   162:14 165:15
   168:9,22,23 169:3
   169:9,15,18,18
   182:15,19,21
   183:18 188:14
   193:4,17,18,19
   194:22 195:25
   196:15,16 203:1
   205:12,12 208:18
   209:1 216:8 224:8
   246:5
**looked**  33:13 70:23
   95:24 135:20
   148:13 180:9,12
   216:1
**looking**  29:18
   35:22 70:23,24
   71:1,2,3,3,8,13
   87:20 96:10,13,21

97:19 108:14 109:1
   113:23,23 114:5
   118:6 134:22,24
   135:13 152:4
   156:23 166:11
   168:17 176:7 178:7
   179:2,4 183:2,3
   188:5,17 190:1,11
   194:6 235:2,14,16
   239:11,11,15 240:5
**looks**  42:3 121:1
   123:12,13,15
   171:11 187:19
   188:4 192:22
   197:20
**lose**  9:18
**lost**  10:3 217:6
**lot**  34:18 40:16
   42:15 46:21,24
   47:12 59:16 82:14
   87:11 108:1 111:14
   111:17,22 112:4,23
   112:25 113:2,9,10
   113:11,17,21,25
   114:6,25 115:5,10
   117:1 119:7,8
   129:3 135:19
   147:16 200:6 203:5
   205:13,14 208:17
   208:18,21 210:14
   212:5,13,14 214:10
   214:10,11,20
   228:11 237:19
   244:16
**lots**  129:4
**low**  98:25 184:22
   184:23,24,25
   214:12,21 245:16
**lower**  151:18
   184:20

**lowest**  214:3
**luck**  84:10 87:10
   160:16
**lunch**  95:4 110:23
   110:24 111:4,5

## m

**m**  2:15 21:3 165:16
**mac**  146:11
**machinations**
   20:21
**machinery**  122:2
   216:15
**machines**  140:23
**macronutrients**
   242:7
**madam**  173:9
**magazines**  184:14
**magic**  149:2
**mail**  20:21
**main**  13:8 40:17
**major**  90:9
**majority**  16:25
   204:9 243:2
**maker**  172:16
**making**  22:3 43:12
   68:10 75:22 89:25
   90:7 114:7 130:20
   131:15 132:11,11
   139:4 141:1 145:13
   172:7 175:14 188:9
   206:5,5 235:18
   243:13
**malgeri**  1:3 24:14
   34:7,9
**man**  142:18
**mangled**  239:22
**manner**  4:10
**manufacture**  44:15
   90:17 92:10 96:12
   134:12 139:7
   140:24 163:4,21

**manufactured**
42:19 44:3,21,23
45:3,5,25 46:24
49:10,15,18 50:4,8
50:11 51:1 87:12
93:7,12 94:2
106:25 107:13,17
108:13 109:1,4,7
112:5 115:20,25
116:5,9,15 117:5
117:20,24 118:3,5
119:9 124:25
126:23 127:15,20
128:18 129:5,10,14
129:17 130:2,4
136:5,9,13 137:11
138:3,7 142:7
179:15 205:1,4
211:9 221:7 222:5
243:12
**manufacturer** 77:8
78:12,21 79:13
81:18 82:7 96:8,11
116:18,20 125:14
129:24 132:16
134:2 137:5 146:17
158:12,14 164:5
172:16,17 245:11
**manufacturer's**
72:4
**manufacturers**
116:22 163:19
164:10 226:21
**manufactures**
106:22
**manufacturing**
14:25 30:6,7 31:17
67:16 70:6 71:24
71:25 77:6 78:13
78:19 80:23 81:13
82:1 83:1 89:9

91:10 92:11 94:9
115:2 130:17,25
131:11,24 132:14
133:18 134:6,10
139:15,20 140:4,8
140:9,15 141:1
142:1 148:5,7
149:11,17 158:22
159:1 164:19
165:12 173:24
178:11 179:17
198:8 202:17
222:18
**march** 183:15
209:6
**margin** 242:11
**mark** 11:7,20 12:11
37:20 41:16 46:8
102:24 105:23
109:11 121:6 187:2
187:8 213:2 240:19
245:24
**marked** 11:9 19:24
32:7 36:4 41:19
103:3 105:24 106:9
106:17 109:12
112:23 118:22,24
173:13 187:5,9
193:1 208:13
213:10 224:3
234:19,20 241:23
245:25
**markers** 56:10
**market** 215:7
221:17 245:6
**marketed** 60:20
**marketing** 7:11
59:23 62:17,22
239:16
**mart** 123:6,13,20
124:6 205:7,8

214:21 216:17
**mass** 48:7,8 121:24
216:14
**master's** 55:17
**material** 3:21 27:22
27:25 86:4,7,12
87:5 88:24 132:13
132:20,21,23,24
133:10 134:3,11
135:20 137:5 147:6
147:22 150:11,19
163:15,15,16 164:1
164:2,3,9 165:11
166:10,11,15 167:3
168:1 169:6,12
172:16 176:1,2
177:11 179:11
189:3,5 225:23,24
226:21,21,22 247:6
**materials** 13:20
14:4,8 15:5 35:15
85:22 86:10 87:16
134:24 145:1
146:17,23,24
164:12 167:10
173:20,23 174:2,8
175:1 176:13 177:1
177:17,22 178:1
179:8 221:23
**math** 93:24 197:11
214:6
**mathias** 2:15
234:12
**matter** 13:14 14:3
15:7 17:4,9 19:21
20:4 34:24 75:24
105:8 112:9 130:16
130:24 131:24
132:13 134:5,9
148:4,24,25 229:15
242:16

**matters** 76:1
**maximum** 181:21
**mckeown** 1:4 25:6
**mean** 16:7 35:16
48:5,25 57:12
60:12 62:24 64:9
66:1 91:20,22
92:11 98:13,24
100:17 138:17,18
143:23 145:8
146:21 147:4,19
150:8 157:19 158:4
158:15 174:15
175:5,18 185:2,17
189:15,18 202:11
203:19 204:21
205:19
**meandering** 205:20
207:14,17
**meaning** 24:9
46:22 62:25 84:8
108:6 116:10
120:21 133:20
149:14 151:16
163:16 164:16
176:22 183:9
189:21 194:12
197:21 202:1
216:17 240:2 245:5
245:7
**meaningful** 201:8
201:23 202:7 215:4
**means** 79:4 100:18
118:2 119:9 129:4
147:12 150:7 166:9
174:17
**meant** 19:18 31:10
31:11 147:21
148:20 204:23
**measure** 201:3

**measured** 87:20 202:8
**measures** 85:21 86:5,9 87:4
**medical** 60:5
**medicine** 211:4
**meet** 82:23 84:6,10 84:13,18,22 85:9 86:20 87:6,9 89:5,7 89:9,22 90:13,20 91:3,12 93:7,12 94:21 105:7,11 129:7 138:4,7,25 142:8 177:9 198:24 199:23,24 242:24
**meeting** 23:1 82:1 82:2,11 125:2 126:13 136:24,25 149:19 198:7 200:2 222:8,15
**meets** 126:1
**mega** 100:8
**member** 35:6
**memoranda** 35:5
**memorized** 7:16,21 8:2,3 76:11 107:10 244:15
**memory** 71:7 94:20 104:15,17 114:16 117:3 146:10 164:17
**mention** 23:1 116:19 222:10
**mentioned** 29:19 29:22,23 31:4,5 32:18 48:13 119:3 150:18 155:4 171:9 183:25 217:11 229:19 244:20
**mentioning** 58:10 226:13

**merieux** 123:6,20 205:6,8 214:21 216:18
**met** 21:22 93:18,18 94:12,15,16,18 105:17,17 122:11 122:18 126:8 127:25 128:5,12 138:10 150:2
**metal** 85:18 86:3,6 86:9 87:5 88:24
**metals** 86:12 87:16 172:3
**methionine** 30:8 46:14 97:10 132:17 133:15 147:25 164:16 165:8,14,19 165:23,24 166:20 166:23,24 168:1 169:7,8,20 170:3,8 170:9 176:6,20 226:18
**method** 121:21,22 121:24
**methodologies** 192:16 216:4
**methodology** 192:25 216:10
**methods** 123:23
**metric** 44:17
**miami** 1:2 2:13
**microbiological** 147:7
**micronutrients** 242:10
**microphone** 67:8
**microsoft** 21:15
**middle** 207:14
**mild** 196:10,10
**milligram** 106:5 152:8 195:4 218:22

219:17
**milligrams** 106:4 108:5 115:16,17 151:6,13,17,21 152:14 170:4,14,15 193:22 194:10,11 195:2,7,8,21 196:2 196:9,14 197:1,8 197:22 198:2,3,16 199:1,2,9,10,14 214:12,13,14,22,24 218:4,5,12,14,15 218:21,23
**million** 172:5
**mind** 133:8 141:11 142:3 165:11 185:4 247:3
**minds** 89:2
**mine** 146:10 241:7 241:7
**minimal** 151:16 211:22
**minimize** 32:13
**minimum** 243:13
**minus** 127:23
**minute** 21:22 31:24 56:25 82:15 115:5 182:18,22 226:5,6 226:7
**minutes** 149:6 152:19,23,23 223:1 226:3,8
**mirror** 168:11
**mischaracterizes** 233:18
**misheard** 171:19 219:13
**mislabeled** 44:5 46:1 49:12 94:3
**mislabeling** 204:12

**misleading** 85:1 88:4 196:23 199:4
**misquoting** 244:25
**missing** 22:3 38:10 38:12,13,14 183:4 186:12 241:7
**misspeak** 204:23
**misstates** 76:5 83:5 90:4 91:18 93:1 109:20 122:19 124:9,13 128:1,14 129:20 137:13 140:11 145:2,16 146:19 148:10 151:9,23 163:6 170:24 172:22 175:3,4 176:15 194:19 198:21,22 200:5 210:7,16 211:17 221:10 244:7
**misstating** 145:23
**mixed** 164:21
**mixing** 80:3
**molecule** 168:15,16 169:13,23 170:10 229:3
**molecules** 166:9
**mom** 140:6
**moment** 7:15 11:22 30:9 38:16 40:24 41:15 53:3 83:11 99:15 105:14 155:2 173:16 180:12 193:25 208:2 226:1 226:2 244:12
**monday** 16:20
**monitors** 203:2
**month** 107:19 108:2 112:24 129:5 228:3 229:2

**months**  18:14
21:23 31:21,22
52:4 107:23 246:17
**mood**  196:10,12
197:24 198:5,5
**morning**  5:8 28:25
29:12 47:6 135:6
138:19
**motion**  88:9 99:16
149:25 171:3
**motivation**  31:3,14
**motivations**  95:18
184:9
**mouse**  167:17
**move**  49:9 66:4
88:6 131:22 149:22
157:25 168:3
170:25 177:16
185:6,11 192:19
194:5 205:10
207:18 217:12
223:18,19,23
**moved**  140:8,14,18
140:22 214:17
**movie**  99:9
**moving**  53:18
56:20
**msds**  225:23
226:22 227:4
**muck**  147:24
**multi**  61:24 96:1
**multinational**
157:11,12
**multiple**  129:4
173:22 188:11
201:24 203:16
224:12 239:10
**multitask**  59:16
**muscle**  96:16
**mute**  153:23
224:16

**n**

**n**  3:1 4:1 19:13
21:3 23:4 183:14
211:7
**nah**  185:4
**name**  4:12 5:8 7:16
7:17,20 12:7 17:19
18:21 19:12 21:2
21:24 23:24 51:13
51:14 53:15 56:5,7
80:24 81:1 96:17
115:13 133:10,15
147:22,23 148:4,6
148:21,21,21,25
154:3,13,17 155:5
155:7,11 156:2
165:14 183:5 205:9
220:4,18 234:11
239:22
**named**  23:3 180:15
**names**  28:12
108:21 116:19
165:3 244:14
**narrative**  100:13
**national**  65:18
**natural**  39:20
**naturally**  147:10
**nature**  42:21 44:1
62:4 166:12 168:14
178:10
**natureticians**
108:12
**naturetition**  3:18
106:20,21 115:24
**near**  19:1 93:19
212:20 228:9,9
**nearly**  93:18 94:16
145:19
**necessarily**  15:18
15:18 70:3 85:23
86:23 88:1 112:8

