# EXHIBIT 5

# Expert Rebuttal Report of
# Douglas S. Kalman PhD, RD, CCRC, FACN, FISSN

*in the case of*

NOAH MALGERI,
KALYN WOLF, BILL WILSON, SHANNON
HOOD, ERIC FISHON and ROBERT
MCKEOWN on behalf of themselves and all
others similarly situated,

Plaintiffs,

vs.

VITAMINS BECAUSE LLC, CT HEALTH
SOLUTIONS LLC, GMAX CENTRAL LLC, and
ASQUARED BRANDS LLC,

Defendants.

United States District Court
Southern District of Florida
Civil Action No: 1:19-cv-22702-KMW

Douglas S. Kalman PhD RD

**DECLARATION OF DOUGLAS S. KALMAN PHD, RD**

1

PLTS EXPERT DISCLOSURES_0244 (CONFIDENTIAL)

I, DOUGLAS S. KALMAN declare as follows:

I make this declaration based upon my personal knowledge and would testify to the same in open court, if asked to do so. I declare under penalty of perjury under the laws of the United States of America that the following is true and correct.

I. **Assignment:**

I was retained by Kantrowitz Goldhamer & Graifman, P.C. ("Counsel"), one of the counsel to the proposed plaintiff classes (the "Classes") in the case *Malgeri, et al v. Vitamins Because LLC, et al*, Case No. 19-cv-22702-KMW (the "Litigation"), to provide an Expert Report and testimony regarding the deficiency of S-Adenosyl methionine ("SAM-e") contained in the subject product dietary supplements manufactured by Defendants Vitamins Because LLC ("Vitamins Because") and CT Health Solutions LLC ("CT Health") (together, "Defendant" or "Defendant Manufacturer"), and their defective nature. All work contained in this report is my intellectual property and is solely intended for use in the Litigation. This rebuttal report may contain confidential, proprietary, and protected information, as well as original compilations, approaches, concepts, trade secrets and information that has commercial value.  No one may use, benefit from or disclose this intellectual property without my express permission.

I was asked to prepare this Expert Rebuttal Report in response to the Expert Report prepared by Nathalie Chevreau, PhD RD, expert for Defendant aSquared Brands LLC. I was also asked to share my Expert Rebuttal or Opinion regarding the Declaration of Neil Ross, Hybrid Expert Witness for Defendant. Because, however, Neil Ross failed to provide a summary of the facts and opinions to which he expects to testify, I have limited my rebuttal here to the Dr. Chvereau's Expert Report.  Within this context, the Rebuttal Report herein will also contain commentary regarding the depositions of Thomas Chapman and Cynthia C. Valenca as it relates to these matters which has become available to me more recently. I continue to rely upon Plaintiffs' Expert Disclosures, the records listed in Appendix B to my prior Expert Report, the records listed in Appendix A to this Rebuttal Report, as well as on my own pre-existing knowledge and expertise.

II. **Rebuttal of Nathalie Chevreau PhD RD**

1. In Dr. Chevreau's declaration, she states "one should be aware that SAM-e in itself is known to be very unstable.[1] SAM-e is specifically known as the stable salt form of S-adenosyl methionine. SAM-e is a methyl donor produced in the human body from methionine (an essential amino acid) and adenosine triphosphate (ATP) in the liver. Exhibit A1.

2. S-adenosyl-methionine ("SAM-e" or "SAMe") was first described in the scientific literature in 1952. SAM-e is a metabolite present in all living cells and plays key roles as a precursor for methylation, aminopropylation and transsulfuration pathways in the body. Exhibit A2

---

[1] However, for the reasons explained below, this is not accurate with regard to the SAM-e products sold to consumers.

3. S-adenosyl-methionine in its native form is labile and degrades rapidly. The key point, however, is that this is true for SAM-e only in its native form. For this reason, chemists and others developed and patented several stable salt forms of SAM-e, such as SAM disulfate tosylate, SAM butanedisulonate, SAM Ademethionine tosylate sulphate, SAM-sulfate P-tolunsulfonate and others. While S-adenosyl-methionine in its native form is labile, when it is in its salt form (the more commercial form), it is stable. The salt form is what is sold in the marketplace as dietary supplements, as the Defendant's own Certificates of Analysis from their raw material suppliers demonstrate. The Certificates of Analysis show that Defendant's product contains the stable S-adenosyl methionine disulfate tosylate version of SAM-e. This fact is also recognized by Dr. Chevreau in her Expert Report (pg 7, numbers 13, 14). Exhibits A1, A3

4. The SAM-e version (S-adenosyl methionine disulfate tosylate) that was used by Defendant in manufacturing their SAMe supplements and is the ingredient at the center of this case, is one that all parties agree – and the supplier certificates of analysis clearly demonstrate – is comprised of up to approximately 52% actual SAM-e ions, and approximately 48% sulfate salts and other compounds. Thus, in order for the subject product SAMe supplements to meet their label claims for the stated amount of SAM-e (*e.g*., label claim of 500 mg SAM-e per capsule), given that only approximately 52% of the raw SAMe material (S-adenosyl methionine disulfate tosylate) constitutes actual SAM-e, Defendant Manufacturer would have needed to input close to double the represented amount of S-adenosyl methionine disulfate tosylate per serving (e.g. approximately 1000 mg (1 gram) of the raw SAMe material per capsule for a label claim of 500 mg/capsule) into their supplement capsules. Put differently, to get a label claim of ~500 mg SAM-e, when using the stable salt forms of SAM-e (which are ~52% SAM-e) which Defendants used, one would need ~1000 mg of the salt material. Testimony from Vitamins Because officials on the matter shows that no such "doubling" was employed to achieve accurate SAMe measures and labeling. Exhibits A1 (pg 7, number 13-14), A10