113:10 124:20
144:7 157:20 172:2
172:4 179:1,5
182:4 183:19
202:16 215:3
235:14 242:17
**necessary**  90:16
197:2
**need**  6:23 8:12
32:12 37:16 80:2
104:18 107:6
113:21 114:2
118:10 131:12
148:15,16 152:23
158:1 162:11,17,19
167:18 172:25
178:22 179:24
185:5 187:2 189:4
189:7 190:12
197:22 202:16
203:22 205:9
206:21 207:3 208:9
208:10 221:12
222:21 223:24
226:1
**needed**  151:13,16
195:5 196:13
**needs**  78:3 223:22
**negative**  165:22
**negligent**  243:13
**neither**  98:9
**nestle**  63:5 64:2
157:16,16,18
**net**  199:11
**never**  15:25 25:18
59:10 64:15 66:15
73:3 80:3 82:25
83:3 135:9 141:3
161:12 185:4 215:6
220:21 229:22
240:20

**new**  2:4,17 54:7,11
54:16 55:18 58:23
111:18
**nice**  233:22
**night**  28:18,25
29:11 135:6 138:19
**nine**  57:4 98:15
102:20,21 127:3,5
127:7,10 190:22,23
193:6
**noah**  1:3 24:14
34:7,9
**nods**  6:20
**noise**  235:10
**nonstop**  65:4
**nope**  71:18,18
**normal**  20:21 124:2
**north**  157:8,17
**notary**  1:23 249:6
249:16
**note**  58:17 77:2
113:8 115:10 173:4
174:1 228:10
231:14 240:11
245:15 247:2,4
251:9
**notebook**  35:16,22
**noted**  48:4 73:22
92:12 101:16
173:18 182:7 216:2
**notes**  3:13 35:10,14
35:16,17,19,23,24
35:24,25 36:1,14
36:20 37:20 115:6
152:19,21 179:23
229:17 250:9
**notice**  1:20 12:17
16:9 115:9 119:18
119:21 120:25
146:16 231:16,17
231:19,23 233:4

246:16
**noticed** 119:17
146:24 153:6
**noting** 148:6
149:16
**nova** 155:19,21
**november** 1:17
16:17,19 249:8
**nsf** 139:17,22
**number** 5:11 11:9
17:7 19:24 21:6,12
25:23 26:20 32:17
32:18 34:22 35:3,5
35:12 36:3,4,9,11
37:2,21 39:6 41:16
41:19,24 47:12,19
53:18 55:15 57:11
58:7,22 59:12,20
60:18 61:1,24
62:13 63:5 64:24
65:15 72:5 74:8
81:23 82:19 86:21
102:24 103:3,6
105:23,24 106:6,7
106:9,14,16,17
109:11,12 110:8
113:9,10,17,21,25
114:25 115:5,10
117:1,2,15 118:19
118:23,24 119:7,8
121:19 126:25
128:25 133:22
148:12 149:8
167:20 173:4,13
181:15 182:8,13,14
182:14 186:18
187:9 205:14
208:18,19,21,24
209:8,13 213:10
214:10,10 217:21
228:11 234:20

**number's** 205:14
**numbers** 108:2
111:15,17,22 112:4
112:23,25 113:11
114:6 129:12,14
168:23,25 169:2
187:23 214:20
**numerically** 177:8
**numerous** 52:12,15
**nusapure** 3:17
106:7,15 109:18
**nutraceutical**
17:18 155:8,12
**nutraceuticals** 18:1
18:5 155:4
**nutrasource** 17:18
18:1,6 20:19,23
21:1 22:24 23:3
38:18,22,25 40:12
40:17 155:3,7,8,10
155:11,11,16,22,24
156:8,23 157:3,5,7
157:10,21 158:8,11
158:23 159:3,9,24
161:7,16,21 224:23
236:5 237:8,12,22
238:5
**nutrasource.ca**
251:1
**nutrient** 218:19
242:4,16,24
**nutrients** 199:25
242:12,19
**nutrition** 24:3 27:8
39:16 40:19,20
55:3,17,19 56:1
58:22 59:7 88:14
242:21
**nutritional** 55:1,6
56:3 60:2,3 65:9

90:1 152:5 164:15
166:25 176:9
184:13
**nutritionist** 53:20
54:7
**nw** 2:20

**o**

**o** 4:1 18:22 183:14
**o'brien** 2:15 3:4
4:25,25 37:3,7,15
111:2 114:17
118:15,20 173:10
173:12 187:4 213:4
223:7,11 226:7
234:8,10,11,22
236:12,20,22
244:19 246:2,11,13
246:15,20,24 247:2
247:5,7
**o'clock** 111:1 223:9
**oath** 3:5 4:6 5:4
249:1
**object** 22:9,10,23
25:17 26:7 30:4
31:9 33:10 34:10
43:1 44:16,24
47:22 48:16 49:7
50:18,22 51:2
67:18,21 68:4,13
68:24 69:12,25
70:7,14,20 72:2,7
72:11,15 75:9 76:5
77:11,21 78:4 79:1
79:15 84:7 87:7,18
88:9,18,25 89:23
90:4,14,21 91:5,18
93:1 94:4,19 95:1
98:20 100:1,5,12
101:1 102:2,22
103:13 104:21
109:20 110:18

112:7 115:21 116:2
116:7 117:22 118:7
122:19 124:4,8
125:5 126:6,10,10
126:24 127:4,8,22
128:1,9,14 129:20
130:6 131:17 132:8
133:5 134:14,17
135:8 137:13 138:5
138:12 139:2,8,12
140:11 142:11
143:6 144:5 145:2
145:16,21 146:19
147:1 148:10
149:24 150:13
151:9,23 153:12
160:9 161:18,22
162:8 163:6 165:5
170:23,23 171:3
175:3 176:15
177:19 178:2,15
180:21 181:2
185:14,23 190:5
194:19 197:9
198:19,21 199:20
200:5 201:15
203:14 204:17
207:16 209:9,17
210:7,16 211:17
215:12,17 216:7,24
217:5,18 219:4,20
221:10 224:15
225:15 227:8,21
228:6,16,20 229:10
230:1 233:13 236:2
240:14 241:13
243:21 244:6 246:7
**objecting** 25:10
30:20 73:19
**objection** 24:15,19
24:23 25:7 26:12

30:4,12,18 31:2
36:7,13 45:18,18
46:5 72:17 73:5,11
73:20,23 74:1,3,14
76:18 77:1 79:10
83:5 84:19,23,25
85:5,10 89:8,24
92:1,18 100:5
108:16 110:18
112:12,16 129:11
137:17 144:19
148:18 171:6
172:22 174:3 177:4
200:9 204:2 210:2
233:25 244:11
247:2,4
**objections** 4:9
25:11 175:15 200:8
247:22
**objective** 137:3
**observation** 129:23
201:4
**observed** 80:24
137:3 214:1
**obtain** 18:15 47:14
132:20 134:11
**obtained** 55:15
150:20
**obvious** 136:17
**occur** 65:12 84:8,9
84:12 85:2,8 89:21
**occurred** 78:13
79:3 83:10 125:21
139:6
**offensive** 143:23
**offered** 157:5
**offhand** 101:14
106:23 107:1
171:25 172:2,4
177:20,24

**office** 6:5,5 13:9
16:24 35:7 119:23
120:4 121:2 146:13
216:1,20,21
**offices** 120:21,22
216:5
**official** 249:11
**oh** 32:12 33:5 47:7
49:22 53:4 66:19
69:10 71:15 106:21
123:3 132:5 179:3
187:2 199:13
215:19 226:4
**okay** 5:18 6:7,7,20
8:18 9:3,10,15
11:25 12:4,9 13:13
13:16 14:18 17:17
17:22 18:13 19:2
21:4 25:12,21 27:2
28:10 29:25 32:7
32:12 33:6 34:6
35:14 36:2,10,23
37:6,13 38:4,12
39:4 41:11 42:5,7
43:15,24 44:11
46:16 47:1,18
49:20 50:16 51:15
52:3,10,15 56:7
57:6,11,22 58:7,13
59:16 64:8,12 65:7
66:10,23 67:14
68:2 71:9,12 73:23
74:6 76:14 77:19
78:8 79:12 80:21
81:1 82:20,22 84:1
85:6,15,25 86:2,25
88:6,8 90:11 93:21
94:11 96:4 97:13
97:18,23 98:6 99:8
99:12 100:16
104:18,25 105:20

111:18 112:3,10,17
113:1,4,20 114:2
114:19 115:14,18
118:22 120:6,19
123:18 125:17
126:2 128:17 132:2
134:4 137:8,20
139:24 140:3
145:11 147:19
149:2,22 150:5,10
150:23 153:20
154:18 168:8 171:7
171:19 174:7
178:25 179:3 180:3
181:16 182:25
191:11,13 212:9
214:18,18 223:20
224:11 231:22
234:17 235:22
237:1,2,5 240:16
240:25 241:22,23
243:16 244:4,9,13
247:1,15,25
**old** 146:10
**older** 63:24
**once** 47:6 75:15
101:6 110:1 189:3
189:3
**ones** 63:24 104:19
104:20,23 119:24
**ongoing** 31:15
184:15
**ontario** 18:25 19:1
**oparil** 2:19 4:19,19
247:21
**open** 8:10 17:5
178:16
**opened** 54:1
**opening** 114:18
**operate** 65:18,19

**operators** 139:17
**opinion** 49:15,17
49:24 50:2 81:15
81:20,23 82:6,14
93:6,11 94:24
122:9 136:11,15
137:12,23,24,25
138:1,2,6 139:11
179:14 181:20
185:13,17 187:18
198:15,23 199:5,17
201:13 209:16,25
210:3,4,5 211:12
219:23 221:22
224:13,19 227:20
230:16,17,21
232:24 233:4,6
239:9 242:2 243:9
**opinions** 27:3 87:4
137:21,22 205:20
**opportunity** 69:3
69:17 72:1 233:2
**opposed** 119:23
**opposite** 92:9
168:17
**option** 74:8
**options** 72:5,9,13
**oral** 136:4
**orchestrated**
117:12
**order** 4:8 47:9 78:1
78:2 113:20 150:20
153:15 164:19,22
189:16 196:25
201:20,20 202:14
203:16 218:17
234:17
**ordered** 99:24
126:22 127:15
**ordering** 251:14

orders  133:4
organization
  139:16
organizational
  68:19,20
organizations
  216:17
organized  23:8
  32:25 184:24
  215:11
organizing  212:10
origin  203:6
original  130:9
osha  226:24
outcome  250:14
outline  163:1
  222:20
outlined  82:4 198:9
outlive  227:10
outlook  21:15,24
outside  19:3 58:5
  79:6 112:14 160:1
  230:2 232:22 236:7
  236:7,16,17 244:10
overall  210:3,4
overarching  239:5
overinflated
  128:24
overlapping  191:13
overlooked  148:14
oversight  62:17
overstepping  60:9
overwhelming
  222:16,17
owns  157:16
oxidation  228:14

**p**

p  4:1 200:21,25
  201:3,7,11
p.a.  4:22

p.c.  2:3
p.m.  1:18 248:5
packaged  91:8
packaging  90:24
  90:25
page  3:2,3,4,5,6,7,8
  3:8,10,11,12,13,14
  3:15,16,17,18,19
  3:20,21,22,23,24
  16:1 121:5 135:19
  173:5 181:7 187:21
  188:6,7,18,19
  190:16 191:4,4,5,6
  191:10,10,11,23
  196:15,15 224:3,3
  235:4,4,4,4,5,5
  238:11 246:6 247:9
  252:4,6,8,10,12,14
  252:16
pages  1:25 35:25
  133:3,7 135:18,19
  190:22,23 191:13
  213:8 235:6,9,11
  240:9
paid  20:13,19,24
  160:6 184:8
pamlab  63:5
pandemic  5:25
paper  122:13
papers  39:14
paragraph  9:1
  42:14,16 43:24
  50:12 57:4 81:12
  178:9 181:9,23
  196:17,18,21
  208:15,15,17
  222:19 224:8
  241:25 243:8,9
paragraphs  241:20
paraphrase  217:13

parcel  225:24
parens  182:7
parent  156:19
part  8:7,8 11:24
  24:6 27:5 28:4
  32:19,20 33:13
  34:1 35:11,12
  40:20 41:5 47:2
  48:8 59:2 62:17
  65:11 82:7 90:6
  97:11 107:9,13
  112:21 113:1 121:3
  124:24 125:10,12
  132:23,25 133:16
  133:25,25,25
  134:23 135:5,24
  141:19 142:6 146:9
  147:8 148:13
  151:11 152:5
  156:13 162:5 164:1
  166:10 167:1,3,4
  168:3 170:19,21
  172:5 177:10
  179:10 180:23
  183:4,19 184:6
  187:18 196:2,7
  200:25 201:6,22,23
  208:14 216:9,10
  225:23 227:4,22,22
  227:25 235:19
  236:3,3 244:3
partial  220:20
partially  220:20
participate  241:2
  245:20
participated  196:1
  196:6
participating  4:3
particular  117:1
  124:1 168:24
  169:17 170:19