5. As the contract manufacturer of the subject product SAMe, Defendant should have understood the nature, purity, and strength of the raw materials they were ordering from their Chinese (or any) suppliers and how their use in formulating SAMe supplements would affect the amount of actual SAMe included in the capsules. Testimony of Thomas Chapman and Cynthia Valenca of Vitamins Because and CT Health, however, demonstrates that Defendant Manufacturer did not understand the difference between the raw SAMe material salt form (the S-adenosyl methionine disulfate tosylate) as compared to its lower S-adenosyl methionine ion content. Exhibits A9, A10. Cynthia Valenca further testified that Defendant failed to ever measure or consider the amount of actual SAMe during their manufacturing process, relying instead on the amount of salt form of SAMe to set their label claims as indicated in the Certificates of Analysis they received from the companies they purchased the S-adenosyl methionine disulfate tosylate from. Exhibit 9 Pages 42 - 58. Mr. Chapman's deposition testimony stated the same. Defendant relied upon the companies they were buying the raw material from for the measure of SAMe material, and did not qualify their suppliers (as is required by 21 C.F.R. § 111.75) or perform any actual identity, purity, strength and composition testing on the SAMe raw

3

material themselves. The description of Defendant's manufacturing confirms that they utilized a given amount of S-adenosyl methionine disulfate tosylate per batch on the mistaken assumption that it would supply that stated amount of actual SAMe, without doubling the raw material to yield the proper amount (consistent with the label claim) of actual SAMe on a per serving basis. This testimony plainly constitutes a party admission(s) that *all* subject product SAMe supplements manufactured by Defendant were, at minimum, at least approximately 50% deficient. In fact, testing of the final product consistently shows that deficiency amounts in the subject product SAMe supplements were typically greater. Exhibits A9 (Pages 42 to 58), A10 (Pages 10, 14, 55, 70-75, 125-126, 180-182, 227).

6. Dr. Chevreau's report concedes that Defendant used SAM-e raw material that was comprised of only approximately 52% actual SAM-e, and that Defendant sold these supplements on their own website to consumers and supplied aSquared and other private label brands with these supplements. Given their admissions that they failed to ever measure the amount of actual SAMe and assumed the SAMe raw material had been confirmed by their supplier as consisting of 95-100% actual SAMe, this is an explicit acknowledgement that the SAMe supplements manufactured by Defendant were designed in such a way as to not to meet their own label claims. Exhibits A9 (Pages 42 – 58) and A10 (Pages 10, 14, 55, 70-75, 125-126, 180-182, 227). If a manufacturer assumes the raw material they are putting in to their supplement capsules measures as 500 mg actual SAM-e, and in reality it only measures as approximately ~250 mg actual SAM-e, that is a defective and deficient product that not only does not meet label claim, but then is also in violation of the FDA and FTC guidance's (laws) that govern the dietary supplement industry.

7. Dr. Chevreau also takes issue with the products purchased for testing and their representative lot numbers. As set forth in my initial report, Dr. Catherine Adams Hutt and Kevin Yan separately purchased bottles of SAM-e product from Vitamins Because and private label brands which used Defendant as contract manufacturer. The purchased SAMe suplements were then logged and sent to various reputable analytical laboratories for third party analysis of SAM-e contents of the product. Requested analysis of the products included determining actual SAM-e content as compared to the label claim. The products Dr. Catherine Adams Hutt tested are listed below along with their bottle lot number and testing results. Exhibit A4

    a. BoostCeutical 2. Labeled as 500 mg SAM-e, Lot# 11021902. Actual SAM-e content: 136 mg (~27% of label claim).
    b. A Squared (A Squared 1). Labeled as 400 mg SAM-e, Lot #29051830. Actual SAM-e content 15.9 mg (3.975% of label claim).
    c. Healthy Way (Healthy Way 1). Labeled as 500 mg SAM-e, Lot #10094. Actual SAM-e content 63.9 mg (~13% of label claim).
    d. Healthy Way (Healthy Way 2). Labeled as 500 mg SAM-e, Lot#8707. Actual SAM-e content 114 mg (~23% of label claim).
    e. Mental Refreshment (Mental Refreshment 1). Labeled as 250 mg SAM-e, Lot# 17071910. Actual SAM-e content, 130 mg (52% of label claim).

PLTS EXPERT DISCLOSURES_0247 (CONFIDENTIAL)

  f. NusaPure (Nusa Pure 1). Labeled as 1000 mg SAM-e per 4 capsules (or 250 mg per capsule), Lot#17071917. Actual SAM-e content per 4 capsules 492 mg, or 123 mg SAM-e per capsule (49% of label claim)
  g. Nusa Pure (Nusa Pure 2). Labeled as 1500 mg SAM-e (per 3 capsules). Lot# 22041901. Actual SAM-e content 101.1 mg (~6.7% of label claim)
  h. Vitamins Because (Vitamins Because 1) Labeled as 1000 mg SAM-e. Lot#17071911. Actual SAM-e content 476 mg (47.6% of label claim)
  i. Vitamins Because (Vitamins Because 2). Labeled as 200 mg SAM-e, ("as S-Adenosyl-L-Methionine Disulfate Tosylate" Lot# 07111913. Actual SAM-e 98 mg (may be considered 49% label claim)