190:23 194:9
  208:21
particularly  227:14
particulars  23:2
parties  4:8 244:16
  246:10 250:11,12
  251:14
parts  30:11 135:20
  164:5 166:13 224:6
party  93:17 236:7
  236:17 244:17
  245:11,17
pasco  249:3
pass  153:4,11 233:7
patent  59:12,20,22
patents  60:9,22
patience  247:16
patronize  73:15
paul  64:25,25
paused  185:5
pay  161:15
paycheck  156:7
paychecks  156:18
paying  139:19
  199:14
payment  159:22
  160:10
pdf  15:22
peer  27:7 38:7 61:9
  62:7 210:23 211:1
  240:6
penalties  252:19
pennsylvania  2:20
people  75:15 88:11
  88:13,19 95:11,14
  116:18 141:15
  164:1
people's  95:18
pepsi  120:12
perceived  56:10

**percent** 15:21
21:21 38:10 43:14
45:9 58:20 93:22
94:6,14,22 108:7
121:14 128:11,20
129:6 136:25 138:3
149:19 169:12,21
169:22 170:1,1,5,9
171:22 174:21
177:6,7 180:12,16
194:13 199:24
203:24 214:4,23
217:22,25 218:17
219:2,8,16,16,24
228:22 242:23
243:2,4,5
**percentage** 45:1,4
165:18
**perception** 140:2,3
140:4
**perfect** 37:18 56:20
91:24 92:5
**perfectly** 91:17,20
158:3
**performance** 48:6
56:10 162:3,4,5
169:11 216:12,13
**performed** 49:5
119:4
**period** 69:21 228:3
**perjury** 252:19
**permitted** 1:22
**person** 19:6,6
23:24 68:17 70:2
85:24
**person's** 21:2
**personal** 97:7
115:18,23 116:3
**personally** 20:19
97:7 116:10 161:8
161:11 192:4

204:25 249:22
**perspective** 76:19
219:10 239:11
240:4,5
**pertinent** 143:21
143:24,25,25 144:3
144:3 146:7
**petaluma** 119:23
216:1 217:3,14
**ph** 147:16 172:9,12
177:22
**pharma** 40:21
**pharmaceutical**
17:18 39:21 40:17
63:6 155:8,12
**pharmaceuticals**
63:7,10
**pharmacological**
203:10
**phase** 40:21
**phd** 1:15 24:3
54:22,23 56:18
249:7 250:7
**phds** 54:25 55:8,23
**philosophy** 54:24
54:25 55:1,3,7,16
**phlebotomy** 54:12
**phonetic** 172:5
189:21
**photographs** 48:23
180:9,13
**photos** 48:24,25
49:2
**phrase** 163:11
175:20 196:4
**physical** 13:3 33:16
52:4 114:3 119:16
**physically** 13:5
16:24 156:18
**physician** 40:7

**physiologic** 152:3
176:9
**picked** 29:12 83:24
**picture** 96:13
**picture's** 56:17
**pictures** 11:18
142:24 167:11
**piece** 71:13
**pieces** 234:24
**pill** 164:6 167:2
189:10,12,21
194:14 195:2 198:2
**pills** 141:2 190:2,9
195:5,19 197:25
199:1
**pizza** 120:15
**place** 110:12
**placebo** 202:7
**places** 237:19
**plaintiff** 2:4 34:7
63:11 65:14 110:15
141:19 229:19,25
**plaintiff's** 17:8,10
26:1,2 61:11
110:15 182:12
186:18 187:6
188:18,20 208:14
234:24 235:3
**plaintiffs** 1:6 4:15
5:11,14 7:22 17:8
17:11 21:7,8 24:8
31:6,7 32:24 33:8
33:12,18 34:2 53:1
53:5,11 65:13
141:7,16 142:10,24
247:25
**plan** 69:7
**planning** 179:1
**play** 225:7
**plaza** 2:16

**please** 4:11 29:20
37:23 49:22 51:7
53:16 83:7 115:10
115:10 119:19
120:20 145:9
148:19 155:2,6
157:25 162:24
165:1,4 168:4
173:9 175:11,14
180:2 182:2,15,24
184:1 188:8,22
191:9,20 193:25
200:8 205:17 206:2
206:4,4,7,25 208:1
208:5,6 224:6,8
226:3 251:11
**plethora** 107:11
**pllc** 2:7
**plus** 93:19 136:24
**point** 30:3 89:5
113:13 120:2,16
158:17 163:11
165:23 170:7 180:1
188:9 193:14
218:15,25 221:19
235:11 238:17
242:25 244:21
247:24
**pointed** 29:25
30:25 131:20
**pointing** 170:7
**police** 144:8
**policies** 65:4 81:16
81:22
**polite** 171:2
**pollack** 2:11,11,11
3:3 4:21,21,22 10:3
10:17,18 99:10,10
103:2 153:4,11,19
153:22 154:4,9,12
154:13 160:6,18,23

161:2 170:25 171:4
171:7,8 173:6,11
173:15,17 175:7,11
175:14,19 178:4,6
185:16,20,24 186:4
186:9 187:5,11
194:3,21 195:1,9
197:16,18 200:7,20
205:17,25 206:3,11
206:16,19,23 207:5
207:11,16,21 208:7
208:12 213:6,12
222:25 223:12,20
223:25 224:1 226:4
226:10 230:6,10,14
230:18,23 231:1,5
231:9,14,18,21,24
232:5,9,14,19
233:9,16,21 234:4
234:23
**poor** 140:1
**pop** 140:6
**portion** 147:9
165:24 166:21,22
169:8,24 170:8,16
170:17 176:6,21
**position** 22:17
**positive** 96:2
151:18 165:22
**possible** 102:19,23
228:23 238:14
**possibly** 223:5
**post** 82:9 221:16
**potential** 74:25
75:2 97:20 200:1
**potentially** 181:25
198:4,10,12 227:17
228:4,7 245:7
**potion** 164:6
**pounds** 44:17

**powder** 164:6
**powders** 141:2
**power** 222:22
223:21
**practices** 7:9,12
30:6 31:17 65:4
81:16,22 89:10
115:2 139:15 198:8
202:18,21 242:16
**precautions** 90:16
**precede** 74:24
**predicate** 128:15
**prefer** 110:25
**prejudice** 158:5
**premium** 82:8
**preparation** 15:6
150:12 151:2
**prepare** 43:25
**preparing** 52:25
146:25 235:12
**prescription** 39:22
60:4
**present** 4:4 50:25
60:19 101:25
112:15 139:6
**presented** 229:12
**president** 39:2,4
155:10
**pretty** 14:7 40:15
48:22 64:13 80:7,9
105:6 111:2 174:12
174:14,20 176:20
216:16 222:1
223:11 229:2
236:20
**prevent** 90:17
**previous** 73:9
**previously** 16:17
48:13 72:19,21,22
111:16 174:13
211:14 220:13

221:1,2 248:1
**price** 39:10
**prior** 5:25 8:24
14:13 22:5 23:7,17
27:4,25 28:3,4 30:7
40:11 73:8 76:5
89:24 90:4 91:18
96:22 97:1 122:19
124:9,9 128:1,15
129:20 137:13
146:20 148:10
170:24 172:22
175:4 198:22
210:16 211:17
221:10 240:8
**private** 130:7 154:1
**privilege** 30:12,21
36:24 99:17 110:19
231:9
**privileged** 22:10,12
22:16 36:16,17,20
**probability** 201:3
**probably** 20:8 51:8
82:19 161:25
205:14 213:6
**problem** 15:3 67:12
71:11 108:10
145:11 178:21
205:19 207:10,24
**procedure** 1:22
48:6 154:23 251:24
251:25
**procedures** 47:15
65:4 120:24 124:24
125:13 202:21
216:22
**proceed** 182:18
**proceeding** 16:12
**proceedings** 4:5
27:5 28:3,5 57:8,21
249:1

**process** 44:2,11
45:15,24 46:3,6,9
46:13,17 47:2,11
47:14,18 48:10,24
48:24 49:9 66:23
133:18 134:6,10
145:19 148:5
**processes** 45:20
94:9 115:13 125:11
125:24 130:17,25
131:11,24 141:1
159:1 237:11,13
**produce** 36:18
103:15,18 200:4
210:14,20
**produced** 52:12
53:16 103:19 104:1
116:12 143:5,15,17
143:20 144:17
164:8 186:14 205:4
210:13 246:9
249:23,23
**producing** 153:13
232:15,23 233:5,8
**product** 32:24 34:9
42:18,25 43:21
44:2,21 46:21
47:11,16 51:11
52:5 58:18,20 59:3
59:10,24,25 60:3
60:19,19,21 61:5
61:10 80:25 82:9
82:22 84:2,5,18,21
85:8,17 86:10,24
87:17 88:1,15 89:4
89:7,11,16,21 90:7
90:9,12 91:3,11,16
91:24 94:18 96:1,4
96:14,17,20 97:1,3
97:7 99:23 100:10
100:24 102:1,5,6

**[product - purposes]**

102:16,16 103:23
105:7 106:4,5,22
106:25 107:16
108:4,12,14 109:1
110:1 113:22
114:12 115:8,15,16
115:17,19 116:8,13
117:2,5,11,20
118:6 121:4,12
122:17 125:15,25
126:8 127:25
128:12 129:7
133:20,20 134:12
134:24 136:5,12
137:9,10 138:10
140:24 141:7 142:9
148:7 149:11,14,14
149:17,21 150:20
150:22,25 151:1,7
157:9 164:19 172:9
172:11 179:8,19
180:20,20,23 181:1
181:3,19 182:4
189:14 190:17
194:10 195:3,7
196:22,24 198:1,3
198:6,20,23,25
199:6,9,9,11,18,23
202:2,15,17,22,24
204:12,13 212:12
212:13,25 214:10
214:10 215:9,11,14
215:22 217:21,23
217:24 218:10,11
218:22 219:18
221:7,17 222:2,4
222:12,18 227:23
227:24,24 228:2,8
228:8 229:20,22
242:4,6,21 243:20

**production** 16:11
62:4 80:23 222:18
**products** 14:21
15:2 23:9,10,10,11
24:5 27:5 32:19
33:2,7,11 34:1
39:20 43:6,12
46:15 50:25 52:18
81:24 82:11 87:23
87:24 88:12,23
94:8,15,21,23
96:12 98:22 100:7
102:10 107:11
108:21 112:5
113:24 114:8
115:25 116:4,18
117:9,24 118:3
124:25 129:9,15,17
130:3,4 136:9
138:6,24 142:7,23
144:12 164:11,13
173:24 178:13
179:15 180:14
183:16,25 184:7
203:1 205:4 213:19
215:5 222:4 224:22
224:23 238:20
243:3 245:6,8,8,10
245:10,17
**professional**
221:21 243:10
**program** 65:20
**project** 157:21
**projects** 97:24
**promise** 223:13
**promulgated** 75:13
**promulgating**
85:24
**pronounce** 166:19
**pronouncing**
154:17

**proof** 63:1
**prop** 87:24,25 88:3
**proper** 227:5,5
**properly** 180:25
**property** 59:12,20
60:22 63:15
**proportion** 128:23
169:7
**proquest** 56:19
**prosecute** 76:21
77:17,18
**protect** 85:21 86:6
86:9 87:4
**protein** 56:8
**proteins** 242:8
**protocols** 46:12
47:24 48:2,3,9
**provide** 16:10
42:17 43:18 157:7
158:24 217:15
239:3
**provided** 35:13
38:2,4,9 144:22
182:16 191:7
208:23 211:10
231:3 234:16
**provides** 159:4
**providing** 156:24
224:13,19 240:8
**psychometric**
202:9
**pty** 1:9
**public** 1:23 78:6
183:13 243:14
249:6,16
**publication** 38:8,11
38:12,13,14
**publications** 97:24
211:6
**publicizing** 184:17