8. Dr. Chevreau's report (e.g. items 15, 16) then utilizes a false flag theory (distraction from the matter at hand technique). It suggests that because only a sampling (i.e., 21 bottles) of the total amount of Defendant's SAMe products were lab tested instead of *all* the bottles that were potentially manufactured and sold by Defendant and the private label retailers who used Defendant as a contract manufacturer, or a sample size of up to 383 bottles, that the conclusions I reached regarding the uniform deficiency and defectiveness of the products cannot be considered valid or correct. This leap of logic is flawed. Marketplace testing of product samples available to consumers online and in the consumer market is a valid methodology used by experts. In fact, it is used as well by the FDA to confirm accuracy and safety of pharmaceutical products and find product-wide problems with various drugs and supplements. Marketplace testing by NOW Foods and released publicly is one example of the testing of SAM-e product manufactured by Defendant. The results of the NOW Foods testing (March 9, 2020) similarly indicated deficiency and defectiveness in Defendant's SAM-e supplements. Exhibits 18-19. Further testing by Eurofins of SAM-e products manufactured by the Defendants ordered by Plaintiff's counsel, also found that the SAM-e products were defective and deficient to label claims. Exhibits A12 – A15. Although I did not rely upon these testing analyses when forming initially forming my expert opinion, their showings of defectiveness and deficiencies in the subject product further confirm my conclusions. Thus, when looking at the totality of the testing performed on Defendant's SAMe supplements, it is apparent that there is consistency of defectiveness and deficiency of the product manufactured by the Defendant. Keep in mind, testing that found similar SAMe deficiencies was completed or coordinated independently by multiple parties: 1) NOW Foods, 2) Plaintiffs' counsel, 3) Dr. Catherine Adams Hutt, and 4) Kevin Yan. Moreover, this cumulative testing was done by four or more well-established analytical laboratories across two counties (United States and Canada), all showing consistency in their findings, that Defendant's SAM-e products were deficient and defective to label claim. The marketplace testing methodology does not need to apply statistics to pinpoint the precise accurate measure of SAMe in each given SAMe batch, as Dr. Chevreau suggests. The marketplace testing, rather, uses validated techniques used an analytical laboratory science (i.e., high performance liquid chromatography) to establish a consistent showing of deficient SAMe content and strength across the range of Defendant's SAMe supplements, and an overall inaccurate and defective manufacturing and labeling process.  Especially in light of other evidence (e.g. failure to adhere to FDA regulations and Good Manufacturing Practices ("GMP"), lack of finished product testing and quality control measures, four laboratories

5

with similar findings, party admissions that the actual amount of SAMe was never measured and that raw SAMe materials were assumed to comprise of 95-100% SAMe content, etc.), the amount of sample testing used was more than sufficient to properly conclude that there was material mislabeling throughout the class period. The laboratory findings confirm that, given the core manufacturing issues and lack of quality control, it impossible that the subject SAMe product ever met its represented label claims.[2] Exhibits A12 – 15, 18, 19.

9. This finding is specifically supported by the deposition testimony of Dr. Cynthia C. Valenca. On pages 124-125, Dr. Valenca confirmed that Defendant Manufacturer used a disulfate tosylate version of the SAM-e product (S-adenolsyl-methionine disulfate tosylate). Dr. Valenca further offered that the SAM-e disulfate tosylate has an active ingredient portion (SAM-e) and that the disulfate tosylate is part of the overall ingredient. On page 125, Dr. Valenca admitted that Defendant did not test for the actual SAM-e ion as "the ion is only like 45 percent," but instead only measured the amount of SAMe salt Dr. Valenca thus admits that Defendant based their label claims on the total amount of S-adenosyl-methionine disulfate tosylate (which is comprised of only ~45% actual SAM-e) instead of the actual SAM-e content (i.e. the SAMe ions portion as indicated in the referenced supplier Certificates of Analysis). Exhibit A9

10. The deposition testimony of Thomas Chapman lends similar support. On Page 14 Chapman admits he is the owner (line 14) of Vitamins Because and CT Health Solutions. In addition, Mr. Chapman indicates on Page 55 that he and his mother (i.e. Cynthia Valenca) were in charge of overall SAM-e production (lines 10 – 15), and he made and supervised Defendant's SAMe manufacturing. Mr. Chapman also indicated that the Defendant did not have any Standard Operating Procedures in place to ensure that they were following the FDA current Good Manufacturing Practices guidelines (Pages 70 – 75). Crucially, it is apparent that he did not understand that the measure of SAM-e disulfate tosylate differed from the amount of actual SAMe (or SAMe ions) contained therein (Page 227). He further testified that, in manufacturing Defendant's SAMe, he and other company personnel would input into the manufacturing software, not the correct measure of actual SAMe, but the rather higher measure of SAM-e disulfate tosylate which contained only approximately 50% of actual SAMe thereby guaranteeing that each batch would be at least approximately 50% deficient. In this light, it's not surprising that the few existing testing records of the finished product secured by Defendant note Defendant's astonishment that the testing revealed such low measures of actual SAMe[3],

---

[2] As a dietary supplement consultant who is familiar with the SAMe supplement industry, I can attest that it is common practice throughout the industry to label SAMe supplements with the measure of milligrams of actual SAMe contained in the enclosed supplements – not the SAMe salt form raw materials. Thus, consumers of SAMe supplements understand a label amount of 500mg of SAMe to indicate that the given serving of supplements contain 500 mg of actual SAMe. The amount of actual SAMe content to be received is the basis of all consumer dosages, and the motivation for consumer purchases of such dietary supplements.

[3] "Why were they testing this low"? *See* Exhibit A23.

6

and a need to double the serving size to fix the ongoing mislabeling problem (Pages 125-126, 180-182 and 227). Exhibit A10, A23.