**publicly** 76:23
184:12 209:6
245:12
**publish** 56:18
211:5
**published** 27:6,7
38:15 56:13,14,16
56:17,18 62:7
97:10 183:17
210:23 239:5,23
245:5
**publishes** 75:14
**pull** 8:18 27:13
155:1 167:8,12
179:2 207:22,24
**pulled** 115:5
119:17
**pulling** 8:1 207:23
**purchase** 34:12,13
34:14 96:9 176:7,8
229:19
**purchased** 32:24
33:8,17 34:9,12
59:10 81:24 95:19
96:4 97:4,7 98:15
100:4 102:15,20
127:2,10,11,19
129:1 141:7 142:10
142:12,25 163:18
175:25 198:20
238:19
**purchasing** 97:1
127:6 176:7
**pure** 87:9
**purity** 84:16 94:7
**purported** 88:11
**purposes** 1:20,21
11:10 19:25 36:5
41:20 103:4 105:25
106:10,18 109:13
118:25 159:4

173:14 187:10
213:11 234:21
246:1
**pursuant**   1:20 4:7
126:21
**push**   9:13
**put**   7:9 21:24 27:21
27:24 56:22 92:21
107:5 111:10
118:13 135:19
137:2 146:5 164:6
180:5 213:13
221:17
**puts**   85:17 113:9
**putting**   39:8
167:17

### q

**qa**   97:11 215:6
**qps**   40:13,14,16,16
**qps's**   40:17
**qualifier**   235:15
**quality**   94:10
124:24 125:13
131:11 140:5
149:12,13 202:8
204:12 222:17,17
239:21,23
**question**   14:22
15:17 20:15 30:23
32:18 33:3,20,22
34:3 44:18 45:23
49:20 57:25 66:9
70:24 72:25 76:14
83:7 85:5,20 88:7
91:22 93:9 102:8
102:12 103:20
104:1 112:21,22
113:13 115:11
117:13,14 124:13
132:4 138:13
142:20 148:15,16

150:7 152:7 157:19
158:2,7,23 159:15
159:20 160:13
162:22 163:8
164:25 169:4
170:21 171:22
172:18 176:12
178:9 179:6 180:18
181:12,13 185:16
185:18,21,22 186:1
186:2,5 187:13,24
188:24 190:6 192:3
193:15 195:18
196:1,19 197:15
199:16 200:10,13
201:1 204:24
205:16,24 206:2,7
206:14 207:6,20
208:5,6,19 210:10
210:19 213:16,17
216:3 217:6 218:1
218:7 220:12
225:16 226:12
230:7,11 232:21
238:13 239:2
243:22 247:13
**questionable**   137:2
137:3
**questions**   5:15 6:13
6:18,25 23:12
62:21 85:2 88:4
107:4,6,7 110:22
142:14 153:3,11
154:23 155:20,21
160:25 162:16
163:2 167:16
168:22 192:15
194:5 202:20
206:10,15,22,22
207:4,9,9,10,12,14
207:17 223:5 224:7

232:11,16,17,20,24
233:6,24 234:15,15
235:1,22 240:11
241:20 247:20,24
**quick**   84:1 235:2
**quickly**   6:12
179:25
**quite**   182:20
**quote**   32:19 42:16
43:18 51:10 88:10
204:15 211:7
221:20

### r

**r**   4:1 18:22 156:3
252:3,3
**raise**   69:5 154:6
**raised**   74:12
183:20
**raises**   77:4
**raising**   77:3
**random**   201:4
**range**   169:21
174:18,23 176:22
177:9
**ranges**   171:21
**rate**   161:4,6,6,7
224:13 225:3,18
228:19 229:8
**rates**   229:5
**ratio**   127:16 128:20
**rationale**   221:3
**raw**   3:21 132:13,20
132:21,23 133:10
134:3,11,24 137:5
144:25 146:16,22
146:24 147:6,22
150:11,19,22,24
151:1 162:21
163:15,15 164:1,2
164:3,9 165:11
166:15 167:3,9,25

169:6 172:16
173:20,23 174:2,8
175:1,25 176:13,25
177:11,17,22 178:1
179:7,10 221:23
225:24 226:21
**rd**   1:15 249:7 250:7
**rdr**   98:19 104:10
**reach**   178:23
**reaching**   179:14
**read**   14:8 27:20
28:9,10 29:4,6,10
49:14 52:11 55:21
76:20 80:12 82:19
83:3 86:2 89:12
93:15 96:22 105:2
114:25 118:10
129:23 130:22,23
131:2 132:24
134:15 135:10,12
135:16 136:1
138:18,18 139:3
143:15 181:9,10
184:23 196:17
215:22 220:3,7,10
220:11,13,15,16,20
220:20,22,23
221:12 222:8
224:10 225:22,22
247:10 251:8
252:19
**reading**   8:19 29:7
48:21 56:16,19
116:16 130:8,9
131:2,2,2 135:5,15
135:20,24 163:14
220:19,22 221:3
243:25
**reads**   242:2 243:9
**ready**   185:10 224:9
224:10

**real** 47:16 84:1
212:23
**realized** 82:10
214:21
**really** 49:22 64:4
82:21 85:20 86:2
103:20 110:22
143:22 148:25
170:14 178:21
182:10 210:19
217:12
**realm** 211:6
**realms** 211:7
**reanswer** 144:21
**reap** 151:7 152:9
**reason** 18:18,19
38:6 65:11 92:12
137:6 183:15 189:4
211:3,24 212:4
215:14,21 217:2,14
224:21 251:10
252:5,7,9,11,13,15
252:17
**reasonable** 44:7
50:13 196:23
221:20 223:11
243:10 251:17
**reasons** 136:17
156:17 243:6
**reattached** 51:25
**recall** 16:18 24:4
98:1,6,7 105:16
167:21 180:19,22
182:2 184:18 220:9
220:19 229:14
**receipt** 101:15
115:13 251:16
**receive** 16:13 28:19
29:1 55:23 68:1
104:3 109:17 161:9
161:11,15,20 162:6

162:20 195:21
**received** 11:21,25
15:22,25 16:4,4,5
65:2,3 77:8,8,15
81:13 93:4 100:10
100:24 101:7,13,17
104:5,6 109:8
132:16 227:23
238:10,15,16,21,25
246:4,8,16,18
**receives** 69:4 134:2
161:8
**receiving** 15:24
23:10 66:24 69:17
70:10 92:24 161:4
224:23
**recess** 9:24 10:23
11:4 57:2 95:5
111:5 153:1 194:2
226:9 244:18
**recognize** 187:14
**recollect** 83:11
103:14 110:10
244:12
**recollection** 11:22
60:16 78:15 160:7
161:3 176:18
183:22,24 194:17
**recommend** 151:25
152:8,14
**recommended**
151:20
**recommending**
152:12
**record** 4:12 9:20
83:6 109:21 124:9
124:13 140:12
145:3,23 151:10
163:7 176:16
187:12 188:17
194:20 207:16

210:8 213:8 250:9
**records** 26:20 27:2
27:4,11 28:4 32:21
35:5 53:2 162:11
163:14 200:6
229:25 233:11
**recovered** 51:22
**recovery** 51:17
96:15
**red** 94:8
**redline** 241:10
**reduce** 128:23
**refer** 73:8,13
155:16
**reference** 26:21
27:12 80:14,17,20
171:17 178:8,10
179:24 215:13
216:10 222:10
**referenced** 202:19
221:19 251:6
**references** 15:15
80:22
**referred** 171:16
**referring** 8:6 52:16
52:17,19 53:6,7
150:21 155:22
158:18 166:7 178:3
186:22
**reflect** 67:3,15
82:15 144:24
**reflected** 117:6,20
126:7
**reflection** 66:24
**reflections** 168:11
**reflects** 68:6 82:15
**refresh** 194:16
**regard** 251:18
**regarded** 156:4
**regarding** 14:25,25
27:7 31:16 38:15

42:17 43:19 59:2,2
60:22,25 61:10
62:22 81:13 94:15
115:23 140:2 172:3
198:8 227:3 242:11
**regards** 94:7
158:25
**registered** 53:19
54:6
**regulated** 239:14
242:15
**regulation** 65:20
239:18
**regulations** 75:16
202:13 218:18
219:7 239:12
**regulatory** 39:17
39:17,18,18,19,23
62:17 63:4 66:6
70:4 75:13 136:22
136:23 137:2
239:10 240:4
**reinspect** 79:17
**reinspected** 79:20
**reject** 172:13,14
**relate** 230:17
**related** 5:12 7:5,6,8
7:10 13:13 14:8,23
15:7 17:4,9 21:19
22:21 39:19 52:20
63:8 65:23 93:3
97:25 115:25
132:12 160:2 161:5
162:2 196:9 197:24
198:5 210:9 239:13
242:12,19
**relates** 13:10 45:16
50:21,24 93:13
139:6
**relating** 21:10 26:3
162:7 190:10

**relation**  65:9 109:8
**relationships**  158:9
**relative**  226:25
  250:10,12
**release**  153:9
**released**  183:14
**relevance**  231:10
**reliable**  204:1
**reliance**  15:5 63:1
**relied**  13:20 14:19
  15:8 52:22 53:1,5
  105:1 137:5 145:13
  179:14 184:21
  187:18 227:22
**rely**  14:5 53:13
  129:25 131:8 144:2
  185:13 227:18
  245:4
**relying**  95:11
  130:20,22 131:5
  136:13 221:14,15
  221:15 229:7
  231:23
**remember**  8:3
  11:19 12:8 38:16
  51:13 78:17 98:4
  105:21 183:8 235:9
  235:10 237:3,9
  241:17 243:25
**remote**  6:6
**remotely**  4:6
**render**  92:15 148:8
**rendering**  142:7
  209:21
**renotice**  3:11 11:1
  11:13
**repeat**  30:22 83:7
  93:9 161:24 162:22
  176:12 190:8
  226:17

**repeated**  185:4
  231:14
**repercussions**
  74:18,21
**rephrase**  57:25
  214:2
**reply**  77:14
**report**  3:23 8:7,8
  8:23 13:19,21 14:5
  15:6,14 20:10
  27:13 29:23 31:16
  34:16,18 38:5 42:7
  42:9,13,17 43:17
  43:18,25 50:12
  52:11,23,25 53:14
  53:16,18,24 55:21
  56:21 57:5 61:21
  62:10 63:16 81:11
  83:3,21 93:5
  100:13 101:13
  102:10 103:6
  104:20,22,23 105:1
  105:3,10,12,13,18
  105:20 107:5,25
  109:25 110:11
  111:8,9,11,18
  113:8,12,15 114:9
  114:11 115:8 116:5
  117:7,16 118:1,9
  123:4 129:18 130:3
  130:5,14 144:12
  151:5,11 152:17
  160:12 178:7,19
  180:5 181:7,14
  182:5,17 183:23
  184:3,19 186:15
  187:6 188:22 190:1
  190:16 192:20
  194:4,6 195:24
  196:16 198:9,22
  205:15 208:15,24

  209:8,13,21,23
  210:1 213:14,17,21
  213:24 217:8 219:9
  221:18,24 222:9,10
  222:10 224:4,6
  227:25 228:4
  230:21,25 235:6,12
  235:20 240:21,22
  241:20 243:8
  244:21 245:1 250:6
**report's**  101:18
**reporter**  4:2,4 9:5
  9:19,23 10:4,16,21
  11:3 12:13 19:11
  19:14 20:2 25:9,14
  30:17 36:8,12 37:6
  37:9,18,24 41:1
  118:17 154:8 173:9
  236:9,15 237:2
  249:5,16
**reporter's**  3:6 6:5
  250:1
**reporting**  4:5,10
**reports**  14:4 39:13
  87:12 98:8 101:12
  101:16 102:7,17
  113:5 181:18
  182:13 183:3 184:2
  185:12 190:19
  193:23 216:2,3,14
  216:25 238:22
**represent**  4:22 5:10
  7:22 141:16 154:4
  234:6 246:3
**representative**
  71:25 192:9 200:18
  220:4 221:8
**representatives**
  110:16
**represented**  58:13
  59:7