11. It is also flawed to suggest that because the individual bottles of SAMe purchased by the named Plaintiffs bottles were not tested, that their purchased SAMe supplements were not subject to the same manufacturing defects and deficiencies. Given the clear and irrefutable evidence of defective manufacturing and consistent failure to adhere to GMP amongst all SAMe supplements manufactured by Defendant, it makes no logical sense to conclude that the subject product purchased by Plaintiffs did not suffer from the same flaws and same lack of consumer value. The SAMe samples purchased for testing covered a range of lots and batches, from both before and after the commencement of this litigation, with varying label claims (e.g. 500 mg, 400 mg, 250 mg) and private labels, and were tested in two different countries and analyzed by at least three or four separate laboratories. And yet, the results of the various testing all found uniform deficiencies as to claimed amounts of SAM-e and actual SAM-e content in Defendant's products. That the testing did not specifically include samples from Plaintiffs' individual purchases is immaterial.[4] Plaintiffs, like all consumer purchasers of Defendant's SAMe product did not receive the represented amount of SAMe or the purchase value of the product.[5] Moreover, as the analytical research and case testimony demonstrates, *all* SAMe supplements manufactured by Defendant were not compliant with regulations for label claims (amount of SAM-e in the product) and also in violation of several aspects of FDA and FTC guidance's (law), as detailed in my initial Expert Report. Exhibit A5. The injury suffered by all consumer purchasers of Defendant's SAMe product, including the individual named Plaintiffs, is thus clear.

12. Moreover, in contrast to the presentation in Dr. Chevreau's report, Sections 17 – 20, the consistency of the testing as overseen by Dr. Catherine Adams Hutt and Kevin Yan are, in fact, of great importance. Collectively, Dr. Hutt and Mr. Yan coordinated testing of Defendant's SAMe supplements by four separate validated and accredited analytical laboratories across two countries (United States and Canada). There was remarkable consistency in the analytical findings, especially when you consider that three different bottles from the same manufactures lots were analyzed, and all tested anywhere from ~82% to 96.5% deficient of label claim. This RING Testing as implemented by Kevin Yan (Nutrasource) was carried out on the following products, and the test results included:

---

[4] Incidentally, because the named Plaintiffs had all opened and used their purchased SAMe products, reliable testing of their particular SAMe samples would not have been possible. The reputable laboratories typically test supplement samples which are sealed and make note of the bottles sealed conditions in their analyses to verify that the testing reflects the true contents of the manufactured product (and not other supplements from a different source).

[5] For this reason, many Plaintiffs accordingly testified that they did not experience the expected health benefits from Defendant's SAM-e supplements which should have been incurred given the represented amount of SAMe on the labels.

7

    a. Healthy Way SAM-e. Labeled as 400 mg, Lot# 20122. Three bottles tested at three different laboratories. Testing at Merieux Nutrisciences found 14.3 mg, Eurofins found 32.8 mg and Labs-Mart found 21.2 mg actual SAM-e content. Three different laboratories analyzed SAM-e from the same produced lot, and all found deficient to label claim (~3.5 to 8.2% of label claim or up to ~96.5% deficient).

    b. Healthy Way SAM-e. Labeled as 1500 mg SAM-e, Lot# 20299. Tested at Merieux Nutrisciences found 72.6 mg, whereas Eurofins found 177 mg and Labs-Mart determined the amount of SAM-e to be 85.6 mg. Three bottles tested at three different laboratories. All three laboratories consistently found this product from this lot also to be defective and deficient to label claim (contains 4.8% to 11.8% of label claim).

    c. Nasa B'Ahava SAM-e. Labeled to contain 500 mg SAM-e. Lot# 20299. Three bottles tested at three different laboratories. Merieux Nutrisciences found 26.3 mg SAM-e, Eurofins found 59 mg SAM-e, and Labs-Mart found 25.6 mg SAM-e. All three laboratories determined their respected bottle tested as defective and deficient (5.1% to 11.8% of label claim) Exhibits A6, A7

13. The consistency in the analytical test findings shows that the deficiencies in Defendant's SAMe supplements was not random or singular. The findings, along with the other evidence of Defendant's defective manufacturing processes and quality control, are clear evidence of the defective and deficient nature of the subject SAMe supplements on a class-wide basis, and a lack of consumer value for all consumer purchases of the product.

14. Dr. Nathalie Chevreau also suggests that perhaps the bottles of SAMe purchased for testing the SAM-e were counterfeit, or not containing SAMe supplements manufactured by Defendant, as the codes and lot numbering do not all appear to be uniform. This desperate attempt to discredit one element of the vast pool of evidence demonstrating the defective and deficient nature of Defendant's SAMe supplements is inherently flawed, and for many reasons, does little to undermine the overwhelming evidence on the matter.

15. First, a material number of the SAMe samples (more than 50% of the products collected and tested) which were analyzed as part of the testing coordinated by Dr. Catherine Adams Hutt and Kevin Yan contained a "Vitamins Because" private label or a printing of a lot number corresponding to the lot numbering system which Defendant identified as their own during an FDA inspection. Exhibits A4, A6. There is thus clear evidence of SAMe deficiencies and mislabeling amongst samples as to which there is no dispute that they were manufactured by Defendant. In fact, *all* market testing of SAMe supplements manufactured by Defendant showed consistent results, reflecting deficiency and mislabeling on a class-wide basis. No market testing has shown otherwise. Exhibits A4, A6.

16. Second, all the market samples considered for this case were purchased from private label brands who used Defendant as a contract manufacturer (e.g. aSquared, NusaPure, Healthy Way, etc.). All these brands have a clear history of using Defendant as their

8

SAMe supplier, the lack of affirmative confirmation through lot numbering notwithstanding. The Azorio company detailed how they purchase, relabel and package supplements supplied from Defendant. Some of these private label companies (e.g. Azorio) have shown clear, undisputed evidence that they repackaged the SAMe supplied by Defendant Manufacturer and recoded their product lot numbers under their own numbering system. Exhibits A16, A17. The different lot numbering system shown on a few of the sample SAMe products is therefore no evidence that the SAMe supplements were not manufactured by Defendant; and in the case of Azorio's private label brands (Earth Natural, Naturetition, and PureControl) decidedly untrue. Exhibits A16 – A17, A24-26. To this end, Dr. Chevreau also fails to supply any Standard Operating Procedures or any other manuals from the private label companies showing how their dietary supplements were supplied and labeled. As such, Dr. Chevreau's speculation that *some* of the marketplace samples may not have originated with Defendant Manufacturer remains unsupported and cannot be confirmed in any meaningful way. Additionally, the speculation by Dr. Chevreau generally avoids the fact that multiple tests over more than a one-year period by at least four different recognized analytical laboratories throughout two countries determined that samples of Defendant's manufactured products did not to meet label claims, and as such, deficient and defective. Exhibits A4, A6, A7, A12 – A15.