**representing**  4:20
  4:25 31:12
**represents**  234:12
**reputable**  204:3
**reputation**  96:19
**request**  210:10
  238:8 246:20
**requested**  43:25
  74:22
**require**  231:24
**required**  69:23
  151:7 211:16
  226:23
**requirement**  91:4
  93:8,13 136:25
**requirements**
  84:22 91:12 94:12
  105:18 139:1
**requires**  81:17
**requisite**  197:1
**rescinding**  221:3
**research**  39:9
  40:18 55:5 58:8,14
  97:9,10,24 108:24
  151:18 200:12
  229:5 239:6,21,23
**researcher**  54:19
  196:7
**reserve**  36:16 91:7
  153:13 247:23,25
**reshare**  130:13
**reside**  18:23
**resolved**  58:12 64:6
  82:5 229:21
**respect**  28:11 31:5
  107:2 207:2,3
  239:16 240:1
**respectful**  186:23
  206:25
**respectfully**  186:4

**respond** 69:4,6,17
69:21,24 70:3,4
72:1 77:9
**responded** 26:10
26:17 78:21 80:1
92:22 153:7
**respondent** 70:22
**responds** 69:22
**response** 43:11
69:22 72:4 79:12
80:8,9 92:20,23,25
93:4 131:3,12
132:6,9 152:4
221:15 238:15
246:4,21
**responsibilities**
39:1
**responsibility**
40:20
**rest** 17:6 146:2,4
188:12 189:19
**restate** 67:2
**rested** 82:6
**result** 59:8 65:3
69:2 121:13,17
123:24 125:1,11,21
125:22,24 126:3
176:23 177:3 201:9
**resulted** 57:23
**results** 23:12 44:12
45:6,17 47:14
48:17,21 49:13,14
49:25 50:2 122:7
137:3 148:7 149:4
149:12,17 174:23
177:1 178:12 182:4
183:17 184:17,19
186:11 188:10,10
196:4 198:13 200:4
200:16,23 201:13
202:4,12,14 204:8

204:9,10,15,25
205:13 210:15,21
211:9,16 212:18
213:23 215:1,15
217:16 222:3
226:13 228:5,7
237:24
**retailer** 243:17,18
**retailers** 65:19
**retained** 7:14 15:4
17:15 18:8 42:16
42:23 43:18 45:23
57:23 62:20
**retest** 172:14
**returned** 251:16
**reuters** 57:14
**review** 9:14 27:2,12
28:5,16,23 30:1,3
31:1 33:14 35:15
53:13 96:25 98:2,3
125:16 126:21
141:12 143:4,19,24
152:19,21 173:22
181:19 182:24
247:9 251:7
**reviewed** 15:6
26:21 27:4,7,14,17
28:4 32:21,23,25
33:7,25 34:8,9,13
34:15,19 38:7
52:22 61:9 62:7
87:11,11 88:12
98:7 110:17 144:17
144:22 145:13
150:12 151:1
162:11 174:11
176:25 182:1
183:12 187:1
210:23 211:1
235:19 240:6
243:16 244:4

**reviewing** 48:17
183:8 221:8 235:12
**reviews** 39:15
96:22
**revise** 163:1
**revisit** 148:12
**rewrite** 148:2
**rhonda** 1:23 249:5
249:16 250:5,22
**richard** 2:19 4:19
247:19
**ridge** 2:3,4
**right** 5:25 6:10 7:2
9:7,8 10:22 11:6
12:16,21 16:20
17:1 18:18 21:6,13
28:15 32:17 36:16
37:5,8,20 40:23
41:5,16,22 42:7,9
42:15 43:8,9,21,24
44:10 46:1 50:17
51:24 52:10 54:24
55:3,9,12,13,19,21
56:7,22 57:4 60:14
63:11 64:22 66:4
71:20 74:18 79:21
80:15 81:2 82:23
83:14,17,19,19
85:18 86:21 89:13
92:7,14 93:5 95:7
96:6 99:21 101:19
101:21,24 103:1,2
105:12,20,21,22
107:9,20,23 108:2
108:3 110:4,11
111:7,18 112:6
114:3,8,22 116:23
117:2,7 118:6
119:9,22 120:7,11
121:14 123:8,10
124:18 126:9,16,20

126:25 127:12
128:13 129:19
132:15 133:16,17
134:8,16 135:13,17
135:22,25 136:1,3
138:20 139:1
142:19 144:13
150:1,2,17 152:15
152:25 153:2
154:11,15 155:14
159:11 160:17
161:20 162:16
164:2 165:1 167:20
168:9,10 169:2
170:11 171:13
173:16,18 177:13
179:18 185:11,23
188:5 191:2,2,19
191:20 193:25
195:3,11,17 201:11
205:9 206:15
209:22 216:19
218:12 220:2
221:14 222:19
228:12 229:12
231:12 233:4
234:18 241:19
244:20,24 248:1
**rights** 153:13
247:23 248:1
**ring** 3:23 23:8
53:16 212:4,7,9,17
212:24 213:13,18
213:24 214:4 236:5
237:15,23
**risk** 78:6
**road** 2:3
**robert** 1:4 25:6
192:22
**role** 60:6,7 61:7,8,8
62:5,6 63:7,8 65:7

65:8 225:7
**roles** 39:1
**rolling** 7:2 206:5
**room** 8:19 100:14
100:16,22 225:13
**rough** 194:12
**round** 57:12,13,17
57:19,23 58:3,4,6
**rounding** 199:10
**routine** 152:6
**rowe** 18:22 22:24
26:18 159:20
**rtg** 58:6
**rule** 86:21 231:13
251:24,25
**rules** 1:22 6:12
30:21 36:21 154:21
242:4,6,17 251:17
**ruling** 153:10
**run** 46:8 201:16,20
203:15,17 211:22
**running** 37:11,16
202:5
**rushing** 182:23
**rx** 1:10

**s**

**s** 1:15 2:7 3:9,14
4:1 5:3 19:13 21:3
30:8 41:7,17 46:14
56:15 97:10 132:17
133:15 147:25
156:3 164:16
165:14,16,19,23,24
166:20,23,24 168:1
169:7,8,19 170:3,8
170:8 176:6,19
226:18 249:6 250:7
251:1,4 252:2,3,22
**safe** 156:4 169:14
**safety** 59:2 225:23
226:22,22,25

**sake** 160:23
**salads** 203:3
**salary** 159:23,24
160:7,8 161:12
**salmonella** 203:3
**salt** 167:1
**sam** 3:21 5:13
43:19 44:2,3,7,12
44:14,22 45:16,25
46:17 47:20 48:15
48:21 49:6,10,15
49:17 50:3,4,8,13
50:20,25 51:4,16
80:14,17,20 87:12
89:17 90:8,12
92:16 93:6,11,13
94:2,11,15,18
95:19,25 96:5 97:6
97:10,14,21,25
98:10,16,18 100:3
102:20,21 105:7,11
108:21 116:22
126:22 130:17,24
131:24 132:12
133:8 134:5,10
138:3 139:7 146:18
147:15 148:1,4,8
148:22,24,25 151:7
151:13,21 152:1,9
157:9,13,23 158:15
162:21 163:4,13,15
164:3,20 165:3,17
165:20,20 166:10
166:14,18,24 167:7
167:7 169:9,10,13
169:15,24,24 170:4
170:14,15 171:22
173:24 174:18
176:21 179:15
180:7,10 183:16
189:10 190:2

194:10,12 195:22
196:2,7,24,25
197:1,23 199:1
202:6 204:10 205:1
210:13 211:8
214:16,20 216:6,22
217:17 218:13
219:11 221:7
224:14,22 225:3,13
225:24 226:12,14
227:3,7,12,14,16
227:19 228:14,15
228:19 229:5,8
237:25 239:24
240:1 243:11 245:7
245:9,16
**saman** 21:3
**sample** 101:16
115:9,12 128:24
169:17 172:12
182:8 187:21
189:14,24 192:9
193:6 197:7 200:3
200:13,15,18 203:4
203:5 211:3 219:14
**samples** 91:8
128:23,25 176:4,4
193:16 209:15
212:13,14 213:23
214:3 215:1
**sampling** 117:11
**sanction** 70:6
**sanctioning** 70:8
**sand** 43:14
**save** 14:14,19
173:15 213:6
241:15
**saved** 8:23 13:1
21:16 241:11,14
**saw** 20:10 45:5
96:17 110:1 172:18

239:8,8,9 244:21
**saying** 16:5 22:16
43:15 46:17 60:14
71:9 73:1 77:25
85:25 99:4 116:20
120:12 123:22
128:16 133:13
137:9 138:9,11,15
148:23,25 155:11
170:2 177:1,5
201:9 220:10
**says** 12:6 17:7
43:17,24 52:11
53:3,18 54:18
55:15 57:11 59:22
65:22 81:12 86:2,5
86:8 90:13,20
96:15 98:25 101:12
103:9 108:11
114:11 115:10
118:5 121:13,20,24
122:13 131:23
144:11 145:22
169:10,19 171:11
171:14,22 187:21
190:22 194:15
195:1 197:4 203:23
224:4 243:1
**scale** 47:6,8 149:5
**scales** 202:9
**schotz** 59:7
**science** 15:14 39:22
62:6 63:4,5,9,9
64:2 96:14 211:4
212:1 240:5
**sciences** 202:1
**scientific** 39:2,4,14
39:14 155:10
164:25 200:23
210:24 211:1
219:10

scientist  97:9
scientists  49:4
scope  44:18 112:15
  144:7,9,9,11 160:1
  169:21 171:10,17
  230:2,4,13 231:4
  231:11,23 232:4,8
  232:22
scoping  175:23
scott  2:6 4:16 5:8
  37:3,7 98:24 99:7
  111:3 114:17 121:8
screen  9:8,8 10:2,2
  10:25 11:7 32:9,13
  35:24 40:24 41:9
  41:15,18 111:10
  115:4 118:13,16
  121:6 130:13 145:7
  174:13 179:22
  181:6,13 186:16
  190:13,14 196:16
  214:17
screening  9:4
scribble  35:25
scroll  9:13 10:15
  12:9 41:25 42:5
  53:22 57:7 59:14
  121:8 124:16 188:1
  188:6 190:15
  191:13,16
scrolling  10:11
  42:4 191:6,14,20
se  76:7
seal  249:11
sean  2:15 4:25
  37:19 114:19 223:5
  234:11
second  8:13 10:10
  17:5 23:2 32:12
  51:7 56:6 67:8
  71:17 95:9 96:17

103:23 113:1
119:19 121:3,6
147:24 171:13
189:4 197:24 224:8
247:8
seconds  194:1
section  30:6
sections  29:13,15
  29:18 30:1,3 31:1
secure  14:11 146:6
see  9:7,8,19,19 10:9
  10:9,14 11:2,14
  12:19 17:2 18:19
  21:11 26:22 35:18
  35:23,24,24,25
  41:7,9,22 42:4
  47:13 50:14 51:24
  52:13 53:2,21,22
  54:21 57:8 58:8
  75:10,18 77:5
  81:18 84:3 93:15
  99:13 103:8,10
  106:7,20 115:6,6
  119:5,7 123:2
  130:18 142:23
  147:7,9 150:25
  160:24 162:17
  165:13,16 171:10
  171:13,21,24 172:1
  172:21 180:1
  181:11,14 182:14
  182:14,16 183:19
  184:13 186:19
  187:22,23 188:2,3
  188:7,12,13,16
  190:12,21 191:10
  196:3 197:4 200:13
  201:21 202:6,15
  203:19 209:2,4
  211:23 212:19
  213:13,21 214:6,9