17. Third, the remarkable consistency of analytical results from the marketplace sample testing speaks for itself. That all the marketplace samples showed consistent deficiencies and mislabeling – all below 50% of the given label claim – indicates that all tested products originated from same manufacturing source. Given the undisputed origin of Vitamins Because and CT Health for many of the marketplace samples (with "Vitamins Because" private labels and/or lot numbering), the testing evidenced indicates that the other marketplace samples shared that same manufacturing origin, where we know many SAMe supplements sold by those private label brands were manufactured.

18. Fourth, the marketplace testing is only one of many pieces of evidence showing the defective and deficient nature of the Defendant's subject SAMe product. Clear and undisputed evidence[6], entirely independent of the marketplace testing, still shows that Defendant's SAMe manufacturing was crucially defective and noncompliant with basic regulations and GMP. Thus, even assuming arguendo that Dr. Chevreau's speculation about the alternative origination of *some* marketplace samples were correct, independent evidence still verifies that *all* SAMe product manufactured by Defendant would be still consist of defective and noncompliant supplements with no consumer value. On the whole, considering the whole universe of evidence of the defective manufacturing, Dr. Chevrau's theory therefore suggests nothing to undermine the clear economic injury suffered by all consumers of Defendant's SAMe (including the named Plaintiffs).

19. In fact, the clearest and most direct evidence of the defective and deficient nature of Defendant's SAMe supplements on a class-wide basis is presented by the FDA'S Establishment Inspection Report ("EIR") in connection with CT Health. This evidence

---

[6] For example, Vitamins Because testimony admits that Defendant failed to qualify its supplier, measure its input of SAMe ions, or consistently test the finished product. Exhibit A10.

9

stands entirely independent of any marketplace testing which showed deficient SAMe product consistent with the independent FDA findings. The EIR recounts that, on January 19, 2018, FDA official Mr. Aaron Fox displayed his credentials and issued an FDA-482 notice of Inspection to Mr. Keith A. Valenca. Upon Mr. Fox identifying himself and explaining the Notice of Inspection, Mr. Keith A. Valenca affirmed that he was the most responsible person available at the firm at the moment. Mr. Valenca further informed Mr. Fox that his wife, Dr. Cynthia C. Valenca, is the most responsible person at the firm and would be arriving shortly. Exhibit A8

20. The EIR notes that Mr. Fox later met with Cynthia Valenca and issued an FDA-483 (on 1/30/2018). Defendant Manufacturer was inspected by the FDA on four occasions, including January 19, 2018, January 23-24, 2018 and January 30, 2018, The FDA found eight observations of concern and reported them to the management (i.e. officials at CT Health, including Cynthia C. Valenca, Partner, Mr. Keith A. Valenca, Partner and Ms. Kimberly Kitzler, Director of Operations, Ms. Tara J. Smothers, Quality Control Manager and Neil Ross, Consultant). Exhibit A8

21. In the EIR, Mr. Fox reports as Observation 2 that "[CT Health] did not establish component specifications for purity, strength and composition." He further notes that "[s]pecifically on 1/19/18, I observed you do not have ingredient specifications for identity, purity, strength or composition for any of your dietary supplements." Under the section denoted as "Supporting Evidence and Relevance", the report notest that Cynthia Valenca confirmed to Mr. Fox that "the firm has not yet established identity, purity, strength, and composition for any of the firm's incoming ingredients." Additionally, Cynthia Valenca also informed Mr. Fox of the FDA that "the firm has not yet tested any raw ingredient components or finished dietary supplements for identity, purity, strength, composition or microbial analysis." Finally, as part of Observation 3, Cynthia Valenca also confirmed that "all products have been approved and released by the firm without testing." These statements form multiple admissions that Defendant's supplements were manufactured and sold in violation of FDA and FTC regulations and guidance (laws that regulate the dietary supplement industry). They also admit that all dietary supplements manufactured by Defendant, including the SAMe supplements of concern in this case were manufactured by Defendant without any standards or testing to properly qualify the ingredient and dosage. Cynthia Valenca additionally indicates to Mr. Fox that Defendant did not have a quality assurance/compliance program in effect but would attempt to create one within one-year for testing of raw ingredients and finished dietary supplements, including tests for identity, purity, strength, composition or microbial analysis. Exhibit A8 (Observation 3, bottom, page 8 of 14). Marketplace testing of Defendant's SAMe and testimony from its officials have shown that sufficient compliance and quality control measures were never instituted as promised.

22. In my opinion, the findings of the analyses coordinated by Mr. Kevin Yan of Nutrasource (RING Testing, three different laboratories analyzing three different bottles of the same product from the same manufacturing production lot) of SAM-e products manufactured by Defendant, which showed the SAMe supplements to be deficient as to their label

10

23. claims further supports the earlier findings and analyses organized by Dr. Catherine Hutt. Both provide further support to my overall conclusion that the Defendant manufactured a deficient and defective SAMe product.