214:12,15,19 235:3
238:2 243:14
seeing  137:4 235:9
  235:11
seeking  57:16
seen  9:16,17 10:1
  11:16,17 17:25
  44:11 45:17 48:23
  103:11 104:12,14
  106:12,13,14
  109:15 110:5,6
  131:7,9 140:20
  142:22,24 150:10
  167:21 190:14
  225:17,21 247:13
segments  29:13,16
self  65:20
sell  96:12 218:11
sellers  65:20
selling  87:22,22
  170:12 218:14
sells  184:7 245:7,9
semblance  222:15
send  47:11 78:3
  92:23 212:14
sending  23:10
  47:20
sends  156:7
sent  13:19 20:20
  21:7,25 25:25 26:5
  26:9,10 38:17
  46:17,22 68:9,17
  79:25 80:3 83:12
  102:10,16 115:9
  119:25 120:7,11
  180:14 220:24
  238:16,20 240:18
sentence  9:1 54:18
  113:2 120:20
  131:23 171:1
  196:21 242:2

separate  47:13
  97:9 242:9
separately  218:19
september  167:19
series  110:22
serve  57:14 62:10
served  65:12
server  14:11
serves  82:18 94:20
  157:3
service  57:14,15
services  17:19
  155:9,12 156:24
  157:4,5,7 158:24
  159:4 161:5 239:3
  240:9
serving  57:19
  108:5 121:16
  122:16 161:5,16
  189:14 194:10,11
  194:15 195:4
  214:14,22,24
  219:18
set  16:17 144:23
  172:6,7 209:25
settled  64:14,17
setup  128:22
seven  57:9 64:10,21
  127:21,23 240:9
severe  94:7
shandong  133:12
  167:23
shannon  1:4 24:25
share  9:3,7 32:9
  40:23 41:15,17
  45:19 51:14 111:10
  118:13,16 141:21
  145:7,9 178:16,18
  186:15 196:15
  242:20

**shared** 7:19 8:23
14:10,25 53:8
121:2 123:1 131:8
131:9,10 132:23
151:12 220:17,25
221:2 224:20
238:11 243:5
246:23
**sharing** 41:2,9 95:9
118:15 141:18
178:20 179:22
181:6 190:13
242:25
**sheet** 7:18 8:2
13:23 19:19 226:22
226:23 251:10,11
**sheets** 48:5 119:18
225:23,23 227:4
**sherry** 64:24
**ship** 237:19
**shipped** 98:18,22
99:24 100:25 101:3
227:24
**shipping** 100:8
224:22
**shoot** 172:8
**shooting** 172:17
**shop** 140:6
**short** 155:11
**shorthand** 249:5
**show** 9:2 35:24
71:2 105:22 114:9
118:4 121:5,8
122:14,15 125:25
127:24 178:13
186:13 188:10
190:25 197:12,12
206:19 207:25
213:16 224:5 235:1
237:7 245:16,23

**showed** 16:2 94:6
105:10 113:6,15
123:1 174:9,13
176:1 177:22
217:21 222:4,12
234:23
**showing** 8:20 10:25
11:24 105:17 106:4
108:5 149:19 179:1
181:6 190:20
208:13 224:2
234:18
**shown** 240:1
**shows** 95:12 122:7
197:22 209:23
219:10
**shutting** 67:8
**sic** 144:24
**side** 58:25 59:4
61:11,12 63:11,12
141:14,15
**sign** 251:11
**signature** 249:15
250:20
**signed** 18:4 192:20
251:20
**significance** 200:22
201:22
**significant** 144:25
200:4 201:8,21
202:12 210:15,21
214:25 215:3,4
229:1
**significantly** 228:2
**similar** 8:19 34:23
35:6 47:14 168:16
174:12 177:2,9,15
179:12 182:4
212:21,22 216:16
236:8,18 237:14

**similarities** 237:20
**similarly** 1:5
**simple** 191:8,8,9
213:16
**simpler** 214:2
**simply** 172:18
**sincerely** 16:3
**single** 42:14 145:12
151:21 152:1,1
157:21 174:25
176:13 189:7,10,12
203:13,15,16,25,25
204:3,7 210:14
211:2,3 237:17,18
238:11
**sir** 11:15 16:21
18:3 19:3 22:8 29:9
35:2,4 38:20 42:8
42:22 44:9 52:24
60:15 66:7 83:7
85:16 86:17 87:19
106:8 109:6,16
113:7 123:17
130:19 132:4
154:17,25 155:3,23
156:2 157:24 158:6
159:12,23 162:2
167:21 174:14
178:7 179:7,13,25
180:6 181:6,18
182:23 184:18
186:24 189:25
190:6,18 191:9
193:5 194:5 195:17
196:16 197:4 200:3
201:19 203:25
204:14 205:17
206:16 207:5,21
208:19,23 209:7,11
210:22 211:8 214:2
220:2 222:3 224:12

226:12 232:1,19
234:2 235:21
241:22 247:18
**sister** 168:16
**sit** 26:25 182:19
207:23
**sitting** 8:17 70:18
101:19 138:9
216:19
**situated** 1:5
**size** 121:16 128:24
189:14 194:10,11
194:15 195:4 200:3
200:13,18
**sku** 237:17,17
**sleep** 29:12
**slightly** 165:3
237:21 244:25
**slow** 9:15 99:16
188:8 191:14,16,19
**slower** 166:23
**slowly** 9:13
**small** 165:17
178:12 223:17
**smothers** 119:22
**snapshot** 11:18,23
16:1
**sneak** 71:14
**sodium** 132:17
133:15 147:25
165:14,19,24
166:11 167:2
**software** 20:18
**sold** 108:22 243:11
243:19 245:10
**solution** 191:9
**solution's** 11:13
**solutions** 1:9 2:10
4:17 5:11 42:20
104:10 108:25
112:23 116:22

251:23
somebody 14:23
 24:9 43:6,14 68:17
 77:14 85:20 133:21
 134:11 141:13
 163:19 197:25
somebody's 21:24
 244:3
somewhat 177:2
 237:11 239:2
son 185:9
sops 100:6
sorry 6:2 7:20
 12:12 16:3,7 19:23
 25:9,14 29:20
 31:10,11 33:5 37:7
 37:11 40:25 41:3
 45:14 49:22 53:25
 54:3 56:22 58:2
 59:15 63:14 66:1
 66:19 67:2,7,10,14
 71:16 93:10,25
 98:24 101:21
 102:12 118:18
 119:10 132:2,5
 133:9 140:1 147:11
 154:5 161:24 174:6
 185:2 205:7 212:3
 213:3,25 214:17,19
 217:6 220:18
 224:17 226:15
 237:4,6 239:8
 245:9
sort 88:3 99:8
 203:9 226:13
sound 15:9 55:13
 246:24
sounded 163:10
sounds 28:15 67:13
 78:16

source 130:1,10,11
 130:11
southeastern
 155:19,21
southern 1:1
speak 25:12,20
 88:19 95:18 141:6
 141:13 154:9
speaking 138:22
 142:11 155:17
 175:14 200:8
 235:24
spec 48:7 121:24
specialist 199:22
specific 8:25 9:1
 13:2 34:11 36:23
 46:11,12 47:24
 48:2,3,4 53:12
 60:21 70:11 74:17
 80:24 96:14 97:21
 122:4 147:14 155:5
 164:17 179:5 182:6
 182:9 183:24 188:9
 189:16 190:17
 202:13 214:11
 221:4 225:21
 240:10 241:20
 242:10,18 243:6
specifically 14:9
 21:16 31:3 35:13
 60:24 80:16 86:19
 118:8 130:15
 138:14 140:25
 158:15 165:10
 180:15 192:1,7,14
 196:11 216:8
 242:14,17 243:9
specifications 82:8
 84:2,16 85:9 90:23
 171:11,14,20,23
 172:6,15,19 174:19

specifics 100:15
specified 90:25
 91:1
specs 82:23 84:6,10
 176:21 177:10
spectroscopy 48:8
 216:14
spell 19:11
spend 162:17
spent 20:4,18,24
 135:12
spikes 237:25
split 110:23
spoke 111:16
 159:16
spoken 24:10,13,17
 24:21,24 25:2,5
 49:4 50:20,24 81:6
 135:9
sponsor 39:7,11
sponsored 184:8
sports 58:8,14
spot 91:24
spreadsheet 3:12
 14:5
square 140:9
stabilize 164:23
stable 229:2
stamp 173:4,7
 181:8 188:18
stamped 186:18
 187:12
stand 55:8 83:24
 185:20
standalone 75:19
 75:22,23
standard 122:5,21
 126:15 141:1,11
 142:1 212:2 226:24
standards 120:23
 216:11,16

stands 156:3
start 42:11 44:10
 77:22 98:14 163:3
 191:17 219:11
 236:13 241:16
started 15:19 32:4
 58:12 62:18 86:15
 124:22 125:7
 140:14 150:1
starting 192:1
starts 235:3
state 1:24 7:6 53:19
 53:20 54:4,7,11,16
 55:19 68:25 76:22
 87:24 88:1,2
 120:21 154:21
 158:1 196:21 200:9
 204:6 234:5 235:13
 249:3,6,16 250:2
stated 15:19 92:17
 155:3 160:6,12
 162:10 170:21
 192:14 219:2,24
 222:6 245:12 248:1
 252:19
statement 43:22
 69:15 75:5,19 76:2
 76:10 85:13 87:19
 92:2 94:1 130:21
 131:6 137:18 148:4
 151:8 153:5 163:10
 178:19 197:20
statements 63:2
 88:4 125:18 145:17
 227:18 235:14
states 1:1 155:24
 196:10,12 197:24
 198:5
stating 4:12 75:18
 98:7

**station** 195:15
**statistical** 39:12
  200:16,22,24
  201:17,20 202:16
  203:13,18,22 215:3
**statistically** 200:4
  202:12 203:20
  210:15,21
**statistician** 40:3
**statute** 251:18
**stay** 54:2 144:9
**stayed** 182:8
**stenographic** 250:9
**stenographically**
  250:6
**step** 47:6,8 149:5
  162:25 247:12
**stick** 30:9
**sticks** 165:10
**stipulation** 4:24
**stop** 40:23 41:1
  95:9 111:3,4
  118:15 175:14
  179:22 200:7,7,7
  206:4,4 235:10
**stopped** 161:13
**stopping** 233:3
**storage** 227:2,5,19
**store** 77:6 100:7
**stored** 100:3,11
  101:6 225:13,25
  227:14
**storefront** 243:25
  244:1
**street** 2:8,12
**strength** 84:16 94:8
  149:12,13,14
**strike** 24:1 45:3
  50:1 78:1 88:6
  95:10 101:22,24
  110:13 149:22,23

170:25 203:11
**structure** 159:22
**studied** 240:3
**studies** 39:15 40:20
  40:22 245:5
**study** 38:15 39:9,10
  97:12,13,19 196:1
  196:7,8,8 200:12
  200:23 211:5
**stuff** 34:21
**subject** 42:18 43:21
  44:2,6 50:13
  116:14 130:3,16,24
  131:24 132:13
  134:5,9 148:4,24
  148:25 196:22,24
  204:1 242:4,6
**submit** 61:21
**submitted** 41:6
  42:2
**subpoena** 246:4,11
  246:12,16,21
**subset** 133:23
  178:12 239:15
  242:15
**subsidiary** 155:25
  156:14
**substance** 203:10
  236:21
**substantial** 223:8
**substantiated** 62:8
  62:9
**substantiation** 7:10
  58:18 61:1,10,25
  62:21,23,25 63:1
  65:23
**substantive** 234:25
**sue** 21:2
**sufficient** 196:3
  211:11

**suggested** 251:15
**suite** 2:8,13,16,20
  157:5
**sulfate** 166:9
**sulfonic** 170:6
**summarize** 131:13
**summarized** 89:15
**summary** 7:10
  48:22 71:21
**sun** 43:10
**sunlight** 225:7
**superior** 58:23
**supplement** 5:12
  60:2 62:3 65:10
  81:17 85:19,23
  86:22 90:17,25
  148:8 156:25 157:2
  157:8,12,17 158:15
  158:16,24 178:10
  180:24 202:3,24
  218:25 219:1,12,23
  239:17 242:22
**supplemental**
  197:3 234:15
**supplementing**
  202:6
**supplements** 27:9
  39:20 42:19 44:2
  84:3 86:8,13 88:15
  91:8 125:14 152:5
  196:25 239:14,14
  242:14,19 243:11
**supplied** 134:23
  165:12
**supplier** 133:11
  134:3 147:23
  163:15,25 167:10
  173:19 176:1
  177:12
**suppliers** 132:21
  133:8 163:16 164:9