23. Dr. Chevreau also faults my initial Expert Report for failing to acknowledge minimal number of tests produced by Defendant that showed their product tested according to label on four occasions. However, my report did directly address this small number of tests. There I explained that, given the very grave FDA citations against ABC laboratories and their findings that their systems were materially defective in many areas of Good Laboratory and Manufacturing Practices, the testing and results of ABC's laboratory are unreliable. Moreover, considering the many tests completed by multiple laboratories, including ABC, which demonstrate that Defendant failed to meet label claims for the amount of SAM-e, the bulk and strength of testing evidence clearly supports a finding of uniform deficiency in the subject product SAM-e supplements. Exhibit A5, ¶¶ 55-57.

24. Moreover, even assuming the reliability of these tests[7], they hardly demonstrate that SAMe strength and label specifications were met. On the contrary, many of the certificates of analysis lack any stated specifications which the lab was measuring up against. See e.g. Exhibit A28. Instead the tests appear to be the company's attempt to fix Defendant's overstated labeling by establishing a "theoretical level" of what an accurate label claim could be – *not* a traditional assay test confirming the accuracy of any previously established and marketed SAMe strength and label specifications which were actually placed on the bottles for consumer purchase.

25. Defendant's handwritten comments on some of the certificates of analysis further undermine Dr. Chevreau's favorable interpretation of these limited tests. Because even on the certificates of analysis which Dr. Chevreau suggests confirm that the label claim was met, Defendant questioned "why were they testing this low"? Thus, even Defendant Manufacturer understood the tests showed lower than expected SAMe strength[8] and a need to readjust labeling, not a confirmation of their previously established SAMe label specifications.  In addition, the testing laboratory that Defendant used, also found that their products were not dosed to specifications shared, hence undermining the allegedly affirming testing results and adding to the evidence of SAM-e manufactured products that were deficient to label claim and defective for use. Exhibits A20 - A22.

26. As alluded to above, all the testing which Dr. Chevreau incorrectly suggests show that the label claim was met were conducted on SAMe manufactured only *after* the start of the

---

[7] Defendant produced only one certificate of analysis from a reputable lab (i.e. Eurofins). Exhibit A27. But this analysis was designed to establish a "Theoretical Level" for product specifications, and not confirm any previously established or represented specifications.

[8] This is not surprising given Defendant's admitted failure to measure the level of actual SAMe in their supplements (as opposed to SAMe tosylate disulfate) and properly double the level of SAMe salt form raw material in each batch.

11

subject litigation, and on bottle's whose label claims were lowered with the stated label claim from 500 or 400 mg of SAMe per capsule to claims of only 250 or 200 mg per capsule. The limited testing thus appears to have been specifically motivated and designed by Defendant to secure evidence in this litigation, and not a reliable random sample testing. But even if interpreted as Dr. Chevreau suggests, in the light most favorable to Defendant, no testing evidence exists which indicates that any SAMe supplements which were labeled to contain 500 or 400 mg of SAMe per capsule ever met their label claim. Similarly, even if interpreted as Dr. Chevreau suggests, in the light most favorable to Defendant, no testing evidence exists which indicates that any SAMe supplements manufactured before the start of this litigation ever met their label claim. Thus, at the very least, by all accounts of the testing evidence, it can be concluded that all subject product SAMe supplements that were manufactured before the start of this litigation and/or included the label claims of 500 or 400 mg of SAMe per capsule[9] were materially deficient in the amount of SAMe and failed to meet their label claims.[10] This of course includes the subject product SAMe purchases made by the named Plaintiffs which all occurred well before the start of the litigation, and were for SAMe supplements claiming a 500 mg of SAMe per capsule.

27. Moreover, even assuming *arguendo*, that there exists evidence that some, very limited number of SAMe batches manufactured by Defendant met their label claim – a contention which is plainly contradicted by Defendant testimony and other evidence –, that would at best establish the existence of a lack of uniformity in Defendant's manufacturing or end-product results (i.e. the subject product's strength or quality), with *some* of Defendant's SAMe supplements meeting the product label while *most* did not. Such a lack of uniformity would itself render all subject product SAM-e supplements valueless to consumers who would then be unable to ascertain the strength and effect of their purchased product for typical supplement use. Put otherwise, no reasonable consumer would purchase a SAMe supplement for any amount of money where the labeled amount of SAMe content could not be guaranteed or varied so greatly amongst the product sold in the marketplace.[11] Thus, even under this interpretation of the

---

[9] Notably, many of the 500 mg of SAMe per capsule label claims were marketed to consumers as 1500 mg of SAMe per serving, where each serving size was then defined as 3 capsules (i.e. the mathematical equivalent of 500 mg/capsule).

[10] In reality, even SAMe marketplace testing of Defendant's SAMe supplement which were manufactured after the start of this litigation and/or contained the lowered label claims of 200 or 250 mg showed consistent deficiencies under the more reliable testing. It can therefore be concluded to a reasonable degree of certainty that all SAMe manufactured by Defendant, even those batches produced after the start of this litigation and after Defendant lowered their SAMe label claims to 200 or 250 mg, were still both defective and deficient, and without material consumer value.

[11] For this reason, Thomas Chapman insisted that there must be a fixed set of manufacturing steps and processes to ensure that the end-product results are consistent. Defendant followed a

evidence, all purchasers of the subject product, including the named Plaintiffs, were injured in having purchased a supplement with no consumer value.

28. Dr. Cheveau also strangely suggests that some of the named Plaintiffs repeat purchases of the subject product SAM-e between 2018 and 2019 somehow suggests that "the product delivered the benefits the consumer was expecting." This statement is immaterial and more reflective of a distraction technique versus dealing with the facts at hand. Repeat customer purchases of any product are affected by a wide variety of factors and by itself is no indication of customer satisfaction.