166:15 179:12
  225:24
**supply** 1:11 69:6
  164:2
**supplying** 164:1,2
**supporting** 238:4
**supposed** 8:8 32:9
  87:23 172:4 195:7
  199:2 214:23
  225:25 246:22
**supreme** 4:7
**sure** 7:14 9:23
  25:15 27:23 33:21
  34:3,20 37:8,9,23
  44:17 47:9 49:12
  57:1 58:22 62:16
  64:18 66:8 67:3
  83:8 85:4 113:12
  117:13,14 131:15
  131:22 137:8
  156:22 161:1
  162:18 163:9,20
  167:12 168:20
  178:20 181:16
  182:21 184:11
  186:11,23 190:15
  191:12 199:16
  213:7 217:7 228:23
  230:10 235:18,18
  236:10,20
**surgery** 51:7,18,23
  51:24 96:16
**surmise** 31:4 82:16
**surprising** 79:22
  239:1
**surrounding** 7:11
  204:9,10
**susan** 19:8
**suture** 64:25,25
**switch** 95:10
  159:11

**switched**  181:13
**sworn**  5:4 249:9
**synthesize**  163:17
  163:23
**synthesized**  163:13
  167:4
**system**  21:16
**systems**  113:12,18
  139:18

---

**t**

**t**  3:9 252:3,3
**tab**  37:11,16
**table**  57:12,13,17
  57:19,23 58:3,4,6
**tablet**  164:22,22
**take**  5:14 6:22 8:11
  29:4 56:25 71:17
  75:15 77:9,13,24
  78:2,6 90:16
  110:23 113:5
  114:10 151:25
  152:8,19,23 160:21
  162:25 164:5 168:9
  173:1 182:15,18,19
  182:21 189:20,22
  192:8,9 195:19
  208:10,18 212:13
  212:13 222:21
  223:1 225:19 226:7
  226:8 234:4 237:18
  245:15 246:5 247:8
**taken**  5:18,24 7:3
  65:11 80:10 93:2
  110:12 154:20
  176:2
**talk**  6:17 34:18
  78:9 82:14 111:12
  141:8 158:22
  166:17 168:20
**talked**  17:3 66:5,5
  98:2 111:13 129:16

135:2 174:22
  215:24
**talking**  22:13,14
  71:5 95:7 111:7,25
  133:2,6 142:16
  143:10,13 147:14
  147:15 150:24
  160:20 163:9 165:9
  175:16 176:5
  190:24 193:2
  195:16 205:22
  206:1,19 207:7
  208:4 232:3,3
  233:15,20 247:11
**tampa**  2:9 244:2
**tara**  119:22
**technique**  203:18
**techniques**  200:25
  203:22
**tecum**  3:11 11:2,14
  153:6,7
**television**  62:3
**tell**  12:2 30:10 32:5
  32:11 61:18 62:24
  73:10 79:2,24
  80:11 83:23 104:16
  104:17 121:20
  134:16 140:19
  144:2 158:4 162:10
  167:24 168:23
  169:1,2,3,12,16
  173:8 178:8 181:18
  182:1 183:1 189:11
  191:23 192:3,4
  194:7 207:23
  213:22 216:9 217:1
  220:8 222:25
  236:15
**telling**  11:19 43:10
  43:14 99:6

**tells**  122:1 169:5
  189:12
**temperature**
  100:14,17,23 225:8
  225:13
**ten**  5:22 7:4 56:25
  57:7 146:10 240:7
**tendon**  51:25 96:16
**term**  33:1 74:15
  163:12 175:21
  212:9,9
**terminology**  28:6
  162:24 165:1
**terms**  80:3
**test**  45:5 47:3,4,9
  48:21 82:23 88:23
  89:2 101:22 122:17
  124:1 126:7,8
  169:14 171:14
  177:2,5,23 181:18
  181:24 182:3
  184:19,21 185:12
  186:11 189:16
  194:4 201:12
  202:23 203:18,25
  204:3,14,25 208:24
  209:8 210:11 211:2
  211:9,20,21,25
  215:15 217:16
  222:3 226:13 228:5
  228:7 237:11,12
**tested**  33:12 45:2,5
  52:18 87:24 94:23
  101:10,13,17 102:1
  102:5,9,15,21
  105:8 108:12
  113:22 122:18
  127:12 128:12,19
  128:19 129:1,2,9
  129:18 137:11
  142:25 176:14

177:18 180:20
  183:23 189:3,10,12
  189:15,18 190:3,9
  191:24 197:8
  198:16 204:7 211:9
  215:8,10,23 227:19
**testified**  5:5 60:11
  63:20 64:8,18
  146:22
**testify**  63:18,22
**testifying**  21:9 26:3
  60:18 64:4
**testimony**  42:17
  43:19 60:10 70:17
  70:17 76:6 90:5
  91:19 112:13
  122:20 128:2,15
  129:21 135:7
  137:14 142:7 144:4
  146:20,25 148:11
  150:12 151:2,24
  162:7 170:24
  172:23 175:4
  198:22 210:17
  211:18 221:9,11
  244:5 251:8,16
**testing**  3:23 14:20
  23:8 24:5 27:5
  32:19,19,23,25
  33:7 34:15,19 44:2
  44:11 45:15,17,20
  45:20,24 46:3,6,7
  46:13,13,17,18
  47:11,14,18,21
  48:14,20,24,24
  49:1,5,9,14,25 50:3
  82:9,14 87:12
  88:12,14,14,16
  94:6 95:8,12,12,13
  95:15,15 97:3,6,11
  98:3,10 102:16

103:20 110:12,14
111:8 117:13
119:14 120:11
122:3 123:9 125:15
126:22 129:3,4
169:22 180:5,14
182:17 183:9 184:2
184:17 185:12,15
188:10 189:23
192:25 201:24
202:22 203:8
204:10 205:13
209:5,13,23 210:13
210:20 211:2,14,15
211:19 212:4,5,8
212:10,24 213:14
213:18,24 214:4,15
214:20 216:6,11,16
216:21,22 217:3,9
217:20 235:25
236:5 237:10,13,15
237:17,17,23 238:8
238:16 243:3
244:22,22 245:15
**testings** 47:25
**tests** 33:13 44:12
93:18,19 127:24
178:12 182:1 188:2
201:10,12,24
203:16 208:16,20
222:12,14
**texas** 61:17,18
98:19,23 99:25
104:10 216:2,21
**textbook** 56:7,17
**textbooks** 15:8
34:22
**thank** 16:8 19:14
32:16 37:18 54:3
55:23 56:20 73:18
102:14 137:18

164:12 167:14
171:25 172:18
177:13 178:20
186:25 187:6
205:11 233:25
234:2 237:22
247:18 248:2,3,4
**thankfully** 210:25
**thanks** 37:19 73:15
99:21 234:4 247:16
**thanksgiving**
233:22
**theme** 105:6 222:16
222:17
**theoretical** 92:8
121:6,7,17,19
122:13,24
**theoretically**
102:23 128:6
**theory** 18:17
123:25
**therapy** 52:4
**thereof** 48:17
**thing** 15:24 125:23
126:4 139:13 144:7
145:12 147:18
158:5 170:20
201:24
**things** 5:12 8:14
14:22 39:6 48:12
62:4 66:17 76:8
82:10 83:13 86:23
123:4 162:19
174:22 179:2,3
184:16 202:19
214:16
**think** 7:11,12 13:18
14:1,17 25:11 26:8
28:8,12 36:8,21
38:23 41:18 58:16
82:17 85:1 88:3

95:20 102:25
105:19 112:14
118:11 124:13
126:25 138:9
141:22 142:9,20
145:23 151:4,5
152:20 153:23
157:16 160:12
163:8,22,23 165:6
170:19 171:9,16
172:25,25 173:18
175:9,12 176:11
177:15 183:4
185:16,21,24,25
187:3 204:3 205:14
212:11 217:8 223:4
230:22,24 234:6
236:25 237:5,9,13
242:5 245:14 246:8
246:15,15,18 247:5
**thinks** 199:8
**third** 10:10 13:18
14:3 16:1 28:8
52:11 89:12 93:17
116:16,25 119:11
134:20 136:12
210:10 211:25
**thirty** 193:25
**thomson** 57:14
**thorough** 236:4
**thought** 29:16
53:24 58:10 66:15
89:1 95:22 96:2
105:6 128:4 142:23
170:13 177:15
189:6 197:16
204:19 206:24
245:6
**thousand** 218:14
**threaten** 77:17

**three** 31:21,22
38:23,23 40:21
46:21,22,23 47:9
47:12 52:3 53:18
58:11 64:20 93:16
96:20 101:15 128:4
128:7 181:21,22
195:5,6,19 197:25
199:1 212:6,14,15
212:17,21,22
214:11 237:18
240:18
**threshold** 219:18
243:1
**tie** 118:8
**tied** 113:12 162:4,5
**time** 1:18 5:23 7:1
7:4 10:10 11:20
12:7 20:17,24
22:18 28:25 29:2
32:3,4,6 36:25 38:8
42:23 43:5 67:12
74:5 75:21 76:4
88:16 118:10
125:20 129:6 139:5
143:23 149:5,20
153:3 155:12
160:22 162:17
182:15 186:22,22
189:4,7 201:12
204:21 208:10
215:20 220:2,7
222:23 227:7,9,10
227:12 228:3 229:2
229:2 232:17
240:19 247:16,21
248:2
**times** 5:21 7:4
13:24 19:20,20
47:9 64:12,18 73:4
73:6 195:6 200:16

240:7,12
**tired** 29:11
**title** 39:2 56:19
**today** 5:16 6:23
  8:14 12:19,22 13:4
  15:23 21:23 26:25
  27:3 31:22 34:21
  41:13 43:10 70:18
  101:19 145:14
  146:25 150:12
  151:3 204:21
  216:19 233:24
  235:23 237:9
  241:15 245:21
**today's** 22:5 23:17
  26:15 27:25 38:9
  241:16
**todd** 66:3
**told** 15:22 42:24
  43:6,11 116:13
  194:14 195:19
  209:4 215:12
**tolerated** 199:12
**tomorrow** 241:16
**tomorrow's** 241:17
**tons** 44:17
**top** 10:9 16:1 103:8
  124:16 191:17
  217:1
**topic** 55:6
**topics** 39:15
**toronto** 19:3
**tosylate** 132:17
  133:15 147:25
  165:15,19,25 166:3
  166:20 167:1 168:1
  169:8,20,25 170:3
  170:6,9,16,17
  176:20 226:19
**total** 20:5 29:8 45:2
  126:22 127:11

128:25 169:23
  170:10
**tough** 37:13
**touro** 55:16
**tower** 2:12
**town** 18:25
**track** 23:14,16 32:3
  150:2 213:3
**tracking** 32:4
**trade** 62:15 64:3
  184:13 239:16
**train** 206:23
**trained** 56:11
**training** 66:7
**transcript** 250:8
  251:6,19
**transcripts** 14:24
  240:13,18 251:13
**treated** 225:25
**treating** 158:21
**tree** 59:18
**trial** 1:21 63:18,20
  63:23 64:5,8,19
  202:6 203:9,9
**trick** 34:3 166:2
  180:18 192:15
  220:11
**triplicate** 47:4
  129:2 137:11
  211:15,15,22,23
  212:2,5 214:15
**true** 35:3 53:23
  84:5,17,21 85:13
  94:2,17,20 114:13
  133:24 146:1
  174:25 176:12
  197:21,25 203:12
  209:14 211:15
  214:3 250:8 252:20
**trust** 53:3 116:11

**truth** 140:20
**try** 25:12 70:11
  71:14 75:21 96:19
  102:13 114:18
  122:10 125:1
  160:15 162:16
  163:22 185:11
  192:18,18 202:19
  203:5 206:24
  208:10 217:12
  220:13
**trying** 25:13 37:9
  54:2 56:22 60:17
  101:21 107:3
  125:23,23 141:21
  163:2 165:6 166:1
  168:19 171:1
  177:13,14 179:4
  185:6 205:18
  207:22 220:10
  224:11,18,18 241:9
  245:13
**turn** 232:11,12
**turned** 228:1
**turns** 219:15
**twelve** 127:23
**two** 6:8 7:4 11:21
  11:25 15:22 25:11
  29:3 43:24 47:12
  50:12 56:9 58:11
  66:17 74:8 79:9,11
  88:13 93:16 99:15
  112:21 142:3
  150:16 152:18
  166:9 168:10
  169:18 174:22
  181:25 187:23
  188:4,4,14 190:23
  191:24 192:24
  208:16 211:24
  212:20 216:5