29. Dr. Cheveau also suggests that my findings are flawed because they are, in part, based on evidence of laboratory testing for which there is insufficient disclosures of the lab methodology. This is an incorrect understanding by Dr. Chevreau, as each analytical report by the various analytical testing laboratories all included sufficient testing references and methodology statements (i.e., HPLC, UPLC). While the selected laboratories have, from my experience, presented here the typical and appropriate disclosures associated with their SAMe analyses, Dr. Chevreau's suggestion that further disclosures could have been made in no way undermines the very consistent findings of the four laboratories which were used. To the contrary, Dr. Catherine Adams Hutt and Kevin Yan both used reliable and reputable laboratories, which are typically relied upon by experts in the supplement industry. Their methodology disclosures were not abnormal for these tests, and the consistent findings across all four labs employing different testing methodologies ensures that accurate findings of deficiencies were made.

## III    Dr. Sharp

30. Dr. Nathalie Chevreau appears to also discount David Sharp's method to estimate class-wide damages for this case. It is my opinion that David Sharp rightly assumed that, on average, Defendant's SAMe supplements were approximately 83% deficient of their label claims. Based upon the testing conducted, and re-shared in this report, there is clear evidence that the Defendant's products were defective and deficient at those levels (with some testing showing up to 96.5% deficiency of label claim). This is further supported by Eurofins testing and analysis organized by Plaintiffs' counsel in their internal pre-suit litigation, as well as Now Foods' assay testing, which both showed similar, material deficiencies in SAMe supplements sold by private label companies who used Defendant as a contract manufacturer.

31. In the alternative, David Sharp's methodology could be used to estimate class-wide damages assuming a minimum deficiency of approximately 50% of the label claims. The 50% deficiency estimation purports with Defendants' party admissions that their manufacturing utilized S-adenosyl methionine disulfate tosylate as their SAMe raw material with the mistaken understanding that such material contained a measure of close

---

set step-by-step manufacturing protocol to attain uniform results in its SAMe strength and content. *See* Exhibit A10 (pp. 77-79, 96, 122).

13

to 95-100% of actual SAMe. In fact, certificates of analysis from the suppliers show that the raw material contained only up to approximately 52% actual SAMe, a distinction which Defendant Manufacturer did not understand, rendering all their SAMe supplements close to 50% deficient, at minimum.

## IV  Additional Information

32. In the deposition of Cynthia C. Valenca, she claims that her company hired Dr. Neil Ross about eight months prior to the FDA inspections in January 2018 which resulted in the FDA issuing a 483 and a report. In Valenca's deposition, she states that Ross helped write the FDA Guidelines for manufacturing and had been employed by the FDA with Mr. Aaron Fox as one of his FDA employees. Exhibit A9 (page 22). An examination of the public and case records indicates that this is not true. It appears that Defendant hired Dr. Ross to assist with a quality assurance/compliance program but he was never employed by the FDA. Within Dr. Valenca's deposition, she also states that Dr. Ross explained to Mr. Fox that there was not really a need for a 483, as the company was in the process of "getting it together." Exhibit A9 (page 23). However, when asked to supply records, notes, quality control documents, operating procedure documents, and particularly those related to the manufacture of SAM-e, Valenca demurred claiming that "we lost a lot of stuff in our move," "a lot of the paperwork was upstairs", "I talked to the lady who used to work for me, that stuff was left behind unfortunately." *See e.g.* Exhibit A9 (page 21). When asked if any documents or paperwork were saved on a computer, Dr. Valenca predictably replied "not that I know of." Exhibit A9. As the person deemed most responsible for compliance with regulatory as a dietary supplement manufacturer, it is rather suspicious that no records of any quality assurance and quality check programs were able to be identified. These records, if they existed, would have allegedly exonerated the company from all their accused wrongdoing by the FDA. It is puzzling, and frankly unlikely, that any competent supplement manufacturer would be unable to locate such basic regulatory records or have access to them in electronic form as required by law (*see* 21 C.F.R. § 111). Exhibit A9, pages 21 – 23.

33. As the most responsible person and partner in her company, it is similarly puzzling that Valenca is under the incorrect impression that Dr. Ross (her consultant) was ever on the Board of the United States Food and Drug Administration and/or helped develop the regulations. Exhibit A9, (page 22). According to Dr. Neil Ross's public curriculum vitae, he has never consulted for, worked for, served on or has had any association with the FDA. He has no documented connection to the FDA outside of submitting documents to the FDA on behalf of some clients. He most certainly was not as an FDA employee, director or "board member" as Dr. Valenca suggested under oath. Exhibit A9. Her inflated assumption regarding Dr. Ross's knowledge, experience, and competencies with FDA compliance raises similar suspicions as to Defendant's ability to properly comply with regulations and GMP. Defendant acknowledged that at the time of the FDA inspection it did not have any active Standard Operating Procedures to make sure that the company was following the FDA laws around dietary supplement manufacturing. Exhibit A8. Valenca further noted that she did not know how intense the Code of Federal

14

Regulations Part 111 were as related to dietary supplement manufacturing, and as such "she did not realize that I had to have something quite so complicated." Exhibit A9 (page 24). The marketplace testing and deposition testimony confirm that adequate compliance was never achieved.

## V   Conclusions

34. It is my professional opinion that the assessments and conclusions presented by Dr. Nathalie Chevreau's in her Expert Report are not of merit. Dr. Chevreau's expert report glosses over many facts and findings surrounding the FDA inspection and appears to minimize other clear evidence of the subject products' defective and deficient nature, including the fact that all samples tested in four different laboratories over two countries in North America demonstrate that Defendant's SAMe manufacturing was defective and never yielded the labeled amount of actual SAMe content. This evidence, coupled with prior history and admitted violations of FDA and FTC regulations indicate a uniform defectiveness and deficiency in the product on a class-wide basis, rendering the product of no real value to or for any consumer.