218:16,16 220:17
  222:7 226:3,5
  240:18
**type** 27:9,10 150:18
  158:5 200:1 203:7
  210:19 249:23
**types** 46:13 60:23
  125:15 150:16
  212:2 237:20
  238:21
**typical** 14:23 45:20
  47:15 100:22
  156:15,16 201:25
  212:1
**typically** 47:4 60:4
  69:19 77:16,22,25
  100:18 122:1 144:6
  163:25 164:20,21
  165:17 168:13
  172:6 189:20 203:3
  211:23 225:4
  238:24
**typos** 241:6

**u**

**u.s.** 39:17 44:7
  50:14 156:18
**uh** 6:20,20
**uhs** 6:20
**ultimate** 164:7
**ultimately** 119:25
  133:20 164:4
  229:21
**ultra** 216:12
**unaware** 140:16
**uncommon** 192:6
**underdose** 198:24
**underdosed** 89:18
**understand** 5:16
  36:1,19 57:25 58:1
  73:14 75:11 76:8
  99:2 102:8 108:12

112:17 138:13
142:19 143:13
155:16 163:1,8
175:20 178:22
185:10 190:6
193:14 195:12,18
200:21 220:9 226:4
**understandable**
238:14
**understanding**
23:8,25 24:2 31:7
70:1 73:17 76:4
98:21 104:11
111:21 116:16
130:1,2 134:1
137:9 147:4 165:2
189:8 190:18
210:22 219:5,7
238:4
**understands** 33:21
142:17,18
**understood** 153:17
156:20 157:24
163:20 170:11
176:10 180:17
243:7
**undertaken** 45:16
**unfair** 7:9,12
**unfortunate** 65:1
**unfortunately**
75:12 227:10 241:6
**unheard** 121:25
**uniform** 146:23
178:10 179:8,12,15
179:17 204:8,15,19
221:7
**uniformity** 130:16
130:24 131:23
132:13,17 133:1,14
133:16 134:9
147:20,21 148:3,20

148:24 149:2,3,4,4
149:10,13,15,16
150:1,2,3,5,7,21
**uniformly** 44:5
45:25 49:12 94:3
**unintelligible**
205:23 206:8
233:14,21
**united** 1:1 155:24
**units** 122:15 123:3
**universe** 34:20
186:11
**university** 55:16,18
55:19 155:19
**unmuting** 223:6
**unquote** 88:10
204:15 211:7
221:20
**unreliable** 217:13
**unsealed** 33:16,16
**unsure** 76:7
**update** 81:16,21
**updated** 82:17
**upgrade** 81:16,22
**upgraded** 82:17
**uplc** 121:23
**upper** 119:21
167:20
**usda** 172:3
**use** 1:21 14:8 32:2
51:11,16 62:23
86:5,8 87:3 90:25
97:7 113:11 114:20
132:19 133:11
140:23 150:6,21,22
163:23 165:1
174:14 183:9,11
201:7 203:12
209:14,15 245:4
**user** 149:16

**uses** 240:2
**usp37** 171:15
**usually** 69:20,21
**utilize** 203:4
**utilized** 8:22 95:16
**utilizes** 152:5
**utilizing** 179:11

| v |
| --- |

**v** 1:7 58:8,22 62:13
63:6 64:24 65:15
251:4 252:1
**vague** 45:18 124:4
124:8 146:19 177:4
**valenca** 28:14,24
29:24 220:19
**valid** 114:13
**validated** 202:8
**validity** 115:8
**value** 114:11 115:7
121:15 126:12
177:22 198:17,25
199:3,6,15,17
200:21,25 201:3,7
201:11 203:19,20
217:23 218:1,7,19
218:21 219:3,8,18
219:25
**values** 148:8
211:24
**varia** 147:16
**variability** 147:5,7
147:9 150:8
**variable** 203:13
**variance** 121:18
122:7 210:12
**variation** 144:25
146:24 147:15,16
199:24 213:23,25
214:4 215:1
**variations** 146:16
146:21 147:4,12

174:1 221:23
**varied** 175:24
**variety** 52:17
108:20 184:7
**various** 14:21
57:20 183:16
226:20
**vary** 179:19
**vastly** 121:1 123:8
123:12,14,15
**vb** 133:8,19 137:19
147:23 158:10,18
159:5,10,13,18
163:4,12,14 164:13
164:19 165:12
166:14 173:19,23
174:8 175:1 176:13
176:25 177:12,17
177:22 178:13
179:8,11,15,19
205:1 210:13 211:9
220:5 221:7,9,9,14
221:23 222:4,4,12
**vb's** 179:17
**vegan** 180:25 181:5
**vein** 23:1
**venable** 65:24 66:2
**veracity** 184:11
**verbally** 6:19
**verify** 43:16 76:8
87:24 251:8
**verifying** 47:16
**veritext** 12:3 15:23
251:12,23
**veritext.com**
251:13
**versions** 241:11,14
**versus** 43:15 46:15
51:24 89:4 90:8
155:11 203:8
238:11,22 242:22

**vetted**   63:3
**vetting**   245:14
**vice**   39:2,4 155:10
**videoconference**
  1:15 249:1,8 250:7
**view**   181:17 184:5
**viewed**   245:7
**violation**   75:8
  76:16,20,23 85:21
**violations**   144:15
  144:15
**virtus**   63:6,10
**visit**   139:20 141:3
**vitamin**   164:4
**vitamins**   1:8 2:9
  3:15 4:17 5:10
  11:12 31:17 33:1
  42:19 44:4,14,22
  45:2,5 49:11,16
  50:4,8 51:1 78:9
  82:25 83:9 87:12
  92:21 93:7,12 94:3
  94:17 100:7 103:9
  103:12,16,17,21,23
  103:24 104:12,13
  104:14 106:23,24
  107:10 108:1,17,19
  108:25 109:5,8,18
  111:14,21,25 112:1
  112:5,22 113:21
  114:8 115:2,20,25
  116:5,9,12,15,17
  116:21 117:10
  118:2,5 119:5
  126:23 127:15,20
  127:25 128:18
  129:10,24 130:2
  135:2,9 136:6,9,13
  137:11,19 138:3,7
  138:10,25 139:4,25
  140:18 141:3 142:8

143:5,15,20 144:18
146:17 150:19
151:1 158:18
193:20 243:19
244:1,10 246:17
251:4 252:1
**volume**   128:25
  154:6

**w**

**w**   2:6 18:22 19:13
  183:14
**wait**   99:4
**waive**   4:9
**walker**   61:2
**walking**   111:9
**want**   9:20 25:15
  28:12 34:20 37:7
  42:1,5 46:3 49:12
  51:12 66:22 71:8
  71:19 95:3 105:3
  107:12 110:22
  130:1 131:13
  133:23 137:8
  141:23 143:9,19,24
  145:7,9 146:3
  153:5 155:15
  156:20 163:20
  168:3,20 171:20
  172:9,20 174:24
  176:24 178:9,21
  179:25 181:22
  182:11 185:8
  186:10,17,23
  187:20,24 194:22
  206:17 208:11
  214:18 215:12
  222:25 224:4 226:5
  227:11 230:10
  232:16,18,23 233:6
  235:1 243:22

**wanted**   29:11
  30:10 114:20
  125:25 132:12
  152:9 178:18
  181:16 191:3,12
  201:21
**wants**   186:3
**warehouse**   140:10
**warehouses**   100:8
  100:8
**warning**   67:20,24
  68:3,6,9,16 69:1,9
  72:14 74:9,11,17
  74:19,22 75:1
  77:20 78:3 79:4,6,9
  79:14,25 80:4
**washington**   2:21
  65:24
**wasting**   143:23
**watching**   116:8
**water**   177:17
**way**   1:10 9:11
  21:10 26:4 41:25
  42:5 43:9 70:6
  80:15 85:24 91:25
  92:3,5 107:24
  113:15 118:12
  122:22 144:21
  163:3,12 168:8,17
  176:17 184:4
  186:21 193:18
  194:21 201:9 207:5
  212:22 214:9,15,20
  218:6,9 219:1
  222:20 223:2 230:1
  239:1 240:19
  241:17,24 243:7
**ways**   152:18
**we've**   17:3 32:7
  56:24 66:5 95:7
  111:7,12 129:16

137:23 150:18
198:16 213:9
238:16
**website**   156:23
**week**   129:5
**weigh**   149:6
**weighed**   189:2
**weighing**   193:11,11
**weight**   121:14
  187:22,22,23
  188:13,14,16,21,21
  189:6,6,17,17
  192:2 193:5,5,8,8,9
  193:9
**weights**   188:4,5,11
  188:11,15 193:6,16
  193:22
**welcome**   19:15
  207:6 224:5
**went**   46:23 98:14
  98:15 154:22
  164:13 208:25
  232:7
**west**   2:8,12
**whatsoever**   123:16
  142:2 198:17 211:3
**wheel**   126:17
**when's**   5:23
**whichever**   167:15
**white**   75:17
**wholeheartedly**
  157:14
**wide**   121:18,18
  144:8
**william**   18:22
  159:20
**wilson**   1:4 24:22
**wish**   45:10
**withheld**   209:7,10
  209:13,19

**witness** 4:4 5:4
10:6 19:13,15
30:22 33:23 57:11
57:14,15 63:8 99:4
99:8,12,15 112:12
116:10 121:11
141:14,18 142:6,22
143:14 145:20
146:1,15 153:9
178:5 186:6 195:3
197:17 200:12
207:25 223:9,21,24
230:3,6 231:15
232:19 233:7,10
234:2 236:9 248:4
249:11 251:19
**wolf** 1:3 24:18
**wondering** 238:3
**word** 62:23 65:2
74:25 97:16 126:13
139:19 140:1 148:3
148:20 163:21,23
166:2 171:10 215:2
221:14 228:13
**words** 92:6 93:10
99:16 102:19
165:16 166:24
170:2 174:14
203:17
**work** 9:7,11 13:7
13:11,24 18:9 19:9
20:13 21:4 23:6
39:12,16 41:5 49:3
57:16 58:18 60:24
61:8 66:2 77:17
103:11 107:12
144:6,10 156:11,19
157:10,16,18
158:12 160:11
162:3 210:23 218:9
238:9

**worked** 7:19 8:5
19:20,21 23:5,9
59:6,6 60:20 61:1
61:25 65:23,24
66:13,15,18,20
221:13 224:24
225:1
**working** 13:9 16:22
16:23 39:7,9 40:11
40:13 57:19 141:14
142:5 241:15
**works** 23:3 62:20
70:15 81:8 98:19
104:9 218:10
**world** 158:13
211:22
**worry** 213:5
**worth** 44:6 50:13
148:6 149:16
**worthless** 199:25
218:23 219:1
**worthwhile** 149:21
**wrap** 156:20
**write** 39:13 112:19
131:4 134:5 192:7
220:12
**writing** 47:19
**writings** 35:6
**written** 53:14
75:15 106:14
112:20 166:2 192:1
242:17
**wrong** 28:7,12
45:22 65:2 86:23
141:20 146:3 200:9
223:2 229:18
**wrote** 45:23 95:19
95:20 130:16,18
133:24 135:25
152:16 225:5

**x**

**x** 3:1,9 90:8 114:12
249:23
**xxxxx** 62:13

**y**

**y** 23:4 98:5,6
114:12
**ya** 55:12
**yan** 23:4,6,7 26:18
53:17 98:5,5,6,9
119:14 120:7 127:2
127:10,15 129:9
136:4 159:17 212:5
215:8,10,13,18,18
215:22 235:23
236:6 237:15
238:23
**yan's** 237:12
**yeah** 9:22 30:16
41:1 55:13 65:6
73:25 99:13 100:22
106:5 108:9 117:13
120:10 131:1
133:12 142:15
167:12,23 171:6,7
173:12 175:9 195:1
197:19 207:13
218:2 223:7 226:3
226:8 230:13 231:4
232:2 234:8 235:18
246:18 247:5
**year** 107:19,22
108:2 112:24 129:6
146:10 161:23
162:1
**year's** 229:1
**years** 6:8 7:4,20
8:10 38:23 57:9
58:11 64:10,21
107:24 161:14

216:6,23 239:24
240:9,19
**yell** 206:11
**yelling** 206:12,12
206:13
**yep** 10:4 143:11
**yesterday** 28:21
220:22,23
**york** 2:4,17 54:7,11
54:16 55:18

**z**

**zero** 199:6,18 218:8
219:3,19,25
**zoom** 6:1,3,6,14
9:11 11:2,14 12:25
37:14 167:16 168:2

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under
rule 1.330(d)(4).




DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.