I certify that the foregoing statements made by me are true. I am aware if any foregoing statement made by me is willfully false, that I may be subject to legal recourse.

Dated this 31st day of December 2021

Douglas Kalman PhD RD

*Douglas Kalman*

PLTS EXPERT DISCLOSURES_0258 (CONFIDENTIAL)

# APPENDIX A

1. DECLARATION OF NATHALIE CHEVREAU, PH.D., R.D., 11.29.2021.
2. Bottiglieri T. *S*-Adenosyl-L-methionine (SAMe): from the bench to the bedside—molecular basis of a pleiotrophic molecule. *American Journal of Clinical Nutrition*, Volume 76, Issue 5, November 2002, Pages 1151S–1157S.
   Link: https://academic.oup.com/ajcn/article/76/5/1151S/4824259
3. U.S. National Institutes of Health. National Center for Advancing Translational Sciences. S-adensosyl-l-methionine disulfate tosylate. https://drugs.ncats.io/drug/564ROC9U09
4. Catherine Adams Hutt PhD, RD, CFS. RdR Solutions Consulting. March 18, 2020 report: "Summary of Test Results." *See* PLTS EXPERT DISCLOSURES 0004-0012.
5. Expert Report of Douglas S. Kalman. See Parts 12 – 26. November 2021. *See* PLTS EXPERT DISCLOSURES 0163-0193.
6. Nutrasource Report: SAM-e Laboratory Ring Testing. December 16, 2020 report ("KGG – SAM-e Laboratory Ring Testing Summary Report".) *See* PLTS EXPERT DISCLOSURES 0041-0044.
7. Pictures of purchased bottles of Healthy Way and Nasa B'Ahava with label, lot number and related information. *See* PLTS EXPERT DISCLOSURES 0110-0128.
8. U.S. Department of Health & Human Services. Food and Drug Administration. Establishment Inspection Report, 03/09/18. [CT Health Solutions EIR 1-19-30-2018]. *See* PLAINTIFFS_064-077.
9. Deposition of Cynthia C. Valenca. Zoom Videoconference October 6, 2021. Pages 21-24, 26-27, 124-125.
10. Deposition of Corporate Officer Through Thomas Chapman. Zoom Videoconference October 5, 2021. Pages 10, 14, 55, 70-75, 77-79, 96, 122, 125-126, 130-134, 139-153, 180-182, 227.
11. Dr. Neil Ross. LinkedIn profile: https://www.linkedin.com/in/neil-ross-059a5a1a/
12. Eurofins Report Number: 2474218-0. Report Date: April 19, 2019. Sample: NusaPure (ASIN B077GKCHPP), Eurofins Sample # 8264986. *See* PLTS EXPERT DISCLOSURES 236-267.
13. Eurofins Report Number: 2474219-0. Report Date: April 25, 2019. Sample: Asquared (ASIN B072NDRFB1), Eurofins Sample # 8264988. *See* PLTS EXPERT DISCLOSURES 238-269.
14. Eurofins Report Number: 2476900-0. Report Date: April 29, 2019. Sample: Vitamins Because You Are Worth It, Eurofins Sample # 8264983. *See* PLTS EXPERT DISCLOSURES 240-241.
15. Eurofins Report Number: 2474217-0. Report Date: April 25, 2019. Sample: WeLikeVitamins (ASIN B01F9IR35M), Eurofins Sample # 8264985. *See* PLTS EXPERT DISCLOSURES 242-243.
16. Declaration of Magdalena Rosio, Managing Member of Azorio, LLC. December 14, 2021. *See* PLAINTIFFS _580-584.
17. Declaration of Magdalena Rosio, Managing Member of Azorio, LLC. July 13, 2020. *See* Case 1:19-cv-22702-KMW, ECF Docket Number 163-4, Entered on FLSD Docket 09/25/2020.

PLTS EXPERT DISCLOSURES_0259 (CONFIDENTIAL)

18. NOW® Testing Identifies Significant Quality Failings in CoQ10 an SAMe Supplements Purchased Online. Link: https://www.nowfoods.com/about-now/press-room/press-releases/now-testing-identifies-significant-quality-failings-coq10-and
19. NOW Finds Quality Issues in Amazon-Purchased Products. May 11, 2020  Link: https://www.nutraceuticalsworld.com/contents/view_breaking-news/2020-05-11/now-finds-quality-issues-in-amazon-purchased-products/
20. Advanced Botanical Consulting & Testing Inc. NusaPure SAM-e 1000mg. Report date 11/21/2019. *See* GMAX0927.
21. Advanced Botanical Consulting & Testing Inc. GMAX Central SAM-e 1500 mg. Report date 8/30/2019. *See* GMAX0932.
22. Advanced Botanical Consulting & Testing Inc. SAM-e 1500 mg. Report date 8/30/2019. *See* GMAX0934.
23. ABC Testing, Lot # 01012005. *See* VBPROD 3716.
24. Eurofins Report Number: 2854057-0. Report Date April 23, 2020. Sample: Earth Natural 1, Eurofins Sample # 9408941. *See* PLTS EXPERT DISCLOSURES 0028-29.
25. Eurofins Report Number: 2854059-0. Report Date April 23, 2020. Sample: PureControl 1, Eurofins Sample # 9408996. *See* PLTS EXPERT DISCLOSURES 0030-31.
26. Eurofins Report Number: 2854058-0. Report Date April 23, 2020. Sample: Naturetition 1, Eurofins Sample # 9408959. *See* PLTS EXPERT DISCLOSURES 0032-33.
27. Eurofins Test, Lot #09071902 [No specification]. *See* VBPROD 5368.
28. ABC Testing, Lot # 9071902. *See* VBPROD 3711.

PLTS EXPERT DISCLOSURES_0260 (CONFIDENTIAL)